```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK


   ------------------------------x

   ANTHONY RAPP and C.D.,

                Plaintiffs,

          vs.                       Case No.:
                                    20-cv-9586 (LAK)

   KEVIN SPACEY FOWLER a/k/a
   KEVIN SPACEY,

                Defendant.
   ------------------------------x




       Remote videotaped deposition of ANTHONY RAPP

                   February 3, 2021
```

Suzanne J. Stotz, CRR, RPR, Notary Public
470403

BARKLEY
Court Reporters
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles     (415) 433-5777 San Francisco   (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose        (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez        (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn        (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

14:32  1  BY MR. SCOLNICK:
14:32  2       Q.    So when did you first learn about
14:32  3  C.D., C.D.?
14:32  4       A.    C.D.
14:32  5       Q.    C.D.
14:32  6       A.    What's the question?  I'm sorry.
14:32  7       Q.    When did you first learn about him?
14:32  8       A.    I learned about him at some
14:32  9  point -- I don't know exactly when it was --
14:32 10  either the end of 2019 or the beginning of 2020
14:32 11  when Kevin -- I learned about his story, I read
14:32 12  his story in 2017, but I didn't know his name.
14:32 13  I didn't know who he was, but I read the story;
14:32 14  and it was particularly powerful to read.
14:33 15              Up until that point, I hadn't heard
14:33 16  any other story that was about a 14-year-old.
14:33 17  So to hear that was quite remarkably upsetting
14:33 18  and powerful.  And, you know, part of --
14:33 19  anyway, so that's when I first heard about him,
14:33 20  his story.  And then I first heard about him
14:33 21  through Kevin Chamberlin, our mutual friend,
14:33 22  who constantly reached out to me in the end of
14:33 23  2019, 2020 and asked me -- said -- shared with
14:33 24  me that C.D. was interested in talking with me
14:33 25  and would I talk.

                            204

                      ANTHONY RAPP

BARKLEY
Court Reporters

14:33  1       Q.    And who is Kevin Chamberlin?  Is
14:33  2   he -- he's a good friend of yours?
14:33  3       A.    Not a good friend.  He's an
14:33  4   acquaintance, an actor in New York that I've
14:33  5   known for many years casually.
14:33  6       Q.    I want to talk to you about that a
14:33  7   little bit more, but maybe we can do that after
14:33  8   a break.  But just so we can put a bow on this,
14:34  9   we've now talked about four people who have --
14:34 10   you've communicated with about Mr. Fowler and
14:34 11   alleged abuse.  That would include Dreyfuss,
14:34 12   Cavazos, Barker, and C.D.
14:34 13             So other than those four people,
14:34 14   have you spoken with anyone who's told you --
14:34 15             MR. SAGHIR:  And Chase, just for
14:34 16        clarity, he also talked about Michael
14:34 17        McElroy.  He talked about the person in
14:34 18        London, Dallas Roberts.  He's talked about
14:34 19        other people.  I'm not sure why you're
14:34 20        focusing on those four most recent.
14:34 21             MR. SCOLNICK:  Well, okay.  I'm
14:34 22        talking about since the article came out,
14:34 23        but --
14:34 24             MR. SAGHIR:  Okay.  Got it.
14:34 25             MR. SCOLNICK:  Okay.  Fair enough.

205

ANTHONY RAPP

BARKLEY
Court Reporters

```
16:52  1   a waiter by grabbing his crotch?
16:53  2         A.    Yes.
16:53  3         Q.    Okay.  Do you still maintain a
16:53  4   relationship with the friend of a friend who
16:53  5   did this?
16:53  6         A.    No, he wasn't -- he wasn't a
16:53  7   friend -- he wasn't a friend of mine.  My
16:53  8   friend was the waiter.
16:53  9         Q.    Okay.
16:53 10         A.    It was a friend of his.  My friend
16:53 11   Chad was the waiter.  His friend brought
16:53 12   someone to the restaurant.  That person was the
16:53 13   one who grabbed his crotch.
16:53 14         Q.    We spoke earlier about Mr. C.D.
16:53 15               You understand that he's the other
16:53 16   plaintiff in this case?
16:53 17         A.    Yes.
16:53 18         Q.    You said that you first became
16:54 19   aware of him not by name when the Vulture story
16:54 20   broke?
16:54 21         A.    Yes, and I -- my best recollection
16:54 22   is this Vulture story was shared with me by
16:54 23   Adam Vary, but that's my best recollection.
16:54 24         Q.    When did Adam Vary share the
16:54 25   Vulture story with you?
```

