Case 1:20-cv-09586-LAK   Document 149-3   Filed 02/18/22   Page 1 of 17

Electronically FILED by Superior Court of California, County of Los Angeles on 01/21/2022 05:32 PM Sherri R. Carter, Executive Officer/Clerk of Court, by J. Lara, Deputy Clerk

Stephen G. Larson (SBN 145225)
slarson@larsonllp.com
Jonathan E. Phillips (SBN 233965)
jphillips@larsonllp.com
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 436-4888
Facsimile:   (213) 623-2000

Attorneys for Respondents KEVIN SPACEY, M.
PROFITT PRODUCTIONS, INC., and
TRIGGER STREET PRODUCTIONS, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| MRC II DISTRIBUTION COMPANY, L.P., a Delaware limited partnership, KNIGHT TAKES KING PRODUCTIONS, LLC, a California limited liability company, and MRC II HOLDINGS L.P., a Delaware limited partnership,,<br><br>　　　　Petitioners,<br><br>　　vs.<br><br>KEVIN SPACEY, an individual, M. PROFITT PRODUCTIONS, INC., a California corporation and TRIGGER STREET PRODUCTIONS, INC., a New York corporation,,<br><br>　　　　Respondents. | Case No. 21STCP03831<br><br>*Assigned to Hon. Mel Red Recana, Department 45*<br><br>**RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD**<br><br>Action Filed:　　November 22, 2021<br>Trial Date:　　　None Set |

LARSON
LOS ANGELES

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 4

II. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND ................................ 6

    A. The Acting and Producing Agreements ............................................................... 6

    B. Public Allegations Against Spacey Lead to Netflix's Decision to Remove Him From Season 6 of HOC ................................................................................. 6

    C. The Arbitration Proceedings and the Award ....................................................... 7

III. THE ARBITRATOR EXCEEDED HIS AUTHORITY BECAUSE THERE WAS NO RATIONAL CONNECTION BETWEEN THE BREACHES FOUND AND THE DAMAGES AWARDED .................................................................................. 9

IV. CONCLUSION ............................................................................................................ 16

LARSON
LOS ANGELES

2

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET
PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Micro Devices, Inc. v. Intel Corp.*
   (1994) 9 Cal.4th 362 ............................................................................................. 9, 10, 11, 12

*McDonald v. John P. Scripps Newspaper*
   (1989) 210 Cal.App.3d 100 .................................................................................................. 10

*Medical Sales & Consulting Group v. Plus Orthopedics USA, Inc.*
   (S.D. Cal., Oct. 25, 2011, No. 08CV1595 BEN BGS) 2011 WL 5075970 ........................... 11

*Metzenbaum v. R.O.S. Associates*
   (1986) 188 Cal.App.3d 202 .................................................................................................. 11

*Postal Instant Press, Inc. v. Sealy*
   (1996) 43 Cal.App.4th 1704 ................................................................................................. 11

**Statutes**

Civil Code Section 3300 ............................................................................................................. 10

Code of Civil Procedure

   § 1285.2 ................................................................................................................................... 4
   § 1286.2, subd. (a)(4) ............................................................................................................. 9

**Other Authorities**

1 Witkin, Summary 11th Contracts
   § 895 (2020) .......................................................................................................................... 10

LARSON
LOS ANGELES

3

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET
PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

1       Respondents Kevin Spacey, M. Profitt Productions, Inc. ("M. Profitt"), and Trigger Street Productions, Inc. ("Trigger Street") hereby respond to Petitioners MRC II Distribution Company, L.P. ("MRC Distribution"), Knight Takes King Productions, LLC ("KTK"), and MRC II Holdings L.P.'s ("MRC Holdings") Petition to Confirm Arbitration Award. For the reasons set forth herein, Respondents request that the Court deny the Petition and, pursuant to Code of Civil Procedure, section 1285.2, further request that the Court instead vacate the arbitration award.

