UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
KEVIN SPACEY FOWLER, a/k/a KEVIN SPACEY,

> Movant,

-against-

22-mc-0063 (LAK)

ADAM VARY,

> Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ANTHONY RAPP, et ano.,

> Plaintiffs,

-against-

20-cv-9586 (LAK)

KEVIN SPACEY FOWLER a/k/a KEVIN SPACEY,

> Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

> Jennifer L. Keller
> Chase A. Skolnick
> Jay P. Barron
> KELLER/ANDERLE LLP
> *Attorneys for Defendant-Movant*

> Jean-Paul Jassy
> JASSY VICK CAROLAN LLP
> *Attorneys for Respondent*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/9/2022

2

Peter J. Saghir
GAIR, GAIR, CONASON, RUBINOWITZ, BLOOM,
HERSHENHORN, STEIGMAN & MACKAUF
*Attorneys for Plaintiff*

LEWIS A. KAPLAN, *District Judge.*

Anthony Rapp claims that Kevin Spacey Fowler, best known as Kevin Spacey, sexually assaulted him in 1986, when Rapp was a 14 year old boy and Spacey a young man in his twenties. Neither then was the prominent actor and show business personality that each later became. Spacey denies that the incident alleged or any other wrongdoing toward Rapp occurred.

Rapp reportedly told no one about this alleged incident for years. But "Rapp's frustration, anger, and incredulity with the sexual boundary he said Spacey crossed with him grew" as "Spacey's star began to rise through the 1990s and 2000s – including a Tony Award, two Oscars, a decadelong run as the creative director of the Old Vic theater in London, and six seasons and counting on the hit Netflix series *House of Cards.*"[1] In 2017, Rapp approached Adam Vary, a friend of Rapp's since 1999 and then a journalist employed by *Buzzfeed,* told him of his frustration, and eventually "went public" with his claim against Spacey. Vary wrote the article, which ultimately appeared online on October 29, 2017.

As far as the record discloses, there were no witnesses to the alleged incident in 1986.[2] Rapp's case thus relies significantly on his own credibility. So it is unsurprising that Spacey

---

[1] Adam B. Vary, *Actor Anthony Rapp: Kevin Spacey Made a Sexual Advance Toward Me When I Was 14*, BUZZFEED (Oct. 29, 2017), https://www.buzzfeednews.com/article/adambvary/anthony-rapp-kevin-spacey-made-sexual-advance-when-i-was-14?msclkid=e68def95cf9a11ecaae1890f7494a88f.

[2] *See, e.g.,* Rapp Dep. (Dkt. 167-3, 20-cv-9586), at 69-70.

served subpoenas to take Vary's deposition and obtain relevant documents from him.   Vary, however, objected to producing any of the requested documents.   Although he appeared for deposition, he declined to answer many pertinent questions concerning his interactions with Rapp and the reasons for some of his own actions.   He sought to justify his unresponsiveness with respect to all of the requested documents and most of the unanswered questions by referring to a journalist shield law and First Amendment qualified journalist privilege.

The matter now is before the Court on Spacey's motion to compel Vary to produce the documents and to answer the questions, as well as for related relief.

### *Facts*

#### *Discovery Relating to Vary and Rapp*

Although Vary declined to produce any documents whatever in response to the subpoenas, Rapp produced a text exchange between Rapp and Vary that is relevant to the disposition of this motion.   So too are some excerpts from Vary's deposition.

#### *The October 27, 2017 Text Chain*

The aforementioned Rapp-Vary text chain, which occurred just two days prior to the publication of Vary's *Buzzfeed* article, was as follows[3]:

| Rapp | Vary |
|------|------|
| Hey there, just checking in. | Hi hello!<br><br>Plugging away at the story. |

---

[3]   Dkt. 155-1, 20-cv-9586 (emphasis added).

| | |
|---|---|
| Cool, hope it's going well. | It is!<br><br>You are very articulate, which always helps. |
| Excellent, I shall leave you to it.<br><br>And I'm glad to hear that. | |
| | One thing to make you aware of: We can't seem to place Spacey at the Tony's in 2008.  He didn't present, and wasn't nominated, and there's no photos we can find. *We don't doubt he was there, but we don't want to nail down a specific date that Spacey could then just flatly deny.  We're still looking, but if we can't nail it down, we'll likely say that you saw him at an industry event or such. (Similarly, we're also going to steer away from exact specificity in the story for the party.)*<br><br>I asked Adam Pascal if he remembered Spacey being there, and he said "I didn't remember that \*I\* was there until you told me about it." |
| Ohhhh it could have been the year of Charlie Brown.   That makes more sense now that I think of it. That would be 1999.   Can you check that year? | |
| | Oh!<br><br>Sure! |

It thus appears, on a preliminary basis, that Rapp told Vary that Rapp had

encountered Fowler at the Tony Award program in 2008 but that Vary subsequently could not

confirm that Fowler even had been present at that event. Without questioning Rapp's account, as the text messages show, Vary suggested that the way to handle this in his story was to (1) avoid saying that the alleged incident related by Rapp had occurred at the 2008 Tony Award program, and (2) be vague about where and when the alleged incident had occurred to avoid Spacey "flatly deny[ing]" the accuracy of the story. Vary went on to suggest that he would "steer away from exact specificity in the story for the party."

In due course, Vary's *Buzzfeed* story came out. It asserted that the last time that Rapp had interacted with Spacey was at the 1999 Tony Awards. It did not mention that Rapp previously had told Vary that he last had interacted with Spacey at the 2008 event.

*Vary's Testimony*

Vary of course was asked about this at his deposition. He acknowledged that he and Rapp have been friends since 1999 and answered several questions about the nature of their friendship prior to 2017.[4] But when he was asked if he had omitted details of Rapp's account and allegations in the *Buzzfeed* story, he refused to answer based on what his lawyer referred to as "the reporter's privilege and the reporter's shield."[5] He did essentially the same thing with respect to all questions relating to the article and his communications with Rapp that appear in the publicly filed excerpt from the deposition transcript, claiming among other things that he could not be questioned

---

[4]     *See* Vary Dep. (Dkt. 1-3, 22-mc-0063), at 58-60.

