# Exhibit 1

Lisa M. Rocchio, Ph.D.
1524 Atwood Avenue, Suite 222
Johnston, RI 02919
P: 401-751-5880
F: 401-751-5881
lrocchio@drlisarocchio.com

**Summary of Forensic Psychological Evaluation**

| | |
|---|---|
| **Name:** | **Anthony Rapp** |
| **Date of Birth:** | **10/26/1971** |
| **Dates of Evaluation:** | **2/6/2021, 2/7/2021, and 2/12/2021** |
| **Place of Evaluation:** | **Secure video-conferencing software (Zoom) while Mr. Rapp was required to remain in Canada due to Covid-19 travel restrictions while filming** |
| **Date of Report:** | **02/25/2021** |

**Introduction**

Anthony Rapp was evaluated at the request of his attorney, Peter Saghir, Esq. who is representing him in the matter of *Anthony Rapp and C.D. (Plaintiffs) against Kevin Spacey Fowler, aka Kevin Spacey (Defendant.)* Mr. Saghir represented that his client Mr. Rapp had reported being sexually assaulted by Mr. Spacey at Mr. Spacey's home when Mr. Rapp was fourteen years old. Mr. Saghir requested a complete forensic psychological evaluation of his client to determine if he has suffered or is suffering from any psychological symptoms, difficulties, impairments in functioning, psychological difficulties or mental disorders, and if so, whether they are attributable in whole or part, to this alleged assault.

**Informed Consent**

Prior to the start of the evaluation, Mr. Rapp was informed of the nature and purpose of the forensic evaluation. He was made aware of the limits of confidentiality and was told that the results of the evaluation would be provided to his attorney and could then become part of the record of the Court. Prior to the start of the evaluation, he was also told that if a case were to be filed, I may be called to testify in court. Mr. Rapp was made aware that his participation in this evaluation was completely voluntary, and that he could choose to end the evaluation at any time. It is my opinion that he understood the purpose of this evaluation, the limits to confidentiality, and my role. Mr. Rapp provided written consent for participation in the evaluation and for the release of this information to his attorney. He also provided written consent for my communication with any collateral interviews that were conducted as part of this evaluation.

**Evaluation Methods**

Mr. Rapp was evaluated via Zoom for a total of nine hours and thirty minutes over the course of three days. Evaluation methods included a semi-structured psychosocial history interview, structured clinical interviews, and the administration of several psychological tests, checklists, and structured questionnaires. Additionally, in preparing this report,

documents that were made available by Mr. Saghir and a book authored by Mr. Rapp were reviewed, and collateral interviews were conducted.

**Additional Sources of Information**
1. Notice of Complaint dated 09/08/2020
2. Book entitled: Without You: A Memoir of Love, Loss, and the Musical Rent, authored by Anthony Rapp
3. Rapp exhibit B: Combined texts
4. Twitter post by Kevin Spacey dated 10/30/2017
5. Buzzfeed article by Adam Vary dated 10/29/2017 and updated 10/30/2017 entitled "Actor Anthony Rapp: Kevin Spacey Made A Sexual Advance Toward Me When I Was 14."
6. Indie Wire article by Jude Dry dated April 17, 2019 entitled "Lupita Nyong'o Inspired Anthony Rapp to Speak Out About Kevin Spacey."
7. Buzzfeed article by Adam Vary dated 10/12/2018 entitled "Anthony Rapp Says It's Still Hard For Men To Say #MeToo
8. Article and video clips on Broadwayworld.com dated January 16, 2019 entitled "VIDEO: Anthony Rapp Discusses Kevin Spacey, RENT LIVE With BuzzFeed News"
9. Transcript of deposition of Anthony Rapp dated 02/03/2021
10. Collateral Interview conducted via telephone with Sean Snow on 02/17/2021 for 55 minutes
11. Collateral Interview conducted via telephone on 02/19/2021 with Robin Magid, LiCSW, for 1 hour and fifteen minutes
12. Collateral interview conducted via Zoom videoconferencing on 2/20/2021 with Ken Ithiphol for one hour

**Relevant Background Information**
*Childhood and Family History*
Mr. Rapp was born in Chicago, Illinois, and raised in Joliet from the age of two. He reported that he met all developmental milestones within expected time limits. He was raised primarily by his mother, as his parents divorced when he was two years old and he did not have much of a consistent relationship nor frequent contact with his father until later in life. Mr. Rapp reported that he and his father's relationship was never particularly paternal, but that he and his mother were extremely close. Mr. Rapp's mother died of cancer in May of 1997, and his father is currently living in an assisted living facility in Evanston Illinois.

Mr. Rapp is the youngest of three children, and he has a sister Anne who is four years his senior and a brother Adam who is three years older.  Mr. Rapp's mother also took over the care for her niece Rachel, who lived with the family from infancy, beginning when Mr. Rapp was in high school. Mr. Rapp considers Rachel to be his sister. In addition, his father has remarried twice, and has a daughter Alyssa in her early 40's and a son Jeffrey in his early 30's from his second marriage.  Mr. Rapp described close and positive

relationships with all his family members. Although there have been times of tension in his relationship with his sister Anne, they have never been estranged, and Mr. Rapp reported that he and his brother Adam are especially close.

*Educational History*

Mr. Rapp attended a private school in Joliet, IL for first and second grades, and then public schools in Joliet through graduation in 1988. He reported engaging in some independent study and working with tutors while on tours, and stated that he was successful in school, and made friends easily, though he described himself as a bit of a "nerd." Following graduation from high school, Mr. Rapp moved to NY, where he completed one semester at Tisch, NYU.

*Occupational History*

Mr. Rapp reported that he became involved with acting at a young age while attending summer camp. His first professional acting position was around the age of nine, when he performed as an understudy in a performance of Christmas Carol in Chicago. He stated that he loved it, did very well, and soon after obtained his actor's equity card. He then performed in Evita in Chicago, also at the age of 9. Between the ages of 10 and 17 when he began at Tisch, he performed in Broadway shows, went on tours with travelling companies, and attended Summer Stock as well as summer camps. He stated that his mother supported his acting and accompanied him as he performed and travelled, initially in Chicago, and then in NY and on national tours. Throughout this time period, he also performed in films, voice-overs, and commercials. His career continued to grow, and he performed in several more Broadway and off-Broadway productions as well as films, and then a workshop production of RENT in 1994, which lead to his performing in the off-Broadway and Broadway productions as well as the touring performances and eventual film in 2005. Since that time, he has continued with a very successful and acclaimed acting career, and is currently filming season 4 of his role in Star Trek Discovery, which began in 2017.

*Psychosocial History*

Mr. Rapp reported that he has always been a bit shy in social situations, but that he gets along well with others and made friends easily. He reported that due to the nature of his work as a young actor, he often interacted with adults, and was frequently in shows and on tour where he was the only child or adolescent. He reported that both prior to, and following the alleged sexual assault by Mr. Spacey, his interactions with adults had been generally positive and supportive. Prior to the alleged incident with Mr. Spacey, he experienced the adults in the theatre community to be safe, and did not feel that he needed to be "on guard" or particularly careful regarding issues related to safety. He has many close friends and a strong support system, and a number of his friendships have been of a very longstanding nature, and some have lasted for twenty-five to thirty years.

