# Exhibit 3

UNITED STATES DISTRICT COURT                                    1

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------- X

ANTHONY RAPP and C.D.,

                    Civil Action No. 1:20-cv-09586(LAK)

                         Plaintiffs,

                    - against -

KEVIN SPACEY FOWLER a/k/a KEVIN SPACEY,

                         Defendant.

----------------------------------------------- X

                         Zoom Deposition


                         January 26, 2022

                         11:03 a.m.


          EXAMINATION BEFORE TRIAL of the Expert

Witness, ALEXANDER BARDEY, M.D., pursuant to Order,

held on the above date and time, via

videoconference, taken by and before KRYSTINA

KORNAK FLORA, RPR, a Notary Public within and for

the State of New York.

```
(1)              - DR. ALEXANDER BARDEY -              6

(2)              THE VIDEOGRAPHER:  Thank you.  The

(3)         court reporter today is Krystina Kornak, also

(4)         with Lexitas.

(5)              Will you please swear in the witness.

(6)    A L E X A N D E R   B A R D E Y,

(7)         called as a witness, having been first duly

(8)    sworn by a Notary Public within and for the State of

(9)    New York, was examined and testified as follows:

(10)   EXAMINATION BY

(11)   MR. STEIGMAN:

(12)         Q.    Would you please state your full name

(13)   for the record.

(14)         A.    Alexander Bardey, M.D.

(15)         Q.    What is your current address?

(16)         A.    303 5th Avenue, Suite 403, New York,

(17)   New York 10016.

(18)         Q.    That's a business address you just gave

(19)   us, right, Doctor?

(20)         A.    That is correct.

(21)         Q.    Okay.  Good morning, Doctor.  My name

(22)   is Richard Steigman and I'm going to be asking you a

(23)   series of questions today.  How are you doing?

(24)         A.    I'm well.  I'm well.  How are you?

(25)         Q.    Okay, good.  I'm doing okay, thanks.
```

(1)                  - DR. ALEXANDER BARDEY -                215

(2)    Mr. Rapp and explained what my thinking was and

(3)    raised a different possibility.

(4)         Q.    Do you think in considering the

(5)    credibility of Mr. Rapp in order to do a thorough,

(6)    fair, completely investigation, you should consider

(7)    the credibility of Mr. Spacey?

(8)         A.    Not in this situation, no.  Not given

(9)    the task that I was asked to perform.

(10)         Q.    So if you were told that Mr. Spacey

(11)    said I did it, you still would have that same

(12)    thought that it's reasonable to think that Mr. Rapp

(13)    is lying because he was jealous.  Is that what

(14)    you're telling us?

(15)              MR. SCOLNICK:  Objection.  There's no

(16)         good-faith basis to raise that hypothetical.

(17)         And form.  Argumentative.  Incomplete

(18)         hypothetical.  Go ahead, you could answer.

(19)         A.    Sure.  No, that's not what I'm saying

(20)    at all.

(21)         Q.    If Mr. Spacey -- well, let me ask you

(22)    this:  Do you know who Andy Holtzman is?

(23)         A.    Andy Holtzman.  The name does not ring

(24)    a bell right now.

(25)         Q.    Okay.  You've never been given his

- DR. ALEXANDER BARDEY -                    216

(1)

(2)  deposition in this case, right?

(3)          A.      I have not reviewed his deposition in

(4)  this case, no.

(5)          Q.      Mr. Scolnick never mentioned this guy's

(6)  name to you at all, right?

(7)          A.      Correct.

(8)          Q.      I want you to assume that Andy Holtzman

(9)  is a witness who testified that he worked with

(10)  Mr. Spacey in the Public Theater in the summer of

(11)  1981 when Spacey was acting in Henry IV, Part I, and

(12)  that Mr. Holtzman was working in an office in the

(13)  theater, and that one day Mr. Spacey came into the

(14)  office, grabbed Mr. Holtzman's crotch, pinned him to

(15)  the desk, grinded Mr. Holtzman until he pushed him

(16)  off.  Mr. Holtzman said what the fuck are you doing,

(17)  this is my office.  And that Mr. Spacey didn't say a

(18)  word and left.  Assuming that was his testimony,

(19)  this is the first you're hearing about this in this

(20)  case?

(21)          A.      Yes.

(22)          Q.      Assuming it to be true, does it affect

(23)  your opinion in any way with regard to the issues

(24)  you brought up about Mr. Rapp lying about what

(25)  happened here?

(1)                    - DR. ALEXANDER BARDEY -              217

(2)              MR. SCOLNICK:   Objection as to form.

(3)         Beyond the scope.   Incomplete hypothetical.

(4)         A.    It does not.

(5)         Q.    Can you explain your answer please?

(6)              MR. SCOLNICK:   Same objections.

