# Exhibit 6

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3   _____
                                            )
 4   ANTHONY RAPP and C.D.,                 )
                                            )
 5                  Plaintiffs,             )
                                            )
 6      -against-                           ) Case No.: 20-cv-9586(LAK)
                                            )
 7   KEVIN SPACEY FOWLER a/k/a KEVIN SPACEY,)
                                            )
 8                  Defendant.              )
     _____ )
 9
```

Videotaped/Videoconference Deposition of

CHRISTOPHER DENNY

December 3, 2021

Cila Meyer, CSR No. 4914
478393

BARKLEY
Court Reporters
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco   (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose        (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez        (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn        (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

```
09:17   1        Q    Why did you call Mr. Saghir three months ago?
09:17   2        A    I called him after, um, an unsettling and
        3   surprising incident.  Again, I have not been asked to do
        4   depositions before, so I don't really know -- I haven't
        5   really known how these things work.
09:18   6             Um.  While I was in the midst of a rehearsal in
        7   my own studio with several other people -- I'm a music
        8   director.  That's what I do for a living -- um, my
        9   doorman buzzed me and said that someone was here from --
       10   and he tried to pronounce the name of an organization.
       11   And I didn't know what that was.
09:18  12             I said, "Who are they?"
09:18  13             And he said, "Well, they have some papers, and
       14   the letterhead says" such-and-such.  And I said -- "they
       15   want to see you."
09:18  16             And I said, "I have no idea who that is."
09:18  17             I'm a New Yorker, so I don't let anybody up
       18   unless I know them.  And I said, "I don't know who they
       19   are, but, you know, no.  I'm not going to have anybody
       20   come up right now in the middle of -- of a rehearsal.
       21   We're right in the middle of things.  So if they need to
       22   reach me, they'll reach me another way."
09:19  23             So the person left.  And I was unsettled by
       24   this, and I really couldn't figure out what it could be
       25   about.  You can imagine your mind goes to a million
```

11

```
         1  things.  Why would some law firm be looking for me.
         2  Your mind goes to millions of places of, you know, oh,
         3  you know, why would someone be looking for me.
09:19    4           And what -- what occurred to me as a
         5  possibility was that it could be because I had said I
         6  would testify in this case, that it could be -- it
         7  wasn't going to be Anthony's attorney, because he would
         8  have called me, so I thought perhaps it could be Kevin
         9  Spacey's attorney.
09:19   10           So what I did was I had Peter's number.  I
        11  called Peter and -- because he had called me, so his
        12  number was in my phone.  So I called him, reintroduced
        13  myself, and just said that this had happened.  And I
        14  said, "Is it possible, do you know whether they're
        15  sending people around to the people on the list, you
        16  know, of those who will testify?"
09:20   17           And he just said, "I have not heard of that,
        18  but it's certainly possible that could be what it was."
09:20   19           I just needed to have some idea for my own
        20  peace of mind as to why someone was trying to get up to
        21  my apartment in the middle of my workday without my
        22  knowing who they were and without introducing themselves
        23  in some normal way.
09:20   24           So that was what it was.  He just told me,
        25  "Yes, that's a possibility."  So he said, "If they come
```

12

CHRISTOPHER DENNY

BARKLEY Court Reporters

```
 1  back to you, you know, then let me know" or whatever.  I
 2  don't even think he said that.  He just said, "They may
 3  come back to you later, but don't worry about it."  That
 4  was the gist of it.
 5      Q   Did Mr. Saghir discuss the substance of the
 6  case with you on that second phone call?
 7      A   No.  He simply responded to my question.
 8      Q   Did he say anything else about what you should
 9  do if anyone on behalf of Mr. Fowler tries to serve you
10  in the future?
11      A   No.  No.
12      Q   Did Mr. Saghir --
13      A   No.  I was going to say no.  We didn't discuss
14  anything like that.  I am not wise enough to know that I
15  have any options.  If someone served me, they served me,
16  you know.
17      Q   Did Mr. Saghir tell you that Anthony Rapp
18  listed you as a witness for trial in this case?
19      A   Well, he had asked me for permission to have
20  myself listed as a -- as a witness or a potential
21  witness.  And I had said "yes" in the first phone call,
22  so that was a given in my mind.  I knew that I had
23  volunteered to do that.
24      Q   And did Mr. Saghir tell you that he disclosed
25  your address as part of the typical process of
```

13

