# Exhibit 1

```
UNITED STATES DISTRICT COURT                              1

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

ANTHONY RAPP and C.D.,

                    Civil Action No. 1:20-cv-09586(LAK)

                    Plaintiffs,

                    - against -

KEVIN SPACEY FOWLER a/k/a KEVIN SPACEY,

                    Defendant.

------------------------------------------------ X

                    Zoom Deposition

                    December 28, 2021

                    10:05 a.m.




            EXAMINATION BEFORE TRIAL of the

Non-Party Witness, JUSTIN DAWES, pursuant to Notice,

held on the above date and time, via

videoconference, taken by and before KRYSTINA

KORNAK FLORA, RPR, a Notary Public within and for

the State of New York.
```

```
 1                     - JUSTIN DAWES -              7
 2  as a volunteer usher at the Long Wharf Repertory
 3  Theater.
 4        Q.    What is the Long Wharf Repertory
 5  Theater?
 6        A.    It is a theater in New Haven,
 7  Connecticut that produces and shows different types
 8  of plays and theatrical productions.
 9        Q.    You said you were in high school.  How
10  old were you at that time?
11        A.    At that time I had just turned 16.
12        Q.    What grade were you in?
13        A.    That was my junior year of high school,
14  11th grade.
15        Q.    As a volunteer usher at the Long Wharf
16  Theater, tell us what it is that you would do?
17        A.    It was my job to -- once people had
18  entered the theater they would show me their tickets
19  and I would show them to their seats.
20        Q.    Where was home at that time?
21        A.    Home was Clinton, New York.
22        Q.    So how is it that you were volunteering
23  as an usher in Connecticut while you lived in
24  Clinton, New York at that time in high school?
25        A.    I had a friend at the time that I had
```

```
 1                    - JUSTIN DAWES -                    22
 2   time?
 3          A.    I was 16.
 4          Q.    Did you have the drink?
 5          A.    I did.
 6          Q.    How many drinks did you have?
 7          A.    In total two, because at some point,
 8   you know, probably after about 20, 25 minutes Kevin
 9   went to refresh our drinks and my friend and I kind
10   of exchanged looks and, you know, he said, you know,
11   "I don't think this is a party," you know, maybe --
12   he said, "Maybe we should get out of here."  And
13   then Kevin came back, we had a second drink, and
14   when that drink was finished we left.
15          Q.    By the way, at that time what, if
16   anything, did you see Mr. Spacey drinking?
17          A.    It appeared to be the same thing that
18   we were drinking.
19          Q.    A mixed alcoholic cocktail?
20          A.    Yeah.  Again, I mean, I don't -- at the
21   time I had no real frame of reference to know what
22   it was, so I just figured it was a mixed drink.
23          Q.    Do you know how many drinks Mr. Spacey
24   had?
25          A.    I do not.  You know, I know that my
```

```
1                        - JUSTIN DAWES -                    27
2          Q.    Over the course of the night --
3    Withdrawn.
4                Over the course of the night when, if
5    ever, did you change positions in the living room?
6          A.    At one point my friend maybe went to
7    the bathroom or get a drink or something.  Kevin and
8    I were sitting next to each other on the sofa at one
9    point.
10         Q.    What, if anything, happened when you
11   and Mr. Spacey were sitting on the sofa?
12         A.    Mostly chatting, and at one point his
13   hand was on my leg.  You know, I thought it was
14   mildly uncomfortable.  I did not, you know, feel
15   threatened, but I thought it was a kind of, you
16   know, probing of a sexual nature to see how
17   comfortable I was with that.  I don't remember
18   really reacting in any way.  I just kind of -- just
19   kind of froze, just sort of noticed it and continued
20   on.
21         Q.    Why did you feel it was probing of a
22   sexual nature?
23               MR. SCOLNICK:  Objection to form.
24         A.    Well, given the situation, you know,
25   that my friend and I were at his house with the
```

```
 1                    - JUSTIN DAWES -                   28

 2    pornography playing on the TV, you know, I think,

 3    you know, I interpreted it as just a -- you know, a

 4    sort of gauging of how willing I was to, you know,

 5    have any kind of intimacy or sexual contact.

 6           Q.    Where on your leg was his hand?

 7           A.    I'd say about two inches above my knee;

 8    left knee.

 9           Q.    How long was his hand on your leg?

10           A.    Maybe 30 to 45 seconds, it seemed like.

11           Q.    How did it make you feel?

12           A.    Uncomfortable, and also like -- like I

13    was -- like this was going to be disappointing,

14    like, I was going to sort of let someone down,

