# Exhibit 2

```
1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
2
                   CASE No. 20-CV-9586 (LAK)
3

4   ANTHONY RAPP, and C.D.

5           Plaintiffs,

6   -vs-

7   KEVIN SPACEY FOWLER, a/k/a Kevin Spacey,

8           Defendant.
    _____
9
```

REMOTE REALTIME/VIDEO DEPOSITION

of LISA MARIE ROCCHIO, PH.D

April 16, 2021

Robin Marie Dispenzieri, RCR, OCR
472120

**BARKLEY**
Court Reporters
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco   (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose        (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez        (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn        (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

```
 1                P R O C E E D I N G S
 2                        - - -
 3    (11:04 a.m.)
 4            THE VIDEOGRAPHER:  We are now going on the
 5    record.
 6            Good morning.  My name is Rob Chnag.  I am a
 7    Videographer associated with Barkley Court Reporters.
 8            The date is April 16, 2021.  The time is
 9    11:04 a.m. Eastern Daylight Savings Time.
10            This deposition is taking place via remote
11    method in the matter of Anthony Rapp, et al, versus Kevin
12    Spacey Fowler, case Number 20CV9586(LAK).
13            This is the video deposition of Lisa Marie
14    Rocchio being taken on behalf of Defendant.
15            Will counselors for all the parties please
16    identify themselves beginning with Defense Counsel.
17            MR. SCOLNICK:  Good morning.  Chase Scolnick of
18    Keller Anderle on behalf of Mr. Fowler.  And I'm joined
19    by Jennifer Keller also of Keller Anderle on behalf of
20    Mr. Fowler.
21            MS. KELLER:  Good morning.
22            MR. SAGHIR:  Good morning.  Peter Saghir of
23    Gair, Gair, Conason on behalf of Anthony Rapp.
24            THE VIDEOGRAPHER:  Thank you.
25            Madame Public Official can now swear in the
```

