CERTIFIED COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE No. 20-CV-9586 (LAK)

ANTHONY RAPP, and C.D.

    Plaintiffs,

-vs-

KEVIN SPACEY FOWLER, a/k/a Kevin Spacey,

    Defendant.
_____

REMOTE REALTIME/VIDEO DEPOSITION

of LISA MARIE ROCCHIO, PH.D

April 16, 2021

Robin Marie Dispenzieri, RCR, OCR
472120

BARKLEY Court Reporters
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles  (415) 433-5777 San Francisco  (949) 955-0400 Irvine  (858) 455-5444 San Diego
(310) 207-8000 Century City  (408) 885-0550 San Jose  (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento  (800) 222-1231 Martinez  (702) 366-0500 Las Vegas  (800) 222-1231 Monterey
(951) 686-0606 Riverside  (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson  (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn  (518) 490-1910 Albany  (914) 510-9110 White Plains
(312) 379-5566 Chicago  00+1+800 222 1231 Paris  00+1+800 222 1231 Dubai  001+1+800 222 1231 Hong Kong

career.  But no, it has never reached 50 percent of my time.

Q. What's your understanding as to why you have been doing more forensic work in the last five years than in earlier years?

A. Personal reasons based on my life in terms of my schedule permitting more of that professional interest and receiving more referrals through word of mouth.  Also having done more presentations and trainings, I think I have become better known in my areas of expertise.

Q. And what are your areas of expertise?

A. I am a clinical and forensic psychologist with expertise in traumatic stress and interpersonal violence.

Q. Do you believe that the #MeToo movement -- first of all, are you familiar with the #MeToo movement?

A. I am.

Q. Do you believe that the #MeToo movement has contributed to your increased work as an expert?

A. No, not in any concrete way.

Q. Do you believe you contributed in any way to the #MeToo movement?

A. Not to my knowledge.  I mean, I've contributed in terms of in my professional work as a therapist, certainly, helping people to cope with the aftereffects of sexual abuse but not specifically to the #MeToo

```
 1            MR. SAGHIR:  Objection to the form as compound.
 2   Rephrase it, Chase.
 3            MR. SCOLNICK:  Sure.
 4   BY MR. SCOLNICK:
 5   Q.   There have been a number of public allegations that
 6   have been made, as part of the #MeToo movement, against
 7   men in power, correct?
 8   A.   Yes.
 9            MR. SAGHIR:  Objection.
10   BY MR. SCOLNICK:
11   Q.   Are you aware or do you believe that any of those
12   public allegations made against a man, a prominent man in
13   power, are false?
14   A.   I have no opinions --
15            MR. SAGHIR:  Again, note my objection to this
16   line of questioning.
17            MR. SCOLNICK:  I'm sorry, I talked over Doctor
18   Rocchio.  What was your answer?
19            THE WITNESS:  I have no opinion about the truth
20   or lack of truth about any specific allegation about
21   which I have no direct knowledge or information.
22   BY MR. SCOLNICK:
23   Q.   I'm going to share screen 3 which will show you
24   Exhibit 9.  If you go to the top of Exhibit 9.  This is a
25   copy of your CV, correct?
```

traumatic event.

Q. And there are many adults who have suffered more than one traumatic event in their life, right?

A. Yes.

Q. Although the incidents of traumatic event is high, the prevalence of PTSD following a traumatic event is relatively low, right?

A. Yes, depending on the type of traumatic event.

So, for example, when someone has been the victim of interpersonal violence, we see higher rates of PTSD than in other types of traumatic events. But, overall, as I have said, PTSD is but one potential possible consequence of exposure to a traumatic event and, certainly, not everyone or even the majority of people do not develop PTSD.

Q. What is the incidence of PTSD in individuals who have suffered interpersonal violence?

A. I would have to look that up. I wouldn't want to hazard a guess.

Q. Is it fair to say that in any forensic evaluation where there may be external motivation to either exaggerate or minimize symptoms, it's essential that the possibility of malingering be considered and evaluated?

A. Yes.

Q. It's important to accurately identify genuine cases

1 of malingering is the intentional production of false or
2 grossly exaggerated physical or psychological symptoms,
3 motivated by external incentives," correct, and then it
4 gives examples?
5 A. Yes.
6 Q. The DSM-5 states that malingering should be strongly
7 suspected if any combination of the following is noted.
8 It gives us four different examples, right?
9 A. Yes.
10 Q. The first is if the evaluation appears in the
11 medical legal context, right?
12 A. Yes.
13 Q. Now, in this case, your evaluation of Mr. Rapp was
14 in a medical legal context, right?
15 A. Yes.
16 Q. Okay. The second is, "a marked discrepancy between
17 the individual's claim of stress or disability and the
18 objective findings and observations." Did I read that
19 correctly?
20 A. Yes.
21 Q. Did you consult with this section, by the way,
22 during your evaluation of Mr. Rapp?
23 A. Not specifically with this section but I certainly
24 paid careful attention and utilized measures in order to
25 assess specifically for malingering throughout my

```
 1  evaluation.
 2  Q.  Okay, did you come to a determination whether there
 3  is a discrepancy between Mr. Rapp's claimed stress and
 4  the objective findings and observations?
 5  A.  I did.
 6  Q.  And what was your conclusion?
 7  A.  That Mr. Rapp's reports to me of his claimed stress
 8  was highly consistent with the objective findings and
 9  observations not only of the evaluation but with other
10  forms of data that I reviewed in the context of the
11  evaluation.
12  Q.  What was the other data that you reviewed?
13  A.  Everything that was listed in the data section of my
14  report.  So it included, for example, um, his -- the
15  text, the collection of texts, collateral interviews with
16  others.  Um, some of the reports of news articles, claims
17  that Mr. Rapp had made publically over time.  Everything
18  that I reviewed in coming to my opinions and conclusions
19  is listed in the report.
20  Q.  Have you reviewed any information or considered any
21  information relating to Mr. Rapp's allegations that was
22  not included in your report?
23  A.  No.
24  Q.  When did you first become aware of Mr. Rapp's
25  allegations against Mr. Fowler?
```

```
 1  Q.   I think my question is a little bit different.  I
 2  understand that you're not going to necessarily tell
 3  someone that they're lying.
 4           Let me ask you this way.  Of the thousand
 5  patients that you've seen who claim to have been sexually
 6  abused, have you ever refused to treat any of them
 7  because you found that you don't believe they're claims
 8  of being sexually abused?
 9  A.   No.
10  Q.   By the way, Doctor, it can be a long day so let me
11  know whenever you want to take a break.
12           Is it part of your role as a treating therapist
13  to determine whether someone's claims of past sexual
14  abuse are credible?
15  A.   No.
16  Q.   In the forensic context, it is part of your job to
17  determine whether claims of sexual abuse are credible,
18  correct?
19  A.   My understanding is that credibility specifically is
20  a matter for the finder of fact.  So my role is to
21  determine whether the data does or does not support their
22  claims.
23  Q.   So when did you begin doing forensic work?
24  A.   Shortly after becoming licensed as a clinical
25  psychologist.
```

<mark>38</mark>