MABKRAP1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ANTHONY RAPP, et al.,

            Plaintiffs,

              v.                  20 CV 9586 (LAK)
                                  Jury Trial

KEVIN SPACEY FOWLER, also
known as Kevin Spacey,

            Defendant.

------------------------------x
                             New York, N.Y.
                             October 11, 2022
                             9:30 a.m.

Before:

                  HON. LEWIS A. KAPLAN,

                             District Judge
                              And A Jury
                    APPEARANCES

GAIR GAIR CONASON RUBINOWITZ BLOOM HERSHENHORN STEIGMAN &
MACKAUF
     Attorneys for Plaintiffs
BY:  RICHARD M. STEIGMAN
     PETER JAMES SAGHIR

KELLER/ANDERLE LLP
     Attorneys for Defendant
BY:  JENNIFER KELLER
     CHASE SCOLNICK
     JAY PHILLIP BARRON

ALSO PRESENT:

ANGELLA IBISHAJ, Gair Gair Conason Rubinowitz Bloom Hershenhorn
Steigman & Mackauf

MABKRAP1

(In open court; jury not present)

THE COURT:  Good morning, everybody.

COUNSEL:  Good morning.

THE COURT:  We do have all the jurors here, but I understand you have an issue?

MR. STEIGMAN:  Yes, your Honor.  Last night, around 7:30 p.m., defense counsel emailed us three new trial exhibits denoted XX, YY, and ZZ.

THE COURT:  And this is something that we have to take up before we complete the cross?

MR. STEIGMAN:  No.

THE COURT:  No?  So let's do it later.

MR. STEIGMAN:  Sure.

THE COURT:  Okay.  Let's bring in the jury.

And it would probably be useful to give me copies of what you're talking about.  Thank you.  You can give them to Andy when he comes back.

MR. STEIGMAN:  Okay.

(Continued on next page)

(Jury present)

THE COURT:  Good morning.  I hope everybody had a good weekend.

Mr. Rapp, you should resume the stand, and you are still under oath.

Mr. Saghir, you can proceed.

MR. SAGHIR:  Thank you, your Honor.

ANTHONY RAPP, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. SAGHIR:

Q.  Good morning, Anthony.

A.  Good morning.

Q.  Anthony, you testified on Friday that you went to The Limelight with Kevin Spacey and John Barrowman.

When, if ever, was Mr. Barrowman your chaperone that night?

A.  Never.

Q.  Did you have a curfew?

A.  I did not.

Q.  Explain that.

A.  I had been coming home after the show during the performance weeks at anytime depending.  Sometimes I would go home directly after the show, sometimes I would go out with the actors or people from the community who came to see the show with my costars.  There was no established curfew by my mom of

when I had to get home.  I had been making my way home sometimes 11:30, sometimes midnight, sometimes 1:00 a.m.  I'd been making my way home safely that whole time that I'd been in New York, so I didn't have a specific curfew.

Q.  You testified on Friday that after Mr. Spacey climbed on top of you, he pressed his pelvis into your hip.

Anthony, when you felt him pressing his pelvis into your hip, tell us what you were thinking.

A.  I was thinking that he was trying to get with me sexually.

Q.  Why did you think that?

A.  Because he was pressing his pelvis -- his pelvis into my hip, and he was holding me tightly with his hands, clutching my shoulders, and he was pressing into me on his bed.

Q.  Anthony, you mentioned on Friday that you had had certain periods in your acting career where jobs may have been far and few between.  You told us about the time that you were a barista at Starbucks.

When, if ever, was there another time what you had a dry spell in your career?

A.  It was sometime around the year 2000, for a little bit of time, where I -- yeah, I'd been having some auditions that hadn't come through.

Q.  What did you do at that time?

A.  I went out to L.A. for a short period, another attempt to have more meetings and auditions, and while I was out there is

when I was cast in *A Beautiful Mind*.

Q.  How long of a period of time was it that you weren't getting jobs?

A.  It's hard for me to recall the exact length of time.  It was a few months.  I'm not certain; I'm estimating.

Q.  Anthony, when, if ever, did you grow bitter during that period of time?

A.  I never grew bitter during that period of time.

Q.  When, if ever, did you blame that dry spell on being an out-gay actor?

A.  Never, ever.

Q.  When, if ever, have you blamed anything on your career on being an out-gay actor?

A.  Never.

Q.  I want to direct your attention back to *Precious Sons* and the performance you were doing at that time.

Ms. Keller showed in her opening statement a photograph of Ed Harris holding you, much like a groom carries a bride.  Anthony, what similarities, if any, are there between how Mr. Spacey held you and how Ed Harris held you in *Precious Sons*?

A.  Well, the only similarity is that I was being held in the air, with his arm -- one arm behind my back and one arm in the crook of my knee.  Every other aspect -- every other aspect of that experience was entirely different.

Q.   Explain that.

A.   He was playing my father, we had a close relationship as actors offstage, it was written into the play, it was a loving moment between father and son, it was carefully staged, there was nothing at all sexual about it.  It was purely a father being silly, and there's a little bit of horseplay in that scene.  And as you see in the picture, too, my arms were around his shoulders and holding him, so it was a loving moment between father and son.  And that is not what the other experience was.

Q.   Were there any other scenes in *Precious Sons* that were similar to your experience with Kevin Spacey?

A.   There was one other scene, yes.

Q.   Tell us about that scene as it happened in the play *precious Sons*.

A.   In the play, at one point, my character was sleeping on the couch in the living room, and it was very dark, and Ed Harris' character as the father, he had a big fight with his wife, my mother, and he stumbled in very drunk, his character, and he approached my character, who was asleep on the couch, mistaking me for his wife.  So, talking, saying her name, and starting -- started to climb on top of me saying Bea, Bea -- I don't remember the exact dialogue, but, like, trying to reconcile with her, make love to her, some version of that, and my character was startled awake, and I don't remember if he ran

away or I ran away, but it ended that scene.

Q.  And what differences, if any, were there between what happened on the stage and what happened with Kevin Spacey in his apartment?

A.  Well, again, we were actors, it was a scene that was written into the play, it was done with care and consent --

MS. KELLER:  Objection; nonresponsive.

THE COURT:  Sustained.

BY MR. SAGHIR:

Q.  Anthony, focusing on the differences, what was different with what Kevin Spacey did to you?

A.  I don't know how to answer -- the difference was Ed Harris' character started to climb on top of me as I was asleep on the couch, so that was different, I wasn't asleep on the bed.  He started to do this, my character immediately was startled awake, and then it stopped, and I'm not sure how else I can answer it.

Q.  And then Kevin Spacey, what happened?

A.  And Kevin Spacey had picked me up, he had laid me down, and he had climbed on top of me.

Q.  Anthony, when, if ever, did Ed Harris press his pelvis into your hips?

A.  Never.

Q.  When, if ever, did you feel your hands restricted by Ed Harris when you were doing the play *Precious Sons*?

A.   Never.

Q.   When, if ever, did you feel that Ed Harris was trying to get with you sexually while you were performing in the play *Precious Sons*?

MS. KELLER:   Objection; irrelevant.

THE COURT:   Sustained.

BY MR. SAGHIR:

Q.   Anthony, was there any period of time where you felt that Ed Harris was trying to get with you sexually?

THE COURT:   Sustained.

Q.   Anthony, when, if ever, have you confused what Ed Harris did to you in *Precious Sons* with what Kevin Spacey did to you in his apartment?

A.   Never.

Q.   Approximately when did you leave New York after performing in *Precious Sons*?

A.   Sometime -- I don't remember if it was the end of May/beginning of June, but it was several weeks after the play closed.

Q.   Where did you return to?

A.   To Joliet.

Q.   Anthony, who was the first person, if anyone, that you told about what happened with Kevin Spacey?

A.   My friend from school, Christopher Hart.

Q.   Approximately when is it that you told him what happened?

A.   I don't recall -- approximately at some point while we were still in school together.

Q.   In high school?

A.   In high school.

Q.   Who is Christopher Hart?

A.   He's a friend that I had known and was one of my very closest friends from fifth grade.

Q.   Tell us about what your relationship was like with Christopher Hart, your friendship, in middle school and beyond.

A.   He was one of the nerd friends.  We were in choir together and swing choir together.  And he especially, among all my friends, we talked the most intimately about -- I'd had one girlfriend in junior high, very, very briefly, but he was a little more experienced in relationships, so that was something we talked about, and he shared with me a lot about what he was going through in his relationships such as they were in junior high and high school.

Q.   What was the age difference between you and Christopher?

A.   We were in the same grade, but I'd skipped a grade, so there was a year between us.

Q.   Now, did there come a point in time where you told Christopher what happened?

A.   There did.

Q.   How many times did you tell him?

A.   Once.

Q.   What is it that provoked that conversation?

A.   I don't recall the exact context.  As I said, we talked very intimately about our personal lives, and I wanted to tell someone about what had happened.  I hadn't shared it with anyone, and I don't remember exactly what provoked it, but it was in the spirit of talking about personal matters.

Q.   So, Anthony, to the best of your recollection, tell us what it is that you told Christopher.

A.   I told him that I had met this actor in New York named Kevin Spacey, and that he invited me to a party at his apartment, and that I had gotten a little bit bored and uncomfortable, and I had gone into his bedroom and watching TV, and didn't realize everybody else had left, and Kevin Spacey came in drunk, and he picked me up like a groom picks a bride, and he laid me down on top of his bed, and he climbed on top of me trying to get with me sexually, and I managed to squirm away and leave.

Q.   Anthony, focusing on the summer of 1986, you told us that you briefly returned to Illinois.

        What did you do during that summer?

A.   I returned for the second time to Interlochen.  It was then called National Music Camp now, it's called Fine Arts Camp.

Q.   What is Interlochen?

A.   It's an arts camp where people study theater, dance, music, art.  It's a rigorous eight-week -- at the time it was an

eight-week program.  So, I went there and studied more acting,

did more plays, sang in the musical, things like that.

Q.  So, following that period of time that you were at camp,

you returned back to Joliet?

A.  Yes.

Q.  For clarity, you would have been starting your junior year;

is that correct?

A.  Yes.

Q.  So, focusing on your junior year, in the fall of 1986, how,

if at all, were you dealing with what Kevin Spacey had done?

          MS. KELLER:  Objection; irrelevant.

          THE COURT:  Sustained at least as to the form.  It's

pretty vague.

BY MR. SAGHIR:

Q.  Anthony, when you returned, and you started going back into

your junior year in high school, what impact, if any, while you

were going to school, did what Kevin Spacey did to you in his

apartment in 1986 have on you?

A.  I pushed it to the side.  I did my best to not think about

it, forget about it, put it away, and just did my best to get

on with my life and enjoyed my life.

Q.  Did that work for you?

A.  For the most part, yes.

Q.  When you say "For the most part," what do you mean?

A.  I mean, there was one occasion while I was still in high

school where -- well, no, I guess I had graduated, but while I was still living in Joliet, when I was reminded of it very vividly, and then it disturbed me again after having pushed it away.

Q.  Tell us what happened.

A.  At the end of 1988, there was a film, *Working Girl*, that came out, and I was a film buff, I was seeing all the movies that were getting attention, and I went to see that movie by myself, as I tended to do, at my local cinema, and early in the film, I did not know he was in the film, he was playing a small role, Kevin Spacey came on the screen, and it was as if somebody had poked me with a cattle prod.  I jumped, it felt like I jumped out of my seat, and immediately flooded with adrenaline and sweaty palms, and I hadn't seen him since then. It was the first time I saw him.

Q.  When you say you hadn't seen him since then, you're referring to the time that you were in New York in his apartment?

A.  Correct.

Q.  Anthony, when, if ever, had you had a reaction, such as you described, being stuck with a cattle prod, just at seeing someone?

A.  Never.

Q.  Anthony, have you watched other movies with Kevin Spacey?

A.  I have.

Q.   What movies?

A.   I saw *The Usual Suspects*, *Glengarry Glen Ross, L.A. Confidential*, *The Ref*, and *American Beauty* -- *Seven* and *American Beauty*.

Q.   Anthony, you just told us about this experience you had where you saw him on screen in *Working Girl* and feeling like you were stuck with a cattle prod.

     Why were you going to see his movies if you had that reaction?

A.   Well, I'm an actor, and I love films, and these films that I mentioned were, by and large, very acclaimed and award — nominated, award-winning, so I felt it was part of my job to see them.  And I knew that he was in them, so I could prepare myself and do my best to -- even though every time I saw him on the screen, I was reminded of what had happened, and it was -- I could never escape that memory, I was able to tamp it down, put it aside, and do my best to just take in the film.  I felt it was my duty to do so.

Q.   What do you mean it was your duty?

A.   As a fellow actor, as a person who was a part of this community -- like in some cases, like in Glen *Glengarry Glen Ross*, Ed Harris was in that film with him, who's somebody who meant a lot to me.  I thought that I had to do my best to just get over it and push it aside and watch it.

Q.   When is the last time you saw a movie featuring Kevin

Spacey?

A.   *American Beauty* was the last film I saw.

Q.   Why was that the last film you saw?

A.   Well, as time had gone on, it had become harder to do what I was describing, to push it aside, as I had gotten older, looking back on it.  And in that film, in particular, he was playing a character who was sexually involved with a teenage girl, and that was especially difficult to be in the presence of.

Q.   Why?

A.   It felt unpleasantly familiar.  It was upsetting.

Q.   Have you ever seen Kevin Spacey in a play?

A.   I have.

Q.   What play?

A.   *Lost In Yonkers*.

Q.   Same thing, Anthony, why did you go see him in a play?

A.   Well, that play was the same season as *Six Degrees of Separation*, which was a play I was doing on Broadway, and both of those plays were the most celebrated plays of the season, they were in competition for the Tony, they were both finalists for the Pulitzer.  In both cases, *Lost In Yonkers* won both the Tony and the Pulitzer, and I felt like it was my job and responsibility, as part of the theater community, to witness the work that was being celebrated, and, again, I thought, well, I just have to put it aside and take in the work and...

Q.   Focusing on television, when, if ever, have you watched Kevin Spacey on television?

A.   Only when he's appeared on award shows.

Q.   Tell us what you mean by that, "award shows."

A.   There have been times when he's presented an award or been the MC of an award or been nominated and/or received awards.

Q.   So, Anthony, did there come a point in time where you would attend Oscar parties?

A.   Correct.

Q.   And who is it that would hold these Oscar parties?

A.   A friend of mine named Elizabeth Law.

Q.   Over what period of time would you go to these Oscar parties?

A.   When I was in town, I would attend them.  She held them in her apartment on the Upper East Side.  So, fairly often over -- I don't remember exactly what year was the first year I went, sometime in the early '90s, until the last time I was actually at her apartment was a number of years ago because I've been away, but we also -- I also attend, if I'm away, by calling in, because there's a pool and everything like that.  So it's been many, many times over the course of years.

Q.   When you say when you're away, just briefly, what are you referring to?

A.   Like in 1998, I was in London doing *Rent* on the West End when the Oscars happened, and I stayed up in the middle of the

night there to watch and called in and attended the party in that way from there.

Q.  Was there ever a time where you were watching the Oscars, and you were at an Oscar party, where you saw Kevin Spacey?

A.  There were -- I don't remember exactly how many, but there was more than one time, yes.

Q.  And what was that like?

A.  It was -- again, I could prepare myself, knowing that he would be there, but it was an unpleasant reminder, and it was never easy to be in the presence of him given what he had done to me.

Q.  When, if ever, did you tell people at the Oscar party what Kevin Spacey had done?

A.  At least once or twice.  I don't recall if it was more than that.  But it's something that I did tell people at the Oscar parties.

Q.  Why would you tell them?

A.  Well, Elizabeth, in particular, was a very close friend of mine, and it was something that happened.  We talked a lot about all sorts of things about the actors that we saw on the screen, and this was a personal experience that I shared.

Q.  In the opening, there was mention of you throwing pencils at a television screen.

         Do you recall that?

A.  I do.

Q.   Explain what happened.

A.   Well, Elizabeth had a rubber chicken that she would sometimes hit the screen with if there was somebody whose performance she didn't like or something she didn't think would win or if there was somebody she thought was not a good person, any kind of whatever reaction, and it was like a playful thing, and at one point, I don't recall exactly what year it was, but there was one year when Kevin Spacey was on the screen, and in that spirit, I threw a pencil.  It was unpleasant to see him on the screen, and I threw a pencil as my form of the rubber chicken.

Q.   Why not simply turn off the TV and not watch the Oscars?

A.   Well, the Oscars is something that I've been watching since I was a little kid.  I didn't want this to prevent me from watching something that I loved watching.  There were times when I knew friends of mine or colleagues who were nominated or winning awards.  I wanted to be able to celebrate that and enjoy that as much as I could.

Q.   So, Anthony, moving forward in time, did there come a point in time when you moved to New York City permanently?

A.   Yes.

Q.   Approximately when was that?

A.   In the fall of 1989.

Q.   And you have been in New York City ever since?

A.   I have except when I've gone away to work other places.

MABKRAP1                         Rapp - Direct

Q.  You told us about seeing Kevin Spacey on film, onstage, and on television.

When, if ever, have you seen him again in person, after you came to New York?

A.  The first time was in around 1993.

Q.  And where were you?

A.  I was working on the film -- film version of *Six Degrees of Separation*.

Q.  And where was that?  Where were you shooting?

A.  We were filming in Manhattan up at this school on the Upper West Side, and I went to -- it was lunch break, and I went to the lunchroom, and I took my tray in, and, you know, there was a big room with lots of tables, and as I entered and got to the table, just eating lunch by myself, I looked up, and across the room, several tables away, I saw Kevin Spacey sitting there.

Q.  Did you know he was going to be there?

A.  I did not.

Q.  So, tell us what it was like when you sat down and saw Kevin Spacey.

A.  It was -- I felt frozen, and it was something that I had been concerned about and afraid of happening at some point, not in particular here, but at some point over the years, I'd been afraid of running into him in a workplace situation.

Q.  What do you mean by that?

A.  We're both in the same business, and it was possible, if

not likely, that at some point, our paths would cross.

Q.   What was your concern if that were to happen?

A.   I didn't know how I would -- I didn't know how -- my concern was I didn't know how it would feel.  I didn't want to experience being in the same room with him, it felt frightening, and, yeah, it was -- it felt like an intrusion. In this case, I was in a safe place in my work, not expecting to see him, so it felt like an intrusion.

     Sorry.

Q.   When was the next time you saw Mr. Spacey in person?

A.   The next time was at the 1999 Tony awards.

Q.   And where was that?

A.   That was held at the Gershwin Theatre, I believe.

Q.   What were you doing at the Tony awards in 1999?

A.   As a member of the cast of *You're a Good Man, Charlie Brown*, we had been nominated for some awards, and we were performing a number from the show on the awards, so during the day, anybody who was performing or presenting or getting awards gathers at the theater to rehearse and et cetera.  So at some point during that day, while I was at the theater, in the house of the theater, I went to the lobby bathroom.

Q.   Tell us what happened.

A.   And, you know, these big bathrooms where audiences go is where I went and used the bathroom, and as I was washing -- like after I washed my hands, I turned to go, and Kevin Spacey

walked through the door.

Q.  What was that like?

A.  Similarly, a frozen moment.  Unlike on the film set, I'd looked at him, and he looked at me, and that was a startling thing to experience, being in his gaze in that way.  And there were other people around, and I wanted very much to get away and get out of there, and there were no words exchanged, and he continued to enter the bathroom, and I made my way past him and out the door.

Q.  Why didn't you say something to him, Anthony?

A.  I didn't know what I would say.  It was public.  I had never had a conversation with him since that night.  I wouldn't even know where to begin.

Q.  Was there a third time that you saw Mr. Spacey in person?

A.  There was.

Q.  When was that?

A.  It was around 2013 or 2014.  There was a benefit concert that I was invited to at Lincoln Center.

Q.  Tell us what happened.

A.  It was -- I think it was called a world youth peace orchestra or something like that.  I was invited and attended a little cocktail gathering beforehand, went in the theater, and I did not know that he was -- turned out to be the MC of that event or he introduced that event.  And my seat was in the very, very front row of Avery Fisher Hall, so I was directly in

front of where he was standing on the stage at the podium

introducing and kicking off the event that night.

Q.  Tell us what you experienced when you saw him.

A.  A similar kind of frozen response, and I was also very

aware that I was, again, in public, I was next to colleagues.

I was sitting next to -- Sicily Tyson was to my right, and any

other number of people that I had recognized were in and around

these seats.  I wasn't in a spotlight, but I felt sort of like

I was in a spotlight.  And, at the same time, I was aware that

when you're onstage, a lot of times you can't see into the

audience, so I felt a little protected in that sense, because I

imagined that he probably couldn't see me, if he was even

looking.  So, that allowed me to feel a little less --

        MS. KELLER:  Objection; nonresponsive.

        THE COURT:  Sustained.

        It's stricken from after the witness said, "I wasn't

in a spotlight, but I felt sort of like I was in a spotlight."

The rest of it is stricken.  The jury will disregard it.

BY MR. SAGHIR:

Q.  Anthony, why didn't you just get up and leave the show at

that point in time?

A.  As I said, I was in the front row.  I felt if I were to get

up and leave, it would be very, very noticeable.  I didn't want

to make any other -- I didn't want to make a scene.  And I also

wanted to experience the concert, so I thought I'll withstand

this, and then he'll leave the stage, and I will be able to just take in the music and the concert.

Q.   When you say you'll withstand this, what does that mean, you'll withstand this?

A.   I'll withstand this discomfort, this unpleasant experience of being in his presence.

Q.   Anthony, you told us that you told Christopher Hart at some point about what Kevin Spacey did to you.

I want to focus on other people that you have told. Focusing on a point in time before 2017, before the BuzzFeed article was published, tell us how many people you told.

A.   I mean, I wouldn't be able to estimate a number.  I've told many people over the years.

Q.   Why is it that you would tell many people about this over the years?

A.   Well, especially as time went on, and his name and presence became more and more ubiquitous, people would ask me -- they would share with me that they saw a movie that he was in or they would ask me if I had seen a movie that he was in, or just his name would come up, and when his name would come up with anyone that I had any kind of affinity with, I would share my experience with them.

Q.   Who is Erin Quill?

A.   She's a friend of mine that I've known for about 30 years.

Q.   Describe your relationship with Erin.

A.   We became close very quickly.  She was in a play that my then boyfriend directed, and I met her that way, but we actually wound up becoming closer over the years than she even was with my now ex-boyfriend, and we've stayed close all these years.

Q.   Did you tell her what happened?

A.   I did.

Q.   Approximately when?

A.   Sometime in the early '90s.

Q.   How many times did you tell Erin Quill the details of what Kevin Spacey did?

A.   Once.

Q.   Anthony, on Friday, we heard from someone by the name of Sean Snow by video.

      How do you know Sean Snow?

A.   I met him, but we didn't become friends then, but we met on the set of School Ties.

Q.   When is it you became friends?

A.   About a year later when he moved to New York, and we ran into each other through mutual friends, and we recognized each other, and we hit -- we reconnected and then became friends.

Q.   Describe your relationship with Sean.

A.   He was a fellow, young gay man in New York in the early '90s, and so we shared our experiences of our romantic relationships, we became intimate, good friends.

Q.   Did there come a point in time that you told Sean what Kevin Spacey did?

A.   There did.

Q.   Approximately when did you tell him?

A.   Sometime in the early mid-'90s.

Q.   How many times did you tell him?

A.   Once.

Q.   We also heard from a gentleman named Christopher Denny on Friday.

A.   Correct.

Q.   How do you know Christopher Denny?

A.   I met him when we volunteered together at an organization called Hearts and Voices.

Q.   Approximately when was that?

A.   Approximately in 1993, I believe.

Q.   Describe your relationship with Mr. Denny.

A.   We had this very cordial working relationship, but he kind of, I don't know, took me under his wing in many ways, like as a mentor, and he's -- yeah, we became very close.  He became a confidante.

Q.   Did there come a point in time that you told him what Kevin Spacey did?

A.   There did come a time, yes.

Q.   And approximately when was that?

A.   Again, in the early mid-'90s.

Q.   How many times did you tell him?

A.   Once.

Q.   Who is Tracie Thoms?

A.   She's a friend and an actress that I worked with.

Q.   How do you know her?

A.   We did the film version of *Rent* together.  She played Joanne, and I played Mark.

Q.   Describe your relationship with Ms. Thoms.

A.   We hit it off right away.  She's a very exuberant person, and we had to rehearse a tremendous amount doing Tango Maureen, so we spent a lot of hours doing that, and we became very close during that experience.

Q.   Did there come a point that you told Ms. Thoms what Kevin Spacey did?

A.   There did.

Q.   Before we get to that, tell us how your career was going when you told her about that.

A.   We were in production on the film version of *Rent*, so I was -- yeah, I mean, I had just completed a national tour of *Little Shop of Horrors* that I had been doing for, I don't remember how long, quite a few months the year before, and so, yeah, I had been working very, very steadily at that point.

Q.   What is it that gave rise to the conversation for you to tell Ms. Thoms what happened with Kevin Spacey?

A.   She brought his name up.  I don't recall which project that

he was involved in at the time, but just asked me if I had seen it or heard about it, and, again, his name coming up in that context, in that case, in particular, I said I wouldn't be seeing it because of what happened, and then I shared what happened.

Q.  We've talked about John Barrowman, who you went to school with in Illinois.

Did you ever tell Mr. Barrowman what happened with Kevin Spacey?

A.  I did.

Q.  Approximately when?

A.  It was years later.  I don't recall the exact time.  We became reacquainted after not talking for many years.

Q.  How many times did you tell him?

A.  Once.

Q.  How did that conversation come about?

A.  In the course of -- we had a meal together, is my best recollection, and in the course of reminiscing, talking about that time he came to New York, and talking about the night we went out, and I shared the experience, and then -- yes.

Q.  I want to talk briefly about your brother Adam, Adam Rapp. We talked about him before.

What is the age difference between you and Adam?

A.  It's three -- about three and a half years.  He was born in June of '68, and I was born October of '71.

Q.   What was your relationship like when you were growing up with Adam?

A.   Adam was very much a jock, and I was very much a nerd and doing all this theater stuff, and he was doing -- he was a track star and basketball player and everything, and so we didn't have a lot of common growing up.

Q.   Did there come a point in time that your brother left home?

A.   Yes.

Q.   Tell us where he went and what happened.

A.   He attended -- well, he went to a military academy in Wisconsin called St. John's Military Academy.

Q.   Why?

A.   He had had some --

          THE COURT:  Sustained.

Q.   Continue.

A.   I'm sorry, what question do I answer?

          THE COURT:  You don't.

          Next question.

Q.   Did your relationship with your brother change over time?

A.   It did.

Q.   Tell us about that.

          MS. KELLER:  Objection; irrelevant.

          THE COURT:  No, I'll allow it briefly.

          THE WITNESS:  When he was in college, he started to write, and he started to share his writing with me, and that

became a way that we started to connect.

BY MR. SAGHIR:

Q.   And there was a period of time that you two lived together?

A.   Correct.

Q.   From when to when, approximately?

A.   Approximately 1991 until 1998.

Q.   When, if ever, did you tell Adam, your brother, about what Kevin Spacey did that night?

A.   At some point in the early mid-'90s.

Q.   How many times do you recall telling him?

A.   Once.

Q.   Anthony, when you told these various people — whether it's Erin, Sean, Chris Denny, Adam — what happened, what is it that you would tell them happened with Kevin Spacey?

A.   I would tell them that I had met him while I was doing the play in New York, that he invited me to a party at his apartment, that while I was there, I wound up in the bedroom sitting there watching TV, and he approached me after everybody had left, drunkenly, picked me up like a groom picks up a bride and laid me down on his bed and laid on top of me and pressed into me, and I got away.