301

ANTHONY RAPP

BARKLEY
Court Reporters

```
16:54  1        A.    When it was published.
16:54  2        Q.    Did you hear anything about the
16:54  3   Vulture story before it was published?
16:54  4        A.    Not that I recall.
16:54  5        Q.    Were you aware of the allegations
16:54  6   that appear in the Vulture story before that
16:54  7   article was published?
16:54  8        A.    Not at all.
16:54  9        Q.    What did Mr. Vary tell you about
16:54 10   the Vulture story after it was published?
16:54 11        A.    I don't recall the exact words
16:54 12   that -- he just shared with me, you might want
16:54 13   to read this or some version of that.  I don't
16:54 14   remember the exact words, but I do have a
16:54 15   record of his conversation.
16:54 16        Q.    You testified earlier that a
16:54 17   Mr. Chamberlin reached out to you?
16:54 18        A.    Yes.
16:54 19        Q.    And that was in 2019?
16:54 20        A.    It's the end of 2019, beginning of
16:55 21   2020, somewhere in there.
16:55 22        Q.    What did Mr. Chamberlin say?  And I
16:55 23   mean, with respect to Mr. C.D.?
16:55 24        A.    Again, I don't recall the exact
16:55 25   language he used, but he asked me if I would be
```

302

```
16:55  1  interested in speaking with -- and I don't
16:55  2  remember even if he said his name at the time,
16:55  3  but his friend who had -- he was the one who
16:55  4  had come forward, and he was asking to talk to
16:55  5  me.  And I replied yes, I would be happy to do
16:55  6  so.
16:55  7         Q.     Were these communications in
16:55  8  writing?
16:55  9         A.     With Kevin?  Yes.
16:55 10         Q.     Do you still have the
16:55 11  communications?
16:55 12         A.     Yes.
16:55 13         Q.     And you agreed to meet with
16:55 14  Mr. C.D.?
16:55 15         A.     I mean, talk to.  Not meet.  Talk
16:55 16  to.
16:55 17         Q.     Where was he living at the time?
16:55 18  Was he in New York City or in Pennsylvania?
16:55 19         A.     He was -- I don't know when I
16:55 20  learned this, but he was living in Pennsylvania
16:55 21  when we talked.  I don't know when I learned
16:56 22  that detail.
16:56 23         Q.     So tell me about the first
16:56 24  conversation you had with him?
16:56 25         A.     It was meaningful to connect with
```

303

```
16:56  1   him and share with him some of what we've both
16:56  2   gone through, and he shared with me that he had
16:56  3   come forward because I had come forward, that
16:56  4   it encouraged him to do so.
16:56  5              And he had learned of the new law
16:56  6   in New York State that had been passed of
16:56  7   undoing the statute of limitations for a
16:56  8   limited period of time for people who had been
16:56  9   subjected to child sex crimes.  And he was
16:56 10   considering moving forward with an action about
16:56 11   that.
16:56 12         Q.     Did he tell you whether he had ever
16:56 13   spoken with the police?
16:56 14         A.     I don't recall that being a part of
16:57 15   the conversation.
16:57 16         Q.     So if I understand correctly, the
16:57 17   very first conversation you had with Mr. C.D.
16:57 18   he raised the prospect of filing a lawsuit
16:57 19   against Mr. Fowler?
16:57 20         A.     Yes.  I'm sorry.  Did you ask me if
16:57 21   I raised it or he raised it?
16:57 22         Q.     He raised it?
16:57 23         A.     Yes, I believe.  That's my best
16:57 24   recollection of the nature of the conversation.
16:57 25         Q.     Well, is it possible that you
```

```
16:57  1    raised the issue of filing a lawsuit for the
16:57  2    first time with him?
16:57  3         A.    No, it's not possible.
16:57  4         Q.    Okay.  So he was the one that
16:57  5    raised that issue with you, right?
16:57  6         A.    Yes, yes.
16:57  7         Q.    And you remember that being during
16:57  8    the first conversation?
16:57  9         A.    Yes.
16:57 10         Q.    What else do you remember him
16:57 11    saying about the possibility of filing a
16:57 12    lawsuit during that first conversation?
16:57 13         A.    I don't recall any other details
16:57 14    per se.  He asked me would I be interested in
16:57 15    speaking to his lawyer Peter who's now my
16:57 16    lawyer.
16:57 17         Q.    So at the time he spoke with you,
16:57 18    he was already -- he already had an attorney --
16:57 19         A.    Yes.
16:58 20         Q.    -- who is Peter?
16:58 21         A.    Yes.
16:58 22         Q.    And did he tell you that he had an
16:58 23    attorney, Peter Saghir -- I'm probably
16:58 24    butchering the name -- but Peter Saghir during
16:58 25    the first conversation you had with him?
```