## I.  INTRODUCTION

In early November of 2017, KTK suspended Kevin Spacey from the Netflix show House of Cards ("HOC") five days after the first of several articles (the majority based on anonymous sources) were published accusing him of sexual misconduct and harassment unrelated to HOC, and one day after a single article, published online by CNN, claimed that he had sexually harassed several former HOC crewmembers. KTK eventually terminated its acting and producing agreements with Spacey, claiming that he had breached those agreements by violating the HOC harassment policy. Petitioners now ask this Court to confirm an October 19, 2020 arbitration award (the "Award") in which the Arbitrator found that Spacey did, in fact, breach his agreements and that Petitioners were entitled to more than $30 million dollars in damages caused by Season 6 of HOC being shortened from 13 episodes to 8.

The Award is permeated with factual and legal errors—most fundamentally, its finding that MRC proved by a preponderance of the evidence that Spacey sexually harassed five former HOC crewmembers. The truth is that while Spacey participated in a pervasive on-set culture that was filled with sexual innuendoes, jokes, and innocent horseplay, he never sexually harassed anyone. In fact, as the evidence established and the Arbitrator recognized in the Award, the few times Spacey was told that his conduct made someone feel uncomfortable or was in any way unwanted, he stopped. And the *only* allegation that he ever attempted to engage in any type of sexual activity with a HOC crewmember was found uncredible by the Arbitrator. Indeed, the Arbitrator stopped short of finding that Spacey actually "sexually harassed" anyone, instead emphasizing that the HOC harassment policy could be violated even if the conduct in question did not rise to the level of sexual harassment under state or federal law.

4

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

LARSON
LOS ANGELES

Unfortunately, Respondents understand that California law is extraordinarily deferential to arbitration awards, and that this Court cannot second guess the Arbitrator's factual or legal findings—regardless of how erroneous they were. As such, Respondents are not asking this Court to vacate the Award based on any of its numerous factual and legal errors. But the deference given to arbitration awards is not unlimited. A court can and must vacate an award if the arbitrator exceeded his or her authority. And among the ways in which an arbitrator exceeds authority is by issuing an award in a breach of contract case that is not rationally related to the breach of that contract. That is precisely what occurred here.

As the Court will see, the Arbitrator found that Spacey breached the Agreements by engaging in specific conduct with specific crewmembers. The Arbitrator then found that MRC Distribution suffered almost $30 million in lost profits caused by the reduction of Season 6 of HOC from thirteen episodes to eight episodes. The fatal problem with the Award is that those two findings are completely unconnected. As the Arbitrator recognized, the reduction in episodes was a foregone conclusion once Netflix dictated to Petitioners that Spacey could not and would not be a part of Season 6. But what the Arbitrator ignored is that the conduct he found to be in breach of the Agreements was not even known by Netflix at the time it made this decision. In other words, the breaches found by the Arbitrator *could not* have been related to Petitioners' damages because those damages had already been caused by the time the breaching conduct was known. Consequently, the Award is not rationally related to the breaches found by the Arbitrator and the Award must be vacated.

To be clear, reaching this conclusion does not require this Court to overturn any of the Arbitrator's factual findings or second guess his interpretation of the law. It simply requires that the Court apply common sense and basic logic—both of which appear to have been discarded by the Arbitrator in his effort to avoid the risk of being seen as siding with Spacey and against the #MeToo movement, and to dispense his own brand of justice. While Respondents recognize that the Arbitrator is all but immune from having his factual findings and legal interpretations questioned by this Court—even where those findings and interpretations are so obviously wrong—he cannot issue an award of damages that are completely disconnected from the breach of

5

LARSON
LOS ANGELES

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET
PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

contract he found to have occurred. Respondents therefore respectfully request that the Court deny the Petition in its entirety and instead grant Respondents' request to vacate the Award.