[5]     *See, e.g., id.* at 119.

about any information he had gathered that had not been published in the story.[6]

*The Document Requests*

The document subpoena with which we are concerned contained twenty-nine requests. Broadly speaking, it sought all documents concerning Vary's communications with Rapp and his attorneys, claims by Rapp of sexual misconduct or assault by anyone, communications with others about sexual encounters with Rapp, and communications by Vary with specific other persons about Rapp.[7]

Vary produced no documents in response to the document subpoena save two pages of text messages with Rapp's counsel.[8] Rather, he objected to each and every request "to the extent that it calls for material protected from disclosure by the Reporter's Privilege/Shield."[9]

*Prior Proceedings Relating to Vary*

Spacey issued three subpoenas to Vary. The second, dated December 6, 2021, sought production of thirty categories of documents and purportedly was issued by the court in the Central

---

[6]    The questions that he refused to answer or, in one case, answered incompletely are set out in the Joint Stipulation. *See* Dkt. 1-1, 22-mc-0063, at 8-35. In each case, the interposed objection in words or substance was: "Objection. To the extent that it calls for the disclosure of unpublished material, objection on the basis of the reporter's privilege and the reporter's shield." In some cases, this was followed by "Instruct the witness not to answer" and/or "He may answer if he believes he can."

[7]    *See* Scolnick Decl. Ex. 4 (Dkt. 1-7, 22-mc-0063), at 3-6.

[8]    Scolnick Decl. Ex. 4 (Dkt. 1-2, 22-mc-0063) ¶ 5.

[9]    *See, e.g.*, Joint Stipulation (Dkt. 1-1, 22-mc-0063), at 61.

District of California,[10] evidently on the theory that Vary was located in Los Angeles.  No copy of the first is in the record, but it was issued on November 4, 2021, and it too purportedly was issued by the Central District, and contained the same document requests.  As Vary's deposition took place on December 16, 2021,[11] the logical conclusion is that his appearance was compelled by the first subpoena, as the second did not seek his testimony.[12]

Following the deposition, at which Vary declined to answer a great many questions largely on the basis of a claim of reporter's privilege, Vary's counsel reiterated a previous objection that the subpoena had been issued out of the Central District of California rather than the Southern District of New York, where underlying action is pending.[13]  In this he was correct, as Fed. R. Civ. P. 45(a)(2) expressly provides that "[a] subpoena must issue from the court in which the action is pending."  Accordingly, Fowler on December 29, 2021 issued and served a document subpoena out of this Court that was identical to the second subpoena save that it dropped one of the thirty original document requests.  Vary produced no documents pursuant to the New York subpoena either, filing objections to all of the requests.

In early February, Fowler moved in the Central District of California for an order compelling Vary to sit for a further deposition to answer the questions that he previously declined to answer (and reasonable follow up questions) and to produce the subpoenaed documents.  On

---

[10]

December 6, 2021 Subpoena (Dkt. 1-4, 22-mc-0063), at 3-5.

[11]

Vary Dep. (Dkt. 1-14, 22-mc-0063), at 2.

[12]

Vary produced no documents pursuant to either of these subpoenas.

[13]

Dkt. 1-1, at 7.

8

February 22, 2022, the Central District transferred that motion to this Court pursuant to Federal Rule 45(f).

As noted, any subpoena issued to obtain testimony or evidence in this action was required by Fed. R. Civ. P. 45(a)(2) to have been issued by this Court. In these circumstances, with respect to the first two subpoenas – those issued by the Central District of California – "the Southern District of New York must be considered the issuing court."[14]  In any case, Vary appeared for and testified pursuant to the first subpoena and thus waived any objection he may have had to its validity based on its issuance by the incorrect court.

*The Present Motion*

Regardless of the kerfuffle about the issuance of the first two subpoenas, the present motion was filed in the Central District of California under Fed. R. Civ. P. 45(d)(2)(B)(I) and transferred to this court pursuant to Rule 45(f).  The motion therefore is before this Court in all respects.

The substance of the motion centers on the availability and scope of the two journalistic protections Vary invoked in refusing to provide discovery: the federal "reporter's privilege" and state-law "reporter's shield" protections.

In Camera *Inspection*

In view of Vary's vague boilerplate objections, failure to produce a privilege/work

---

[14]
> *Moon Mtn. Farms, LLC v. Rural Community Ins. Co.,* 301 F.R.D. 426, 428-29 (N.D. Cal. 2014) (quoting *Wultz v. Bank of China, Ltd.,* 304 F.R.D. 38, 43 (D.D.C. 2014) (internal quotation marks omitted)); *see UBS Secur. LLC v. Third Eye Capital Corp.,* No. CV 14–3997 FMO (MANx), 2014 WL 12613381, at *3 (C.D. Cal. Oct. 21, 2014).

product log, and failure to articulate a basis on which the Court might assess the nexus between any documents withheld and the protections invoked, the Court ordered *in camera* inspection of the withheld materials in order to inform its analysis of whether the material should not be produced to Fowler notwithstanding Vary's failure to establish a valid entitlement to privilege.

On June 7, 2022, Vary submitted to chambers the following:

1.  Five USB sticks numbered USB#1 through USB#5 containing various document files.  USB#1 contains Vary's "unpublished, non-confidential material." USB#2 contains the "unpublished, confidential material." USB#3 contains "attorney-client communications from November 4, 2021 . . . to May 31, 2022."  USB#4 contains "non-privileged documents." USB#5 contains "documents reflecting communications between Vary and his . . . mother, father, sister and cousin," none of whom "played any role in the reporting of the articles about Fowler or Rapp."

2.  A copy of a declaration of Vary in opposition to Fowler's motion.

3.  A purported log said to "concern[] confidential source information."

4.  A purported privilege log said to "concern[] attorney-client communications and attorney work product."

5.  A transmittal letter dated June 6 from Vary's counsel that describes the materials just referred to and containing case citations and some legal argument.  The letter bears the legend "Under Seal For *In Camera* Review Pursuant to Court Order, Dkt. 17, 22-mc-00063."  The letter indicates that copies of the letter were emailed to counsel for plaintiff and defendant "*without attachments*, under seal, attorneys' eyes only."  (Emphasis added).

10

In briefing this motion, Fowler reiterates that he does not seek any communications from confidential sources.[15]

### Discussion

*Fed. R. Evid. 501 and Reporter's Shield Laws – New York Law Governs Here*

At the outset, the parties disagree emphatically as to the source(s) of law governing this motion.  Vary insists that he enjoys absolute protection from disclosure under California's reporter's shield[16] and that his documents here are protected to the same extent by the First Amendment.  Spacey rejoins that if any shield law applies on these facts, it is New York's.