*Sexual History*

Mr. Rapp reported that he began what he described as consensual "fooling around" in the form of mutual masturbation or masturbation in each other's presence around the age of

eleven or twelve with two of his male friends. He described having his first "crush" and kiss with a boy at summer camp in 1986. Mr. Rapp told me that his first experience of more intimate sexual contact occurred the fall of 1986 when he was a sophomore and the other boy was a senior, referred to by the pseudonym "Ricky" in his book. He stated that though the interaction was initiated by "Ricky", he experienced their sexual encounter as wanted and voluntary on his part. At the time, Mr. Rapp believes that "Ricky", then a fellow student who was a senior was approximately aged 17 or 18, though he is described as age 18 in Mr. Rapp's book. Mr. Rapp and "Ricky's" sexual encounters were reportedly observed by a friend's father, and were then disclosed to Mr. Rapp's mother, who expressed significant concern about the age difference between the boys, and who asked Mr. Rapp to stop having contact with this other student. Mr. Rapp acknowledged that had "Ricky" been age 18 at the time, their sexual encounter would have been illegal under the laws of Illinois at the time, but stated that he remains, even to this day, uncertain as to "Ricky's" exact age at the time. In addition, he reported that he did not consider this interaction to have been non-consensual or unwanted, and experienced himself as a willing participant. He further denied experience trauma or stress related symptoms in response to this incident, either in the past or currently.

Mr. Rapp reported that he was aware of his sexual attraction to boys and identified as queer in his teen years, and stated that he had his first "real boyfriend" at the age of 18. He then made a decision to come out publicly as a queer man during his next relationship, by publicly thanking his boyfriend at the time in his theatre bio, when he was around the age of twenty. He stated this occurred sometime during their relationship which occurred between the years of 1991-1993. Mr. Rapp stated that he considered himself to be a "serial monogamist" and had several other monogamous relationships, and that apart from his current relationship with Ken Ithiphol, the longest relationship lasted approximately five years with a man who he identified by the pseudonym "Todd" in his book in order to protect his privacy.

Mr. Rapp's relationship with "Todd" began in 1996, and was characterized as both intense and tumultuous. "Todd" was Mr. Rapp's partner during the time of his mother's cancer treatments and death on May 22, 1997, and their relationship and its challenges are described in greater detail in Mr. Rapp's memoir. It was following a single violent and public fight with "Todd" that he decided to begin psychotherapy to help cope with his anger and grief related to his mother's death.

Mr. Rapp reported that he had other significant relationships prior to becoming involved with his current partner, Ken, in 2016. He also stated that over the course of some of these relationships he engaged in "random hookups" and sexual behavior that he believes was and is inconsistent with his value system and about which he feels a great deal of guilt and shame. He reported that during this time in his life, he had great difficulty asserting his boundaries and often found himself "going along" with sexual activity when he was approached, even if he was not interested at the time.

*Legal History*

Mr. Rapp denied any involvement with the legal system outside of the context of this current legal matter

*Medical, Psychiatric, and Substance Abuse History*
Mr. Rapp denies a history of substance use disorder or difficulties with substances. He reported occasional alcohol and marijuana use, as well as a single episode of use of hallucinogenic mushrooms. He stated that he first sought psychotherapy in 1997 with Robin Magid, LiCSW, initially to help him to cope with grief and bereavement related to his mother's cancer and eventual death in May, 1997. Mr. Rapp also experienced intense grief, sadness and loss related to the sudden and traumatic death of Jonathan Larson in January, 1996. He reported, and Ms. Magid confirmed, that that episode of psychotherapy was primarily focused on issues related to grief, bereavement, relationships, and emotional regulation, and that they met regularly for a period of several years. They then met on a less regular basis, described as "on and off as needed" until they began a second episode of more regular treatment around 2016.

Both Mr. Rapp and Ms. Magid reported that he did not disclose the alleged sexual assault by Mr. Spacey during the first episode of treatment, and that he first began to speak of it with her around 2016 or 2017 as he was preparing to make a public statement about his experiences. Mr. Rapp reported, and Ms. Magid confirmed, that during their work together since that time, treatment has focused on Mr. Rapp's growing awareness of the psychological impact of the alleged assault by Mr. Spacey and on its negative effects on Mr. Rapp's emotional and psychological health, treatment of his trauma related symptoms, his behavior in relationships, and difficulties he has had regarding expressing his feelings and honoring and asserting his boundaries. They have also worked on ways that these issues have impacted Mr. Rapp's relationship with his current partner. In addition to talk therapy, they have addressed trauma symptoms related to the alleged assault by Mr. Spacey through the use of Eye Movement Desensitization and Reprocessing (EMDR.) EMDR is an evidence-based form of psychotherapy that is commonly used to treat trauma related symptoms.

**Report and Context of Alleged Sexual Assault by Kevin Spacey**
Mr. Rapp's description to me of the events he experienced the night of the alleged assault by Mr. Spacey was consistent with reports and descriptions made in other materials I reviewed, such as Buzzfeed articles and text exchanges with others, his deposition, and information provided to me during collateral interviews with his psychotherapist, his friend of 30 years, and his current partner.

Mr. Rapp stated that he began rehearsals for the production of Precious Sons in January of 1986, and was living in NY with his mother during the time of the rehearsals and performances. The play ran until sometime in the late spring or early summer, and Mr. Rapp was unsure of the exact date. During that same time period, he said that Mr. Spacey was performing in the Broadway production of Long Day's Journey into Night. As Mr. Rapp explained to me, at that time, actors performing on Broadway frequently were aware of each other and viewed each other's work, particularly when that work received

critical acclaim. He told me that he recalled briefly meeting Mr. Spacey at some sort of
an awards celebratory luncheon or dinner, and that sometime in May a friend of his
named John from Illinois visited NY to see Mr. Rapp perform. He stated that during his
friend's visit, which he believed lasted for about one week, the two of them went to see
the show Mr. Spacey was performing in, and that after the show, the two of them went
backstage to meet the cast. He stated that it was common for actors to go backstage after
viewing other's performances.

Mr. Rapp reported that while backstage, he and his friend John, who was around
seventeen or eighteen at the time, (Mr. Rapp was fourteen) met Mr. Spacey, who invited
the two of them out for a meal after the show. He said that the three of them went to a
local dining spot near the theatre for dinner and that Mr. Spacey then invited the two of
them to the "Limelight" which was a nightclub, though Mr. Rapp did not know that at the
time. The boys agreed to go, and Mr. Rapp said that when they arrived, he observed Mr.
Spacey speaking to someone at the door, and that the three of them were then let in and
escorted to a roped off area that he now realizes was the "VIP" area of the nightclub. Mr.
Rapp stated that at that time, he found Mr. Spacey to be friendly and collegial, and was
unaware of any inappropriate behavior on Mr. Spacey's part at the time. However, he
also told me that he now realizes that it was not appropriate, and probably illegal, for an
adult to bring two underage boys, aged fourteen and seventeen or eighteen to a nightclub.
In addition, he told me that his friend John has since told him that Mr. Spacey was
touching his leg and knee throughout the evening under the table.