(7)         A.    Whether or not Mr. Spacey engaged in

(8)    such conduct, which by your description is overtly

(9)    sexual, does not imply that he engaged in anything

(10)   similar with anybody else at any given moment.   I

(11)   have to look at Mr. Rapp's case specifically,

(12)   especially to answer the question that I was asked,

(13)   which was did he suffer psychological damages.   The

(14)   fact that Kevin Spacey may have or may have not done

(15)   that to the individual you mentioned has absolutely

(16)   no bearing on whether or not Mr. Rapp suffered any

(17)   psychological consequences.

(18)        Q.    Well, as a forensic psychiatrist, if

(19)   someone who engages in aggressive sexual conduct,

(20)   un-wanted touching, is that relevant in determining

(21)   whether or not they did it in another instance?

(22)              MR. SCOLNICK:   Objection as to form.

(23)        This is beyond the scope of this witness'

(24)        testimony.   He's been called and he will

(25)        offer testimony regarding your client's

(1)                    - DR. ALEXANDER BARDEY -                    218

(2)         alleged claims of emotional distress.   This

(3)         is not relevant.   This is beyond the scope.

(4)         Q.    You could answer.

(5)         A.    Sure.   If I were or had been tasked

(6)    with conducting a psychosexual evaluation of

(7)    Mr. Spacey, then what you're telling me now would be

(8)    relevant, but that's not what I was tasked with.

(9)         Q.    Why would that be relevant if you were

(10)   tasked with doing a psychosexual evaluation of

(11)   Mr. Spacey?

(12)              MR. SCOLNICK:   Objection.   This is

(13)         beyond the scope of testimony.   This

(14)         hypothetical, you have no good-faith basis to

(15)         ask it.   This is not the task, and we're

(16)         going so far field here of what we're talking

(17)         about.   This is about Mr. Rapp and his

(18)         allegations and claims.   There's no

(19)         good-faith basis for these questions.   Form.

(20)         Incomplete hypothetical.

(21)   Q.    You could answer.

(22)   A.    I could answer?

(23)   Q.    Yeah.

(24)   A.    Well, if I were conducting a

(25)   psychosexual evaluation of an individual it would be

- DR. ALEXANDER BARDEY -                    219

(1)

(2)  important for me to know the repeated acts to see if

(3)  there's a specific modus operandi, if this is part

(4)  of a proclivity, if this is part of some paraphilia

(5)  because that speaks to risk of recidivism and it

(6)  speaks to dangerousness to the community.  So that

(7)  specific inquiry is relevant in doing a psychosexual

(8)  evaluation of an individual who's committed or is

(9)  accused of committing such acts.

(10)      Q.    What you're saying is it would be

(11) relevant to determine the likelihood that they might

(12) act that way again, right?

(13)          MR. SCOLNICK:  Objection.  This is

(14)      beyond the scope of the testimony; beyond the

(15)      scope of what Dr. Bardey has been called to

(16)      do; and beyond the scope of the testimony

(17)      we'll provide at trial.  Incomplete

(18)      hypothetical, vague and ambiguous, and form.

(19)      Q.    You could answer.

(20)      A.    Sure.  That's what recidivism means.

(21)      Q.    Right.  It also might be relevant in

(22) determining whether or not a person is guilty of the

(23) act they're charged of, whether or not they tend to

(24) engage in such behavior, right?

(25)          MR. SCOLNICK:  Same objections.  Beyond

- DR. ALEXANDER BARDEY -                      220

the scope.  Form.  Incomplete hypothetical.

Vague and ambiguous.

(4)     A.    In a criminal setting where someone's

guilt or innocence about having committed such an

act would be the issue at hand then, yes.

(7)     Q.    Even in such a civil case where the

issue is whether or not the act occurred, whether or

not the person has a proclivity to act that way

would be relevant to determine if they acted that

way in this particular instance.  You'd agree with

that as a forensic psychiatrist, right?

(13)          MR. SCOLNICK:  Same objection.  Beyond

the scope.  Form.  Relevance.  Incomplete

hypothetical.  Vague and ambiguous.

(16)     A.    Well, the allegations that you

described are far field from the allegations that

Mr. Rapp brings forward.  So, you know, with that

limited presentation and hypothetical I don't see a

real connection between those two behaviors,

certainly not enough to draw conclusions that one

speaks to a proclivity towards engaging in that kind

of inappropriate sexual conduct.