```
 1  disclosing a witness for trial?
 2  A    No.  I don't think we talked about it.  Again,
 3  I made assumptions.  You know, I watch television
 4  programs.  That's all I know.
 5  Q    You don't believe there's anything improper
 6  with one side seeking to contact or depose the other
 7  side's witness before trial, do you?
 8  A    Nothing improper.  I naively assumed that
 9  someone would contact me in some normal way like email
10  me, or call me, or something and say, "We want" -- "we
11  need to serve you with this."  You know, I mean some
12  way.  "Will you be home?  You know, just -- I'm not used
13  to people trying to sort of barge in and, you know, kind
14  of get me by surprise.  So that was what . . .
15  Q    Do you remember anything else about that second
16  phone call?
17  A    No, I don't.
18  Q    You mentioned there was a third phone call.
19  Can you tell me about that?
20  A    Well, that was after the people -- two men
21  showed up, when I was out of the apartment working
22  elsewhere, and they showed up and they were let up by my
23  foster son who was here.  They were let upstairs.  My
24  doorman buzzed.  And my foster son, who was here that
25  day, let them up because they said they were -- it was
```

(Timestamps 09:22 appear at lines 2, 5, 8, 15, 17, 18, 20)

14

CHRISTOPHER DENNY

BARKLEY
Court Reporters

```
        1  food delivery.  And in fact I was expecting a shipment
        2  from, you know, some director later that day.  So he
        3  mistakenly thought that's who it was.  And he said,
        4  "Okay.  Come on up."
 09:23  5         And when he opened the door there were two men
        6  videotaping him, who just shoved a platter full of fruit
        7  and cheese and stuff and a note supposedly from Michael
        8  Feinstein in his hands, and then demanded his ID.  And
        9  really shook him.  He was not prepared and said, "Who
       10  are you?"
 09:24 11         "We want to see your ID right now," according
       12  to him.
 09:24 13         And I presume you have videotape of this, so
       14  you know exactly what they did and said.  But his
       15  recounting to me was that they demanded his ID.  He
       16  didn't give them ID.  He didn't know who they were.  So
       17  he just said, "Who are you?"
 09:24 18         And they wouldn't tell him who they were or why
       19  they were there, but they shoved that in his hands and
       20  shoved two envelopes, you know, in his hands without
       21  saying anything about what they were.  And eventually
       22  one of the men said to the other "he's not the person"
       23  or whatever.  But the other kept demanding my foster
       24  son's ID.  And finally they left.
 09:24 25         And I got a series of texts from my, you know,
```

```
 1  foster son just saying, you know, "Call home.  Call
 2  home."
 3         And I interrupted the rehearsal I was in and
 4  called home and was told the story and was obviously
 5  very unhappy with the way these people had behaved.  Um.
 6  So, um, I felt that was worth telling someone, and so I
 7  decided to call Peter Saghir simply because I had spoken
 8  to him when I had -- apparently I assume then, you know,
 9  had someone attempt to come up before, and now they had
10  done it in sort of a sneaky way, and -- and rather upset
11  my foster son.
12         Um.  And so I -- I recounted this to him as I
13  just told you.  And I had opened the envelopes and I had
14  received the paper that specified this date and time for
15  a deposition.
16    Q   And you spoke with Mr. Saghir on that third
17  occasion?
18    A   I told him what had happened.  And I told him
19  that I was upset about it.  And, you know, his advice
20  was simply that, you know, if I didn't want to have
21  people doing this again and again, because they had not
22  served me actually.  They simply put these envelopes in
23  the hands of my foster son, he said, "Perhaps, you know,
24  if you want to, you could call Chase Scolnick and you
25  could simply tell" -- "say that you received this, and
```