15    because I knew this was not really going anywhere.

16           Q.    Explain what you mean by that?

17           A.    Like I said, I mean, it felt like a,

18    you know, sort of probing of boundaries and, you

19    know, I -- I was not going to become involved in a

20    sexual situation at that point, so I kind of thought

21    if -- you know, if I didn't then this is going to be

22    disappointing to Kevin who had invited us and was

23    hosting us, and I thought, oh, we're just going

24    to -- we should probably just go.

25                   MR. SCOLNICK:  Objection to form as to
```

```
 1                    - JUSTIN DAWES -              31

 2   where he said, "I think this is the party, we should

 3   go," and we kind of agreed, okay, well, he's making

 4   a drink let's have this drink and go.

 5        Q.    What, if anything, did Mr. Spacey say

 6   when you went to leave?

 7        A.    I would characterize his response as,

 8   you know, mild dismay, slight disappointment, like,

 9   I think he said, "Oh, I thought we were going to

10   hang out."  "I thought we were hanging out."  You

11   know.

12        Q.    So where did you go after Mr. Spacey's

13   home?

14        A.    We just went back to where I was

15   staying with my friend.

16        Q.    Did you ever speak to Mr. Spacey again?

17        A.    I did not.

18        Q.    Mr. Dawes, I want to show you a

19   photograph.

20              MR. SAGHIR:  And I would just ask

21        Ms. Kornak, if she could bring it up please.

22        Q.    Mr. Dawes, are you able to see that

23   photograph?

24        A.    I am.

25              MR. SAGHIR:  Chase, do you have it?
```

```
 1                    - JUSTIN DAWES -                    33
 2              Why is it that you agreed to testify
 3   today in connection with this case?
 4         A.     Basically because I felt that it was
 5   the right thing to do.  I thought that, you know,
 6   while this experience I would not characterize as,
 7   you know, particularly grievous or traumatic for
 8   myself, you know, I think the details of this --
 9   this incident may be salient in, you know -- I
10   thought the information might be relevant and
11   valuable to this trial, this case.
12         Q.     Mr. Dawes, prior to testifying here
13   today did we speak?
14         A.     Yes, we've spoken several times.
15         Q.     Did I ask you what happened when you
16   went to Mr. Spacey's apartment in 1988?
17         A.     You did.
18         Q.     Did you tell me?
19         A.     I did.
20         Q.     Did you tell me the same thing that
21   you've told this jury here today?
22         A.     I've told the exact same thing as best
23   as I could recall.
24              MR. SAGHIR:  Thank you for your time.
25              MR. SCOLNICK:  I have some questions,
```

```
 1                  - JUSTIN DAWES -                35

 2        Q.    By the way, where are you right now?

 3        A.    I am just outside of Portland, Oregon,

 4   staying with a family friend.

 5        Q.    When did you first communicate with

 6   Mr. Rapp's counsel?

 7        A.    I believe it was early December of this

 8   year, about a month ago.

 9        Q.    And how is it that you made contact

10   with Mr. Rapp's counsel?

11             MR. SAGHIR:  Objection to form.

12        A.    I got a message from my mother in law

13   that said that someone had contacted her attempting

14   to reach me, at which point I contacted them.  I

15   contacted the number that had been left as a message

16   for me.

17        Q.    Did you know at the time the message

18   was left that it was Mr. Rapp's counsel?

19        A.    No, I did not.

20        Q.    Do you have a phone number that works

21   in the United States?

22        A.    I do not actually.  Partly because I'm

23   only here during summer and Christmas, and the way

24   phone cards work here is after 60 days the phone

25   number, you know, expires.  So, essentially, every
```

```
 1                    - JUSTIN DAWES -              78
 2   even a bedroom?
 3        A.    No, no one informed me that.
 4        Q.    And did you believe these statements to
 5   be true when you read them in 2017?
 6        A.    Like I said, I had no reason to doubt
 7   the veracity of this account based on my own
 8   interactions with Mr. Spacey.
 9        Q.    I want to put aside your own claims
10   here, because we talked about them in a minute -- we
11   talked about them a few minutes ago.  Are you with
12   me?
13        A.    Hmm-hmm.
14        Q.    Okay.  When you read Mr. Rapp's account
15   that he saw Mr. Fowler standing in a bedroom
16   doorway, did you believe that to be true when you
17   read it; yes or no?
18        A.    I had no reason to doubt the veracity
19   of Mr. Rapp's allegations.
20        Q.    You contacted BuzzFeed after reading
21   this story, correct?
22        A.    I did.