4

LISA MARIE ROCCHIO, PH.D

BARKLEY
Court Reporters

```
 1  witness.
 2          PUBLIC OFFICIAL:  Thank you.
 3          Doctor Rocchio, would you please raise your
 4  right hand.  Do you solemnly swear to tell the truth, the
 5  whole truth and nothing but the truth, so help you God?
 6          THE WITNESS:  I do.
 7          PUBLIC OFFICIAL:  Thank you.
 8          MR. SAGHIR:  Chase, before we begin, I just want
 9  to put a brief statement on the record that we are
10  requesting, pursuant to 30(e)(1), the opportunity to
11  review and sign the deposition transcript.
12          MR. SCOLNICK:  Okay.
13          PUBLIC OFFICIAL:  I am going to head out.  Thank
14  you, everybody.
15                         - - -
16                    DIRECT EXAMINATION
17  BY MR. SCOLNICK:
18  Q.   Good morning, Doctor Rocchio.
19  A.   Good morning.
20  Q.   Doctor Rocchio, you have been retained by Peter
21  Saghir's law firm, correct?
22  A.   Yes.
23  Q.   And you were retained to conduct a forensic
24  evaluation on Anthony Rapp; is that true?
25  A.   Yes.
```

```
 1  Q.   And on the criminal side, you said how many would
 2  you estimate?
 3  A.   That have experienced some form of sexual abuse, the
 4  vast majority.
 5  Q.   What about in your clinical practice?  How many
 6  people have you encountered who have claimed to have
 7  suffered from sexual abuse?
 8  A.   Hundreds upon hundreds.  It's a primary area of
 9  expertise of mine so I get referrals and treat
10  individuals.  Probably, by this time over the course of
11  my career, as many as 1,000 I've assessed and treated for
12  issues related to sexual abuse either as children or as
13  adults sexual assault, sexual violence in the context of
14  intimate partner relationships, childhood sexual abuse.
15  Q.   And of those thousand or so clients, patients that
16  you've evaluated and worked with in a clinical setting
17  who claimed to have been abused sexually, how many of
18  them, if any, have you found to have lied about whether
19  they were abused?
20  A.   None.  That's not my role.  My role as a therapist
21  is not to determine the specific facts of what has or
22  hasn't happened.
23           I wouldn't tell someone that they were lying
24  just as I wouldn't tell someone yes, this happened.  I
25  have no way of knowing that.
```

```
 1  Q.  I think my question is a little bit different.  I
 2  understand that you're not going to necessarily tell
 3  someone that they're lying.
 4          Let me ask you this way.  Of the thousand
 5  patients that you've seen who claim to have been sexually
 6  abused, have you ever refused to treat any of them
 7  because you found that you don't believe they're claims
 8  of being sexually abused?
 9  A.  No.
10  Q.  By the way, Doctor, it can be a long day so let me
11  know whenever you want to take a break.
12          Is it part of your role as a treating therapist
13  to determine whether someone's claims of past sexual
14  abuse are credible?
15  A.  No.
16  Q.  In the forensic context, it is part of your job to
17  determine whether claims of sexual abuse are credible,
18  correct?
19  A.  My understanding is that credibility specifically is
20  a matter for the finder of fact.  So my role is to
21  determine whether the data does or does not support their
22  claims.
23  Q.  So when did you begin doing forensic work?
24  A.  Shortly after becoming licensed as a clinical
25  psychologist.
```

```
 1  Rapp before 1986?
 2  A.   I did not.
 3  Q.   Did you request to speak with any witnesses who knew
 4  Mr. Rapp in 1986?
 5  A.   I did.
 6  Q.   Who did you request to speak with?
 7  A.   Um, his brother Adam.
 8  Q.   And were you able to speak with him?
 9  A.   I was not.
10  Q.   Why not?
11  A.   The timing of the evaluation was really fast and I
12  didn't have time to set up a meeting time with Adam, um,
13  prior to having to write my report and submit it.
14  Q.   Do you plan to speak with Adam before trial?
15  A.   Not at this time, no.
16  Q.   Do you plan on speaking with any other witnesses
17  before trial?
18  A.   Not at this time, no.
19  Q.   You did speak with three witnesses in addition to
20  Mr. Rapp, correct?
21  A.   I did.
22  Q.   And those witnesses are Robin Magid, Sean Snow and
23  Ken Ithiphol?
24  A.   Yes.
25  Q.   I would like to speak with you about those
```

```
 1  always present in a legal case, then the forensic
 2  evaluation has to include a careful assessment of both
 3  response style and malingering.
 4  Q.   Okay, I'm turning to Exhibit 8.  I will share it
 5  with you.  Does Exhibit 8 appear in your report?
 6  A.   It does.
 7  Q.   This is a report that you wrote to summarize your
 8  findings and evaluation of Mr. Rapp?
 9  A.   Yes.
10       (Defendant Exhibit No. 8 was marked for
11  identification.)
12  BY MR. SCOLNICK:
13  Q.   And your opinions and conclusions are at the end of
14  the document, right?
15  A.   Yes.
16  Q.   I would like to turn to those.  Starting at page 19,
17  those are your opinions?
18  A.   Yes.
19  Q.   These are the opinions that you expect to offer in
20  this case?
21  A.   Yes.
22  Q.   Do you expect to offer any other opinions that are
23  not listed in this opinion section?
24  A.   No.
25  Q.   The first opinion is, "Mr. Rapp is a 49-year-old
```

219

```
 1   actor who reports having been sexually assaulted by Kevin
 2   Spacey, in the late spring or early summer of 1986, when
 3   Mr. Rapp was 14 years old and Mr. Spacey was in his 20s."
 4           "The results of the evaluation found ample
 5   evidence to support conclusive that Mr. Rapp experienced
 6   this reported episode of sexual victimization by
 7   Mr. Spacey, in the spring or summer of 1986, at
 8   Mr. Spacey's home, when Mr. Rapp was age 14."
 9           My question is, and I think we've covered this
10   before, you understand that you're not the fact finder in
11   this case, right?
12   A.   Of course.
13   Q.   You're not going to make credibility evaluations.
14   That's the job of the jury, right?
15   A.   Correct.
16   Q.   And you're not opining whether or not Mr. Rapp's
17   allegations are true or false, right?
18   A.   I am stating what the evidence in the case that I
19   reviewed supported.  So, yes, correct.
20   Q.   Going to number 4.  It's your opinion that Mr. Rapp
21   is currently experiencing PTSD; is that correct?
22   A.   Yes.
23   Q.   And you believe that that's a result of his
24   allegations against Mr. Fowler, right?
25   A.   I believe it's the result of the incident he alleges
```

```
 1  2017, Mr. Rapp scored 28 out of 80, correct?
 2  A.  On that screening measure, yes.  But again, on the
 3  PCL, the way that -- you don't only look at the total
 4  score because someone could have a very, very high total
 5  score, but if those scores are all coming, say for
 6  example, from only one or two of the criterion, even if
 7  they had an extremely high score, say, well over 38, if
 8  they don't have the other criteria, then they wouldn't
 9  meet full criteria for the diagnosis.  And, I mean,
10  that's fine.
11       Many people can have significant certain
12  ascribed difficulties in response to trauma even if they
13  don't have PTSD although that wasn't the case with Mr.
14  Rapp.
15  Q.  In reaching your opinion, are you making any
16  assumptions?
17  A.  No.
18  Q.  Are you assuming that the allegations are true?
19  A.  No.
20  Q.  Well, if the allegations are not true then,
21  obviously, Mr. Rapp does not suffer from PTSD related to
22  the allegations, correct?
23  A.  You asked me if I came into the evaluation with any
24  assumptions.
25  Q.  No, I'm sorry.  That wasn't my question.
```