Q.   Would you tell people about The Limelight dinner and going backstage?

A.   I don't recall -- generally, I don't believe so. Generally, I told them that experience.

Q.   Why didn't you tell them about going backstage, dinner, and going to The Limelight?

A.   It wasn't the memory.  The memory was about that incident in the apartment itself.

Q.   Anthony, have you ever written a tell-all book?

A.   I've not written a tell-all book.

Q.   Have you ever written a book?

A.   I have.

Q.   What book?

A.   It's a book called:  "Without You:  A Memoir of Love, loss, and the musical *Rent*."

Q.   Over what period of time did you write that book?

A.   I started several months after my mom died, sometime at the end of 1997, and I completed my draft sometime in early 2005.

Q.   With respect to the title, "A Memoir of Love," explain what that means, a memoir.

A.   Well, for me, a memoir is a capturing of a very specific period of time and very specific stories related to that period of time as opposed to an autobiography, which generally is about a whole survey of someone's life and career.

Q.   So, focusing on your book, did that focus on a specific period of time?

A.   It did.

Q.   What period of time?

A.   It focused on towards the end of 1994, when I first

auditioned for *Rent*, the workshop production, the studio production of it, through the development of that show, the Off-Broadway production after Jonathan Larson, my friend who wrote the show, died.  My mom's cancer recurred during that time, and then she died in May of 1997, and then the book follows through a little bit after that time.  So it's approximately a three-year period that's the main thrust of that book, from the end of 1994 until sometime in the middle/end of 1997.

Q.  Did you include all experiences you had had in your life up to that time in that book?

A.  I did not.

Q.  So, tell us how it is that you chose what to include in the book and what not to include in the book.

A.  Well, I think of the book kind of like a tree.  So, like, the main trunk of that tree was all of those events that were directly related and occurred during that time, and then, because the book so much dealt with my relationship with my mother, there were some moments where I flashed back to a couple of isolated incidents from my childhood that related to my relationship with my mother.  So, that was what was determining what I included in my book.

Q.  When, if ever, did you write about the incident with Kevin Spacey in 1986 in your memoir?

A.  Never.

Q.   Tell us why not.

A.   It didn't feel relevant to the story I was telling.  It's not anything I ever talked to about with my mother.

Q.   I want to focus on your mother for just a moment.

     You told us that your mom would accompany you to New York, that she drove you back and forth to the Goodman Theatre.  Tell us how else your mom supported you as an actor in your career.

A.   Well, she would -- I don't know exactly how she made these arrangements, but she would arrange for her job to be able to return to work if she left with me.  She accompanied -- I needed a guardian with me, and she was my guardian, making it possible for me to do the work that I did.

Q.   So, when she would travel with you, as your guardian, what happened with Adam?

A.   He went to St. John's Military Academy.  He was in that school from his -- I believe it was his freshman year.  I don't know that for certain.  So he was there doing -- sorry, yes.

Q.   Sorry, continue.

A.   I don't know, yeah, that's where he was during the school year.

Q.   And how about Ann, when your mom would be traveling with you, where would Ann be, your sister?

A.   She would mostly, as far as I remember, stay home in Joliet and attend school.  She was an older teenager.  There was a

period where she also stayed with our father and his wife for some period of time, but I'm not certain about the details of the timing of all that.

Q.  So, Anthony, explain for us what dynamic or what impact, if any, your mom spending this time with you on the road and traveling had on your family.

A.  It did -- I came to learn later, it did have an effect on their relationship, "their" meaning my brother and my sister and my mother.

Q.  What do you mean you came to learn later?

A.  Well, as we children became adults, it was something that we talked about with each other, that they shared with me, some of the difficulties that I became aware of as an adult.

Q.  Anthony, you told us your mom passed away in May of 1997, correct?

A.  Correct.

Q.  Did your mom continue working as a nurse after you were an adult?

A.  Yes.  She worked as long as she could until she was no longer well enough to keep working.

Q.  Approximately how long did she work?  Until when?

        MS. KELLER:  Objection; irrelevant.

        THE COURT:  Sustained.

BY MR. SAGHIR:

Q.  Anthony, when, if ever, did your mom give up her career for

you as an actor?

A.   She never gave up her career.  She took time off, and she returned to her work when she returned back to Joliet.

Q.   By the way, there was also a mention in the opening about a time that you hit your mother.

     Do you recall that?

A.   I do.

Q.   Tell us what that's about.

A.   In the course of our relationships -- the relationship, she had spanked me once or twice when I was a kid, but had never laid a finger on me until I was a teenager, about 13, and we were having an argument about me going to bed, and I don't remember whether I was sassy to her and she slapped me first time ever, and I said if you ever slap me again, I will slap you back.  About less than a year later, somewhere in the time when I was in New York with her for *Precious Sons*, a similar situation, she was wanting me to study my lines, I was sassing her back in a bratty way, and she -- we were in two different rooms, she came in the room, and she slapped me, and I slapped her back.  I actually missed her face, I hit her glasses, and knocked her glasses off of her face.

     These are the only two times it ever happened.  I was not proud of it.  It's something that we healed from later, certainly.  It was not characteristic of the nature of our relationship.

Q. Anthony, there was also mention of an instance where you viciously beat a boyfriend.

Do you recall hearing that?

A. I recall that, yes.

Q. Did there come a point in time that you got into a physical fight with one of your boyfriends?

A. There did.

Q. Who was that?

A. His name was Josh Safran.

Q. When was that, approximately?

A. It was in July of 1997.

Q. Tell us what happened.

A. I was -- we were backstage -- not backstage. We were -- it's difficult to describe. There's an alleyway in -- at the Nederlander Theatre where I was performing in *Rent*, where the public was not allowed, but where the cast and crew and our guests would sometimes gather between shows or after the show. It was a Sunday, so it was between shows in July, it was the last performance of one of my closest friends in the show. My mom had just passed away several weeks before. I was very upset about my friend leaving the show, I was going to really miss him, it felt like a compounding of loss. And Josh and I were having an intense argument, and I was incredibly upset and very pressure cooker feeling, and in the course of the argument, I said something like I can't do this anymore, and he

then said, well, then never talk to me again, and as he walked away, that -- all the compounding loss, I snapped.

Q.   When you say you snapped, what do you mean by that?

A.   I mean that it didn't feel like a choice, it felt like a snap.  I saw red, you could say — it's the phrase that people use — that it never made sense to me before, it makes sense to me now, and I launched myself at him, and I struck him and knocked him down.  And my -- Jesse, who I had mentioned, my friend from the show, and another actor from the show pulled me off of him, and I was so flooded with adrenaline — it's the kind of thing people talk about being able to lift a car off of -- you know, when they're flooded with adrenaline, I am not very strong, I pulled myself away from these two strong men, launched again at Josh, striking him with my fist in the back of his -- I believe in the back of his neck and on his shoulder.  And they got me off him again, and then I had the experience of coming to, coming back into myself.

Q.   As a result of that, what happened?

        THE COURT:  Sustained as to form.  What does that mean?

Q.   Mr. Rapp, after you got into this fight with Josh, what did you do next about that fight?

        MS. KELLER:  Objection to the characterization of "fight."

        THE COURT:  Sustained.

BY MR. SAGHIR:

Q.   After you had this physical altercation with your boyfriend, Josh, what did you do after that with respect to the physical altercation?

         MS. KELLER:  Objection to the term "altercation."

         THE COURT:  Sustained.

Q.   Anthony, I want to shift gears for a minute.

         Did you ever go to therapy?

A.   I did.

Q.   When was the first time you went to therapy?

A.   Directly after that incident.

Q.   So, tell us why it is you went to therapy in 1997.

A.   My friend, who'd become a big source of support in the time that my mom was ill, Cy O'Neil, encouraged me to get help after that event.

Q.   When you say "after that event," what event are you talking about?

A.   The event that I just described, of when I struck Josh.

Q.   So, after striking Josh, you went for therapy, correct?

A.   Correct.

Q.   And who was that with?

A.   Her name was Robin Magid.

Q.   Tell us who Robin Magid is.

A.   She passed away earlier this year.  She was a social worker who was on staff at an organization called Friends Indeed,

which was an organization that I had attended groups at during the course of my mother's illness.

Q. So, did you begin treating with Ms. Magid?

A. I did.

Q. I want to focus first on the period of time that you treated with Ms. Magid.

Explain that for us.

A. Well, this was in 1997. I saw her fairly regularly during that time, until I left New York, early in 1998, to go to do the show in London. But I would occasionally have a couple of phone calls with her from there. And then when I returned back to New York, I treated with her as often as was possible with my schedule, for a few years. I don't know the exact timing, but several years, from 1997 until sometime in the early 2000s.

Q. And after the early 2000s, did you continue treating with Ms. Magid?

A. Not on a regular basis, but there would be occasions where I would check in, very, very seldom, but every once in a while.

Q. Did there come a point in time that you began treating with her regularly again?

A. There did.

Q. Approximately when?

A. Approximately the end of 2016/beginning of 2017.

Q. So, starting with that first period, 1997, that you talked about, to the early 2000s, give us a sense of what it is that

you were treating with Ms. Magid for at that point in time.

A.   I was treating with her to process and work through the profound grieve that I was experiencing from the death of my mother and the effects it was having, including things like that outburst.

Q.   Focusing on the period of time from 2005 to 2016, what is it that you were discussing with her during those check-ins?

A.   I mean, most often, it was around the anniversary of my mom's death.  I found that to be a particularly difficult time. And, usually, the fall — her birthday is in October, my birthday is in October — and then Thanksgiving and Christmas, that tended to be a time that -- where grief could be quite strong for me.

Q.   By the way, the incident that you told us about with your mom, when, if ever, have you blamed that on Kevin Spacey?

A.   Never.

Q.   And with respect to the fight that you had with Josh outside the Nederlander Theatre, when, if ever, have you blamed that on Kevin Spacey?

A.   Never.

Q.   So, you told us that you began treating with Ms. Magid again in around 2016/2017.

        What is it that brought you back to treating with her at that time?

A.   I was just -- in some ways, I was generally feeling I

hadn't had any kind of therapy in quite a while, so I was just looking for some opportunity to look back more deeply into my life, and, also, I was in a relatively new and very meaningful relationship with Ken and wanted to get extra support and tools with some of the struggles we were having.  I was very committed to our relationship working out.

Q.  When you say some of the struggles you were having with Ken, give us a sense of what you're talking about.

A.  Well, when we met, I was on tour with *If/Then*, and he was living in California.  He was able to visit me on the road, but there were stresses related to having a long-distance relationship.  So, that had been one of the things that had been a source of struggle.

And then he was moving in with me here in New York, which was a big transition for him.  So just looking for extra support, to help navigate an adult relationship.

Q.  Anthony, when, if ever, did Ms. Magid ask you if you had been sexually abused?

A.  She never asked me if I was sexually abused.

Q.  Focusing on that first period of time that you were treating with Ms. Magid, did you ever tell her what Kevin Spacey had done?

A.  I didn't.

Q.  How about during that interim period with the check-ins, from about 2005 to 2016, did you ever tell her?

A.   No.

Q.   When is it you first told Ms. Magid what happened?

A.   In October of 2017.

Q.   Anthony, why had you never told her prior to that point in time?

A.   It had never come up in my thoughts when we were in the room together.  I was always bringing up what was directly in front of me, and it was something that had never occurred to me as something that would be something to treat in therapy.

Q.   When you told Robin what Kevin Spacey had done, how did it feel to tell her?

          MS. KELLER:  Objection; irrelevant.

          THE COURT:  Sustained.

BY MR. SAGHIR:

Q.   As a result of telling Ms. Magid what Kevin Spacey had done, tell us what happened.

          MS. KELLER:  Objection; vague.

          THE COURT:  Sustained.

Q.   When you told Ms. Magid what Kevin Spacey had done, what, if anything, did she tell you to do?

A.   Well, she started to ask me questions about it, about how it had felt to go through it.

          THE COURT:  Mr. Rapp, the question is:  What, if anything, did she ask you to do, or tell you to do.

          MR. SAGHIR:  I'll withdraw that last question, your

Honor.

BY MR. SAGHIR:

Q.  With respect to Ms. Magid, did you do work with her around what it is that Kevin Spacey had done in 1986, therapy?

A.  I did.

Q.  Tell us about the therapy that you did around what it is that Mr. Spacey had done to you.

A.  Well, first, we had, I guess you call it, talk therapy where she started asking me questions about it, and started to -- my experience was sort of lift the lid on it, and engage with it in a way that I had never done before.

Q.  What do you mean by that?

A.  I just mean that I had described it always and thought of it as this thing over here that had happened, but so much of the time I had thought about his part in what he had done, and I hadn't reflected on the impact that it had on me.  And so, in conversation, that's when I first started to really engage with exploring and understanding the long-term impact that it had had.

Q.  And what impact did that have on you, addressing this with Robin at that level?  What impact did that have on your daily life?

A.  It started a process of -- it's hard to describe, it's hard to articulate.  I began to, in general, have intruding thoughts about it, sleepless nights sometimes.  It was apparent in

addressing it, brought it to the surface in a way that it had never been to the surface before, and we also -- we did a tool, a therapy called EMDR, which is another way that we worked together on it.

Q.   Just tell us what happens during these EMDR sessions.

A.   It's an attempt to go back to the incident itself that has created a sense of trauma that has never been dealt with in that way, and it's a very structured exercise or process of treatment of spending time in that space and letting up and out things that have never been expressed about it and working toward a goal of trying to -- I'm a layman, I'm doing my best to articulate it — of talking about some of the thoughts associated with it, and trying to replace them with other thoughts or have other thoughts that could be possible to get some healing around it and space around it.

Q.   Anthony, was this the first time that you had confronted what Kevin Spacey did to you in a therapeutic setting?

A.   Absolutely, yes.

Q.   Are you familiar with a Dr. Michael Collins?

A.   I am.

Q.   Who is that?

A.   He's a doctor based in Southern California.

Q.   Did you see him for a period of time?

A.   I saw him briefly in 2016, after Ken and I had been together for some time.  He lived near where Ken lived, in

Redondo Beach, California.

Q. Why is it you went to see Dr. Collins?

A. Again, I was beginning to want to have extra support and reengage with therapy to get tools to work with difficulties that were coming up.

Q. When you say "difficulties that were coming up," what are you referring to?

A. The difficulties related to -- specifically related to a long-distance relationship.

Q. Did Dr. Collins administer any psychological testing?

A. He did not.

Q. Did he tell you that he was evaluating you for PTSD?

A. He did not.

Q. To your knowledge, did he give you any diagnosis?

A. He did not, to my knowledge.

Q. Anthony, have you ever taken any medications for anxiety, depression, or any type of psychological issues like that?

A. I have not.

Q. We've talked about a BuzzFeed article that was published. When was that published?

A. It was published the end of October 2017, I believe October 29, 2017.

Q. I want to focus on the work that you were doing as an actor at the time that you gave the interviews to BuzzFeed and this article was published.

When was the last time you had been on Broadway in relation to the BuzzFeed article being published?

A.   *If/Then* ran for a year, from, I believe, March of 2014, and we closed almost exactly a year later, in March of 2015.

Q.   Briefly, what is *If/Then*?

A.   It was a musical starring my *Rent* castmate, and longtime friend, Idina Menzel, and I played her best friend.

Q.   After the run of the show on Broadway, what, if anything, did you do with the show at that point in time?

A.   A few months after we closed, we began a national tour that went from, I believe it was, October of 2015 till August of 2016.

Q.   What television work, if any, were you doing at around the time that the BuzzFeed article came out?

A.   I had completed production on the first season of *Star Trek Discovery*.

Q.   Were there any other seasons in the works?

A.   Well, I was signed to a six-year contract.  There's no guarantee of that, but there was -- there were many indications that it would not be just a one-season only show.

Q.   Focusing your attention on concerts, what, if any, concerts were you doing in and around 2016 and 2017?

A.   My original *Rent* castmate, Adam Pascal and friend, we did a series of concerts.  We did some residency at studio -- 54 below here in New York City for a couple of weeks here, and

then we did a series of mini residencies at three different venues in Southern California in the fall of 2016, in Los Angeles, San Diego, and San Francisco.

Q.   Just briefly, when you say "residencies," what does that mean?

A.   It means it's not just a one night only; it's two or more or several nights at any given venue.

Q.   Anthony, in light of the work that you were doing at the time that you gave these interviews to Adam Vary and the article was published, what, if any, concerns did you have about that impacting your work as an actor?

A.   Can you rephrase the question?

Q.   Sure.  I'll withdraw the question.

You told us that at around the time that the BuzzFeed article was published, you had performed on Broadway in *If/Then*, you were touring, you were on *Star Trek*.  What concerns, if any, did you have about coming forward to BuzzFeed at that time as it pertained to your career?

A.   I didn't have concerns about my career.

Q.   What do you mean by that?

A.   I had shared with my producers and what we call the show runners and the PR people of *Star Trek Discovery* that I was contemplating doing this, and I had their full support, so I didn't feel like that was in any way in any kind of jeopardy.

Q.   Tell us what concerns you did have.

A.   I was certainly aware that Kevin Spacey was a very highly regarded actor and very successful.  He was in the middle of *House of Cards*, which was a very big success.  So, I was aware -- concerned that there might be some backlash toward me.

Q.   Anthony, when, if ever, did you want a career like Kevin Spacey's career?

A.   I never wanted a career like Kevin Spacey's career.

Q.   Explain that.

A.   I was very proud of and happy and grateful for the career I've had.  I had worked steadily since I was a little kid except for a couple of moments here and there, but, by and large, I'd been a part of projects that I was proud to be a part of, and I'd worked with people that I respected, loved.  I was in a -- I had financial security.  I had some ability to be picky about what projects I did.  So, I was grateful for the chance to continue being a working actor.

Q.   Anthony, I want to focus on October of 2017.  There came a point in time that you contacted Adam Vary, a reporter for BuzzFeed?

A.   Correct.

Q.   What is it that compelled you to contact Adam Vary?

A.   So, in October of 2017, I became aware of women coming forward about experiences they'd had with Harvey Weinstein, a film producer, but I hadn't paid attention to any of those stories specifically, and I read -- until I read an article

MABKRAP1                        Rapp - Direct

that Lupita Nyong'o wrote, a first-person article she wrote

about her experiences with Harvey Weinstein.

Q.   And who is she?

A.   She is an Oscar-winning actress.

Q.   Anthony, as a result of reading this article by Lupita

Nyong'o, what did you do?

A.   Well, I thought how she articulated seeing Harvey Weinstein

after her experiences, how -- what -- I identified so strongly

with that experience, of being troubled and disturbed by his

presence in her life and in the entertainment industry, that

resonated very, very powerfully for me, and I saw -- I

identified and resonated with this experience of her and others

sharing their experiences to shine a light where there had been

darkness before.

        THE COURT:  Mr. Rapp, do you remember the question you

were asked?

        The question you were asked was:  As a result of

reading this article by Ms. Nyong'o, if I got that name

correctly, what did you do?  Did you do anything?

        THE WITNESS:  I did, sir.  I had this experience of

thinking through all that.  That's the first thing I did.

        THE COURT:  Fine.  Next question.

BY MR. SAGHIR:

Q.   So, tell us what you did after you processed what you just

told us.

A.   I reached out to Adam Vary.

Q.   Who is Adam Vary?

A.   He is a friend of mine, and he's a journalist.

Q.   When you say he's a friend of yours, tell us about that.

A.   I first met him when he was a student at Miami of Ohio University.  I had done many different lectures and visits to schools.  And when I was at his school, he actually interviewed me for his -- I don't know if it was school paper, school magazine, and we had maintained contact and friendship in the years since.

Q.   Anthony, you could have taken this incident to many different publications.

     How is it that you decided to take it to Adam Vary? Why?

A.   Well, I reached out to him as someone that I knew and trusted, and I didn't know necessarily at first that I was -- that it was going to be published, but I wanted to have an off-the-record conversation with him, sharing with him my experience and getting his feedback and seeing if this was something that was in the spirit of the other women who'd come forward about Harvey Weinstein.

Q.   When you say he was someone that you knew and trusted, why, if at all, was that important to you?

A.   It was important to me.  It was such a personal experience, it was important to me that I share it with someone that I knew

was someone with integrity, someone who was a thoughtful journalist. I'd read articles of his where he talked about complex issues in a way that was sensitive and thoughtful. So, that felt safe to me to share it with him in that context.

Q. So, tell us what happened when you contacted Mr. Vary.

A. I said, as I said, it was off the record, and then he said -- in the course of the conversation, he said he would discuss it with his editor, to see if this was something that they would want to possibly report. And in the meantime, I said I would like to talk to Ken about it, I would like to talk to -- I hadn't had, yet, the conversation with my producers. I wanted to start to really think about what this might involve and be prepared for whatever might come my way, if I were to do this.

Q. Did there come a point in time that you gave an interview to Adam Vary?

A. There did.

Q. And, eventually, an article was published on BuzzFeed about what Kevin Spacey had done to you in 1986?

A. Correct.

Q. Anthony, what, if any, involvement did you have in the publication of the article?

A. I had no involvement in the publication of the article.

Q. When, if ever, did you see a draft of the article before it was published?

A.   Never.

Q.   Did you even know when the article was going to be published?

A.   He told me that day, at some point, that he believed that it was going to be published that evening.

Q.   So, Anthony, I want to focus on the period of time the BuzzFeed article has been published.

         Tell us how you're feeling now, day to day, with respect to what Kevin Spacey had done back in 1986.

A.   It -- it's very difficult to articulate, sir.  I'll do my best.  It felt very exposing, very vulnerable.  I was receiving a lot of messages from people in my life, some of whom knew the story, some of whom didn't know this experience, sharing their empathy and support.  It was a very stressful and intense period of time.  It's difficult to put into words beyond that.

Q.   Stressful and intense why?

         MS. KELLER:  Objection; irrelevant.

         THE COURT:  Sustained.

BY MR. SAGHIR:

Q.   How, if at all, would your experience with respect to what Mr. Spacey did to you prior to the BuzzFeed article, how did that change after the article was published in terms of how you dealt with it?

A.   Well, it was in this time that I'd also shared it with Robin, so it was all concurrent, beginning to peel back these

layers and look at the impact that it had on me in a way that before it had always been about what he'd done and looking at it from something of a distance. It was the first time of delving into it. So, as I shared earlier, it was the beginning of that process.

Q. Anthony, did we ask you to meet with a psychologist by the name of Lisa Rocchio?

A. You did.

Q. Did you meet with her?

A. I did.

Q. How many times?

A. I believe three or four times.

Q. When did you meet with her?

A. In February of 2021.

Q. Approximately how much time did you spend with her during those sessions?

A. A total of nine or ten hours.

Q. During those sessions with Dr. Rocchio, tell us what it is that you did.

A. She administered some tests to begin with. They were -- like, they were on a computer screen, and they were versions -- different kinds of tests of asking all sorts of questions about my history, about my mental state. They were -- some of them were like sliding scale, like with answers like always, never, sometimes, et cetera; some of them were more, have you ever X,

Y, or Z thing.  That was the first thing.  So we did those tests, and then we had conversations.

Q.  When you say "conversations," tell us what you're talking about.

A.  She asked --

THE COURT:  And bear in mind, you're not being asked what was said --

THE WITNESS:  I understand.

THE COURT:  -- what you talked about.

THE WITNESS:  She asked me questions about anything that I might regard as traumatic in any way, if it was physical, a car accident, a broken bone, anything like that. And I did my utmost to share everything that came to mind in that respect.

And then she asked me all sorts of questions about my life, my childhood, my parenting, and she asked me many questions, and we talked in great detail about what had happened with Kevin Spacey and the aftermath and the work that I'd done with Robin in therapy, et cetera.

BY MR. SAGHIR:

Q.  Anthony, did you meet with a Dr. Alexander Bardey on behalf of the defendants on March 26, 2021?

A.  I did.

Q.  How many times did you speak with him?

A.  Once.

Q.  For approximately how long?

A.  About two and a half hours.

Q.  You told us that you took tests with Dr. Rocchio.  Did you take tests with Dr. Bardey as well?

A.  Not with him.

Q.  With who?

A.  With his associate, a woman.  I don't recall her name.  She administered the tests.  At least one of them was quite different than the test that Dr. Rocchio administered.

Q.  How so?

A.  I experienced it being much more binary than the sort of multiple choice or sliding scale.

Q.  What does that mean, "binary"?

A.  Meaning yes or no or true or false as opposed to sometimes, always, never, et cetera.

Q.  Did you also do talk therapy or have conversations with Dr. Bardey as you did with Dr. Rocchio?

A.  Yeah, it was explicitly declared to me that it was not therapy by both Dr. Rocchio and Dr. Bardey, but that, yes, he then talked to me for two and a half hours, yes.

Q.  Did Dr. Bardey video-record his interview with you?

A.  He did.

Q.  Have you watched it?

A.  I have.

Q.  Was the entirety of that interview that Dr. Bardey did with

MABKRAP1                          Rapp - Direct

you recorded on video?

A.   It was.

Q.   Anthony, when, if ever, did you tell Dr. Bardey that you were jealous of John Barrowman when he visited in 1986?

A.   Never.

Q.   When, if ever, did you tell Dr. Bardey that you were jealous of Kevin Spacey?

A.   Never.

Q.   When, if ever, did you tell Dr. Bardey that you had a crush on Kevin Spacey when you were 14?

A.   Never.

Q.   When, if ever, did you tell him that you wanted Kevin Spacey's career?

A.   Never.

Q.   Did you ever tell him that you felt like a third wheel that night at The Limelight?

A.   Never.

Q.   Have you ever had a crush on John Barrowman?

A.   No, I have not.

Q.   Have you ever had a crush on Kevin Spacey?

A.   No, I have not.

Q.   We heard from a witness on Friday, Andrew Holtzman.  Had you ever met him before?

A.   I had not.

Q.   Had you ever spoken to him before?

A.  I had not.

Q.  Anthony, I want to focus on this lawsuit.  This lawsuit has been going on for a couple of years now.  Tell us what it has been like having to retell this story.

A.  It is somewhat retraumatizing to go into the kind of depth that's required of this process.  It's a process I understand, and I accept, as being difficult, and it's been very difficult.

Q.  When you say it's been difficult, tell us what you mean.  How has it impacted your daily life?

A.  Well, especially in the most intense moments, like in and around doing the deposition, in the first place, these conversations with Dr. Rocchio and Dr. Bardey, and in this time leading up to this trial and these days, it is impacting my sleep, it's impacting my experience of being able to be present in my life without the stresses and thoughts and memories invading me.  And very specifically in the course of the deposition, it was the first time that I had been -- I mean, it was on Zoom, but I was with Kevin Spacey, he was on the Zoom watching me share this experience.  That was the first time that ever happened.  That was incredibly difficult to be in his presence, and these days, in this courtroom, and in and around the building, it is extremely difficult to withstand that.

Q.  When you say it's difficult, be specific.  What do you mean?

A.  I mean even this morning, I was in line to enter the

building, and Kevin Spacey came into the line, and just even out of the corner of my eye seeing him, I'm jolted with a cattle prod, and my hands are sweaty, and my heart is racing, and it's hard to breathe.  All of that is happening in my body when that happened this morning.

Q.  When, if ever, have you regretted bringing this lawsuit?

MS. KELLER:  Objection; irrelevant.

THE COURT:  Sustained.

BY MR. SAGHIR:

Q.  Anthony, with respect to this lawsuit over the past two years, you told us about the deposition.

How else has it impacted you in your day-to-day life?