16:58  1      A.     Yes.
16:58  2      Q.     And what did you tell him?
16:58  3      A.     I'm sorry.  What did I tell C.D.?
16:58  4      Q.     So -- no.  Sorry.
16:58  5             So C.D. told you -- C.D. brought up
16:58  6   the issue of filing a lawsuit in the first
16:58  7   conversation, and he told you about his lawyer,
16:58  8   right?
16:58  9      A.     Yes.
16:58 10      Q.     And he asked you if you'd being
16:58 11   willing to speak with his lawyer, right?
16:58 12      A.     Yes.
16:58 13      Q.     And how did you respond?
16:58 14      A.     I said I'd be -- I'd be happy to
16:58 15   speak to him and learn more.
16:58 16      Q.     Learn more about potentially filing
16:58 17   a lawsuit, right?
16:58 18      A.     Yes, and what was going on and the
16:58 19   nature of the law and et cetera.  It was new
16:58 20   information for me.
16:58 21      Q.     So how did you -- how did you first
16:59 22   communicate with, with Peter?
16:59 23      A.     I don't recall if it was via
16:59 24   writing him an email or calling him directly.
16:59 25   I don't recall which was first.

16:59 1    Q.    Did you reach out to him, or did he
16:59 2  reach out to you?
16:59 3    A.    I don't -- I'm sorry.  I don't
16:59 4  recall which direction it went.
16:59 5    Q.    Do you remember how long after your
16:59 6  conversation with, with C.D. you made contact
16:59 7  with Peter?
16:59 8    A.    Soon thereafter.
16:59 9    Q.    Within a week?
16:59 10   A.    I would -- I would think so.  I
16:59 11 don't know for certain, but that makes sense to
16:59 12 me.
16:59 13   Q.    And how long after your initial
16:59 14 conversation with Mr. Saghir did you -- did you
16:59 15 retain him as your attorney?
16:59 16   A.    I don't recall the exact length of
16:59 17 time.  There was a -- you know, my first ever
17:00 18 engaging this process, we had a meeting in
17:00 19 person at some point during that process.
17:00 20 There were other correspondences.  I don't
17:00 21 remember the exact number of correspondences or
17:00 22 meetings, conversations we had.
17:00 23   Q.    Is that the only communication
17:00 24 you've ever had with C.D.?
17:00 25   A.    There was -- there was one other

307

ANTHONY RAPP

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 17:00 | 1 | time a couple of months later to just check in, |
| 17:00 | 2 | and that's the only other time that I've spoken |
| 17:00 | 3 | with him. |
| 17:00 | 4 | Q.   Did you understand in that initial |
| 17:00 | 5 | call that C.D. was asking if you were |
| 17:00 | 6 | interested in joining him in the lawsuit? |
| 17:00 | 7 | A.   I don't recall the nature of the |
| 17:00 | 8 | language around that.  I just -- I don't recall |
| 17:00 | 9 | the exact way it was described. |
| 17:00 | 10 | Q.   Regardless of how it was described, |
| 17:00 | 11 | he was referring you to his attorney Peter, |
| 17:00 | 12 | right? |
| 17:00 | 13 | A.   Yes. |
| 17:00 | 14 | Q.   Okay.  And you understood that at |
| 17:01 | 15 | that point he was already contemplating filing |
| 17:01 | 16 | a lawsuit against Mr. Spacey? |
| 17:01 | 17 | A.   Yes. |
| 17:01 | 18 | Q.   And you understood the reason that |
| 17:01 | 19 | he was referring you to Peter was to see if you |
| 17:01 | 20 | were also interested in following suit, right? |
| 17:01 | 21 |       MR. SAGHIR:  Objection.  Objection. |
| 17:01 | 22 |   Objection.  He hasn't said that. |
| 17:01 | 23 |       MR. SCOLNICK:  I asked the |
| 17:01 | 24 |   question. |
| 17:01 | 25 |       THE WITNESS:  I'm sorry.  I don't |

308

| | | |
|---|---|---|
| 17:01 | 1 | understand what's unclear. |
| 17:01 | 2 | BY MR. SCOLNICK: |
| 17:01 | 3 | Q. You understood the reason C.D. was |
| 17:01 | 4 | referring you to Peter was to see if you were |
| 17:01 | 5 | interested in filing a suit, right, filing a |
| 17:01 | 6 | lawsuit? |
| 17:01 | 7 | MR. SAGHIR: Note my objection. |
| 17:01 | 8 | THE WITNESS: I understand that's |
| 17:01 | 9 | part of what was being discussed. |
| 17:01 | 10 | BY MR. SCOLNICK: |
| 17:01 | 11 | Q. What else did you guys discuss, you |
| 17:02 | 12 | and C.D.? |
| 17:02 | 13 | MR. SAGHIR: Objection. Who? Who? |
| 17:02 | 14 | MR. SCOLNICK: I said C.D. |
| 17:02 | 15 | THE WITNESS: As I said, he -- we |
| 17:02 | 16 | expressed -- what he expressed about |
| 17:02 | 17 | having heard my story and sharing my |
| 17:02 | 18 | story. We expressed sharing in that |
| 17:02 | 19 | experience of coming forward to some |
| 17:02 | 20 | degree. |
| 17:02 | 21 | BY MR. SCOLNICK: |
| 17:02 | 22 | Q. Did C.D. say he believed his case |
| 17:02 | 23 | would be stronger if you would join? |
| 17:02 | 24 | A. I don't recall that being said. |
| 17:02 | 25 | Q. Has he ever told you that? |