## II.   RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

### A.   The Acting and Producing Agreements

In 2011, Spacey, through his loan-out companies M. Profitt and Trigger Street, entered into two agreements with KTK to act and provide executive producer services on HOC (the "Agreements"). (Award at 4.[1]) KTK ultimately assigned the right to exploit HOC to MRC Distribution. (*Id.*) MRC Distribution in turn entered into an agreement with Netflix, Inc. to license the rights to distribute HOC. (*Id.*) While Netflix initially was not involved in creative decisions on HOC, by Season 6 the contract between Netflix and MRC Distribution gave Netflix "approval rights over almost ever aspect of the production; Netflix became the 'tie breaker' when it came to the Show's production and its creative path forward." (*Id.* at 10.)

### B.   Public Allegations Against Spacey Lead to Netflix's Decision to Remove Him From Season 6 of HOC

Season 6 began filming on or about October 13, 2017, and Spacey provided all required services in connection with the first two episodes of the season. (Award at 10-11.) Then, on October 29, 2017, *BuzzFeed* published an online article containing allegations against Spacey for actions that allegedly occurred in 1986. (*Id.* at 11.) The next day, Netflix and KTK's parent company, Media Rights Capital ("MRC"), jointly announced that they were "deeply troubled" by this accusation, and that HOC's upcoming season, Season 6, would be its last. (*Id.*) Then, a day later, on October 31, MRC and Netflix announced that they were indefinitely suspending production to review the current situation and to address any concerns of the cast and crew. (*Id.*)

Two days after production was suspended, on November 2, 2017, CNN published an article at *money.cnn.com* containing anonymous accusations that Spacey had sexually harassed and even sexually assaulted unnamed former HOC crewmembers. (*Id.* at 13.) After the CNN

---

[1] Petitioners have stated that they will be filing the Award under seal given the confidentiality of the arbitration proceedings. Respondents agree with this approach and thus, like Petitioners, have not attached a copy of the Award to this Response. All citations to the Award are to the under-seal Award to be filed at a later date.

6
RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

LARSON
LOS ANGELES

article was published, MRC released a public statement asserting that it was only aware of a single complaint regarding Spacey from Season 1, which it said had been "resolved promptly to the satisfaction of all involved," and that it "has not been made aware of any other complaints involving Mr. Spacey." (*Id.*) Netflix echoed MRC's statement, asserting it "is not aware of any other incidents involving Kevin Spacey on-set." (*Id.*).

Despite having confirmed they were unaware of any other complaints or incidents involving Spacey on HOC, and despite not having even begun an investigation into the anonymous accusations reported by CNN, Netflix immediately decided it would force MRC to produce Season 6 without Spacey. Ted Sarandos, the head of Netflix, made this clear in an email to four Netflix employees sent within hours of the CNN article being published: "Lets [sic] announce tomorrow that There is NO scenario in which Kevin Spacey will appear in any version of a final season of the show .... Let's also be clear that we will [n]ot be releasing GORE" (a film unrelated to MRC in which Spacey had the title role). (*Id.*)

Netflix made this decision public on November 3, 2017. Less than 24 hours after MRC and Netflix's statements appearing to support Spacey, Netflix declared that it would "not be involved with any further production of *House of Cards* that includes Kevin Spacey … We have also decided we will not be moving forward with the release of the film *Gore*, which was in post-production, starring and produced by Kevin Spacey." (*Id.* at 13-14.) MRC then issued its own statement declaring that Spacey was "suspended, effective immediately." (*Id.*).

Having removed Spacey from the show, Netflix and MRC worked together to rewrite Season 6 without Spacey's character. While MRC initially sought to keep the season at thirteen episodes, Netflix refused. Following several rounds of negotiation, Netflix ultimately agreed to allow a shortened season of only eight episodes. (*Id.* at 15-17.) While this reduction in episodes actually saved Petitioners a significant amount in production costs, it led to an even larger decrease in MRC Distribution's contractual revenue from Netflix. Ultimately, MRC Distribution suffered $29,527,586 in lost profits from the reduction in episodes. (*Id.* at 45-46.)