As a threshold matter, the Court first must ask whether *either* shield law is relevant to this motion.  Fed. R. Evid. 501 provides that privilege claims in federal court are governed by federal common law unless the U.S. Constitution, a federal statute, or a rule of the U.S. Supreme Court provides otherwise, except that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."[17]

While state law indeed supplies the rule of decision for each of Rapp's claims in the underlying civil action, there remains the question of whether either state's reporter's shield is a law that "governs privilege."  Clearly, California's is not.  The California Supreme Court has held

---

[15]       *See* Dkt. 21, 22-mc-0063, at 1.

[16]       *See* CALIF. CONST. ART. I, §2(b); CALIF. EVID. CODE § 1070(a).

[17]       *Id.*

11

explicitly that "the [California] shield law by its own terms" is "not a privilege."[18]  It is well-established that Rule 501 does not look to state law on nonprivilege immunities even where such protections may be understood colloquially as "privileges" – as is commonly the case with attorney work-product protection, for example.[19]

New York's shield law, on the other hand, uniformly is understood by New York courts to be a law governing privilege.[20]  The statute codifies both (a) an absolute privilege protecting journalists from compelled disclosure of unpublished source identities and news obtained or received in confidence and (b) a qualified privilege for nonconfidential newsgathering material.[21]

---

[18]

    *New York Times Co. v. Superior Ct.*, 51 Cal.3d 453, 456 (1990).

[19]

    *See Condon v. Stephan Mach. Corp.*, No. 90 CIV. 0283 (PKL), 1990 WL 311599, at *3 n.1 (S.D.N.Y. June 18, 1990) ("Pursuant to [Rule 501], the Court is required to apply state law to questions of privilege in diversity cases. However, [the party claiming privilege] has asserted only the work product doctrine of Rule 26(b)(3), which is commonly recognized as a qualified immunity and not  a privilege."); *see also Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 702-03 (10th Cir. 1998); *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 698-99 (S.D. Fla. 2007); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471 (S.D.N.Y. 1993); *Retail Brand All., Inc. v. Factory Mut. Ins. Co.*, No. 05 CIV. 1031RJHHBP, 2008 WL 622810, at *3 (S.D.N.Y. Mar. 7, 2008).

[20]

    In contrast to the California Supreme Court, the New York Court of Appeals made clear that New York's shield law codifies rules of "privilege" rooted in the state constitution. *People v. Combest*, 4 N.Y.3d 341, 345 (2005) ("We first recognized a journalist's privilege in nonconfidential news in *O'Neill v Oakgrove Constr., Inc.* (71 NY2d 521 [1988]), where we determined that our state constitutional guarantee of freedom of the press requires the protection of a qualified privilege when a party to a civil lawsuit seeks nonconfidential information from a news organization . . . .  In 1990, the Legislature enacted Civil Rights Law § 79-h (c) to codify our three-pronged test.").  *O'Neill* and the subsequently amended shield law revised prior interpretations of the statute that had declined to treat it as a law governing privilege. *See, e.g., Apicella v. McNeil Lab'ys, Inc.*, 66 F.R.D. 78, 83-84 (E.D.N.Y. 1975) ("Since no state privilege is created, the state rule has only a limited effect . . . under Rule 501 of the Federal Rules of Evidence[.]") (citations omitted).

[21]

    *See, e.g., Holmes v. Winter*, 22 N.Y.3d 300, 316 (2013); *see also Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 476 (S.D.N.Y. 2016).

Accordingly, New York's shield law has been held to apply in federal court through Rule 501 even where the claim does not involve compelled disclosure of confidential sources.[22]

The Court notes that the conceptual boundary between "privilege" and nonprivilege evidentiary rules is not susceptible to clear-cut or mechanical rules.  As one legal scholar recently has observed, whether a particular evidentiary rule is classifiable as a "privilege" orbits a combination of "common features [that] help to distinguish them from other rules of evidence – specifically, their breadth, power, and extraordinary costs."[23] While there is no settled and definitive test for when a rule of evidence rises to the level of a "privilege" under either New York or California law, their respective high courts' classifications are binding here.  Whether or not a rule of evidence operates as a "privilege" is a matter of legal consequence, not semantics.[24]

In sum, the Court need not embark on the potentially perplexing choice-of-law inquiry the parties invite in their briefs,[25] substantially because there is no "true" or "actual" conflict

---

[22]

See, e.g., Giuffre, 221 F. Supp. 3d at 476.

[23]

Rebecca Wexler, *Privacy As Privilege: The Stored Communications Act and Internet Evidence*, 134 HARV. L. REV. 2721, 2748 (2021); *id.* at 2748-49 (noting that "privileges" often are distinguishable as rules that apply "to every stage of a case, from investigations by law enforcement or criminal defense counsel, to grand jury proceedings, to pretrial, trial, and postconviction proceedings," "shield information from distribution to foreign tribunals," "block not merely the admissibility of evidence in court but also litigants' ability to compel the production of information for their own review" and "can shield information from warrants, subpoenas, and discovery orders" as well as wiretapping).

[24]

See Geoffrey C. Hazard, Jr., *An Historical Perspective on the Attorney-Client Privilege*, 66 CALIF. L. REV. 1061, 1085 (1978) (noting that the choice of "definition of [a] privilege will express a value choice between protection of privacy and discovery of truth and the choice of either involves the acceptance of an evil--betrayal of confidence or suppression of truth").

[25]

For instance, although both parties appear to assume that California's choice-of-law rules apply, the Court knows of no authority that supplies a reasoned answer to the question of whether a Rule 45 transfer obligates the transferee court to employ the transferor forum's

of laws in these circumstances under either state's choice-of-law regime.[26]  And even if there were

a conflict requiring a weighing of interests with respect to Vary's privilege claim, the totality of

contacts and interests relevant to this subpoena strongly favor New York, where *Buzzfeed* was

headquartered at the time Vary – then a *Buzzfeed* employee –  prepared and published his article

about Rapp – a New York resident.[27]

      A second threshold question concerns the extent to which the federal reporter's

---

      choice-of-law analysis.  As a general matter, "the law applicable subsequent to a transfer depends on the statutory provision pursuant to which the transfer was made." *Caribbean Wholesales & Serv. Corp. v. US JVC Corp.*, 855 F. Supp. 627, 629 (S.D.N.Y. 1994). Illustrative of this point is that a Section 1404(a) transfer requires the transferee court to apply the state law of the transferor forum, while a Section 1406 transfer for improper venue does not.