Mr. Rapp said that at some point during their time at the nightclub, Mr. Spacey
mentioned that he was having a gathering at his apartment and invited Mr. Rapp to
attend. He also provided Mr. Rapp with his address, and Mr. Rapp agreed to go. Mr.
Rapp stated that he did not find it unusual to be invited to an adult gathering, and had
frequently attended events such as cast parties or events following shows with other
actors, so he had no reason to be concerned, and did not find the invitation to be unusual.
In addition, Mr. Rapp stated that as a fourteen-year-old boy with few peers or young
friends in the city, he had become embarrassed about doing things with his mother, and
was eager to go to places on his own and to have more independence.

Though he was unclear about the exact date, Mr. Rapp said that he believes the gathering
was several nights later, and that he attended alone. He described being impressed by the
glass high rise building, and stated that Mr. Spacey's apartment was several floors up. He
stated that when he arrived, he was greeted at the door and let in by Mr. Spacey, and that
there were a few other adults at the party, none of whom he knew or recognized. Mr.
Rapp told me that although he felt a little uncomfortable at the gathering given that he
didn't know anyone, he wanted to stay out, again because he didn't want to go home
early to his apartment with his mother. He also stated that he saw a bedroom off of the
main room, and the door to that room was opened. Because he didn't know anyone, he
went to that bedroom and spent some period of time watching television while sitting on
the side of the bed. Though he could not describe the exact timeframe, Mr. Rapp believes

he watched the David Letterman Show, and that Molly Ringwald may have been the guest that evening.

Mr. Rapp said that he lost track of time while watching television, and that at some point realized that Mr. Spacey was standing in the doorway. He stated that he believed Mr. Spacey was intoxicated as he looked somewhat bleary eyed and was swaying slightly. He also reported that he did not hear any other voices in the other room and did not see anyone behind Mr. Spacey, and assumed that everyone else had gone home, and he was now in the apartment alone with Mr. Spacey. Mr. Rapp then told me that Mr. Spacey walked from the doorway and approached the bed, where Mr. Rapp was sitting upright and watching television, picked Mr. Rapp up "like a groom picks up a bride" with one arm holding his upper torso and his other arm moving down, grazing his buttocks, down his legs, and then holding him behind his knees. After picking him up, Mr. Spacey placed Mr. Rapp on the bed, face up with his head near the headboard of the bed. Mr. Rapp told me that Mr. Spacey then lay his full body on top of Mr. Rapp, with the full weight of his body on that of Mr. Rapp's. He said he remembers feeling Mr. Spacey's chest on his chest, and his pelvis pressing into his hip, as well as the weight of Mr. Spacey's body, which he described as feeling like "dead weight." Though their bodies were not completely aligned, Mr. Rapp said that Mr. Spacey's arms were holding his back behind his shoulders, and that his pelvis and legs were also laying on his, though at a slight angle. Mr. Rapp said that while he was confused and shocked, it was clear to him that there was sexual intent in Mr. Spacey's behavior at the time

Mr. Rapp described feeling shocked, confused, and frightened. He said that he "squirmed out" from under Mr. Spacey and went to the bathroom, which was closest to him, and shut the door to try to collect himself and make sense out of what had happened, and to figure out what to do. While in the bathroom, he saw a picture of Mr. Spacey with another man, and had the thought that Mr. Spacey was gay, and that somehow explained his behavior. Mr. Rapp was frightened and believed that he needed to get out of the apartment as quickly and safely as possible. He stated he then left the bathroom and walked to the door of the apartment. He told me that Mr. Spacey followed after him, and that while Mr. Rapp was in the hallway, outside of the apartment, Mr. Spacey stood in the doorway and asked him if he was sure he wanted to leave. Mr. Rapp said that he replied that he was sure, said good night, and walked home to his apartment where he lived with his mother.

**Context and Aftermath of the Alleged Sexual Assault:**
Mr. Rapp reported that following his alleged experience of sexual victimization by Mr. Spacey, he attended summer camp and that during that summer, he disclosed the incident to a friend at camp. He stated that he attempted to put the incident with Mr. Spacey out of his head, characterized it to himself as "weird" and "uncomfortable," and felt confused about how to understand what had happened. He minimized both the event and its impact on him, and even initially believed that as an actor, he was somehow obligated to "put it behind him" and to watch Mr. Spacey's performances and work. In addition, he continued to actively pursue his own professional acting career.

Mr. Rapp said following this episode of victimization, he began having an unusually intense interest in being "pursued" or "wanted" sexually by others, and frequently focused on whether or not others were interested in him sexually. He reported that these feelings did not feel consistent with what his peers were describing as normal sexual interest or "horniness" associated with adolescence. Mr. Rapp also reported to me that this preoccupation with being wanted or pursued, accompanied by difficulty saying no or setting boundaries around sexual behavior continued into much of his adult life. He reported that as time went on, he felt "compelled" to respond sexually when others showed him sexual interest, and described engaging in behaviors while feeling almost as if he did not have a choice in the matter. He described multiple incidents where he consented to and participated in sexual encounters with men in whom he had no real interest nor desire. He described feeling a great deal of shame and embarrassment about these behaviors, and described them as contradictory to his own personal values. Mr. Rapp had difficulties respecting his own limits and setting boundaries, particularly when it came to sexual interactions, and also had consistent difficulties in intimate relationships. His self-report was consistent with information contained in other documents reviewed and with information reported during collateral interviews with his current partner, his friend of thirty years, and his psychotherapist. He said it did not begin to change until around 2016 when he began the complicated process, not yet finished, of dealing with his experience of victimization and its negative impact on him in psychotherapy.

Mr. Rapp reported that his efforts to "just move on" and "forget what happened," or to avoid thinking about Mr. Spacy eventually were unsuccessful, and described a particularly intense incident at the age of sixteen where he was in a movie theatre watching a movie that he did not realize Mr. Spacey would be acting in. He described experiencing an "electric shock" and extreme startle reaction, accompanied by a "freeze response" when Mr. Spacey came onto the screen. As Mr. Spacey's fame and artistic acclaim rose, it became harder and harder for Mr. Rapp to avoid exposure to discussions or information having to do with Mr. Spacey. He described experiencing fear, confusion, shame and guilt, as well as intrusive memories of the assault, alternating with continued efforts to avoid thinking about it. He was also fearful of running into Mr. Spacey and described two instances where he encountered him. One was when Mr. Spacey visited the set of a film Mr. Rapp was performing in, and the other was when Mr. Spacey entered a public bathroom while Mr. Rapp was preparing to leave. On both of those occasions, Mr. Rapp again experienced a "freeze" response and feelings of violation, shame, fear, and uncertainty. He worried that Mr. Spacey could negatively impact his career, and was fearful that he would be in a situation where the two of them would be forced to interact. In addition, as he grew older, he became more and more aware of how inappropriate, illegal, and victimizing it was for a man in his 20's to sexually assault a fourteen-year-old boy.