(24)     Q.    By the way, we talked this morning

about your having done reviews on other CVA cases,

```
 (1)                - DR. ALEXANDER BARDEY -              221
 (2)    about 50 of them.  Do you recall that?
 (3)         A.      Yes, sir.
 (4)         Q.      One of the things you told us was
 (5)    those -- some of those claims were credible because
 (6)    the defendants in those cases had acted in similar
 (7)    peculiar ways, right?
 (8)         A.      Yes, I did testify to that.
 (9)         Q.      Why in the world were you reviewing
(10)    that, the proclivities of the defendants if you were
(11)    just doing this psychological report of the damages
(12)    that was caused to the plaintiffs?
(13)         A.      As I said during my testimony, because
(14)    of the bizarre nature of the abuse itself, that some
(15)    of what was described was so, in a sense, incredible
(16)    that the repeated consistent descriptions by the
(17)    various plaintiffs made that incredible description
(18)    of the abuse they suffered more credible.
(19)         Q.      Do you know who Justin Dawes is?
(20)         A.      I beg your pardon?
(21)         Q.      You ever hear the name Justin Dawes,
(22)    D-A-W-E-S?
(23)         A.      I have not.
(24)         Q.      You have no idea who he is with respect
(25)    to this case, right?
```

(1)                    - DR. ALEXANDER BARDEY -                222

(2)          A.      Correct.

(3)          Q.      You never read his deposition

(4)    transcript in the case, right?

(5)          A.      Did not.

(6)          Q.      Mr. Scolnick never mentioned him to

(7)    you?  Never told you to assume anything about him?

(8)          A.      He did not.

(9)          Q.      I want you to assume that Mr. Dawes

(10)   testified that in the fall of 1988 he was 16 years

(11)   old and he was volunteering at a theater in

(12)   Connecticut where Mr. Spacey was performing in a

(13)   play, and that Mr. Spacey invited Dawes and a friend

(14)   of his to his house for an alleged party, and when

(15)   he got there there was no party.  That Mr. Spacey

(16)   had gay pornography playing on the television, that

(17)   he made the 16-year-old a couple of alcoholic

(18)   drinks, that he put his hand on Mr. Dawes' leg.

(19)   Assume that's true, do you think that has any

(20)   relevance in determining whether or not Mr. Rapp is

(21)   lying about this?

(22)          MR. SCOLNICK:  Beyond the scope of the

(23)   testimony.  Form objection.  Misstates the

(24)   testimony.  Incomplete hypothetical.  You

(25)   could answer.

```
(1)                  - DR. ALEXANDER BARDEY -          223
(2)          A.    It doesn't move the needle either way
(3)    in terms of the credibility of what was recounted in
(4)    Mr. Rapp's case.
(5)          Q.    Well, if Mr. Dawes' testimony is true
(6)    do you think it reflects that Mr. Spacey may be
(7)    attracted to underaged boys?
(8)                MR. SCOLNICK:   Objection.  This is so
(9)          far field and inappropriate.   This is not an
(10)         evaluation that Dr. Bardey is doing of
(11)         Mr. Spacey.  This is not responsive to any of
(12)         the opinions your expert has given.  This is
(13)         not anything he's going to testify to or has
(14)         been tasked to testify to.  Argumentative.
(15)         Entirely irrelevant.   Incomplete
(16)         hypothetical.  Vague and ambiguous.  Form.
(17)         Q.    You could answer.
(18)         A.    If I could remember the question, I'm
(19)    sorry.
(20)         Q.    The question is:  Assume Mr. Dawes'
(21)    testimony is true, does it reflect that Mr. Spacey
(22)    has an attraction to teenage boys?
(23)               MR. SCOLNICK:   Same objections.
(24)         A.    It could.
(25)         Q.    Could you think of any other reason why
```

(1)                    - DR. ALEXANDER BARDEY -              224

(2)    a grown man would invite a 16-year-old kid over,

(3)    play him gay porn, and make him alcoholic drinks and

(4)    touch him?

(5)              MR. SCOLNICK:  Objection.  Now

(6)         you're --

(7)         Q.    -- other than sexual attraction to a

(8)    kid?

(9)              MR. SCOLNICK:  Objection.  Now you're

(10)        misstating the evidence.

(11)             MR. STEIGMAN:  Okay.  You have your

(12)        objection, counsel.

(13)             MR. SCOLNICK:  Misstating the evidence.

(14)        Beyond the scope.  Calls for speculation.

(15)        Entirely irrelevant.  Beyond the scope of

(16)        anything that your witnesses testified to or

(17)        in any witness' report.  Beyond anything that

(18)        Dr. Bardey is going to testify to.  Calls for

(19)        speculation.  Misstates the evidence.

(20)        Q.    You could answer.