```
 1  that you would voluntarily be deposed at this time."
 2  Or in my case I was, at the time, thinking I might like
 3  to move the day a few days later, but it turned out not
 4  to be necessary.  So he simply said, "If you want to,
 5  you could sort of hopefully prevent future occurrences
 6  like that by simply calling and letting them know that
 7  you're willing to voluntarily speak to them."  And I
 8  said I'm going to do that, so I did the next day.
 9      Q    Well, I wasn't aware of the details of the
10  interaction with your son, so I apologize if it was
11  inconvenient or distressing for him.
12           But can you remember anything else about the
13  phone call you had with Mr. Saghir that third time?
14      A    No.  I don't really recall anything else, no.
15      Q    You and I spoke last week; correct?
16      A    Was it last week?  If you say so.  It was a few
17  days ago, yeah.
18      Q    Okay.  We had a short call; correct?
19      A    It was Friday maybe.  I think it was Friday,
20  yeah.  Yes.  I had called you more than two weeks
21  earlier, which was when I had had this conversation -- I
22  know I had called you a couple of weeks earlier and
23  spoken to someone at your office.  Did not hear back.
24  They said they would get you my message and information.
25  Did not hear from you.  So after what I guess was a
```

17

CHRISTOPHER DENNY

BARKLEY
Court Reporters

```
         1  couple of weeks or so, I called again.
09:28    2       Q    I called you last week, returned your call?
09:28    3       A    I think that's correct.
09:28    4       Q    I was polite and courteous on the phone call
         5  with you; correct?
09:28    6       A    Absolutely.  Yeah.
09:28    7       Q    You have no complaints about my interaction
         8  with you, right, on the call?
09:28    9       A    Not at all, no.
09:28   10       Q    When was the last time you spoke with
        11  Mr. Saghir?
09:28   12       A    Um.  Actually, there was a fourth time because
        13  it was just -- I'm sorry.  I'm just not counting
        14  properly.  There was a fourth time.  I spoke with him,
        15  um, I guess it was a couple of nights ago.  And he, um,
        16  he called me simply to make sure that I was doing this,
        17  you know, this date and time; and that I knew that I
        18  had -- it was 12 o'clock our time not 9 o'clock; that I
        19  had to be ready and, you know -- and that I had -- just
        20  to make sure that I knew what time, and that it was on
        21  Zoom, and so on and so forth.
09:29   22            You know, I said, "Yes, I know that."  And I
        23  told him then that I had spoken to you and confirmed I
        24  would do it, and so that was that.  So, yeah, you're
        25  right.  There was -- there was that.
```

18

```
 1            DEPOSITION OFFICER'S CERTIFICATE
 2   STATE OF CALIFORNIA    )
                            ) ss.
 3   COUNTY OF LOS ANGELES  )
 4
 5
 6           I, Cila Meyer, hereby certify:
 7           I am a duly qualified Certified Shorthand
 8   Reporter in the State of California, holder of
 9   Certificate Number CSR 4914 issued by the Certified Court
10   Reporters' Board of California and which is in full
11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).
12           I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being examined,
15   the witness was first duly sworn by me.  (Fed. R. Civ.
16   P. 28(a)(a)).
17           I am not a relative or employee or attorney or
18   counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  (Fed. R. Civ. P.
21   28).
22           I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25                          / / /
```

70

CHRISTOPHER DENNY

BARKLEY
Court Reporters

```
 1    of the testimony given by the witness.  (Fed. R. Civ. P.
 2    30(f)(1)).
 3            Before completion of the deposition, review of
 4    the transcript [xx] was [  ] was not requested.  If
 5    requested, any changes made by the deponent (and
 6    provided to the reporter) during the period allowed, are
 7    appended hereto.  (Fed. R. Civ. P. 30(e)).
 8
 9    Dated: December 20, 2021
10
11                            _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```