23        Q.    Did the editors or the people at
24   BuzzFeed with whom you spoke, did they tell you that
25   they had concealed details of Mr. Rapp's account to
```

```
 1                    - JUSTIN DAWES -              79
 2   prevent him from being publicly contradicted?
 3        A.    They did not say anything of the sort
 4   to me, no.
 5        Q.    Did they tell you that they concealed
 6   details of Mr. Rapp's account for any reason?
 7        A.    No.  They really did not -- we did
 8   not -- we did not speak about anything really beyond
 9   my own purview of the events which occurred in the
10   fall of 1988, in Mr. Spacey's home that I was
11   involved in.  We did not speak at all to my
12   recollection of anything regarding Mr. Rapp or his
13   case or the events which were reported in this
14   article.
15        Q.    How many times did you speak with the
16   folks at BuzzFeed magazine?
17        A.    So I e-mailed them initially and they
18   e-mailed me back and said that someone would contact
19   me by phone.  Within 48 hours someone contacted me
20   by phone.  They asked me to write an account, I
21   shared an account of those events as to the best of
22   my recollection via e-mail, and then after that they
23   reached out to me several times mainly to kind of --
24   to -- to establish the identities of different
25   people that I talked to after this who could
```

```
 1                   - JUSTIN DAWES -                    80
 2    corroborate these events, that I told them, you
 3    know, shortly after returning back to my high school
 4    from after being in New Haven.
 5           Q.    Okay, you wrote this e-mail to them.
 6    Do you still have this e-mail?
 7           A.    I'm sure I do.
 8           Q.    Will you provide that e-mail to us?
 9           A.    Happily.
10           Q.    Okay.  So I could give you my e-mail
11    address now if you want to write it down.
12           A.    Okay.
13                 Okay, go ahead.
14           Q.    C-S-C-O-L-N-I-C-K, @ --
15           A.    Sorry, I've got C-S-C-O...
16           Q.    L-N-I-C-K @ K-E-L-L-E-R-A-N-D-E-R-L-E,
17    dot com.
18           A.    And that's K-E-L-L-E-R-A-N-D-E-R-L-E,
19    dot com?
20           Q.    Yeah.
21                 MR. SAGHIR:  Just for clarity,
22           Mr. Dawes, let me give you my e-mail address.
23           When you send it to Mr. Scolnick you could
24           send it to me as well.
25                 THE WITNESS:  Okay.
```

```
 1                  - JUSTIN DAWES -              82
 2          A.    Yes, as far as I'm aware of.
 3          Q.    Did you ever ask for a correction to
 4     the story?
 5          A.    I did not.
 6          Q.    Do you believe the story was an
 7     accurate account of what you told them, the story as
 8     it appears in the article?
 9          A.    Yes, I believe so.  You know, I think
10     I -- I talked to them for probably 25 to 30 minutes,
11     so -- and then if you look at the parts that, you
12     know, I'm quoted as saying in the article, that's
13     really about a couple minutes of, you know, if I
14     were to say that, so, I mean, clearly there's
15     probably more that I shared with them that they did
16     not include in the article, but what was included in
17     there I did not find to be inaccurate in any way.
18          Q.    Did you share your friend's identity
19     with them in the e-mail that we were discussing
20     earlier?
21          A.    I did.
22          MR. SAGHIR:  Just note my objection to
23          the e-mail being disclosed to the extent it
24          discloses that person's name.
25                And I would caution Mr. Dawes.  He
```

```
 1                    - JUSTIN DAWES -                88
 2              MR. SCOLNICK:  And just for the record,
 3         I renew my objection to the refusal to
 4         identify this witness.  It clearly does not
 5         fall within the confines of the Court's order
 6         which applies to alleged victims who have not
 7         identified themselves or come forward.  This
 8         person is a witness, and even assuming
 9         Mr. Dawes' story is accurate he wouldn't be a
10         victim, and I think it's a misrepresentation
11         of the Court's order to suggest otherwise.
12              MR. SAGHIR:  That's all pure
13         speculation, Chase, and obviously for the
14         reasons I stated before I believe this may
15         fall within the order of December 13, 2021;
16         and as I've said before, I'm not instructing
17         the witness what to say or not to say, but I
18         am cautioning that there is this order out
19         there that prohibits the disclosure of his
20         name who I believe does fall within the
21         Court's order.
22         Q.    Did you see your -- did you see
23   Mr. Fowler touch your friend in any way?
24         A.    Outside of -- I mean, like, maybe a
25   handshake or a hug upon leaving.  I don't recall,
```