242

LISA MARIE ROCCHIO, PH.D

BARKLEY Court Reporters

1          I'm saying in reaching your conclusions, are you
2  making any assumptions?
3  A.   So it's not an assumption.  And as I indicated in my
4  conclusion, the data suggests that the incident occurred.
5  There's an enormous amount of corroboration, and in order
6  to make a diagnosis -- I mean, in my office, for example,
7  I go by what someone has told me.
8          A forensic evaluation is, obviously, a much
9  higher standard.  But yes, obviously, there's -- I guess
10 what I'm objecting to is your use of the word
11 "assumption."  It's a finding.  But it's not just an
12 assumption.  It's a conclusion that's based on my
13 evaluation in its entirety and numerous and extensive
14 data points including assessment from a lingering review
15 of documents.
16 Q.   One of your assessments for malingering was the text
17 you referred to in your conclusions and it is, let's see,
18 the M-FAST, correct?
19 A.   Yes, it's a screening measure.  So it's akin to the
20 PCL where you give the measure and if someone's scores
21 are elevated on that measure, then it warrants further
22 assessment with a different measure.  But in this case,
23 clearly, Mr. Rapp's responses did not warrant that, so
24 that additional measure was not administered.
25 Q.   The M-FAST test does not ask those questions related

```
 1  Q.   You would agree with me that if Mr. Rapp's
 2  allegations are false, then your opinion would not be
 3  valid, right?
 4  A.   Certainly, yes.
 5  Q.   You agree with me that if Mr. Rapp lied to you
 6  during your interview, then your opinion would not be
 7  valid, right?
 8            MR. SAGHIR:  Objection.
 9            THE WITNESS:  I would agree that if the events
10  described never occurred, then my opinions clearly would
11  not be valid, yes.
12  Q.   Your opinion depends on Mr. Rapp's allegations being
13  true, right?
14  A.   In part.  I mean, parts of my opinion, for example,
15  overall psychological functioning, his current symptoms.
16  It's not just about his allegations being true but now we
17  would also be talking about the opinions and observations
18  of multiple other individuals over the course of many,
19  many, years.
20  Q.   Your attempt to determine whether Mr. Rapp suffers
21  from any personality disorders.
22  A.   That was certainly something that I considered in
23  the course of my evaluation, yes.
24  Q.   What test did you administer to determine whether
25  Mr. Rapp suffers from any personality disorders?
```

```
 1                    C E R T I F I C A T E

 2

 3
               I, Robin M. Dispenzieri, Registered Professional
 4   Reporter, do hereby certify that I was authorized to and did
     remotely report said remote video and realtime deposition of
 5   Lisa Marie Ricchio, PH.D and that the foregoing pages are a
     true and correct transcription, to the best of my ability, of
 6   this deposition held remotely.

 7             I further certify that I am not attorney or counsel
     of any of the parties, nor am I a relative or employee of any
 8   attorney or counsel of party connected with the action, nor am
     I financially interested in the action.
 9
               The foregoing certification of this transcript does
10   not apply to any reproduction of the same by any means unless
     under the direct control and/or direction of the certifying
11   reporter.

12             Dated this 30th day of April, 2021.

13

14

15
             /_____
16
             Robin M. Dispenzieri, RPR, OCR
17           Catuogno Court Reporting
             One Monarch Place; Suite 200
18           1414 Main Street
             Springfield, MA 01144-0600
19           Telephone:  413-233-9282
             Job #472120

20

21

22

23

24

25

                              255
```