A.  It's really -- it's impacted me as this looming thing.  I don't know how -- it's hard to describe beyond that.  I recognize it as something I've done voluntarily, and I did go into it knowing that it was undoubtedly going to be stressful and difficult, and, at the same time, yes, it makes these things recur that might otherwise be simpler, in some ways, to try to again keep shoving it to the side and not keep bringing it into the light in this way.

Q.  Anthony, how have the events of 1986 involving Kevin Spacey on that one night impacted your life?  Tell us.

A.  Well, I've shared these specific incidents.  Those are very clear moments where my experience of safety in my own body was interrupted and disturbed and startled when I saw him onscreen

when I was a teenager, and as his name and notoriety increased, it was harder and harder to escape that.  I was able to push it down, to the best of my ability, but it was something that sometimes it was directly in my face, sometimes it was off to the side, but it was something lurking, and wondering if I would ever run into him, if I would ever have to work with him, what would I do, how would it be.  That was a source of stress. Sometimes it's very present; sometimes it's off to the side.

And then, as I have shared, in the wake of coming forward and in the wake of this lawsuit, all of those stresses have been increased exponentially.

And I did it, again, willingly, hoping that maybe by doing so, I could help protect others.

THE COURT:  Strike that --

MR. SAGHIR:  Your Honor, may I have one brief moment?

THE COURT:  -- the last remark.

Yes, yes.

(Pause)

BY MR. SAGHIR:

Q.  Anthony, with respect to John Barrowman, when did he tell you what happened between him and Mr. Spacey?

A.  When I shared with him my experience.

Q.  And that was approximately when?

A.  It was years after we'd been in high school together.  I believe it was in London, because that's where he was living --

THE COURT:  I'm sorry, I just have to interrupt for a minute.  The question that I heard — and I see the reporter heard it, too — was:  "Anthony, with respect to John Barrowman, what did he tell you what happened between him and Mr. Spacey?"  Was that actually the question?

MR. SAGHIR:  Forgive me.  When did he tell you what happened?

THE COURT:  Yes, when did he tell you what happened between him and Mr. Spacey, that is, between Mr. Barrowman and Mr. Spacey?

MR. SAGHIR:  Yes, your Honor.

THE COURT:  That's the question you're asking?

MR. SAGHIR:  That's correct.

THE COURT:  Is that the question you understood?

THE WITNESS:  Yes, that is the question I --

THE COURT:  Okay.  Let's go ahead.

THE WITNESS:  I'm not sure where we were, sir.

BY MR. SAGHIR:

Q.  Just approximately, when was it that you told -- that John Barrowman told you what happened between him and Mr. Spacey, just the time and date, approximately?

A.  Approximately, I believe it was when I was doing *Rent* in London in 1998.

Q.  Prior to that point in time, when you had that conversation, were you aware of anything that happened that

night at The Limelight backstage and at dinner between Kevin Spacey and John Barrowman?

A.   I was not.

Q.   When, if ever, did John Barrowman tell you about what happened at the apartment with Kevin Spacey?

A.   I don't understand the question.

Q.   Sure.

When, if ever, did John Barrowman tell you about his encounter with Kevin Spacey at Kevin Spacey's apartment?

A.   He did not.

Q.   Until when?

A.   He didn't tell me.  I learned of that in the course of this trial.

MR. SAGHIR:  Thank you.  No further questions, your Honor.

THE COURT:  Thank you.

We'll take our morning break here.  11:20, folks.

(Recess)

(Jury not present)

THE COURT:  You can come back up, please.  Let's bring in the jury.

(Jury present)

THE COURT:  All right.  Let's proceed.  Jury is present.

Ms. Keller, cross-examination.

MS. KELLER:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. KELLER:

Q.  Good morning, Mr. Rapp.

A.  Good morning.

Q.  Mr. Rapp, you gave your Kevin Spacey story to *BuzzFeed* magazine in October 2017, correct?

A.  Correct.

Q.  And if we could look at Plaintiff's Trial Exhibit 38 and tab 11, if we can show that to you.

That's your article we're talking about?

A.  I don't see anything.

Q.  Sorry.  That's your article we're talking about?

THE COURT:  I don't think --

Well, go ahead.  Go ahead.

A.  Yes.

Q.  That's the article we're talking about, correct?

A.  Correct.

Q.   OK.   You can take that down.

So you decided to go public with this article in 2017 during the quiet moment sitting by the window in your apartment, right?

A.   I decided -- I'm sorry, the --

Can you rephrase it?

I decided to reach out to explore the possibility in that moment.

Q.   Well, you said you decided in 2017, during a quiet moment sitting by the window in your apartment, having read this article, this op-ed piece by the actress Lupita Nyong'o, right?

A.   Correct.

Q.   And it's very vivid in your mind that that was the turning point for you, reading the article by Ms. Nyong'o, right?

A.   Correct.

Q.   Now, Ms. Nyong'o is not just an Oscar winner, but she's a black actress, star of stage and screen, who won an Oscar for her performance in *12 Years A Slave*, correct?

A.   Correct.

Q.   And she was nominated for a Tony for her role in *Eclipsed*, true?

A.   Yes.

Q.   And most recently she starred as Nakia in *Black Panther* the movie, correct?

A.   Correct.

Q.   The smash hit, true?

A.   Yes.

Q.   And she also starred in Jordan Peele's *Us*?

A.   Yes.

Q.   So she's a legitimate star who's had kind of a meteoric rise, isn't she?

A.   I think that's fair to say, yes.

Q.   Her personal story in that op-ed piece in the *New York Times* moved you to your core, didn't it?

A.   Correct.

Q.   You were shaken when you read it, right?

A.   I recall I was shaken when I read it, but in the wake of reading it, I do remember an experience of shaking.

Q.   If we could look at your deposition transcript, February 3rd.

        THE COURT:  Same rules.  Just refer to the deposition and read what you're focusing on after you've said the page and line.

        MS. KELLER:  Yes, your Honor.

Q.   February 3, 2021, your deposition at pages 233, lines 1 through 4.

        Counsel, have you had a chance to find it?

        MR. SAGHIR:  I have.  Thank you.

Q.   When I read that article, I was extremely shaken and moved, and that's when I immediately knew that I had to come forward

myself.

Is that true?

A.   That's as -- yes.

MR. SAGHIR:  Objection, your Honor.  I would ask that the whole question and answer be read.

THE COURT:  Yes, read the whole question and answer.

MS. KELLER:  I'm trying to find where we start.

THE COURT:  Have I been provided with the deposition transcripts?

MR. SAGHIR:  Yes, you have, your Honor.

THE COURT:  Andy.

It's in the video drive?

Well, let's see.  Is the hard copy in either of these?

MR. STEIGMAN:  I can't see.

THE COURT:  I guess they are not yours then.

MR. STEIGMAN:  Judge, we can share it.

THE COURT:  Yes.  Thank you.

MS. KELLER:  Your Honor, I'm just going to move on.

BY MS. KELLER:

Q.   So you reached out to your old friend Adam Vary?

MR. SAGHIR:  I object.  She read part of the question.

THE COURT:  She didn't read any part of the question at all.

MR. SAGHIR:  I'm respectfully asking she read the entire question and answer.

THE COURT:  Yes, I understood that was your point, now that I see it.

MS. KELLER:  It's a rather long narrative, your Honor.

THE COURT:  It's a long narrative, unresponsive answer, so let me read it in full.

(Pause)

I'm not going to require that the whole thing be read. If you want to put it in later, I'll deal with that.

Thank you, Mr. Steigman.

MR. STEIGMAN:  Do you want to keep it, Judge?

THE COURT:  If you don't need it right now, I'll keep it.

MR. STEIGMAN:  You're more important.  We'll make due.

THE COURT:  I don't know about that, but I appreciate it.

MS. KELLER:  Your Honor, may I read the portion that I was about to read?

THE COURT:  Well, you just did, didn't you?

You said 233, lines 1 to 4.  That's what I thought you read.

MS. KELLER:  I've lost track of whether I even read it.

THE COURT:  Well, let me take a look.

MS. KELLER:  It's pretty quick, your Honor.  I can just do it now.

MABsRAP2                              Rapp - Cross

THE COURT:  You did read it.

MS. KELLER:  OK.

THE COURT:  Then you asked him whether it was true, and he said yes.

MS. KELLER:  All right.

BY MS. KELLER:

Q.  So you reached out to your old friend Adam Vary, a writer at *BuzzFeed*, immediately after reading that story, right?

A.  Correct.

Q.  In fact that same day, true?

A.  Correct.

Q.  And you contacted Adam Vary instantly after reading Lupita Nyong'o's story because it resonated so powerfully with you, right?

A.  Correct.

Q.  And you publicly said Lupita Nyong'o's *New York Times* article is what inspired you to come forward, haven't you?

A.  Yes.

Q.  An organization called Out & Equal awarded you the person of the year at its annual event in 2018 for publicly accusing Mr. Spacey, right?

MR. SAGHIR:  Objection, relevance.

THE COURT:  Pardon me?

MR. SAGHIR:  Relevance.

MS. KELLER:  I can make an offer of proof, your Honor.

THE COURT:  I don't think it is necessary.  Overruled.

BY MS. KELLER:

Q.  You gave a keynote speech at that event black tie, right?

A.  Correct.

Q.  And you repeated to that audience that reading the *New York Times* article about Lupita Nyong'o is what caused you to share your story, right?

A.  Correct.

Q.  Because her courage gave you courage, true?

A.  I don't know that that is the way I phrased it.

Q.  Is that true?

A.  It -- it's -- it's an element of it, if I'm -- it's an element.  It's not the only aspect of it.

Q.  All right.  Now, crediting Ms. Nyong'o with inspiring you to come forward, that was something that you thought would make a better story, wasn't it?

A.  No.

Q.  Well, it's simply not true that her article inspired you, is it?

A.  I don't know how that can be the case.

Q.  Well, let's take a look if we can at Defendant's Trial Exhibit Z, tab three.

MS. KELLER:  I'm not seeing that.  We need the op-ed piece.  There we go.

Q.  Does this look familiar, Mr. Rapp?

MR. SAGHIR:  What exhibit?

THE COURT:  What exhibit are you displaying?

MS. KELLER:  I have it as Defendant's Trial Exhibit Z.

THE COURT:  Well, can you scroll down on this so that I can see what the marking is?

MS. KELLER:  I'm sorry, your Honor.  Can we have this as Defendant's AAA?

THE COURT:  So you said can we have this as, if I understood you correctly.  I don't know what that means.  Does that mean it's marked Defendant's Exhibit AAA, or does that mean you would like to mark it?

MS. KELLER:  If it's not already marked as AAA, we would like to mark it.

THE COURT:  Well, I don't know.  I mean, you're the counsel.

MS. KELLER:  May I have a moment to consult?

(Counsel confer)

We would like to have it marked, your Honor.

THE COURT:  All right.  Andy, let's get it marked.

THE DEPUTY CLERK:  Do they have a hard copy, Judge?

THE COURT:  Do you have a hard copy?

MS. KELLER:  Yes, your Honor.

BY MS. KELLER:

Q.  This is the article you've been referring to, isn't it?

A.  Correct.

MABsRAP2                    Rapp - Cross

Q.  Let's take a look at the date on that article.  The date of that article is October 19.

THE COURT:  Are you offering the article in evidence?

MS. KELLER:  Yes, your Honor, I am.

THE COURT:  All right.  Any objection?

MR. STEIGMAN:  Can we see it first?

THE COURT:  Not for the truth, obviously.  Not for the truth.

MR. SAGHIR:  We don't have a complete copy.

THE COURT:  You don't have a complete copy.

Would you show your adversaries the article?

MS. KELLER:  I will.

MR. SAGHIR:  No objection, your Honor.

THE COURT:  All right.  Defendant's Exhibit AAA is received to establish what the op-ed piece said, not to be considered for the truth of whatever it contains.

MS. KELLER:  Your Honor --

THE COURT:  That may occur with other documents in this case, it may occur with testimony.  And just to put it in terms that I've used for a lot of time, it could conceivably, in some other case, be relevant to know that somebody said the moon is made of green cheese.  And if there was some documentary evidence that the person actually said the moon was made of green cheese, that would be received for the fact that the person said it on a prior occasion, not to prove what the

moon is made of.  That's what's going on here.

Let's go.

MS. KELLER:  Thank you, your Honor.

May we publish this for the jury?

THE COURT:  Yes, you may.  You may.

BY MS. KELLER:

Q.  You see the date on this op-ed piece is October 19, 2017, correct?

A.  Correct.

Q.  Now, you had contacted Ms. Vary with your Kevin Spacey story on October 11, 2017, eight days before Ms. Nyong'o's story was in the *New York Times*, right?

A.  Correct.  I did not recall that.

Q.  You didn't recall that when you testified earlier that it is what inspired you, right?

A.  Correct.

Q.  And you didn't remember it at your deposition when you said it's what inspired you, right?

A.  Correct.

Q.  You didn't know that you were -- you didn't know when you made that speech, the very moving speech where you included that Ms. Nyong'o's story had inspired you, that it actually came out eight days after you had gone to Mr. Vary, right?

A.  Correct.

Q.  Let's now look if we can at Exhibit Z, Trial Exhibit Z, and

MABsRAP2                          Rapp - Cross

ask you to look at this first, and counsel.

Do you recognize this as one of the text messages you exchanged with Mr. Vary?

A.   Yes.

MS. KELLER:   Your Honor, move to admit and publish.

THE COURT:   Any objection?

(Counsel confer)

MR. SAGHIR:   No objection with the limitations, your Honor, that you previously stated that it is not coming in for the truth of the matter.

MS. KELLER:   Your Honor, insofar as it is a party admission, it should --

THE COURT:   Of course.   Defendant's Exhibit Z is received insofar as it relates to statements attributed to the witness.   You may consider it for the truth of what he said. Insofar as it relates to statements by Mr. Vary, you may not consider it for the truth of what Mr. Vary said, but only for the fact that he said it.

Let's proceed.

BY MS. KELLER:

Q.   So this is dated October 11, 2017, correct?

A.   Correct.

Q.   And in this you text Mr. Vary, Hey, my friend, can you call me when you get a chance?   In the wake of the Harvey Weinstein story and its fallout, I am wanting to speak out about someone

else very powerful in our industry, but I want to to try to do it in the best most effective manner and would want your help and participation if you feel it would be appropriate.

Those were your words, right?

A. Correct.

Q. And that same night Mr. Vary told you things were in a good place with your story, is that right?

A. May I see it?

Q. Yes.

A. Correct.

Q. So hey, Anthony, got time to talk? Wanted to fill you in on where things are. Things are in a good place.

And you say, Yes, I do in a minute. Can I call you?

Now, on October 12, the next day, six days before the *New York Times* published Ms. Nyong'o's article, Mr. Vary told you he had already spoken to his editors about your story, correct?

A. Correct.

Well, may I see it? Sorry.

Q. Yes. Hey, do you have some time to talk still? In talking this over with my editors, they had just raised some things that I hadn't considered and I wanted to get the chance to talk it out with you a bit more.

And you say -- he you say, Yes.

A. Yes.

Q.  So by October 13, five days before the *New York Times* published Ms. Nyong'o's article, Mr. Vary told you that everyone at *BuzzFeed* wanted to be sure your story had the strongest impact possible, is that right?

A.  Is that what he said?

Q.  Yes.

A.  I'm sorry, I don't recall that phrase in what he said.

Q.  OK.  Can we have the text up again?  Exhibit Z, page three.

Do you see it now, I think everyone here wants to be sure your story has the strongest impact possible?

A.  It is a clause in a longer sentence.

Q.  Is that a statement he made to you, that he -- that everyone at *BuzzFeed* wanted to make sure it had the strongest impact possible?

A.  You -- you -- that is a statement in a context of a longer statement.

Q.  Well, bottom line is your acceptance speech in 2018 was not truthful, was it?

Your acceptance speech where you cited Ms. Nyong'o as having been your inspiration and recalling that at that very moment you decided to come forward and you had immediately contacted Mr. Vary, none of that was true, was it?

A.  I'm learning right now that it wasn't true.  It was how I remembered the events unfolding when I thought back on them.

Q.  But the events weren't 31 years old, were they?

They were just, what, couple months old, two, three
months old?

A.   When was the Out & Equal?

Q.   I'm talking about the conversation with Mr. Vary, the 2018
Out & Equal speech.

A.   I'm saying, when was that?

Q.   2018.

A.   When in 2018?

Q.   Why don't you tell me, because let's see if you remember.

A.   I do not remember when in 2018 it occurred.

Q.   What I'm saying, Mr. Vary, is what I'm asking you rather is
these events that you're talking about here, they weren't
31 years old, were they?

A.   They were not.

Q.   And yet you got them completely wrong, right?

A.   I got -- I got -- I got that it was in the wake of the
Harvey Weinstein, and I conflated when I read the article
relative to every other step of the process.

Q.   You thought it would be poignant to say that you were
inspired to come forward by a superstar black actress who had
actually been sexually harassed, right?

A.   I did not think it was poignant, I thought it was what has
happened.

Q.   It would be useful for you, you would get more sympathy,
wouldn't you?

A.   No, I was sharing my memory of how it happened.

Q.   A very dramatic memory, right?

A.   A very personal memory.

Q.   That turned out to be wrong?

A.   That turned out to be a part of the overall memory of hearing Harvey Weinstein stories.

Q.   You got the date wrong?

A.   I did get the date wrong, yes.

Q.   That op-ed piece hadn't been published yet, right?

A.   Correct.

Q.   So you were wrong when you said that you were struck and inspired and immediately that day called Mr. Vary; that wasn't true, was it?

A.   It wasn't true that that sequence of efforts that was in -- it was part of that time.

Q.   I'm not asking that.

A.   I understand.

          THE COURT:  Mr. Rapp, this will all go a lot better if you listen to the question and just answer the question.

Q.   It wasn't true that you came forward because of the Lupita Nyong'o article, and that the same day you read it you contacted Adam Vary because you knew had you to come forward; that wasn't true, was it?

A.   That was not true.

Q.   Thank you.

Now I would like to speak with you about when you met Mr. Spacey in the spring of 1986. You said it was one of the theater events where you met Mr. Spacey, right?

A. Correct.

Q. And the encounter was brief, true?

A. Correct.

Q. Collegial and friendly?

A. Correct.

Q. And Mr. Spacey didn't ask you for your phone number, right?

A. Correct.

Q. You didn't give him your phone number, true?

A. Correct.

Q. You didn't give him your address?

A. Correct.

Q. He didn't tell you where he lived?

A. No.

Q. He didn't do anything inappropriate during this interaction?

A. Correct.

Q. He didn't try to hit on you, pick you up?

A. Correct.

Q. In fact, he didn't say anything inappropriate, right?

A. Correct.

Q. In fact, Mr. Spacey didn't seem to show interest in you, much interest in you of any kind, inappropriate or otherwise,

right?

A.  I wouldn't say much interest.  As much interest as all of us were experiencing with each other relative to that it seemed like a normal amount of interest.

Q.  Other than this very passing hello, he didn't express any interest in you, did he?

A.  There was -- it was more than a passing hello.

Q.  Now, the fact that he didn't ask for your phone number or your address or anything else, or give you his, that didn't surprise you, did it?

A.  No.

Q.  I mean, you were only 14, true?

A.  Correct.

Q.  And you looked even younger.

So Mr. Spacey didn't invite you out for drinks or dinner or to a club, true?

A.  Not that day.

Q.  OK.  Now, the next time you met Mr. Spacey, you were with your friend from Joliet, John Barrowman, right?

A.  Correct.

Q.  And even though it looks like Barrowman, he pronounces it Barrowman, right?

A.  Yes.

Q.  So Mr. Barrowman was staying with you and your mom while he was visiting you in New York?

A. Yes.

Q. He was also an actor?

A. He was an aspiring actor.

Q. He was an aspiring actor and had been in a number of productions back in Joliet, right?

A. Yes.

Q. He had ambitions to make acting his career, that's what you mean by aspiring?

A. Yes.

Q. And he had been in *Oliver* with you back in Joliet?

A. Yes.

Q. He had also starred in high school performances at *Camelot* where he played Sir Lancelot?

A. Yes.

Q. That is a very romantic role, isn't it?

A. Yes.

Q. He had been the male lead in *Hello Dolly*, true?

A. I don't recall that.

Q. He had played *Li'l Abner*, the lead, he was Abner?

A. Yes.

Q. He had been in *Anything Goes* where he played Billy Crocker, the romantic lead, true?

A. I don't recall that.

Q. Well, he wasn't just an accomplished actor, but he could also sing and dance, right?

A.   Yes.

Q.   He was a theater standout at your old high school?

A.   He was, yes.

Q.   And, in fact, the piano accompaniment, Beverly Holt, at your school said he was going to be a star, right?

A.   I don't know that.

Q.   Well, he has become a bit of a star; he's gone on to illustrative career, hasn't he?

A.   Yes.

Q.   He played leading roles on the stage in London?

A.   Yes.

Q.   *Anything Goes*, *Ms. Saigon, Phantom of the Opera*, *Sunset Boulevard*, *La Cage*?

A.   I don't know that he was in all of those shows.  I'm aware of some of that.

Q.   Didn't you follow his career?

A.   Not closely.

Q.   You know he's been in movies?

A.   I don't know what movies he's been in.

Q.   Does *De-Lovely* ring a bell, about Cole Porter?

          MR. SAGHIR:  Relevance, Judge.  Objection.

          THE COURT:  Overruled.

A.   It rings a very, very faint bell.

Q.   *De-Lovely, The Producer*, *Zero Dark Thirty*?

A.   I've heard of *Zero Dark Thirty*, I have not seen it.

MABsRAP2                         Rapp - Cross

Q.   He's been on TV in *Desperate Housewives*, right?

A.   I didn't know that.

Q.   And for years he was Captain Jack Hartness in *Dr. Who* in the United Kingdom?

A.   Yes.

Q.   And then he got his own spin-off *Torchwood*, right?

A.   Yes.

Q.   He's also written books, judged talent shows *Dancing on Ice*; you know that, don't you?

A.   I didn't know he judged *Dancing on Ice*.

Q.   Anyway, back in 1986, at that time John Barrowman was a grown man, true?

A.   I knew him -- I didn't know how old he was.  I knew him. He had been three years ahead of me in school.

Q.   Well, he's actually four and a half years older than you, right; you know that now?

A.   I know that now.

Q.   And he was six feet tall, true?

A.   I don't recall his height.

Q.   Well, he looked fully grown, didn't he?

A.   I -- I don't -- I thought of him as a high school friend and colleague.

Q.   He didn't look like you looked in 1986, did he?

A.   I think that's fair to say, yes.

Q.   He towered over you, didn't he?

A.  I didn't experience him towering over me.

Q.  OK.  Let's look at Defendant's Exhibit TT.

          This is the photo from the play *Precious Sons*.  That's
you in *Precious Sons*?

A.  No.  That's my headshot, which I'm not sure when exactly
that was taken relative to being in *Precious Sons*.

Q.  That was in the play program, the playbill, right?

A.  Yes.

Q.  For *Precious Sons*?

A.  Yes.

Q.  And Mr. Barrowman, on the other hand, was already a college
student at University of Iowa, true?

A.  I know that now.  I'm not sure I knew that at the time.

Q.  He stayed with you for a week, didn't he?

A.  Yes.

Q.  In a one-bedroom apartment?

A.  Yes.

Q.  And you were friend from Joliet?

A.  We were friends.  We weren't close friends, but we were
friends, yes.

Q.  Did he omit mentioning that he was actually a college
student at the University of Iowa?

A.  I just don't recall whether I knew that at the time or not.

Q.  Let's look at Defendant's Trial Exhibit R.

          THE COURT:  Look, counsel, let's not have any

confusion over the exhibits.  The exhibits are not in evidence unless somebody offers them, and they are received.  So don't make the assumption based on the pretrial order that they are all in.  Same thing I said to plaintiff's counsel earlier, but go on.

MS. KELLER:  Thank you, your Honor.

THE COURT:  I mean, they are not going to the jury. They are not being published.  They don't know what you're referring to when you pull these things out.

MS. KELLER:  Thank you.  I appreciate it.

BY MS. KELLER:

Q.   Let's look at this photograph of you from the playbill Defendant's Exhibit TT.

MS. KELLER:  Move to admit that, your Honor.

THE COURT:  Any objection?

MR. SAGHIR:  No objection.

THE COURT:  Received.

(Defendants' Exhibit TT was received in evidence)

MS. KELLER:  Move to publish.

THE COURT:  You don't have to say moved, but you may publish.

MS. KELLER:  Thank you, your Honor.  I'll try not to move any more than I have to.

THE COURT:  It's usually good advice.

BY MS. KELLER:

Q.  All right.  So this is you in the playbill for *Precious Sons*, true?

A.  Yes.  That is my headshot, yes.

Q.  And then I want to show you Defendant's Trial Exhibit R.

Is that a photograph of John Barrowman around that age?

A.  I don't know whether it is around that age or not.

Q.  Is that how he looked at the time he came to visit you?

A.  I don't -- he wasn't wearing a suit and tie when he came to visit me.  I'm not sure his hair --

THE COURT:  Look, Mr. Rapp, if you really thought she was asking about the clothing, then you're exactly right.

But try to be responsive to the question.  OK?

THE WITNESS:  OK.

Q.  That's pretty much what Mr. Barrowman looked like at the time he visited you, isn't it?

A.  Seems to be, yes.

MS. KELLER:  Move to admit, your Honor.

THE COURT:  Any objection?

MR. SAGHIR:  No objection.

THE COURT:  Received.

(Defendant's Exhibit R received in evidence)

BY MS. KELLER:

Q.  Now, Mr. Barrowman was a handsome young man in 1986, wasn't it?

MABsRAP2                              Rapp - Cross

THE COURT:  Sustained.

MR. SAGHIR:  Objection.

Q.  You were pleased when Mr. Barrowman came to visit you in 1986 in New York, weren't you?

A.  Yes.

Q.  He was coming to see you in your first Broadway play, first one that achieved liftoff?

A.  Yes.  First one that opened, yes.

Q.  And he was staying with you and your mom?

A.  Yes.

Q.  You were excited to see him?

A.  I was -- I was happy that he was coming, yes.

Q.  And the two of you went to see Mr. Spacey and Jack Lemmon in *Long Day's Journey Into Night*, correct?

A.  We went -- they were in the play.  We went to see that play.

Q.  Well, at the time Jack Lemmon was a huge star, wasn't he; both of stage and films?

A.  Yes.

Q.  He was one of the major stars in the United States at the time, was he not?

A.  Yes.

Q.  So you knew Mr. Lemmon was in *Long Day's Journey*, didn't you?

A.  I did.

Q.  Now, you managed to get back stage at the production after the performance, right?

A.  Correct.

Q.  And that was kind of one of the perks of being in a Broadway play yourself, that you were able to go backstage and see fellow actors in other plays?

A.  Yes.  It was part of the -- I would call almost like a ritual among the theater community.

Q.  So you and Ms. Barrowman ended up in Jack Lemmon's dressing room?

A.  In the antechamber.  Not in the actual dressing room itself, in the antechamber outside the more private area of the dressing room.

Q.  He was very nice to you and spoke to the two of, didn't he?

A.  Absolutely.

Q.  Must have been very, very exciting to meet him?

A.  It was.

Q.  And that is where you saw Mr. Spacey as well, true?

A.  Yes, he came down and joined.

Q.  He spoke with the two of you, you and Mr. Barrowman?

A.  Yes.

Q.  And the only time he spoke to you backstage that day was when you were with Mr. Barrowman, right?

A.  Correct.

Q.  You were never alone with Mr. Spacey backstage?

A.   Correct.

Q.   He expressed no sexual interest in you backstage?

A.   Correct, correct.

Q.   And didn't behave inappropriately backstage?

A.   Correct.

Q.   Made no physical contact with you backstage?

A.   There may have been a handshake.  I don't recall anything other than that.

Q.   OK.  So --

        THE COURT:  Do you recall a handshake?