| | | |
|---|---|---|
| 17:02 | 1 | A. Not that I recall, no. |
| 17:02 | 2 | Q. Do you believe that your case would |
| 17:02 | 3 | be stronger -- well, let's -- if C.D. joined -- |
| 17:02 | 4 | strike that. |
| 17:02 | 5 | Do you believe the fact that C.D. |
| 17:02 | 6 | has joined your case makes it stronger? |
| 17:02 | 7 | MR. SAGHIR: Objection. |
| 17:02 | 8 | THE WITNESS: I don't know how to |
| 17:02 | 9 | answer that. I am responding to the law |
| 17:02 | 10 | changing and that there's some opportunity |
| 17:02 | 11 | for accountability in a criminal act. And |
| 17:03 | 12 | I'm participating in this to that end. |
| 17:03 | 13 | BY MR. SCOLNICK: |
| 17:03 | 14 | Q. You're also seeking money, right? |
| 17:03 | 15 | A. That is part of the process. |
| 17:03 | 16 | Q. Well, part of the process includes |
| 17:03 | 17 | calculations that have been submitted relating |
| 17:03 | 18 | to the damages that you claimed. |
| 17:03 | 19 | Do you understand that? |
| 17:03 | 20 | A. I understand that because it's been |
| 17:03 | 21 | explained to me. |
| 17:03 | 22 | Q. Did you ever consider filing this |
| 17:03 | 23 | lawsuit alone and not with C.D.? |
| 17:03 | 24 | A. No. I was not aware of the law |
| 17:03 | 25 | change. I was made aware of the law change in |

```
17:03   1    this case, in this moment when made contact.
17:03   2         Q.    I want to try to put a date on your
17:04   3    communication with C.D., that first
17:04   4    conversation.
17:04   5               When do you think that was?
17:04   6         A.    It was sometime in early 2020.
17:04   7         Q.    Okay.  After speaking with C.D.,
17:04   8    did you ever consider filing your own lawsuit
17:04   9    separate and apart from his?
17:04  10         A.    No, I didn't consider that.
17:04  11         Q.    Other than the two communications
17:04  12    that you discussed with C.D., have you spoken
17:04  13    with him since?
17:04  14         A.    No.
17:04  15         Q.    Have you communicated with him
17:04  16    since?
17:04  17         A.    Not that I recall in any way.  I
17:05  18    had those two conversations.  That's it.
17:05  19         Q.    Have you communicated with him in
17:05  20    writing at any point?
17:05  21         A.    We had the text messages making
17:05  22    arrangements to speak, and I have a record of
17:05  23    that.
17:05  24         Q.    When did you decide that you wanted
17:05  25    to file a lawsuit?
```

311

```
 1                C E R T I F I C A T E
 2
 3
 4              I, SUZANNE J. STOTZ, a
 5   Registered Professional Reporter, Certified
 6   Realtime Reporter, and Notary Public in and for
 7   the State of New York, do hereby certify that
 8   the foregoing is a true and accurate transcript
 9   of the stenographic above-captioned matter.
10
11                         _____
12
13              SUZANNE J. STOTZ, RPR, CRR
14           My Commission Expires March 2, 2022
15
16
17   DATED:  February 19, 2021
18
19
20   NOTE:   THE CERTIFICATE APPENDED TO THIS
21   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
22   OF THE SAME BY ANY MEANS, UNLESS UNDER THE
23   DIRECT CONTROL AND/OR DIRECTION OF THE
24   CERTIFYING COURT REPORTER.
25
```

```
 1              E R R A T A    S H E E T
 2        I have read my testimony in the foregoing
 3    transcript and believe it to be true and
 4    correct to the best of my knowledge and belief
 5    with the following changes:
 6    PAGE     LINE          CHANGE
 7    _____  _____  _____
 8    _____  _____  _____
 9    _____  _____  _____
10    _____  _____  _____
11    _____  _____  _____
12    _____  _____  _____
13    _____  _____  _____
14    _____  _____  _____
15    _____  _____  _____
16    _____  _____  _____
17
18    _____  _____
19    WITNESS SIGNATURE                  DATE
20
21    Sworn and subscribed to before me this
22    _____ day of _____ , 2021.
23
24    Notary Public of the
25    State of _____.
```