### C. The Arbitration Proceedings and the Award

Following notice from KTK that it was terminating the Agreements, Petitioners and

7

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET
PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

LARSON
LOS ANGELES

Respondents filed dualling arbitration demands claiming breaches of the Agreements. An arbitration hearing was held in February of 2020. (Award at 3.) Over the course of the hearing, the Arbitrator reviewed video recordings of deposition designations, including from the six HOC crewmembers who Petitioners claimed had been sexually harassed by Spacey (although one of them had actually testified that Spacey's conduct had not upset him or even made him uncomfortable). Live testimony was also received from both fact and expert witnesses. The Parties then submitted post-hearing briefs followed by closing arguments conducted via Zoom on June 2, 2020, after which the matter was submitted for decision. (*Id.*)

An Interim Award was issued on July 14, 2020 finding in favor of Petitioners. Following further briefing on Petitioners' motion to recover attorneys' fees and costs, the Final Award was issued on October 19, 2020. In the Award, the Arbitrator found that Petitioners had met their burden to establish by a preponderance of the evidence that Spacey violated the HOC harassment policy during various interactions with five of the six crewmember witnesses. (*Id.* at 33-38.) Although the Arbitrator did not make any finding that this conduct actually constituted sexual harassment under state or federal law, he ruled that it nonetheless violated the harassment policy due to language in the policy expanding its scope beyond that of the law. (*Id.* at 38.)

Notably, however, none of the conduct was found to be ongoing at the time of Spacey's suspension or to have occurred during the filming or production of the first two episodes of Season 6. The alleged conduct involving two of the crewmembers was found to have ceased during a prior season after they, in a joking manner, indicated that they wanted Spacey to stop. (*Id.* at 20-21.) The interaction with the third crewmember only occurred during one of the early seasons. (*Id.* at 22.) The allegations regarding the fourth crewmember involved one incident in each of two early seasons. (*Id.* at 23.) And the fifth crewmember only testified about one incident—which he said did not upset him or even make him uncomfortable—at a kick-off party for an early season. (*Id.* at 28.) None of these five crewmembers claimed that Spacey ever tried to initiate any sexual activity, that he had continued any behavior after they told him or signaled to him that it was unwanted, or that there was ever any quid pro quo sexual harassment.

Finally, as for the sixth crewmember—the only one who even accused Spacey of

LARSON
LOS ANGELES

8
RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

attempting to engage in sexual activity, which the Arbitrator described as the "most egregious conduct (by far) alleged against Spacey"—the Arbitrator recognized numerous credibility issues with the accusation and ultimately *rejected* MRC's argument that the alleged conduct had occurred in breach of the Agreements. (*Id.* at 36-37.) As will become clear below, this finding is critical to this Petition because this sixth crewmember's accusation was the only one that had also been included in the CNN article. (See *id.* 24; Declaration of Stephen G. Larson ("Larson Decl."), ¶ 3.) In other words, none of the breaches actually found by the Arbitrator had been part of the CNN article that led Netflix to force Petitioners to cut Spacey out of Season 6.

Based on these factual findings, the Arbitrator ruled that Spacey had breached the Agreements. (Award at 38-43.) The Arbitrator further found that Petitioners were entitled to $29,527,586 in damages for lost profits resulting from the reduction of Season 6 from thirteen to eight episodes, $1,197,626.85 in attorneys' fees, and $235,706.80 in costs. (*Id.* at 45-47.)