[26]      Even where the relevant state laws differ in material respects, California's choice-of-law analysis weighs the states' relative interests only where there is a "true conflict" – in other words, where the states' respective "interest[s] in the application of [their] own law *under the circumstances of the particular case*" actually diverge. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95, 107–08 (2006) (emphasis added).  Only if "the court finds that there is a true conflict" will it "carefully evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application of its own law." *Id.*  Similarly, New York's choice-of-law analysis first asks whether an "actual conflict" exists. *See In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993).  In New York, an "actual" conflict exists only when the applicable law from each jurisdiction provides for different substantive rules *and* where those rules have the potential to affect significantly the outcome of the case. *See Dish Network Corp. v. Ace Am. Ins. Co.*, 431 F. Supp. 3d 415, 422 (S.D.N.Y. 2019), *aff'd*, 21 F.4th 207 (2d Cir. 2021).  The Circuit thus has emphasized that differences in the law must be "relevant" and portend a "significant *possible* effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005) (emphasis in original).  As discussed above, California's reporter shield falls outside the purview of Fed. R. Evid. 501's state-law exception and thus cannot affect the outcome of this case.

[27]      Where a true conflict exists, New York courts look to see which jurisdiction has the greatest interest in the litigation using a "center of gravity" or "grouping of contacts" approach. *Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (citing *Auten v. Auten*, 308 N.Y. 155, 160 (1954)). In California, if the court finds a true conflict, "it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law 'to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state[,]' and then ultimately applies 'the law of the state whose interest would be the more impaired if its law were not applied.'" *Kearney*, 39 Cal.4th at 108 (quoting *Bernhard v. Harrah's Club*, 16 Cal.3d 313, 320 (1976)).

privilege remains independently operative in the scenario where the New York reporter's shield statute applies through Fed. R. Evid. 501. In *Gonzales v. National Broadcasting Co.*,[28] the Circuit expressly declined to "decide whether the [federal] privilege is founded in the Constitution," noting that its past decisions on this question "have expressed differing views on whether the journalists' privilege is constitutionally required, or rooted in federal common law."[29] If the federal reporter's privilege is derived entirely from the First Amendment, it follows that the Federal Rules of Evidence could not displace it. If it is derived entirely from the federal common law of privilege, then Rule 501's text makes clear that the federal rule would cease to apply.

In this case, such an inquiry is obviated by the fact that the relevant protections supplied by the New York reporter's shield are inclusive of and broader than those supplied by the federal privilege. This is true as to both confidential-source and nonconfidential newsgathering material on these facts. With respect to the former, New York's shield law provides an "absolute" protection from disclosure whereas federal law provides only a qualified privilege that can be overcome. Similarly, the Circuit has made clear that the federal privilege for nonconfidential newsgathering material is subsumed within the protections afforded by the New York statute. Prior to *Gonzales*, the protections applicable to nonconfidential newsgathering material through the federal privilege and the New York statute were "identical."[30] *Gonzales*, however, upended that

---

[28]
     194 F.3d 29 (2d Cir. 1999).

[29]
     *Id.* at 35 n.6.

[30]
     *Id.* at 34 (noting that "the contours of the privilege under federal law [had been] 'identical' to those under the applicable New York statute" with respect to nonconfidential newsgathering material) (quoting *In re Application to Quash Subpoena to Nat. Broad. Co., Inc.*, 79 F.3d 346, 353 (2d Cir. 1996)); *see also United States v. Cutler*, 6 F.3d 67 (2d Cir.1993).

symmetry by narrowing the federal privilege.  Whereas both protections once were overcome only by a clear and specific showing that the information sought was "(i) highly material and relevant; (ii) critical or necessary to the maintenance of a party's claim, defense, or proof of a material issue; and (iii) not obtainable from an alternate source,"[31] the Circuit retethered the federal privilege to a "less demanding" standard, one that asks only whether the materials at issue are (1) of "likely relevance to a significant issue in the case" and (2) "not reasonably obtainable from other available sources."[32]  Accordingly, because the protections afforded by the New York statute are in all respects broader than those potentially applicable here through the federal privilege, it is immaterial whether and to what extent the First Amendment exerts independent force in these circumstances.

*Application of New York Law*

*Vary Acted as "Professional Journalist" Covered by the New York Reporter's Shield*

New York's shield law extends, in relevant part, to the "professional journalist," defined as someone who "for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a newspaper, magazine, news agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public."[33]  The Circuit has acknowledged that the New York statute and the federal reporter's privilege are motivated by an identical "paramount public interest": that of maintaining "a vigorous,

---

[31] *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983).

[32] *Gonzales*, 194 F.3d at 36.

[33] N.Y. Civ. Rights Law § 79-h(a)(6) (McKinney).

aggressive and *independent* press."[34]   The Circuit has held also that those "who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press."[35] It therefore follows that the matter of Vary's independence from Rapp is material to whether he falls within the New York reporter's shield's ambit in this case.

   As discussed in further detail below, a number of the documents Vary withheld from Fowler raise serious questions about the reliability of Vary's reporting and his independence from Rapp.  To be sure, those questions do not arise merely from the fact that Vary and Rapp apparently have been personal friends since 1999.  Rather, what calls Vary's independence into question is the messages to Rapp and other documents indicating Vary's willingness to shape the story to Rapp's objectives, to overlook or massage unverified details, or to directly advise Rapp on public relations strategy.  These statements go far beyond a "point of view" about the subject matter.  In some instances, they come close to painting Vary as a commissioned agent.

   That said, the Court credits for these purposes several instances in which Vary appears to have refused to depart from the editorial process for Rapp, including by refusing an overt request by Rapp to review a pre-publication draft of the story.  The Court sees no indication that Vary made changes to the final story at Rapp's urging, attempted to circumvent his editors, or

---

[34]    *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011) (holding that the federal reporter's privilege is "intended to protect the public's interest in being informed by 'a vigorous, aggressive and *independent* press'") (quoting and adding emphasis to *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir.1987)); *Baker v. F and F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972) (noting that New York state law reflects the same "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment").

[35]    *Berlinger*, 629 F.3d at 308.