In 2017, as more and more individuals, particularly in the entertainment industry, began to speak about their experiences of harassment and assault in the context of #MeToo, Mr.

Rapp began to feel he needed to speak publicly about his experience. He was particularly influenced by a story shared by Lupita Nyong'o about her experiences with Harvey Weinstein.  In addition, Mr. Rapp, as confirmed by collateral interviews and documents reviewed, became aware of other allegations that Mr. Spacey had perpetrated sexually inappropriate behavior toward others, and felt ashamed and guilty about not coming forward sooner. He was saddened and angered by the idea that many others were aware of Mr. Spacey's alleged predatory behaviors and had not taken action to speak out or prevent further behavior. His hope was that he could both prevent others from being hurt by Mr. Spacey, and give others the courage to come forward. As he had done when he chose to publicly come out as a queer man, he wanted to serve as a role model for others, particularly men, who may feel shame and fear about coming forward with their own experiences of sexual assault and harassment.

Mr. Rapp chose to give a Buzzfeed article in which he named Mr. Spacey and described his experience of sexual assault. Since that time, he has spoken publicly about his experience of victimization, has given other interviews, and has made himself available to speak with other survivors of sexual assault. He has received much feedback from others, mostly positive, although he has also been criticized and his mother has been blamed for allowing him to attend the party in the first place. The criticisms of his mother were particularly painful, but Mr. Rapp has reported that although his 2017 disclosure exacerbated his trauma-related psychological symptoms resulting from the victimization, which he continues to experience, he still believes he made the right decision.

### Psychological Testing Results and Interpretation

Mr. Rapp was evaluated using a semi-structured psychosocial history interview, structured clinical interviews and the administration of several psychological tests, checklists and structured questionnaires.

### Psychological Tests and Structured Questionnaires

Psychosocial History Interview
Clinical Interview
Folstein Mini Mental Status Exam-2
Beck Depression Inventory – 2 (BDI 2)
Beck Anxiety Inventory (BAI)
Mood Disorders Questionnaire (MDQ)
Personality Assessment Inventory (PAI)
Miller Forensic Assessment of Symptoms (M-Fast)
Trauma Symptom Inventory-2 (TSI-2)
Adverse Childhood Experience (ACE) Questionnaire
Life Events Checklist (LEC)
Posttraumatic Checklist 5 (PCL-5)
Clinician-Administered PTSD Scale for DSM-5 (CAPS-5)

*Mental Status, Validity, and Response Style*

Mr. Rapp is a 49-year-old man of mixed European-American descent. He was well-groomed and neatly, casually dressed for our meetings. He was polite and cooperative with all phases of the evaluation process, and was forthcoming and responsive to questions throughout the evaluation. Mr. Rapp was fully oriented to person, time, and place. He consistently appeared to be making his best effort to respond to my questions and asked questions of me as was appropriate. Speech was clear, with demonstrated insight and no observed difficulties elaborating on his responses. There was no evidence of thought disorder or confusion, and Mr. Rapp denied current and past experiences of auditory, visual, or olfactory hallucinations. His range of affect was somewhat constricted, with a sad and anxious mood. Mr. Rapp denied current and past suicidal or homicidal ideation, plan, and intent.

Mr. Rapp was administered the **Folstein Mini Mental Status Exam (MMSE)**, and his responses to this measure and to clinical interview suggested that he was not suffering from any cognitive deficits that would have negatively impacted the results of the evaluation.

The **Miller Forensic Assessment of Symptoms Test (M-FAST)** is a screening measure that was developed to assess the deliberate distortion of self-reported symptoms. In a forensic context, the possibility that the individual being evaluated is feigning psychological symptomology or malingering must be carefully evaluated. Mr. Rapp's total score on the M-FAST was a zero, which was consistent with responses typical of honest responders.

*Personality Functioning*
The **Personality Assessment Inventory (PAI)** is a 344-item objective inventory of adult personality used to assess areas of psychopathology. The PAI also provide information relevant for possible clinical diagnosis. This assessment tool contains a number of validity indices designed to assess response style and factors that could impact and/or distort the validity of the testing.  These factors include results such as positive or negative impression management, failure to complete the test properly, confusion, a tendency to respond to items in a careless or inconsistent manner, defensiveness, exaggeration, malingering, and a tendency to endorse items in an improbable manner. Mr. Rapp's PAI profile was valid and his scores on validity indices suggested that he responded in a forthright manner and though he had a tendency to portray himself as relatively free of common shortcomings, he did not attempt to present himself in an inaccurately negative manner, nor was there any evidence to suggest that he was exaggerating any symptoms.

Although Mr. Rapp's responses to the primary clinical scales PAI fell within normal limits, it is significant to note that the one subscale where his scores were clinically elevated was in response to questions related to intrusive and painful symptoms related to a traumatic stressor. He did not report experiencing significant difficulties related to mood, anxiety, somatic concerns, thought disorder, self-harming, or aggressive behaviors. His interpersonal style was described as "open, genuine, and conforming," and

he was described as likely to be seen by others as a "warm, quiet individual who is fairly eager to please."

The PAI findings are supported by Mr. Rapp's self-report, information gathered during the collateral interviews and by his performance on other assessments.

*Mood and Anxiety*
The **Beck Depression Inventory – II (BDI-II)** is a self-report screening inventory that assesses attitudes and symptoms characteristic of depression experienced by the respondent over the past two weeks. Mr. Rapp's total score on the BDI-II was 23 out of total maximum score of 63, suggesting that he was experiencing moderate symptoms of depression at the time of the evaluation.

The **Beck Anxiety Inventory (BAI)** is a self-report screening inventory that assesses the severity of common symptoms of anxiety experienced by the respondent in the past week. Mr. Rapp's total score on the BAI was 19 out of a total maximum score of 63, indicating he was reporting moderate symptoms of anxiety at the time of the evaluation.

The **Mood Disorder Questionnaire (MDQ)** is a self-report instrument used to screen for symptoms suggestive of Bipolar Disorder. Mr. Rapp's responses on the MDQ resulted in a negative screen, suggesting that there was no need for further evaluation for Bipolar Disorder.

*Trauma*
The **Traumatic Stress Inventory – 2 (TSI-2)** is a measure of both acute and chronic posttraumatic symptomatology. The TSI-2 contains validity scales designed to assess factors that could distort the validity of the testing results such as exaggeration, minimization, improbable or infrequent combinations of symptoms, confusion, careless responding, or malingering. The results of the TSI-2 validity scales resulted in a valid profile, suggesting that Mr. Rapp attended to the items, responded in a forthright manner, and did not attempt to exaggerate his psychological symptoms or to present himself in an inaccurately negative manner.

The results of the TSI-2 clinical scales indicated that Mr. Rapp's scores on scales measuring difficulties intrusive experiences of trauma, defensive avoidance, and sexual concerns were significantly clinically elevated, and were the areas causing him the greatest levels of distress and concern.  His responses on this measure were consistent with his self-report, information gathered during the collateral interviews, review of documents, and by his performance on other assessments.