(21)        A.    Sure.  Before I could draw any

(22)    conclusions about someone's sexual attraction to

(23)    minors or to the existence of any sexual paraphilia

(24)    I would need to conduct a much more in-depth

(25)    evaluation.  Individuals engage in bizarre behaviors

```
(1)                - DR. ALEXANDER BARDEY -              225
(2)   for a number of reasons; sometimes driven by
(3)   psychosis, sometimes driven by substance use,
(4)   sometimes driven by the manifestations of another
(5)   mental illness, and sometimes driven by some sort of
(6)   sexual paraphilia.  A full and complete evaluation
(7)   would be necessary to draw those kinds of very
(8)   important conclusions from any single fact.
(9)        Q.    I appreciate your answer, sir.  What
(10)  you're saying is if Mr. Dawes' testimony is true,
(11)  then Mr. Spacey certainly engaged in bizarre
(12)  behavior, right?
(13)            MR. SCOLNICK:  Objection.  Misstates
(14)        the testimony.  Also beyond the scope.
(15)        Argumentative.  Incomplete hypothetical.
(16)        Vague and ambiguous.
(17)       Q.    You could answer.
(18)       A.    Sure.  It would seem bizarre.
(19)       Q.    Okay.  And one of the possibilities for
(20)  that bizarre behavior would be sexual attraction to
(21)  teenage boys, right?
(22)            MR. SCOLNICK:  Objection.  This is
(23)        beyond the scope of the doctor's testimony,
(24)        Richard.  If you want to keep going down this
(25)        road, it's entirely irrelevant, it's wasting
```

- DR. ALEXANDER BARDEY -                226

your time, it's wasting the doctor's time,

it's wasting my time.  At this point it's

getting to be harassing.  It has no place in

this testimony.  It's beyond the scope of

anything we're going to testify to, and at

this point you're just seeking to get sound

bites that you could play, and they're not

admissible at trial.  They have no possible

basis to be admitted at trial.

        MR. STEIGMAN:  I guess we're going to

see, judge, but in the meantime I'd like the

answer to the question.

        MR. SCOLNICK:  Calls for speculation as

well.  Incomplete hypothetical.

        MR. STEIGMAN:  So I stipulate you have

an objection on all of those bases, plus

whatever else you want at the time of trial

and there is no need, as we go through the

other people that have complained about

Mr. Spacey, to interrupt the deposition with

your laundry list of objections.  I

stipulate.  You have an objection on every

ground plus the ones you haven't thought of

yet.  Okay?

- DR. ALEXANDER BARDEY -                    227

(2)    Q.    You could answer the question, Doctor.

(3)    A.    Certainly.  In terms of evaluating

(4) someone's psychosexual profile, all of that

(5) information would be relevant and would raise

(6) various possibilities including the one that I

(7) mentioned before.

(8)    Q.    Right.  So that bizarre behavior could

(9) be explained by sexual attraction, psychosis, drug

(10) or alcohol use, true?

(11)    MR. SCOLNICK:  Objection.  Same

(12)    objections before.

(13)    A.    True.

(14)    Q.    Probably not that he wanted to mentor

(15) him on the finer points of filmmaking, can we agree

(16) on that?

(17)    MR. SCOLNICK:  Objection.

(18)    Argumentative.  Speculation.  Incomplete

(19)    hypothetical.

(20)    Q.    You could answer.

(21)    A.    You're referring to Mr. Dawes?

(22)    Q.    Yeah.

(23)    A.    I don't know what -- I don't know who

(24) Mr. Dawes is.  I don't know if he was an actor or

(25) not.  I don't know what the relationship was with

(1)                    - DR. ALEXANDER BARDEY -              228

REDACTED

(1)                    - DR. ALEXANDER BARDEY -            229

REDACTED

(1)                    - DR. ALEXANDER BARDEY -              230
                              REDACTED

(1)                 - DR. ALEXANDER BARDEY -                231

REDACTED

(1)                    - DR. ALEXANDER BARDEY -              232
REDACTED

(1)                    - DR. ALEXANDER BARDEY -              233
                              REDACTED

(1)                    - DR. ALEXANDER BARDEY -              234
REDACTED

(1)                    - DR. ALEXANDER BARDEY -            260
                              REDACTED

(1)                    - DR. ALEXANDER BARDEY -              261

REDACTED

(1)                    - DR. ALEXANDER BARDEY -              262

REDACTED

(1)                    - DR. ALEXANDER BARDEY -              263
                                 REDACTED

(1)                    - DR. ALEXANDER BARDEY -              264

REDACTED

```
(1)                - DR. ALEXANDER BARDEY -              275
(2)    in?  Do you want to go through it some more?
(3)         A.    No, I'm good.
(4)         Q.    Okay.  First of all, as a forensic
(5)    psychiatrist, if you were to evaluate Mr. Spacey's
(6)    credibility and his story, it would be necessary to
(7)    review an e-mail such as this that he wrote the day
(8)    he found out about the allegations, right?
(9)              MR. SCOLNICK:  Objection.  Beyond the
(10)        scope.  Incomplete hypothetical.  Calls for
(11)        speculation.
(12)        A.    If I were specifically evaluating
(13)   Mr. Spacey then reviewing such documents would be
(14)   instructive, sure.
(15)        Q.    Right.  I mean, you could never do a
(16)   complete thorough, fair, and accurate evaluation of
(17)   Mr. Spacey's story and ignore what he said right
(18)   after he found out about it, right?
(19)              MR. SCOLNICK:  Objection to form.
(20)        Vague and ambiguous.  Calls for a legal
(21)        conclusion.
(22)        A.    I can't specifically answer that,
(23)   because I wouldn't know what other information I had
(24)   and whether that information would be enough for me
(25)   to render an opinion.  This letter may or may not
```