1                      - JUSTIN DAWES -                    89

2    no, I have no specific recollection.

3          Q.    How old was your friend in 1988?

4          A.    I don't know.  I would -- I would be

5    guessing.

6          Q.    How did you meet this friend?

7          A.    I worked with this friend on a

8    theatrical production in Clinton, New York.

9          Q.    Was this through your school or was

10   it --

11         A.    It was a community theater.

12         Q.    This person was older than you, right?

13         A.    Hmm-hmm.

14         Q.    Is that a yes?

15         A.    Yes, it is.  Yes.

16         Q.    Do you know how old -- I'm sorry.  You

17   said you didn't know how old this person was in

18   1988; is that right?

19         A.    I do not know.

20         Q.    You claim you stayed with this friend

21   in Connecticut in 1988; is that right?

22         A.    I did.

23         Q.    Did this person have their own home?

24         A.    He had an apartment.

25         Q.    Who did your friend live with?

```
 1                    - JUSTIN DAWES -                96
 2   but, I mean, most of the adults were.  I could
 3   not -- I cannot say specifically whether he was or
 4   was not.
 5        Q.    Were you drinking at Bennigan's?
 6        A.    I was not able to order drinks, I was
 7   under age.  You know, I might have shared some of my
 8   friend's drink that he had.  That wouldn't be out of
 9   the ordinary.  It's possible.
10        Q.    And you shared drinks with your friend
11   before this alleged night at Bennigan's in 1988?
12        A.    Do you mean prior that evening or in
13   the past prior to that?
14        Q.    In the past prior to that.
15        A.    Yes, we had.
16        Q.    So your friend was at least 21 years
17   old, correct?
18        A.    Yes.
19        Q.    Do you know what your adult friend's
20   relationship was with Mr. Fowler?
21        A.    I do not know.  I do not know
22   specifically.  I mean, I know they weren't close
23   personal friends.  I know that when I came to work
24   there, that I was cautioned by my friend and at
25   least one other person that in my interactions with
```

```
 1                  - JUSTIN DAWES -                  97
 2    Kevin, they said be aware that he is -- has a
 3    fondness or predilection for boys -- younger boys,
 4    so they said just be aware of this in your
 5    interactions with him.
 6         Q.    Mr. Dawes, have you ever told anyone
 7    else this -- this latest detail that someone
 8    allegedly told you that Mr. Fowler has a
 9    predilection for boys?
10         A.    I don't recall telling anyone that, no.
11         Q.    In fact, you never mentioned that to
12    anyone before, just now, have you?
13         A.    Probably not, no.
14         Q.    Okay.
15         A.    I mean, I've told friends and people I
16    knew.  Yeah.
17         Q.    Which friends did you tell that you
18    were approached by someone at the theater who told
19    you that Mr. Fowler has a predilection for young
20    boys?
21         A.    It was brought to my attention that --
22    you know, that -- at that theater and within that
23    community that that was a kind of widely understood
24    fact.
25         Q.    Who told you that it was a widely
```

```
 1                  - JUSTIN DAWES -              102
 2   something to the effect of, oh, you have to see
 3   Chinatown, it's a classic movie, everyone should see
 4   Chinatown.
 5        Q.    Did anyone else -- strike that.
 6              Was anyone else invited?
 7        A.    I know my friend and I were.  I don't
 8   know if anyone else was actually invited.  I was
 9   under the impression that we were not the only
10   people invited.  That was my understanding.
11        Q.    Well, were there other people around at
12   the table when Mr. Fowler allegedly invited your
13   adult friend and you?
14        A.    Yeah.  I believe so, yeah.  There were
15   people -- we were kind of wrapping up.  Yeah, there
16   were some people around.
17        Q.    So did you think those people were also
18   going to attend?
19        A.    I thought that was likely, yeah.
20        Q.    Did you express concern to your friend
21   about what other people had told you about
22   Mr. Fowler and his predilections?
23        A.    No.  No, not necessarily, because, you
24   know, I didn't -- I didn't -- I was not
25   personally -- I didn't feel like I was in danger or
```