        THE WITNESS:  I don't -- I don't definitively recall a handshake.  I think it's likely, but I don't recall definitively.

Q.   Nothing inappropriate happened?

A.   Nothing inappropriate.

Q.   So Mr. Spacey invited you and Mr. Barrowman to join him at dinner, right?

A.   Correct.

Q.   OK.  Let's pause there.

        You told your friend, the reporter, Adam Vary, a very different story in 2017, didn't you?

A.   I don't recall.

Q.   You omitted any mention of ever going backstage or meeting Jack Lemmon and Kevin Spacey.  You omitted any mention of that in the *BuzzFeed* article, right?

A.   I don't recall.

Q.   When is the last time you looked the *BuzzFeed* article, that is the first time you came forward with your story?

A.   Years ago.  I don't recall the last time I read the article.

Q.   Let's see if we can put that on screen and refresh.  See if we can refresh your memory.

I'm talking about specifically did you say you ran into Kevin Spacey "at one of those late-night post show gatherings at which many different Broadway casts would gather and mingle?"

A.   Yes.

Q.   So you didn't say, I met him in Jack Lemmon's dressing room with John Barrowman and he invited us to dinner, correct?

A.   I'm not sure that I described it any particular way.  It's not how it is written in the article.  I don't remember how I exactly described it.

Q.   Well, did you describe running into Mr. Spacey at a post-show gathering that involved lots of different casts where people were mingling and eating, because that's what's written in the article?

A.   I understand.  I don't recall how I related it to Mr. Vary.

Q.   Did you try to tell Mr. Vary the truth?

A.   Yes.

Q.   And you knew that he would be careful with your story,

right?

A.  I knew he would be careful with the emotional content of my story.

Q.  Well, did you think he was going to be careless with the facts of your story?

A.  Not at all.

Q.  And, in fact, you read over the article after it was published and you were not misquoted, true?

A.  True.

Q.  You read over the article after it was published and you did not see anything in the article that was inaccurate, true?

A.  Correct.

Q.  So there is a difference, isn't there, between meeting -- you initiating the meeting by going backstage to the dressing room, meeting Jack Lemmon and Mr. Spacey, and Mr. Spacey then, post show, asking the two of you if you would like to go to dinner on the one hand, and on the other hand, Mr. Spacey picking out two underage boys from the middle of a crowd of different cast members and saying, Hey, hi, come join us, and then inviting you immediately to The Limelight.

That's the story that you told Mr. Vary, right?

MR. SAGHIR:  Objection, your Honor.  Misstates the evidence.

THE COURT:  Overruled.

Q.  Didn't you tell Mr. Vary you encountered --

Rapp said he encountered Spacey, again, at one of those post-show functions when a 17-year-old friend from Joliet was visiting him in New York. And he was, like, Hey, hi, come join us, Rapp said. Spacey then invited both boys to join him at the popular nightclub Limelight even though, as Rapp explained, I looked younger than 14?

A. Yes, I considered being backstage at the play one of those post-show functions.

Q. Well, one of those late-night post-show gatherings at which many different Broadway casts would gather and mingle, what other casts were gathering and mingling with you and Mr. Barrowman and Mr. Spacey at some function?

A. It's -- it's a character -- I don't know how to answer the question. There was no other casts gathering and mingling, and I did not tell Mr. Vary otherwise.

Q. Well, he was meeting a lot of actors during that period, enjoying the time-honored custom of late-night post-show gatherings at which many different Broadway casts would eat and mingle.

You told him that. You said nothing in the story was inaccurate when you reviewed it?

A. Correct.

Q. Rapp said he encountered Spacey again at one of those post-show functions when a 17-year-old friend from Joliet was visiting him in New York and he was like, Hi, Hey, come join

us, Rapp said.  Spacey then invited both boys to join him at the popular nightclub Limelight even though, as Rapp explained, I looked younger than 14.

A.  Correct.

Q.  Again, you said there was nothing inaccurate about this story, right?

A.  It's -- it's not inaccurate.  I considered being backstage at the play and going out to dinner one of those post-show functions that I was referring to.

Q.  You considered that to be a post-show gathering at which many different Broadway casts would eat and mingle?

A.  Correct, ultimately in the course of the whole evening.

Q.  Well --

            THE COURT:  No.  Just a minute.

            Mr. Rapp, the job here is for Ms. Keller to ask the questions, for you to listen to them, and you to answer them, not to add whatever comes through your mind about it.  OK?

            THE WITNESS:  OK.

            THE COURT:  Your lawyer will have plenty of time to examine you again later.

            THE WITNESS:  OK.

BY MS. KELLER:

Q.  You would agree that it sounds a little sinister for there to be a gathering of many different cast members eating and mingling, and then for Mr. Spacey to have picked out two

underage boys -- because you said Mr. Barrowman was 17 in this article rather than 19 -- picked out the two underage boys and then invited them immediately to a nightclub, right?

A.   I'm sorry.  The question is would I regard that as sinister?

Q.   That seems a little sinister compared to what really happened?

A.   That's not how I think of it, no.

Q.   You don't see this as a fairly major divergence from your current story?

A.   I do not.

Q.   Now, the first time you included going to Jack Lemmon's dressing room at *Long Day's Journey Into Night* was at your deposition in this case, right?

A.   Correct.

Q.   Up until then, it was just this meet-and-mingle gathering and Mr. Spacey singling out you two underage boys to go to a nightclub, right?

A.   Can you rephrase the question?

Q.   Well, I'll just leave it at that.

      The first time you've ever told the story of going with Mr. Barrowman to Jack Lemmon's dressing room at *Long Day's Journey* was your deposition in this case, right?

A.   I don't know -- I can't answer that question.  I do not recall the exact -- I do know I did say that in the deposition.

I don't recall if I never said that before.

Q. Well, couple questions ago you said, yes, it was the first time.

Which is it; is it the first time or you don't recall?

A. I'm sorry.

MR. SAGHIR: Objection, vague, argumentative.

THE COURT: Argumentative.

Q. Well, by the time of your deposition, you knew that John Barrowman was going to be testifying, right?

A. I don't know when I came to learn that he was going to be testifying.

Q. And you knew that Mr. Barrowman, when he testified, was going to talk about how you actually met Mr. Spacey going back to Jack Lemmon's dressing room; you knew that when he testified, he was going to talk about that, right?

A. I didn't know anything about what he was going to testify.

Q. You knew that's what had happened, didn't you?

A. Yes.

Q. And you're sure of that?

A. Yes.

Q. Now, that would have been an awfully interesting fact for Mr. Vary's story, but you didn't tell Mr. Vary about that, did you?

A. I don't.

MR. SAGHIR: Objection, vague, your Honor, as to what

fact she's referring to.

THE COURT:  Sustained as to form.

Q.  You didn't tell Mr. Vary one word about Jack Lemmon that night, correct?

A.  I don't know that for certain.

Q.  Is it your testimony that you told Mr. Vary and he deliberately left it out?

A.  I have -- I have no way of knowing what he deliberately included or left out.

Q.  I'm asking, did you tell him?

A.  I do not recall whether I did or not.

Q.  And you didn't think that that was an important fact?

A.  I -- I -- I didn't -- I don't know how to answer the question.  I don't -- I don't recall whether that was part of the conversation or not.

Q.  Well, after the *BuzzFeed* article came out and you saw that it had this thing about how you had met at a late-night post-show gathering at which many different Broadway casts would eat and mingle, did you call Mr. Vary or write him or text him and say, Hey, you got that wrong, that's really not where we met, we really met in Jack Lemmon's dressing room?

A.  Again, I didn't.  It felt like it reflected an experience like being in the dressing room.

THE COURT:  Sir, just answer the question, please.

Q.  I'm not --

A.   I didn't -- I didn't -- I didn't call and correct anything.

Q.   You didn't write him either?

A.   Not that I recall, no.

Q.   You didn't ask for any kind of correction?

A.   Correct.

Q.   Now, you were happy to join Mr. Barrowman and Mr. Spacey at dinner, right?

A.   Correct.

Q.   Joining the two adults?

A.   I did not think of John as an adult.

Q.   Did you think of him as a child?

A.   I thought of him as a teenage friend of mine from high school.

Q.   So 18 and 19 to you is not an adult?

A.   I don't -- it didn't seem that way to me at the time.

Q.   Where was your cutoff for adulthood, 21?

A.   Probably something like that.

Q.   So you wanted Mr. Barrowman to treat you like a friend, right?

A.   Correct.

Q.   Did it occur to you when Mr. Spacey asked Mr. Barrowman and you to dinner that he wanted to get to know Mr. Barrowman better?

A.   It did not occur to me, no.

Q.   Now, the three of you went to a restaurant, right?

A.  Correct.

Q.  And chatted?

A.  Correct.

Q.  But, again, Mr. Spacey only spoke with you when Mr. Barrowman was there, right?

A.  Correct.

Q.  And Mr. Spacey was flirting with Mr. Barrowman, right?

A.  I did not observe that.

Q.  Well, he certainly wasn't flirting with you, was he?

A.  Correct.

Q.  And, again, at the restaurant, he didn't make physical contact with you, true?

A.  True.

Q.  Now, after dinner the three of you did go to a club called The Limelight, right?

A.  Correct.

Q.  And it was pretty early in the evening?

A.  Define pretty early in the evening.

Q.  Pretty early.  So you had gone to a matinee, right?

A.  Yes.

Q.  Matinee would have ended by what?

A.  It was a long play.  Most Sunday matinees were usually three o'clock.  So I think we would get out at six, 6:30, something like that.

Q.  Well, didn't this one start earlier because it was a long

play?

A.   I do not know for sure.

Q.   You didn't -- you went to dinner at what, 6:30ish?

A.   We had spent some time backstage talking, so it was probably half hour, 45 minutes after the show came down.  I would say seven he o'clock.  630, 7:00 is very possible.

Q.   You didn't go to a fancy fine dining restaurant, just went to a place to grab a bite, correct?

A.   Correct.

Q.   After that you went to The Limelight, true?

A.   Correct.

Q.   Now, so going to The Limelight maybe 7:30, 8:00?

A.   Probably after 8:00.

Q.   Not exactly the type of hour where night clubs in New York City get going on a Sunday night, right?

A.   I have no way of knowing that at the time.

Q.   Well, how about now?

A.   I don't -- I don't know that either now.  I do not know.

Q.   You have no idea -- how old are you now?

A.   I'm 50.

Q.   And you have no idea when night clubs get into full swing?

          MR. SAGHIR:  Objection, relevance as to what goes on now.

          THE COURT:  Overruled.

A.   I haven't entered a nightclub in some time.  I do not know.

MABsRAP2                       Rapp – Cross

Q.  Do you think that night clubs have a busy, crowded business in New York City at about 8:00 on a Sunday night?

A.  I have no way of knowing that.

Q.  There were other children, other kids in The Limelight, weren't there?

A.  I did not observe any other children that night.

Q.  You didn't observe Drew Barrymore there?

A.  I did not.

Q.  Wasn't she kind of a bit of a celebrity at that nightclub?

A.  I did not know that.

Q.  Wasn't she a bit of a celebrity at the time?

A.  Yes.

Q.  And she was a noted child actress, right?

A.  Yes.

Q.  She was around 11 years old then?

A.  I believe so.

Q.  And there were actually pictures, aren't there, of Drew Barrymore at The Limelight at that age?

A.  I do not know.

Q.  Now, you've testified that you don't know when your play *Precious Sons* closed, right?

A.  I know it was the week -- well, if I testified to that, is that true, I -- I --

Q.  I'm asking you.  You said earlier you really didn't know when your play closed, true?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   The exact date, I didn't know.  I could tell -- I know when it closed relatively speaking.

Q.   Well, I'm trying to pinpoint a date here, because isn't it the true that you went to see the matinee the next day after your play closed?

A.   I don't know definitively if that is true.

Q.   . Rapp, you know of something called IMDb, Internet Broadway Database?

A.   Yes.

Q.   That's used by just about everybody on Broadway, right?

A.   I don't know that.

Q.   OK.  It's something that is run by the Broadway League, right?

A.   I don't know that either.

Q.   Funded by the State of New York?

A.   I don't know anything about --

Q.   You know it's a very common resource for people on Broadway to use, right?

A.   I know it's a resource, yes.

Q.   Well, you know it's a resource that among other things has every play going back to the beginning of Broadway and it has, among other things, their opening date and closing date, right?

A.   Sure.

Q.   So very simple to go to IMDb, put in *Precious Sons*, and up it pops, opening date March 20, 1986, closing date May 10,

1986, right?

A.  Sure.

Q.  Very easy?

A.  Sure.

Q.  All these years, haven't you been curious to pinpoint when your play closed?

A.  No.  I mean, I remember it closed a week of the Tony nominations release.  That was the part that stands out in my memory.

Q.  All these years, for decades you've never looked to see, gee, I want to pinpoint that closing date?

A.  Not that I recall.

Q.  But you put it on your Wikipedia page, didn't you?

A.  I didn't put anything on by Wikipedia page.

Q.  I see in a footnote you're complaining that somebody had changed your page without permission.  That's you complaining about that?

A.  May I explain?

Q.  Have you ever looked at your Wikipedia page?

A.  I have.

Q.  And it lists everything you've been in, and *Precious Sons* it lists as having closed on May 10, 1986, right?

A.  I guess so.

Q.  Well, it's a pretty simple matter to find that out.  It takes about 15 seconds of Googling or going to IMDb, right?

A.   OK.

Q.   So your play closed May 10, 1986, true?

A.   True.

Q.   Now, this incident with Mr. Spacey that you say happened at his apartment, you also say you don't know when that was, right?

A.   Correct.  I don't know the date.

Q.   You know it was before John Barrowman left, right?

A.   I'm sorry.  Which incident?

Q.   The incident that you claim occurred in Mr. Spacey's apartment where you were so victimized that it is still with you and haunts you?

A.   And the question was whether that?

Q.   The question was, you said in your deposition that that was after the closing, right?

A.   Correct.

Q.   And after you and John Barrowman had gone to see Mr. Spacey in *Long Day's Journey Into Night*?

A.   Correct.

Q.   At a matinee, right?

A.   Correct.

Q.   And there was a matinee the very next day after your play closed, right?

A.   Correct.

Q.   Now, so we know it was sometime after May 10, and

Mr. Barrowman was only there a few more days, right?

A.   Not a few more days.

Q.   A week?

A.   No.

Q.   Two weeks?

A.   No.  He had been -- he was there for a total of a week.  He had been there during the week.  He had seen me in *Precious Sons*, seen other plays, and then he left after either the next day or maybe the day after that.  He left after we went out to dinner and The Limelight, went back to Joliet or to school.

Q.   Well, your play closes May 10?

A.   Correct.

Q.   So is it the very next day that you and Mr. Barrowman go see *Long Day's Journey into Night* matinee on a Sunday?

A.   That seems possible.  I don't recall the exact date, but that seems like it makes sense.

Q.   I'm not asking if it's possible.  Is that what you think happened?

A.   I think that's what happened.

Q.   OK.  Now, back to joining Mr. Barrowman and Mr. Spacey at The Limelight, did it occur to you that you might be seen as something of a tagalong?

A.   It did not occur to me, no.

Q.   And you told us earlier, when you were being examined by Mr. Saghir, that you didn't -- you didn't really enjoy yourself

at The Limelight?

A.   I didn't enjoy the environment of The Limelight very much, yes.

Q.   It was a nightclub, it didn't make a great impression?

A.   Correct.

Q.   Your first trip,  you really wanted to get out of there, you didn't want to stay, right?

A.   Yeah.  I didn't want to stay there a long time, yes.

Q.   Because you weren't enjoying yourself?

A.   I was not enjoying the environment of The Limelight, yes.

Q.   Were you enjoying yourself, but not the environment?

     I'm wondering why you're splitting hairs here.  You weren't enjoying yourself, right?

A.   I wasn't -- I wasn't, to some degree, enjoying the company. It was difficult to have conversations in the environment.

Q.   You weren't having fun at The Limelight with the environment around you being what it was, true?

A.   Correct.

Q.   OK.  You told your friend, Mr. Vary, something very different.  You told him about The Limelight.  It was just a fun night, just talking and hanging out, right?

A.   Correct.

Q.   It was a fun night.

     Now, if you're not enjoying yourself, how are you having a fun night?

A.   As I said, the conversations, such as I could have, it was fun.  The overall experience of going to dinner and The Limelight was a fun experience, and hanging out.

Q.   So you were both fun and not enjoying yourself at the same time, true?

A.   To some degree.

Q.   Did you tell Mr. Vary about that, about that split, that, you know, I wasn't having -- I was having a fun night talking and hanging out, but I wasn't enjoying the atmosphere of The Limelight, so I didn't particularly enjoy myself there?

A.   I don't recall.

Q.   Well, you know you didn't, did you?

A.   I don't know that.

Q.   And how many years -- you knew that that article was going to come up in this trial, didn't you?

A.   I didn't know anything.  I assumed it was possible.

Q.   Well, you knew it had come up in your deposition, right?

A.   I believe so.

Q.   Well, you re-read your deposition before testifying here?

A.   Yes.

Q.   You knew that it had been focused on in your Honor deposition, right?

A.   Correct.

Q.   And so you knew it was going to come up at the trial.  You're telling me you never bothered to review the article?

MR. SAGHIR:  Objection, form.

THE COURT:  Overruled.

A.  I re-read the article at some point in this process.  I don't recall exactly when.

Q.  So you said that the three of you went to the a VIP section at The Limelight, right?

A.  Yes.

Q.  You sat down at a low table at The Limelight and talked while you were there?

A.  Correct.

Q.  Right?

But the truth is, Mr. Spacey spent his time flirting with Mr. Barrowman, didn't he?

A.  I did not observe that.

Q.  Well, the two of them danced together, right?

A.  I don't remember that.

Q.  Are you saying it didn't happen, or you don't recall?

A.  I don't recall that happening.

Q.  Again, you just don't remember one way or the other, or it didn't happen?

A.  I didn't observe it happening.  I have no recollection of seeing them dance together.

Q.  And you likewise have no recollection of Mr. Spacey flirting with Mr. Barrowman?

MR. SAGHIR:  Objection, asked and answered.

A.   Correct.

Q.   But, again, at The Limelight, as opposed to earlier, he didn't flirt with you, right?

A.   Correct.

Q.   He didn't offer you alcohol, right?

A.   Correct.

Q.   And you were never alone with Mr. Spacey, right?

A.   Correct.

Q.   But while you were at The Limelight that evening, your testimony is Mr. Spacey invited just you to a party at his home on another evening, right?

A.   That's the best of my recollection.

Q.   And you claim that Mr. Barrowman was with you when Mr. Spacey invited you to a party at his apartment on a future date, true?

A.   I believe that that's the way it happened, yes.

Q.   Mr. Spacey wrote down his address for you while you were at The Limelight and, of course, he must have written down a date, true?

A.   I believe so, yes.

Q.   What date?

A.   I don't recall that.

Q.   What time of night did he tell you to come by?

A.   After his performance.  Late.  I don't recall the time exactly.

Q.  How about a phone number?

A.  I don't recall whether there was a phone number included or not.

Q.  Did you keep that piece of paper with that phone number or not phone number?

A.  Did I keep it at what point?

Q.  Did you keep it ever?

A.  Not after that incident, no.

Q.  So was it because you were too traumatized to keep that piece of paper?

A.  I -- I do not recall when or how I didn't no longer had that piece of paper.

Q.  And so considering that you were altogether very close and Mr. Barrowman was with you at the time, he was in a position to see you get that piece of paper with the address of Mr. Spacey, correct?

          MR. SAGHIR:  Objection, calls for speculation.

          THE COURT:  Give me a moment.

          Overruled.

A.  Can you rephrase the question?  I'm sorry.

Q.  So the three of you all standing together and Mr. Barrowman being there when Mr. Spacey invited you to the party, Mr. Barrowman was in a position that he could have seen Mr. Spacey hand you that address, right?

A.  It's very possible, yes.

Q.  So you left The Limelight with Mr. Barrowman and you went home that evening, right?

A.  Correct.

Q.  And you said you made your way safely home with John?

A.  Yes.

Q.  And was it dangerous on the way home?

A.  Not necessarily.

Q.  When you say not necessarily, was danger lurking?

A.  No.

Q.  I made my way safely with John.

        Why did you insert the word safely?

A.  Which is a very different experience than what I had the other night, when I went to Kevin Spacey's apartment.  There was a matter of distinguishing between those two events.

Q.  Well, that's not what you testified to.  You just testified you were asked about -- you left The Limelight with Mr. Barrowman.  Do you remember what time you left the nightclub that evening?  No, I don't recall the time.  It was nighttime, but I don't know exactly what time, but it wasn't -- yeah, I don't know, I made my way home safely with John.

        MR. SAGHIR:  Objection.

Q.  He was staying with us.

        MR. SAGHIR:  Objection.  I don't know what she's reading from.  Page number, I would ask that the page be identified.

MS. KELLER:  I'm sorry, counsel.

THE COURT:  Yes.

MS. KELLER:  February 3, 2021, deposition transcript at page 37, lines 18 to 24.

MR. SAGHIR:  Just one moment, please.

THE COURT:  All right.  So start again.

MS. KELLER:  Page 37, lines 18 to 24.  May I read it, your Honor?

THE COURT:  Yes, you may.

BY MS. KELLER:

"Q.  Do you remember what time you left the nightclub that evening?

"A.  No, I don't recall the time.  I -- it was nighttime, but I don't know exactly what time, but it wasn't -- yeah, I don't know.  I made my way home safely with John.  He was staying with us."

A.  Correct.

Q.  You weren't contrasting it with the assault upon you that you allege Mr. Spacey committed, you were just responding to what time did you leave the nightclub, right?

A.  In my mind, that was part of what was on my mind when I answered that question.

Q.  I'm asking you, isn't that the question and isn't that the answer?

A.  Yes.

Q.  And now how far back are you thinking about what exactly was in your mind when you answered?

You're thinking back to February 2021?

A.  Correct.

Q.  So when you were being deposed on that day, was it your position that you could answer a question like this appearing to respond to the question, but in your mind have a completely different scenario?

A.  No, that's not what I just said.

Q.  OK.  But you're saying what was in your mind was contrasting it with Mr. Spacey and the night of the assault upon you, right?

Would a reader have any way of knowing that?

A.  No.

MR. SAGHIR:  Objection.

Q.  You also claim the first time you had ever been to Mr. Spacey's apartment was at an alleged party on a future date, is that right?

A.  Correct.

Q.  Although, if I'm not mistaken, when you were being asked questions by Mr. Saghir, it sounded like you were maybe backing off that a little bit.

You were asked, you said you didn't recall being there another time?

A.  Correct.

Q.  And that's because you now know that John Barrowman has talked at length about how the two of you went to Mr. Spacey's apartment after The Limelight, right?

A.  Correct.

Q.  And he's talked about how Mr. Spacey flirted with him, right, and he flirted back?

A.  I'm sorry.  At what point are you asking me?

Q.  I'm talking about that you know that Mr. Barrowman was deposed in this case and said all those things?

A.  Yes.  I know that now, yes.

Q.  Yeah.  And you know that he talked at length about going back, Mr. Spacey flirting with him, him flirting back, right?

A.  Correct.

Q.  And you know that he also said that that at one point, Mr. Spacey kind of gave him a gentle push onto the bed and the two of them were lying there together, right?

A.  Correct.

Q.  And that if it hadn't been for you being in the bathroom at the time and them not wanting to do anything in front of you, that something sexual would probably have happened; do you remember he said that, right?

A.  I know he said that, or something like that, yes.

Q.  So in the past you've denied -- you were the first person deposed here, right?

A.  I'm sorry.  I'm not -- what?  I'm sorry, what?

Q.  You were deposed before Mr. Barrowman was deposed?

A.  Yes.

Q.  You didn't know what he was going to say, right?

A.  Correct.

Q.  And he hadn't talked to you about what he would say?

A.  Correct.

Q.  And he hadn't talked to us about what he would say, right?

        MR. SAGHIR:  Objection, calls for speculation.

        THE COURT:  I don't think there is any speculation involved in his saying whether Mr. Barrowman had talked to him about it.

        MR. SAGHIR:  No.  Forgive me, your Honor.  With respect to whether they had spoken to Mr. Barrowman, their firm.

        THE COURT:  Well, he would know that.

        I'm sorry.  I'm sorry, I take your point.  Let's see.

        MS. KELLER:  Well, from the deposition transcript, your Honor --

        THE COURT:  Just a minute.

        (Pause)

        Objection sustained.

BY MS. KELLER:

Q.  OK.  But it was only after Mr. Barrowman was deposed that you realized you had a problem with your story, right?

A.  That is not how it occurred to me.

Q.   Well, when you told your story at the deposition, you said you had never been in that apartment before, right?

A.   That is my memory.  That's my recollection.

Q.   It was one time?

A.   That is my recollection, yes.

Q.   And it was because you had been given the address at The Limelight?

A.   Correct, that is my recollection.

Q.   And the only time you had been there was also the first time you had ever been in a high-rise in Manhattan, right?

A.   That is my recollection.

Q.   It really stuck in your mind.

       You keep saying that is my recollection.  Has Mr. Barrowman's story in any way changed your recollection?

A.   It -- it hasn't changed my recollection.  I have the same recollection.  I don't dispute his story, I just do not remember it.

Q.   Wouldn't that have been pretty dramatic, going into this apartment in a high-rise for the very first time when you were with Mr. Barrowman?

A.   I don't -- I don't know how to answer that question. Wouldn't -- I don't know how to answer that question.

Q.   Well, you've said that the first time you were in the apartment, you saw this magnificent view and really impressed?

A.   Correct, yes.

Q.  But you put that first time as being at the so-called party that Mr. Spacey had, right?

A.  That is my memory, yes.

Q.  But now it turns out that actually you had been in that building with Mr. Barrowman, right?

A.  That is what Mr. Barrowman says happened, yes.

Q.  And you have no current recollection of it, but you're not going to dispute it?

A.  Correct.

Q.  So Mr. Barrowman, as you know, gave a pretty detailed deposition about this, right?

A.  Yes.

Q.  And he said that, among other things, Mr. Spacey had a dog, he had a -- Mr. Barrowman remembered him having a brown lab, right?

A.  Yes.

Q.  You've never mentioned a dog anywhere in any statement you've given anybody, have you?

A.  I have not.  I do not remember a dog.

Q.  Ever?

A.  Correct.

Q.  And you understood when you were deposed that it was critical that you tell the truth?

A.  Absolutely.

Q.  You knew are you were under oath?

A.   Yes.

Q.   You knew that you would be asked about it, if there was ever a trial, right?

A.   Correct.

Q.   You knew people would rely on it, right?

A.   Correct.

Q.   Now, you didn't tell Dr. Bardey, when he interviewed you, our psychiatrist, our expert on your damages, you didn't tell him anything about the episode of having gone to Mr. Spacey's apartment with John Barrowman, right?

A.   Correct.

Q.   Nothing about them being flirtatious with each other, right?

A.   Correct.

Q.   You knew it was also important to be 100 percent honest with Dr. Bardey, right?

A.   Yes.

Q.   And accurate, right?

A.   Yes.

Q.   Same thing with your testifying expert witness, Dr. Rocchio, right?

A.   Yes.

Q.   She also asked you about your allegations?

A.   Yes.

Q.   You told her about The Limelight?

A.   Yes.

Q.   But nothing about going to Mr. Spacey's apartment with John Barrowman?

A.   Correct.

Q.   And you claim -- or you did claim, maybe that's changed -- that Mr. Spacey harassed Mr. Barrowman after the evening you went to The Limelight, right?