### III. THE ARBITRATOR EXCEEDED HIS AUTHORITY BECAUSE THERE WAS NO RATIONAL CONNECTION BETWEEN THE BREACHES FOUND AND THE DAMAGES AWARDED

Respondents are not challenging the Arbitrator's erroneous findings that Spacey breached the Agreements through his interactions with the five specific crewmembers at various times during the first five seasons of HOC. Again, although Respondents categorically deny that Spacey sexually harassed anyone on HOC, they understand that California law does not allow this Court to second guess the Arbitrator's factual findings, no matter how erroneous. But even accepting these findings, the Arbitrator nevertheless exceeded his authority in awarding Petitioners nearly $30 million in lost profit damages because the breaches he found to have occurred had no rational connection to Petitioners' damages. As such, despite the highly deferential standard for reviewing an arbitration award, this Court should deny the Petition and instead vacate the Award.

A court must vacate an arbitration award where the arbitrator "exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd. (a)(4).) In *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, the California Supreme Court addressed when an award based on a

LARSON
LOS ANGELES

9

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

breach of contract could be found to be in excess of the arbitrator's authority. After discussing and rejecting several competing lines of cases that had promulgated various standards, the Court set forth the following standard:

> We distill from these cases what we believe is a meaningful, workable and properly deferential framework for reviewing an arbitrator's choice of remedies. Arbitrators are not obliged to read contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. [Citation.] **The remedy awarded, however, must bear some rational relationship to the contract and the breach.** The required link may be to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), to an interpretation implied in the award itself, or to a plausible theory of the contract's general subject matter, framework or intent. [Citation.] **The award must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator).** Where the damage is difficult to determine or measure, the arbitrator enjoys correspondingly broader discretion to fashion a remedy. [Citation.]
>
> The award will be upheld so long as it was even arguably based on the contract; it may be vacated only if the reviewing court is *compelled* to infer the award was based on an extrinsic source. [Citations.] In close cases the arbitrator's decision must stand. [Citation.]

(*Id.* at 381, bolding added.)

Taken as a whole, this standard is clearly designed to give as much deference as possible to an arbitration award. But that deference is not unlimited. The key for purposes of this Petition is the requirement that, at the very least, an award by rationally related to the breach found by the arbitrator. As the Court explained in a footnote, "[t]he award is rationally related to the breach if it is aimed at compensating for, or alleviating the effects of, the breach." (*Id.* at 381, fn. 12.)

This is, of course, consistent with the "fundamental rule of law … that whether the action be in tort or contract compensatory damages cannot be recovered unless there is a causal connection between the act or omission complained of and the injury sustained." (*McDonald v. John P. Scripps Newspaper* (1989) 210 Cal.App.3d 100, 104, citation and quotation marks omitted); see also 1 Witkin, Summary 11th Contracts § 895 (2020) ["It is essential to establish a causal connection between the breach and the damages sought"].) This principle has been codified in Section 3300 of the Civil Code, which provides: "For the breach of an obligation arising from contract, the measure of damages … is the amount which will compensate the party aggrieved for

LARSON
LOS ANGELES

10

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

all the detriment *proximately caused thereby*, or which, in the ordinary course of things, will be likely to result therefrom." (Emphasis added.) Put differently, "damages cannot be *presumed* to flow from liability. 'It is essential to establish a *causal connection* between the breach and the damages sought.'" (*Metzenbaum v. R.O.S. Associates* (1986) 188 Cal.App.3d 202, 211–212, emphasis in original, citations omitted.)

Taken together, this fundamental rule of causation and the standard set forth in *Advanced Micro Devices* mean that it is not enough for an arbitrator to find that a contract was breached and that the non-breaching party incurred damages. Rather, to justify awarding those damages, there must be a rational causal relationship between the specific breaches found and the damages incurred. (*Advanced Micro Devices*, 9 Cal.4th at 381; see also *Postal Instant Press, Inc. v. Sealy* (1996) 43 Cal.App.4th 1704, 1709 [noting that "the breaching party is only liable to place the nonbreaching party in the same position as if *the specific breach* had not occurred," and that "the breaching party is only responsible to give the nonbreaching party the benefit of the bargain to the extent *the specific breach* deprived that party of its bargain"] emphasis added; *Medical Sales & Consulting Group v. Plus Orthopedics USA, Inc.* (S.D. Cal., Oct. 25, 2011, No. 08CV1595 BEN BGS) 2011 WL 5075970, at *11–12 [where the plaintiff proved some, but not all, of the alleged breaches of an agreement, the court found that the plaintiff "cannot prevail because [he] has not proven any damages flowed *from the breaches establish[ed]*"] emphasis added.)