17

sought any special treatment for Rapp vis-a-vis *Buzzfeed*. Nor has it encountered any evidence of financial ties linking Vary and Rapp, although Vary appears to have separately courted compensation in connection with a documentary about Fowler where the filmmakers sought Vary's assistance in connecting to potential victims. Still, in all the circumstances, the Court is satisfied Vary acted as a "professional journalist" as defined by this particular statute.

### *Vary's Confidential-Source Materials Subject to Absolute Protection*

The Court first must determine what if any of the material Vary has designated "confidential source" information warrants that classification under New York law. To the extent that Vary was acting as a professional journalist, the statute affords him an absolute privilege from disclosing any "news obtained or received in confidence or the identity of the source of any such news coming into [his] possession in the course of gathering or obtaining news for publication."[36]

In his sealed submission to the Court, Vary identified and segregated the "documents containing unpublished, confidential material protected from disclosure by the reporter's shield" on a single external drive ("USB#2"). The Court notes at the outset that USB#2 principally is organized into fourteen successively numbered folders referring to fourteen different confidential sources, labeled "CS1" through "CS14," respectively. However, the folder marked "CS12" on USB#2 contains no files.

As his cover letter explains, Vary elected to "redact[] or remove[]" certain information from the *in camera* submission on the ground that the unredacted documents would

---

[36] N.Y. CIV. RIGHTS LAW § 79–h(b) (McKinney 2011); *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 107 (2d Cir. 2012). Fowler has clarified also that he is not seeking confidential source materials.

"identif[y] confidential sources" to the Court.  At the outset, the Court is inclined to agree with Vary that "disclos[ing] identifying confidential source information" absent a legal obligation to do so could "irreparably harm his career as a professional journalist."[37]  But it observes also that Vary's *in camera* document production and redactions do in fact identify several of his purportedly confidential sources.  For example, three of the supposedly confidential sources are immediately identifiable because Vary included unredacted copies of identical emails or text messages elsewhere in his submission.  That his submission in many places is internally inconsistent as to whether a particular document represents confidential-source or nonconfidential newsgathering material adds difficulty to the Court's task on this motion.

A key question on this motion is when and whether confidential-source protection carries over to information obtained in confidence by some third-party who later relays that information to a journalist.  The plain text of the statute, which is silent as to intermediaries, extends simply to all "news obtained or received in confidence."[38]  As the text itself makes plain, what matters is whether confidentiality attaches at point at which *the journalist* "obtain[s]" or "receive[s]" the information.  In other words, statutory protection does not attach solely because information at some point upstream of the reporter has traveled in confidence.  Rather, Section 79-h(b) is concerned solely with the nature of the relationship between the journalist and the person from whom he or she obtains information, whatever its content.  So much is confirmed by the final clause, which clarifies that absolute protection attaches "notwithstanding that the information was not

---

[37]     Vary Cover Letter, at 2.

[38]     N.Y. Civ. Rights Law § 79-h(b) (McKinney).

solicited by the journalist or newscaster prior to disclosure to such person."[39]

As a result, New York courts have interpreted Section 79-h(b) to require direct or indirect evidence of an express or implied agreement or understanding that confidential material will not be disclosed.[40] An understanding or agreement can be implied only where it is reasonable to conclude that *both* the journalist and the source, from their acts and conduct and the circumstances, mutually intended for the source's identity or information to remain confidential.  In other words, even if it were apparent that a source desires to remain anonymous or avoid disclosure, the requisite "cloak of confidentiality" still may be absent if the source does not "rely upon [the journalist] to shield" the information.[41]

This point is illustrated by *WBAI-FM v. Proskin*,[42] which determined that confidentiality was lacking where a radio station had received an anonymous phone call advising of the location of a pseudonymous letter about an imminent bomb threat.[43] Even though the source

---

[39] *Id.*

[40] *See, e.g., Knight-Ridder Broad., Inc. v. Greenberg*, 70 N.Y.2d 151, 156-59 (1987); *In re Pennzoil Co.*, 108 A.D.2d 666, 666 (1985); *see also Hennigan v. Buffalo Courier Express Co., Inc.*, 85 A.D.2d 924 (4th Dept. 1981); *People v. LeGrand*, 67 A.D.2d 446 (2d Dept. 1979).

[41] *See Knight-Ridder Broad., Inc.*, 70 N.Y.2d at 156.

[42] 42 A.D.2d 5 (3d Dept.1973).

[43] *Id.* at 7; *see also People v. Korkala*, 99 A.D.2d 161, 165 (1st Dept. 1984) (noting that a "provision contained in the initial version of the [proposed1981 Amendments] that would have eliminated the 'cloak of confidentiality' requirement for invoking the Shield Law was deleted from the version finally passed"); *People v. Bova*, 118 Misc. 2d 14, 19 (Sup. Ct. Kings Cnty. 1983) ("The 1981 amendment to the Shield Law, which extended the protection of the statute to unsolicited information, did not negate the 'cloak of confidentiality' requirement. Protection of unsolicited news is fully compatible with the confidentiality requirement.").

clearly "took pains to conceal his identity," the source's unilateral desire or action to remain confidential did not give rise even to an implicit confidential relationship.

At the outset of this analysis, the Court observed that, with the sole exception of an interview transcript in which Rapp discusses Confidential Source 4 ("CS4"), nothing in Vary's submissions – including Vary's declaration and cover letter – indicates that any of the information on USB#2 that Vary received *from Rapp himself* was obtained "in confidence." As audio recordings make clear, Rapp was well aware of Vary's principal aim, which was "telling your [i.e., Rapp's] story." And, with the sole exception of the interview transcript pertaining to CS4,[44] nothing in Vary's *in camera* production remotely implies that Rapp had different expectations of Vary when identifying or discussing these purportedly confidential sources than he did with respect to the dozens of other people and events he identified by name during the same interviews.

To be sure, that some of Vary's withheld documents are absolutely protected confidential-source materials is immediately apparent. There can be no serious doubt that the submissions for Confidential Sources 1, 2, 3, 4, 8, 11 and 13 should not be disclosed. In the cases of CS1, CS2, and CS3, the withheld materials make clear that all three sources sought and obtained an express verbal assurance of confidentiality at the outset of their respective conversations with Vary. Similarly, the documents corresponding to CS9 and CS11, respectively, are text threads in which the source made clear that he or she would share information with Vary only on the condition that he receive it "off the record" or not for publication. And in the cases of CS4, CS8 and CS13,

---

[44] The relevant interview transcript contains a timestamp and bolded, capitalized text reading **"OFF THE RECORD"** immediately before Rapp shared identifying information about and the sexual orientation of a friend from high school. The Court notes also that the identifying information in this document was highlighted, not redacted, and therefore disclosed to the Court.

the understanding is implicit in Vary's allusions to anonymizations or a notation that the conversation had moved "off the record."