The **Life Events Checklist** and the **Adverse Childhood Experience (ACE) Questionnaire** are both self-report measures designed to assess for exposure to adverse and potentially traumatic life events.

The ACE Questionnaire assesses for adverse experiences occurring prior to age 18 such as physical or emotional maltreatment, sexual abuse, experiences of neglect, exposure to violence and exposure to household members with significant mental illness or substance abuse. Mr. Rapp's score on the ACE questionnaire was three out of ten, indicating that he experienced three adverse experiences during childhood. These events included his parent's divorce when he was two years old, the alleged sexual assault by Kevin Spacey at the age of fourteen, and a sexual advance by an actress with whom he was staying when he was seventeen years old and she was in her forties. Although he reported that they later engaged in a sexual in a sexual encounter, he did not experience that encounter to be traumatic or distressing.

On the LEC, Mr. Rapp was asked to indicate which of a number of "difficult or stressful things that sometimes happen to people" he had experienced, witnessed, or learned about, or that he had been exposed to as part of a job. His responses to this measure indicated that he has experienced several highly stressful or traumatic events in his lifetime, including a car accident where he was hit by a drunk driver, a skiing accident that ultimately resulted in a tear of his ACL, being assaulted by a stranger at the age of 15 in London, the alleged assault by Kevin Spacey, an alleged sexual assault by a massage therapist as an adult, his mother's cancer and ultimate death, and the sudden death of a close friend.

Although Mr. Rapp reported that his mother's death and the death of Jonathan Larson had both been extremely difficult and traumatic for him, when asked to identify the "worst event", which is defined in this questionnaire as "the event that currently bothers you the most," he clearly stated that it was the alleged sexual assault by Mr. Spacey. Following completion of the LEC, Mr. Rapp was then asked to complete the Posttraumatic Checklist specifically in reference to that "worst event."

The **Posttraumatic Checklist (PCL-5)** is a self-report measure designed to assess and screen for symptoms of Posttraumatic Stress Disorder (PTSD). PTSD is a disorder that may develop following the experience of a traumatic event involving exposure to "actual or threatened death, serious injury, or sexual violence. Symptoms are categorized into four clusters that are experienced in relation to that specific traumatic event: Intrusive memories, persistent avoidance, negative alterations in cognition or mood, and marked alterations in arousal and reactivity. In order to meet the criteria for diagnosis, the symptoms must also cause clinically significant distress or impairment in functioning.

As Mr. Rapp had indicated that the alleged experience of victimization by Mr. Spacey was the incident causing him the most current distress on the LEC, in responding to the PCL-5, Mr. Rapp was asked to report the extent to which he was experiencing symptoms specific to his alleged experience of sexual assault by Mr. Spacey within the past month. Mr. Rapp's total score on the PCL-5 for the past month was 37 out of a total score of 80, suggesting that Mr. Rapp is suffering from current symptoms of PTSD that warrant further evaluation. He endorsed symptoms consistent with a diagnosis of PTSD on all

four symptom clusters for PTSD: intrusion, avoidance, cognition and mood, and arousal and reactivity.

Mr. Rapp reported symptoms of intrusion such as repeated disturbing and unwanted memories of the alleged assault by Mr. Spacey as well as feeling upset when reminded of the incident and experiencing strong physical reactions when reminded of the incident. He also endorsed symptoms of avoidance such as avoiding memories, thoughts, or feelings as well as external reminders of the incidents.  He reported difficulties with cognition and mood as well as strong negative feelings such as fear, horror, anger, guilt or shame, as well as loss of interest in activities that he used to enjoy. Finally, he endorsed symptoms of arousal and reactivity such as being "super alert" and on guard, and difficulties falling or staying asleep.

Mr. Rapp was asked to complete the Posttraumatic Checklist 5 a second time based on his symptoms during 2017, following his public disclosure of the alleged assault, which is a time period he identified as also experiencing significant symptoms of PTSD. During this second administration, Mr. Rapp again endorsed significant symptoms consistent with PTSD across all four symptom clusters, and his total score was 28/80, providing empirical support for his report of symptomatology at that time.

Because Mr. Rapp endorsed symptoms consistent with PTSD on the PCL-5, he was then administered the **Clinician-Administered PTSD Scale for DSM-5, Past Month Version (CAPS-5)**. The CAPS-5 is a structured clinical interview that can be used to make a current and past diagnosis of PTSD, and is widely considered to be the "gold standard" for PTSD assessment.

In response to the CAPS-5, Mr. Rapp was again asked to report and describe specific symptoms in reference to the alleged sexual assault by Mr. Spacey which he had previously identified as the event currently bothering him the most of the extremely stressful and/or traumatic experiences endorsed on the LEC.

On the CAPS-5, Mr. Rapp again reported clinically significant symptoms associated with all four symptom clusters of PTSD. Specifically, during the past month, he reported clinically significant symptoms of intrusion associated with the alleged sexual assault by Mr. Spacey such as unwanted intrusive memories of the event with difficulty dismissing those memories; feeling emotional distress and upset when exposed to reminders or the event of images and reports of Mr. Spacey; strong physical reactions when reminded of the event such as a tightening in his stomach, a feeling of being "frozen", and a tightening in his chest.

Next, he reported clinically significant avoidance of both thoughts and feelings as well as situations and things that reminded him of the assault. For example, he described expending a significant amount of effort avoiding thinking about the assault, efforts to distract himself and involve himself in projects and work to avoid experiencing feelings

related to the assault, avoiding exposure to images of Mr. Spacey, and avoidance of Mr. Spacey's professional work.

He also reported clinically significant symptoms associated with cognition and mood, such very strong, and at times overwhelming negative feelings related to the assault such as anger, shame, fear, anxiety, sadness and grief; a profound loss of interest in reading and a decreased interest in sexual intimacy with his partner; feeling distant and cut off from others; and difficulties feeling positive emotions such as joy or a sense of "lightness" in mood.

Finally, he reported clinically significant alterations in arousal and reactivity associated with the alleged sexual assault such as a sense of hypervigilance and fear of being caught off guard; and exaggerated startle response, problems with concentration, both with reading and with memorizing lines; and difficulties with sleep including trouble falling asleep, middle of the night awakening, and waking earlier than he wants or needs to.

Mr. Rapp's reports of symptoms are currently associated with moderate subjective distress and moderate impairment in interpersonal functioning, as well as mild difficulties with occupational functioning.  All of these symptoms were reported in response to the trauma of alleged sexual victimization at the age of fourteen by Mr. Kevin Spacey. Based on his responses to the CAPS-5, Mr. Rapp meets full DSM-5 diagnostic criteria for Posttraumatic Stress Disorder for the past month.