(1)                    **- DR. ALEXANDER BARDEY -**                **276**

(2)    **impact on an evaluation, but it might have nothing**

(3)    **to do with whether -- you know, if my task is to**

(4)    **evaluate him psychologically and do a psychosexual**

(5)    **evaluation, I'm not sure this letter would**

(6)    **necessarily change my evaluation one way or the**

(7)    **other.**

(8)        Q.    Well, you'd have to look at it to know,

(9)    right?

(10)        A.    Sure.  If it was made available to me,

(11)    I would look at it and be able to tell you.  Sure.

(12)        Q.    If you found out that Mr. Rapp had

(13)    written an e-mail the night this happened, would you

(14)    say to the lawyers, well, that might not even

(15)    matter, don't show it to me?

(16)        A.    If something exists I'd like to see it.

(17)        Q.    Right.  Because you're full, fair,

(18)    thorough, and accurate.  You want to see anything

(19)    that might relevant, right?

(20)        A.    Up until the time that I have enough

(21)    information to render an opinion, yes.

(22)        Q.    And once you have enough information to

(23)    render an opinion you don't want to know anymore, is

(24)    that your testimony?

(25)        MR. SCOLNICK:  Objection.

```
(1)                - DR. ALEXANDER BARDEY -              278

(2)          Q.      In evaluating whether or not Anthony

(3)     Rapp was telling the truth, did you think it was

(4)     important in any respect to understand what

(5)     Mr. Spacey was saying about what happened?

(6)          A.      In terms of evaluating his

(7)     psychological impact of his claims, no.

(8)          Q.      In evaluating whether or not --

(9)          A.      Hang on, let me finish my answer.

(10)                 In terms of assessing whether or not

(11)    the abuse occurred, sure.

(12)         Q.      And you evaluated whether or not the

(13)    abuse occurred without having any information about

(14)    what Mr. Spacey actually was saying about it, right?

(15)         A.      No.

(16)                 MR. SCOLNICK:   Objection.  Misstates

(17)            the testimony.   The witness already said he

(18)            read the public statement.

(19)         A.      No.   I did not opine that he was lying.

(20)    I raise it as a possibility.   My opinion was about

(21)    the extent and presence of psychological damages.

(22)         Q.      Just stick with my question, Doctor.

(23)                 You evaluated whether or not Anthony

(24)    was telling the truth; yes or no?

(25)         A.      No, that was not the purpose of my
```

```
(1)               - DR. ALEXANDER BARDEY -              279
(2)   evaluation.
(3)        Q.    I didn't ask you the purpose of your
(4)   evaluation, Doctor.  Try to listen to me.  Just try.
(5)        A.    I am listening, but you're
(6)   mischaracterizing my testimony.  My evaluation, and
(7)   it's specifically stated in the beginning of my
(8)   report what I was trying to do, which is to
(9)   determine whether he was psychologically damaged.
(10)  In doing that I considered his credibility and I
(11)  made arguments qualifying his credibility that I
(12)  further qualified during my testimony today.
(13)        Q.    Yes or no, you evaluated Mr. Rapp's
(14)  credibility with respect to whether or not this
(15)  incident happened?
(16)        A.    I considered it.  I did not evaluate
(17)  it.
(18)        Q.    How do you consider it without
(19)  evaluating it?  I mean, what does that mean?
(20)        A.    By evaluation -- you need to explain
(21)  exactly what you mean by evaluation.  In my opinion,
(22)  an evaluation is answering a very specific inquiry.
(23)  Did you evaluate whether he was suffering from a
(24)  mental disease.  Did you evaluate whether he had
(25)  PTSD.  Did you evaluate whether this or that.  It's
```

```
(1)                - DR. ALEXANDER BARDEY -          282
(2)         A.    No, I do not know.
(3)             Q.    If I told you that Mr. Spacey testified
(4)   he really never had any nice encounters with Anthony
(5)   over the years, but he thought it would be congenial
(6)   to put that in a public statement regarding his
(7)   allegations.  How would that affect your
(8)   consideration of Mr. Spacey's credibility?
(9)         A.    I would consider it.  I mean, I'm not
(10)  going to render an opinion based on a single line in
(11)  a letter about someone's credibility, but I would
(12)  certainly consider it in the overall assessment.
(13)            Q.    Would you think the fact that he was
(14)  writing I've only had the nicest encounters with
(15)  Anthony over the years when he later admitted he
(16)  never had any nice encounters with him, would that
(17)  make it more credible, the same, or less credible?
(18)            MR. SCOLNICK:  Objection.  Beyond the
(19)            scope.  Dr. Bardey is not here to testify as
(20)            to Mr. Spacey's credibility.
(21)            Q.    You could answer.
(22)            A.    That would be an inconsistency.
(23)  Whether that inconsistency would ultimately impact a
(24)  credibility would rest on a number of other factors
(25)  and a complete evaluation.
```