- JUSTIN DAWES -                    103

1          jeopardy and I thought, you know, I was with a

2          friend who was older and I thought I was pretty

3          mature and we could handle ourselves if the

4          situation became uncomfortable, which it did and

5          which we did.

6          Q.    How did you get to Mr. Fowler's

7    apartment?

8          A.    My friend's car.  He drove us.

9          Q.    What kind of car did your friend have?

10         A.    I don't know.  It was an early '80s

11   model, two-door hatchback.

12         Q.    How long did it take to get from

13   Bennigan's to Mr. Fowler's apartment?

14         A.    I recall maybe about ten minutes.

15         Q.    Let's talk about the place you claim

16   was Mr. Fowler's apartment.  Was this apartment --

17   was it a separate house or was it a building?

18         A.    I believed it was a -- kind of a

19   narrow, stand-alone house that we were on the ground

20   floor of.

21         Q.    Were there multiple doors for other

22   apartments or it was just a free-standing house?

23         A.    I recall it was -- we just went in the

24   front door of a free-standing house.

```
 1                    - JUSTIN DAWES -              133
 2         Q.    Sir, that was not my question.  Did you
 3   or did you not tell Mr. Saghir that you couldn't
 4   recall the layout of the apartment when he was
 5   asking you questions?
 6         A.    I believe I've answered that question.
 7         Q.    Isn't it true, sir, that you never said
 8   that to Mr. Saghir when he was asking you questions
 9   about the layout of the apartment?  You never told
10   him that you couldn't remember the details of the
11   layout, did you?
12         A.    Well, Mr. Saghir was never browbeating
13   me in an adversarial manner.
14         Q.    Sir, that was not my question.
15               My question:  Did you tell Mr. Saghir
16   when he was asking you question about the layout of
17   the apartment that you could not recall the layout;
18   yes or no?
19         A.    I believe the record will show what I
20   answered to Mr. Saghir's questions.
21         Q.    Have you ever been sexually abused?
22         A.    I have not.
23               MR. SAGHIR:  Objection.
24         Q.    Have you ever told anyone that you were
25   sexually abused?
```

```
 1                        - JUSTIN DAWES -                134
 2          A.    I have not.
 3          Q.    Have you ever accused anyone of
 4   engaging in sexually inappropriate behavior with
 5   you?
 6          A.    I have not, outside of the events that
 7   I've described today.
 8          Q.    Are you claiming that your story is
 9   sexual abuse?
10          A.    I don't believe I've stated that.
11          Q.    That's what I'm asking.  Is it your
12   claim now --
13          A.    You asked me if I have ever accused
14   anyone of inappropriate behavior, and I said I had
15   not outside of the events which I have relayed to
16   you today.  So I would not characterize this as
17   sexual abuse, I would characterize it as
18   inappropriate sexual behavior in the presence of a
19   minor.
20          Q.    You said you're a minor?  You were
21   16 years old at the time, correct?
22          A.    Do I have a different understanding
23   than you do of what a minor is?
24          Q.    Are you aware that the age of consent
25   in Connecticut is 16?
```

```
 1                    - JUSTIN DAWES -                135
 2         A.    No, I was not.
 3         Q.    What, if anything, do you remember
 4   Mr. Fowler saying to you when you claim you were at
 5   his apartment?
 6         A.    It was small talk.  I don't really
 7   recall the content of the conversation.  Mostly had
 8   some drinks, small talk.  We talked about the play,
 9   the people in the play.  I don't recall any more
10   than that.
11         Q.    Are you claiming Mr. Fowler discussed
12   sex with you?
13         A.    I am not.
14         Q.    You claim there was pornography on the
15   television.
16         A.    Yes, that's correct.
17         Q.    Are you alleging that Mr. Fowler said
18   anything about the pornography on the television?
19         A.    No.  I don't recall it ever being
20   mentioned except between my friend and myself.
21         Q.    When you claim you discussed this with