A.   I don't know the language that I used to describe.

Q.   Well, you said that Mr. Spacey had sent unwanted flowers to Mr. Barrowman, right?

A.   That was my memory of what Mr. Barrowman told me.

Q.   Well, your memory of what Mr. Barrowman told you turned out to be backwards, didn't it?

A.   It's possible.

Q.   It was actually Mr. Barrowman who sent flowers to Mr. Spacey to thank him for the evening, wasn't it?

A.   I learned that that is what Mr. Barrowman says, yes.

Q.   He was pretty impressed having met a Broadway actor and Jack Lemmon, kind of dazzled, wasn't he?

         MR. SAGHIR:  Objection, speculation.  No foundation.

         THE COURT:  Sustained.

Q.   Did he appear to you to have been pretty impressed by that experience?

A.   Which aspect of the experience?

Q.   All of it, meeting Mr. Spacey, meeting Mr. Lemmon, going to

The Limelight, going to Mr. Spacey's apartment, that was pretty impressive to Mr. Barrowman, wasn't it?

MR. SAGHIR:  Objection, speculation.

THE COURT:  Sustained as to form.

Q.  Well, did you go shopping with Mr. Barrowman for flowers the day after the two of you went to Mr. Spacey's apartment?

A.  No.

Q.  Did you also said that Mr. Spacey was making unwanted phone calls to Mr. Barrowman's home back in Joliet, right?

A.  That is my memory of what Mr. Barrowman shared with me.

Q.  That turned out to be wrong, didn't it?

A.  I don't know that -- I don't know -- I don't know that that turned out to be wrong.

Q.  Mr. Barrowman actually enjoyed the calls from Mr. Spacey and so did his parents, especially his mother, right?

A.  I -- I don't know how to answer the question.  I'm not privy to that.

Q.  Did you review Mr. Barrowman's deposition transcript before testifying?

A.  I did.

Q.  So you read what he had to say about that?

A.  I -- I -- I've read a lot.  I've read -- yes, I read it.

Q.  You know that, according to Mr. Barrowman, his mother enjoyed the phone calls and she and Mr. Spacey chatted about her native Scotland, right?

A.  I -- I remember, yes.  Now, that -- yes, I remember reading something like that, yes.

Q.  Well, there were a number of calls and they were friendly, according to Mr. Barrowman, right?

A.  Yes.

Q.  But until Mr. Barrowman actually testified --

And he lives in the United Kingdom now, right?

A.  As far as I know.

Q.  Yeah.  That is where he is most of the time, right?

A.  I believe so.

Q.  So until he testified, you were portraying Mr. Spacey as something of a harasser or a stalker in terms of sending these unwanted flowers and all the unwanted calls, right?

A.  I had never -- I don't know that I used the word stalker, harasser.

Q.  Well, didn't you say that Mr. Barrowman's parents at one point had to get on the phone and tell Kevin to stop calling because he was calling so often?

A.  That was my memory of what John shared with me.

Q.  That turned out to be wrong, too, right?

A.  Seems possible, yes.

Q.  Well, you've even seen a letter from Mr. Barrowman?

A.  I've seen a letter from Mr. Barrowman?

Q.  Well, haven't you seen a letter from Mr. Barrowman where he's congratulating him on his performance in *The Iceman*

*Cometh*?

THE COURT:  No, no, counselor, not in evidence.

MS. KELLER:  Let's take a look at Defendant's Trial Exhibit D.

THE COURT:  Is that E?

MS. KELLER:  D as in dog, your Honor.  D as in brown laboratory dog.

THE COURT:  Oh, D as in dog, not E as in elephant. I've got to keep the whole menagerie straight.

MS. KELLER:  It's my California accent ruining everything.

BY MS. KELLER:

Q.  So you see this letter?

A.  Yes.

Q.  It says John Barrowman across the top and dear Mr. Spacey?

THE COURT:  Let's not get into the content of the letter.

MR. SAGHIR:  Objection.

MS. KELLER:  I won't read the contents, your Honor.

Q.  Have you seen that letter before?

A.  I have not.

THE COURT:  I'm sorry, I couldn't hear the answer.

A.  I have not seen that letter before.

Q.  In that case, we're going to move on.

You knew that Mr. Barrowman and Mr. Spacey were in

contact numerous times by phone and after that meeting in New York, right?

A.   I did not know that.

Q.   Mr. Barrowman also told you about an encounter with Mr. Spacey on Mr. Spacey's bed, didn't he?

A.   He did not.

Q.   He told you the two of them had flirted?

A.   That is not how he described it to me.

Q.   Well, when you saw Mr. Barrowman in London, and you know what year that was, it was when you were there to do *Rent*, right.

A.   That seems like it makes the best sense.  Yes, 1998 makes the most sense of the timing.

Q.   The two of you, you invited Mr. Barrowman out to dinner, right?

A.   I don't know if I in invited him or he suggested it.

Q.   He was also in the play at the time in *The West End*, right?

A.   I don't remember that.

Q.   What theater were you performing in?

A.   The Shaftesbury Theatre.

Q.   So you said that Mr. Barrowman told you he had an experience with Mr. Spacey that was similar to your allegations, right?

A.   In my mind, there were similarities.

Q.   I am not asking in your mind.  I'm asking, did

Mr. Barrowman say to you, I had a similar experience with Spacey to what you're describing after you told him about what had happened to you?

A.   I don't believe he used those words, no.

Q.   Well, at your deposition at page 153, lines 12 through 15, you were asked whether Mr. Barrowman told you he had had an experience with Mr. Spacey that was similar to your allegations.

"Q.   Did Mr. Barrowman ever tell you that he had a similar experience with Mr. Fowler?

"A.   Yes."

A.   Correct.

Q.   Do you want to change that testimony now?

A.   No.

Q.   Because a minute ago I understood you to say something different?

        MR. SAGHIR:  Objection.  Judge, it's confusing as to what she's referring to.

        MS. KELLER:  I'll rephrase, your Honor.

        THE COURT:  Yes.

BY MS. KELLER:

Q.   A minute ago I asked you, did Mr. Barrowman ever tell you that he had a similar experience with Mr. Fowler, and you said no.

A.   May I see -- I'm now very confused about -- I'm confused

about which question and the context of the question.

Q.  Let me just ask you point blank, same question:  Did Mr. Barrowman ever tell you, when you met with him in London that time for dinner, that he had had a similar experience with Mr. Fowler to the one that you described to him; yes or no?

A.  I don't know how to answer the question in the sense that I don't recall whether he used the words to me, I had a similar experience.  He shared back to me an experience that related to my experience.

Q.  Did he ever tell you he had had something similar happen?

Do you know what similar means?

A.  I understand.

Q.  Very much like what happened to you.

Did he tell you that, or not?

A.  I'm doing my best to answer this question.  It was -- it -- in my sharing of my experience, he shared back his experience. It felt similar to me.

THE COURT:  Let's just read the testimony, question and answer.

MS. KELLER:  Your Honor, I've already read it.  I'll read it again.

"Q.  Did Mr. Barrowman ever tell you that he had a similar experience with Mr. Fowler?

"A.  Yes"

Q.  Now, Mr. Rapp, you were not honest?

MABsRAP2                          Rapp – Cross

THE COURT:  Before you go on, was that answer you gave at your deposition true, or was it not true?

THE WITNESS:  It was true.

THE COURT:  OK.  Let's move on.

Q.  Did Mr. Barrowman tell you Kevin Spacey had been touching his knee all night under the table at The Limelight?

A.  That is what he told me, yes.

Q.  That's what you testified to at your deposition, right?

A.  Yes, that is what he told me.

Q.  But Mr. Barrowman never told you that?

A.  That is not true.  He told me that.

Q.  Mr. Barrowman says the three of you never even sat at a table at The Limelight?

A.  I understand.

Q.  That it was all standing by the bar and dancing, no table?

A.  That is not my memory.  That is not my experience.

Q.  Not your memory or experience, or he's wrong?

A.  I don't know how to answer that question.  What I've testified to is what I was a part of and what I experienced, what I witnessed, what I saw.

Q.  Well, bottom line, you never mentioned anything about you and Mr. Barrowman having gone to Mr. Spacey's home after The Limelight up until this trial?

A.  Correct.

Q.  I mean, 36 years now, and you've never told anybody about

MABsRAP2                          Rapp - Cross

that, right?

A.  Correct.

Q.  So you're now realizing you were actually there two times, through?

A.  I'm not realizing that.  I'm acknowledging it's possible. I have no memory of it.

Q.  Well --

THE COURT:  So you --

Well, go ahead.  How much longer do you expect to be?

MS. KELLER:  Quite a while, your Honor.

THE COURT:  OK.  We'll take our lunch break here. We'll see the jury back at two o'clock.  I'll see counsel at -- will we need any more than five minutes?

MR. STEIGMAN:  I don't think so, Judge.  30 seconds.

(Luncheon recess)

MABKRAP3

AFTERNOON SESSION

1:55 PM

(Trial resumed; in open court; jury not present)

THE COURT:  Good afternoon, everybody.

COUNSEL:  Good afternoon, your Honor.

THE COURT:  Okay.  So, Mr. Steigman, the Exhibits X, Y, and Z, double in each case?

MR. STEIGMAN:  Exactly right, Judge.  So we received an email from Mr. Scolnick at 7:30 last night, with additional exhibits, as the Court has mentioned, XX, YY, and ZZ.  XX appearing to be an old photo from Getty Images that depicts Mr. Spacey, and I think, according to their label, may also depict Mr. Papp, I don't know.  YY is a letter, dated April 6, 1982, from Joseph Papp to Liv Ullmann.  At the bottom left, you'll notice is a capital JP/ks.  I'm going to take an educated guess that Mr. Spacey will offer testimony that he typed this letter.  And ZZ is a mailgram, dated March 9, 1982, from Mr. Spacey's parents, addressed to him at the New York Shakespeare Festival, telling him to break a leg on his performance.

Presumably, these exhibits would be introduced through Mr. Spacey's testimony to try to undercut Mr. Holtzman, but they were never disclosed, never a part of the pretrial order. Mr. Holtzman testified back in January 7th of this year.  The Court's rule says that all exhibits have to be part of the

MABKRAP3

pretrial order.  There are certain exhibits that this does not fall under.  They chose not to confront Mr. Holtzman with this, and now the prejudice to us is, to the extent that --

THE COURT:  How do you confront Mr. Holtzman with a photograph in which he is not depicted, I assume, an event at which he perhaps was not present, but I don't know anything to the contrary, a letter between Mr. Papp and Ms. Ullmann, and this mailgram from Mr. Spacey's parents, how do you confront Mr. Holtzman with that?

MR. STEIGMAN:  Either confront him or reference it, Judge.  If we had been provided the documents, and there were questions about -- look, I'm going to take an educated guess as to where this is going — that there was some cross-examination about Mr. Spacey filling in at certain times for the receptionist, and Mr. Holtzman said I never saw her.

So, of course, I don't know, because I haven't had a chance to depose Mr. Spacey on it, and I haven't had a chance to question Mr. Holtzman on it, but, presumably, let's say that Mr. Spacey says, look, I would have typed that letter two feet outside of Holtzman's desk, and this proves that he's not telling the truth about never having seen me --

THE COURT:  Why don't I hear what they have to say about it instead of speculating.

MR. STEIGMAN:  Okay.  My point is — and I'll sit down --

MABKRAP3

THE COURT:  It's not in the pretrial order, I got that point.

MR. STEIGMAN:  And if it were, I could have questioned him about it.

THE COURT:  Let's find out whether there's a reason.

Okay.  Mr. Scolnick?

MR. SCOLNICK:  Thank you, your Honor.

The pretrial order does not cover impeachment exhibits.  It does not require us to turn over impeachment exhibits before trial.  That's what these are.  Mr. Holtzman testified --

THE COURT:  This is to impeach whom?

MR. SCOLNICK:  To impeach Holtzman and his rebuttal for Holtzman, so both of those would fall outside the pretrial order.  And I think Mr. Steigman is a good guesser, among other things.  That's exactly where we're going with this.

THE COURT:  It must be the great food that everybody ate in the cafeteria.

MR. SCOLNICK:  So, your Honor, with respect to YY, this is a letter that was written on --

THE COURT:  The point is why, why?

MR. SCOLNICK:  So, your Honor, we would introduce this to impeach Mr. Holtzman's testimony, because Mr. Spacey was, in fact, working in Mr. Papp's office.  He was there quite frequently when Mr. Holtzman was in the office and out,

Mr. Holtzman would have seen him, and this letter, with Mr. Spacey's initials on the bottom, is corroboration of that, and it --

THE COURT:  You're going to put this in through Mr. Spacey?

MR. SCOLNICK:  Yes, your Honor.

THE COURT:  All right.  Sufficient unto the day.

MR. STEIGMAN:  I just want to say, I do not believe counsel has properly stated what the pretrial order requires. It says:  No exhibit not listed below may be used at trial except (a) for cross-examination purposes, (b) by plaintiff on rebuttal, or (c) if good cause for its exclusion from the pretrial order is shown, not about rebuttal or coming back after another witness or even --

THE COURT:  Well, cross-examination is almost, but not quite, impeachment, but as the author here, I'm going to make up my mind how it should be dealt with.

The jury is now waiting for us.  This is several days off.  I'll deal with it between now and then.

MR. SCOLNICK:  There is one other issue, your Honor.

The parties have an open dispute about a line item in one of the depositions, and I think it is relevant as we're cutting things.  It is for Mr. Barrowman's deposition.  There was one objection the Court hasn't decided on, and that is, page 46/12 through 48/15, and to refresh the Court's

MABKRAP3

recollection, we objected to that coming in.  We withdraw our objection, so it can come in.  I just want to put that on the record.

THE COURT:  Well, that's easy.

Okay.  Let's get the jury.

MR. STEIGMAN:  Would you like him to resume the stand now?

THE COURT:  Yes, please.

(Continued on next page)

(Jury present)

THE COURT:  All right.

Welcome back, folks.

Mr. Rapp, you're still under oath.

Let's continue, Ms. Keller.

MS. KELLER:  Thank you, your Honor.

ANTHONY RAPP,

CROSS-EXAMINATION CONTINUED

BY MS. KELLER:

Q.  Mr. Rapp, I think when we broke, we had been talking about your conversation with Mr. Barrowman in London in 1998, and in that conversation, Mr. Barrowman did tell you that he and Mr. Spacey had been flirting with each other, right?

A.  No, that is not what he told me.

Q.  And he told you about Mr. Spacey having more or less playfully pushed him down on the bed, right?

A.  No, he did not tell me that.

Q.  Now, let's talk again a little more about Mr. Barrowman.

So, you and Mr. Barrowman had gone to *Long Day's Journey Into Night*, gone back to Jack Lemmon's dressing room, all that, gone out to The Limelight, Mr. Barrowman goes home, okay?

And I believe you said that within a few days of his leaving, this incident that you claim happened with Mr. Spacey in his apartment occurred with you, right?

A. It was some short time thereafter, yes.

Q. Yes, okay.

Now, having just visited Mr. Spacey with Mr. Barrowman days before this alleged assault on you happened, you didn't even pick up the phone and tell Mr. Barrowman, oh, my God, you'll never believe what happened to me with Kevin Spacey, did you?

A. Correct.

Q. You didn't communicate with him at all, right?

A. Correct.

Q. When you went back to Joliet, you didn't communicate with him, right?

A. Correct.

Q. He was home for the summer break, right?

A. I didn't know that.

Q. You didn't phone him back in Joliet to thank him for coming to see you in *Precious Sons*?

A. I don't believe I did.

Q. You just went completely radio silent with Mr. Barrowman at that point, right?

A. I wouldn't characterize it as radio silent. We weren't close friends.

Q. No, but --

THE COURT: Could we please answer the question. You know what "radio silence" means. Let's answer the question.

It wasn't about whether you were close friends.

THE WITNESS:  I understand "radio silence" means it sounds like an intentional act.  That's what I was --

THE COURT:  Look, I'm not going to quibble with you. The jury will draw whatever conclusions they're going to draw from this.

Go ahead.

BY MS. KELLER:

Q.  So, you didn't contact him one more time, despite the fact that you and he had just been in New York together for a week, right?

A.  Correct.

Q.  Now, I wanted to move on and talk about this party you say you went to at Mr. Spacey's apartment days or some short time after you and Mr. Barrowman went to The Limelight.

It would have been within one week of seeing *Long Day's Journey*, correct?

A.  I don't know that for certain.

Q.  Well, haven't you done anything to try to figure out what day it was you went to Mr. Spacey's?

A.  Yes, I've searched my memory, and, yes, I've done that, yes.

Q.  Other than searching your memory, that's it, that's all you've done?

A.  That's the only documentation -- I don't have any

documentation to refer to.  It's my memory.

Q.  Well, you said the same thing about knowing when *Precious Sons* ended, but we were able to find that pretty quickly, weren't we?

A.  Correct.

Q.  Now, you said your mother let you go to this party very late, right?

A.  Correct.

Q.  You were used to going to functions with adults alone in New York, you said?

A.  Yes.

Q.  Even though you were just 14?

A.  Yes.

Q.  But your mom was a stage mom, wasn't she?

A.  She -- I don't know how to answer that question.

Q.  Well, she didn't work when she lived with you in New York?

A.  Correct.

Q.  And her only purpose for being in New York in 1986 was to take care of her 14-year-old son, you, right?

A.  Correct.

Q.  And she took that job very seriously, didn't she?

A.  She did.

Q.  The two of you were quite close?

A.  We were close.

Q.  Lived together in a one-bedroom apartment?

A.   Correct.

Q.   You were with her every day?

A.   I was with her at some point every day, yes.

Q.   And the whole time you were there in *Precious Sons*, you never spent the night anywhere other than in that one-bedroom apartment with your mom, right?

A.   Correct.

Q.   And your mother was very protective of you when you were 14 years old in New York, right?

A.   I don't know how to answer that question.

Q.   Well, did you, in preparation for the trial, read the testimony of your brother, Adam?

A.   I did.

Q.   Do you agree with him that your mother was very protective of you?

A.   I agree to some degree, yes.

Q.   That she was your chaperone?

A.   I don't agree with that.

Q.   That she would attend your *Precious Sons* performances every evening?

A.   I do not agree with that.

Q.   That your mother would escort you to the playhouse every evening?

A.   I do not agree with that.

Q.   And that she'd join you at social functions?

MABKRAP3                        Rapp - Cross

A.  I do not agree with that.

Q.  Your mother was constantly present when you were in New York in 1986?

A.  I do not agree with that.

Q.  Well, now, let's ask about that, because that's not from your brother, Adam, that's from you in your book without you. So I want to ask you about some of the things that you wrote.

For example, at page 211 of 303 --

THE COURT:  Is the book an exhibit at this point?

MS. KELLER:  It should be marked, your Honor, as defense next in order.

BBB, your Honor.

THE COURT:  Triple?

MS. KELLER:  B as in boy.

THE COURT:  And, of course, there's no hard copy, right?

MS. KELLER:  I am looking over at my able co-counsel, Mr. Barron, and he looks like he's got a hard copy.

THE COURT:  Good.  Let's get it marked.

MS. KELLER:  The brains of the operation.

BY MS. KELLER:

Q.  This is a book you wrote yourself, this book, *Without You*?

A.  Correct.

Q.  And you said you worked on it over a period of years; is that right?

A.   Correct.

Q.   So, if we look at page 211 of 303 of your book, looking at

the first paragraph --

A.   Yes.

Q.   -- you recognize that as part of your book, don't you?

A.   I do.

          THE COURT:  Are you offering it?

          MS. KELLER:  Your Honor, we move to admit.

          THE COURT:  Any objection?

          MR. STEIGMAN:  Is it just the page that they're

offering?

          THE COURT:  The book.

          MR. STEIGMAN:  The whole book?

          THE COURT:  That's what I took the offer to be.

          MS. KELLER:  That's fine.

          I'm going to be asking about a number of parts of it.

          MR. STEIGMAN:  All right.  No objection.

          THE COURT:  Pardon?

          MR. STEIGMAN:  No objection.

          THE COURT:  The book is received, Defendant's BBB.

          (Defendant's Exhibit BBB received in evidence)

BY MS. KELLER:

Q.   In your book, you said that when you were in New York for

rehearsals for *Precious Sons*, you had grown restless with your

mom's constant presence?

A.  Correct.

Q.  You said you wanted to be an adult now, and you didn't want to have to answer or have her follow you around the city, right?

A.  Correct.

Q.  And you said, "And I do mean follow.  I took to walking very quickly down the street, leaving Mom huffing and puffing behind me," right?

A.  Correct.

Q.  "As she implored me to slow down and walk with her."

So your mother's constant presence with you bothered you?

A.  At that time, yes.

Q.  Yeah, at that time, being while you were in New York for *Precious Sons*?

A.  During rehearsals.

Q.  Oh, Mr. Rapp, are you really saying that this is limited to merely rehearsals and nothing else?

A.  This instance, I was talking in that context, yes.

Q.  Well, didn't you say that when we were living in New York during rehearsals, you had grown restless with Mom's constant presence?

A.  Correct.

Q.  It's not just limited to rehearsals, she was a constant presence, period, wasn't she?

A.   She was not.

Q.   Wasn't your mother especially protective of you because your brother, Adam, had been molested by her boyfriend?

A.   I was not aware of that at that time.  I had no idea of that.

Q.   Well, I'm asking you now.  You're aware of it now?

A.   Yes.

Q.   You've been aware of it for many years?

A.   Correct.

Q.   It was very traumatic for your family?

A.   I'm sorry, I don't know when I became aware of it.  It was very traumatic for our family to learn of that, yes.

Q.   I'm not asking whether you were traumatized by it, I'm talking about your mom.

Your mom knew about it?

A.   Correct.

Q.   And you're telling me that your mother was -- despite that having happened, was letting you leave your apartment at what must have been midnight at the earliest, walk to the home of a man that she had never met, an adult male, that she had never met, alone?

A.   I do not know when she came to learn of my brother's experiences.

Q.   That's not really my question, though, okay, exactly when she came to learn of it.  She knew of it by then.

A.  I do not know if that's true.

Q.  She broke with her boyfriend over it before you went to New York, right?

A.  Forgive me.  He was Adam's big brother, Big Brothers Big Sisters.  I never knew him to be her boyfriend.

Q.  At any rate, you said that you left your apartment, and you walked straight to Mr. Spacey's from your apartment; is that right?

A.  Correct.

Q.  You didn't stop off anywhere, you didn't go anyplace first?

A.  That's to the best of my recollection, yes.

Q.  And I think you said, at trial, it took about 20 minutes?

A.  That's the best estimate that I can make.

Q.  And once you got to the party, you said you spent very little time in the party before going into the bedroom and watching TV, correct?

A.  Correct.

Q.  And David Letterman was already on, right?

A.  That's my memory, yes.

Q.  In 1986, David Letterman had what was called *The Late Late Show*, right?

A.  I don't know what it was called.

Q.  Okay.  It came on at 12:30 --

A.  Correct.

Q.  -- after Johnny Carson?

A.  Correct, yes.

Q.  And according to you, in your deposition, you have a vivid memory that Molly Ringwald was on his show that night?

A.  Correct.

Q.  Now, as far as undertaking your search to try to find out what date this was, it was pretty easy to just put David Letterman, Molly Ringwald, May 1986 in Google, press the button, bam, up comes May 20th, right?

A.  Correct.

Q.  So, it was May 20th that you went to this alleged party, right?

A.  That makes sense, yes.

Q.  Well, weren't you curious all these years, again, wondering, gosh, when could this have been?

A.  At what point, ma'am?

Q.  At any point in the last few decades, knowing that you could either Google it or you could use what's called IMDb, which is the counterpart to the Broadway database, but for movies and TV, and you could get it like that?

A.  I understand.

Q.  But when you took the stand on direct examination, you acted as if, oh, gosh, I just couldn't pinpoint it, I don't know, right?

A.  Correct.

        May I explain?

Q.  Well, no.  You can explain when your lawyer asks you some questions.

A.  Okay.

Q.  You knew what IMDb is, right?

A.  Correct.

Q.  You knew you could Google it, right?

A.  Correct.

Q.  So, Molly Ringwald was already on the TV, right?

A.  I don't know if she was already on it.  She was on it at some point while I was watching TV.

Q.  While you watched the show?

A.  Correct.

Q.  So you saw her?

A.  Correct.

Q.  That's how you remembered it?

A.  Correct.

Q.  Now, by the way, the database that I'm talking about, that has every David Letterman episode and every guest, right?

A.  I suppose so.

Q.  IMDb?

A.  I think so, yes.

Q.  So it would be easy for you to find any show you wanted that whole month?

A.  Easy --

Q.  Easy for you to look up any show you wanted to look up with

David Letterman or any other TV show that month, right?

A.   Yes.

Q.   Which you never did?

A.   I never did.

Q.   So, David Letterman customarily started his show with a monologue, right?

A.   Yes.

Q.   Six, eight minutes, something like that?

A.   Probably.

Q.   Then a commercial or commercials, right?

A.   Yes.

Q.   And then he might have his first guest?

A.   I'm sure.

Q.   So, if you watched Molly Ringwald come on, that's probably at least, let's be conservative and say, 10:40 -- I mean, 12:40 a.m., right?

A.   Sure.

Q.   You've taken 20 minutes to walk there, and you've barely spent any time at the party before you go into the bedroom and start watching TV, right?

A.   Correct.

Q.   So, you had to leave your house alone, weighing 100 pounds, at age 14, at -- after midnight?

A.   That's possible, yes.

Q.   Well, isn't it probable?  Isn't that what it looks like

given the information you've given us?

A.  Only I don't know how much of the TV I was watching before Letterman.  So, it's somewhere in the range.

Q.  Well, you never said anything about any TV other than Letterman being on?

A.  Correct.  That's the memory that I have of -- that guest stood out in my memory, yes.

Q.  And your testimony?

A.  Yes.

Q.  So, you've never testified about anything other than David Letterman, you walk in, David Letterman is on, true?

A.  I don't know that that's true.

Q.  Well, you said you never changed the channel, right?

A.  Correct.

Q.  But you walked into the bedroom and saw David Letterman was on?

A.  If that's what I said, that's what I said.  I don't recall in this moment that it was definitively on at that time.  I remember very vividly seeing Molly Ringwald on David Letterman.

Q.  Okay.  So, on May 20th, your play had been over for ten days, right?

A.  Correct.

Q.  And your mom didn't have a job in New York other than taking care of you?

A.  Correct.

Q. You weren't working anymore right then, right? Your play had wrapped up?

A. Correct, I wasn't working.

Q. And your brother and sister were not in New York, they were back in -- well, your brother, was he home from military school in the summer?

A. I don't think by then, but I don't know for certain.

Q. He says he went to military school for four years, right?

A. Correct.

Q. All four years of high school in Wisconsin?

A. Yes.

Q. So he was a boarder?

A. Yes, it was -- yes, his military school was a boarding school. He resided there, yes.

Q. So, they are not in New York, they're probably home, right, in Joliet?

A. I don't know that Adam's home in Joliet, but Ann is almost certainly in Joliet.

Q. So, you're saying that you and your mom stayed in New York for at least ten days, maybe eleven, because you'd have to have a trial date after your play ended?

A. It was longer than that.

Q. And when did you recall that it was longer than that?

A. As I've come back to look at -- to examine the timing of when we went back to Joliet.

Q.  Well, you hadn't examined that timing as of your deposition?

A.  I had not actively examined it, no.

Q.  So you examined the timing of going back to Joliet, but not the timing of when your play was or when Molly Ringwald was on David Letterman?