To establish that rational connection, the breaches must have been a "natural and direct" cause of the damages. (*Postal Instant Press*, 43 Cal.App.4th 1710 [finding a causal disconnect between a franchisee's past breaches and the claimed damages because "the franchisee's failure to timely make these past royalty payments is not a 'natural and direct' cause of the franchisor's failure to receive future royalty payments"].) Absent that connection, an award of damages logically cannot be "aimed at compensating for, or alleviating the effects of, the breach," and therefore cannot be rationally related to the breach. (*Advanced Micro Devices*, 9 Cal.4th at 381, fn. 12.) After all, if an award of damages is untethered to the breaches found, it necessarily is untethered to the contract as a whole—and thus a reviewing court is "*compelled* to infer the award

11
RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

was based on an extrinsic source." (*Id.* at 381, emphasis in original.) To find otherwise would defy logic and common sense.

In the briefing before the JAMS Appellate Panel, the parties focused on the application of the "substantial factor" test for causation, presenting dualling nuanced legal arguments regarding the proper formulation and application of that test. But for purposes of the current Petition, a far simpler analysis is all that is needed. This is because, under the undisputed facts and the Arbitrator's own findings, there can only be one rational conclusion: The damages suffered by Petitioners were completely and necessarily *unrelated to* the breaches found by the Arbitrator.

Spacey was found to have breached the Agreements by violating the HOC harassment policy in connection with five specific crewmembers—alleged violations that were unknown to Netflix at the time it dictated that Spacey would no longer be involved in HOC. (Award at 20-28, 34-38; Larson Decl., ¶¶ 3-6, Ex. 1.) The Arbitrator then found that these five breaches caused Petitioners nearly $30 million in damages. (Award at 45-46.) But the lack of a rational relationship between the breaches and the damages is revealed by examining the Arbitrator's findings regarding nature of Petitioners' damages, the reason they were incurred, and the timing of when Petitioners and Netflix became aware of those breaches.

The evidence and the Arbitrator's findings were consistent: Petitioners' damages were limited to MRC Distribution's lost profit caused by the loss of contractual revenue from Netflix and Sony. (*Id.* at 45-46.) The evidence and the Arbitrator's findings were also consistent regarding the reason why there was a loss of contractual revenue: The loss was a direct result of the reduction in total episodes ordered by Netflix, with Season 6 being reduced to only eight episodes rather than the originally contracted thirteen. (*Id.*)

Petitioners' causation theory thus necessarily rested on an assumption that Spacey's breaches caused the reduction in episodes. But, as the Arbitrator acknowledged, there were a number of factors that led to this reduction, including (1) Netflix's refusal to continue forward if Spacey was involved, which then required Season 6 to be completely reworked to exclude Spacey's character; (2) the impending delivery deadlines of the show to Netflix; and (3) Robin Wright's commitment to act in the movie *Wonder Woman*. (*Id.* at 42.) Nonetheless, the Arbitrator

12
RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

LARSON
LOS ANGELES

found that "though not the sole factor for the shortened Season Six, Spacey's actions were the *impetus* for the entire snowball that has become this case." (*Id.*)

The problem, of course, is that for the damages to be rationally related to the breach, it was not enough to find merely that Spacey's "actions" caused the shortened Season 6. Rather, those "actions" must be actions that were actually proven in the arbitration and found by the Arbitrator to have breached the Agreements. And here, the *only* actions the Arbitrator found to have breached the Agreements involved specific interactions between Spacey and the five specific crewmembers—none of which were, or could even possibly have been, a factor in the decision to shorten Season 6 and thereby reduce Petitioners' contractual revenue (i.e., Petitioners' damages).