CS5, CS6, and CS7 are entirely different matters.  For one, the materials submitted in connection with these sources are not communications between Vary and the supposedly confidential sources.  Rather, they are communications between Vary and third persons *about* those aforementioned "sources."  In none of those cases does the Court discern any indication that the third person was acting as a necessary intermediary or agent between the designated source and Vary.

With respect to each of these three sources, Vary submitted only a single document. The document marked CS5 is a half-page of interview notes from one of Vary's follow-up conversations with Rapp that appears to detail other reports of sexual assault by Fowler not involving Rapp.  In contrast to Vary's interview notes indicating that Rapp provided information about CS4 in confidence, no part of the CS5 material is marked confidential or off the record, nor does any part of Vary's declaration, source log, or other materials offer any details or circumstances permitting the court to conclude that Rapp discussed CS5 under a cloak of confidentiality.  Indeed, Vary's own declaration explicitly states that he "promised Rapp that [he] would not reveal the identity of a person [Rapp] described" in "*one* instance" only – quite obviously, that instance was the portion of the interview discussing CS4.[45]

The sole document submitted for CS6 is an email exchange between Rapp and CS6 that Rapp appears to have forwarded to Vary unsolicited.  Here, too, nothing in the email thread or anywhere else in Vary's *in camera* submission implies that Rapp relayed those messages to Vary

---

[45]    Vary decl. at 2 (emphasis added).

in confidence or that Vary had reached an understanding or agreement with CS6 directly.

As for CS7, Vary offers what appears to be a copy of a mass email from a *House of Cards* production company representative to certain show personnel about sexual harassment training. Again, nothing in Vary's submission suggests where, from whom, or how he obtained a copy or screenshot of that email, much less that the person who provided it did so under the cloak of confidentiality. Plainly, the Court is without any sufficient basis on which to confer confidential-source protection to the materials associated with CS5, CS6, or CS7.

CS10 and CS14 present the only close questions as to the availability of confidential-source protection. The single document marked CS10 is a copy of a text message exchange between Vary and an "industry source." Similarly, the sole document submitted for CS14 is a text message conversation thread between Vary and a *Buzzfeed* colleague to whom he had sent a partial screenshot of an incomplete email exchange purportedly between CS14 and Vary. Vary, however, failed to submit the complete email exchange to the Court. In both instances, nothing about the message or its context indicates that CS10, CS14, or Vary were under the impression that the information was received in confidence.

Still, Vary avers in his declaration that "[f]or the confidential sources that [he] communicated with directly, [he] made promises to those confidential sources not to disclose those sources' identifying information."

To be sure, it is possible to establish confidential-source protection solely on the basis of a reporter's sworn statements. To interpret Section 79-h(b) to require a writing or some other extrinsic proof of agreement in every case would gut the statute, especially since in the most sensitive cases the absence of such a record may be essential to securing the confidential source's safety.

At the same time, a conclusory declaration such as Vary's is insufficient and unpersuasive. The declaration contains no specific facts about these individual sources, much less facts on which the Court could find that an agreement or understanding formed between particular individuals. It is entirely devoid of information suggesting the scope, timing, or contours of the purported promises, and even where it is clear from the documents themselves that Vary "communicated . . . directly" with a purported confidential source, the submissions are without context as to the nature of those relationships, reason(s) why the sources desired or sought confidentiality, or anything else that might allow the Court to divine an agreement by "common sense."[46] That these facts are missing raises additional questions (1) in light of Vary's failure to submit the complete correspondence for CS14 (as opposed to the partial screenshot he previously shared with his colleague via text) and (2) because CS10 suggests that the confidential communication in question was one transmitted – rather than "obtained or received" – by Vary. It appears from the latter submission that CS10 sought from Vary a copy of a shooting script from *Gore,* an unreleased film starring Fowler. Vary apparently agreed to share it on the condition that the document "remain with [CS10]," to which the source replied: "That's great. I'm a tomb." Of course, the CS10 and CS14 documents may be protected from disclosure for other reasons. But the Court cannot conclude any more from Vary's *in camera* submission than it could from his

---

[46]  *See, e.g., Trump v. O'Brien,* 403 N.J. Super. 281, 300 (App. Div. 2008) (applying New York law) (holding that confidential-source protection attached where journalist "attested to the fact that sources sought confidentiality because of fear of retribution" and where, in light of the facts proffered, "common sense supports the sources' desire for confidentiality since, if identified, it appears inevitable that they would be named as defendants in Trump's defamation suit and would likely suffer additional personal and economic consequences"); *cf. In re Application of Dack,* 101 Misc. 2d 490, 502 (Sup. Ct. Monroe Cnty. 1979) ("The affidavits submitted by reporters . . . are conspicuous in their absence of any descriptions of the circumstances surrounding the imparting of the witnesses' statements. . . . Suffice it to say that respondents have failed to meet their burden of establishing confidentiality.").

24

boilerplate subpoena responses that those materials fall within Section 79-h(b).

In sum, the Court concludes that both the identifies of and the redacted information appearing on USB#2 in the documents marked CS1, CS2, CS3, CS4, CS8, CS9, CS11, and C13, respectively, are subject to absolute protection under Section 79-h(b) of the New York reporter's shield.[47]   In contrast, there is no proper or persuasive basis to afford those protections to the identities or documents associated with CS5, CS6, CS7, CS10, CS12, and CS14, respectively.  Still, as discussed below, the bulk of the documents Vary improperly has designated as "confidential source" material remains protected by the statute's qualified privilege for nonconfidential newsgathering material, albeit under a different standard.