## Collateral Interviews

All collateral interviews were conducted at my request, and with the consent of Mr. Rapp. At the start of each collateral interview, the individual was made aware of the limits of confidentiality at the beginning of the interview. I explained that I am a forensic psychologist who had been retained by Mr. Rapp's attorney, Peter Saghir, and that I would be summarizing the content of our interviews in a written report, which would be provided to Mr. Saghir. I further explained that the results of our interview could then become part of the record of the Court, and that I could also be asked to testify. Mr. Snow, Ms. Magid and Mr. Ithiphol all gave verbal consent for participation in the interviews and for the release of this information to Mr. Saghir. I also contacted Mr. Rapp's brother Adam to request an interview, and although Adam Rapp agreed to be interviewed, we were unable to complete that interview prior to completing this report due to time constraints.

*Sean Snow*

I spoke with Mr. Snow by telephone for approximately one hour on 02/17/2021. Mr. Snow told me that he and Mr. Rapp initially met on the set of School Ties in Boston, MA. They then met again in NY when they both attended Tisch, NYU. After running into each other for a few times, the two became friends, and have been close friends ever since. Mr. Snow completed his degree at Tisch, and has worked as an actor in NY and later in LA, California for a number of years. After  9/11/2001, Mr. Snow told me he felt a desire to shift to a career where he felt he could really help people, and began taking

classes in criminal justice and applying to police academies. He worked as a police officer for 5 years in San Diego, and then as a detective who worked homicides and cold cases. He eventually moved and subsequently became a sheriff and then began working in the area of sexual crimes against children, where he has been working for the past 6 years.

Mr. Snow told me that Mr. Rapp told him about his experience of sexual assault by Mr. Spacey one evening when they were at dinner, fairly early in their friendship. He said it was sometime after the movie Usual Suspects came out, and that he was telling Mr. Rapp how impressed he was by Mr. Spacey's acting talents, and that Mr. Rapp was triggered by the conversation about Mr. Spacey. Mr. Snow said that Mr. Rapp's recount of the alleged sexual assault was consistent with what Mr. Rapp has said in other settings, in interviews, and in other subsequent discussions. When asked what he had been told, Mr. Snow described the incident in a manner that was consistent with that reported to me by Mr. Rapp. Mr. Snow reported that at the time Mr. Rapp confided in him, they were speaking as friends, and that Mr. Rapp clearly felt badly about what he alleged had happened to him, and that he told him that he felt guilty, worried that his mother would feel badly if she knew what had happened to him, and felt ashamed about the incident.

I asked Mr. Snow how he had observed this alleged assault to have impacted Mr. Rapp, and Mr. Snow said that he believed that Mr. Rapp used his intellect as a defense. He stated that over the course of their friendship it was clear to him that Mr. Rapp struggled a lot in intimate relationships and that he struggled to form lasting bonds with intimate partners. Mr. Snow also told me that he observed that Mr. Rapp chose some very "toxic" partners, and would then struggle to make the relationship work, even with people who were clearly toxic. Mr. Snow stated that while he and Mr. Rapp are friends, Mr. Rapp's behavior was consistent with what he has commonly seen in survivors of childhood sexual abuse. For example, he told me he believed Mr. Rapp initially felt that he somehow should have known better than to have been at the party, and that later he blamed himself for not coming forward earlier, as he believed he may have prevented others from subsequently being assaulted by Mr. Spacey. He also stated that as a young person, Mr. Rapp had looked up to and trusted adults, and had found safety and comfort in the theatre community. He shared that he and Mr. Rapp had talked about the ways that Mr. Rapp's sense of trust and safety was violated and betrayed following the alleged assault by Mr. Spacey, and that the abuse of power inherent in sexual abuse often results in this sense of violation.

Mr. Snow also told me that Mr. Spacey's alleged sexual assault of Mr. Rapp had been an "open secret" in Hollywood, before it was disclosed publicly by Mr. Rapp in the Buzzfeed article. For example,  he stated that when he was still working as an actor, he was asked by an actress who was aware of his friendship with Mr. Rapp if he knew what had "happened to him with Kevin." I asked Mr. Snow if he had observed any impact on Mr. Rapp following his public disclosure, and Mr. Snow confirmed Mr. Rapp's reports to me that disclosing his experience felt like a relief, and that he felt he was finally taking action to reduce the stigma around sexual assault and perhaps to encourage others to

come forward. However, he also stated that Mr. Rapp had received negative comments on social media and had been very hurt by criticisms that were made of his mother. In addition, he reported that talking about the incident of the alleged violation had been clearly distressing for Mr. Rapp.

Mr. Snow stated strongly that Mr. Rapp confided in him as a friend seeking support long before any discussion of a lawsuit, and that he had also asked Mr. Snow questions related to Mr. Snow's professional experiences with other victims of childhood sexual assault in the context of trying to understand his own experiences and their impact.

*Robin Magid, LiCSW*
I conducted a collateral telephone interview with Ms. Magid on 02/19/2021 lasting approximately one hour and fifteen minutes. Ms. Magid reported that she is a psychotherapist who has provided treatment to Mr. Rapp since 1997. She confirmed Mr. Rapp's reports that treatment began in 1997, primarily dealing with issues related to grief, bereavement, anger, and relationships, and that in that episode of care, Mr. Rapp did not disclose the alleged incident with Mr. Spacey. She stated that they met consistently for some time, and then treatment became more sporadic until around 2016, when they began meeting again more consistently. Ms. Magid reported that it was her professional opinion that work served as a primary outlet and coping strategy for Mr. Rapp, and that even while grieving the death of his mother, he was able to work at a high level. She reported that while Mr. Rapp and his mother were very close, and his grief was very painful and intense, Mr. Rapp responded positively to treatment. She also corroborated Mr. Rapp's descriptions to me about his childhood and family as well as his positive interactions with adults in the theatre community. She stated that during this episode of treatment, she became aware of difficulties Mr. Rapp had with asserting his boundaries, and setting limits, and also described multiple episodes where he had a "freeze" response in response to another's anger or disappointment. She reported that prior to learning about the alleged episode of sexual victimization by Mr. Spacey, she had regarded Mr. Rapp's difficulties with boundaries and interpersonal relationships as well as his profound "freeze" response to conflict to be concerning, and had wondered what in his life could account for this particular constellation of symptoms.

Ms. Magid reported that when Mr. Rapp returned to consistent treatment in 2016, he disclosed the incident of alleged sexual abuse by Mr. Spacey, and described the ways in which he was triggered by seeing pictures of Mr. Spacey on the screen or his performances, for example hosting the Tony awards. She reported that at that time, he began the complicated process, not yet finished, of dealing with his experience of victimization and its negative impact on him.

Ms. Magid told me that as they began working on the impact of the alleged sexual abuse, Mr. Rapp's previously described difficulties in interpersonal and sexual relationships began to make more sense to her from a clinical perspective. Ms. Magid also reported that Mr. Rapp had disclosed to her in therapy his fears of reprisal from Mr. Spacey as well as his feelings that the theatre had been his greatest source of safety and comfort,

and that some of that was taken away from him as a result of the alleged assault. She stated that treatment also focused on ways that Mr. Rapp's experience of sexual victimization by Mr. Spacey was impacting his relationship with his partner Ken. She described Mr. Rapp's difficulties with boundaries, with assertiveness, and with a "freeze" response when Ken became angry.