- DR. ALEXANDER BARDEY -                    283

(1)

(2)      Q.     Next sentence:  "This is upsetting and

(3)  I wish I remembered anything from what he

(4)  describes."  As a forensic psychiatrist, if

(5)  Mr. Spacey remembered seeing Mr. Rapp backstage with

(6)  Mr. Barrowman, going to dinner with him, going to

(7)  the Limelight with him, going back to the apartment

(8)  with the two of them, would you think that would be

(9)  consistent with the statement "I wish I remembered

(10)  anything from what he describes"?

(11)          MR. SCOLNICK:  Objection.  Richard,

(12)          this is entirely misleading.  This was

(13)          written before the article came out and

(14)          you're implying otherwise.

(15)      Q.   You could answer.

(16)      A.   I mean, the statement could be true or

(17)  could be not true.  I don't think I could qualify it

(18)  just by reading it.  He says he did not remember and

(19)  that he was in the active throes of doing drugs and

(20)  drinking, which obviously can cause blackout and

(21)  impairments in memory, and I think what he's saying

(22)  is very consistent with that.

(23)      Q.   Can you explain that answer please?

(24)      A.   Sure.  I think it's well established

(25)  that drug use and alcohol -- heavy alcohol use can

- DR. ALEXANDER BARDEY -                    284

(1)

(2) lead to impairments in memory, and that he alludes

(3) to that saying that around that time he was using --

(4) you know, a lot of drinking and doing a lot of drugs

(5) and as a result may not have remembered some of his

(6) behavior. So that in and of itself could be true.

(7)       Q.   Could alcohol and drug abuse also lead

(8) to inappropriate sexual conduct?

(9)            MR. SCOLNICK:  Objection.  Beyond the

(10)      scope.  Incomplete hypothetical.

(11)      A.   If you're asking that question in

(12) general, I would have to say sure.

(13)      Q.   By the way, Doctor, someone in

(14) Mr. Spacey's shoes as being accused of this, if they

(15) say they were not attracted to teenage boys that

(16) would be something relevant, right?  If they say,

(17) hey, kids are not my thing that's something that

(18) would be relevant, right?

(19)            MR. SCOLNICK:  Objection.  Beyond the

(20)      scope.

(21)      A.   Sure, I would consider it.

(22)      Q.   Yeah.  And if they say that, one of the

(23) things you'd want to do is consider the credibility

(24) of that statement, kids are not my thing, right?

(25)            MR. SCOLNICK:  Objection.

```
                    - DR. ALEXANDER BARDEY -                285
(1)
(2)      A.    Sure.
(3)      Q.    And in considering that you'd want to
(4)  know about alleged other incidents involving
(5)  teenagers and kids, right?
(6)              MR. SCOLNICK:  Objection.  Beyond the
(7)          scope of testimony.
(8)      A.    If I were conducting a psychosexual
(9)  evaluation of Mr. Spacey then, sure, yes.
(10)     Q.    Because if Mr. Dawes' testimony is true
(11) it undercuts any idea that kids are not his thing,
(12) right?
(13)             MR. SCOLNICK:  Objection.  Richard,
(14)         that is a misrepresentation of the evidence.
(15)         You're talking about someone who is of age in
(16)         the laws of the state at the time.  It's
(17)         misleading.
(18)     Q.    You could answer.
(19)     A.    No.  Again, as we said before,
(20) inappropriate behavior can be borne out of any
(21) number of reasons.  So individuals who are not in
(22) any way attracted to underage people can engage in
(23) inappropriate behaviors with underage people if
(24) driven by other issues, such as substance use or
(25) other forms of mental illness.  It doesn't
```

- DR. ALEXANDER BARDEY -                    286

necessarily mean that they are -- or they are

pedophiles.

(4)     Q.    Gotcha.

(5)           You could just go after teenagers

sexually even if you're not a pedophile, is what

you're saying, if you're psychotic or on drugs or

alcohol, right?

(9)           MR. SCOLNICK:  Objection.  Objection.

Misstates the testimony.  Argumentative.

Assumes facts.

(12)    Q.    You could answer.

(13)    A.    Sure.  That is possible that someone

because of their mental illness, because of their

substance intoxication can involve in behavior that

they wouldn't normally involve in, involving a group

of people that they would never be otherwise

attracted to.