22   your friend was Mr. Fowler present?
23         A.    No.
24         Q.    What does your friend do for a living
25   now?
```

```
 1                     - JUSTIN DAWES -              143
 2          A.    I cannot recall.  I'm aware of the
 3   film, I don't know if I've seen it or not.  If I
 4   have seen it, I have no recollection of seeing it.
 5          Q.    Have you ever met -- I'm sorry, go
 6   ahead.
 7          A.    I could not tell you a thing about that
 8   movie other than its title.
 9          Q.    Have you ever met Mr. Rapp?
10          A.    I have not.
11          Q.    Have you ever communicated with
12   Mr. Rapp?
13          A.    I have not.
14          Q.    When did you first become aware of
15   Mr. Rapp?
16              MR. SAGHIR:  Objection to the form and
17          vague.  What do you mean by that?  Could you
18          clarify?
19              MR. SCOLNICK:  Yeah.
20          Q.    I mean, when did you first become aware
21   of him as an entertainer?
22          A.    I was not -- I didn't really -- I can't
23   say I know him by name.  After the BuzzFeed article
24   I said -- I realized, oh, he was in a movie I've
25   seen, Dazed and Confused, and that was my thought
```

```
 1                    - JUSTIN DAWES -                162
 2         Q.    Have you ever considered filing a case
 3    against Mr. Fowler?
 4         A.    I have not.
 5         Q.    Did you ever discuss with Mr. Saghir
 6    the possibility of filing a case against Mr. Fowler?
 7         A.    We have -- we have discussed nothing of
 8    the sort.
 9         Q.    Do you claim to have been traumatized
10    by your allegations against Mr. Fowler?
11         A.    I never claimed to have been
12    traumatized.  I've claimed to have been made
13    uncomfortable; I've claimed to have been dismayed,
14    to have been mildly disturbed.  But traumatized?
15    No, I've never used that phrase.
16         Q.    Do you believe that you suffered
17    psychologically in any way by what you claim
18    happened at Mr. Fowler's apartment?
19              MR. SAGHIR:  Objection.  This goes way
20         beyond the scope.  Improper question for this
21         witness.  Not relevant to the claims.
22         A.    I believe that would really depend on
23    what was the definition of "suffered
24    psychologically."  I think it would be unfair and
25    down-playing of people who have really suffered at
```

```
 1                    - JUSTIN DAWES -                 166
 2   right?
 3          A.    I've been consistent in what I've
 4   claimed happened.
 5          Q.    Are you claiming that Mr. Fowler
 6   touched your buttocks?
 7          A.    I have not claimed that.
 8          Q.    Are you claiming that Mr. Fowler
 9   touched your friend in any way that was sexual?
10          A.    Not that I'm aware of.
11          Q.    Has your friend ever told you that he
12   was touched inappropriately by Mr. Fowler?
13          A.    I have not.
14          Q.    Did Mr. Fowler remove his clothing?
15          A.    He did not.
16          Q.    What was he wearing?
17          A.    I would be guessing to recall that.  I
18   don't know.
19          Q.    Was the pornography you claim to be
20   playing, was it on a VCR?
21          A.    I don't know.  I assumed it to be, as
22   that's how most, you know, movies were shown at the
23   time.  I don't recall seeing a -- specifically
24   seeing a VCR, but I assumed that it was a VHS tape.
25          Q.    How big was the TV?
```

```
 1                     CERTIFICATION                   199
 2   STATE OF NEW YORK  )
                        )  ss.:
 3   COUNTY OF NASSAU   )
 4
 5              I, KRYSTINA KORNAK, a Notary Public
 6   within and for the State of New York, do hereby
 7   certify:
 8              That JUSTIN DAWES the witness(es)
 9   whose deposition(s) is(are) hereinbefore set forth,
10   was(were) duly sworn by me and that such
11   deposition(s) is(are) a true and accurate record of
12   the testimony given by such witness(es).
13              I further certify that I am not
14   related to any of the parties to the action by blood
15   or marriage; and that I am in no way interested in
16   the outcome of this matter.
17              IN WITNESS WHEREOF, I have hereunto
18   set my hand this 5th day of January, 2022.
19
20   _____
21              KRYSTINA KORNAK
22
23
24
25
```