A.  I'm sorry, at what point, counselor?

Q.  Between your deposition last year and today.

A.  Can you rephrase the question?

Q.  Yes.

You didn't research the day your play ended, which was on your own Wikipedia site, or IMDb, you didn't research when this episode of Letterman was on, which was easy to do in ten seconds, but you are saying you did research when you went back to Joliet?

A.  I didn't use the word research.  I tried to remember the timing of when we went back to Joliet.

Q.  So, all you did to try to -- you didn't do research, you just thought about it some more?

A.  Correct.

Q.  You didn't use any documents to refresh your memory?

A.  Correct, I didn't use any documents.

Q.  Didn't pull out any old calendars, any old airplane tickets?

A.  I don't have any of those items.

Q.  So, you just mulled it over.

Now, of course, you had said in your deposition that you and your mom were gone by June; is that right?

A.  That's the best of my recollection, yes.

Q.  Okay.  So, by June 1st, you were back in Joliet, but between May 20th and June 1st, you were still in New York?

A.  That's the best -- yes.

May I explain?

Q.  I think your lawyer will have a chance to ask you about that.

A.  Okay.

Q.  Now, let me go back to the party.

So, you didn't have Mr. Spacey's phone number to give your mother in case she became worried about you at the party with this man she'd never met, right?

A.  That's the best of my recollection, yes.

Q.  And this was pre-cell phones?

A.  Correct.

Q.  So, those of us who are dinosaurs can remember having just a landline to use?

A.  Correct.

Q.  And not that you're a dinosaur, but I, for sure, am.

You knew where Mr. Spacey's apartment was because he gave you the address at The Limelight, you said?

A.  Correct.

Q.   And you also said that at least until today, you thought the first and only time you'd ever been to Mr. Spacey's apartment was at this party that you say he had?

A.   Correct.

Q.   So, Mr. Spacey opened the door to his apartment when you arrived at the party, right?

A.   Correct.

Q.   Welcomed you, yes?

A.   Yes.

Q.   And did not appear to be drunk or glassy eyed or staggering, correct?

A.   Correct.

Q.   He seemed fine?

A.   Yes.  To the best of my impression, yes.

Q.   Yes, nothing drew your attention to that?

A.   Yes.

Q.   And this was well after midnight, correct?

A.   I don't know that for certain.

Q.   Okay.  You said that you walked in, and it was a nicely sized one-bedroom?

A.   Correct.

Q.   Nicely sized meaning fairly spacious?

A.   In my experience, having been in where we lived, it was -- it felt more cramped than the apartment that I walked into.

Q.   Well, when you were asked about it, you didn't say it was

more cramped than the one I was used to, correct?

A.  No, no.  I meant the apartments that I had lived in, it felt more cramped than this apartment seemed to me.

Q.  I get it.

So that's what you meant by it was a nicely sized one-bedroom?

A.  Correct.

Q.  And there were people present, right?

A.  Correct.

Q.  And the attendees at this party appeared to be what you called Broadway types?

A.  I don't recall saying that or thinking that.

MS. KELLER:  I would ask to read from Mr. Rapp's deposition transcript at page 56/lines 17 through 22.

May I read it, your Honor?

THE COURT:  Go ahead.

BY MS. KELLER:

Q.  Reading:

"Q.  Did you describe during interviews these people being Broadway typed?

"A.  I presumed, but I didn't know for sure.  I had no direct recollection of any of them specifically being anyone I recognized."

Was that true?

A.  Correct.

Q.  So, you assumed, at the time, that the people at the party were Broadway types, right?

A.  Correct.

Q.  For all you knew, Jack Lemmon might walk in any minute, right?

A.  Sure.

Q.  And you were working on Broadway in 1986?

A.  I was no longer working on Broadway, but I had been, yes.

Q.  You had been.

        And you were active in the Broadway scene?  You'd been in another play there that hadn't opened?

A.  Correct.

Q.  Have you ever heard the term theater rat that somebody used here in this trial, being a theater rat?

A.  I don't know that I've heard that term before.

Q.  Okay.  Well, you were a theater guy, weren't you?

A.  Yes, very much so.

Q.  And you can't provide the identity of any single person who was at this party, right?

A.  Correct.

Q.  You can't describe them at all, true?

A.  True.

Q.  You can't say how many men you saw?

A.  Correct.

Q.  How many women you saw?

A.   Correct.

Q.   The ages of anyone?

A.   Correct.

Q.   Whether any of the people had facial hair or a beard?

A.   Correct.

Q.   Whether any of them was bald?

A.   Correct.

Q.   Whether they were young or old?

A.   Correct.

Q.   And in the five years since you've publicly accused
Mr. Spacey, not a single person has come forward to say, hey, I
was at that party?

A.   Correct.

Q.   And you've been telling this Kevin Spacey story of yours
for at least 30 years, right?

A.   Yes -- yes.

Q.   At least 35, right?

A.   I need help with math.  I don't recall the exact year.  The
first time I spoke to my friend, Christopher, it was while I
was in high school, sometime between 1986 and 1988.

Q.   Bottom line is there's not a single person who can confirm
you were at that party that you're talking about, true?

A.   True.

Q.   Now, you said you were uncomfortable because you didn't
know any of the people at this party, right?

A.   Correct.

Q.   You were intimidated and shy because you didn't know the people present, true?

A.   Correct.

Q.   Whom you had described as people you presumed to be Broadway types, right?

A.   Correct.

Q.   Weren't you trying to make new connections on Broadway? Wasn't that one reason you would go to parties?

A.   I would go to meet the people that I had seen and thank them for their work.  That was one of the things I enjoyed doing at those parties.

Q.   And also meeting new people in hopes of making new connections, right?

A.   I'm not sure that's true.

Q.   And you were very self-possessed when you were living in New York at the time, right?

A.   Correct.

Q.   You introduced yourself to people that you didn't know all the time, right?

A.   I wouldn't say all the time, no.

Q.   Frequently?

A.   I would say in specific contexts.

Q.   Well, you met people, introduced yourself to people, people introduced themselves to you, and that's in the context of how

self-possessed you were?  You remember testifying to that,
right?

A.  Correct.

Q.  And so when you introduced yourself to somebody, that
person is someone you don't know, right?

A.  Correct.

Q.  It's a new person to you?

A.  Correct.

Q.  And when somebody introduces themselves to you, that person
is a new person to you, right?

A.  Correct.

Q.  And you did quite a bit of that, true?

A.  They were -- the people I introduced myself to were people
I recognized.

Q.  So, if you saw somebody at a party who you didn't know, you
would avoid them?

A.  I just wouldn't introduce myself to them.

Q.  Even a small party?

A.  Correct.

Q.  Even a small party with an actor who was in a big Broadway
hit at the time?

A.  Correct.

Q.  So, you would attend industry events by yourself, right?

A.  Sometimes, yes.

Q.  And you would go up at those events and introduce yourself

to people, true?

A.   True.

Q.   Because you were self-possessed, right?

A.   I would introduce myself when I recognized them, to thank them for their work.

Q.   Did you ever, during your deposition, say you only said hello to people or introduced yourself if you knew already who they were?

A.   I didn't say that, no.

Q.   No?  You just said that you were self-possessed, you introduced yourself, people introduced themselves to you, you were very grownup in a lot of ways, right?

A.   I was grownup in some ways.

Q.   You wanted to be treated as an adult, right?

A.   In some ways, yes.

Q.   Well, that's what you battled with your mom about, right?

A.   Can you -- you said battled with my mom?

Q.   Yes.

     You would argue with your mom because you felt she was treating you like a baby, right?

A.   I'm not sure that's true.

Q.   And haven't you said in interviews that you have never been shy?

A.   I may have said that.  I don't remember.

Q.   Well, I'm looking at a December 16th, 2012 BMW article,

"Interview with Anthony Rapp On Love, Loss, and Without You."

Do you remember telling the interviewer, I don't think I was ever shy?

A.  I don't recall that.

Q.  I'm not sure there was ever a question of coming out of my shell, you ever remembering saying that?

A.  I don't.

May I see the context?

Q.  Do you even remember the interview at all?

A.  I truly don't know what interview you're referring to.

Q.  We're pulling it up onscreen right now.

Do you recognize this?

A.  I do.

THE COURT:  What's the exhibit, Ms. Keller?

MS. KELLER:  Well, your Honor, unless -- we can mark it defense next in order, which I guess would be CCC, but unless he says he recognizes it, I don't know what we're going to do with it.

THE COURT:  So --

MS. KELLER:  For identification, your Honor.

THE COURT:  And the designation is?

MS. KELLER:  Defense CCC.

THE COURT:  CCC?

MS. KELLER:  Yes, your Honor.

THE COURT:  Okay.

MR. SAGHIR:  Is there a hard copy?

MS. KELLER:  Yes.  Mr. Barron has it.

BY MS. KELLER:

Q.  Do you have any memory of being interviewed ten years ago?

A.  I do.

Q.  Do you now recognize this article?

A.  I mean, I recognize it as an article that I gave, yes, yeah.

Q.  And do you recall saying that, I'm not sure it was a question of coming out of my shell, I don't think I was ever shy?

A.  I do.

Q.  And is that true, that you were never shy?

A.  I don't think it's true -- it's not true that I was never shy.

Q.  Now, back to the party again.

So, even though you felt uncomfortable and shy, you didn't just turn around and leave, right?

A.  Correct.

Q.  And you said that's because you didn't want to go home and have to hang out with your mom, true?

A.  I don't know if I said hang out with my mom.

Q.  Be with your mom?

A.  Correct.

Q.  And so, you didn't talk to a single soul at the party,

right?

A.   Correct.

Q.   You just looked around and walked into the bedroom to watch TV?

A.   Well, I first took in the view, and I saw the television was on, and I then went in and sat down to watch the television that was on.

Q.   It was not just that you were shy and uncomfortable, but you very quickly became bored, you said; is that right?

A.   Sure.

Q.   And you're bored without ever talking to a single person, you just looked around and decided, I'm bored; is that right?

A.   I don't know that I decided I'm bored.

Q.   But you realized you were bored?

A.   Correct.

Q.   You looked at the great view, I'm bored, into the bedroom, right?

     And you've talked about all the dozens and dozens of people that you've told over the years your Kevin Spacey story, every one of them, you've told there was a bedroom, right?

A.   Correct.

Q.   Every single one, there was a bedroom, it had walls, and a door, true?

A.   Correct.

Q.   Now, you've drawn a picture of the layout of Mr. Spacey's

apartment as you remembered it in 1986, correct?

A.   Correct.

Q.   And, again, this was at your deposition, which was the first one taken, right?

A.   The first one --

Q.   The first deposition taken in this case was you, right?

A.   I did not -- I don't know that.  I guess so.  I assume so, if you're saying it's true.

Q.   Well, you know it was before Mr. Barrowman, right?

A.   Correct.

Q.   At the time you had your deposition, you didn't have the benefit of what he was going to say, right?

A.   I don't know what you mean by "the benefit."

Q.   You didn't know what he was going to say?

A.   Correct.

          THE COURT:  Look, counsel, can we agree whether or not it was the first deposition taken?

          MS. KELLER:  We'll stipulate, your Honor.

          MR. SAGHIR:  It was, yes.

          THE COURT:  It's agreed that it was the first deposition taken in this case.  Thank you.

BY MS. KELLER:

Q.   So, Mr. Scolnick asked you to draw a picture of the layout of Mr. Spacey's apartment as best you recalled it in 1986.

          Do you remember that?

MABKRAP3                      Rapp - Cross

A.  I do.

Q.  I'm showing you Defendant's Trial Exhibit RR.

MS. KELLER:  I think that's already in evidence, your Honor.

THE COURT:  I don't remember, but I think it was only used in the openings.

MS. KELLER:  All right.

MR. SAGHIR:  It was received.

THE COURT:  Was it admitted?

MR. SAGHIR:  Plaintiffs' Exhibit 2.

THE COURT:  I'm sorry?

THE DEPUTY CLERK:  They marked it as exhibit -- Plaintiffs' Exhibit 2.

THE COURT:  It's Plaintiffs' Exhibit 2.

MS. KELLER:  Okay, Plaintiffs' Exhibit 2.

BY MS. KELLER:

Q.  Is this the diagram that you drew?

A.  Correct.

Q.  Now, I see it says living room/kitchen on the right square, correct?

A.  Correct.

Q.  And in the upper left where it says bedroom?

A.  Correct.

Q.  And you've drawn a picture of a bed?

A.  Correct.

MABKRAP3                        Rapp - Cross

Q.  And then next to that is bathroom?

A.  Correct, yes.

Q.  With a door leading to the bedroom, right?

A.  Yes.

Q.  And you've drawn in a wall or walls enclosing the bedroom around the door, right?

A.  Correct.

Q.  Now, until you were questioned at your deposition, nobody had investigated -- well, let me take that back.

Nobody had questioned you extensively about what you claimed had happened, true?

A.  I don't -- can you rephrase the question?

Q.  Yes.

Until your deposition, no one had extensively questioned you about what you claimed had happened, true?

A.  Not true.

Q.  Adam Vary?

A.  Adam Vary.

Q.  Adam Vary, your friend, good friend, right?

A.  A friend.

Q.  Your friend, who told you that he was going to deliberately keep things vague to keep Mr. Spacey from being able to refute what you said, right?  You remember that?

A.  I do.

Q.  That's the person you told your story to?

A.   Correct.

Q.   And you said he extensively questioned you?

A.   He extensively questioned me.

Q.   And yet, there's no mention anywhere in his story of Jack Lemmon, the dressing room, The Limelight after -- let me take that back.

There's no mention in his story of Jack Lemmon in the dressing room, right?

A.   There's no mention in his story of Jack Lemmon and the dressing room.

Q.   Or of Mr. Spacey taking you to dinner after you came to Jack Lemmon's dressing room area, no mention of that, right?

A.   I don't recall whether it's mentioned in the article or not.

Q.   Well, we looked at it before we broke, so it's not in there, right?

A.   I don't know that.  I didn't read the whole article; I don't know.

Q.   Did you read it over the noon hour just to refresh your memory?

A.   I did not.

Q.   Any reason for that?

A.   The reason --

Q.   Did you want to be able to remain deliberately vague and say I don't know?

A.   No, ma'am.

Q.   So, you recall, before we broke, my questioning you about saying that, rather than going to Lemmon's dressing room and then being invited to dinner by Mr. Spacey, that the BuzzFeed article your friend, Adam Vary, wrote, instead said that you had gone to one of those late-night events where members of different casts eat and mingle.

Do you remember that?

A.   There were many different questions.

Q.   That was one.

Do you remember my asking that?

A.   I remember your asking that question.

Q.   And if I'm right, I think you said that you didn't see any difference between that and going back to the dressing room, chatting, and then being invited out to dinner.

Am I right?

A.   I said some version of that, correct.

Q.   And the late-night gathering, this was a matinee performance of *Long Day's Journey Into Night*?

A.   Correct.

Q.   It wasn't late night?

A.   Correct.

Q.   Did you ever call Mr. Vary and say I want to correct that, too, it says late night in there, late-night gathering, and that's not very fair to Mr. Spacey?

A.   I'm not sure that in that moment in the article, it refers to it specifically as a late-night gathering.

Q.   Well, I read it to you a little while ago, we all talked about it, and that's what it says.

MR. SAGHIR:  Objection, Judge.  Is there a question?

THE COURT:  Yes, let's put a question.

BY MS. KELLER:

Q.   Do you not remember what we talked about just before the noon hour today?

A.   I remember there being a difference between one mention of the gatherings and another mention of the gatherings.  That's what I remember.

Q.   Well, there were differences in mentions of the gatherings, but I'm talking about Mr. Vary's story, only Mr. Vary's story.

A.   I understand.

In Mr. Vary's story, there were differences between those two mentions of the gatherings.

Q.   Rapp said he encountered Spacey again at one of those postshow functions when a 17-year-old -- well, let me start before that, at the other part I guess you're referring to.

You ran into Kevin at one of those late-night postshow gatherings at which many different Broadway casts would gather and mingle.

That was in the article, isn't it?

A.   That's not how it's stated in the article.

Q.   Did you read it over the noon hour?

A.   I did not.  I'm looking at it right now.  It's on my screen.

Q.   He was meeting a lot of actors during that period enjoying the time-honored custom of late-night postshow gatherings, at which many different Broadway casts would eat and mingle.  Rapp had relocated from Joliet, Illinois, with his mother, Mary, for the run of the play.  He'd even taken the semester off from school.  Sometimes his mother would accompany him to these events, but sometimes she'd let him go alone.  Rapp said he encountered Spacey again at one of those postshow functions when a 17-year-old friend from Joliet was visiting in New York, and he was, like, hey, hi, come join us, Rapp said.  Spacey then invited both boys to join him at the popular nightclub, Limelight, even though, as Rapp explained, I looked younger than 14.

        Late-night postshow gathering.

A.   Gathering postshow functions includes matinees.

Q.   It was at one of those -- well, we're talking late night, we're not saying late night and matinee gatherings, are we?

A.   I understand.  I'm just -- I'm not responsible for how he articulated it.  It's a postshow function to gather after a matinee.

Q.   Did you contact him to have him -- I mean, it's an internet magazine, he could have easily corrected it, right?

A.  I didn't read it as a dispute.

Q.  No, it was what you wanted because it made Mr. Spacey look like he was picking out two underaged kids at an event, right?

A.  Not correct.

Q.  And, in fact, a year later, Mr. Vary did an update with you, and you didn't correct one thing from the first story then either, right?

A.  Correct.

Q.  Nor did you tell him about Jack Lemmon, the dressing room, all of that, you didn't tell Mr. Vary that at all, did you?

A.  I don't know what specifically I told him in that follow-up interview.

Q.  So you don't know if you told him and he just cut it out or you didn't tell him?

A.  Correct, I don't know that.

Q.  Was that an unimportant fact to you?

A.  That -- I'm not sure how to answer that question.  I don't recall it coming up in the conversation between us.

Q.  Well, it would only come up if you brought it up, right?  I mean, Mr. Vary wouldn't know anything about Jack Lemmon and the dressing room, you'd have to bring it up, right?

A.  I suppose so.

Q.  So, when you say I don't remember it coming up, what you really mean is I don't remember telling him about it, right?

A.  Correct.

Q.  And what I asked you after that was, wasn't that an important detail to you?

A.  I'm sorry?

Q.  Meeting Jack Lemmon in his dressing room, Jack Lemmon talking to you and your friend?

A.  So, when you asked me is it an important detail to me, in what context?

Q.  In the context of all of this, everything here, the story, what happened that night, all of it.  It's an important detail?

A.  I mean, it's an aspect of what I remember of that time, yes.  It's -- it was a meaningful encounter with Jack Lemmon.

Q.  Okay.  So, we have looked at the drawing that you made of the bedroom, and we've established, I think you agreed, that you've been telling people for many years about the bedroom.  In fact, you never told a single person in 36 years up until today that that was a studio apartment, did you?

A.  I never said that, correct.

Q.  And that's because it was an integral part of your story that there be a bedroom, so that you could be in it and not know all the other guests had left, right?

A.  That is not correct.

Q.  If the walls come down, and it's just one room, you can see if people are leaving, right?

A.  Perhaps, but that is not what happened.

Q.  When you say "perhaps," again, you've reviewed John

Barrowman's testimony, right?

A.  Correct.

Q.  And he says, sitting on the edge of the bed, you could see right to the door, right?

A.  If you're sitting on a certain edge of the bed, you could see the door.

Q.  It's one big room, isn't it?

A.  Not in my memory, no.

Q.  In your memory, you're converting that -- what, that alcove into a bedroom?

A.  Correct.

Q.  And do you think in the few days between the time you and Mr. Barrowman were there and the time you were there later, that somehow contractors came in and erected a wall and a door?

A.  I do not think that, no.

Q.  So, you were wrong about that?

A.  I remember there being a bedroom.

Q.  I know what you're saying you remember, but what I'm asking you is, is it possible you're completely wrong about that?

A.  It's possible, and I remember a bedroom.

Q.  Now, you said the bed took up a lot of space in the bedroom, right?

A.  Correct.

Q.  There was only a little bit of room from the foot of the bed to the door in the main room, but not much, right?

A.  Correct.

Q.  And you sat on the bed in the bedroom?

A.  Correct.

Q.  You didn't shut the door completely to the rest of the apartment when you were in the bedroom?

A.  Correct.

Q.  You left it cracked to some degree?

A.  To some degree, yes.

Q.  And that's why you couldn't see that everybody had left?

A.  I was also not facing in that direction.  I was facing away from the rest of the apartment and watching television.

Q.  And you weren't watching television for very long before Mr. Spacey appeared in the doorway, right?

A.  I was watching it for some time.  I don't know exactly how long.

Q.  A pretty short period of time, right?

A.  I was watching it for some time.

Q.  You weren't going to hang around a place where you were bored and uncomfortable and didn't know anybody for any longer than you needed to, right?

A.  I don't know what you mean by "needed to."

Q.  Well, needed to, to avoid having to go home and be with your mother.

A.  Can you please ask the question?

Q.  Yeah.

You weren't going to hang around there where you were uncomfortable and bored, and there were all these adults who you didn't know, and you didn't know even if they were male or female or old or young or bald or hairy, you weren't going to hang around there for a very long period of time?

A.   I hadn't made any decision about how long I might stay or not at that point.

Q.   And you said the next thing that you recalled was you saw Mr. Spacey in the doorway of that bedroom?

A.   Correct.

Q.   And there had to be a doorway, again, for your story to be true, right?

A.   Not for it to be true.  It was what I remembered.

Q.   Okay.  So, are you saying that what you remembered and what is true can be two completely different things?

A.   I'm saying that I remember there being a doorway.  I was answering your question when you said "for it to be true."

Q.   I'm just saying, was there or wasn't there a doorway?

A.   There was a doorway.

Q.   And you say Mr. Spacey stood in the doorway to the bedroom, and you could only see a little bit past him into the main room, right?

A.   Correct.

Q.   You didn't know whether he opened the door himself or if somebody else did?

A.  Correct.

Q.  And other than the little crack in the doorway, you couldn't see if there was anybody left in the apartment, right?

A.  I don't know that I called it a little crack.

Q.  Okay.  Through the crack of whatever size, you couldn't see who else was in the rest of the apartment, right?

A.  Correct.

Q.  You couldn't see into the main room of the apartment because the walls separated the bedroom from the main room?

A.  Correct.

Q.  At some point, you realized that when Mr. Spacey approached you in the bedroom, nobody else was in it anymore, right?

A.  Correct.

Q.  And you're still sitting on the bed?

A.  Correct.

Q.  So, when the door opened wide, were you able then to see the entire apartment?

A.  I don't recall exactly how much I could see.  I also didn't hear any other voices.

Q.  Had you been hearing voices before that?

A.  I hadn't been listening for them.  In that moment, I noticed I didn't hear any other voices.

Q.  Had you heard voices before that, whether you were listening for them or not?

A.  I don't recall whether I heard them or not at that point.

Q.   Was there music on?

A.   There was some low music on.

Q.   And dim lights?

A.   Yes.

Q.   Again, you don't know what time the party started, right?

A.   I don't.

Q.   So, you don't know if the other guests, say, showed up also five minutes of midnight and then left at 12:45?

A.   Correct, I have no idea.

Q.   And you said Mr. Spacey approached you while you were sitting on the bed and picked you up like a bride, right?

A.   Correct.

Q.   And you were acting in *Precious Sons* with Ed Harris at the time, and you would rehearse regularly?

A.   I'm sorry, we would rehearse regularly?

Q.   You would rehearse or you would put on the play regularly, let's say that?

A.   It had closed at that point, but, yes.

Q.   Okay.

        I'm talking about during the period of time when you were in the play --

A.   Yes.

Q.   -- *Precious Sons*, you had rehearsed a lot, and you had also put on a number of productions, right?

A.   Correct.

Q.  Dozens of times?

A.  Correct.

Q.  So, let's look at Exhibit 00, Defense Trial Exhibit 00, tab 8, which is a video from your performance with Ed Harris.

MS. KELLER:  Maybe we can go ahead and play that, if there's no objection.

MR. SAGHIR:  Is the video being offered into evidence?

MS. KELLER:  We're not going to show the entire play, but -- unless his Honor wants us to.

MR. SAGHIR:  I'm not really sure what they're showing, your Honor.

THE COURT:  An excerpt from the video of the play.

MR. SAGHIR:  Correct.  There's a portion of the play that we've seen, but she's talking about a full play, so I'm not sure what it is that they're showing.

MS. KELLER:  No, I'm not talking about a full play.

MR. SAGHIR:  What was exchanged previously?

MS. KELLER:  Yes.

MR. SAGHIR:  Okay, sure.  No objection.

THE COURT:  What exhibit is it?

MS. KELLER:  It's Exhibit 00.

THE COURT:  OO?

MS. KELLER:  OO.

THE COURT:  OO as in ostrich.

Okay.  OO is received as an excerpt from the play.

(Defendant's Exhibit OO received in evidence)

MS. KELLER:  Thank you.

May we play that, Mr. Barron.

(Video played)

BY MS. KELLER:

Q.  So, you recognize this from your performance in *Precious Sons*?

A.  Yes.

Q.  Now, you spent hours every day listening to the same bits of dialogue from *Precious Sons*, right?

A.  Yes.

Q.  And the rhythms of the play had kind of seeped into your subconscious, had they not?

A.  Yes, to some degree, yes.

Q.  In fact, you wrote about that in your book, right?

A.  Yes.

Q.  You couldn't get the text of the play out of your head, right?

A.  Especially during rehearsals.

Q.  Well, yeah, the text often takes on the life of a song I can't get out of my head, and I find myself parroting back phrases wherever they fit in conversations.

Was that how you felt?

A.  Sometimes, yes.

Q.  Now, Ed Harris' character, we said he picked you up like a

MABKRAP3                        Rapp - Cross

bride, right?

A.  Correct.

Q.  And we've already seen Exhibit OO, I'm not going to go into that again.

One of Ed Harris' arms was under your middle back area in *Precious Sons*, right?

A.  I believe so, yes.

Q.  And with respect to Mr. Spacey, one of his arms was under your middle back, right?

A.  Correct.

Q.  Ed Harris' character in *Precious Sons* was intoxicated, right?

A.  At least in that one scene, maybe more, but, yes.

Q.  And, certainly, in one of the two scenes where he got on top of you, right?

A.  Correct.

Q.  And Mr. Spacey, you say, was also intoxicated at the party, right?

A.  Correct.

Q.  And apparently became intoxicated very quickly because between the time that he answered the door, when he seemed fine, and the time when he was standing in the doorway, he had become glassy eyed, unsteady, and you could tell he was visibly drunk, right?

A.  Correct.

Q.  Any idea, was he drinking shots with both hands, or did you see him with a bottle up to his lips or anything like that?

A.  No, ma'am, I didn't see any of that.

Q.  So, you say Mr. Spacey got on top of you, right?

A.  Correct.

Q.  In two different scenes in *Precious Sons*, Ed Harris' character gets on top of you, right?

A.  If you say so.  I don't remember that specifically.

Q.  Well, this is a play you were in.

A.  I understand.

Q.  A pretty big deal in your life?

A.  Yes.

Q.  And you played the character Freddy?

A.  Yes.

Q.  And Ed Harris played your dad, Fred?

A.  Correct.

Q.  So, in one scene — see if this jogs your memory — Fred gets on top of Freddy on the ground, says, oh, poor abused thing, rubs his beard in Freddy's face as Freddy struggles to get away, and then still struggling, Fred laughing lowers him to the floor holding him tight, still rubbing his beard into his face.

Does that ring a bell?