The key lies in the timing of the decision made by Netflix to refuse to go forward with HOC if Spacey remained involved. The timeline is not in dispute. On October 31, 2017, two days after the *BuzzFeed* article was published and before *any* allegation against Spacey related to HOC had been published, MRC and Netflix jointly agreed to suspend production of Season 6. (*Id.* at 11.) Then, on November 2, 2017, CNN published its article containing allegations of sexual harassment on the set of the HOC. (*Id.* at 13.) That same day, almost immediately after the article was published, Ted Sarandos, the head of Netflix, made his intentions clear in an email to four Netflix employees: "Lets [sic] announce tomorrow that There is NO scenario in which Kevin Spacey will appear in any version of a final season of the show .... Let's also be clear that we will [n]ot be releasing GORE" (a film unrelated to MRC in which Spacey provided producing and acting services). (*Id.*) On November 3, as Sarandos dictated, and before any investigation had taken place or MRC had even identified any of the CNN article's anonymous accusers, Netflix announced it would not be involved in any further production of HOC involving Spacey. (*Id.* at 13-14.) MRC followed Netflix's announcement with one of its own, stating that Spacey was suspended indefinitely. (*Id.* at 14.)

As the Arbitrator correctly found, once Netflix decided on November 2 that it would not move forward with Spacey on the show, it became impossible for MRC to complete Season 6 with Spacey—because Netflix was never going to change its mind—or to produce a 13-episode Season 6. (See *id.* at 15-16 ["Netflix would not compromise on its position, refusing to move forward with

13

Spacey on the Show. MRC could not complete Season Six of the Show under its contract with Netflix if Spacey was involved"].) So, from November 6 through December 3, 2017, MRC negotiated with Netflix on a reworked Season 6 without Spacey's character. The Arbitrator summarized this process, including the various factors that ultimately led to the reduced, eight-episode agreement on pages 16-17 of the Award. Noticeably absent is *any* evidence or *any* finding by the Arbitrator that one of those factors was whether Spacey had engaged in the conduct that ultimately was found to have breached the Agreements. (*Id.* at 16-17.) The reality was that the truth or falsity of the allegations was irrelevant to Netflix's decision to issue its ultimatum regarding Spacey's continued involvement with HOC because, from their standpoint, the accusations alone were threatening their brand reputation. (*Id.* at 14-15.)

But more importantly for this Court's analysis, there was absolutely no evidence that Netflix was even aware of the conduct that formed the basis for Spacey's breaches. Indeed, for four of the five crewmember witnesses, Netflix literally could *not* have been aware of the conduct at the time it made its decision because the accusations had not even been made yet. As already addressed, Netflix's decision was made within hours of the CNN article being published on November 2, 2017. Yet four of the five accusations were not uncovered until the crewmembers were interviewed several weeks later by an outside investigator hired by Petitioners. (*Id.* at 15 [noting that the investigator was not even engaged until after Spacey had been suspended], and 18 [explaining that the investigation started during the negotiations between Netflix and MRC over the number of Season 6 episodes, which didn't begin until several days after Netflix had made its decision, and that actual interviews did not occur until after an initial "triage" phase in which the investigator was determining who to interview]; see also Larson Decl., ¶¶ 3-6.[2])

This was confirmed by a Netflix executive, who testified that when the CNN article was published—which, again, was only a matter of hours before Netflix decided that Spacey would not

---

[2] As for the one crewmember whose accusation became known to MRC either the same day or one day prior to the CNN article and Netflix's decision—the crewmember who the Arbitrator acknowledged had not even been offended or upset by his interaction with Spacey—Petitioners submitted zero evidence that they shared this accusation with Netflix. (See Award at 27-28; Larson Decl., ¶ 5.)