*Vary's Nonconfidential Newsgathering Materials*

The bulk of the remaining materials – including all documents on USB#2 not subject to confidential-source protection – are subject to the reporter's shield's qualified privilege for nonconfidential news and news sources.  The Court concludes that the following are protectable as "news . . . not obtained or received in confidence"[48]: (1) all source identities and documents appearing on USB#1 except (a) communications with Rapp prior to 2017, (b) communications between Vary and attorneys concerning Fowler's subpoena, and (c) 2021 communications with Darlow Smithson Productions concerning Vary's prospective involvement in the documentary film about Spacey; (2) all source identities and documents appearing on USB#2; and (3) one file of 2017

---

[47]
    By the same token, any direct communications or notes of interviews with those sources also
    fall outside the scope of Fowler's subpoena.

[48]
    N.Y. Civ. Rights Law § 79-h(c) (McKinney).

Rapp-Vary text messages that appears to have been mistakenly included on USB#4.[49]

 The question thus becomes whether Fowler has overcome the qualified privilege as to any portion of the nonconfidential newsgathering material. To do so, he must show that the material "(i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source," and in a manner capable of supporting "clear and specific findings" that those requirements have been met.[50]

 The dispositive issue here is whether any portion of Vary's nonconfidential newsgathering material "is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto."[51] While the New York Court of Appeals has yet to interpret this particular portion of Section 79-h(c),[52] the Circuit has adopted an interpretation that requires a clear and specific finding that "the claim for which the information is to be used 'virtually rises or falls with the admission or exclusion of the proffered evidence.'"[53] The test is "not merely that the

---

[49]

 As the Court has noted already, Vary designated USB #1 for the "unpublished, non-confidential material" and USB#2 for the "unpublished, confidential material." USB#4 is marked simply "non-privileged documents." The Rapp-Vary text thread that appears on USB#4 is duplicative of messages already included on USB#1.

[50]

 N.Y. CIV. RIGHTS LAW § 79-h(c) (McKinney); *see Matter of Perito v. Finklestein*, 51 A.D.3d 674, 675 (2d Dept. 2008); *Flynn v. NYP Holdings*, 235 A.D.2d 907, 908 (3d Dept. 1997).

[51]

 N.Y. CIV. RIGHTS LAW § 79-h(c) (McKinney).

[52]

 *See People v. Juarez*, 31 N.Y.3d 1186, 1203 (2018) (Rivera, J., dissenting) ("This Court has not previously opined on the proper standard to use to assess whether a party has fulfilled the 'critical or necessary' prong for the disclosure of information enjoying a qualified privilege.").

[53]

 *In re Application to Quash Subpoena to Nat. Broad. Co., Inc.*, 79 F.3d 346, 351 (2d Cir. 1996) (quoting *United States v. Marcos*, No. 87 CR 598, 1990 WL 74521, at *3 (S.D.N.Y.

26

material be helpful or probative, but *whether or not the defense of the action may be presented without it.*"[54]

Fowler argues principally that the subpoenaed records are necessary to proper evaluation of Rapp's credibility.  While the Court certainly expects that the claims and defenses in this case are likely to rise or fall on questions of credibility generally, it notes also the lingering doubt surrounding whether credibility is *ever* a proper basis for overcoming the qualified privilege, even where credibility is "the central issue in the case."[55]  What is more, even if this case does rise or fall on the issue of Rapp's credibility, as indeed is likely, it still would require a sizeable leap to hold that it rises or falls on the admission or exclusion of *Vary's documents*.  Generally speaking, it is more difficult to establish that such disclosure is critical or necessary to maintaining an action where the movant seeks unpublished statements of an opposing party, rather than those given by the movant him or herself.[56]  Although Fowler already is in possession of text messages indicating that Vary may have had a motive to omit or change details to protect Rapp from later being contradicted about inaccurate statements, he is not in a position to show how the undisclosed materials – at least those falling within the qualified newsgathering privilege – would render Rapp's claim non-viable.

---

[54]
     June 1, 1990)).

[55]
     *In re Application to Quash Subpoena to Nat. Broad. Co., Inc.*, 79 F.3d at 351 (quoting *Doe v. Cummings*, No. 91–346, 1994 WL 315640, at *1 (Sup. Ct. St. Lawrence Cnty. Jan. 18, 1994)) (emphasis added).

[56]
     *Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 479–80 (S.D.N.Y. 2016); *see In re Am. Broad. Companies, Inc.*, 189 Misc.2d 805, 808 (Sup. Ct. N.Y. Cnty. 2001) ("[T]he privilege may yield only when the party seeking the material can define the specific issue, other than general credibility, as to which the sought-after interview provides truly necessary proof.").

     *See, e.g.*, *People v. Combest*, 4 N.Y.3d 341 (2005).

The Court already has determined on summary judgment that Fowler's defense is viable even without those materials.  The New York Legislature amended the shield law to create a qualified privilege so that nonconfidential material would be subject to disclosure only as "*a last resort*."[57] Accordingly, at least under the Second Circuit's present interpretation of Section 79-h(c), Fowler cannot overcome Vary's qualified privilege as to the abovementioned newsgathering materials.

*Attorney-Client Privilege and Work-Product Protection Not at Issue*

The Court need not determine here whether Vary's communications with his, Rapp's, or *Buzzfeed*'s attorneys are protected by the attorney-client privilege, since the attorney communications he submitted all are outside the scope of the subpoena.  For that reason, Vary need not produce the attorney communications included on USB#1 or USB#4 nor any document appearing on USB#3 save for the privilege log.

*Materials Not Privileged or Protected*

Having identified those portions of the withheld material properly "protected from disclosure by the Reporter's Privilege/Shield,"[58] what remains at this juncture are the materials on USB#4 (other than the attorney communications and the 2017 Rapp-Vary text messages), Vary's pre-2017 communications with Rapp and 2021 messages regarding the Fowler documentary on USB#1, and all of USB#5.  As the Court noted earlier, Vary's *in camera* submission identifies

---

[57]

*In re Am. Broad. Companies, Inc.*, 189 Misc. 2d 805, 808 (Sup. Ct. N.Y. Cnty. 2001) (emphasis in original).

[58]

*See, e.g.*, Joint Stipulation (Dkt. 1-1, 22-mc-0063), at 61.

USB#4 simply as "non-privileged documents."  And because Vary already has segregated the nonconfidential and confidential news materials on USB#1 and USB#2, respectively, it is not clear whether Vary even intends to assert that any of the materials on USB#4 is subject to any privilege or other substantive immunity.  Nevertheless, the Court has no difficulty concluding that nearly all of them are not, principally because they are available already to Fowler or to the public.  Indeed, the majority of the documents are public court filings and final versions of published news articles. Others plainly are irrelevant in that they have no discernible connection to Rapp, Fowler, or any portion of the subpoena.  Ultimately, the Court is satisfied that Vary need not produce any documents on USB#4 aside from two files of Twitter messages between Vary and the representative from Darlow Smithson Productions, as those messages are referenced in and belong to the USB#1 email exchange about the Fowler documentary.

Vary's pre-2017 communications with Rapp and the 2021 messages about the Fowler documentary are a different story.  First, it should go without saying that those documents are wholly unrelated to newsgathering.  Nothing in the pre-2017 exchanges between Rapp and Vary suggests a professional relationship or the prospect of future reporting on Rapp.  Meanwhile, the messages about the Fowler documentary are simply about whether Vary might take on a paid role in connection with that film, separate from his employment as an entertainment writer.  Both documents are relevant to Rapp's credibility in connection with his publicly reported account of what transpired in 1986.  To be sure, neither Vary's credibility nor the accuracy of his reporting is a focus of this motion.  But whether Vary had a motive to omit or change details to protect Rapp from later being contradicted about an inaccurate statement plainly is germane to Fowler's defense

here, particularly in light of the text messages already produced by Rapp.[59]

Lastly, also relevant is a brief text exchange between Vary and Vary's father on USB#5, which contains "documents reflecting communications between Vary and his . . . mother, father, sister and cousin," none of whom "played any role in the reporting of the articles about Fowler or Rapp." Obviously, what Vary's family members think about his reporting or about Kevin Spacey has no bearing on the merits of Rapp's suit. One of the messages, however, is relevant for a different reason, namely that it alludes to a negative interaction among Vary, Vary's father, and Fowler at a restaurant prior to publication of the 2017 *Buzzfeed* story. The Court concludes that this message and incident are relevant to the reliability of Vary's reporting on Rapp and therefore Rapp's credibility – on which this entire case turns.

The Court reaches its conclusion that the aforementioned documents comfortably satisfy Rule 45's relevance threshold in part as a function of its extensive *in camera* review, which yielded new questions about the reliability and independence of Vary's reporting on Rapp's allegation. While those questions were insufficient to place Vary outside the ambit of the New York reporter's shield, they certainly make more relevant any potential motives to obscure unverifiable or inaccurate information that Rapp may have recounted to Vary when initially deciding to go public.

*Vary's Objections to the Document Requests*

As noted earlier, Vary objected to all of the document requests. He repeated the same

---

[59]    Indeed, the questions going to Vary's pre-2017 ties to Rapp were among the comparatively few that Vary answered and to which his attorney did not object at the deposition. *See* Vary Dep. (Dkt. 1-3, 22-mc-0063), at 58-60.

boilerplate with respect to each, objecting

> "to the extent that it calls for material protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or doctrine [and] . . . to the extent it calls for the disclosure of material protected from disclosure by the right to privacy [and] . . . as vague, ambiguous, overbroad and unduly burdensome [and] . . . to the extent that it calls for material that is publicly available and/or equally accessible to the Subpoenaing Party [and] . . . to the extent that it calls for material not in Vary's possession, custody or control [and . . . ] to the extent that it calls for material that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence [and] . . . on the grounds that the burden associated with searching for and producing potentially responsive materials, if any, is not proportionate to the relevance, if any, of the requested material."[60]

This course warrants comment quite apart from the issues discussed above.

As an initial matter, an objection to a request "to the extent that" it calls for something meeting a particular description or is framed in an allegedly objectionable way is useless because it informs neither the requesting party nor the Court of what if anything, has been withheld. It thus leaves everyone at sea as to whether there is something to litigate about and leads to the needless expenditure of time and money.

To put a finer point on it, Vary failed to articulate or even imply a good faith basis for asserting *any* of these boilerplate objections. Certainly Vary's counsel failed to rely on any of them in opposing Fowler's motion to compel compliance with the document subpoena. No privilege/work product log nor any other showing of nexus between any document(s) withheld and the privilege/protection invoked was submitted as would have been required by Fed. R. Civ. P. 45 and this Court's local civil rules had there been any claim of attorney-client privilege or work

---

[60] Vary Subpoena Objections (Dkt. 1-7, 22-mc-0063), at 5.

product protection.[61]   There was no substantiation for any claim of burden, and a reading of the subpoena makes clear that there was nothing vague, ambiguous or overbroad about it.   The possession, custody and control objection was superfluous because the subpoena itself, by incorporation of Fed. R. Civ. P. 34(a)(1)(A) in its definition of "document," is expressly limited to materials "in the responding party's possession, custody, or control."[62]   Meanwhile, the purported relevance objection failed to identify any extent to which any of the requests called for irrelevant material.

Objections in these terms are inappropriate.   This Court is unlikely to tolerate them again.

### *Conclusion*

For the foregoing reasons, Fowler's motion to compel is GRANTED to the extent that it seeks (a) production of Vary's pre-2017 communications with Rapp, 2021 communications with Darlow Smithson Productions, and documents regarding any interactions between Vary and Fowler and (b) a supplemental deposition.   Vary shall sit for a supplemental deposition not to exceed four hours and answer, to the extent consistent with this Memorandum Opinion, all questions he refused to answer at his initial deposition and all reasonable follow up questions and questions about or relating to the newly produced documents and matters disclosed therein.   The documents shall be produced no later than August 15, 2022.   The supplemental deposition shall take place on a date mutually acceptable to Vary and the parties, which shall be on or before September 9, 2022.   It

---

[61]   See In re Chevron Corp., 749 F. Supp. 2d 170, 180 (S.D.N.Y. 2010), aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp., 409 F. App'x 393 (2d Cir. 2010); see also RG Abrams Ins. v. L. Offs. of C.R. Abrams, No. 221CV00194FLAMAAX, 2022 WL 422824, at *15 (C.D. Cal. Jan. 19, 2022); Fed. R. Civ. P. 45(e)(2); S.D.N.Y. Local Civ. R. 26.2.

[62]   Fed. R. Civ. P. 34(a)(1).

otherwise is DENIED.  In addition, the order to show cause dated June 13, 2022 (Dkt. 220, 20-cv-9586) is discharged.  Items 3, 4 and 5 listed in that order will be filed on the public docket on or after August 11, 2022.

        SO ORDERED.

Dated:       August 9, 2022

                                       Lewis A. Kaplan
                             United States District Judge