I asked Ms. Magid if the trauma focused treatment had been specifically related to the alleged incident with Mr. Spacey as opposed to other potentially traumatic stressors, and she stated that it had been. For example, she described using EMDR (an evidence-based treatment for trauma) to help Mr. Rapp cope with specific memories, thoughts, feelings, and beliefs that were specifically related to the alleged assault by Mr. Spacey. She described Mr. Rapp experiencing symptoms of Posttraumatic Stress disorder such as having unwanted intrusive memories and strong physical reactions to reminders of the assault, engaging in avoidance behaviors, and strong negative emotions related to the victimization. She also reported he had experienced feelings of powerlessness, worthlessness, and difficulties with trust and intimacy as well as with boundary setting in response to the alleged sexual assault by Mr. Spacey.

When I asked her if he had talked with her about his sexual experience with an older high school boy or with an adult woman who had made a sexual advance toward him when he was seventeen, she said that while he had told her about those experiences, it was neither her impression nor clinical opinion that either of those experiences was traumatic or particularly distressing to Mr. Rapp, and that they were not the focus of treatment.

Ms. Magid further emphasized that Mr. Rapp had made these disclosures to her of his alleged victimization by Mr. Spacey prior to any discussion or contemplation of a lawsuit, and that his reports to her of the sexual assault and its impact and their subsequent work together was explicitly in the context of treatment. She stated that Mr. Rapp had also told her that the #MeToo movement was a primary motivating factor for his coming forward publicly. She stated that he wanted to speak up so that perhaps others would not have to experience what he went through.

I also asked Ms. Magid her clinical opinions about Mr. Rapp's current level of symptoms and functioning. She reported that he had experienced the deposition and needing to talk extensively about the incident of sexual assault to have been "grueling," and stated that he has reported an increase in both intrusive memories and avoidance behaviors. She stated that although he had made significant progress in treatment, it was her clinical opinion that ongoing trauma-focused treatment would be needed.

*Ken Ithiphol*
I conducted a collateral interview via Zoom videoconferencing technology with Mr. Ithiphol on 02/20/2021 for approximately one hour. Mr. Ithiphol has been in an intimate and romantic relationship with Mr. Rapp since approximately December 2015. He stated that he reached out to Mr. Rapp online after seeing him perform in the show If Then in LA, California, while Mr. Rapp was on tour. He stated that the relationship progressed

fairly quickly and that after about one year of dating he moved to NY and the two of them began living together.

Mr. Ithiphol's reports of his early relationship with Mr. Rapp were consistent with reports made by Mr. Rapp, as well as by Ms. Magid. He described their relationship as very passionate and intense, but also reported that there was some instability and distress related to their mutual difficulties around trust, transparency and communicating their needs and expectations to each other. He stated that things could be both very passionate but also very stormy between them. When I asked him to elaborate, Mr. Ithiphol described arguments escalating very quickly and suddenly and stated that Mr. Rapp has had a very hard time dealing with Mr. Ithiphol's feelings and expressions of anger or disappointment. He described witnessing Mr. Rapp "freeze" and "collapse" in response to an argument, and stated that Mr. Rapp's shutting down at those times was more extreme than he had ever witnessed in others. He stated that it would often take Mr. Rapp a very long time to come back to a place of equilibrium after he was triggered, and that Mr. Rapp was very sensitive to the idea of disappointing someone or letting someone down. He also said that in those moments, Mr. Rapp would frequently talk about not feeling safe and be unable to communicate.

Mr. Ithiphol reported that this dynamic has improved over time as both he and Mr. Rapp have benefitted from psychotherapy but that it does continue to happen. He also reported that he has witnessed this reaction when others have expressed anger or disappointment to Mr. Rapp, and described an incident between Mr. Rapp and Mr. Ithiphol's sister. Mr. Ithiphol reported that Mr. Rapp had talked with him about the alleged sexual assault by Mr. Spacey fairly early in their relationship, following their either viewing or discussing some show that Mr. Spacey was in. Mr. Rapp's description of the incident to Mr. Ithiphol was consistent with his descriptions in the media, to other friends, to his therapist, in his deposition, and to me during this evaluation.

I asked Mr. Ithiphol how he had observed this experience of sexual victimization to have impacted Mr. Rapp, and he said it was most obvious to him when he saw the difficulties Mr. Rapp has experienced with personal boundaries and enforcing his own limits, particularly related to his body and personal space. He also corroborated Mr. Rapp's reports to me and to his therapist of feeling a lack of control in previous sexual encounters, and Mr. Rapp's reports that he felt he had to "go along" with sexual encounters even when not interested.

Mr. Ithiphol also described observing how impacted Mr. Rapp was by the #MeToo movement, and stated that he had been completely absorbed in reading and learning of other's experiences of assault and violation. He stated that Mr. Rapp became "emotionally raw" as a result and that he believed it was re-traumatizing for him because it reminded him of his own experiences. However, at the same time, he stated that Mr. Rapp also began to feel empowered, and began to believe that perhaps there could be some accountability for what Mr. Spacey had allegedly done to him and to others. He stated that over time, Mr. Rapp came to better understand the degree to which he had

minimized his experience of victimization and its traumatic psychological impact on him. Mr. Ithiphol reported that as Mr. Rapp became more and more aware of the degree to which he had been been violated and harmed by Mr. Spacey's alleged assault, it "blew his mind" and he became very distressed. He reported that at that time, Mr. Rapp experienced a marked loss of sexual interest and desire, became withdrawn and disengaged, and spoke about feeling great distress when reminded of his experiences. Mr. Ithiphol described Mr. Rapp at times being "too worked up" to sleep, increasingly sensitive, and hypervigilant and "on guard."

Mr. Ithiphol stated that after coming forward, Mr. Rapp expressed some feelings of relief, and felt affirmed by the support he got from others in the community. While most of the responses were positive and supportive, he also stated that Mr. Rapp experienced some negative responses as well. Overall, he stated that coming forward and coming to terms with his experience of victimization was very difficult for Mr. Rapp, but that Mr. Rapp believed he did the right thing because his motivation was to encourage others to come forward with their stories and to prevent others from being harmed by Mr. Spacey.

Mr. Ithiphol also reported that Mr. Rapp has experienced an exacerbation of symptoms over this past month. He described Mr. Rapp as being more depressed, crying more easily and frequently, a marked decrease in his desire for sexual intimacy and touch, as well as continued avoidance of anything that Mr. Spacey has performed in. He also reported that Mr. Rapp has been more guarded and is much more easily startled, and has exhibited a "freeze" response when reminded of his experience of the alleged sexual assault.

## Opinions

1. Mr. Anthony Rapp is a 49-year-old actor who reports having been sexually assaulted by Kevin Spacey in the late spring or early summer of 1986, when Mr. Rapp was fourteen years old and Mr. Spacey was in his twenties. The results of this evaluation found ample evidence to support the conclusion that Mr. Rapp experienced this reported episode of sexual victimization by Mr. Spacey in the spring or early summer of 1986 at Mr. Spacey's home, when Mr. Rapp was aged fourteen.

   As detailed above, Mr. Rapp's account of the assault was corroborated by multiple sources, and was consistent with his public disclosures about the incident, with text and social media messages between Mr. Rapp and friends and colleagues regarding his very early disclosures of his alleged victimization by Mr. Spacey, other's experiences and/or knowledge of allegations of Mr. Spacey's predatory behaviors, and with information provided by collateral sources.

2. *Mr. Rapp met Mr. Spacey when he was a fourteen-year-old boy, and considered Mr. Spacey to be an adult colleague. At that time in his life, Mr. Rapp, as a child actor, had frequently been in the presence of other adult actors, and there was evidence throughout this evaluation that with the exception of the assault by Mr. Spacey, those experiences had been positive, supportive, and many adult actors*

had served as mentors. The theatre community had been a place of safety and comfort for Mr. Rapp.

Mr. Spacey's sexual assault violated Mr. Rapp's sense of safety and greatly increased his sense of vulnerability, as well as causing feelings of great distress, confusion and shame. The theatre, which had always been a source of comfort and safety, became a place where Mr. Rapp felt a lack of safety. In addition, he experienced fear of future encounters with Mr. Spacey, experiences of retaliation from Mr. Spacey, and had concerns that he would not be believed and that Mr. Spacey and others would attempt to discredit him in his chosen profession.

3. The psychological strategies utilized by Mr. Rapp in an effort to cope with the effects of this sexual victimization experienced included denial, suppression, compartmentalization, directed forgetting, minimization and avoidance. These factors, in combination with the effects of the abuse itself, such as feelings of shame, confusion, and self-blame, interfered with Mr. Rapp's ability to accurately appraise his situation, and greatly interfered with his ability to recognize that he had been victimized by Mr. Spacey, and had been harmed as a result of that victimization.

As a result, although Mr. Rapp understood the fact that Mr. Spacey's actions were wrong, it was not until the publicity surrounding the #MeToo movement, when many individuals publicly came forward regarding their own experiences of assault and abuse, that Mr. Rapp became increasingly aware of the impact of the victimization on his psychological and emotional functioning, and made the difficult decision to share his story publicly. Though he had reported the incident in an interview earlier, Mr. Spacey's name had been redacted from the resulting article. By coming forward in the initial 2017 Buzzfeed article, Mr. Rapp hoped he could prevent any further abuse perpetrated by Mr. Spacey upon others, and that he would serve as a role model for others, particularly men, who may feel shame and fear about coming forward.

4. In my opinion, Mr. Rapp is currently experiencing Posttraumatic Stress Disorder (PTSD), in response to this sexual assault. Mr. Rapp currently meets the full DSM 5 diagnostic criteria for Posttraumatic Stress Disorder, with the identified Criterion A stressor being the alleged sexual assault by Mr. Spacey.

Mr. Rapp also experienced an episode of Posttraumatic Stress Disorder related to the assault by Mr. Spacey in 2017, in the time leading up to and following his public disclosure of his experience. In both episodes of Posttraumatic Stress Disorder, Mr. Rapp's symptoms are clearly and substantially related to the alleged assault by Mr. Spacey.

In addition to Posttraumatic Stress Disorder, Mr. Rapp has experienced difficulties with setting limits and boundaries in intimate relationships, has

experienced intense feelings of shame and confusion, guilt for not coming forward sooner, and interpersonal difficulties which included episodes of impaired sexual desire and functioning. He has also been subjected to negative comments, harassment, and insults following his public disclosure of his experience of assault by Mr. Spacey. It is my opinion that these additional difficulties are substantially related to the alleged sexual assault by Mr. Spacey. The results of this evaluation and subsequent opinions are highly consistent with data from multiple sources, including psychological testing, review of text and social media exchanges, and collateral interviews with those who had the opportunity to observe and discuss with Mr. Rapp his behaviors, thoughts, feelings, and symptoms in a non-forensic context. It is significant to note that this opinion was also supported by information provided by Mr. Rapp's therapist, with whom he spoke for the purpose of getting treatment for his difficulties.

5. With respect to his prognosis, Mr. Rapp experienced a sexual assault that has directly resulted in Posttraumatic Stress disorder as well as significant psychological difficulties primarily in the areas of emotional, sexual, and interpersonal functioning rather than in occupational domains. Mr. Rapp's ability to succeed in his chosen occupation in spite of his experience of victimization is likely the result of a combination of several individual protective factors, his effective use of coping strategies, strong support system, and his long-term engagement in psychological treatment.

With respect to protective factors, Mr. Rapp had no previous psychopathology, a close and supportive family, a current close and supportive intimate partner, a strong support system, and high levels of professional ability, talent, and success. Since the alleged episode of victimization by Mr. Spacey, he has developed numerous coping strategies and feels positive about coming forward, both as a queer man and as a survivor of sexual assault, and believes he has been able to make a positive difference in the lives of others. Mr. Rapp continues to make use of compartmentalization as a coping mechanism, which allows him to engage in his work. Mr. Rapp has made good use of his support system and psychotherapy in the past when coping with the traumatic death of his mother, relational and interpersonal challenges, and more recently with the traumatic sequalae of the alleged sexual victimization by Mr. Spacey. He is currently continuing with appropriate trauma-based psychotherapy.

Mr. Rapp's willingness and demonstrated ability to engage in psychotherapy and his high levels of social and emotional support will likely enable him to continue to progress in treatment over time. However, as with many victims of sexual assault, ongoing treatment will likely be needed to continue to mitigate the negative psychological impact of the traumatic victimization.

6. In a forensic context, where a motivation exists to falsely report psychological distress, the issue of malingering or the false report of symptoms must be

carefully considered and assessed.  On a test that was developed to screen for the deliberate distortion of self-reported symptoms (M-FAST), Mr. Rapp answered in a manner consistent with honest responders.  Mr. Rapp's overall response style indicated that Mr. Rapp minimized rather than exaggerated his symptoms. There was no evidence in Mr. Rapp's psychological testing or psychosocial history to suggest that he was misrepresenting, exaggerating, or manufacturing his account of his experiences, symptoms, or psychological distress.

Mr. Rapp's psychological testing findings and self-report were consistent with the information gathered from documents reviewed, including public interviews given by Mr. Rapp, and information reported during collateral interviews with his psychotherapist, partner, and close friend of thirty years, who is currently a detective working on sex crimes perpetrated against children.

It is also significant to note that the information Mr. Rapp shared both publicly and privately with those close to him has been consistent, and was initially shared in a non-forensic context where Mr. Rapp described his reports of his distress, symptoms, impaired functioning, for the purpose of obtaining support, receiving psychological treatment, and attempting to better understand his experiences and their impact and meaning.

*The above opinions and conclusions, as with all forensic evaluations, are tentative and subject to revision should new information be made available to me, or arise in the course of discovery, that would tend either to confirm or refute my current impressions and opinions.*

Respectfully submitted,


*Lisa M. Rocchio, Ph.D.*
_____                    _____
Lisa M. Rocchio, Ph.D.                                            02/25/2021
Clinical and Forensic Psychologist                          Date
Licensed in RI, NY, and MA