(19)    Q.    Okay.  Continuing on that first

paragraph, Mr. Spacey writes, "I have no memory of

this encounter.  If I made a pass at him when he was

that young, I am shocked and deeply sorry."  Do you

see that?

(24)    A.    Yes.

(25)    Q.    Is that consistent in your mind with

```
(1)                  - DR. ALEXANDER BARDEY -              287
(2)    someone who says kids are not my thing?
(3)         A.    Sure --
(4)              MR. SCOLNICK:   Objection.   Beyond the
(5)    scope.
(6)         A.    Sure it is.   As we just discussed, if
(7)    he engaged in behaviors because of drugs or alcohol,
(8)    he may not be attracted to kids normally.   That may
(9)    be a function of his impaired mental state.
(10)        Q.    Got you.
(11)             And, in fact, in the next sentence he
(12)   writes, "1986 was a period of time when I was
(13)   drinking and doing drugs quite heavily.   It would be
(14)   some months after this period that I would quit both
(15)   drinking and doing any drugs for eight years."
(16)             If you were evaluating Mr. Spacey with
(17)   respect to his credibility on this or if you were
(18)   considering his credibility with respect to this
(19)   incident, would you factor in that statement?
(20)        A.    Sure.
(21)        Q.    How would you factor that in?
(22)        A.    Well, I would want to explore the
(23)   extent and nature of the substance use, how it
(24)   impacted on his behavior.   It would be part of my
(25)   evaluation.
```

- DR. ALEXANDER BARDEY -                    288

(1)

(2)        Q.    And if I asked you to assume that

(3)  Mr. Spacey at trial [sic] when he was confronted

(4)  with this said, no, no, no, I wasn't drinking and

(5)  doing drugs in 1986; now I remember I started doing

(6)  drinking and drugs heavily in 1987.  Would that

(7)  bring up a question for you if you were considering

(8)  his credibility?

(9)              MR. SCOLNICK:  Objection.  Beyond the

(10)        scope.  Incomplete hypothetical.  Form.

(11)             A.    Well, again, based on a single

(12)  statement I can't draw any significant conclusions.

(13)  You're talking about a difference of one year of

(14)  something that would have occurred many, many years

(15)  ago.  If he was throes of active substance use, I'm

(16)  not sure he could credibility remember whether he

(17)  started or stopped in '86 or '87.

(18)             Q.    In other words, if you're an alcoholic

(19)  or a drug addict, it may not affect your memory from

(20)  the things you do under the influence, it may

(21)  actually affect your memory from things you did

(22)  before your addiction, right?

(23)             MR. SCOLNICK:  Objection.  Misstates

(24)        the testimony.  Incomplete hypothetical.

(25)        Calls for speculation.  Beyond the scope.

```
(1)                - DR. ALEXANDER BARDEY -              289
(2)           A.      Long-term alcohol use can cause memory
(3)    deficits in the long run, but that's not an acute
(4)    finding the way an alcoholic blackout is.  What I'm
(5)    saying is when an individual gives a history of
(6)    substance use while they're in the active throes of
(7)    their substance use, they have a hard time recalling
(8)    when they were doing drugs, how much they were
(9)    doing, when it started, when it stopped.
(10)          Q.      And of course '86 to '87 is only a
(11)   one-year difference, it might be hard to
(12)   specifically remember, right?
(13)          A.      Correct.
(14)          Q.      If I told you that Mr. Spacey
(15)   testified, no, no, no, I didn't start drinking
(16)   heavily until I got a continent away in England in
(17)   1987, and he understood these allegations arose from
(18)   New York in 1986; if you were considering his
(19)   credibility, what would you think of that, that not
(20)   only was he a year off, but he was a continent off?
(21)   That he initially said he was drinking in New York
(22)   heavily in '86, but now in the context of this
(23)   lawsuit he remembers he was drinking and doing drugs
(24)   not until he got to England in '87.  How would you
(25)   evaluate that statement?
```

- DR. ALEXANDER BARDEY -                    290

(1)

(2)         MR. SCOLNICK:  This is so far beyond

(3)   what this witness is going to testify to.

(4)   Beyond the scope of the testimony that we

(5)   offered him for.  Beyond the scope of the

(6)   report.  Beyond the scope of what we

(7)   anticipate to be testified to at trial.

(8)   You're asking him to testify about someone

(9)   else's credibility that he hasn't evaluated

(10)  based on limited statements, outside the

(11)  context of any evaluation.

(12)        MR. STEIGMAN:  Well, Chase --

(13)        MR. SCOLNICK:  It's clearly improper.

(14)  You're wasting everyone's time.

(15)        MR. STEIGMAN:  The judge will decide

(16)  that he's chosen, based upon floor plans and

(17)  the evaluation of the credibility of

(18)  Barrowman and a lot of other things, to raise

(19)  the issue that Anthony must be lying.  And

(20)  when there's two people who know or should

(21)  know what happened, if he's going to offer an

(22)  opinion or speculate about Anthony lying, it

(23)  certainly brings up questions about what

(24)  Mr. Spacey says.  And that's my position, you

(25)  have your position.  I told you I acknowledge

- DR. ALEXANDER BARDEY -                          291

(1)

(2)     your objections.  You needn't keep making

(3)     them.  I will not deem them waived to this

(4)     line of questioning.  If you're quiet and let

(5)     us continue when you talk about wasting time,

(6)     and we'll let the judge hash it out when it

(7)     comes to trial.

(8)     Q.    You could answer.

(9)     A.    Well, it would certainly ask for

(10)    further exploration of what exactly the timeline of

(11)    his life, where he was, when he was drinking, when

(12)    he was not drinking.  So those are inconsistent

(13)    statements that would have to be explored further.

(14)    Q.    Yeah.  Because one of things you'd be

(15)    looking out for is someone who is changing his

(16)    testimony just to help himself -- defend himself in

(17)    a lawsuit, right?

(18)    A.    Sure.

(19)    Q.    Because the same way you say that

(20)    Mr. Rapp might be incentivized to win money,

(21)    Mr. Spacey might have equal incentive not to have to

(22)    pay a judgment to Mr. Rapp for what he'd done, don't

(23)    you think?

(24)    MR. SCOLNICK:  Same objections.

(25)    A.    That's a possibility, sure.

```
(1)              - DR. ALEXANDER BARDEY -          294
(2)      A.    Well, that sentence doesn't necessarily
(3)  call for credibility.  It just would pique my
(4)  interest to see exactly what he means by that, and I
(5)  would want to explore that further with him and with
(6)  people that he knew at that time to find exactly
(7)  what those ways were that he's describing.  I don't
(8)  know what that means, behaving in ways that were not
(9)  consistent with the person that I wanted to be.
(10) That could be any number of things, and I'd want to
(11) explore that further before rendering an opinion
(12) about it.
(13)      Q.    I understand.  Because as a forensic
(14) psychiatrist who does this for a living, when you
(15) see the context was an allegation of sexual assault
(16) and his reaction, jeez, I was drinking and doing
(17) drugs heavily, and I was behaving in ways that were
(18) not consistent with the person I wanted to be, it
(19) brings up the possibility that that includes
(20) engaging in the type of conduct for which he was now
(21) being accused, doesn't it?
(22)          MR. SCOLNICK:   Objection.  Calls for
(23)      speculation as to what someone meant in a one
(24)      sentence of an e-mail from four years ago
(25)      regarding something that happened 35 years
```

(1)                    - DR. ALEXANDER BARDEY -                    295

(2)        before.

(3)        Q.     You could answer.

(4)        A.     I think a much deeper inquiry would be

(5)   necessary before rendering any kind of opinion about

(6)   that.  Because again, as I said, I don't know what

(7)   he means by ways that were not consistent.  I don't

(8)   know if that means he was being social or not

(9)   social, or socially withdrawn, or spending a lot of

(10)  money.  It doesn't necessarily imply anything

(11)  inappropriate or sexual at all.  It needs to be

(12)  explored further, but I can't draw conclusions from

(13)  that line.

(14)        Q.     Well, I understand what you're saying.

(15)  If I'm drinking all the time and I'm behaving in

(16)  ways that were not consistent with the person I want

(17)  to be, it might mean I'm sleeping till noon and

(18)  never leaving the house, right?

(19)        A.     It could be, sure.

(20)        Q.     That would be sort of a non-thing to

(21)  point out in the face of an allegation that you

(22)  sexually assaulted somebody, that you were alone too

(23)  much, right?

(24)        MR. SCOLNICK:  Objection.  Calls for

(25)        speculation.

```
(1)                    CERTIFICATION              340

(2)    STATE OF NEW YORK   )

                          )  ss.:

(3)    COUNTY OF NASSAU    )

(4)

(5)              I, KRYSTINA KORNAK, a Notary Public

(6)    within and for the State of New York, do hereby

(7)    certify:

(8)              That ALEXANDER BARDEY, M.D. the

(9)    witness(es) whose deposition(s) is(are) hereinbefore

(10)   set forth, was(were) duly sworn by me and that such

(11)   deposition(s) is(are) a true and accurate record of

(12)   the testimony given by such witness(es).

(13)              I further certify that I am not

(14)   related to any of the parties to the action by blood

(15)   or marriage; and that I am in no way interested in

(16)   the outcome of this matter.

(17)              IN WITNESS WHEREOF, I have hereunto

(18)   set my hand this 8th day of February, 2022.

(19)

(20)   _____

(21)              KRYSTINA KORNAK

(22)

(23)

(24)

(25)
```