A.  Now it does, yes.

Q.  And your dad, Fred, says, don't be a pantywaist, right?

MABKRAP3                                Rapp - Cross

A.   Yes.

Q.   Because you're saying you're hurting me with your beard?

A.   Okay.

Q.   Okay.  So he's on top of you, and he's pinning you down, and his body weight is on you, right?

A.   Correct.

Q.   And then there's another moment in Act II -- and would it be fair to say it was pretty controversial on Broadway, one of these two scenes, where he gets on top of you?

A.   I can't have any comment to that.  I don't recall there being any controversy surrounding our play.

Q.   Really?  Okay.

     So, this one, Fred drunkenly comes home, Freddy is lying on the sofa, Fred takes off his shoes and socks, his tie and hat, his jacket and shirt, and then just in his undershirt and pants, he goes over, comes on the sofa, mounts the figure on the sofa, and disappears into the darkness, saying, I need you to love me for an hour and a half.

     That figure on the sofa was your character, Freddy, right?

A.   Correct.  He -- may I explain?

Q.   Well, the phrase I need you to love me for an hour and a half --

A.   May I explain?

Q.   -- that was sex, right?

A.   May I explain the context?

Q.   I understand the context.  He thought it was his wife.

A.   Correct.

Q.   I get that.

A.   Okay.

Q.   But the bottom line is a drunken adult man comes in, full weight on top of you, and says, I need you to love me for an hour and a half, right?

A.   I don't know that that's -- I'm not -- I don't remember the exact sequence of it or the exact timing of when he said that, so I want to be very precise with you, ma'am.  So...

Q.   You remember that happening, don't you?

A.   I remember the scene.  I don't remember the exact sequence of the events of that scene and how it was actually staged and actually played.

Q.   You remember Fred saying, I need you to love me for an hour and a half?

A.   Now I do.  I didn't remember that line until now.

Q.   Because he's thinking that's his wife, and he wants to have sex with his wife, right?

A.   Correct.

Q.   Now, earlier you said there was nothing sexual at all about when Ed Harris got on top of you, but there was even though he was mistaken about who it was, right?

A.   I meant Ed Harris.  That's what I --

Q.  Oh, Ed Harris, the person, as opposed to the character?

A.  Correct.

Q.  But as far as the character, he was climbing on top of you twice a night, for weeks on end, right?

A.  Correct.

Q.  And, in fact, you feel that Ed Harris' character climbed on top of you so many times, that you became accustomed to the action of having a man crawl on top of you, right?

A.  To some degree, yes.

Q.  Now, you also said that when Mr. Spacey picked you up, his hand grazed your butt.

        Do you remember that?

A.  Correct.

Q.  Grazed, meaning it was part of the act of picking you up, correct?

A.  Correct.

Q.  It wasn't that he squeezed your buttocks, right?

A.  Correct.

Q.  He didn't grab your buttocks, right?

A.  Correct.

Q.  He didn't do anything to cause his hand to linger on your buttock, it just grazed it, true?

A.  True.

Q.  Now, you reviewed the complaint in this action.  When this complaint was filed, you reviewed it and actually signed it,

what's called a verified complaint, under penalty of perjury, right?

A.   Correct.

Q.   And you looked it over pretty carefully because you were having to sign it, and it said right on it that, you know, you were sworn as one of the plaintiffs in the case, and you read the verified complaint, and the same is true to my knowledge, in other words, you swore to this under penalty of perjury everything in the complaint was true, right?

A.   Correct.

Q.   And one of the things that you said was that, while plaintiff was at the home of defendant, Kevin Spacey, defendant intentionally and voluntarily and without plaintiff's consent engaged in an unwanted sexual advance with a 14-year-old and grabbed then infant Plaintiff Anthony Rapp's buttocks, lifted him on a bed, and laid on plaintiff's body.

     So, that says grabbed your buttocks, right?

A.   Correct.

Q.   Now, did you think that you would get more media attention if you said that Mr. Spacey's had grabbed — grabbed — instead of grazed?

A.   No, ma'am.

Q.   Now, when Mr. Spacey fell across your body, it was like a dead weight, correct?

A.   He didn't fall across my body, ma'am.

MABKRAP3                      Rapp - Cross

Q.  Okay.  Let's use your language.

        You would describe it as what, climbing on top of you?

A.  Correct.

Q.  And he felt like a dead weight, true?

A.  To some degree, yes.

Q.  Well, to some degree, meaning that's what you said in your
deposition, right?

A.  Correct.

Q.  And he didn't have an erection?

A.  Not as far as I could tell.

Q.  He didn't touch your penis?

A.  No, ma'am.

Q.  Didn't try to get you to touch his?

A.  No, ma'am.

Q.  Didn't try to remove your pants?

A.  No.

Q.  Didn't remove his own?

A.  No.

Q.  Didn't try to get you to remove your pants?

A.  No.

Q.  Didn't put his hand down your pants?

A.  No.

Q.  Or have you put yours down his?

A.  Correct.

Q.  He didn't tell you he was going to remove your clothes?

MABKRAP3                        Rapp - Cross

A.   Correct.

Q.   Didn't kiss you?

A.   Correct.

Q.   Didn't discuss sex with you in any way?

A.   Correct.

Q.   Didn't say he wanted you to touch him?

A.   Correct.

Q.   Didn't show you any pornography?

A.   Correct.

Q.   And he was -- when Mr. Fowler's body was on top of yours, it was diagonally at a slight angle?

A.   At a slight angle partially, yes.

Q.   When you say Mr. Spacey was on top of you, which side was his head on?

A.   On -- against my left cheek.

Q.   How long do you say that Mr. Spacey was this dead weight on top of you?

A.   It was a frozen moment for me.

Q.   No, I'm asking you how long.

A.   I understand.

     Some amount of time.  Anything that I say is an estimate in that moment.  Fifteen to thirty seconds is my best estimate.

     (Continued on next page)

BY MS. KELLER:

Q. And when you made the decision you wanted to wriggle away, you were easily able to do it, right?

A. Correct.

Q. You then stepped into the bathroom and closed the door?

A. Correct.

Q. And you said, what is happening, right?

A. That was -- I said that in my head before stepping into the bathroom. That was continuing to be a question in my head in the bathroom.

Q. Which side of the bed did you get off to go into the bathroom?

A. The side of the bed closest to the bathroom.

Q. And in the bathroom you saw a picture which made you realize for the first time that Mr. Spacey was gay, is that right?

A. Well, it seemed to indicate that. It made -- that is how it seemed to me.

Q. You said somewhere in your mind it kind of clicked, ah, I guess he's gay, right?

A. Yes. It confirmed for me, this feeling was confirmed by looking at the picture.

Q. But the picture that you saw was just two men together, right?

A. Correct.

MABsRAP4                      Rapp - Cross

Q.  They weren't naked, right?

A.  Correct.

Q.  They weren't in Speedos?

A.  Correct.

Q.  They weren't at Fire Island?

A.  I don't know where they were.

Q.  It was just two men together.  You didn't know if it was father and son, right?

A.  They looked contemporaries to me.

Q.  You didn't know if it was Mr. Spacey's brother?

A.  Correct.

Q.  Or who it was, uncle, dead cousin?

A.  Correct.

Q.  They weren't kissing, correct?

A.  Correct.

Q.  But you looked at that picture and you said, he must be gay, true?

A.  Correct.

Q.  Now, you hadn't come to this realization when you saw Mr. Spacey and Mr. Barrowman together?

A.  Correct.

Q.  You knew Mr. Barrowman was gay, right?

A.  I did not.

Q.  Well, certainly by the time you talked to him in London, you knew he was?

A.  By then, yes.

Q.  And he was out, right?

A.  I don't know -- I don't know when he came out publicly.  I don't know that.

Q.  When you left the bathroom, you walked into the bedroom, you said?

A.  Correct, yes.

Q.  And the door between the bedroom and the main room was on your right side?

A.  I'm sorry, could --

Q.  The door between the bedroom and the main room was on your right side as you left the bathroom?

A.  Correct.

Q.  And after you left the bathroom, you walked through the bedroom to the door to the main room?

A.  Correct.

Q.  Now, is Mr. Spacey still on the bed being a dead weight?

A.  When I walked out of the bathroom, I glanced and saw him on the bed.  I don't know if he was a dead weight at that point.

Q.  He hadn't moved, had he?

A.  Not as far as I could tell.

Q.  Since you had wriggled away right?

A.  Correct.

Q.  So you got up, made it to the main room, went to the door, opened the door?

A.  Correct.

Q.  And left, but not before he said, Are you sure you really want to go?

A.  Correct.

Q.  When did he get up from the bed?

A.  At some point after I passed him and made my way to the door.  I do not know when.

Q.  Weren't you just trying to get out of there as fast as you could?

A.  I wasn't running.

Q.  Yeah.  I'm asking, weren't you trying to get out of there just as fast as you could?

A.  Sure.

Q.  I mean, you were walking very briskly, weren't you?

A.  I don't know how briskly I was walking.  I was walking..

Q.  Were you just slowly sauntering to the door like nothing happened?

A.  No.

Q.  You wanted to get out of there?

A.  Yes.

Q.  So you were walking as fast as possible, right?

A.  I was walking with some determination.

Q.  Were you walking fast?

A.  I don't know.

Q.  So Mr. Spacey, as you've left the bedroom, is still

unmoving on the bed right where you had left him when you wriggled away. You're making your way across the room, but suddenly Mr. Spacey appears again in the doorway at the front door, right?

A. Correct.

Q. And you don't know how he got there, right?

A. I know he -- he walked there. I don't know.

Q. Well, you don't know, do you?

I mean, what if he crawled drunkenly?

A. He was standing when I saw him.

Q. But OK, I'm trying to understand this. Because you head out the door of the bedroom, he's still drunk on the bed and he's not moving from where you had left him before you went to the bathroom. You briskly walk across that apartment. And that apartment is what, 420, 450 square feet?

A. I don't know.

Q. That's right, you thought it was a good-sized one bedroom.

OK. So you briskly walk toward the door and suddenly he's in the door frame of the front door, is that what you're saying?

A. Correct.

Q. I know that you're an actor on Star Trek, but you're not alleging he used a transporter to transport himself to the door, are you?

A. I'm not.

MABsRAP4                         Rapp - Cross

Q.  OK.  Let's move on.  Let's talk about the people you told
your Kevin Spacey story to.

          THE COURT:  Let's take our afternoon break here.

          MS. KELLER:  Thank you, your Honor.

          THE COURT:  15 minutes.

          (Recess)

(In the robing room)

MR. STEIGMAN:  The reason we're in camera -- I appreciate the court's indulgence -- it relates to the 412 motion and the court's decisions.  So the book was offered in evidence.  Of course they haven't used any improper portion of it, but the book needs to be redacted in my view to comport with the limitations the court issued pursuant to 412.

I didn't think it would be an issue, and I sought out Mr. Scolnick and Ms. Keller just to say, you know, here is my understanding -- just to summarize your order -- that they are permitted to question Mr. Rapp about one particular incident when he was 14 and this boy was 17 or 18 and they engaged in sexual conduct, and two other instances that you're permitted to question Dr. Roccio about in seeking to undercut her opinion, the incident with the masseuse and the incident with Susan Tyrrell.  I understood everything else to be out.

Counsel -- I'll let you speak to it -- had a potentially different take.  We said, well, we better get this squared away.

MR. SCOLNICK:  Thank you.

I think that's right.  I do have a different view, your Honor.  The book that we're talking about here was expressly relied on by Dr. Rocchio, their expert, to form the basis of her opinion that Ms. Rapp is suffering from PTSD.  So there are a number of incidents in the book, stories from

including when Mr. Rapp was 11, 12, 13 years old and engaged in various sexual conduct and contact.

THE COURT:  Look, I think I went out of my way in the order to specifically cull out the masseuse and the other thing.

MR. STEIGMAN:  Susan Tyrrell and the one thing with him.

THE COURT:  Yes, Susan Tyrrell.

But I think I made clear that, for purposes of crossing the doctor, they are entitled to adduce whatever she had in front of her.

MR. STEIGMAN:  So if I may, I would say to you under 412, for each and every act of prior sexual conduct, it requires this analysis and it requires the court to say that the probative value substantially outweighs any unfair prejudice or embarrassment, things like that.

In the absence of an order, you can talk about this, you can talk about that.  I think it would be improper for them to mention it.

THE COURT:  OK.  I understand the tension, potential tension between 412 and 703, 705.  I was able clearly to resolve that as to those two incidents.

MR. STEIGMAN:  Right.

THE COURT:  I have no idea what else is in this book, and you're telling me all of this stuff is in the book.

MR. STEIGMAN: Some. But here is what I'm troubled by. The court says, I have no idea what is in this book. The whole point of the section was they were required to make a pretrial motion to get permission to talk about these things. In the absence of that, the statute says it is inadmissible, period.

THE COURT: I'm happy to have you identify for me the sections you're worried about, plaintiff, and then to have you address this -- I guess it has to be overnight -- in writing. I certainly had in mind the 412, 703, 705 issue when I wrote on this over the weekend, and I'm not sure that 412 trumps 703 and 705. Indeed, I'm kind of inclined to the opposite view, which is why I ruled the way I did, but I'll hear you again on it.

MR. STEIGMAN: OK. Thank you.

THE COURT: OK.

MR. SCOLNICK: Thank you, your Honor.

Just so I understand, you're going to raise the specific --

THE COURT: He's going to identify what he wants redacted, and I welcome -- at an hour when I'll still awake to read it -- whatever you want to submit to me.

MR. STEIGMAN: Do we agree you're not using anything today that is not specifically dealt with in these orders?

MR. SCOLNICK: Yes. It would be with the experts.

THE COURT: Right.

MR. STEIGMAN:  OK.

THE COURT:  And from the look of it, we're not going to get to the expert until next week.

MR. STEIGMAN:  You know, as I said, Judge, I live in optimism and I'll die in the spare, right?

THE COURT:  After we completed the third, just another 30 minutes from Mr. Saghir this morning, I began to wonder.

MR. SCOLNICK:  I can say this, your Honor.  We're really looking at the witness list and trying to make cuts to expedite the trial.

THE COURT:  I appreciate whatever either side does to move things along.

MR. SCOLNICK:  Thank you, your Honor.

(Continued on next page)

(In open court; jury not present)

THE COURT:  Let's get the jury.

MR. STEIGMAN:  If we may, Judge.

THE COURT:  Yes, thank you.

(Jury present)

THE COURT:  OK.  We had a legal point that came up that I had to see counsel about in the robing room, but we'll continue.

MS. KELLER:  Thank you, your Honor.

BY MS. KELLER:

Q.  Mr. Rapp, I would like to talk with you about some of the people you told your Kevin Spacey story to.

You said you went home after the party, right?

A.  Correct.

Q.  Despite how close you were, you didn't tell your mother, right?

A.  Correct.

Q.  And, in fact, you never, to the day she died, you never told your mother about these allegations, true?

A.  Correct.

Q.  And you didn't tell Mr. Barrowman about your allegations?

A.  Not at that time.

Q.  Until Mr. Spacey was an international star in 1998, right, true?

A.  True.

Q.  Then just in passing during a dinner in London, right?

A.  Correct.

Q.  You kept a journal during high school, true?

A.  Very occasionally.

Q.  Well, however occasionally, you never wrote anything about this in it, did you?

A.  Not as far as I can recall.

Q.  Still got the journal?

A.  I do not.

Q.  So you told *BuzzFeed* that for years you had told no one about your experience and you had never spoken with Mr. Spacey ever since.

        Do you remember that?

A.  I'm sorry, the first part of the question?

Q.  You told *BuzzFeed*, Mr. Vary, that for years you had told no one about your experience and you've never spoken with Mr. Spacey since then.

        Do you remember saying that?

A.  I do remember saying that.

Q.  And do you remember in the article that it was as Mr. Spacey's star began to rise through the 1990s and 2000s, including a Tony award, two Oscars, a decade-long run as the creative director of the Old Vic Theatre in London and the sixth season and counting on the Netflix series *House of Cards*, that it was after that you decided to come forward?

A.   I'm sorry.  Is the question after that, that I decided to come forward?

Q.   I'll keep going.  You told *BuzzFeed* you didn't start telling your Kevin Spacey story to anybody until '90 to '92?

A.   That was my -- that's the best of my recollection at the time, yes.

Q.   That's what you told them?

A.   Yes.

Q.   OK.  You now say that the first person you told about your allegations was your friend Christopher Hart, is that right?

A.   Correct.

Q.   And he was your friend from Joliet, Illinois?

A.   Correct.

Q.   You first told Christopher sometime after you returned home from New York in 1986, right?

A.   Correct.

Q.   And you say you told Mr. Hart the same Kevin Spacey story you told us here in this court, right?

A.   I told him the substance of what I told him and many others over the years, yes.

Q.   You didn't tell Mr. Hart any details that you didn't provide at your deposition, true?

A.   Not as far as I remember.

Q.   Now, again, along with everybody else, you told Mr. Hart that this story happened in a bedroom, right?

MABsRAP4                          Rapp - Cross

A.  Correct.

Q.  And to back up, you went to high school with Mr. Hart?

A.  I went to junior high and high school with him.

Q.  And Mr. Hart also attended high school with John Barrowman?

A.  Correct.

Q.  The three of you had been in *Oliver* together?

A.  I don't remember Christopher being in *Oliver*.

Q.  Had Christopher been in other productions?

A.  I don't remember if he did the shows.  I know we were in choir together.  I don't remember what shows he may or may not have been a part of.

Q.  Are you never mentioned Mr. Barrowman's visit at all to Christopher Hart, right?

A.  I don't remember.  I don't know.

Q.  You never mentioned to Mr. Hart going to Jack Lemmon's dressing room with Mr. Barrowman and meeting Jack Lemmon and Mr. Spacey?

A.  I don't -- I don't know.

Q.  Have you reviewed Mr. Hart's deposition testimony?

A.  I did, as part of all I reviewed at some point, yes.

Q.  And you know that he said no, you never told him?

A.  OK.

Q.  And you never told him about going out to dinner with Mr. Barrowman and Mr. Spacey, correct?

A.  Correct.

Q.  Never told him about going to a nightclub with the two of them, correct?

A.  Correct.

Q.  In your telling of the story of Mr. Hart, it was as if Mr. Barrowman had never even existed in New York at that time, didn't tell him about the visit, didn't tell him about going anywhere with him, right?

A.  At that time -- at which time, ma'am?

Q.  That time in New York, right around when he visited you.

A.  I'm sorry.  Can you repeat the question?

Q.  In your retelling of the story to Mr. Hart of what happened back in New York with Mr. Spacey --

A.  Yes.

Q.  -- you never once mentioned that Mr. Barrowman even came to visit you?

A.  Correct.

Q.  Let alone that you had gone to a nightclub together?

A.  Correct.

Q.  Let alone that you had met Jack Lemmon together?

A.  Correct.

Q.  You didn't tell Mr. Hart that Ed Harris had picked you up like a bride in the play *Precious Sons*?

A.  Correct.

Q.  And you didn't tell Mr. Hart that Ed Harris' character had laid on top of you in the play *Precious Sons*?

A.  Correct.

Q.  You didn't tell Mr. Hart you had been to Mr. Spacey's apartment more than once?

A.  Correct.

Q.  Now, you also -- to talk about another friend, you have a friend named Erin Quill, correct?

A.  Correct.

Q.  You told Erin Quill the Kevin Spacey story in the early '90s?

A.  Yes.

Q.  You came out of the closet in about '92?

A.  I'm sorry.  In public, you mean?

Q.  Yes.

A.  I believe it was 1993 is when that happened.

Q.  Well, in 1992 or 1993, did you believe it was professionally hazardous for a working actor to come out?

A.  I did not believe that it was professionally hazardous, no.

Q.  Did you see that in the *BuzzFeed* story?

The *BuzzFeed* article said, Compounding Rapp's frustration was that he had already been out publicly since 1992, when doing so was acutely political and professionally hazardous for a working actor.

You remember seeing that in the article, right?

A.  Correct.

Q.  "At that time, I wanted to scream to the rooftops, this guy

is a fraud, Rapp said?"

A.   Was that in the *BuzzFeed* article?

Q.   Yes.

A.   OK.

Q.   And you remember saying that you wanted to shout from the rooftops, this guy -- meaning Kevin Spacey -- is a fraud?

A.   Correct.

Q.   Not a fraud as an actor?

A.   No.

Q.   Because you knew he was an excellent actor?

A.   Correct.

Q.   One of the best?

A.   Correct.

Q.   It was he's a fraud because he hasn't come out publicly about his sexuality?

A.   Not just that.

Q.   Well, you also said that you felt he was portraying himself as straight?

A.   Correct.

Q.   And that was because he had been seen dating women in the media, right?

A.   Correct.

Q.   Now, you don't know anything about his relationships with those women, do you?

A.   No, correct.

Q.  You have no personal knowledge of whether these were legitimate real relationships or not, right?

A.  Correct.

Q.  And, in fact, you yourself said that you had been involved with both men and women romantically?

A.  Correct.

Q.  In fact, you refused to use the term gay but said you wanted to use the term queer -- not my term but yours -- and I take it part of that is because you had had relationships with women?

A.  Correct.

Q.  And were those legitimate relationships?

A.  Yes.

Q.  There was nothing fraudulent about them, was there?

A.  Correct.

Q.  But you were very angry with Mr. Spacey because you decided that you knew that his relationships were fraudulent, right?

A.  That is not how I would characterize it, ma'am.

Q.  You see yourself as an advocate in the gay community?

A.  I do.

Q.  And you feel that you could never respect people for not coming out of the closet publicly, right?

A.  I don't know that -- that sounds like a very strong statement, that I could never respect people for not coming out of the closet.

Q.  Well, in your book *Without You*, did you write that "At times I felt as though I could never respect him for this decision" -- and this is somebody who was not an out actor, Mr. Spacey -- because to me the stakes for queer people in America, specifically young queer people, were too high for anyone with a conscience to justify remaining in the closet, especially if that someone was a public figure in a position to bring much-needed attention to queer issues.

So you could never respect someone wanting to stay in the closet?

A.  I said at times I felt that, and there is other things that I also said about it.

Q.  Wasn't that your own boyfriend you were talking about?

A.  Correct.

Q.  And, in fact, you ended a relationship with him because he refused to come out, right, publicly?

A.  May I explain?

Q.  Well, is that true?

THE COURT:  Answer the question.

A.  It's -- it's not because he refused to come out publicly, it's because he didn't want to be photographed with me at the opening night of *Rent*.

Q.  And that is because he was afraid people would draw the inference that you were a couple, right?

A.  Correct.

MABsRAP4                          Rapp - Cross

Q.   Which would out him, right?

A.   Correct.

Q.   And you had just had it with him not being out and you couldn't respect him, right?

A.   That is not -- that is an oversimplification.

Q.   I'm just looking at what you wrote:  At times I felt as though I could never respect him for this decision because to me the stakes for queer people in America, specifically young queer people, were too high for anyone with a conscience to justify remaining in the closet.

     With a conscience, so it was a matter of morality for you?

A.   An aspect of it is, yes.

Q.   Yeah.  If someone wasn't out, they were immoral?

A.   I would not say that, no.

Q.   Wouldn't you say that should be an individual choice?

A.   I do, in fact, say that as well, yes.

Q.   And the majority, the vast majority of the LGBT community takes that position, right?

A.   Correct.

Q.   You're aware of that because you're an activist, right?

A.   Correct.

Q.   But you called Mr. Spacey a fraud and you also said that anybody who was a public figure in a position to bring much-needed attention to queer issues, it's even more important for

them to come out, right?

A.  Can you point me to the context and to the statement of where this was?

Q.  The context is the whole paragraph I just read.

A.  Yes.

Q.  Because to me, the stakes for queer people in America, specifically young queer people, were too high for anyone with a conscience to justify remaining in the closet, especially if that someone was a public figure in a position to bring much-needed attention to queer issues.

So you had --

MR. SAGHIR:  Could we just have the paragraph read for completeness?

Stopping before it's read --

THE COURT:  Go on.  Read the rest of the paragraph.

Q.  "On the other hand, I recognized that each queer individual had a very personal choice to make:  To reveal that aspect of his or her personal life or not to.  Marcus was his own person, and I was my own person, and while I wished that he felt differently about being in the closet, I did love him, and I didn't want our differing politics, as personal as they were, to determine the outcome of our relationship."

But you broke up with him because he was afraid of being outed by going to your award ceremony as your date, right?

A.   I feel like that's an oversimplification.

Q.   Well, that is what it comes down, isn't it?

You wanted him to go with you, the two of you to be photographed together, and he was concerned people would infer that he was your date and therefore you were a couple.

I mean, it's not that difficult, is it?

A.   It was a very, very particularly meaningful event that I'm speaking of.

Q.   Well, no matter how meaningful it was to you, he didn't want to be outed?

A.   Correct.

Q.   And that caused you to say it's over, right?

A.   Correct, I couldn't -- yes.

Q.   And this public figure, you certainly would agree that in terms of public figures, there were very few people in the entertainment world more public than Kevin Spacey in terms of being almost a household name?

A.   Correct.

MR. SAGHIR:  Objection as to vague as to when.

THE COURT:  The witness has already answered.

MS. KELLER:  I'm sorry, your Honor?

THE COURT:  The witness has already answered.

MS. KELLER:  Thank you.

BY MS. KELLER:

Q.   Now, you also believe there is a bias in Hollywood against

out gay actors, right?

A.   I'm not sure that I believe that, no.

Q.   Well, you've talked about that with your friend Erin Quill, haven't you?

A.   I'm not sure that I have articulated it in that way, no.

Q.   Well, you having read over Erin Quill's --

THE COURT:   The question did not ask you whether you articulated it in that way.

Could you please address the substance of the question?

THE WITNESS:   OK.

THE COURT:   What was the question again?

BY MS. KELLER:

Q.   You've discussed with your friend Erin Quill how frustrating it is to be an out gay actor in Hollywood, right?

A.   I did not discuss it in those terms.

Q.   Well, you discussed it in terms of Erin Quill saying that you have discussed your frustration about the inequity in Hollywood and the bias toward out gay actors with her; you have discussed that with her, have you not?

A.   I have discussed aspects of this.  I did not -- I do not articulate -- I did not think of it in terms of bias against out gay actors.

Q.   I'm not asking about how you're articulating it.  I'm saying has that topic come up with Ms. Quill, as she says it

has?

A.   The topic of out gay actors has come out with Ms. Quill, yes.

Q.   Of bias towards out gay actors?

A.   I don't -- I don't know how to answer it any better.  It's been -- some aspect of what it means to be out or not has come up between us.

Q.   And also what has come up with Ms. Quill is your frustration and anger at other actors who are obviously gay to you but in the closet and refuse to come out, right?

A.   Correct.

Q.   And you also believe and told Ms. Quill that your bravery in coming out has impacted your career, right?

A.   I have not said that.

Q.   You didn't tell her that you felt your bravery was impacting your career and you wished everybody else would be equally as brave as you?

A.   I did not use that -- I did not say that, no.

Q.   Well, you may not have articulated it in those words.  Was that the gist of it?

A.   The -- can you rephrase the question?

Q.   Didn't you talk with Ms. Quill about the fact that you felt your bravery in coming out was impacting your career and you wished everybody else would be equally brave?

A.   I wouldn't -- I did not say that to her, no.

Q.  In those words, but did you?

A.  Correct.

Q.  But was that the gist of the conversation?

A.  I did not feel that my being out has impacted my career one way or the other.

THE COURT:  The question is:  Did you, in words or in substance, communicate that thought to Ms. Quill?

THE WITNESS:  I did not.

Q.  Now, around 1992 Ms. Quill brought up Kevin Spacey, right?

A.  Correct.

Q.  And it was just after she had seen Kevin Spacey in *Lost in Yonkers*?

A.  Correct.

Q.  He got a tremendous amount of acclaim for that role, did he not?

A.  Yes.

Q.  What did that include?

A.  It included the Tony award.

Q.  That's the highest award the theater can give, right?

A.  Yes.

Q.  And she was telling you how much she admired Mr. Spacey's acting, which as we've noted he had been celebrated for?

A.  Correct.

Q.  And you responded to Ms. Quill's praise of Kevin Spacey by telling her your Kevin Spacey story, right?

A.   Correct.

Q.   And can we have a picture of exhibit next in order, which would be DDD.  If we can move that down to center of the photograph a little more.

        Was that a photograph of Mr. Spacey from his role as Louie in *Lost in Yonkers*?

A.   It says it's a photograph from *Ghosts*.

Q.   I'm sorry.  Oh, Liv Ullmann, you're absolutely right.  I got that wrong.  Liv Ullmann, I should recognize her.

        So *Lost in Yonkers* he won a Tony award for, right?

A.   Correct.

Q.   And you've never won a Tony?

A.   Correct.

Q.   You've never been nominated for a Tony?

A.   Correct.

Q.   And, in fact, you were very, very deeply disappointed not to be nominated and expected to being nominated for your role in *Rent*, right?

A.   Correct.

Q.   There was an article in the *Advocate* about that and the *Advocate* is a gay magazine?

A.   Correct.

Q.   I mean, it's aimed at the gay community primarily?

A.   Yes.

Q.   And there was an article in the *Advocate* that was

practically already handing you the statuette, wasn't it?

I mean, it was really predicting that you were going to win?

A.  I don't have any recollection of the details of that article.

Q.  Well, weren't you interviewed for it?

A.  I was.

Q.  So it must have made you especially angry when you didn't win for the biggest role of your life and Mr. Spacey won for *Lost in Yonkers*, true?

A.  *Rent* was after *Lost in Yonkers*.

Q.  Yeah, but whatever the time period was, I'm not saying you were direct competitors.  That had to really make you angry --

A.  No, ma'am.

Q.  -- at the fraud Mr. Spacey was?

A.  Is that a question?

Q.  Yes.

A.  I'm sorry.  So can you ask me again?

Q.  Yes.  Weren't you angry as somebody you regarded as a fraud won a Tony award for *Lost in Yonkers*?

A.  No, ma'am, I was not angry about that.

Q.  You're aware that -- well, you told Ms. Quill that you saw Mr. Fowler enter the bedroom through the bedroom door in his apartment, right?

A.  Correct.

Q.   Just like everybody else you've talked to.

          But you never told Erin Quill you had gone to
Mr. Spacey's apartment with John Barrowman, true?

A.   True.

Q.   Or that you saw Mr. Spacey flirt with him, true?

A.   True.

Q.   Or that the three of you went to The Limelight, true?

A.   True.

Q.   So, again, John Barrowman kind of got edited out of the
story you told Ms. Quill, is that right?

A.   It's not true that he got edited out.  I did not talk about
that night with John Barrowman, I talked about the night I went
by myself.

Q.   You just omitted the -- you omitted the way you met
Mr. Spacey to begin with and where you were and who you were
with when you were actually invited to the party, you omitted
all that?

A.   I talked about the night I went.

Q.   You omitted all of that that I just mentioned?

A.   I talked about the night I went.

Q.   And only that?

A.   And only that.

Q.   And you told your friend Sean Snow the same Kevin Spacey
story.  You told him that in the '90s, right?

A.   Correct.

Q. Same thing, happened in a bedroom, true?

A. Correct.

Q. Same lack of any context about Mr. Barrowman and Spacey, true?

A. True.

Q. And would it be fair to say that Mr. Spacey's fame grew throughout the 1990s?

A. Yes.

Q. He continued to star in movies?

A. Yes.

Q. In 1990, he was in Glengarry Glen Ross with Al Pacino, Jack Lemmon, Alec Baldwin, Alan Arkin, and Ed Harris, who you had been in *Precious Sons* with?

A. Correct.

Q. He starred in *The Ref* in 1994?

A. Correct.

Q. Continued to live in the closet as far as you were concerned, right?

A. Correct.

Q. And you continued telling people your Kevin Spacey story?

A. Correct.

Q. Dozens of people, right?

A. I don't know the exact number. It's many people over the years.

Q. Well, you gave us a list. That was sure a lot of people?

MABsRAP4                        Rapp - Cross

A.  Yes.

Q.  So in 1995, Mr. Spacey starred in the movie *Seven* with Brad Pitt and Morgan Freeman, right?

A.  Sure.

Q.  And then in around 1995, he starred in the movie *The Usual Suspects*?

A.  Correct.

Q.  That was an even more of a breakthrough role, wasn't it?

A.  Yes.

Q.  Critically acclaimed?

A.  Yes.

Q.  And he won an Academy Award for best actor and supporting role?

A.  Yes.

Q.  Each time Mr. Spacey would win an award, it enraged you, didn't it?

A.  It did not enrage me, ma'am.

Q.  It made you terribly upset, right?

A.  It was -- it did not enrage me.  It was difficult to be in his presence and --

Q.  That's not the question.

A.  Yeah.

Q.  Each time you saw him being nominated for a Tony, an Academy Award, a Golden Globe, an Emmy, it infuriated you?

A.  No, ma'am.

Q. Now, you talked about the Oscar party at your friend Elizabeth Law's apartment?

A. Correct.

Q. And this is the year that Mr. Spacey won for *The Usual Suspects* I'm going to ask you about?

A. OK.

Q. You were present at her apartment when he was actually -- when he was given that award on TV, right?

A. Yes.

Q. And people at the party were praising and celebrating Mr. Spacey's talent, right?

A. Correct.

Q. Still in the closet he was?

A. Correct.

Q. And this is when you started throwing pencils, plural, at the TV screen, right?

A. She said pencils plural?

Q. Yes.

A. I remember a pencil. I was holding one pencil, but...

Q. Well, didn't you text back and forth with her about this very incident in 2017, right after your *BuzzFeed* article came out?

A. Yes.

(Continued on next page)

BY MS. KELLER:

Q.   And she said, the Oscar party is standing behind you, of course, and Lisa remembers the time you threw pencils at Kevin Spacey's face on my TV screen.  Now, that's a piece of corroborating evidence I had forgotten.

          Anyway, continuing to think of you today, and you replied:  Oh, wow, yes, I remember that now.

          Do you recall those text messages?

A.   Yes.

Q.   So, she sees that as corroborating evidence for you, right?

A.   Right.

Q.   She remembers you becoming upset and throwing pencils at the TV screen and telling your Kevin Spacey story, right?

          MR. SAGHIR:  Objection; speculation.

          MS. KELLER:  Well, I'm just talking about --

          THE COURT:  Overruled.

BY MS. KELLER:

Q.   I'm just talking about the words on the paper that I see, Mr. Rapp.

          MS. KELLER:  Can we have next in order, which should be EE, I think, EEE.

          THE COURT:  How many Es?

          MS. KELLER:  I think three, your Honor.

BY MS. KELLER:

Q.   Do you recognize this, Mr. Rapp?

A.   I do.

Q.   Okay.  This is the text messaging between you and Elizabeth Law?

A.   Correct.

Q.   October 30, 2017?

A.   Yes.

MS. KELLER:  Your Honor, move to admit.

MR. SAGHIR:  Just one moment so we can see the exhibit.

THE COURT:  I need to read the whole thing.

THE WITNESS:  I haven't seen the top of it.

MR. SAGHIR:  I don't have a copy.

THE COURT:  Can I have a copy of this thing on paper?

MS. KELLER:  Yes, your Honor.

THE COURT:  Thank you.

MR. SCOLNICK:  May I approach, your Honor?

THE COURT:  Yes, please.

Thank you.

(Pause)

MR. SAGHIR:  Judge, I would just ask to see this unredacted to see what has actually been redacted from this.

MR. SCOLNICK:  Your Honor, these are text messages that plaintiffs provided to us.  They're his text messages.

THE COURT:  Which have been redacted?

MR. SCOLNICK:  Yes, we've redacted them, your Honor.

THE COURT:  You redacted them?

MR. SCOLNICK:  Yes.

THE COURT:  He wants to see what you redacted, which is a perfectly reasonable request.

MR. SCOLNICK:  Yes, your Honor.

MS. KELLER:  Well, we can move on while we're --

THE COURT:  Let's do that.

MS. KELLER:  -- waiting for that, your Honor.

BY MS. KELLER:

Q.  So, this party where you threw pencils at the screen, you told people at the party your Kevin Spacey story, right?

A.  Correct.

Q.  And not long after this, Kevin Spacey won his first Oscar, you gave an interview with The Advocate, which we had talked about, and your profile at that time -- The Advocate article was April 30, 1996, and it was entitled, "Star 96:  Featured In The Musical Sensation --"

THE COURT:  Sorry.  Let's go back and unscramble this question and see what you want to ask, please.

BY MS. KELLER:

Q.  Did you give an interview To The Advocate on April 30, 1996?

A.  Yes, I gave -- I don't know if I gave it that day, but I gave an interview to The Advocate in April 1996, yes.

Q.  And that was an article entitled, "Star 96:  Featured In

The Musical Sensation *Rent*, Anthony Rapp Steps Out On The Great
White Way," right?

A.   Okay.

Q.   And that was the article that predicted that you were going
to be nominated for a Tony, right?

A.   I don't know that for sure.

Q.   Now, at the time, your profile had been too low to merit
exposure in the press, true?

A.   That was generally my impression, for the most part.

Q.   And you wrote about that in your book?

A.   Correct.

Q.   That your profile was so low, and you had so little
opportunity to raise it, that you jumped at the chance to sit
down with a reporter from The Advocate, right, your phrase?

A.   Did I say so low?  Is that my phrase?

Q.   "But since then, my profile had been too low to merit
exposure in the press, gay or otherwise, so I jumped at the
chance to sit down with a reporter from The Advocate."

A.   Correct.

Q.   That's from your book, right?

A.   Yes, yes.

Q.   Okay.

      So, you gave that interview specifically to raise your
profile, right?

A.   It's among the reasons.

MABKRAP5                         Rapp - Cross

Q.  Well, you gave that interview because you wanted to do anything to raise your profile for the sake of your work and for the sake of gay and lesbian issues, right?

A.  Correct.

Q.  Both.

And you told the magazine that you wanted to win a Tony Award?

A.  Yes.

Q.  That a Tony Award would do wonders for your career, true?

A.  Correct.

Q.  And that think of the visibility, millions of people watching me lean over and kiss the man I'm seeing on the lips, that's a great image that I'd want to leave people with.

That was important to you, right?

A.  Correct.

Q.  But you didn't win a Tony Award?

A.  No.

Q.  Or even get nominated?

A.  Correct.

Q.  But the author of the article called you courageous for being publicly out of the closet, right?

A.  Is that in the article, that he called me courageous?

Q.  Yeah.

A.  Okay.

Q.  And you expressed in the article your frustration for

actors who refused to come out of the closet?

A.  May I hear the quote?

Q.  Yes.

        Shall I read you the whole paragraph?

A.  I'd appreciate the context.

Q.  "Although Rapp has had his share of relationships" --

        MR. SAGHIR:  Where is this?

        MS. KELLER:  I'm sorry.  This is The Advocate article, 4/30/96, page 2, bottom.

        MR. SAGHIR:  Starting with what, please?

        MS. KELLER:  Starting with "although."

BY MS. KELLER:

Q.  "Although Rapp has had his share of relationships with both men and women, he calls his current boyfriend the love of my life.  I have never been able to love someone as openly and fully as I do him.  Rapp's forthrightness in discussing his personal life may seem courageous to some, but he has even stronger words for those who believe that coming out is still comparable to career suicide. 'Maybe they won't make 20 million a picture anymore, but who the fuck cares?  If they haven't made enough money yet, then I feel sorry for them.  Ultimately, the difference they could make in people's lives is so great, they really have nothing to lose.'"

A.  Yes.

Q.  So, when you're talking about people making 20 million a

picture, that was focusing on A list actors, right?

A.   Correct.

Q.   Like Kevin Spacey?

A.   I have no idea how much money he was making, but...

Q.   Well, he was one of the biggest stars in Hollywood?

A.   Correct.

Q.   So, if anybody was making 20 million, he was probably one of them, right?

A.   Perhaps.

Q.   And that sounds pretty angry, Mr. Rapp, "Maybe they won't make 20 million a picture anymore, but who the fuck cares."

I know you said before that you weren't angry, but this sounds angry, doesn't it?

A.   I -- it sounds to me -- I wouldn't call it angry, no.  It sounds to me -- I remember how I was feeling when I said it.

Q.   "If they haven't made enough money yet, then I feel sorry for them," that sounds contemptuous, doesn't it?

A.   I don't think it's contemptuous.  I don't think it sounds contemptuous, no.

Q.   And you're comparing them to you who are courageous enough to have come out, right?

A.   Those weren't my words.

THE COURT:  Yes, we understand that, sir, but would you just answer the question.

THE WITNESS:  I was comparing them to the -- to me who

had made a choice to be out.

THE COURT:  Thank you.

BY MS. KELLER:

Q.  And, still, Kevin Spacey's star continued to rise, right?

A.  Correct.

Q.  And you were having trouble even getting media attention, true, as his star rose?

A.  I'm sorry, I don't know when you're referring to.

Q.  I'm referring to the period that we just talked about, The Advocate, 'Star 96, the next few years, you were having trouble getting enough media attention?

A.  That is not -- that's not accurate.

Q.  Well, in around 1997, Kevin Spacey started in the movie *L.A. Confidential*, right?

A.  Yes.

Q.  And that was another highly acclaimed movie, right?

A.  Correct.

Q.  You knew he was one of the stars, true?

A.  True.

Q.  You went to see Mr. Spacey in *L.A. Confidential*, right?

A.  Correct.

Q.  And you said something earlier, you said that even though it was hard to see him, that you went because it was your duty?

A.  Correct.

Q.  Your duty to whom?

A.   To myself as an actor, as a member of this community.

Q.   And then you said you didn't see anything he was in after *American Beauty*, right?

A.   Correct.

Q.   Did your duty stop?

A.   I felt that I had done my duty, yes.

Q.   So, your duty was to see his films up until he made *American Beauty* and then not after; is that right?

A.   I felt, after *American Beauty*, I had seen enough, and I did not want any more.  It was not a matter of duty at that point for me.

Q.   And *L.A. Confidential*, that wasn't -- you didn't go see that because it was a great movie, it was because it was your duty as an actor?

A.   No, part of my duty was to see the acclaimed movies that were out.

Q.   Again, you said duty to yourself.

     Didn't you also have a duty to yourself to take care of your psychological health?

A.   Yes.

Q.   And if I understand what you have told your expert witness psychologist, every time you saw Kevin Spacey was a horrible thing, even if you were prepared for it, it was terrible, it was traumatic, it retraumatized you, right?

A.   I don't know that I -- I said that it was difficult.  I

used language to describe it as a challenging experience, it was difficult.

Q.   Well, you've used language in here like being hit with a cattle prod or freezing when you see him, or it was extremely difficult so you had to steel yourself to go see these movies?

A.   Correct.

Q.   But off you went because it was your duty?

A.   Correct.

Q.   Now, once again, Mr. Spacey did a great job in that movie, didn't he?

A.   Yes.

Q.   And his acting in the movie was celebrated again in the media, right?

A.   I believe so.

Q.   And you thought he was still in the closet, it appeared to you that you had made a judgment about his relationships, and you decided he was in the closet, right?

A.   Correct.

Q.   Now, in around 2000, he starred in *American Beauty*, right?

A.   Correct.

Q.   And that movie was extraordinarily well received, wasn't it?

A.   Yes.

Q.   It made a lot of money at the box office, true?

A.   Yes.

Q.   Won multiple Academy Awards?

A.   Yes.

Q.   And Mr. Spacey won yet another Academy Award, this time for
Best Actor --

A.   Correct.

Q.   -- right?

     And he also won a Screen Actors Guild for best actor?

A.   Okay.

Q.   True?

     Also won British Film Academy Awards, BAFTA, for best
actor in a leading role?

A.   Okay.

Q.   And when you observed him in that movie, you thought he
was -- did an excellent job of acting, didn't you?

A.   It was hard for me at that point to also judge his
performance.

Q.   Well, if it was your duty as an actor to see the movie,
doesn't that imply a certain objectivity that you have to have?

A.   It implies an attempt at objectivity, yes.

Q.   And if you can't summon that objectivity, then you couldn't
fulfill your duty as an actor to evaluate the movie, right?

A.   To some degree.

Q.   You knew he did a superb acting job in that movie,
Mr. Rapp, don't you?

A.   I know that he gave an acclaimed performance in that movie.

Q.   "Acclaimed."

So, he was celebrated by others?

A.   Correct.

Q.   He won an Academy Award?

A.   Correct.

Q.   People praised it to the heavens?

A.   Correct.

Q.   But you're not willing to say he did a really good job, you're only willing to say he was acclaimed, right?

MR. SAGHIR:  Objection, Judge, to the relevance of this.

THE COURT:  Overruled.

THE WITNESS:  It was very difficult for me, especially in that movie, to assess the quality of his performance.

BY MS. KELLER:

Q.   Well, what was most difficult, Mr. Rapp, is that he won an Academy Award, wasn't it?

A.   No, ma'am.

Q.   If he were just Kevin nobody having a small role in the movie, but you had claimed that the same thing had happened to you in his apartment, you wouldn't be having those reactions, it was that he was acclaimed, celebrated, awarded, right?

A.   Can you please rephrase that question?

Q.   I don't think I need to.

So, Mr. Spacey at this point is still living in the

closet?

A.   Yes.

Q.   And you continued being frustrated that he didn't come out as gay, right?

A.   Correct.

Q.   You attended another Oscar party in Elizabeth Law's in 2000, right?

A.   Correct.

Q.   And he was up for another Oscar, the second Oscar we've just been talking about, so you repeated again your Kevin Spacey story to the party, right?

A.   Correct.

Q.   Every time he was up for an award, you would tell your story to try to get attention away from him and onto you, right?

A.   That is not why I did it.

Q.   Tear him down and build yourself up?

A.   That is not why I did it.

Q.   So, Mr. Spacey's success continued into the early 2000s, and around 2001, you gave another interview with The Advocate, right?

A.   Correct.

Q.   You had recently released a music album, "Look Around"?

A.   Yes.

Q.   You were trying to promote the album, right?

A.   Sure.

Q.   It wasn't doing very well, was it?

A.   It was a very small independent album.

Q.   It wasn't doing well, was it?

A.   I don't know how to qualify that, ma'am.

Q.   Well, in the interview with The Advocate, you explained you couldn't even get anyone to review your CD.  That's not doing well, isn't it?

A.   Can you please read some context?

Q.   Yes.

     The context is, you complained in The Advocate interview that you couldn't even get anyone to review the CD you had made of your music.

A.   Okay.

Q.   That's not doing well, is it?

A.   That's one aspect.

Q.   Well, another aspect is that you said you had -- the day before the interview, you had gone to a college, given a performance of your music, and tried to sell CDs, and you'd only sold 26 of them; is that right?

A.   Did I say only 26?

Q.   Yes, that's what you said.

A.   Can you please read the quote?

     MS. KELLER:  Can we pull up tab 15.  It's going to be next in order.

Q.   This is a June 1st, 2001 article, tab 15, "Interview with Anthony Rapp."

          THE COURT:  Look, Mr. Rapp, is your problem here with the word "only"?

          THE WITNESS:  Yes.  I think it characterizes it, my saying it in a certain way.

          THE COURT:  So, do you actually think that going and giving a performance and offering your CDs for sale and selling 26 means it was a success?

          THE WITNESS:  At that concert, yes, I do, your Honor.

          THE COURT:  Fine.  Let's go on.

BY MS. KELLER:

Q.   So, this is the question and answer:

          "Hensley:  You had a gig last, right?

          "Rapp:  Yeah.  It was at a college in New Jersey.  We sold 26 CDs.

          "Questioner:  That's awesome.  I probably sold 26 CDs since the beginning of my recording career (laughs).

          "Have you had any rude awakening since you embarked on this project?

          "Answer:  Yeah, I guess it's that even though I have some small degree of fame in certain circles, it's been hard to get anybody to review the CD because some outlets don't review independent CDs.  I was spoiled by the fact that *Rent* got so much attention so easily.  We didn't have to do anything.

People were just interested."

That's what you said, wasn't it?

A.  Yes.

Q.  And when you talk about *Rent* being such a success early, you were a young guy when *Rent* was a hit on Broadway.

How old were you?

A.  When we opened, I was 24.

Q.  And you thought that was the beginning of a media reprise of the type that Kevin Spacey had had?

A.  I don't know that I would -- I was very, very happy with the success of that show and very proud of it.

Q.  And you thought that you were going to be nominated for a Tony, maybe win a Tony, right?

A.  Yes, some people had expressed that to me.

Q.  And you thought this was going to be a huge career boost, right?

A.  Yes.

Q.  Now, you said earlier, when Mr. Saghir was questioning you, that you didn't envy the career Mr. Spacey had, you were perfectly happy with your career, and you had no jealousy of him.

You remember that?

A.  Correct.

Q.  And your career, it's not easy to make a living as a working actor, is it?

A.   It's not easy, no.

Q.   And it's hard to get roles, it's hard to stay employed, it's hard to do what you've done, right?

A.   At times, it is, yes.

Q.   But do you really expect us to believe that you are not envious of somebody who's won multiple Oscars, a Tony, hosted the Tonys, nominated for multiple Emmys, won Golden Globes -- I won't go on.

You wanted to be that person, didn't you?

A.   I did not want to be that person.

Q.   You wanted to have that career, that's what I mean?

A.   No, ma'am.  I wanted to work as an actor.

Q.   And do character roles and not be a star, right?

A.   I wanted to work as an actor in projects that I could be proud of.  If awards were part of it, that was great.  That was not why I was an actor.

Q.   So, you never had a role like *Long Day's Journey Into Night*, did you?

A.   I don't know what you mean by that.

Q.   A really difficult, deep, complex story that is part of the greatest play canon in the American theater?

A.   I've played Hamlet, I've played Henry V, I've done Mark Cohen in *Rent* as a deep and complex role.  I've played many deep and complex roles.

Q.   I'm talking about on Broadway.

A.   Okay.

Q.   Or in the movies.

A.   Okay.

Q.   You played in *You're a Good Man, Charlie Brown*, right?

A.   Correct.

Q.   I mean, you wouldn't put that in the same category, would you, as *The Iceman Cometh*?

A.   It's a very, very different kind of show from *The Iceman Cometh*, yes.

Q.   Well, so, this journalist you were talking to about your CDs, to raise your profile, which you had said needed raising, you told -- and, remember, you jumped at the chance to be interviewed, right?

A.   This is a different interview than that one.

Q.   Had something drastically changed?

A.   There was a different context for this interview than that first interview where I talked about jumping at the chance.

Q.   Well, you're talking about your 26 CDs, for example.

Anyway, you told this journalist, also, your Kevin Spacey story, right?

A.   Correct.

Q.   And that was to raise your profile, right?

A.   No, ma'am.

Q.   You said you were at a party at Kevin Spacey's apartment, and of the Q&A, if we can go down to page 7, the questioner --

MABKRAP5                          Rapp – Cross

you were talking about how Ian McKellen had said that he's a better actor since he came out publicly because there was no longer anything he had to compensate for or hide, right?

A.   Yes, I see that quote, yes.

Q.   And you said now, as for some actors being closeted may make it more interesting because that might create some sort of tension in their work, right?

A.   Correct.

Q.   And the interviewer said:  That makes me think of a certain -- this says a certain leading man and a certain award winning film, but what he was really talking about was Kevin Spacey and *American Beauty*, right?

A.   Correct.

Q.   And this was redacted, the magazine wouldn't let them put Kevin Spacey in there, right?

A.   Correct.

Q.   For two reasons, but one big reason being they didn't publicly out people without their consent, right?

A.   Correct.

Q.   And you said:  It's hard for me to evaluate his acting because I'm so angry at him.

        I thought earlier you told us you weren't angry?

A.   In the instances you were talking about, that's -- it didn't feel like anger.

Q.   And you said, "I met him when I was 14 because we were both

in plays, and he invited me to a party at his house, I was bored, so I was in his bedroom watching TV and didn't know everybody had left, and he came to the bedroom, and he picked me up and lay down on top of me.

"Questioner:  Oh, my God, what did you do?

"Answer:  I squirmed away and went into the bathroom. I came out, and I excused myself, and he's like 'Are you sure you want to go?'  I always wonder if he remembers it because he was pretty drunk, and he's had so many."

So, when you say he was pretty drunk --

A.  Correct.

Q.  -- you left out the part about how he was sober at the front door, right?  And then a very short amount of time later, appears to be dead drunk, true?

A.  I didn't say dead drunk.  Pretty drunk.

Q.  Okay, not dead drunk, but glassy eyed, you know, having obvious problems standing up, holding onto the door frame, right?

A.  Some version of that.

Q.  Yeah.  You didn't talk about that, you didn't say that, you know, it's really a strange thing because maybe even a half an hour earlier, he looked totally sober to me, you didn't say that, did you?

A.  Everything -- this is what I said.  What's in the article is what I said.

Q.  So, it's the same story you've just been repeating over and over and over again, the only thing missing here is the bride part, right?

A.  Okay.

Q.  And putting in that he was so drunk, that's because you believed Kevin Spacey would deny your false allegation, right?

A.  No, ma'am.  That's because that was my impression.

Q.  Well, you figured that if you said he was very drunk, he might not even remember it, right?

A.  No, ma'am, I didn't figure if I said that.  I said that because that was my impression.

Q.  Well, you injected it in here, I always wonder if he remembers it because he was pretty drunk.  So, you were already insulating your story from criticism because if he denied it, you could say, well, he was so drunk, he wouldn't remember it, right?

A.  No, ma'am, I was not insulating myself.  I was expressing my thoughts about that.

Q.  But Kevin Spacey's name was not published in that article, which was a huge disappointment to you, right?

A.  I wouldn't articulate it as a huge disappointment, no.

Q.  And your album didn't go platinum or gold or anything, it was a flop, right?

A.  I would not characterize it as a flop.  It was a small independent album.

Q.  Kevin Spacey continued making movies into the 2000s and was widely sought after for movies as well as stage and TV, right?

A.  Correct.

Q.  He became one of the industry's most bankable stars, right?

THE COURT:  It sounds to me like we're moving on, and this is a good point to break.

So, we'll resume at 9:30 tomorrow.

Folks, I have -- what is it, Mr. Scolnick, or are you just rising?

MR. SCOLNICK:  Just rising.

THE COURT:  Just rising.  Well, continue rising.

I have two very brief hearings in criminal cases, but I need to do them, basically, now.

Are we ready on them?

THE DEPUTY CLERK:  We're not ready yet.

THE COURT:  So, please vacate the room expeditiously, and then if you have to leave things, you'll be able to come back shortly.

(Witness temporarily excused)

(Adjourned to October 12, 2022, at 9:30 a.m.)

* * *

INDEX OF EXAMINATION

Examination of:                                    Page

ANTHONY RAPP

Direct By Mr. Saghir . . . . . . . . . . . . . 213

Cross By Ms. Keller  . . . . . . . . . . . . . 270

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 TT was    . . . . . . . . . . . . . . . . . . 291

 R    . . . . . . . . . . . . . . . . . . . . . 292

 BBB    . . . . . . . . . . . . . . . . . . . 344

 OO    . . . . . . . . . . . . . . . . . . . . 380