14
RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

LARSON
LOS ANGELES

be involved with Season 6—Netflix was unaware of any other HOC-related allegations against Spacey (other than the single allegation from Season 1 that both Netflix and MRC had acknowledged in their press releases and that was not a basis for Petitioners' claims or the Arbitrator's findings of breach). (Larson Decl., Ex. 1 at 29:9-12.) Rather, the only thing Netflix was aware of—and the reason for their ultimatum—was that Spacey had been publicly accused by Anthony Rapp and others (primarily anonymously) of various sexual misconduct unrelated to HOC, and that CNN had published an article containing anonymous accusations of misconduct on the HOC set involving unnamed male crewmembers. (See *id.*) But this information is irrelevant for this Court's analysis.

Regarding the non-HOC accusations, not only were they never proved by MRC, they were necessarily irrelevant precisely because they had nothing to do with HOC and thus nothing to do with the Agreements. As for the CNN accusations, they must be disregarded for purposes of this analysis as well because *they were never proven*. Indeed, the only one even litigated was the accusation that the Arbitrator found lacked credibility. (Award at 36-37; see also Larson Decl., ¶ 3.) Thus, although it is undisputed that the accusations in the CNN article did play a role in Netflix's decision that ultimately led to shortening Season 6, it would be illogical to allow conduct that was never proven to have occurred—let alone to have breached the Agreements—to substitute for a rationally relationship between the actual breaching conduct and the damages awarded by the Arbitrator.

Returning to the conduct the Arbitrator did find to have breached the Agreements, obviously information learned only after a decision has been made cannot retroactively become a factor in that decision. Again, this is a simple matter of logic and common sense. And as such, Spacey's alleged interactions with the five specific crewmembers necessarily could not have had anything to do with Netflix's decision to force Petitioners to cut Spacey out of Season 6, the resulting reduction in Season 6 episodes, or MRC Distribution's eventual lost revenue caused by producing less episodes. (See Award at 45-46 [explaining that MRC Distribution's damages were directly caused by the reduction in episodes].) In short, the damages awarded not only lacked a rational relationship to the breaches found, they were quite literally unrelated.

LARSON
LOS ANGELES

15
RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

## IV. CONCLUSION

For the reasons set forth above, the damages awarded by the Arbitrator were not rationally related to the breaches he found to have occurred. As such, Respondents respectfully request that the Court deny the Petition and instead vacate the Award.

Dated: January 21, 2022    LARSON LLP

By: _/s/ Stephen G. Larson_
Stephen G. Larson
Jonathan E. Phillips
Attorneys for Respondents KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., and TRIGGER STREET PRODUCTIONS, INC.

LARSON
LOS ANGELES

16
RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD

# PROOF OF SERVICE

**MRC II Distribution Company, LP, et al v. Kevin Spacey, et al.**
**Case No. 21STCP03831**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 555 South Flower Street, Suite 4400, Los Angeles, CA 90071.

On January 21, 2022, I served true copies of the following document(s) described as **RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD** on the interested parties in this action as follows:

| | |
|---|---|
| Kinsella Weitzman Iser Kump Holley LLP<br>Michael Kump<br>Gregory P. Korn<br>808 Wilshire Boulevard, 3rd Floor<br>Santa Monica, CA 90401<br>Tel:  (310) 566-9800<br>Fax:  (310) 566-9850<br>Email: mkump@kwikhlaw.com<br>         gkorn@kwikhlaw.com<br>         msanks@kwikhlaw.com | Attorneys for Petitioners<br>MRC II DISTRIBUTION COMPANY, L.P.,<br>KNIGHT TAKES KING PRODUCTIONS,<br>LLC and MRC II HOLDINGS L.P. |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address ygutierrez@larsonllp.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 21, 2022, at Los Angeles, California.

_____
Yvonne M. Gutierrez

RESPONDENTS KEVIN SPACEY, M. PROFITT PRODUCTIONS, INC., AND TRIGGER STREET PRODUCTIONS, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD