MACsRAP1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ANTHONY RAPP, et al.,

 4                 Plaintiffs,

 5          v.                              20 CV 9586 (LAK)
                                            Jury Trial
 6   KEVIN SPACEY FOWLER, also
     known as
 7   Kevin Spacey,

 8                 Defendant.

 9   ------------------------------x
                                            New York, N.Y.
10                                          October 12, 2022
                                            9:35 a.m.
11
     Before:
12
                        HON. LEWIS A. KAPLAN,
13
                                            District Judge
14                                            And A Jury
                          APPEARANCES
15
     GAIR GAIR CONASON RUBINOWITZ BLOOM HERSHENHORN STEIGMAN &
16   MACKAUF
          Attorneys for Plaintiffs
17   BY:  RICHARD M. STEIGMAN
          PETER JAMES SAGHIR
18
     KELLER/ANDERLE LLP
19        Attorneys for Defendant
     BY:  JENNIFER KELLER
20        CHASE SCOLNICK
          JAY PHILLIP BARRON
21
     ALSO PRESENT:
22   ANGELLA IBISHAJ, paralegal

23

24

25
```

MACsRAP1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Be seated, folks.

3          First of all, Mr. Saghir, I thank you for the letter

4    you sent me.

5          Secondly, reflecting on the manner in which this

6    proceeded yesterday, I have two suggestions that I think will

7    greatly simplify the remainder of the cross-examination.

8          Ms. Keller, you're a very experienced trial lawyer and

9    a good one.  All the lawyers in this case are very good, and we

10   all have our way of asking questions.  Unsurprisingly, you have

11   repeatedly asked Mr. Rapp did he tell somebody X.  And Mr. Rapp

12   then says something like, I didn't use those words.  And we're

13   off to six more questions.  I, of course, am guilty of

14   hyperbole here, six more questions to get him to answer the

15   substance of the question.

16         And, Mr. Rapp, you're a very intelligent young man and

17   you listen acutely for every adjective and every particle of a

18   question to figure out how you can answer the question without

19   answering the question, frankly.  We're going to have an end to

20   that.

21         And I would suggest -- it's up to you, Ms. Keller,

22   conduct your examination as you wish -- but if you ask, did you

23   tell so-and-so, in words or in substance, then we don't have to

24   go through the quibbling about the words.

25         Mr. Rapp, your job is to answer the questions, not to

MACsRAP1

1    engage in, you know, what you were thinking at the time or any

2    of that.  OK?  Let's try to do that.

3            Let's get the jury.

4            MR. SAGHIR:  Your Honor, would you like Mr. Rapp to

5    take the stand again?

6            THE COURT:  Yes.  Thank you.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good morning, everybody.  Members of the

3     jury, you can sit down as soon as you come in.  Everyone is

4     standing for you.

5              We're going to continue the cross-examination of

6     Mr. Rapp.

7              Mr. Rapp, you're still under oath.

8      ANTHONY RAPP, resumed.

9              You may proceed, Ms. Keller.

10             MS. KELLER:  Thank you, your Honor.

11    CROSS-EXAMINATION

12    BY MS. KELLER:

13    Q.  Mr. Rapp, your friend Tracie Thoms told you, perhaps not

14    in these exact words, but told you how much she admired

15    Mr. Spacey's acting in 2004 or 2005, correct?

16    A.  Correct.

17    Q.  And you responded by, again, telling your Kevin Spacey

18    story to her, right?

19    A.  Correct.

20    Q.  Now, in 2006 Mr. Spacey was nominated for a Grammy for his

21    work in a movie called *Beyond the Sea*, right?

22    A.  I'm not aware of that.

23    Q.  You're not aware of the movie where he played Bobby Darin

24    and sang every song?

25    A.  I'm aware of the movie.  I'm not aware of the Grammy

MACsRAP1                          Rapp - Cross

1   nomination.

2   Q.  Was it not something that you followed, Grammy nominations?

3   A.  Generally, I don't follow them very closely.

4   Q.  Did you follow the Grammy nominations when *Rent* was

5   involved?

6   A.  Certainly.

7   Q.  But just for that?

8   A.  Not just for that, but I was aware of the Grammy

9   nominations the year that *Rent* was on Broadway, yes.

10  Q.  And you know that Mr. Spacey continued to play prominent

11  roles throughout the 2010s, right?

12  A.  Yes.

13  Q.  He was nominated for a Golden Globe for best actor in a

14  television drama for *House of Cards*, right?

15  A.  I believe so.

16  Q.  And as well as multiple -- nominated for multiple Emmys for

17  *House of Cards*, right?

18  A.  I believe so.

19  Q.  Those are not award that you were ever nominated for, true?

20  A.  True.

21  Q.  And you didn't care about that, am I right?

22  A.  I didn't care -- I didn't care about not having been

23  nominated for Emmys or Golden Globes.

24  Q.  But yes for the Tony, right; you did care about this?

25  A.  I cared about that very much, yes.

1    Q.  Now, you told your even Spacey story to well over 100

2    people over the years, right?

3    A.  I don't know the number, ma'am.

4    Q.  Do you remember giving, early on in the case, an answer to

5    what's called an interrogatory, where you gave a list of all

6    the people you had told up to that point that you remembered?

7    A.  Yes, I do remember that.

8    Q.  Pretty long list, wasn't it?

9    A.  Yes.

10   Q.  And I would like to talk now about all the people you

11   didn't tell.

12          You said that you saw a therapist named Michael

13   Collins in 2016 and '17 in California, correct?

14   A.  Correct.

15   Q.  And you saw Dr. Collins, you said, primarily for

16   relationships with your husband Ken, right?

17   A.  We weren't married at the time, but yes.

18   Q.  Your relationship with Ken?

19   A.  Yes.

20   Q.  And part of that was dealing with the stressors of the long

21   distance relationship, right?

22   A.  Correct.

23   Q.  And part of it was relationship issues generally, true,

24   with Ken?

25   A.  Yes.

MACsRAP1                        Rapp - Cross

1    Q.  OK.  You thought that he was a good therapist?

2    A.  Sure, yes.

3    Q.  You were comfortable with him?

4    A.  Yes.

5    Q.  You spoke to him about your feelings and emotions?

6    A.  As pertaining to my relationship with Ken, yes.

7    Q.  And you know having been in extensive therapy that

8    experiences before that relationship can influence how the

9    relationship goes, right?

10   A.  In some cases, yes.

11   Q.  Well, that is what you're claiming in this case through

12   your expert witness.  You're claiming that the incident that

13   you say happened with Mr. Spacey has permeated relationships

14   throughout your life, right?

15   A.  I'm claiming that as part of my therapy, we have explored

16   the ways it has impacted my life, including the possibility

17   that it's had an impact on some of my interpersonal

18   relationships, yes.

19   Q.  You didn't tell Dr. Collins your Kevin Spacey story when

20   you saw him, did you?

21   A.  Correct.

22   Q.  Did you even tell him without giving a name, that you had

23   been sexually abused by anybody?

24   A.  Correct, I did not.

25   Q.  You didn't tell him about what you considered to be one of

MACsRAP1                          Rapp - Cross

1   the most traumatic incidents in your entire life, true?

2   A.   True.

3   Q.   You didn't tell him that this incident had caused you

4   tremendous amount of pain and anxiety?

5   A.   True.

6   Q.   Now, you also started -- you also saw this therapist, Robin

7   Magid in New York intermittently for nearly 25 years starting

8   in 1998, true?

9   A.   1997.

10  Q.   You described her on the stand as a social worker, right?

11  A.   I believe that's her -- that's what I knew her title to be,

12  yes.

13  Q.   Was she a licensed clinical social worker?

14  A.   That's as far as I know, yes.

15  Q.   OK.  And she was -- you thought she was a good and

16  supportive therapist?

17  A.   Very much so.

18  Q.   And you talked with her about all sorts of things in your

19  life, not just your relationship with Ken, but your whole life

20  for 25 years, right?

21  A.   When I started seeing her, I was talking about my grief of

22  losing my mother.

23  Q.   And for the next 25 years, you talked about all sorts of

24  things with her, right?

25  A.   Yes.

MACsRAP1                        Rapp - Cross

1   Q.   Now, and was she supportive of you?

2   A.   Very much so.

3   Q.   You didn't tell Ms. Magid your Kevin Spacey story until

4   after you told *BuzzFeed* magazine and you knew the story was

5   going to come out, right?

6   A.   That is my -- my memory is when -- when I spoke to her was

7   when I was considering coming forward.

8   Q.   Well, specifically it was October 23, 2017?

9   A.   Correct.

10  Q.   And you weren't just considering it, you had already been

11  talking to Adam -- to Adam Vary since October 10 and the story

12  was about to be published in three days?

13  A.   That is not correct, ma'am.

14  Q.   Well, let's take a look.  If we could look at Defendant's

15  Exhibit Z.

16          THE COURT:  Defendant's Exhibit Z as in zebra?

17          MS. KELLER:  Yes, your Honor.

18  Q.   This is your first text message?

19  A.   Correct.

20  Q.   To Adam Vary:  Hey, my friend, can you call me when you get

21  a chance?  In the wake of the Harvey Weinstein story and its

22  fallout, I am wanting to speak out about someone else very

23  powerful in our industry, but I would want to try to do it in

24  the best, most effective manner and would want your help and

25  participation if you feel it would be appropriate.  He says,

MACsRAP1                          Rapp - Cross

1    Yes, happy to.  I can talk in about 20 minutes?

2    A.   Yes.

3    Q.   That was October 11?

4    A.   Correct.

5    Q.   Right?

6    A.   Yes.

7    Q.   Let's look if we could turn to see if we can refresh your

8    recollection by showing you a note, therapy notes from

9    Ms. Magid.

10             MS. KELLER:  Can we show that to Mr. Vary, please.

11             MR. SAGHIR:  Mr. Rapp.

12             MS. KELLER:  I'm sorry, Mr. Rapp.  Thank you, counsel.

13   Q.   Do you see in the top left-hand corner --

14             THE COURT:  Before you go on, what exhibit are you

15   displaying?

16             Is it in evidence?

17             MS. KELLER:  It is not an exhibit yet and it is not in

18   evidence.  It is --

19             THE COURT:  We're going to get it marked right now

20   first off, because someday an Appellate Court may be looking at

21   this and they have to know what we are talking about.

22             MS. KELLER:  You're right, your Honor.

23             Can we have that marked for identification as -- I

24   think by now it's Defense FFF.

25             THE COURT:  Well, we'll hope so.

MACsRAP1                         Rapp - Cross

1          Do you have a hard copy to hand up?

2          MR. SCOLNICK:  Yes, your Honor.

3          THE COURT:  We can have it marked.

4          MS. KELLER:  Shall I wait until that is done, your

5     Honor?

6          THE COURT:  Yes, please.

7          (Pause)

8          MR. SCOLNICK:  May I approach, your Honor?

9          THE COURT:  Yes, please.

10          All right.  Next question.

11          (Counsel confer)

12     BY MS. KELLER:

13     Q.  If you look in the top left-hand corner, you see a date?

14          THE COURT:  Well, it's still not in evidence, counsel.

15          MS. KELLER:  I'm sorry.

16          THE COURT:  It's not in evidence.  You haven't

17     identified it.

18          MS. KELLER:  Yes, your Honor.  I'm not intending to

19     introduce it.  It may come in through his therapist.  I'm

20     asking if this refreshes his recollection.

21          THE COURT:  About what?

22          MS. KELLER:  About the date he told Ms. Magid.

23          THE COURT:  Well, he didn't say he didn't remember the

24     date.  You posited to him that it was October 23, and he agreed

25     with that.

MACsRAP1                         Rapp - Cross

1                MS. KELLER:  OK.  It was October --

2                THE COURT:  Let me go back and double-check.

3                (Pause)

4                Well, specifically it was October 23, 2017?

5                Answer:  Correct.

6                MS. KELLER:  OK.

7                THE COURT:  Then you asked:  And you weren't just

8        considering it, you had already been talking to Adam, to Adam

9        Vary, since October 10 and the story was about to be published

10       in three days?  And he answered:  That is not correct.

11               He didn't say he didn't remember.

12               MS. KELLER:  Thank you, your Honor.  I appreciate

13       that.

14       BY MS. KELLER:

15       Q.  It was October 11 you first contacted Adam Vary, right?

16       A.  When I first contacted Adam Vary, it was October 11, yes.

17       Q.  OK.  Sorry about that.

18               So the *BuzzFeed* story didn't come out until

19       October 30, am I right?

20       A.  It was October 29 or 30th.

21       Q.  OK.  So you told Ms. Magid seven days before that story

22       came out for the first time about your Kevin Spacey story,

23       right?

24       A.  Correct.

25       Q.  And when she asked you why it was you hadn't told her all

MACsRAP1                          Rapp - Cross

1    those years, you said that you were afraid she would think you

2    were bad, right?

3    A.   That is not correct.  I know that's in her notes, that is

4    not what I told her.

5    Q.   OK.  You told dozens of people your Kevin Spacey story,

6    though, before ever coming forward and telling your therapist

7    of many decades, true?

8    A.   True.

9    Q.   Now, during your 20 years of therapy with her, you told her

10   many, many upsetting details about your private life, right?

11   A.   I talked to her about intimate matters, some of them more

12   upsetting.

13   Q.   OK.  You told her about hitting your mom in the face?

14   A.   I'm not sure that I did.

15   Q.   You told her about attacking and beating your boyfriend

16   when he wanted to leave you?

17   A.   That was the reason that I entered therapy with her, yes.

18   Q.   You told her about various other attacks on you, right?

19   A.   I'm not sure.

20   Q.   Well, you told her about various other attacks on you

21   including being physically attacked, right?

22   A.   I may have.

23   Q.   You never told your story about Mr. Spacey to the police,

24   true?

25   A.   True.

MACsRAP1                          Rapp - Cross

1   Q.  Or to any law enforcement agency, right?

2   A.  Correct.

3   Q.  In fact, in your book *Without You* that you published in

4   2006, you also included very personal details about your life,

5   right?

6   A.  Correct.

7   Q.  You wrote about your family?

8   A.  Correct.

9   Q.  You wrote that your grandmother had abused your mother?

10  A.  Correct.

11  Q.  You wrote about fights with your mother?

12  A.  Yes.

13  Q.  You wrote about all kinds of things about relationships?

14  A.  My -- my relationships, yes.

15  Q.  You wrote about sexual relationships?

16  A.  Yes.

17  Q.  And sometimes you named the partners, sometimes you

18  anonymized them?

19  A.  Yes.

20  Q.  You wrote about being happy at times?

21  A.  Yes.

22  Q.  Sad at times?

23  A.  Yes.

24  Q.  You wrote about going to therapy?

25  A.  Yes.

1   Q.  You wrote about all sorts of details about your childhood,

2   right?

3   A.  I -- I wrote some details about my childhood.

4   Q.  Well, even your mother falling on the stairs when you were

5   a baby and carrying you down to that level of detail, right?

6   A.  Yes.

7   Q.  And you wrote about being in New York in *Precious Sons* in

8   1986?

9   A.  Yes.

10  Q.  And all about your acting career?

11  A.  All about my acting career?  I didn't write all about my

12  acting career, no.

13  Q.  OK.  You wrote about your acting career?

14  A.  Yes.

15  Q.  Now, you included references to your friend Andy Dick?

16  A.  Yes.

17  Q.  And sometimes you used pseudonyms for people and sometimes

18  not?

19  A.  Correct.

20  Q.  But, once again, you never included the Kevin Spacey story

21  in your book, true?

22  A.  True.

23  Q.  And you didn't even try to anonymize Mr. Spacey like you

24  had for some other people in your life?

25  A.  Correct.

MACsRAP1                           Rapp - Cross

1    Q.  You didn't include any claim in your book that any

2    anonymous actor picked you up and put you on a bed and got on

3    top of you, correct?

4    A.  Correct.

5    Q.  OK.  I want to move on a little bit.

6           You currently play a role in the Star Trek Discovery

7    series on Paramount?

8    A.  Yes.

9    Q.  And that is not on broadcast TV, that's a streaming series?

10   A.  Yes.

11   Q.  So somebody that's to subscribe to Paramount to see it?

12   A.  Paramount+, yes.

13   Q.  Paramount+.  So this is a spinoff, one of the 12 Star Trek

14   series?

15   A.  Yes.  It was the relaunch of this new era of these new

16   Star Trek series.

17   Q.  You have a recurring, but not a starring role?

18   A.  I'm a serious regular.

19   Q.  OK.  It first aired in September of 2017, right?

20   A.  Correct.

21   Q.  And the show announced its second season about late October

22   of 2017, it announced that it was being renewed?

23   A.  If you say so.  I don't remember when that was announced,

24   but I believe you.

25   Q.  You were pleased that the series was renewed for a second

1   season, true?

2   A.  Very much so.

3   Q.  It hadn't been a sure thing, had it?

4   A.  It never is.

5   Q.  Yeah.  But the show had not been doing well enough for you

6   to know if it was going to be renewed?

7   A.  That is not the case.

8   Q.  And you wanted to promote the show, right?

9   A.  Correct.

10  Q.  You wanted to raise your visibility?

11  A.  It's part of my job to promote the show.

12  Q.  You wanted to -- you knew that the #MeToo movement was

13  gaining steam in October 2017, right?

14  A.  Correct.

15  Q.  Some of those stories were appearing in the *New York Times*,

16  right?

17  A.  Correct.

18  Q.  You know the *New York Times* is known for its investigative

19  reporting, true?

20  A.  True.

21  Q.  But you didn't contact the *New York Times* with your Kevin

22  Spacey story, did you?

23  A.  I did not.

24  Q.  And so you said you contacted your old friend Adam Vary at

25  *BuzzFeed*.  As I recall, you said that he was used to doing

1    complex articles and he was a reporter of integrity, is that

2    right?

3    A.   Correct.

4    Q.   Can you name any of the complex articles?

5    A.   I know he worked at -- I can't name the article.  There

6    were any number of articles I read of his over the years,

7    including when I first met him at college, where he wrote a

8    complex article about an issue on the campus I found to be

9    quite thoughtful and well reported and well written.

10   Q.   Isn't *BuzzFeed* known for quizes about celebrities and food?

11   A.   Parts of *BuzzFeed* are.  There is also *BuzzFeed News*.

12   Q.   Now Adam, of course, wrote for *BuzzFeed*, right?

13   A.   He wrote for *BuzzFeed News*, yes.

14   Q.   And it was your understanding that *BuzzFeed* did not require

15   corroboration for its stories, true?

16   A.   Not true.

17   Q.   Let's talk about if we could have Defendant's Trial

18   Exhibit AA.  I believe that's already in evidence.

19             THE COURT:  I'm not sure about that.  I'm handicapped

20   without Andy being here this morning.  He'll be back this

21   afternoon.  But according to what I can determine, it is not in

22   evidence.

23             MS. KELLER:  OK.

24             THE COURT:  Subject to correction.

25             MS. KELLER:  Let's take a look where it starts Adam

MACsRAP1                         Rapp - Cross

1      Vary, one thing to make you aware of.

2                OK.  One thing to make you aware of --

3                THE COURT:  Ma'am, you've just got to stop doing this,

4      this way.  Are we offering it into evidence or not?

5                You're not to talk about the substance unless it's in

6      evidence.

7                MS. KELLER:  We have a redacted version consistent

8      with the court's rulings that we will offer.

9                THE COURT:  Well, let's do it.

10               MS. KELLER:  Your Honor, I offer Exhibit AA.

11               THE COURT:  Any objection?

12               MR. SAGHIR:  Just one moment, your Honor.

13               No objection, your Honor.

14               THE COURT:  AA is received.

15               (Defendant's Exhibit AA received in evidence)

16     BY MS. KELLER:

17     Q.  If we can go down to the part where Mr. Vary says, one

18     thing to make you aware of.

19               And this is October 27, right?

20     A.  Correct.

21     Q.  One thing to make you aware of:  We can't seem to place

22     Spacey at the Tony's in 2008.  He didn't present and wasn't

23     nominated and there is no photos we can find.  We don't doubt

24     he was there, but we don't want to nail down a specific date

25     that Spacey could then just flatly deny.

MACsRAP1                        Rapp - Cross

1                Is that your idea of a reporter of integrity?

2                    MR. SAGHIR:  Objection.

3                    THE COURT:  Overruled.

4   A.  He was working to verify what I had told him.  I considered

5   that --

6                    THE COURT:  Mr. Rapp, start again.  We'll have the

7   question read back, and please answer the question.

8   Q.  Is that your idea --

9                    THE COURT:  It is a yes-or-no question, not an essay

10  question.

11                   THE WITNESS:  I'm sorry, yes.

12  Q.  Is that what you consider a reporter of integrity?

13  A.  I do.

14  Q.  And the reason that he was writing you that, is that you

15  had told him a story about running into Mr. Spacey in a

16  bathroom at the Tony's in 2008, remember that?

17  A.  I do.

18  Q.  And you told him that you were frozen and, you know, the

19  whole electric cattle prod thing and all that.  I don't know if

20  you told him about the cattle prod.  You ran into him and it

21  was --

22  A.  Correct.

23  Q.  -- it was very difficult for you?

24  A.  Correct.

25  Q.  And it turned out that it wasn't 2008, right?

1    A.   Correct.

2    Q.   So Mr. Vary, rather than reporting what you told him,

3    decided to try to figure out when Mr. Spacey and you might have

4    been at the Tony's, right?

5    A.   I don't know that that is what -- I can't answer what he

6    was trying to do.  I'm sorry.  I don't know.  What was the

7    question?

8    Q.   Let's see.  Let me ask you a little more about this

9    paragraph before I move on.

10           We're still looking, but if we can't nail it down, we

11   will likely say you saw him at an industry event or such.

12           So not even at the Tony's, right?

13   A.   That's what he said.

14   Q.   Is that your idea of a reporter of integrity, who would

15   massage a story that way?

16           MR. SAGHIR:  Objection to the form, argumentative.

17           THE COURT:  Overruled.

18   A.   I don't -- how can I -- can you rephrase the question?

19   Q.   Is that your idea of a person of integrity, a reporter of

20   integrity?

21   A.   To some degree.

22   Q.   You've told him that you saw Mr. Spacey at the Tony's in

23   2008.  His response is, We can't find any record of it and we

24   don't want to let Spacey be able to deny this.  We don't want

25   to give him the ability to deny it, right?

MACsRAP1                          Rapp - Cross

```
 1    A.  Correct.
 2    Q.  I mean, what if Mr. Spacey was out of the country; that
 3    would be bad, right?
 4    A.  Correct.
 5    Q.  So he decided he would make it, if they couldn't nail down
 6    when it actually was, he would make it vague, just that you saw
 7    him at some industry event, right?
 8    A.  Correct.  That's what he said.
 9    Q.  He would come up with something that could not be disproven
10    because it would be so vague, right?
11    A.  Correct.
12              May I explain?
13              THE COURT:  No.  No.
14    Q.  Then he said, similarly --
15              THE COURT:  Excuse me, Ms. Keller.
16              Your lawyers have an opportunity to question you
17    later.
18              THE WITNESS:  I understand.
19              THE COURT:  Your job is to answer these questions.
20              THE WITNESS:  I understand.
21    BY MS. KELLER:
22    Q.  Then he said, similarly, we're also going to steer away
23    from exact specificity in the story for the party.
24              Now, the party he was referring to was the party you
25    said you went to at Mr. Spacey's house, right?
```

1   A.  Correct.

2   Q.  So he didn't want to give anything specific because he

3   didn't want Mr. Spacey to be able to bring out a calendar and

4   say, Hey, that couldn't have happened, right?

5   A.  I do not know -- I don't know how to answer that question.

6   Q.  Well, you didn't write back to him, I don't know what you

7   mean, let's try to tell the truth, did you?

8   A.  I did not.

9   Q.  Keep it vague, wasn't that the message?

10         MR. SAGHIR:  Objection.

11         THE COURT:  Sustained.

12  Q.  You never objected when Mr. Vary said he would steer away

13  from exact specificity in the story for the party, correct?

14  A.  Correct.

15  Q.  And you didn't tell Mr. Vary that you thought this would be

16  dishonest journalism, right?

17  A.  Correct.

18  Q.  And, in fact, in this very trial, you yourself have tried

19  to keep it vague, haven't you?

20  A.  I don't know what you mean.

21  Q.  Well, you claimed not to know the end date for *Precious*

22  *Sons*.  Gee, I'm not sure.  I kind of know maybe a little here

23  and there.

24         But all you had to do was look at your own Wikipedia

25  page or IMDb and you would know exactly what date it ended,

MACsRAP1                          Rapp - Cross

1    right?

2              MR. SAGHIR:  Objection to the form.

3              THE COURT:  Overruled.

4    A.  The question is?

5    Q.  The question is, you've been keeping it vague even in this

6    trial, right?

7    A.  I -- I've been -- I've said what I knew to be true.

8    Q.  You didn't even want to say the date *Precious Sons* ended

9    because that would create a bracket for when this incident with

10   Mr. Spacey allegedly happened, true?

11   A.  Not true.

12   Q.  And you could easily look it up, as we pointed out

13   yesterday, in 10 or 15 seconds, right?

14   A.  It's -- yes, it's true it's easy to look up.

15   Q.  And you also wanted to keep it vague on the day that you

16   claim this happened, although at one time in the past you said

17   that you remembered at the party Molly Ringwald was on David

18   Letterman, right?

19   A.  Correct.

20   Q.  And, again, easily looked up, 10, 20 seconds and there it

21   is, May 20, right?

22   A.  Apparently, yes.

23   Q.  Apparently.

24              You knew you could do that, didn't you, look it up

25   yourself?

1   A.  I did not know when I was asked those questions that I

2   could do that.

3   Q.  Or at any time in the previous 30 years?

4   A.  Correct.

5   Q.  When you said you knew you could count on Mr. Vary to take

6   care of your story, what you meant by that was to slant it in

7   your favor and not ask difficult questions of you, right?

8   A.  Not right.

9   Q.  And to make sure that if you said something to him like the

10  2008 Tony story, that turned out to be wrong, that he would

11  eliminate it or change it or make it vague, right?

12  A.  Not right.

13  Q.  And this is how he took care of your story, isn't it?

14  A.  No, ma'am.

15  Q.  It turns out that you ran into Mr. Spacey at the Tony's in

16  1999, so you now say, right?

17  A.  That is what happened.

18  Q.  Because you were in a production -- you were in one number

19  with your cast of Charlie Brown, a song from Charlie Brown,

20  right?

21  A.  Correct.

22  Q.  But you weren't at the Tony's, you didn't have a seat at

23  the Tony's?

24  A.  Correct.

25  Q.  And you weren't even one of the two people in the duet who

MACsRAP1                          Rapp - Cross

1   came out and sang the majority of the song, right?

2   A.   I'm -- I'm -- we did a number.  I was in the number on the

3   Tony's.

4             THE COURT:  Just answer the question.

5   A.   I don't know what she's -- I don't know what you're

6   referring to.

7   Q.   I'm referring to the duet and then your group coming in at

8   the very end for 10 seconds or so and singing and dancing.

9   A.   OK.

10  Q.   That is what happened, right?

11  A.   OK, sure.

12  Q.   You weren't in the duet?

13  A.   I was not in the duet.

14  Q.   And you didn't have a seat in the Tony's.  So even then,

15  even when you said, well, I was there for Charlie Brown and I

16  know Spacey was there, so even then you couldn't really be sure

17  you had run into him, because you had only been there for

18  rehearsals and then that one very brief number?

19  A.   That's not true, ma'am.  I'm certain that I was there and

20  I'm certain that I ran into him.

21  Q.   Just as certain as you were when you told Adam Vary that it

22  was 2008 that you ran into him?

23  A.   Not -- I mistook the date.

24  Q.   Mr. Spacey was nominated at that time for a Tony for

25  *The Iceman Cometh*, right?

MACsRAP1                          Rapp - Cross

1   A.  Correct.

2   Q.  You weren't a nominee?

3   A.  I was not.

4   Q.  You've never been a nominee for a Tony?

5   A.  Correct.

6   Q.  And he was nominated for leading actor in a play, right?

7   A.  Correct.

8   Q.  So except for being on stage, being there for rehearsals of

9   your Charlie Brown number and being on stage for that 10 to

10  15 seconds, you weren't even involved with the Tony's that

11  year, right?

12  A.  I was involved with the Tony's that year.

13  Q.  Yeah, except for that one brief period you were not?

14  A.  During the day, I was there for any number of hours.  I

15  don't remember the exact time.  I was there for a period of

16  time during the day, and then I was there for the broadcast and

17  backstage and everything that evening.

18  Q.  You were backstage for your number?

19  A.  What I -- yes.

20  Q.  In fact, you complained to Mr. Vary that you weren't a

21  nominee, didn't you?

22  A.  I don't recall that.

23  Q.  You complained you've never been a nominee, and he said he

24  was outraged on your behalf?

25  A.  I complained -- may I see this?  I don't recall this

MACsRAP1                        Rapp - Cross

1    conversation.

2              MS. KELLER:  I think that's the same exhibit page

3    three of four.  Same exhibit.

4              THE COURT:  We're talking about AA?

5              MS. KELLER:  Yes, your Honor.

6              THE COURT:  Thank you.

7    BY MS. KELLER:

8    Q.  This is when you're trying to figure out with Mr. Vary when

9    you could have physically seen Mr. Spacey at an Oscar's?

10   A.  Is that a question?

11   Q.  Yes.  Is that correct?

12   A.  This was after that conversation follows when I said, ah,

13   now I know it was the 1999 Tony's.  I was mistaken about the

14   year.

15   Q.  And you're even trying to figure out not just the year, but

16   how it was that you could have run into him.  And he says, do

17   you remember -- if we can go back up where we just were,

18   Mr. Barron -- do you remember if it was during the show or

19   before?  And you said, Well, I didn't have a seat in the

20   theater, so it has to be during the rehearsal time earlier in

21   the day.  Those jerks, is his reply.  And you said, ha.  I

22   wasn't a nominee.

23              We go down.

24              Your character's name was in the title.  Your

25   character being Charlie Brown, right.

1              You said, Still have never been a nominee.

2              He says, I am outraged.

3              You say, For a Tony.  LOL.  I thank you for your

4    outrage?

5    A.  Correct.

6    Q.  OK.  Let's go on down.  Where it says Brian under here, the

7    Brian Dennehy story, Brian Dennehy beat Mr. Spacey that year

8    for that Tony, right?

9    A.  I don't remember.

10   Q.  Weren't you backstage when all the awards were being

11   presented?

12   A.  Yes.  I don't remember who won what awards that year.

13   Q.  For leading actor in a play?

14   A.  Correct.  I don't remember.

15   Q.  OK.  Let's go on down.  I think that was the part I wanted.

16   That's OK.  Take it off.

17              So he told you he was outraged that you hadn't ever

18   been nominated for a Tony, right?

19   A.  Correct.  That's what he said, yes.

20   Q.  Now, as I understand it, your claim is that every media

21   interview you have given about Kevin Spacey has increased your

22   emotional trauma, true?

23   A.  To some degree.

24   Q.  You keep hedging and saying, to some degree, a little bit.

25              Isn't it true that you're seeking monetary

1   compensation, a lot of it, because you claim than you have

2   emotional trauma, which includes emotional trauma from ever

3   speaking with the media about Mr. Spacey, true?

4           MR. SAGHIR:  Judge, objection.  There's been an order

5   on this very issue.

6           THE COURT:  Sustained, at least as to form.

7   BY MS. KELLER:

8   Q.  Is one of your claims for damages that every time you give

9   a media interview about Mr. Spacey, your emotional trauma

10  increases?

11  A.  Correct.

12  Q.  So even if you do a media appearance of your choosing,

13  you're increasing your trauma, true?

14  A.  True.

15  Q.  Now, you've also been given your profile has really been

16  raised as a result of making the claims you've made against

17  Mr. Spacey, right?

18  A.  I don't know how to measure that.

19  Q.  Well, Adam Rapp was not a household name, and probably

20  still isn't, before you made these claims, right?

21  A.  Adam Rapp is my brother.

22  Q.  I'm sorry.  I'm sorry, you're right.  I haven't had my

23  third cup of coffee this morning.

24          Mr. Rapp, your name was not a household word?

25  A.  I don't -- I don't know -- I don't know how to qualify

1    that.

2    Q.  You didn't have an international profile?

3    A.  I have performed internationally.  I had some kind of

4    international profile.

5    Q.  You didn't have a major international profile?

6    A.  I don't -- that's speculation.  I don't know how to answer

7    that question.

8    Q.  Glowing statements have been made about you because of

9    this, right, because you came forward and accused Mr. Spacey?

10   A.  I don't know how to answer this question, ma'am.  This is a

11   very -- I wanted -- I take my oath very seriously.  I want to

12   answer the question.  I don't know how to answer that question.

13   Q.  Let me be specific.  The *Advocate* nominated you for person

14   of the year because of publicly accusing Mr. Spacey, right?

15   A.  The *Advocate* nominated me for person of the year.  I don't

16   know that that's true.

17   Q.  You have been on TV shows and radio shows talking about

18   this, right?

19   A.  I have been on -- I've done a couple of interviews about

20   this, yes.

21   Q.  And you were also claiming that being lifted up, put on

22   that bed, and having Mr. Spacey fall on you 36 years ago is

23   still, still one of the most traumatic incidents in your entire

24   life, right?

25   A.  He did not fall on me, ma'am.

MACsRAP1                          Rapp - Cross

1    Q.  OK.  However it happened, you're claiming that this

2    incident that you allege was still 36 years later among the

3    most traumatic in your entire life?

4    A.  Correct.

5    Q.  Now, you have to raise your profile.  You've made

6    accusations against other people, haven't you?

7    A.  I don't know what you're referring to, ma'am.

8    Q.  Well, for example, you're familiar with Yul Brynner?

9    A.  Correct.

10   Q.  And I think you talked on direct exam how you were in the

11   *King and I* with Yul Brynner and he was playing the king?

12   A.  Yes.

13   Q.  And Yul Brynner died in 1985, right?

14   A.  Correct.

15   Q.  But in 2019 you came forward with a story in *Entertainment*

16   *Weekly* entitled Anthony Rapp says Yul Brynner could be pretty

17   nasty, punched him in the stomach backstage at the King and I.

18            Do you remember that?

19   A.  I do not remember this article, no.

20   Q.  Can we have exhibit next in order which would be GGG.  See

21   if that refreshes your memory.

22   A.  It does not.  I do not recognize this article.

23   Q.  Do you remember stating in the article, if we can find

24   this, He punched me in the stomach when I was in his way.  He

25   went, Get out of my way.  It was backstage in the dark.  He had

1    been playing the king for 30 years at that point, so I think he

2    thought he was the king?

3    A.   That's not what I'm reading.

4    Q.   OK.

5    A.   Now I see it, yes.

6    Q.   Did you say that?

7    A.   Yes.

8    Q.   You said, If this happened in 2019, it would be a very

9    different story, right?

10   A.   Correct.

11   Q.   Was that the first time you told your Yul Brynner punched

12   you in the stomach story?

13   A.   Not at all.

14   Q.   Had you also told this to friends every time they praised

15   Yul Brynner?

16   A.   Whenever -- I told it when I talked about my experiences

17   being in the *King and I*, if that came up.

18   Q.   And also, April 5, 2019 --

19              MS. KELLER:  And, your Honor, I would move that into

20   evidence, that exhibit.

21              THE COURT:  This is the Exhibit GGG?

22              MS. KELLER:  Yes, your Honor.

23              MR. SAGHIR:  We don't have the exhibit.  I've never

24   seen it.  I would ask for a copy and to be able to review it.

25              MS. KELLER:  We'll get that to you, counsel.

MACsRAP1                        Rapp - Cross

1          THE COURT:  Yes.

2     BY MS. KELLER:

3     Q.  And on April 5 --

4          MR. SAGHIR:  Judge, before we question, may I see the

5     exhibit, before we keep questioning about it, please?

6          THE COURT:  She's moving to another subject, I

7     thought.  No?

8          MS. KELLER:  I'm sorry.  I thought it was on counsel's

9     screen.  I seem to see it.

10          MR. SAGHIR:  I'm seeing about three lines.  Can I get

11     the article, please?

12          MS. KELLER:  Can we show counsel the portion,

13     Mr. Barron, where this quote appears.

14          MR. SAGHIR:  I need the whole -- you're trying to --

15          Respectfully, I need the whole article.

16          THE COURT:  Yes, I understand that.  When we resume

17     tomorrow and henceforth, counsel who are going to use on cross

18     exhibits that have not previously been exchanged are to have

19     copies, hard copies in the courtroom, and to make a copy

20     available to the other side and to me.

21          This is standard procedure in 28 years of my

22     experience as a judge and 25 before that as a lawyer.  I don't

23     know why we can't do it in this case.  That goes to both sides.

24          MS. KELLER:  We will, your Honor.

25          May I have a moment?

1              THE COURT:  Yes.

2              (Pause)

3    BY MS. KELLER:

4    Q.  There was also an article in *People* magazine entitled

5    Anthony Rapp says King and I star Yul Brynner punched me in the

6    stomach once.

7              Do you remember that?

8    A.  I do not.

9    Q.  And you were on an Internet TV show where you told the

10   interviewer that Mr. Brynner punched you in the stomach, right?

11   A.  I don't -- I don't know what you're referring to.

12   Q.  Well, the Internet TV show actually showed a picture of you

13   in the article you just saw.  Did that refresh your memory?

14   A.  Yes.  But I now know what you mean, yes.

15   Q.  OK.  And so you told her, the interviewer, that Mr. Brynner

16   punched you in the stomach, right?

17   A.  Correct.

18   Q.  Now, died in 1985.  You were ten when you say this

19   happened?

20   A.  Yes.

21   Q.  But you thought it would get you publicity to say it in

22   2019 --

23   A.  No, ma'am.

24   Q.  -- that this has happened to you?

25   A.  No, ma'am.

1    Q.  And it did get publicity, didn't it?

2    A.  It turns out it did.

3    Q.  Of course, Mr. Brynner couldn't defend himself at that

4    point, could he?

5            MR. SAGHIR:  Objection.

6            THE COURT:  Overruled.

7    A.  Correct.

8    Q.  And you also -- you also claim a bully violently attacked

9    you from behind when you were getting off the school bus,

10   right?

11   A.  Yes.  Yes, I know what you're talking about, yes.

12   Q.  And that is one of the things that you told your therapist,

13   right?

14   A.  Yes.  Well, I'm sorry, you mean my therapist?  I'm not sure

15   I had that conversation with Robin.  I may or may not have.  I

16   don't know.

17   Q.  You talked about it with your expert who is going to

18   testify here, right?

19   A.  Correct.

20   Q.  You also say you were violently attacked by a group of men

21   in London when you were 15?

22   A.  It was not a group of men, it was boys, and one -- one of

23   them punched me and kicked me.

24   Q.  You didn't say that these three ruffians came up on us and

25   started being aggressive and that one of them punched you in

MACsRAP1                              Rapp - Cross

1   the face, knocked you down, and kicked you in the head?

2   A.  I did say that, yes.

3   Q.  OK.  And you've given -- you gave.  Again, you gave your

4   therapist and -- well, I take that back.

5          You gave your expert who is going to testify in this

6   trial other examples of traumatic things that had happened to

7   you, right?

8   A.  Correct.

9   Q.  And to this particular psychologist, you did include your

10  Kevin Spacey story, right, because that's what this trial is

11  all about?

12  A.  Yes, I answered her questions about that, yes.

13  Q.  You told her you were hit by a drunk driver in Illinois in

14  1995?

15  A.  Yes.

16  Q.  And you discussed your relationship with Josh Safran, the

17  person you referred to yesterday?

18  A.  Yes.

19  Q.  He's a celebrity producer?

20  A.  I suppose so, yes.

21  Q.  You've had a relationship with him for a number of years?

22  A.  Yes.

23  Q.  Right?

24         You told the people who, Drs. Bardey and Rocchio in

25  connection with this trial, that he had never been violent with

MACsRAP1                          Rapp - Cross

1  you, right?

2  A.  That he had never been violent with me, correct.

3  Q.  But didn't you tell your friend Erin Quill that Josh had

4  been violent with you?

5  A.  I did not.

6  Q.  Didn't you tell her he had hit you multiple times?

7  A.  No, ma'am.

8  Q.  And did you report to Dr. Rocchio that your husband Ken has

9  been abusive to you?

10  A.  I did not report that he's been abusive to me, no.

11  Q.  That he pushed you so hard that you fell on the ground?

12  A.  I -- I shared with her, yes, that he pushed me and I

13  stumbled to the ground onto my butt, yes.

14  Q.  Well, did you tell her he pushed me so hard that I fell to

15  the ground?

16  A.  I don't remember the exact words I used, but yes.

17  Q.  And multiple times you've had arguments with your husband

18  that had become violent, right?

19  A.  Not correct.  Not multiple times.  I -- I don't know how to

20  answer that question.  I would not say this -- two times, so I

21  guess that's multiple.  But it was two times.

22  Q.  Well, you told her about one occasion where Ken shoved you

23  and slapped you, right?

24  A.  I don't recall saying that he slapped me.

25  Q.  This is in connection with this case.  This is the recent

1  interview by Dr. Rocchio, your expert?

2  A.  It was in early 2021.

3  Q.  Right.  And you told her that he slapped you and shoved you

4  and hit you in the shoulder?

5  A.  OK.

6  Q.  So --

7          THE COURT:  Is that correct?  Did you tell her that?

8          THE WITNESS:  I -- I don't remember.

9  Q.  Because --

10          THE COURT:  Did you tell her that in substance?

11          THE WITNESS:  In substance, some version of that, yes.

12  BY MS. KELLER:

13  Q.  And you told her that Ken has also been mean-spirited

14  toward you, right?

15  A.  At times.

16  Q.  And that he's called you names and criticized you?

17  A.  At times.

18  Q.  Now, on direct examination when your lawyer was questioning

19  you, you said that you had a very good relationship with Ken,

20  it was very loving, and there had never been anything like

21  that.

22          Do you remember that?

23  A.  I said there's never been anything like that.  I do not

24  know that I said there's never been anything like that.

25  Q.  Isn't the substance of what you said that you had this very

MACsRAP1                         Rapp - Cross

1  loving and wonderful relationship?

2  A.  I -- I do not know -- I don't know how to answer this

3  question.

4  Q.  Isn't that the substance of what you testified to when your

5  lawyer asked you?

6  A.  I -- I want to answer this question well.  I do not know

7  what testimony you're referring to.

8  Q.  But the worst event in your life was your Kevin -- one of

9  the worst events was your Kevin Spacey incident, is that right?

10 A.  Correct.

11 Q.  Now, the damages that you're asking the jurors to award you

12 are damages for your pain and suffering, is that right?

13 A.  Correct.

14 Q.  And the emotional pain that you have felt all these years,

15 right?

16 A.  Correct.

17 Q.  And understanding how what Kevin Spacey allegedly did to

18 you has impacted your life and your relationships and your

19 relationship to intimacy and sex?

20 A.  In part, that is one of the things that I have been

21 exploring in therapy, yes.

22 Q.  Well, I'm asking you whether you claim that this incident

23 that you say happened in 1986 has impacted you in your life and

24 your relationships and your relationship and intimacy and sex?

25 A.  Yes.  To some degree it has, yes.

MACsRAP1                        Rapp - Cross

1   Q.  Well, that's what your claim is, isn't it?

2   A.  That's part of my claim.

3   Q.  And there are also -- have you also claimed there are

4   layers of how it has impacted you in your life and your

5   relationships, right?

6   A.  Yes.

7   Q.  Layers and layers?

8   A.  I don't know if I said layers and layers.  There are layers

9   to it, yes.

10  Q.  And when you consulted Dr. Collins, you were consulting him

11  about your relationship with Ken, right?

12  A.  Yes.

13  Q.  But you didn't talk about your Kevin Spacey story to him,

14  right?

15  A.  Correct.

16  Q.  And that's even though you had already decided that there

17  were layers of how it had impacted in your life and in your

18  relationships and your relationship with intimacy?

19  A.  I had not decided any such thing at that time.

20  Q.  So did you only decide in the last year or two?

21  A.  It began to become apparent in 2017, when I began to talk

22  to Robin Magid about it.

23  Q.  When you went out to *BuzzFeed* about it?

24  A.  Not when I -- when I spoke to my therapist about it is when

25  it became -- started to become apparent to me.

MACsRAP1                      Rapp - Cross

1   Q.  You only talked to your therapist after you talked to Adam

2   Vary at *BuzzFeed*, right?

3   A.  After having exploratory conversations with Adam Vary.

4   Q.  Well, it was about to be published.  It was long past the

5   exploratory phase.  We've seen that in your text messages,

6   correct?

7   A.  Incorrect, ma'am.

8   Q.  Mr. Vary, you just didn't want her to be blindsided, you

9   didn't want her to see this in the media and say, what the

10  heck, all these years and you've never told me about it?

11  A.  That is incorrect, ma'am.

12  Q.  One of your claims is that you became abnormally

13  preoccupied with sex after you went to a party at Mr. Spacey's

14  apartment, right?

15  A.  I'm sorry.  Did you -- the question phrased, can you --

16  Q.  Is one of your claims that you became abnormally

17  preoccupied with sex after you say you went to this party at

18  Kevin Spacey's apartment?

19  A.  Yes.

20  Q.  And you told your expert Dr. Rocchio that after that, you

21  were drawn to anyone expressing sexual interest in you and you

22  sought out sexual attention, right?

23  A.  To some degree, at some points in my life.

24  Q.  No, I'm not talking about some degree at different points,

25  I'm talking about directly afterwards?

MACsRAP1                    Rapp - Cross

1   A.  Not -- not everything you just said pertains to that,

2   directly afterwards.

3   Q.  So are you saying that you developed an abnormal

4   preoccupation with sex that persisted throughout your life

5   because of Kevin Spacey?

6   A.  I think it's complicated and difficult to answer that yes

7   or no.

8            THE COURT:  Do your best.

9            THE WITNESS:  I -- I -- I can recognize ways in which

10  I began to be aware of people's attention on me in that summer

11  and fall and thereafter, in a way that I had never been before

12  in my life.

13  Q.  Do you think that pubescent males in general start to

14  become quite aware of sex and sexual attraction?

15  A.  Perhaps.

16  Q.  Perhaps?

17  A.  Sure.

18  Q.  Come on, we all know that, don't we?

19  A.  It depends on the level of awareness.

20  Q.  Don't you think that as males go through puberty and

21  experiencing sexual urges and physical manifestations of that,

22  that they develop an intense interest in sex?

23            Come on, Mr. Rapp.

24            MR. SAGHIR:  Objection, argumentative.

25            THE COURT:  Overruled.

MACsRAP1                         Rapp - Cross

1   A.  What is the question?

2           The question is do I think that young men become --

3   there is different parts of the question.  I just want to make

4   sure I'm answering it.

5           THE COURT:  I'll have the reporter read it back, and

6   you listen carefully, please.

7           (Record read)

8   A.  I think some do and some don't.

9   Q.  But in your case, you think it was because of Mr. Spacey?

10  A.  It's not that simple.

11  Q.  I notice that you've said several times it's not that

12  simple, and yesterday a number of times you used a similar

13  phrase, that I was oversimplifying things.

14          Is that a strategy that you're using when you testify

15  to try to deflect a yes-or-no answer?

16  A.  It's not a strategy, ma'am.  I take my oath very seriously.

17  I swear to tell the truth and nothing but the truth, and that

18  is what I am working very hard to do.

19  Q.  But as we discussed yesterday, sometimes the truth and your

20  memory are different, right?

21  A.  In some cases, yes.

22  Q.  You told Dr. Rocchio you had a desperate edge and craved to

23  be desired and have sexual attention directed to you, right?

24  A.  At certain times in my life, yes.

25  Q.  And you trace that to Mr. Spacey?

1   A.   Aspects of it, yes.

2   Q.   Including even today?

3   A.   Um, I didn't say that.  I've done a lot of work in the

4   meantime.

5              THE COURT:  Mr. Rapp, answer the question.

6   A.   I do not consider that true today.

7   Q.   Now, with respect to your becoming hypersexual after this

8   incident you say happened with Mr. Spacey, you had no sexual

9   encounters with any boys or men during your entire senior year

10  of high school, isn't that right?

11  A.   Through my entire senior year of high school?

12  Q.   Yes.

13  A.   I have to think.  I have not thought of that period of my

14  life in quite a long time.  I have -- I can't answer that

15  question without having a chance to think back.  I don't know

16  how to answer that question, ma'am.

17  Q.   I'm looking at your deposition testimony and I was trying

18  to go one by one, but let's put them together.

19              During your junior and senior years in high school,

20  you didn't remember having any sexual encounters, is that

21  right?

22  A.   I -- I remember now.  I don't know how --

23              What is the question?

24  Q.   The question is, isn't it true that you had no sexual

25  encounters with men or boys during your junior or senior years

MACsRAP1                         Rapp - Cross

1   in high school?

2   A.   That is not my recollection in this moment sitting here

3   right now.

4   Q.   But that was your recollection in the moment sitting right

5   there during your deposition, right?

6   A.   To the best of my recollection, yes.

7   Q.   And that was your recollection when you were interviewed by

8   Dr. Bardey, our expert, right?

9   A.   I believe so.

10  Q.   And that was March of 2021 that Dr. Bardey interviewed you,

11  right?

12  A.   Yes.

13  Q.   There was one other encounter that you told Dr. Bardey

14  about -- and I'm not going to go into it here -- but there was

15  one encounter that you had that you did not initiate, is that

16  right?

17  A.   I don't know what you're referring to, ma'am.  I -- I --

18  Q.   I'm not going to go into it.

19  A.   I understand.

20  Q.   Is one of the things that you attribute to your Kevin

21  Spacey claimed incident that you have been unable to resist

22  sexual propositions from others, even when you're not

23  interested?

24  A.   That is an aspect of it, yes.

25  Q.   Is that true up until today?

1    A.  I -- I'm -- I'm in a monogamous relationship.  It doesn't

2    come up today.

3    Q.  But for the five years, for example, that you were on an

4    app called Grinder, OK, you were soliciting and being solicited

5    by other gay men, right?

6    A.  I wasn't soliciting.  I was being solicited.

7              MR. SAGHIR:  Judge, I object to this.

8              THE COURT:  Strike the answer.  The jury will

9    disregard the last exchange.

10   BY MS. KELLER:

11   Q.  Well, during periods of time when you were actively in the

12   market, as it were, for sexual partners, did you blame that on

13   Mr. Spacey?

14   A.  I don't know how to answer that question.  It's -- it's --

15   I didn't -- I don't know how to answer that question, ma'am.

16   Q.  Do you blame him for that today?

17   A.  I don't blame -- I don't know how to answer this question.

18             THE COURT:  Let's move on.

19             MS. KELLER:  I will do so, your Honor.

20             Your Honor, I believe that my cross is finished.

21             THE COURT:  You're sure now?

22             OK.  Any redirect?

23             MR. SAGHIR:  Yes, your Honor.  Thank you.

24             THE COURT:  You may proceed when you're ready,

25   Mr. Saghir.

1          MR. SAGHIR:  Thank you.

2     REDIRECT EXAMINATION

3     BY MR. SAGHIR:

4     Q.  Good morning, Mr. Rapp.

5     A.  Good morning.

6     Q.  Anthony, on cross-examination you were asked by Ms. Keller

7     the following questions and gave the following answers at page

8     279:

9     "Q.  You see the date on this op-ed piece is October 19, 2017,

10    correct?

11    "A.  Correct.

12    "Q.  Now, you had contacted Mr. Vary with your Kevin Spacey

13    story on October 11, 2017, eight days before Ms. Nyong'o's

14    story was in the *New York Times*, right?

15    "A.  Correct.  I did not recall that."

16    Q.  Anthony, which article was published first, the Lupita

17    Nyong'o article or the *BuzzFeed* article?

18    A.  The Lupita Nyong'o article.

19    Q.  Was the article by Ms. Nyong'o the article that compelled

20    you to come forward?

21    A.  The article by Lupita Nyong'o is what cemented and

22    confirmed that I was going to give the interview.

23    Q.  Explain what you mean by that and why you were contacting

24    Adam Vary on October 11.

25    A.  I was contacting Adam Vary to begin an exploratory

1    conversation about what might be involved if I were to come

2    forward, including how reporting would happen, how

3    corroboration would.  Happen, and also in that time, I let him

4    know that I also needed to consult with Ken, I needed to

5    consult with my producers, I needed to think more deeply about

6    the ramifications of this.  And it was after reading her

7    article and what she said about breaking silence that confirmed

8    for me that I'm going to go ahead and give the interview.

9    Q.  You were asked the following questions and gave the

10   following answers on cross-examination, page 283, line 19:

11   "Q.  You thought it would be poignant to say that you were

12   inspired to come forward by a superstar black actress that had

13   actually been sexually harassed, right?

14   "A.  I did not think it was poignant.  I thought it was what

15   had happened.

16   "Q.  It would be useful for you, you would get more sympathy,

17   wouldn't you?

18   "A.  No.  I was sharing my memory of how it happened."

19   Q.  Anthony, what, if anything, did Ms. Nyong'o being a black

20   superstar actress have to do with your reading the article and

21   responding to the article?

22   A.  Nothing.

23   Q.  Were you inspired by her article to come forward?

24   A.  I was deeply inspired by her article.

25   Q.  Why?

MACsRAP1                        Rapp - Redirect

1  A.  Because of the powerful way that she spoke about breaking

2  silence to hold people empowered to account.

3  Q.  Ms. Keller asked you the following questions and you gave

4  the following answers, page 295, line 19:

5  "Q.  OK.  Let's pause there.  You've told your friend, the

6  reporter Adam Vary, a very different story in 2017, didn't you?

7  "A.  I don't recall.

8  "Q.  You omitted any mention of ever going backstage or meeting

9  Jack Lemmon and Kevin Spacey, you omitted any mention of that

10  in the *BuzzFeed* article, right?

11  "A.  I don't recall."

12  Q.  Anthony, when you say you don't recall, explain what you

13  mean.

14  A.  I mean, we had lengthy conversations during the interview

15  process.  I don't recall the details exactly how I shared them

16  with him, and I was taking very seriously my oath to tell the

17  whole truth.

18  Q.  What, if any, involvement did you have in writing the

19  article for *BuzzFeed*?

20  A.  I had no involvement in the writing of the article for

21  *BuzzFeed*.

22  Q.  You were asked the following questions and answers by

23  Ms. Keller on cross-examination, line 21, page 303:

24  "Q.  Did it occur to you, when Mr. Spacey asked Mr. Barrowman

25  and you to dinner, that he wanted to get to know Mr. Barrowman

1   better?

2   "A.  It did not occur to me, no."

3   Q.  Anthony, why didn't it occur to you that Mr. Spacey wanted

4   to get to know Mr. Barrowman better than you?

5   A.  I did not observe anything that Mr. Spacey did to him or to

6   me that would indicate that.

7   Q.  You were asked the following questions and gave the

8   following answers, page 310 of the trial transcript, beginning

9   on line 20:

10  "Q.  OK.  Now, back to joining Mr. Barrowman and Mr. Spacey at

11  The Limelight, did it occur to you that you might be seen as

12  something of a tagalong?

13  "A.  It did not occur to me, no."

14  Q.  Anthony, why didn't it occur to you at The Limelight that

15  you were a tagalong?

16  A.  Because at The Limelight and at dinner and in the dressing

17  room, I felt very included in the conversations and in the

18  events that we were all participating in together.

19  Q.  Anthony, you were asked the following questions, page 318

20  of the trial transcript, beginning lines 16:

21  "Q.  You also claim the first time you had ever been to

22  Mr. Spacey's apartment was at an alleged party on a future

23  date, is that right?

24  "A.  Correct.

25  "Q.  Although if I'm not mistaken, when you were being asked

MACsRAP1                           Rapp - Redirect

1     questions by Mr. Saghir, it sounded like you were maybe backing

2     off that a little bit.  You were asked -- you said you didn't

3     recall being there another time.

4     "A.  Correct.

5     "Q.  And that's because you now know that Mr. Barrowman has

6     talked at length about how the two of you went to Mr. Spacey's

7     apartment after The Limelight?

8     "A.  Correct."

9     Q.  Anthony, after The Limelight, when you went there with

10    Kevin Spacey and John Barrowman, where did you go?

11    A.  We went home to my apartment with my mom.

12    Q.  Do you have any memory of going to Mr. Spacey's apartment

13    after The Limelight with John Barrowman?

14    A.  I have no memory of that.

15    Q.  Are you backing off on that, that you went home?

16    A.  I'm not backing off on that.

17    Q.  You were asked the following questions and gave the

18    following answers, page 323, beginning line 7:

19    "Q.  Now, you didn't tell Dr. Bardey, when he interviewed you,

20    our psychiatrist, our expert on your damages, you didn't tell

21    him anything about the episode of having gone to Mr. Spacey's

22    apartment with John Barrowman, right?

23    "A.  Correct.

24    "Q.  Nothing about them being flirtatious with each other,

25    right?

MACsRAP1                         Rapp - Redirect

1    "A.  Correct."

2    Q.  Anthony, why didn't you tell Dr. Bardey about going back to

3    Mr. Spacey's apartment with John Barrowman after The Limelight?

4    A.  I did not remember that happening.

5    Q.  Why didn't you tell Dr. Bardey about John and Kevin Spacey

6    being flirtatious with each other that night?

7    A.  I never observed them being flirtatious with each other

8    that night.

9    Q.  You were asked questions about a conversation that you had

10   with John Barrowman in 1998 in London.  Do you recall that?

11   A.  I do.

12   Q.  It was at that time that Mr. Barrowman told you for the

13   first time what had happened between he and Mr. Spacey,

14   correct?

15   A.  Correct.

16   Q.  Prior to having that meal with John Barrowman in London in

17   1998, did you have any indication or idea of anything that had

18   happened between John Barrowman and Kevin Spacey?

19   A.  I had no idea or indication of that.

20   Q.  When you met with John, when if ever did he tell you that

21   Kevin Spacey and he were flirting with each other?

22   A.  He did not say that to me.

23   Q.  When if ever did he tell you that he went and bought

24   flowers for Kevin Spacey?

25   A.  He did not tell me that.

MACsRAP1                          Rapp - Redirect

1   Q.  What did he tell you?

2   A.  He told me that Kevin Spacey sent flowers to his house.

3   Q.  What else did he tell you?

4   A.  He told me when we were at The Limelight, Kevin Spacey was

5   touching his knee under the table all night long.

6   Q.  What did he tell you Kevin Spacey did after John returned

7   back home to Illinois?

8   A.  He told me that he called his house repeatedly.

9   Q.  What did John tell you his parents had to do?

10  A.  John told me that his parents had to ask Mr. Spacey to stop

11  calling.

12  Q.  You were asked questions by Ms. Keller on cross about

13  similarities between what happened to Mr. Barrowman and what

14  happened to you with respect to Mr. Spacey.

15         Do you recall those questions?

16  A.  I do.

17  Q.  Tell us what, if anything, was similar between what John

18  Barrowman told you happened to him and what happened to you

19  with Kevin Spacey.

20  A.  John expressed it to me as unwanted behavior on the part of

21  Mr. Spacey.

22  Q.  You were asked questions on cross-examination by

23  Ms. Keller, page 339, line 3:

24  "Q.  Now, having just visited Mr. Spacey with Mr. Barrowman

25  Day's before this alleged assault on you happened, you didn't

1    even pick up the phone and tell Mr. Barrowman, Oh, my God,

2    you'll never believe what happened to me with Kevin Spacey, did

3    you?

4    "A.  Correct.

5    "Q.  You didn't communicate with him at all, right?

6    "A.  Correct."

7    Q.  Why didn't you tell John Barrowman what Kevin Spacey did to

8    you in his apartment in 1986?

9    A.  He was not a close friend.  He was not a confidante.  I did

10   not have that kind of friendship with him.

11   Q.  When if ever did you share intimate details prior to that

12   night in 1986 with John Barrowman?

13   A.  Never.

14   Q.  On cross-examination, Ms. Keller asked you many questions

15   about your mother being protective, about her being a chaperon,

16   attending every performance at *Precious Sons*, escorting you to

17   the Playhouse every evening, and you told her that you did not

18   agree with that.  Do you recall that?

19   A.  I do.

20   Q.  Anthony, explain what your relationship was like with your

21   mom when you initially came to New York City to perform in

22   *Precious Sons*.

23   A.  When I initially came, I was in rehearsals every day from

24   about 10:00 a.m. to 6:00 p.m. generally, and she would

25   accompany me to rehearsals which were in the West Village.  At

1    some of the performances, she did come to the theater and watch

2    the show.  Many of the performances she did not.  Many times

3    over the course of the time that I was in the show, I made my

4    way to and from the theater by myself without her.  And as time

5    went on, I asserted my independence more and more, and she

6    granted me that freedom and independence more and more.

7    Q.  And when you say she granted you that freedom and

8    independence, give us a sense of what that means.

9    A.  It means I made my way to the theater, either would walk

10   there or take the subway there.  I would -- if I was out after

11   the play, I would spend the time by myself with my cast mates

12   and any other people.  That was all by myself, by -- in my

13   independence.  And then sometimes she may be at some of those

14   events, but not all of them.

15   Q.  Anthony, there is a lot of people who might be thinking,

16   a 14-year-old kid walking around at midnight or one in the

17   morning?  Explain that.

18   A.  I recognize that it was a very unusual life that I was

19   living.  I was -- yes, I was living an unusual life for most

20   14-year-olds.  I -- I had demonstrated my independence and my

21   ability to be trusted to be safe, and she granted me that

22   freedom.

23   Q.  Anthony, you were asked many questions about the people who

24   were at the party that you went to at Kevin Spacey's apartment

25   in 1986.  You told us you don't remember the ages, you don't

1    remember if they had facial hair, you don't remember if they

2    were bald, young, old, male, female.  Do you remember all those

3    questions?

4         Why is it that you don't remember the details of the

5    people who were at Kevin Spacey's party?

6    A.  Because the memory that is seared in my memory from that

7    night was what happened in the bedroom with Kevin Spacey.  I --

8    the other details are more vague and fuzzy to me.

9    Q.  How long were you in the main room before you went to the

10   bedroom?

11   A.  Not a very long time.  A few minutes, at most.

12   Q.  How many people did you speak to in the party?

13   A.  I spoke to no one at the party.

14   Q.  How many people did you know?

15   A.  I knew only Kevin Spacey.

16   Q.  How well did you know him?

17   A.  Very little, just from the one evening that we had spent

18   together.

19   Q.  You were asked the following questions by Ms. Keller, page

20   386, beginning line 23:

21   "Q.  Now, when Mr. Spacey fell across your body, it was like a

22   dead weight, correct?

23   "A.  He didn't fall across my body, ma'am.

24   "Q.  OK.  Let's use your language.  You would describe it as

25   that as what, climbing on top of you?

MACsRAP1                      Rapp - Redirect

1    "A.  Correct.

2    "Q.  And he felt like dead weight, true?

3    "A.  To some degree, yes."

4    "Q.  When you said to some degree, yes, explain what you meant.

5    A.  I meant that I felt the weight of his body, but it wasn't

6    dead.  He was holding me with his arms and he was pressing his

7    pelvis into my hip.

8    Q.  You were asked by Ms. Keller the following questions on

9    cross-examination, page 390, lines 22 and 23:

10   "Q.  You knew Mr. Barrowman was gay, right?

11   "A.  I did not."

12   Q.  Explain what you knew about Mr. Barrowman when he came to

13   visit you in New York City in 1986.

14   A.  The last I had known, he had a girlfriend.  We never talked

15   about anything personal.  He had not come out to me.  I had no

16   idea he was gay.

17   Q.  Have he shared any gay experience that he had in his life

18   prior to 1986 with you?

19   A.  None whatsoever.

20   Q.  Did you have any idea that he was gay when he came to visit

21   you?

22   A.  I had no idea he was gay.

23   Q.  I'll focus on page 399 of the trial transcript.  Ms. Keller

24   asked you the following questions on cross-examination,

25   beginning at line 11:

1     "Q.  Mr. Rapp, I would like to talk with you about some of the

2     people you told your Kevin Spacey story to.

3            You said you went home after the party, right?

4     "A.  Correct.

5     "Q.  Despite how close you were, you didn't tell your mother,

6     right?

7     "A.  Correct."

8     Q.  Anthony, tell us why you didn't tell your mom.

9     A.  We had never talked about sex at all.  It seemed like if I

10    was going to tell her about this, it would open up that whole

11    door, which seemed incredibly complicated and intimidating and

12    overwhelming to contemplate.  I didn't want to worry her and I

13    didn't want to lose my independence.

14    Q.  When you say you didn't want to worry her, what do you

15    mean?

16    A.  I mean, I -- she -- she probably would have been very

17    worried about this, and I didn't ever in general want to worry

18    her about me or my life.

19    Q.  You were asked questions by Ms. Keller on cross-examination

20    about what you had told Christopher Hart, and you gave the

21    following answers to the following questions:

22    "Q.  In your retelling of the story to Mr. Hart of what

23    happened back in New York with Mr. Spacey --

24    "A.  Yes.

25    "Q.  -- you never once mentioned that Mr. Barrowman even came

1  to visit you?

2  "A.  Correct.

3  "Q.  Let alone that you had gone to a nightclub together?

4  "A.  Correct.

5  "Q.  Let alone that you had met Jack Lemmon together?

6  "A.  Correct."

7  Q.  And it goes on.

8       Anthony, why didn't you tell Christopher Hart about

9  those details of the night that you went to dinner and The

10  Limelight with Kevin Spacey and John Barrowman?

11  A.  Because that was not the night of the incident in the

12  bedroom.

13  Q.  Anthony, you were asked the following questions about a

14  relationship you had that broke off at the time of *Rent*.  You

15  were asked those questions by Ms. Keller on cross-examination,

16  page 407, beginning line 13:

17  "Q.  Wasn't that your own boyfriend you were talking about?

18  "A.  Correct.

19  "Q.  And, in fact, you ended a relationship with him because he

20  refused to come out, right, publicly?

21  "A.  May I explain?

22  "Q.  Well, is that true?

23  "A.  It's -- it's not because he refused to come out publicly.

24  It's because he didn't want to be photographed with me at *Rent*,

25  at the opening night of *Rent*."

MACsRAP1                        Rapp - Redirect

1  Q.  Anthony, explain what happened with your boyfriend that

2  night.

3  A.  I, knowing how he felt about not wanting to be out, I

4  wanted to revisit the conversation as it pertained to him

5  joining me at the opening night of *Rent*, which was at that

6  point in my life the most important event of my life.  My mom

7  was going to be there, so it was all very, very, very

8  meaningful.  I wanted to reopen that conversation.  I still

9  believed that I could try to separate the different ways we

10  felt about being out publicly.  And it was in that conversation

11  that it really hit home that if I couldn't share these kinds of

12  most important moments of my life with my partner, I didn't

13  know a way forward to be in a relationship with him.

14  Q.  Ms. Keller then read you a portion of your book, and I want

15  to read the complete paragraph, what followed after what she

16  read.  I'll read the entire thing.

17          "At times I had felt as though I could never respect

18  him" -- referring to your boyfriend -- "for this decision

19  because to me, the stakes for queer people in America,

20  specifically young queer people, were too high for anyone with

21  a conscience to justify remaining in the closet, especially if

22  that someone was a public figure in a position to bring much-

23  needed attention to queer issues.  On the other hand, I

24  recognized that each queer individual had a very personal

25  choice to make to reveal that aspect of his or her personal

1    life or not to.  Marcus was his own person and I was my own

2    person, and while I wished that he felt differently about being

3    in the closet, I did love him and I didn't want our differing

4    politics, as personal as they were, to determine the outcome of

5    our relationship."

6            Explain what you meant by that, when you said it

7    didn't -- you didn't want the politics to determine the outcome

8    of your relationship.

9    A.  Yes, as I -- that -- that I could -- it's a way to try to

10   agree to disagree and still move forward.  That's what I was

11   hopeful for.

12   Q.  Was that able to work?

13   A.  It was not able to work.

14   Q.  You also wrote, and you were questioned about this

15   paragraph:  "The stakes for queer people in America,

16   specifically young queer people, were too high for anyone with

17   a conscience to justify remaining in the closet, especially if

18   that someone was a public figure in a position to bring much-

19   needed attention to queer issues."

20           Explain what you meant by that.

21   A.  I mean that visibility is what has made a difference in the

22   movement of more acceptance and freedom for queer individuals.

23   And people in the public eye with a platform have an

24   opportunity to continue to forward that visibility, and that

25   young people in particular are particularly vulnerable to

MACsRAP1                         Rapp - Redirect

discrimination and even being kicked out of their families and

threatened and bullied, etc.  So visibility is meant to combat

that.

Q.  You were asked the following question on cross-examination,

page 412, beginning line 8:

"Q.  And also, what has come up with Ms. Quill is your

frustration and anger at other actors who are obviously gay to

you but in the closet and refuse to come out, right?

"A.  Correct."

Q.  What frustration and anger are you referring to?

A.  I'm referring to, in some cases, when there are people who

are public figures who are themselves spouting homophobic

comments and/or enacting homophobic legislation and they are

gay.  I think that that is -- I'm angry at that hypocrisy.  And

I'm also frustrated that people who are in a position of power,

who have a powerful platform and security in many ways, don't

elect to take the opportunity to forward visibility.

Q.  You were asked the following questions and gave the

following answers, trial transcript page 413, line 24:

"Q.  And you responded to Ms. Quill's praise of Kevin Spacey by

telling her your Kevin Spacey story, right?

"A.  Correct."

Q.  Why did you tell Erin Quill your Kevin Spacey incident when

she told you about seeing *Lost in Yonkers*?

A.  Well, she was a close friend of mine and his name came up.

1    And as it did, I was, again, reminded of what had happened

2    between us and the -- the reminder of him reminded me of that

3    incident.  And she was a close friend and I shared my

4    experience with her.

5    Q.  You were asked the following questions and gave the

6    following answers, page 414, line 12:

7    "Q.  And you've never won a Tony?

8    "A.  Correct.

9    "Q.  You've never been nominated for a Tony?

10   "A.  Correct.

11   "Q.  And, in fact, you were very, very deeply disappointed not

12   to be nominated and expected to be nominated for your role in

13   *Rent*, right?

14   "A.  Correct."

15   Q.  Anthony, in all the time that you've been an actor in the

16   theater, have you ever met an actor who wouldn't want to win a

17   Tony?

18   A.  Probably not.

19   Q.  Would you like a win a Tony some day?

20   A.  Of course.

21   Q.  Is winning a Tony award the reason that you're an actor?

22   A.  It's not the reason I'm an actor.

23   Q.  Explain that.

24   A.  It would certainly be nice.  I recognize that it can have a

25   positive professional impact.  I recognize that it's very

1  meaningful to my friends who have won Tony awards, what they

2  share with me, what that experience means to them.  It would be

3  nice to have that experience.  That feels like a bonus to the

4  opportunity to be a working actor, working on projects that I

5  care about, projects I can be proud of, projects that when I

6  have the chance to be part of something meaningful, that is

7  what is most important to me.

8  Q.  When you say projects that you care about, what do you mean

9  by that?

10 A.  I mean something like *Rent*, which to me puts forth into the

11 world values and subjects and stories that I can 100 percent

12 get behind.  That is the epitome of a project that I care

13 about.

14 Q.  You were asked the following questions and gave the

15 following answers, page 425 of the trial transcript on,

16 cross-examination by Ms. Keller when she was reading from an

17 article:

18 "Q.  Quoting the article, although Rapp has had his share of

19 relationships with both men and women, he calls his current

20 boyfriend the love of my life.  I have never been able to love

21 someone as openly and fully as I do him.  Rapp's forthrightness

22 in discussing his personal life may seem courageous to some.

23 He has even stronger words for those who believe coming out is

24 still comparable to career suicide.

25        "Maybe they won't make 20 million a picture anymore,

MACsRAP1                          Rapp - Redirect

1    but who the fuck cares.  If they haven't made enough money yet,

2    then I feel sorry for them.  Ultimately, the difference they

3    could make in people's lives is so great, they really have

4    nothing to lose."

5    A.  Yes.

6    Q.  So when you're talking about people making 20 million a

7    picture, that was focusing on A-list actors, right?

8    A.  Correct.

9    Q.  Anthony, when you say, if they haven't made enough money

10   yet and I feel sorry for them, what did you mean by that?

11   A.  I mean that, to me, values and principles are more

12   important than money.

13   Q.  On page 428 of the trial transcript, you were asked the

14   following questions and gave the following answers:

15   "Q.  And then you said you didn't see anything he was in after

16   *American Beauty*, right?

17   "A.  Correct.

18   "Q.  Did your duty stop?

19   "A.  I felt that I had done my duty, yes.

20   "Q.  So your duty was to see his films up until he made

21   *American Beauty* and then not after, is that right?

22   "A.  I felt after *American Beauty*, I had seen enough and I did

23   not want anymore.  It was not a matter of duty at that point

24   for me."

25   Q.  When you say, after *American Beauty* you had seen enough and

1    I did not want anymore, tell us what you meant.

2    A.   I meant that every time I watched his work was difficult

3    and challenging, and that movie in particular was especially

4    difficult and challenging because of the subject matter that

5    was disturbingly familiar to me.  And I recognized and I didn't

6    want to put myself through that difficulty anymore.

7    Q.   Ms. Keller went on to ask you more questions about *American*

8    *Beauty* and recited the accolades of Kevin Spacey in that movie,

9    page 431 in the trial transcript beginning at line 1:

10   "Q.   Acclaimed.  So he was celebrated by others?

11   "A.   Correct.

12   "Q.   He won an Academy Award?

13   "A.   Correct.

14   "Q.   People praised it to the heavens?

15   "A.   Correct.

16   "Q.   But you're not willing to say he did a really good job,

17   you're only willing to say he was acclaimed, right?

18   "A.   It was very difficult for me, especially in that movie, to

19   assess the quality of his performance.

20   "Q.   Well, what was most difficult, Mr. Rapp?

21        It was that he won an Academy Award, wasn't it?

22   "A.   No, ma'am."

23   Q.   What was difficult?

24   A.   As I'm watching him on the screen, I'm seeing the man who

25   climbed on top of me when I was 14 years old.  And in that

MACsRAP1                          Rapp - Redirect

1    film, he had a sexual relationship that he pursued with a

2    teenage girl, and that was especially difficult.

3    Q.   What, if anything, did Kevin Spacey winning an Oscar, an

4    Emmy, a Tony, whatever it might be, what did that have to do

5    with you stopping watching his movies?

6    A.   It -- that didn't have to do with me stopping watching his

7    movies.  I don't -- I ...

8    Q.   What was it that made you stop watching his movies?

9    A.   What I've said.

10   Q.   You were asked the following questions and gave the

11   following answers on page 432 of the trial transcript:

12   "Q.   You attended another Oscar party at Elizabeth Law's in

13   2000, right?

14   "A.   Correct.

15   "Q.   And he was up for another Oscar, a second Oscar we've just

16   been talking about, so you repeated again your Kevin Spacey

17   story to the party, right?

18   "A.   Correct.

19   "Q.   Every time he was up for an award, you would tell your

20   story to try to get the attention away from him and on to you,

21   right?

22   "A.   That is not why I did it.

23   "Q.   Tear him down and build yourself up?

24   "A.   That is not why I did it."

25   Q.   Tell us why you told people at the Oscar party what Kevin

1   Spacey did to you.

2   A.   Because when I saw him on the screen, I was reminded of

3   what he had done to me.  I saw the man who climbed on top of me

4   when I was 14 years old, and I had already told my friend

5   Elizabeth at that time, so she asked again about it, and I

6   shared it again that night.

7   Q.   You were asked questions by Ms. Keller on cross-examination

8   as to what it's like trying to get work as an actor, and she

9   asked you the following questions and you gave the following

10  answers, page 436, beginning on line 2:

11  "Q.   And it's hard to get roles, it's hard to stay employed,

12  it's hard to do what you've done, right?

13  "A.   At times it is, yes.

14  "Q.   But did you really expect us to believe that you are not

15  envious of somebody who has won multiple Oscars, a Tony, hosted

16  the Tony's, nominated for multiple Emmys, won Golden Globes, I

17  won't go on.  You wanted to be that person, didn't you?

18  "A.   I did not want to be that person.

19  "Q.   You wanted to have the career, that's what I mean?

20  "A.   No, ma'am.  I wanted to work as an actor.

21  Q.   When you said you wanted to work as an actor, tell us what

22  you meant by that.

23  A.   I mean, I wanted to have my career, where I got to be a

24  part of the projects that I could be proud of.  And I wanted to

25  work as steadily as possible to afford me the opportunity to

1    have as much choice as possible.  And I wanted to work with

2    good people, I wanted to work with quality writing, I wanted to

3    be a part of a community that I loved since I was a child.  I

4    wanted that to continue as long as possible in my life.

5    Q.  When if ever did you want Kevin Spacey's career?

6    A.  I never wanted Kevin Spacey's career.  I wanted my career.

7    Q.  Had you ever told anybody that you wanted Kevin Spacey's

8    career?

9    A.  I never told anyone that I wanted Kevin Spacey's career.

10   Q.  You were asked questions by Ms. Keller on cross-examination

11   about a text exchange you had with Adam Vary?

12   A.  Yes.

13   Q.  And in her questioning, Ms. Keller was focusing on you

14   saying that in 2008, you thought that you had met Kevin Spacey

15   at that time, which later turned out to be wrong, correct?

16   A.  Correct.

17   Q.  What did you say in response to Mr. Vary when he said we

18   can't place him in 2008?

19   A.  I don't remember what I said.

20   Q.  Do you have that?

21          MR. SAGHIR:  This is in evidence, your Honor.  This is

22   AA, your Honor, in evidence.

23   Q.  Anthony, I'm showing you a portion of the text message.

24   Can you see that?

25   A.  I can.

1    Q.  I ask you to take a look at that and ask you, does that

2    refresh your recollection as to what you said?

3    A.  Yes.

4    Q.  So after you initially told Adam Vary that you believed it

5    was 2008, tell us what happened.

6    A.  I -- I remembered the years that I had been at the Tony

7    awards, which were not very many, and I remembered that I was

8    there in 1999.  And I also remembered the very specific

9    bathroom -- it's the way that it all clicked in my memory of

10   when it was.  That was the beginning.  It must have been then.

11   It was beginning to become clearer in my memory.

12   Q.  With respect to the text messages that --

13             MS. KELLER:  Your Honor, can we have a second here?

14   Our screen isn't working.

15             THE COURT:  Of course.

16             (Pause)

17             MS. KELLER:  Mr. Scolnick is doubling as an AV person

18   today.

19             THE COURT:  Plugging it in often helps.  Has it come

20   back up?

21             MS. KELLER:  It has not.

22             Can we take a bathroom break while we're doing it?

23             THE COURT:  We'll take 15 minutes here.  And,

24   Rosemary, if you can call AV to come up.

25             Have you got it fixed?

1              MR. SCOLNICK:  No, your Honor, I don't.

2              THE DEPUTY CLERK:  OK.  I'll get the jury.

3              THE COURT:  How much longer, Mr. Saghir?

4              MR. SAGHIR:  About ten minutes, your Honor.

5              (Recess)

6              THE COURT:  Where's Mr. Rapp?

7              Here he is.

8              (Jury present)

9              THE COURT:  Be seated.

10             You may continue, Mr. Saghir.

11             MR. SAGHIR:  Thank you, your Honor.

12    BY MR. SAGHIR:

13    Q.  Anthony, you were asked questions --

14             MR. SAGHIR:  You can take down the exhibit.  Thank

15    you.

16    Q.  Anthony, you were asked questions by Ms. Keller about

17    telling Tracie Thoms about what Kevin Spacey did to you in

18    2004, 2005.

19             Did you tell Tracie Thoms what he did because you were

20    jealous of her or jealous of him?

21    A.  I did not.

22    Q.  Why did you tell her?

23    A.  Because, as would happen, when she brought up his name, it

24    reminded me of what had happened between us and I shared with

25    her my experience.  She was a close friend that we were working

1   together, became very close very quickly.

2   Q.  Ms. Keller pointed out on her cross-examination that you

3   never told Dr. Collins about what Kevin Spacey did to you.

4           Why did you see Dr. Collins?

5   A.  I saw Dr. Collins to get support in the early days, months

6   of my relationship with Ken.

7   Q.  How long did you treat with Dr. Collins?

8   A.  Very briefly.  Several sessions.  No more than ten.

9   Q.  When if ever did Dr. Collins ask if you had been sexually

10  abused?

11  A.  He never asked.

12  Q.  Why didn't you tell him?

13  A.  It -- it didn't come up in my thinking about any aspect of

14  what I was talking to him about.  It wasn't -- it was not there

15  for me.

16  Q.  When you say with what you were talking about, you're

17  referring to your relationship with Ken?

18  A.  Correct.

19  Q.  You were asked questions about your treatment with Robin

20  Magid?

21  A.  Correct.

22  Q.  And Ms. Keller pointed out that you've been in therapy for

23  20 or 25 years.

24          Let's be clear about the amount of therapy that you

25  have had with Robin Magid.  Tell us the periods of time that

1   you have treat with Ms. Magid.

2   A.   It was a more concentrated period of time when I was in

3   town from around -- from 1997 until sometime in the early, mid

4   2000s.  I don't know the exact date.  And then there were long

5   periods of time where I would check in with her every once in a

6   while for a number -- for many years until about 2016,

7   beginning of 2017.

8            MS. KELLER:  Your Honor, this has all been asked and

9   answered.

10           THE COURT:  Yes, indeed.

11           MR. SAGHIR:  Briefly, your Honor, directly responding

12   to her cross.  Just briefly.

13           THE COURT:  It's not necessary.

14   Q.   Ms. Keller on cross-examination made a big deal that you

15   did not include Kevin Spacey in your book without you.

16           Tell us why he wasn't in your book.

17           MS. KELLER:  Asked and answered.

18           THE COURT:  I'll allow it.

19   A.   My book was centered around my experiences with being in

20   Rent and the death of my mother.  And any stories that I told

21   about my childhood were directly related to aspects of things

22   that I talked to about with my mother.  This is something I

23   never talked to about with her, so it didn't feel it was

24   relevant to the story I was telling in my book.

25   Q.   Ms. Keller was also making a big deal about the fact that

MACsRAP1                    Rapp - Redirect

1    you didn't anonymize Kevin Spacey or you could have.

2              Why didn't you do that in your book?

3    A.  Well, if I were to anonymize him, I would have no idea how

4    to go about that without concealing anything about him or the

5    details, and that would create speculation and gossip and that

6    is not why I was writing my book.

7              MR. SAGHIR:  Put up Exhibit AA, please.  Go to the

8    third page, please.

9    Q.  Are you able to see that text exchange, Anthony?

10   A.  I do.

11   Q.  You were asked questions by Ms. Keller about your

12   conversation with Adam Vary and not being nominated?

13   A.  Correct.

14   Q.  This text exchange on the bottom of page three and the top

15   of page four, if you can show that as well.

16              Is that the text exchange you had with Mr. Vary about

17   not being nominated for an Oscar?

18   A.  Correct.  Tony, yes.

19   Q.  I'm going to read that and ask you a question about it.

20   A.  OK.

21   Q.  Well, this is you in the blue.

22              Well, I didn't have a seat in the theater, so it has

23   to have been during the rehearsal time earlier in the day.

24              Those jerks, Adam Vary said.

25              You say, Ha, I wasn't a nominee.

1          Then Adam Vary, in all caps, Your character's name was

2     in the title.

3          Then you say, Still have never been a nominee.

4          He says in all caps, I'm outraged.

5          You say, For a Tony.  Then you say, LOL.  I thank you

6     for your outrage.

7          Explain that text exchange to us.

8     A.  Um, it was a playful text exchange.  His all caps were in a

9     joking manner, as there is any number of times when we had all

10    caps joking text exchanges.  It was in that spirit.

11    Q.  You testified on cross-examination that when you do media

12    appearances that it increases your trauma from what Kevin

13    Spacey did to you.

14          Explain that for us.

15    A.  Um, well, media -- media appearances and interviews related

16    to these events?

17    Q.  Correct.

18    A.  Yes.  Well, anytime that I'm coming into the public to talk

19    about this, it's an opening up of a painful and traumatic

20    experience.  Yes, so it -- it triggers painful memories, and

21    it's something that I'm willing to do to continue to speak the

22    truth.

23    Q.  Anthony, there is a lot of press covering this trial.

24    They've been outside the courthouse every day.

25          Have you spoken to the press one time about this

1  trial?

2  A.  I have not.

3  Q.  Ms. Keller asked you about Yul Brynner and when he punched

4  you in the stomach backstage.

5          How if at all has that affected you throughout your

6  adult life?

7  A.  It has not.

8  Q.  Ms. Keller brought up a time that you were beat up when you

9  were a kid or knocked down from a school bus.

10         How does that affect you in your adult life?

11 A.  It does not.

12 Q.  She also asked you about an instance where you were punched

13 in London.

14         Have you ever been back to London after that?

15 A.  I have indeed.

16 Q.  How does that affect you in your adult life?

17 A.  It does not.

18 Q.  She also mentioned that you were hit by a drunk driver.

19         Tell us what happened.

20 A.  I was going on an onramp and a car came the -- going the

21 wrong way, and I swerved to miss him and his car hit my car's

22 rear wheel.  I spun out.  Somehow all the other traffic missed

23 hitting either of us.

24 Q.  Were you injured?

25 A.  I was not injured.

MACsRAP1                          Rapp - Redirect

1    Q.  Have you continued to drive cars?

2    A.  Yes.

3    Q.  How if at all did that experience impact your adult life?

4    A.  Not at all.

5    Q.  Ms. Keller on cross-examination said that Ken has been

6    abusive to you.

7            Do you recall that?

8    A.  I do.

9    Q.  Has Ken ever been abusive to you?

10   A.  He has not.

11   Q.  Have you had certain altercations with Ken over the time?

12   A.  We've had a couple of altercations.

13   Q.  Tell us about the two times and tell us what happened.

14   A.  I don't remember the content of the disagreement.  In a

15   disagreement, there were shoves back and forth.  And another

16   time there was a shove that resulted in me falling on my butt,

17   and I was not injured in either of those times.  And these were

18   all incidents that happened several years ago.

19   Q.  When you say they happened several years ago, what's the

20   importance of that, if any?

21   A.  That through the support of our therapist, we've gone

22   through a lot of work, and we are in a very healthy and strong

23   and committed place and have been for some time.

24   Q.  She also mentioned that Ken has been mean-spirited to you

25   and called you names.

1              Do you recall that?

2    A.  I do.

3    Q.  Were there certain times early in the relationship that the

4    two of you argued or fought?

5    A.  Correct.

6    Q.  Explain that.

7    A.  Just that, that there were times when, in the heat of the

8    moment, he said some things that I felt were mean.

9    Q.  Ms. Keller stated to which you agreed about what Kevin

10   Spacey had done to you was the worst event in your life.

11             Do you recall that?

12   A.  Can you repeat the question?

13   Q.  Sure.  Ms. Keller asked you about what Kevin Spacey had

14   done to you and whether or not that was one of the worst events

15   in your life.

16             Do you recall that?

17   A.  I do.

18   Q.  OK.  Was what Mr. Spacey did to you, was that one of the

19   most traumatic events in your life?

20   A.  It was indeed.

21   Q.  Was it indeed the most traumatic event?

22   A.  It was the most traumatic single event.

23   Q.  Certainty you've had other traumatic events in your life,

24   correct?

25   A.  Correct.

MACsRAP1                         Rapp - Redirect

Q.   So why is it that you identify what Kevin Spacey did to you
as the most traumatic event?

A.   It is the thing as I look back through my life, that the
way that it's recurred, the reactions that I've had, my
understanding of trauma, I understand that the way that that
experience linked back to that experience and the affect that
it's had over me over time and continues to have, especially in
very specific situations, is directly related to trauma, as
distinct from these other events that were indeed traumatic or
upsetting, but didn't have that same lingering impact.

Q.   When you say that same lingering impact, what is it that
you're referring to?

A.   I'm referring to those moments when I've felt like I was
hit with a cattle prod, with the moments of disturbing invasive
thoughts and memories, the moments of frozen in fear and seeing
him.  The moments of even -- even being able to overcome that
feeling, but the effort involved in having to put it aside.
All of that over the years has been the impact that I've felt
from what happened that night.

Q.   Ms. Keller was asking you questions about your text
exchange with Adam Vary on October 11 and how the Lupita
Nyong'o article came out sometime after.

     On cross-examination, you testified that those were
exploratory conversations you were having with Adam Vary.  What
did you mean when you said those were exploratory

1  conversations?

2  A.   I was -- I seriously wanted to come forward, but I did not

3  know what would be involved in that.  I did not know what the

4  reporting process was going to be, if this was in fact going to

5  happen.  I did not know yet all of the conversations I needed

6  to have in my life to make sure that I was -- had the support I

7  needed and all the information I needed that I had really, with

8  Ken, considered the possible impact.

9          So it was the beginning of a process that didn't

10  complete until I actually said yes, now I'm ready to have an

11  interview and have this story go on the record and be

12  published, which happened on October 24th.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MACKRAP2                         Rapp - Redirect

1    BY MR. SAGHIR:

2    Q.  And when was that in relation to the Lupita Nyong'o

3    article?

4    A.  Her article came on October 19th.

5            MR. SAGHIR:  Could you please put up Exhibit AA.

6            Thank you.

7            If you could scroll up to the first page, please.

8    Q.  Mr. Rapp, you were asked several questions about

9    misremembering when you saw Kevin Spacey at the Tonys, and then

10   you had said it was 2008.

11           Do you recall that?

12   A.  What I had originally said it was 2008, yes.

13   Q.  Correct.

14           I'm showing you what's been marked as Exhibit AA, and

15   I'd like to read from that.

16           MR. SAGHIR:  And, Angella, if you could scroll down as

17   I do.

18   Q.  For clarity, Adam Vary is in the white text box.

19           "One thing to make you aware of, we can't seem to

20   place Spacey at the Tonys in 2008.  He didn't present and

21   wasn't nominated, and there's no photos we can find.  We don't

22   doubt he was there, but we don't want to nail down a specific

23   date that Spacey could then just flatly deny.  We're still

24   looking, but if we can't nail it down, we'll likely say that

25   you saw him at an industry event or some such.  (Similarly,

MACKRAP2                         Rapp - Redirect

1    we're also going to steer away from exact specificity in the

2    story of the party).  I asked Adam Pascal if he remembered

3    Spacey being there, and he said, quote, 'I didn't remember that

4    I was there until you told me about it.'"

5              Then you said:  "Oh, it could have been the year of

6    *Charlie Brown*.  That makes more sense now that I can think of

7    it.  That would be 1999.  Can you check that?"

8              Mr. Rapp, at any time did you tell Adam Vary to steer

9    clear of any specific dates?

10   A.  I did not.

11   Q.  At any time, did you tell Adam Vary to be vague?

12   A.  I did not.

13   Q.  Did you ever withhold any information from Adam Vary?

14   A.  I did not.

15   Q.  And, in fact, as we can see from this text exchange, as

16   soon as he said 2008, you recalled the correct time of 1999,

17   correct?

18              THE COURT:  Sustained.

19              MR. SAGHIR:  Put up Exhibit Z, please.

20   Q.  Anthony, are you able to see Exhibit Z?

21   A.  Is that the text exchange with Adam?

22   Q.  Yes.  From October 11th.

23   A.  Yes.

24   Q.  I'm going to focus on the text exchange in blue, and that

25   is your text exchange, correct?

MACKRAP2                          Rapp - Redirect

1    A.   Correct.

2    Q.   It's October 11th, 2017, at 2:47 p.m., and you wrote, "Hey,

3    my friend.  Can you call me when you get a chance?  In the wake

4    of the Harvey Weinstein story and its fallout, I am wanting to

5    speak out about someone else very powerful in our industry, but

6    I would want to try to do it in the best, most effective manner

7    and would want your help and participation if you feel it would

8    be appropriate."

9            Anthony, when you said, "I would want to try to do it

10   in the best and most" efficient manner -- "effective manner,"

11   pardon me, tell us what you meant.

12   A.   I meant that what I was witnessing in the way that the

13   women who had come forward about Harvey Weinstein, the way that

14   they were being given -- their voice was being heard, the way

15   that it was being reported with integrity and courage on the

16   part of the authors of the article, as well as the women coming

17   forward, that, to me, was a demonstration of effective and the

18   best manner.  It was being taken seriously, and it was making a

19   difference.  And I wanted, if I was going to come forward with

20   this, to have the possibility of making a difference.

21   Q.   Anthony, you were asked a number of questions on

22   cross-examination about why you came forward, and Ms. Keller

23   suggested you came forward for publicity, you came forward to

24   raise your profile, you came forward to improve your career.

25           Did you do that?

MACKRAP2                          Rapp – Redirect

1   A.  No, sir.

2   Q.  Tell us why you came forward in 2017 to BuzzFeed.

3   A.  I came forward because I knew I was not the only one that

4   Kevin Spacey had made inappropriate sexual advances to.

5             MS. KELLER:  Objection; form.

6             THE COURT:  The answer is stricken, and the jury will

7   disregard it completely.

8             MR. SAGHIR:  Judge, may we be heard on this issue?

9   This is my last question.

10            THE COURT:  Come to the sidebar.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. SAGHIR:  Judge.

3          MR. STEIGMAN:  Your Honor, there are pages and pages

4     and pages of Mr. Rapp's deposition which he was asked numerous

5     questions, and he gave very clear answers about all of the

6     specific experiences he had heard firsthand, secondhand, from

7     other people, how that influenced him, how he felt guilty for

8     not having reported it, like this was happening because he

9     hadn't told anybody, and he went through, at tremendous length

10    in Mr. Scolnick's questioning, all of the psychological reasons

11    he felt like he wanted to do it and needed to do it.  We didn't

12    go there on direct.  Ms. Keller spent an awful lot of time on

13    cross suggesting you did this because you wanted to be a bigger

14    star, you did it for publicity.  They opened the door, so it

15    would certainly be appropriate to give a limiting instruction

16    it's not coming in for the truth, but they have made a big deal

17    of the operation of his mind, and we simply can't tell the

18    truth.  The jury is left with an incomplete impression.

19          THE COURT:  Ms. Keller.

20          MS. KELLER:  Your Honor, he was asked at his

21    deposition what he had firsthand knowledge of, and he only had,

22    as I recall, maybe three instances where he claimed people --

23          THE COURT:  Three?

24          MS. KELLER:  Three instances where he claimed people

25    had told him.  One was a grown man who said that Kevin made a

MACKRAP2                    Rapp - Redirect

1    pass at him, one was a grown man in a steam room who said Kevin

2    walked out naked in front of him, and he could see his penis

3    hanging out, and the third one was somebody else who said -- a

4    grown man who said that he had gone to dinner with him, and

5    then Kevin tried to kiss him or did kiss him, that's it.  There

6    was nothing that had anything to do with what Mr. Rapp is

7    talking about here, but what they want to do is use rumor,

8    innuendo, and to try to make it sound like he's saving other

9    kids from this happening to them.

10            THE COURT:  Yes, look, the ruling stands.  We're not

11   having a trial by rumor.

12            (Continued on next page)

1           (In open court)

2           THE COURT:  The ruling stands.

3   BY MR. SAGHIR:

4   Q.  Anthony, you heard in the opening, and you heard on

5   cross-examination, that you're a liar, that you have been

6   making this up since you were 14.

7           Have you been lying about what Kevin Spacey did to you

8   in his apartment?

9   A.  I have not.  It's something that happened to me that was

10  not okay.

11          MR. SAGHIR:  Thank you.

12          THE COURT:  Thank you.

13          Anything further, Ms. Keller?

14          MS. KELLER:  Yes, your Honor, and I will be brief.

15  RECROSS EXAMINATION

16  BY MS. KELLER:

17  Q.  Mr. Rapp, I want to go back to what you had to say about

18  Ms. Nyong'o's story inspiring you.

19          Until this very trial, you have claimed that it was

20  the very day you read her story that you became inspired and

21  knew you had to come forward, right?

22  A.  Correct.

23  Q.  And, in fact, you said you were so moved, to your core, so

24  shaken and moved, reading her story, that you reached out to

25  your friend, Adam Vary, that very same day, right?

1   A.  Correct.

2   Q.  And you also told that story publicly, right?

3   A.  Correct.

4   Q.  But we've established that that story didn't come out for

5   over a week after you contacted Adam Vary, true?

6   A.  True.

7   Q.  And as I understand it, now you're saying, well, what you

8   really meant was that it was sort of a work in progress, that

9   you didn't -- hadn't fully and completely decided whether to go

10  forward with it, right?

11  A.  Correct.

12  Q.  But back in 2001, you tried to get The Advocate to print

13  the story.  You told your Kevin Spacey story to the reporter

14  from The Advocate, we've already gone through that, right?

15  A.  I wouldn't characterize it as trying to get The Advocate to

16  print the story.

17  Q.  Well, you were in an interview, you used Mr. Spacey's name

18  with that reporter, right?

19  A.  Correct.

20  Q.  And it was only after it was published that you found out

21  that The Advocate couldn't print his name, their own internal

22  policies prevented them from doing so, right?

23  A.  Correct.

24  Q.  So, you fully intended in 2001 to say the story publicly

25  and have it come out about Mr. Spacey, right?

MACKRAP2                    Rapp - Recross

1    A.  We were in -- having conversation.  I did not have an

2    intention to have it come out publicly.  We were having an

3    interview.  I had no idea of what he may or may not print in

4    that interview.

5              THE COURT:  Look, Mr. Rapp, do you really believe that

6    there is no connection between interviews and publications?

7              THE WITNESS:  Yes.  The nature of that interview was a

8    very different kind of interview, your Honor.

9              THE COURT:  Okay.

10   BY MS. KELLER:

11   Q.  You did know that you were being interviewed by a reporter

12   for a publication, right?

13   A.  Yes.

14   Q.  A publication meaning something that becomes public?

15   A.  Yes.

16   Q.  Okay.  Now, I also want to ask you, you said that you felt

17   it was your duty as an actor to see all these movies, but after

18   *American Beauty*, it was no longer your duty, right?

19   A.  Some version of that, yes.

20   Q.  And that's because one of the major reasons is that it was

21   so disturbing to see Mr. Spacey's character in that film having

22   a sexual relationship with a teenage girl, right?

23   A.  Correct.

24   Q.  But in the film, his character didn't have a relationship

25   with a teenage girl, right?

1    A.  I don't remember the details.  He wanted to have a

2    relationship with a teenage girl.

3    Q.  Well, the details were about a middle-aged man having a

4    fantasy, right?

5    A.  Okay.

6    Q.  A fantasy about that.

7            And then at the end of the movie, perhaps you will

8    recall, that when he has a chance to make his fantasy come

9    true, he chooses not to, he does the right thing?

10   A.  I don't recall.

11           MR. SAGHIR:  Objection.

12   Q.  As far as not speaking to the media during trial, you were

13   asked about that in the context of all the things you've done

14   to raise your profile by telling your Kevin Spacey story up

15   until now.

16           You understood, did you not, that Judge Kaplan had

17   made it very clear to the parties that he did not want the

18   parties trying this case in the media?

19           MR. SAGHIR:  Objection.

20           THE COURT:  What's the objection?

21           MR. SAGHIR:  I withdraw the objection.

22           THE WITNESS:  I'm sorry, I don't understand the

23   question.

24   BY MS. KELLER:

25   Q.  You understood, did you not, that Judge Kaplan had made it

MACKRAP2                         Rapp - Redirect

```
 1  very clear at the beginning that he did not want the parties
 2  trying this case in the media, right?
 3  A.  Correct.
 4  Q.  So, you knew that if you did speak to the media, it would
 5  really run afoul of what the Court had -- the rules that the
 6  Court had asked us to respect, right?
 7  A.  Correct.
 8  Q.  So, it wasn't that you didn't want the PR, it's that you
 9  didn't want to run afoul of Judge Kaplan, right?
10  A.  What is the question?
11  Q.  The question is:  It's not that you decided, I won't speak
12  to the media because I'm not going to try to get publicity for
13  myself, it's because you knew Judge Kaplan didn't want us to do
14  that, right?
15  A.  No, ma'am.
16          MS. KELLER:  Your Honor, I have nothing further.
17          THE COURT:  All right.  Thank you.
18          MR. SAGHIR:  Two questions?
19          THE COURT:  Mr. Saghir.
20  REDIRECT EXAMINATION
21  BY MR. SAGHIR:
22  Q.  Anthony, when you gave that interview to The Advocate in
23  2001 and told what it is that Kevin Spacey had done to you, did
24  they submit the questions to you in advance to review?
25  A.  Not at all.
```

MACKRAP2                          Rapp - Redirect

1    Q.  Did you know what questions they were going to ask?

2    A.  No.

3    Q.  Were you just responding to the questions of the

4    interviewer?

5    A.  I was.

6    Q.  What is it that you recall seeing in *American Beauty*?

7    A.  I recall seeing Kevin Spacey desiring and having some kind

8    of sexual relationship with a teenage girl.  That is what I

9    recall.

10              MR. SAGHIR:  Thank you.

11              THE COURT:  Tell me we're not going to have the movie

12   shown.

13              MS. KELLER:  Nothing further, your Honor.

14              THE COURT:  I want an agreement about what's in it.

15              MR. SAGHIR:  Stipulated.  So stipulated.

16              THE COURT:  No, no, no, I'm serious about that.

17              MR. STEIGMAN:  A stipulation with regard to the facts

18   of the movie?

19              THE COURT:  Yes.

20              Okay.  You're excused, Mr. Rapp.

21              THE WITNESS:  Thank you.

22              (Witness excused)

23              THE COURT:  Next witness.

24              MR. SAGHIR:  Your Honor, we call Christopher Hart to

25   the stand.

MACKRAP2                         Hart - Direct

1          THE COURT:  Mr. Steigman, at your convenience, can you

2     pick up your volume?

3          MR. STEIGMAN:  That works.  Thank you, Judge.

4     CHRISTOPHER HART,

5          called as a witness by the Plaintiffs,

6          having been duly sworn, testified as follows:

7          THE WITNESS:  My name is Christopher Hart, and it's

8     spelled C-h-r-i-s-t-o-p-h-e-r, H-a-r-t.

9          THE COURT:  You may proceed.

10         MR. SAGHIR:  Thank you, your Honor.

11    DIRECT EXAMINATION

12    BY MR. SAGHIR:

13    Q.  Good afternoon, Mr. Hart.

14    A.  Hi.

15    Q.  Mr. Hart, I'm going to ask you to keep your voice up so we

16    can hear you all the way back here, okay?

17    A.  Got it.

18    Q.  With the microphone in front of you.

19    A.  Okay.

20    Q.  Where do you presently live, Mr. Hart?

21    A.  In San Francisco.

22    Q.  How long have you lived there?

23    A.  About nine months.

24    Q.  How old are you?

25    A.  I am 51.

1   Q.  Can you tell us where you were born and where you grew up?

2   A.  I was born in Homestead, Florida, but I grew up around

3   Chicago, in Joliet, Illinois.

4   Q.  Mr. Hart, tell us about your educational background, if you

5   would, up through the end of high school.

6   A.  Okay.  So, I went to Troy schools, which is in the suburbs

7   of Joliet, and I went there for grade school, middle school,

8   and then for high school, I went to Joliet West until the first

9   semester of my junior year.  For my second semester, at the

10  beginning of '87, I went to a school in South Carolina, and I

11  was only there that semester, and then I graduated from school

12  in St. Johns, Michigan, where I spent my whole senior year.

13  Q.  Just briefly, why is it that you went from Joliet to South

14  Carolina and then up to Michigan?

15  A.  My dad's job changed.

16  Q.  Mr. Hart, when you say that you left Joliet in your first

17  semester of junior year, approximately when would that be?

18  A.  I'm not precisely sure when we moved, but it would have

19  been December or the very beginning of January.

20  Q.  Of what year?

21  A.  '86 into '87, because I started school in South Carolina in

22  January of' 87.

23  Q.  What year did you graduate high school in Michigan?

24  A.  1988.

25  Q.  So, you've taken us through high school.

1          Tell us what you did after high school, in terms of

2    college and any further education.

3    A.  After high school, I went to college in North Carolina, at

4    the University of North Carolina Wilmington, for my first two

5    years, and then I took a break and went into the army, where I

6    was a Russian linguist and cryptologist.

7    Q.  I didn't catch that?

8    A.  I'm sorry.  I went into the army, where I was a Russian

9    linguist and cryptologist.  And then after the army, I went

10   back to North Carolina and finished at the University of North

11   Carolina Greensboro.

12   Q.  What degree did you graduate with?

13   A.  English.

14   Q.  In what year?

15   A.  1995.

16   Q.  What do you do for a living?

17   A.  I'm the assistant general manager for Saks Fifth Avenue in

18   San Francisco.

19   Q.  Can you tell us what you do as the assistant general

20   manager?  Give us a sense of your daily duties.

21          MR. SCOLNICK:  Objection, your Honor; relevance.

22          THE COURT:  I'm sorry, what happened?

23          MR. SAGHIR:  I'm just asking about his basic duties as

24   an assistant general manager for Saks Fifth Avenue.

25          MR. SCOLNICK:  My objection is on relevance, your

MACKRAP2                    Hart - Direct

 1 │ Honor, 401, 403.

 2 │            THE COURT:  Who is speaking?  I'm sorry.

 3 │            MR. SCOLNICK:  I'm sorry, your Honor.  I'm speaking,

 4 │ it's Chase Scolnick.

 5 │            THE COURT:  Get closer to the microphone so I can

 6 │ understand you.

 7 │            MR. SCOLNICK:  Yes, your Honor.

 8 │            Objection; 401, 403.

 9 │            THE COURT:  Sustained.

10 │ BY MR. SAGHIR:

11 │ Q.  Mr. Hart, did you grow up with Anthony Rapp?

12 │ A.  I did.

13 │ Q.  Tell us when you first met Anthony.

14 │ A.  I think it was probably fifth or sixth grade.

15 │ Q.  How is it that the two of you met?

16 │ A.  We had classes together, and we were also in choir

17 │ together.

18 │ Q.  What is the age difference between you and Anthony?

19 │ A.  I'm 11 months older than he is.

20 │ Q.  Were you two in the same grade throughout middle and high

21 │ school?

22 │ A.  Yes, we were.

23 │ Q.  So, tell us about your friendship with Anthony in middle

24 │ school and high school, the type of activities you would do

25 │ together, and how you spent your time.

1    A.   Pretty much everything nerdy that you can imagine.

2    Watching Dr. Who on, you know, Sunday nights, playing Dungeons

3    & Dragons together with our friends, we'd go to the mall, go to

4    the arcade, hang out, walk around the neighborhood.

5    Q.   How would you describe your friendship with Mr. Rapp in

6    high school and in middle school?

7    A.   It went through a lot of stages.  When we first became

8    friends, we were like a group of friends, he was one of the

9    group, and we always did group things.  Eventually, we became

10   closer, and, you know, he would spend the night, and we'd have

11   sleepovers, we would go to the movies together, go to the mall

12   together, things like that.

13   Q.   So, when you talk about the period of time when you became

14   closer, give us a sense of what grade you were in or how old

15   you were at that time.

16   A.   I think we started getting close around seventh grade.

17   Like, you know, probably seventh through ninth was our peak

18   where we were very, very tight.

19   Q.   Did you remain friends at the time that you left Joliet to

20   go to South Carolina?

21   A.   No.  So, we had a falling-out somewhere in the beginning of

22   my junior year, so beginning of -- yeah, junior year of high

23   school.

24   Q.   When we talk about the beginning of your junior year of

25   high school, what date are you referring to, what year?

MACKRAP2                          Hart - Direct

1    A.  I guess that would have been September-ish of '86.

2    Q.  Do you recall what it was that you had this falling-out

3    over with Mr. Rapp?

4    A.  I have no idea.  We were teenage boys, and, you know, boys

5    fight, and, you know, to this day, I have no idea why we got

6    into that.

7    Q.  Did you do any plays with Anthony while you were in high

8    school?

9    A.  Just one.

10           Actually, it wasn't when I was in high school, I was

11   still in eighth grade.

12   Q.  Tell us what play.

13   A.  I was in *Oliver* with him, and that was at the local high

14   school, but we were still in middle school.

15   Q.  Did there come a point in time that Anthony left to go to

16   New York to perform in *Precious Sons*?

17   A.  Yes.

18   Q.  Were you aware of that, when he went there?

19   A.  Yes.

20   Q.  Approximately how long was he gone?

21   A.  I think that he was gone, like, pretty much the whole

22   second semester of our sophomore year.

23   Q.  When Anthony came back from New York in the summer of 1986,

24   did the two of you get together?

25   A.  Yes.

1    Q.  Tell us about that.

2    A.  You know, I was excited that he was back, so we arranged a

3    sleepover fairly shortly after he came back, so that would have

4    been sometime, I guess, in June because I was out of school at

5    that point.

6    Q.  Did there come a time when Anthony told you about an

7    experience that he had with Kevin Spacey?

8    A.  Yes.

9    Q.  And, for clarity, when is it that he told you that,

10   approximately?

11   A.  That would have been that first time that he stayed over,

12   and, you know, we finally were able to kind of reconnect and

13   catch up.

14   Q.  So, what month and year are you referring to?

15   A.  That would be June of 1986.

16   Q.  How did the topic come up?

17   A.  I don't know exactly how it came up.  I know we were

18   talking about his time in New York, you know, so I don't

19   remember specifics about the whole conversation, but we

20   obviously were 14-year-old boys, 15-year-old boys, we talked

21   about sex, so it seems like there's a natural inclusion for

22   that to start that conversation.

23   Q.  Tell us what it is that Anthony told you when he got back

24   to Illinois.

25   A.  That he was at a party at Mr. Spacey's house, and that he

```
 1    was kind of bored and away from everybody, because it seemed
 2    like there were a lot of adults there, and that I guess later
 3    in the evening, he was watching TV, and at some point,
 4    Mr. Spacey came in and, you know, picked him up and put him on
 5    the bed and laid on top of him, and he, you know, kind of
 6    wriggled around, got free, and got out of there.
 7    Q.  Is there anything else you recall Anthony telling you?
 8    A.  Not specifically, no.  That was a pretty momentous thing,
 9    so that's really what I remember of it.
10    Q.  When you say it was a pretty momentous thing, what do you
11    mean by that?
12    A.  Well, you know, I hadn't known any of my friends or anyone
13    really that had had any sort --
14              MR. SCOLNICK:  Objection, your Honor; relevance.
15              THE COURT:  Sustained.
16    BY MR. SAGHIR:
17    Q.  Are you still friends with Anthony?
18    A.  Yes.
19    Q.  Describe the nature of your friendship now.
20    A.  I guess a step below Facebook friends.  You know, we'll
21    text each other happy birthday on our birthdays.  You know, if
22    he sees something that I post with my daughter, he might
23    comment on it, but that's kind of the extent of it.  You know,
24    I haven't really actually seen him in person until this period
25    and since, like, 2015.
```

MACKRAP2                          Hart - Direct

1  Q.  When Anthony told you what Kevin Spacey did to him, what

2  did you think?

3          MR. SCOLNICK:  Objection; relevance.

4          THE COURT:  Sustained.

5  BY MR. SAGHIR:

6  Q.  When Anthony told you what Kevin Spacey did to him, what

7  did you say?

8  A.  I don't remember what I said specifically.  I think I was,

9  you know, probably just fairly shocked that that had happened,

10 because it hadn't happened with any of my friends, anything

11 with an adult.

12 Q.  Mr. Hart, do you know someone by the name of John

13 Barrowman?

14 A.  Yes, I know who he is.

15 Q.  Who is he?

16 A.  He's an actor.

17 Q.  How did you -- have you ever met him?

18 A.  I've met him.  He was also in *Oliver* when I was in *Oliver*

19 with Anthony.

20 Q.  Were you friendly with Mr. Barrowman in high school?

21 A.  No, not at all.

22 Q.  Explain that.

23 A.  I was a little kid.  It just -- it wasn't my circle.

24 Q.  Mr. Hart, when you and Anthony were in high school, when,

25 if ever, did Anthony tell you that he was attracted to John

1    Barrowman?

2    A.  I don't remember him ever telling me that.

3    Q.  When, if ever, did Anthony even talk to you about John

4    Barrowman?

5    A.  I don't remember him ever talking about him.

6    Q.  When, if ever, did he tell you that he had a crush on John

7    Barrowman?

8    A.  He's never told me that.

9    Q.  Mr. Hart, how did you get to New York from California?

10   A.  I flew.

11   Q.  Who paid for that flight?

12   A.  Your firm did.

13   Q.  And you're staying at the Hampton Inn, correct?

14   A.  I am.

15   Q.  Who is paying for the Hampton Inn?

16   A.  Your firm is.

17   Q.  When do you leave?

18   A.  As soon as we finish here.

19           MR. SAGHIR:  Thank you.  No further questions at this

20   time.

21           THE COURT:  Thank you.

22           Cross-examination, Mr. Scolnick?

23           MR. SCOLNICK:  Yes, your Honor.

24

25

MACKRAP2                          Hart – Cross

1    CROSS-EXAMINATION

2    BY MR. SCOLNICK:

3    Q.  Good morning, Mr. Hart.

4    A.  Hello.

5    Q.  Mr. Hart, now, you've spoken with Mr. Rapp's counsel before

6    today, correct?

7    A.  Yes.

8    Q.  You've spoken with them multiple times, right?

9    A.  Yes.

10   Q.  And you were deposed in this case, correct?

11   A.  That's correct.

12   Q.  You've spoken with Mr. Rapp's counsel before you were

13   deposed, right?

14   A.  That's correct.

15   Q.  They asked you questions about what you recalled with your

16   interactions with Mr. Rapp in 1986, correct?

17   A.  That's correct, yes.

18   Q.  And you answered their questions, right?

19   A.  Yes.

20   Q.  You answered all of their questions, right?

21   A.  Yes.

22   Q.  Because you wanted to be helpful, right?

23   A.  Yes.

24   Q.  Now, I also called you, didn't I?

25   A.  You did.

MACKRAP2                    Hart - Cross

```
1    Q.  I also tried to ask you some questions about what you
2    recalled, correct?
3    A.  Correct.
4    Q.  You did not answer all of my questions, right?
5    A.  Also correct.
6            THE COURT:  Sorry, I can't hear you.
7            THE WITNESS:  Sorry.  Also correct.
8    BY MR. SCOLNICK:
9    Q.  And you did not answer my questions because Anthony was
10   your friend, and you wanted to support his lawsuit against
11   Kevin Spacey, right?
12   A.  No, I wanted to support Anthony, not specifically a
13   lawsuit.
14   Q.  Ah, Mr. Hart --
15           MR. SCOLNICK:  Could we have tab F up, please?
16   Q.  -- you were deposed on November 9th of last year, correct?
17   A.  Correct.
18   Q.  I asked you:
19   "Q.  Why is it you didn't want to --
20           THE COURT:  Page number.
21           MR. SCOLNICK:  Yes, your Honor.
22           THE COURT:  I don't know how to get this point across.
23           MR. SCOLNICK:  Yes, your Honor.  Page 16, lines 6
24   through 11.
25           THE COURT:  Just read it.
```

MACKRAP2                          Hart - Cross

1    "Q.  Why is it you didn't want to answer my questions and you

2    did answer Mr. Saghir's questions?

3    "A.  Because Anthony is my friend, and I trust his judgment.

4    If he's, you know, getting a lawyer and such, then I'm going to

5    be supportive of that."

6              Was that true?

7    A.  Yes.

8    Q.  Do you realize this case is about Mr. Rapp's claims of what

9    he alleges in 1986?

10   A.  Yes, I do.

11   Q.  And he was in New York then, right?

12   A.  Yes.

13   Q.  You were not in New York in 1986, right?

14   A.  Correct.

15   Q.  He claims he went to a party at an apartment of

16   Mr. Spacey's, right?

17   A.  Yes.

18   Q.  And you've never been to an apartment of Mr. Spacey's,

19   right?

20   A.  I'm sorry?

21   Q.  You've never been to an apartment belonging to Mr. Spacey,

22   right?

23   A.  No.

24   Q.  You have no firsthand knowledge of whether Mr. Rapp's

25   claims are true or false, right?

MACKRAP2                         Hart - Cross

1    A.  I do not.

2    Q.  I want to talk to you about what Mr. Rapp told you when he

3    spoke with you in 1986, okay?

4    A.  Okay.

5    Q.  You said after Mr. Rapp came back from New York, he told

6    you about his trip, right?

7    A.  Yes.

8    Q.  You and Mr. Rapp would talk about sex a lot when you were

9    in junior high, right?

10   A.  Sure.

11   Q.  He told you he went to a party at Kevin Spacey's apartment?

12   A.  Yes.

13   Q.  Now, of course, at this point, you didn't know who Kevin

14   Spacey was, right?

15   A.  Correct.

16   Q.  He told you he went inside Kevin Spacey's bedroom, right?

17   A.  I remember him saying that there was a bed there, so, I

18   mean, I assume, yes, bedroom.

19           THE COURT:  Well, no, you're assuming that he told you

20   he went into a bedroom, yes?

21           THE WITNESS:  Yes.

22           THE COURT:  Or you remember him telling you he went

23   into a bedroom?

24           THE WITNESS:  I am assuming that he told me that.  I

25   don't necessarily remember him saying specifically he went into

1    the bedroom, but I know that he was lifted onto a bed, so,

2    therefore, my assumption was it was a bedroom.

3                THE COURT:  Okay.

4    BY MR. SCOLNICK:

5    Q.  Mr. Hart, on November 9th, at your deposition, page 39/5

6    through 8, the question was:

7    "Q.  Go ahead.

8    "A.  Okay.  That he was in the bedroom, that Kevin Spacey

9    lifted him onto the bed and laid on top of him, he wriggled

10   free and left."

11               Was that true?

12   A.  Yes.

13   Q.  Turning to page 38, lines 2 through 4:

14   "Q.  Did Mr. Rapp tell you where he was in Mr. Fowler's

15   apartment?

16   "A.  He said he was in the bedroom."

17               Is that true?  Yes or no, sir.

18   A.  Again, I don't know that he specifically said bedroom.  I

19   think that was just me interpreting and remembering it that

20   way.  So, I don't know for certain that that's what he said.

21   That is how I took it.

22   Q.  First of all, sir, have you corrected your transcript?  Did

23   you have to make any corrections to your deposition transcript

24   between November and today?

25   A.  I didn't.  I also didn't know that I could do that.

1   Q.  You also testified on November 9th, 2021, page 11, lines 2

2   through 16:

3   "Q.  Okay.  And what did you tell Mr. Saghir on the phone call?

4   "A.  I told him that Anthony came back from doing the show, we

5   arranged within the first week or two to have him spend the

6   night, as we often did, and, you know, we were catching up

7   on -- you know, I hadn't seen him in a few months, catching up

8   on everything, and, you know, in the context of this, he told

9   me he had been at a party at Kevin Spacey's house and that he

10  was in the bedroom.  And I believe that, you know, it was

11  toward the end of the night, and he said at, you know, one

12  point Kevin Spacey picked him up, laid on top of him on the

13  bed, and Anthony, you know, was uncomfortable, and he kind of

14  wriggled out and got out of there.  That was really all there

15  was to it."

16          Was that true?

17  A.  Yes.

18  Q.  Okay.

19          Now, Mr. Hart, you were actually here in court

20  yesterday, weren't you?

21  A.  Yes, I was in the conference room.

22  Q.  Okay.

23          And you're aware that this case has been going on,

24  right, or this trial has been going on for several days now?

25  A.  I'm not sure when it started, but, yes.

MACKRAP2                         Hart - Cross

1    Q.  And you spoke with -- between your deposition, did you

2    speak with Mr. Rapp's counsel between your deposition and

3    trial?

4    A.  Yes.

5    Q.  Did you speak with Mr. Rapp's counsel after opening

6    statements, which were last week, on Thursday?

7    A.  Yes; I spoke with him on Monday.

8    Q.  Have you made any public statements about this case, saying

9    that, you know what, now I got it wrong in my deposition, and I

10   know I said it was a bedroom three times under oath, but I must

11   have been mistaken?  Have you said that to anybody?

12   A.  I have not.

13   Q.  Did you say to Mr. Rapp's counsel, you know what, I told

14   you it was a bedroom when we talked about it, I told you it was

15   a bedroom three times during my deposition under penalty of

16   perjury, but, you know what, that was a mistake, I may have

17   just imagined it?  Did you say that to him?

18   A.  I did not.

19   Q.  And you're here trying to support Mr. Rapp's case, right?

20   A.  I'm here trying to support Mr. Rapp.

21   Q.  And his case, right?

22   A.  I mean, if that's what he's here to do, yeah.  I mean, I'm

23   here to support him.  I'm here to tell what I remember.

24   Q.  Do you know that Mr. Rapp testified, just today and

25   yesterday, that he told you there was a bedroom when he talked

1    to you?

2    A.  Okay.

3    Q.  Now, Mr. Rapp, he never told you he had been to Kevin

4    Spacey's apartment more than once, did he?

5    A.  Not that I recall, no.

6    Q.  He didn't tell you that he had been to Mr. Spacey's

7    apartment with John Barrowman either, did he?

8    A.  Not that I recall, no.

9    Q.  And you know who John Barrowman is, you testified about

10   that on direct examination, right?

11   A.  Yes.

12   Q.  He's an actor, pretty famous guy, right?

13   A.  Yes.

14   Q.  And you also knew who John Barrowman was in 1986, right?

15   A.  Correct.

16   Q.  So, by the time you're having this conversation with

17   Mr. Rapp in 1986, you knew darn well who Mr. Barrowman was,

18   right?

19   A.  Yes.

20   Q.  At that point, you had already been in a play with him,

21   right?

22   A.  Yes.

23   Q.  And you said that you didn't really know him because you

24   were a little kid and he was older, right?

25   A.  Yes.

MACKRAP2                    Hart - Cross

1    Q.  He was a number of years older than you, right?

2    A.  Correct.

3    Q.  But even though he was a number of years older, you still

4    were in a play together, right?

5    A.  Yes.

6    Q.  And I suppose he played one of the lead roles, right?

7    A.  He was the head of the workhouse, and I was one of the

8    orphans.

9    Q.  And he was a talented guy, right?

10   A.  Yes.

11   Q.  He played a lot of leads in town in 1986 and earlier,

12   right?

13   A.  I don't know.  I didn't really follow him.  That was

14   literally the only show I did.

15   Q.  He was a popular good looking guy, right?

16   A.  He's a good looking guy.  Again, I wasn't in school with

17   him, so I don't know how popular he was.

18   Q.  But you were in a play with him, right?

19   A.  Yes.

20   Q.  You were in a play with him because you wanted to be in a

21   play, right?

22   A.  Yes.

23   Q.  No one forced you, right?

24   A.  Correct.

25   Q.  And you were interested, at least at that time, in acting,

1    right?

2    A.  Well, it was really that the -- they needed kids because it

3    was a high school production, and they needed orphans, and I

4    could sing, and it sounded like something fun to do.

5    Q.  Right, you were interested in singing and dancing at that

6    time, right?

7    A.  Singing, not so much dancing.

8    Q.  Okay.

9          So, you did the play, right?

10   A.  Yes.

11   Q.  Now, you also knew in 1986 who Mr. Lemmon was, right, Jack

12   Lemmon?

13   A.  Probably, yes.  I don't know when I would have learned

14   about him necessarily.

15   Q.  Mr. Hart, he was one of the biggest actors in the United

16   States in the 1980s, right?

17   A.  Yeah.  I was a 15-year-old kid that didn't pay a lot of

18   attention to, like, TV and movies.

19   Q.  Even though you were doing plays and dancing and singing,

20   right?

21   A.  I did a play.

22   Q.  Okay.

23          So, Mr. Rapp did not tell you that he went to Jack

24   Lemmon's dressing room when he was in New York, did he?

25   A.  No, not that I recall.

MACKRAP2                              Hart - Cross

1   Q.  He didn't tell you that he went to one of the biggest

2   actors in the world dressing room just weeks earlier, right?

3   A.  Right.

4   Q.  By 1986, can we agree that -- going back to Mr. Barrowman,

5   that he was already a grown man who had gone off to college?

6   A.  Yes.

7   Q.  Right.

8        Because you were in a play with him when you were

9   seventh or eighth grade, and he was already a senior at that

10  time, right?

11  A.  Yes.

12  Q.  Right.

13       So, Mr. Rapp never told you that he and John

14  Barrowman, the same person that you were in a play with not too

15  long before, had gone to see Kevin Spacey and Jack Lemmon in a

16  play, did he?

17  A.  No, not that I recall.

18  Q.  He didn't tell you that Mr. Barrowman and Mr. Spacey went

19  to dinner together, right?

20  A.  No.  I don't remember that at all.

21  Q.  He didn't tell you the three of them went to The Limelight,

22  did he?

23  A.  No.

24  Q.  He didn't tell you that he saw Mr. Barrowman and Mr. Spacey

25  flirting together?

1    A.  No, not that I recall.

2    Q.  And he didn't tell you that he and Mr. Barrowman went to

3    Mr. Spacey's apartment, did he?

4    A.  No, not that I recall.

5    Q.  Left that detail out completely, didn't he?

6            Is that a yes?

7    A.  Yes.

8    Q.  In fact, Mr. Rapp left out everything about John Barrowman

9    coming to New York, didn't he?

10   A.  Yes.

11   Q.  He didn't tell you one word about Mr. Barrowman, this

12   person that you both knew, coming to New York City just weeks

13   earlier, right?

14   A.  Well, we didn't both know him.  I knew who he was.  I don't

15   know him -- he wouldn't have been somebody that we would have

16   discussed because it's not in my circle.  Like, I wouldn't have

17   cared.

18   Q.  Mr. Hart, can we agree you knew who he was?

19   A.  Sure.

20   Q.  And at that time, you did act in a play with him, right?

21   A.  Yes.

22   Q.  Okay.  So he didn't tell you that just weeks earlier, this

23   person you both acted in a play with had come out to visit him

24   for a week and stayed with him in New York, he mentioned not a

25   word of that, did he?

MACKRAP2                          Hart - Cross

1    A.  No, not that I recall.

2    Q.  Mr. Rapp did tell you he was in *Precious Sons*, though,

3    right?

4    A.  Yes.

5    Q.  He told you the play was fun, right?

6    A.  Yes.

7    Q.  But he didn't tell you that Ed Harris' character had picked

8    him up in the air in the play, right?

9    A.  No, I don't remember anything about that.

10   Q.  He didn't tell you that Ed Harris' character lied on top of

11   him in the play twice, did he?

12   A.  No, I don't remember any of that.

13   Q.  He didn't tell you that Ed Harris' character made a sexual

14   advance on him in the play, did he?

15   A.  Not that I recall.

16   Q.  He didn't tell you that eight nights a week, Mr. Harris'

17   character pretended, in character, to make a sexual advance on

18   him, did he?

19   A.  No.

20   Q.  Instead, he told you that Kevin Spacey lied on top of him,

21   right?

22   A.  Yes, he did.

23   Q.  Now, Mr. Rapp wasn't crying when he told you his Kevin

24   Spacey story, was he?

25   A.  No, not that I recall.

MACKRAP2                        Hart - Cross

1    Q.  Mr. Rapp wasn't shaking when he told you this Kevin Spacey

2    story, was he?

3    A.  Not that I recall, no.

4    Q.  And you've talked about this two or three times with

5    Mr. Rapp over the years?

6    A.  Yes.

7    Q.  You spoke extensively about your relationship at different

8    ages with Mr. Rapp, just on direct examination, right?

9    A.  Yes, sir.

10   Q.  You spoke about how your relationship has evolved over

11   time, right?

12   A.  Yes.

13   Q.  And you also spoke about your relationship in middle

14   school, right?

15   A.  Correct.

16   Q.  That would be before this trip to New York in 1986, right?

17   A.  Correct.

18   Q.  You even talked about some of the things you did together,

19   right?

20   A.  Yes.

21           MR. SCOLNICK:  Your Honor, without getting into

22   specifics, I renew the 412 motions.

23           THE COURT:  You renew?

24           MR. SCOLNICK:  The 412 motions.

25           THE COURT:  I'm having trouble understanding the last

 1    words.

 2             MR. SCOLNICK:  I renew my motion under 412.

 3             MR. STEIGMAN:  Which has to be under seal to start

 4    with.

 5             THE COURT:  All right.

 6             Members of the jury, a longer lunch hour than usual

 7    today.  2:00 o'clock, please.  And we have to clear the

 8    courtroom, so all spectators must leave, and the witness,

 9    please.  See you at 2:00 o'clock.

10             THE WITNESS:  Okay.  Thank you.

11             (Witness temporarily excused)

12             MR. SAGHIR:  Your Honor, are we going to resume with

13    the witness before lunch?

14             MR. STEIGMAN:  No; he said lunch.

15             MR. SAGHIR:  I'm sorry.

16             (Jury not present)

17             THE COURT:  You may be seated.

18             Who are all the people in the back of the courtroom?

19             MR. STEIGMAN:  The front row is Ken and people from my

20    office.

21             THE COURT:  Well, I don't know Ken's last name, but,

22    Ken, out of the courtroom, please.

23             Now, people from your office, what are they doing

24    here?  Are they participating in the prosecution of the case,

25    or are they spectators?

MACKRAP2                          Hart - Cross

1           MR. STEIGMAN:  Well, they're assisting.

2           THE COURT:  Is there any objection to their remaining,

3    Ms. Keller?

4           MS. KELLER:  None on our part, your Honor.

5           THE COURT:  Okay.

6           (Pages 562-575 SEALED by order of the Court)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MACsRAP3

```
1                         AFTERNOON SESSION

2                             1:55 p.m.

3              (Jury not present)

4              MR. STEIGMAN:  Your Honor, we have done a little more

5    research.

6              THE COURT:  This is on the same subject as before?

7              MR. STEIGMAN:  Yes.

8              THE COURT:  Well, we still have an issue with people

9    in the courtroom.  Why don't you want it up?

10             Have you given it to the other side?

11             MR. STEIGMAN:  No.  It's really the notes of the

12   advisory committee to Rule 412, right, so I just want to

13   call --

14             May I?

15             THE COURT:  It has to do whether offer of substantive

16   evidence or impeachment?

17             MR. STEIGMAN:  Right.

18             This is what we both found over the lunch break that

19   supports the position that --

20             THE COURT:  Say no more.

21             The ruling on the one matter we discussed before lunch

22   in the closed session is simply not with this witness.

23             MR. STEIGMAN:  Is what.

24             THE COURT:  Not with this witness, foreclosed for this

25   witness.
```

MACsRAP3

1           MR. STEIGMAN:  OK.

2           THE COURT:  The standard in 412(d)(2) is not satisfied

3    as to this witness.

4           OK.  Let's go.

5           MR. STEIGMAN:  One more thing.  Defendant's expert

6    Dr. Bardey is in the courtroom now.  Dr. Rocchio will be

7    testifying next.  I ask that he be excluded during

8    Dr. Rocchio's testimony.

9           THE COURT:  Any reason why not?

10          MR. SCOLNICK:  Yes, your Honor.  Dr. Bardey is a

11   rebuttal witness to Dr. Rocchio.  He should be here to listen

12   to the testimony he's going to rebut.  He's an expert, not a

13   lay witness, your Honor.

14          THE COURT:  Yes, I understand that.  Does the rule

15   make that distinction?

16          It's Rule 612, I believe.

17          MR. SCOLNICK:  615, your Honor.

18          THE COURT:  Thank you.  It does not.

19          Dr. Bardey will have to wait outside, or if he's not

20   going to testify today, he's free to go.

21          MR. SCOLNICK:  Yes, your Honor.

22          MR. SAGHIR:  Your Honor, would you like Mr. Hart to

23   resume the stand at this time?

24          THE COURT:  I'm sorry, I couldn't hear you.

25          MR. SAGHIR:  Would you like Mr. Hart to resume the

MACsRAP3

1    stand?

2             THE COURT:  One minute.

3             Mr. Scolnick, if you have any authority to the

4    contrary on that, I'm happy to look at it.

5             MR. SCOLNICK:  Nothing further than we've already

6    cited in our letters, your Honor.

7             THE COURT:  No, no, no.  I'm talking about

8    Dr. Bardey's presence.

9             MR. SCOLNICK:  I'm sorry.  I don't, your Honor.

10            THE COURT:  OK.  Thank you.

11            Yes, let's get Mr. Hart back.

12            THE DEPUTY CLERK:  Shall I get the jury, Judge?

13            THE COURT:  Yes.

14            THE DEPUTY CLERK:  Thank you.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

MACsRAP3                    Hart - Redirect

1           (Jury present)

2           THE COURT:  Mr. Hart, you're still under oath.

3           THE WITNESS:  Yes, sir.

4           THE COURT:  OK.  Now, we're still on cross,

5     Mr. Scolnick, yes?

6           You may continue.

7           MR. SCOLNICK:  Yes, your Honor.  I have nothing

8     further.

9           THE COURT:  OK.  Any redirect?

10          MR. SAGHIR:  Briefly.

11    REDIRECT EXAMINATION

12    BY MR. SAGHIR:

13    Q.  Mr. Hart, during cross-examination you were asked about

14    whether or not you were here to support Anthony or his lawsuit

15    and a portion of your deposition was read to you.

16          Do you recall that?

17    A.  Yes, I do.

18    Q.  I'm now going to read the entire portion of the deposition.

19    This is coming from page 16 of the deposition of November 9,

20    2021, line 15.

21          THE COURT:  Line 15 to where?

22          MR. SAGHIR:  Line 15 to 16.

23          MR. SCOLNICK:  Counsel, can you please put it on the

24    screen so he can see it?

25          THE COURT:  Pardon me?

1            MR. SCOLNICK:  I was just asking if counsel can put it

2     on the screen so we can see it.

3            THE COURT:  Don't you have the deposition here?

4            MR. SCOLNICK:  I'm pulling it up now, your Honor.

5            THE COURT:  It's only two lines.

6            MR. SAGHIR:  It's just ...

7            THE COURT:  I'm sorry.  Another quarter is heard from.

8            MR. SAGHIR:  I apologize.  I'm sorry, your Honor.

9     Should I start?

10           THE COURT:  Well, I'm going to give Mr. Scolnick a

11    chance to get it up on his computer.

12           MR. SCOLNICK:  I have it, your Honor.  Thank you.

13           THE COURT:  OK.  Page 16, lines 15 and 16.

14    BY MR. SAGHIR:

15    "Q.  Why is it you didn't want to answer my questions and you

16    did answer Mr. Saghir's questions?

17    "A.  Because Anthony is my friend and I trust his judgment.  If

18    he, you know, gets a lawyer and such, then I'm going to be

19    supportive of that.

20    "Q.  You want to be supportive of this case, correct?

21    "A.  No, I want to be supportive of him."

22    Q.  Mr. Hart, explain what you meant by that.

23    A.  Um, he's my friend.  We went through a lot together in that

24    time, and he trusted me with something that was, you know,

25    pretty earth-shattering to us at the time.  And, you know, I

MACsRAP3                        Hart - Redirect

1     just wanted to be supportive of him.  He asked -- he asked me

2     to, you know, speak my truth, so I did.

3              MR. SAGHIR:  I have no further questions.  Thank you.

4              THE COURT:  Thank you.

5              Mr. Scolnick, anything else?

6              MR. SCOLNICK:  No, your Honor.  Thank you.

7              THE COURT:  All right.  Thank you, Mr. Hart.  You're

8     excused.

9              THE WITNESS:  Thank you, your Honor.

10             (Witness excused)

11             MR. STEIGMAN:  Before I call the next witness, I think

12    we need to speak with the court again.

13             THE COURT:  It affects the cross, right?

14             MR. STEIGMAN:  And the direct, for sure.  For sure.

15             THE COURT:  OK.  If it affects the direct, members of

16    the jury, we have to do something without you being present and

17    we have to clear the back of the courtroom again.  Turn off the

18    feed to the overflow room.

19             (Pages 582-601 SEALED)

20

21

22

23

24

25

MACsRAP3                          Hart - Redirect

1                    (In open court; jury not present)

2                    THE DEPUTY CLERK:  Judge, are we ready to go?

3                    THE COURT:  I'm ready to go.

4                    (Jury present)

5                    THE COURT:  Members of the jury, sorry about the

6       interruption.  There are one or two things relating to this

7       case that have to be done in a closed courtroom, and that was

8       one of them.

9                    Hopefully the last.  Hopefully.

10                    Let's go.

11                    MR. STEIGMAN:  Your Honor, plaintiff calls Dr. Lisa

12      Rocchio.

13                    THE COURT:  Whoever on the jury asked if you could

14      stand and stretch your back, go for it.

15                    THE DEPUTY CLERK:  Please remain standing and raise

16      your right hand.

17       LISA ROCCHIO,

18           called as a witness by the Plaintiff,

19           having been duly sworn, testified as follows:

20                    THE DEPUTY CLERK:  Please state your name and spell

21      your last name for the record.

22                    THE WITNESS:  Lisa Rocchio, R-o-c-c-h-i-o.

23                    THE COURT:  You may proceed, Mr. Steigman.

24                    MR. STEIGMAN:  Thank you, your Honor.

25      DIRECT EXAMINATION

1    BY MR. STEIGMAN:

2    Q.  Good afternoon, Dr. Rocchio.

3    A.  Hello.

4    Q.  What is your profession?

5    A.  I'm a clinical and forensic psychologist.

6    Q.  Can you tell us what clinical psychology is, please?

7    A.  Clinical psychology is the study of human behavior,

8    thoughts, feelings, both abnormal and normal.  We study and

9    we're trained to assess psychopathology as well as human

10   strength and resilience.

11   Q.  What is forensic psychology?

12   A.  Forensic psychology is the application of the field of

13   psychology to some particular legal issue.  So it's psychology

14   at the intersection of psychology and law.

15   Q.  Can you tell the jury and court, please, your educational

16   background?

17   A.  Sure.  I attended NYU University for my bachelor's degree

18   and then I earned a master's degree and a doctoral degree in

19   psychology at the University of Rhode Island.  As part of that,

20   I conducted a pre-doctoral fellowship at Yale University School

21   of Medicine, and then following the earning of my degree, I did

22   a one-year post-doctoral fellowship in a private practice

23   setting as well as in a psychiatric hospital.

24   Q.  OK.  Let's back up a little bit.

25            Can you give us an overview of the coursework and

1    training that you received in connection with your master's and

2    Ph.D.?

3    A.   So it was a five-year program taking courses in general

4    areas of psychology, abnormal psychology, human development,

5    physiology, also specialty areas, perception, cognition.  I

6    took classes on forensic psychology, violence in the lives of

7    women, psychology of poverty.  Three -- three years full-time

8    of classes during which time I was also taking supervised

9    treatment and assessment of patients.  So learning how to

10   conduct individual therapy, marital therapy, family therapy.

11   And I did that for three years while I was also preparing both

12   a master's thesis, and then ultimately a dissertation, because

13   my program was a scientist and practitioner one.

14        Do you want me to continue?

15   Q.   If you would, tell us, were there any topics during that

16   period of time that you focused on?

17   A.   So I focused on eating disorders, I also focused on

18   violence and trauma, as well as forensic psychology.

19   Q.   When you talk about trauma, can you explain what you're

20   talking about, please?

21   A.   So trauma really occurs on the continuum.  So it's

22   essentially traumatic stress is any significant event that

23   exceeds a person's capacity to cope with that event, and it can

24   occur on a continuum at the more severe end.  We consider

25   trauma to be something where you either experience or witness

an actual or threatened death, severe bodily injury, or sexual

violence, for example.

Q.  OK.  What is -- are you familiar with the phrase

interpersonal violence?

A.  Yes.

Q.  Can you describe that for us, please?

A.  So interpersonal violence is an umbrella term that refers

to any sort of violence and trauma that one perpetrates upon

another.  So it's my area of expertise that would encompass

rape, sexual assault, childhood sexual abuse, sexual

harassment, and things of that nature.

Q.  You mentioned childhood sexual abuse?

A.  Yes.

Q.  What do you mean by that?

A.  Childhood sexual abuse is -- it's important for that to

be -- to understand that it's not simply a single event, it

occurs in a context.  So when we're talking about childhood

sexual abuse, we have to understand the dynamics.  But

essentially, it's when an individual, who either is an adult,

does something of a sexual nature either to or with a child.

And it can be both contact, so it can involve sexualized

contact, or it can be noncontact, for example, showing a child

pornography, for example, or having inappropriate

conversations.  But a sexual interaction between an adult and a

child.

1   Q.  I think you mentioned that in connection with your master's

2   and Ph.D., you did clinical work as well?

3   A.  Yes.

4   Q.  All right.  How many patients, and can you just give us an

5   overview about that?

6   A.  Sure.  So I had to complete about 400 hours of clinical

7   work.  Then I did about 1,000 hours, 1,500 to 2,000, before I

8   even got my Ph.D., and afterward another 2,000.  So in the

9   course of my training, it was between three and 4,000 hours.

10  Since that time, I've been seeing patients as well.

11  Q.  I'll ask you about that.  The three to 4,000 hours of

12  predoctoral, can you give us an overview of the clinical

13  experience you had?

14  A.  So when I was in graduate school, we ran a psychotherapy

15  clinic.  So I saw patients in an outpatient psychotherapy

16  clinic.  I also worked at Brown University Psychological

17  Services providing treatment to Brown students, I worked at the

18  University of Rhode Island Psychological Services providing

19  services to URI students, and then for the year that I was at

20  Yale, I worked for six months in an adult day hospital program

21  for adults with significant psychiatric illness.  And for the

22  other six months, I worked at what was then called Yale

23  Psychiatric Institute, which was a psychiatric hospital and day

24  program for adolescents.

25  Q.  What is a predoctoral fellowship?

A.   Within the field of psychology, you have to apply in order

to earn your degree when you're in a scientific -- science

practitioner model accredited university program, as I was.

One of the requirements of the degree is a full year of

full-time supervised clinical experience and you have to do

that at an accredited training site that has been, you know,

accredited to meet various criteria.

Q.   OK.  You described that you did that, correct?

A.   Yes.

Q.   After you got your Ph.D., what did you do next

professionally?

A.   So to meet requirements for licensure I had to, again, do

another full year of supervised clinical work.  And during that

year, I worked at a psychiatric hospital at Butler Hospital in

Rhode Island working in a program called that was a dialectical

behavior therapy program.  Dialectical behavior therapy is a

form of therapy that was initially developed to work with

chronically suicidal and self-injurious women.  It was an

all-women patient program, and the bulk of those women have

experienced some form of trauma during their childhood.

          In addition, I worked in the private practice

providing that form of treatment on an outpatient level with

supervision.  And then I also taught psychology classes during

that year at the Providence College.

Q.   During that period of time that you've described for us,

MACsRAP3                    Rocchio - Direct

1  did your focus include issues or patients who were victims of

2  childhood sexual abuse?

3  A.   Yes.

4  Q.   Can you describe that for us, please?

5  A.   So I was working at that time with both adolescents and

6  adults and had developed an interest and expertise in the area

7  of traumatic stress and interpersonal violence.  Also, because

8  I received training in this very specialized form of treatment,

9  oftentimes people would seek me out because I had that

10  training, and it can be quite helpful for people who have

11  really difficult lives or who have experienced trauma.  And

12  then, you know, over time I began to see more and more of those

13  patients.

14  Q.   You completed your post-doctoral fellowship?

15  A.   I did.

16  Q.   What did you do next?

17  A.   I got licensed in the state of Rhode Island and I opened an

18  independent practice ) where I provided psychotherapy to

19  adolescents and adults and began hiring staff to work in that

20  practice.

21  Q.   OK.  Have you continued in that practice?

22  A.   I've continued in that practice, and then also in addition

23  to that practice, as part of that practice, I also engaged in

24  forensic work.

25  Q.   OK.  We'll talk about the forensic work.

1          With respect to your clinical practice, you said

2    you're licensed in Rhode Island?

3    A.  Among other states, yes.

4    Q.  Tell us the states you're licensed in and what those

5    licenses are, please.

6    A.  So I'm licensed to practice psychology in Rhode Island,

7    Massachusetts, New York, Connecticut, and Maine.  And those

8    licenses allow me to both see patients, if I wanted to, in

9    those states, to conduct teletherapy with a patient residing in

10   those states while I'm residing in Rhode Island, and allow me

11   to travel to those states to perform forensic psychological

12   evaluations, to practice psychology.

13   Q.  All right.  Forgive me for asking, but how long have you

14   been, since completing your doctorate and getting licensed,

15   your post-doctoral studies, how long have you been engaged in a

16   private clinical practice?

17   A.  My first licensure I earned at the very end of 1997, so

18   25 years.

19   Q.  OK.

20   A.  26.

21   Q.  OK.  Do you have a focus in your clinical practice?

22   A.  I do.

23   Q.  Tell us about that.

24   A.  In my clinical practice, I focus primarily on working with

25   victims of traumatic stress.  So that would be a broad-based,

any sort of trauma stress.  So I work with first responders, I

work with police officers, I work with firefighters, I work

with people who been involved in motor vehicle accidents.  And

I also work with people who have experienced traumatic grief,

so they've lost a loved one, perhaps a child under traumatic

circumstances.  And then also my expertise in rape, sexual

assault, adult victims of childhood sexual abuse, intimate

partner violence, and sexual harassment.

          So those folks comprise the bulk of my clinical

practice, although I also treat many patients who are coming in

for difficulties in life adjustment or perhaps they are having

relationship trouble or depression, anxiety, that sort of

thing.

Q.   In your field, do you have any teaching responsibilities?

A.   I do.  Well, certainly as the owner of a practice where I

employ other therapists, I have a responsibility to continue to

train them and some of them, you know, didn't come to me with

expertise in the area of trauma.  So I provide training and

supervision to them.

          But I also, along the clinical faculty at the Warren

Alpert School of Medicine and in my role there, I provide

supervision for the psychiatry fellows who are wanting to

practice psychotherapy.  So I supervise the psychotherapy

portion and also give invited lectures and seminars regarding

the treatment of trauma.

MACsRAP3                        Rocchio - Direct

1   Q.  Are you involved with any professional organizations?

2   A.  I am.

3   Q.  Tell us about that, if you would.

4   A.  So I've been very heavily involved with the Rhode Island

5   Psychological Association, I have served on their ethics

6   committee for a number of years, I have served as a former

7   president of that organization.  I'm a fellow of the American

8   Psychological Association and a member of some international

9   traumatic stress organizations, as well as the Anxiety and

10  Depression Association of Rhode Island.  I'm quite, quite

11  active, and in particular, I'm a founding member of the

12  Division of Trauma Psychology, which is a subdivision at the

13  American Psychological Association.  And I sit on the ethics

14  committee as part of the entire American Psychological

15  Association.  I'm part of that ethics committee.

16  Q.  Have you published in your field?

17  A.  I have.

18  Q.  Can you describe that for us, please?

19  A.  So as a clinician, one of the things I like to do is public

20  service.  So a lot of my publications have been kind of public

21  service announcements for other professionals.  But I also

22  recently was the special editor of a journal, the journal is

23  called Personal Injury and the Law, and that special section of

24  the journal was a series of articles that looked specifically

25  at issues pertaining to the assessment of complex trauma in

1   forensic settings.

2          And as part of that, I wrote the -- co-authored the

3   introduction and edited all the other pieces and then also

4   wrote my own piece, which was on ethical and professional

5   considerations in the assessment of -- in the forensic

6   assessment of complex trauma and childhood sexual abuse.

7   Q.  All right.  You've mentioned forensic a few times and I

8   think you defined that for us earlier.

9          Can you describe your practice as a forensic

10  psychologist, what that is and what you do?

11  A.  So there are basically three separate things that I can,

12  and do, do as a forensic psychologist.  The first would be to

13  perform forensic evaluation.  So an attorney will contact me

14  and they may have a particular question that they want the

15  answer to.  So what was someone's mental state at the time that

16  they committed a crime or what are some of the factors in this

17  person's life that might have contributed to, you know, their

18  behavior that the court may wish to know at sentencing.  Or has

19  this person suffered any harm as a result of some alleged

20  incident or known incident.

21          So I conduct an extensive evaluation, and then rarely

22  end up getting called to testify.  A lot of the cases end up

23  settling outside of court.  I'll also testify when needed in

24  those cases.

25          Sometimes I come in, and without having done an

1    evaluation, and just provide the court with relevant

2    information as a subject matter expert.  So I'll provide

3    answers to questions and provide information, educational

4    information about the state of the scientific literature in the

5    field of traumatic stress and childhood sexual abuse or rape

6    sexual assault.  I might do that for prosecutors or I might do

7    that in defense cases.

8            And then the other way is not as a testifying expert,

9    but as a consultant to attorneys.  So if an attorney has some

10   psychological issue and they need expert help understanding the

11   data or understanding someone else's evaluation, I might work

12   as a consultant in that way.

13   Q.  How many forensic evaluations have you done in your career?

14   A.  If I had to estimate, I would say around 100.

15   Q.  I think you mentioned those are in both criminal and civil

16   cases?

17   A.  Criminal and civil, yes.

18   Q.  You've testified as a witness for the U.S. government at

19   times, correct?

20   A.  I have.

21           MR. STEIGMAN:  Your Honor, I offer Dr. Rocchio --

22           THE COURT:  I'm sorry.  That's not my practice.  Not

23   necessary.

24           MR. STEIGMAN:  Won't do it.

25   Q.  Doctor, at some point, did my office get in touch with you

1    to conduct a forensic psychological examination of Anthony

2    Rapp?

3    A.  Yes.

4    Q.  Can you give us an overview -- that was back in the

5    beginning of 2021?

6    A.  Yes.

7    Q.  So can you give us an overview of how you undertook to

8    perform this forensic exam?

9    A.  Yes.  So it's really important to understand that when I'm

10   working in a forensic capacity, it's a completely separate and

11   distinct role from when I'm working in a clinical setting.  So

12   in a clinical setting, I'm functioning as an advocate.  I'm

13   taking, often, what my patients say at face value and I'm

14   providing treatment in accordance with their goals.

15          In a forensic capacity, I'm working as an independent

16   evaluator and my job is much more investigatory.  The person

17   I'm evaluating is not my client.  The attorney is my client.

18   So I go in to answer a very specific question.  But in order to

19   do so, I take on kind of that investigatory role.

20          So I will ask to review all of the external documents

21   in the case.  So in a criminal case, I might be looking at

22   crime scene reports and crime scene photos or autopsy reports.

23   I might look at medical records, educational records,

24   deposition testimony, so I can see what others have said.

25          Then I spend usually at least about eight to ten,

MACsRAP3                        Rocchio - Direct

1    eight to 12 hours one-on-one with a patient where I perform

2    with the individual -- sorry -- where I conduct both

3    psychological testing and extensive professional psychological

4    clinical interviewing to understand this person and to help me

5    arrive at an opinion.

6           Thirdly, I conduct collateral interviews.  So often

7    there are people in an individual's life, whether that's a

8    parent or therapist or a partner, who can provide me with

9    information about how this person is functioning in the world,

10   how some event might have impacted them, how their relationship

11   is.  If it's someone who knew the person, say, before as well

12   as after the alleged event, I might be able to get a chronology

13   from them.

14          But the point here is that I go in and I look at all

15   of -- all of that information, and then I integrate it and form

16   an opinion.  I share the opinion with the attorney.  If the

17   attorney chooses, they may say, OK, thank you for your opinion,

18   good-bye.  Or they may say, could you please prepare a report

19   and be prepared to testify.

20          So my data is objective.  I don't always at all find

21   necessarily the data that the attorneys might be arguing, but

22   at least the attorneys know what's going on with their case

23   from a psychological perspective.

24   Q.  Sorry, Doctor.  So in connection with our retaining you as

25   a forensic psychologist, we'll go through the specifics of it,

1   but you did that evaluation and you offered an opinion in a

2   report, is that correct?

3   A.  Yes.

4   Q.  And you also were deposed by defense counsel in the case,

5   correct?

6   A.  Yes.

7   Q.  Now, the purpose, the overall purpose -- this is a

8   preliminary matter -- was to determine what, if any,

9   psychological damage Anthony Rapp sustained as a result of the

10   incident with Mr. Spacey, correct?

11   A.  Yes.

12          MR. SCOLNICK:  Objection, your Honor.

13          THE COURT:  Excuse me?

14          MR. SCOLNICK:  Objection, your Honor.  Motion in

15   limine number two.

16          I'm sorry, number three, your Honor.

17          (Pause)

18          THE COURT:  Question and answer is stricken.

19          Rephrase your question.

20          MR. STEIGMAN:  Let me do it this way, your Honor.

21   BY MR. STEIGMAN:

22   Q.  You came to understand that Mr. Rapp has made certain

23   allegations about conduct that occurred in Mr. Spacey's

24   apartment in New York City in 1986 when he was 14 and

25   Mr. Spacey was 26, right?

1   A.  Yes.

2   Q.  You understand that Mr. Spacey has completely denied those

3   allegations, right?

4   A.  I do.

5   Q.  OK.  When I referred to the incident with Mr. Rapp and

6   Mr. Spacey, can we agree we're talking about what Anthony Rapp

7   alleges, nothing more, nothing less, OK?

8   A.  OK.

9   Q.  Was your role to determine what, if any, psychological

10  damage Anthony Rapp sustained as a result of the incident with

11  Mr. Spacey?

12          MR. SCOLNICK:  Same objection, your Honor.

13          THE COURT:  Look, if the incident occurred.  The

14  question is thus modified.

15          MR. STEIGMAN:  Can we read that into --

16          THE COURT:  I know you tried to work around it, but

17  it's going to be a repetition and a repetition of an assumption

18  that I think has to be clearly an assumption.

19          MR. STEIGMAN:  Do you want me to say it every time?

20          THE COURT:  Not passionately.  I think that's the way

21  we're going to have to do it.

22          MR. STEIGMAN:  OK.

23          THE COURT:  I think I can manage.

24          MR. STEIGMAN:  I'm going to try to remember.

25  BY MR. STEIGMAN:

1   Q.  You're not here to offer testimony about anybody's

2   credibility, right?

3   A.  No, I'm not.

4   Q.  OK.  Your role was to determine if Mr. Rapp has any

5   psychological damage and see if you could form an opinion as to

6   the cause or causes, is that fair?

7   A.  Yes.  Causes or partial causes, yes.

8                   (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. STEIGMAN:

2   Q.  Okay.  Are you paid for your time as a forensic

3   psychologist?

4   A.  Yes.

5   Q.  How much do you charge?  What's your rate?

6   A.  $450 an hour.

7   Q.  Approximately how many hours have you put into this case?

8   A.  Somewhere over 50 thus far, and probably less than 75.

9   Q.  So that's a lot of hours.  Can you give us an idea of what

10  you've been doing in those hours, to form your opinion in this

11  case?

12  A.  Sure.

13          I would say probably 40 of those hours were spent on

14  the evaluation itself.  So, reading any of the preliminary

15  materials that I had access to prior to my meeting with

16  Mr. Rapp, reviewing records, and I had the opportunity to

17  review Mr. Rapp's deposition testimony, as well as some of the

18  court filings, so I could better understand what he was

19  alleging.  And then I spent about, as I said, nine and a half

20  hours directly with Mr. Rapp.  I spent several other hours

21  conducting collateral interviews.  And then I spent probably a

22  good -- the reports that I write, pulling all of that

23  information together, probably another 20 to 30 hours on the

24  report alone.

25          Then because my evaluation was done in 2021, since

MACKRAP4                        Rocchio - Direct

1    that time, there have been a number of lengthy depositions that

2    have been taken in this case.  So, I have spent considerable

3    time reading all of those depositions.

4           And then, obviously, traveling here, preparing to

5    testify today, reviewing my records, and then I was also

6    deposed.  So, I spent a day, a full day, answering questions

7    from Mr. Spacey's attorney.

8    Q.  Okay.

9           Are there certain objective tests that you

10   administered to Anthony as part of this evaluation?

11   A.  Yes.

12   Q.  I want to go through those.  There are a number of

13   different tests that you administered; is that correct?

14   A.  A number of different tests, as well as structured clinical

15   interviews and screening measures.

16   Q.  What is a structured clinical interview?

17   A.  So, a structured clinical interview is basically a test

18   format, and it's a clinical interview that's been designed by

19   the test takers to answer a specific question.  In this case,

20   it's something called the clinical interview for posttraumatic

21   stress.  And you have to ask questions on that instrument

22   precisely as they're written, and then there's a very specific

23   coding scheme that takes into account both the intensity and

24   the frequency of the reported symptom, and then it allows me to

25   evaluate in an objective manner whether or not that symptom is

MACKRAP4                          Rocchio - Direct

related to a particular, what's called, Criterion A event.  So

when you're assessing using that measure for PTSD in general,

it's not, oh, a whole bunch of trauma can cause PTSD.  The

assessment is done with a specific incident, and then you look

to see whether or not there were symptoms related to that

incident.

         So that was one of the measures.  That's a structured

clinical interview.  It's the most widely used assessment tool

for PTSD.  It's used in the Veterans Administration and for

veterans disability.  It's a highly respected and

well-researched instrument.

Q.  What's a Criterion A event?

A.  So, one of the things a psychologist that we use is

something called the DSM-V, which is a manual that's actually

produced by the American Psychiatric Association, and it lists

different diagnoses with their criteria.

         So, for posttraumatic stress disorder, in order to

qualify for the diagnosis, you have to experienced what the DSM

refers to as a Criterion A event, which is defined as either

experiencing oneself or witnessing either an actual or

threatened death, serious bodily injury, or sexual violence.

There are other disorders for traumatic stressors that don't

necessarily need that criteria, but for PTSD, you have to have

that particular event, and then a very specific set of symptoms

that relate to it.  So that's Criterion A for PTSD.

1    Q.   Okay.  Among the tests that you administered, was something

2    called the Folstein Mini-Mental Status Exam II?

3    A.   Yes.

4    Q.   Tell us what that is, please.

5    A.   So, the Folstein is just a very common mini-mental status

6    exam.  You may have even had it at the doctor's office

7    yourself.  It's just a very kind of gross general screen to

8    rule out significant cognitive impairment.  So I want to make

9    sure that the person I'm evaluating is cognitively able to

10   perform the evaluation.

11   Q.   What were the results of the Folstein Mini-Mental Status

12   Exam II for Anthony Rapp?

13   A.   Perfect store.

14   Q.   What is the Beck Depression Inventory?

15   A.   So, the Beck Depression Inventory is one of those

16   self-report screening tools that I administer.  And it asks a

17   number of questions about various severity of experiences of

18   depression, but only within the last two weeks.  So, it's a

19   real snapshot of how this person has been feeling in the past

20   two weeks, and it's self-reported; it's very evident, you know,

21   what the symptoms are, you know, have you felt sad, have you

22   felt low energy, have you been down, you know, those kinds of

23   things.

24   Q.   There's also something called the Beck Anxiety Inventory?

25   A.   The Beck Anxiety is a paired instrument, and it assesses

MACKRAP4                        Rocchio - Direct

1   for things like worry and physical tension, and just general

2   kinds of anxiety symptoms, yes.

3   Q.  You gave Anthony both of those tests, right?

4   A.  I did.

5   Q.  What's the Mood Disorders Questionnaire?

6   A.  The Mood Disorders Questionnaire is, again, another

7   checklist or questionnaire that I administered just to assess

8   to make sure that there were -- there was no evidence or

9   suggestion of more severe, serious preexisting bipolar

10  disorder.  And so, when you're -- you do the screen, and if

11  somebody tests positive on that screen, it would say to me,

12  okay, you know, red flag, you need to go and further assess for

13  bipolar disorder.

14  Q.  Any evidence of bipolar disorder?

15  A.  No, none.

16  Q.  What's the Personality Assessment Inventory?

17  A.  The Personality Assessment Inventory is one of those

18  objective tests that we talked about earlier.  It's a 344-item

19  test, and you answer each question on a scale of, you know, a

20  four-point scale as to how true particular series of statements

21  are for you.  So, it's not linked to any particular point in

22  time; it gives a sense of what is this person reporting on this

23  test about themselves.

24          And then it has what's called embedded validity

25  measures.  So, there are ways that the questions are worded,

they may ask the same question different ways, they may ask

kind of improbable questions that somebody who was trying to

fake mental illness might endorse, they ask specific questions

so that you can tell how is this person approaching the test —

are they exaggerating, tending to exaggerate their responses,

are they tending to minimize their responses, are they

defensive?  And then it also has a number of clinical scales

and subscales that give you a sense of how is this person

functioning from a symptomatic perspective, what are some

potential diagnoses you might want or need to consider, it

gives you a sense of how this person is interpersonally — are

they warm, are they dominant, are they egotistical — so it

gives you an overall sense of a person and some suggested

hypotheses for further evaluation.

Q.  Doctor, can you just explain to us how a validity scale

works, how a test itself could reveal whether or not someone

was exaggerating or minimizing his symptoms?

A.  So, validity scales, in general, are -- as I said, they're

embedded items, they're items that you wouldn't necessarily

know, you know, what it is they're getting at.  And what they

do is they norm the item pool against other normative groups.

So, for the PAI, in particular, they normed it with what's

called a community sample, kind of a random sample, of

individuals, and they saw how those people scored, and then

they normed it with a clinical sample, a sample of individuals

MACKRAP4                    Rocchio - Direct

1    who were known to have significant and severe psychiatric

2    illness.

3         So, now there are some -- on one of the scales, for

4    example, there are items embedded in here that are so severe

5    and so extreme, that even people who have known severe

6    psychiatric illness don't get scores that high on this item.

7    So, what we know is that when people are trying to fake or

8    exaggerate illness, they tend to overreport.  So, it kind of

9    gives us that sense.

10        And then it might also ask for things that most of us

11   are willing to admit to — like sometimes I get mad or I get

12   annoyed when I get something in the mail -- I'm making these up

13   because -- for test security purposes -- but things like that,

14   where most of us would be willing to say, yes.  Well, if you're

15   saying no to, like, anything that could potentially be

16   negative, then it's pretty clear that you have what's called a

17   defensive profile, you're trying to make yourself better.  And

18   that would be important -- all of these kinds of response

19   styles are really important to understand in a forensic

20   evaluation.

21   Q.  You mentioned the PAI.  That's the Personality Assessment

22   Inventory, correct?

23   A.  Yes.

24   Q.  You gave other tests as well, the M-FAST, the Miller

25   Forensic Assessment of Symptoms, Trauma Symptom Inventory-II,

Adverse Childhood Experience Questionnaire, Life Events
Checklist, Posttraumatic Checklist-V, and the CAPS-V, right?

A.   Yes.

Q.   Could you tell us a little bit about those, in particular
the CAPS-V?

A.   Okay.  Is it okay if I group them in a way that makes
sense?  I'll talk about them all.

Q.   Absolutely.

A.   So, the first thing you do -- I do when I'm beginning an
assessment is I really want to know how this person is
responding, so that gives me information that I can then use
for the rest of the test.  So, in the beginning, I give the
PAI, I give the Mini-Mental Status Exam, and I give another
screening interview, which is called the M-FAST, the Miller
Assessment of Symptoms Test.  And what that test does is it
specifically assesses for malingering.  And it works very
similarly to how I just described a norm MAT test on folks who
they know have severe psychiatric illness and they see what do
those folks and various types of illness, how do they perform
on this test, what kinds of symptoms do they have.

         They also do things like they will get a pool of
subjects, and they'll say I want you to fake being depressed,
answer this the way you might if you were trying to fake
something.  So they norm it.

         So, that particular screening is -- I administered.

1    And then if someone scores above a certain threshold on that

2    instrument, there's a much longer structured clinical interview

3    I would have had to have done to further assess for

4    malingering.  So, the test will let me know, according to the

5    test makers, is this person answering a test in a way that's

6    consistent with how our group of honest responders answered.

7             So, that's what the M-FAST is.

8             And then the third instrument that gives me validity

9    information is something called the Trauma Symptom Inventory-2,

10   and that instrument was developed by a researcher and

11   clinician, a very well-known author in the field of trauma, to

12   assess for the types of symptoms, problems, and difficulties

13   that someone who has experienced a traumatic event may have.

14   Because posttraumatic stress disorder is one possible

15   manifestation of trauma, but we know that trauma can actually

16   cause a whole range of various kinds of issues — from

17   depression, anxiety, health issues.  So there's that test.

18   That test has the same kinds of validity measures in it as the

19   PAI does, but it was normed on a traumatized sample group.

20            So, those three, plus the CAPS, which is a structured

21   clinical interview, it's not validated with particular validity

22   scales.  That scale is where the person has to describe in

23   detail the alleged circumstance that they're saying is the one

24   that currently, in the past month, is bothering them the most.

25   So, they use the language in there to say, like, what's the

1    worst event, but they then define it to say, what's currently

2    bothering you the most?

3           And then you ask a series of questions that are mapped

4    to the diagnostic symptoms of posttraumatic stress disorder,

5    and you say, you know, do you have intrusive thoughts, do you

6    get upset when you're reminded of the event.  And for each of

7    those, the person has to give me examples of what exactly the

8    symptom looks like, how it affects them, how they cope with it

9    when it happens, how disruptive it is, and then also how

10   frequently over the course of the past month has it happened.

11          So, I'm then able, using scoring instructions, to both

12   link it — is it or is it not linked to this alleged event they

13   first told me about — and then, also, I can give a score

14   zero -- absent, mild, moderate, severe, or extreme, based on

15   that severity and frequency indicator.

16   Q.  I'm sorry, go ahead.

17   A.  So, those four, I was just going to say, are the ones that

18   are most objective and the ones I would rely most heavily on.

19          The others are what's known as face valid clinically

20   relevant screening tools.  They're the kinds of things you

21   might get when you go to see your doctor.  They're screening

22   that how's this person been in the last week, the last couple

23   of weeks, how much are they reporting anxiety, are they

24   reporting depression, and I do that for two reasons — one, it

25   helps give me a very narrow window so I can better understand

MACKRAP4                          Rocchio - Direct

what this person is saying about their state of mind at the
time that I'm evaluating them, but then it also gives me a way
to do a validity check, because those, it's very obvious, if
you want to report that you're really depressed, it's very
clear how to do that on those forms.  So I want to see is this
person, on the forms where it's obvious how they're supposed to
answer, if they have a problem, how are they answering, versus
on the ones where it's not clear.

          The other one that you mentioned is something called
the Life Events Checklist.  And what that is, is it's required
to be administered prior to administering the CAPS, the
clinical interview, and it goes through in great detail a list
of, I believe, 17 different types of traumatic events that an
individual could have experienced or witnessed or found out
about about a loved one, to find out and get a full trauma
history.  That test can be administered as, here, fill this out
for me, or it can be conducted in the way that I did it, which
is we went through, asked about each event, and got a sense of
it, and then the person said, okay, of all of those things,
which is bothering you the most over the past month.  And it
also asks, have you had other events in your life that have
bothered you to the same degree, even if this is the one that's
bothering you the most.

          And then that becomes that Criterion A index event for
the rest of the PTSD assessment.

1          THE COURT:  We're going to break for the afternoon

2    break.  Fifteen minutes.

3          (Jury not present)

4          (Recess)

5          THE COURT:  Dr. Rocchio, come on up, and we'll get the

6    jury.

7          MR. STEIGMAN:  Judge, at the end — we don't have to do

8    it now, but when we're done for the day — perhaps if I could

9    have a moment for clarification with respect to one of the

10   points of the ruling, or I could do it quickly now at a

11   sidebar?

12         THE COURT:  Let's do it later.

13         MR. STEIGMAN:  Yes.  Thank you.

14         THE COURT:  Yes.  We have a 4:30 criminal, so we'll

15   break a little early today.

16         And tomorrow, there's a memorial for the late

17   Judge Pauley at 4:00 o'clock, so I'll break shortly before

18   4:00.

19         Okay.

20         (Continued on next page)

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Okay.  Let's continue.

3            MR. STEIGMAN:  Thank you, Judge.

4  BY MR. STEIGMAN:

5  Q.  Dr. Rocchio, before the break, when we were talking about

6  the validity scales, you mentioned that companies or

7  researchers actually have people try to beat the test to try to

8  fake symptoms, right?

9  A.  Yes.

10  Q.  Okay.  So, explain that to us.  What's going on with that?

11  A.  So, when they're trying to determine how various groups

12  might score on a particular measure, researchers will assign,

13  as I said, you know, I want you to take this test, and I want

14  you to pretend that you have PTSD, and they'll have that group

15  take the test.  Then they'll have a group who, through other

16  means, they know has PTSD, and they'll have them take the test,

17  and then you can, in that way, compare how easy is it when we

18  tell people, look, here are the criteria for PTSD, we want you

19  to try to answer this test, and we want you to try to fake it,

20  try to answer this test so that it'll score a particular way,

21  and then they compare that to people who actually they know

22  have the diagnosis.  And, I mean, this is a main research

23  method for a number of tests and disorders, but that's

24  basically how it works.

25  Q.  What has that research revealed?

A.  The PAI, in particular, is extraordinarily difficult to
fake.

Q.  Why?  If you tell someone what the symptoms are, why is it
so hard to just spit back the symptoms and fake out the test?

A.  So, as I said, there are 344 items, and they tap a whole
range of things, and each answer is answered on a 1 to 4 scale
of how likely is this to be about you, how true is this to be
about you, and to try hold in your mind exactly which questions
load on which scales, and to know for questions, say, that have
nothing to do with PTSD, how do people who have PTSD respond to
that question.  You know, and the other way that you know is
people who are trying to fake a psychiatric illness, really of
any kind, they're typically going to elevate.  If someone is
going to fake it, they're not going to fake that they have a
mild version of something, they're going to fake it, and so
you're going to see things, other kinds of red flags, like
super high scores, like, across the board.  And then that's the
reason why the forensic guidelines call for doing a multimethod
when you're conducting a forensic assessment, because I can
look at the validity scales, for example, on the PAI and the
TSI, plus the M-FAST all together and see, on all these
different validity scales, how is this person responding.

Q.  So, in your evaluation of Anthony Rapp, you have three
different tests that included validity scales?

A.  Yes.

MACKRAP4                          Rocchio - Direct

1   Q.  With respect to the results of Anthony Rapp's evaluation of

2   those three tests, what, if anything, did the validity scores

3   show?

4   A.  The validity scores showed that he attended consistently to

5   items, that he responded in a way that, without any indication

6   of exaggeration or attempt to form a negative impression, that

7   there was no overt or direct attempt to try to form a positive

8   impression.  And every scale that I administered to him was a

9   perfectly valid profile.

10  Q.  Any evidence of malingering?

11  A.  None.

12  Q.  Any evidence of exaggeration?

13  A.  None.

14  Q.  Any evidence of minimization?

15  A.  No.

16          MR. SCOLNICK:  Objection.  I think this is getting

17  into motion in limine 3.

18          THE COURT:  Overruled.

19  BY MR. STEIGMAN:

20  Q.  In the course of this case, have you learned that the

21  defendant retained a psychiatrist named Alexander Bardey?

22  A.  Yes.

23  Q.  Did Dr. Bardey also administer certain tests to Anthony

24  Rapp, as part of this litigation?

25  A.  Yes.

1    Q.  Do you know what tests he administered that had validity

2    scores?

3    A.  I do.

4    Q.  Can you tell the jury, please?

5    A.  Dr. Bardey administered a test called the Millon Multiaxial

6    Inventory, which is a similar kind of broad-based measure to

7    the PAI.  It's much shorter, and, actually, it's a little bit

8    of a harder test to quantify because people have to answer in a

9    true/false manner on that particular test; they don't have kind

10   of the flexibility.  But he gave that, and that had validity

11   scales on it.

12        He gave the Trauma Symptom Inventory-II, which was one

13   of the same tests that I administered.

14        And then he administered, or he had his assistant

15   administer, the SIRS-II, which, if you remember, I talked about

16   administering the Miller test, which is a screening instrument,

17   and Anthony got a zero on that test.  He didn't say yes to any

18   single one of those items.  But had he scored at a 6 or higher,

19   then I would have had to have administered the SIRS.

20   Obviously, since he said no to everything there, there was no

21   point, to me, to administer the SIRS.  So those are the three

22   tests that Dr. Bardey administered.

23   Q.  What did the zero on that Miller test indicate?

24   A.  He didn't report any of the symptoms that would be

25   exaggerated or improbable or unlikely, that -- you know, you

1    can score up to 5 -- up to 6 before the kind of indication that

2    you need to do more evaluation for malingering.  And

3    malingering is falsely reporting symptoms, falsely reporting

4    symptoms or psychological distress, psychiatric illness, for

5    the purpose of some external gain.

6    Q.   In the course of your review in this case, did you have a

7    chance to review Dr. Bardey's objective testing?

8    A.   I did.

9    Q.   And did you review the raw data of those tests?

10   A.   I did.

11   Q.   Did you review the validity scores?

12   A.   I did.

13   Q.   What did the validity scores of the tests that Dr. Bardey

14   administered to Anthony Rapp reveal?

15   A.   Completely valid, completely normal, totally valid

16   profiles, in terms of response style.

17          MR. SCOLNICK:  Your Honor, objection as to this

18   witness commenting on the rebuttal expert.  The rebuttal expert

19   can comment on the plaintiffs' expert, but I don't think it's

20   appropriate for it to go the other way.

21          MR. STEIGMAN:  I don't see why it's inappropriate.

22   They served a report, they served testing, they gave us data.

23          THE COURT:  Is this an opinion expressed in her

24   report?

25          MR. STEIGMAN:  It is not.  She didn't have the data.

MACKRAP4                         Rocchio - Direct

1   We got the data a week ago, two weeks ago.

2            THE COURT:  The answer is stricken, and the jury will

3   disregard her testimony about Dr. Bardey's results.

4   BY MR. STEIGMAN:

5   Q.  You have had a chance to review Dr. Bardey's deposition,

6   correct?

7   A.  Yes.

8            MR. STEIGMAN:  Can we go to page 42, line 8, please.

9   Q.  I want you to assume that Dr. Bardey was asked the

10  following questions and gave the following answers, starting on

11  page 42, line 8.

12           MR. SCOLNICK:  Objection, your Honor; same issue.

13  This is not in her report.

14           THE COURT:  Well, I better see the Q&A first.  Is it

15  on the screen?

16           MR. STEIGMAN:  Yes, it is.

17           Can we approach, or no?

18           THE COURT:  Just give me the page and line.

19           MR. STEIGMAN:  I would like to read 42/8 through 43,

20  line 20.

21           THE COURT:  Turn the page on the screen, please.

22           (Pause)

23           THE COURT:  Sustained.

24  BY MR. STEIGMAN:

25  Q.  Doctor, do you have an opinion with regard to whether or

MACKRAP4                        Rocchio - Direct

1    not an intelligent person who's done his research can alter the

2    results of validity tests while staying within a valid

3    response?

4    A.   No.   I mean, the whole point of having a valid assessment

5    instrument is so that you can determine whether or not a person

6    is responding validly.   You can't just pick and choose which

7    results you want.   You can't say this is a valid test, but you

8    know what, I don't think it's valid.   And you can't --

9    similarly, if you get an invalid test, I can't say, well, the

10   test is invalid, but it did show blah, blah, blah.   Either the

11   test is valid, and you have to interpret the results, or the

12   test is invalid.   It's not -- I mean, that's the point of

13   giving an objective test, right?   Otherwise you could just do a

14   clinical interview.

15   Q.   Were there certain differences in the results of the Trauma

16   Symptoms Inventory when you gave it to Anthony Rapp and

17   Dr. Bardey did?

18        MR. SCOLNICK:   Objection, your Honor; this is

19   rebuttal.

20        THE COURT:   Sustained.

21   BY MR. STEIGMAN:

22   Q.   In performing a clinical or a forensic evaluation, if a

23   patient has increased or decreased Trauma Symptom Inventory

24   scores over a period of time, what, if anything, is the

25   significance of that?

MACKRAP4                        Rocchio - Direct

A.   So, you may have remembered, I called it the Trauma Symptom

Inventory-II.  It's a second version of the test.  But one of

the things that they added to the test was the ability

specifically to compare, change scores over time, so that the

test is actually developed so that you can administer it at

multiple times to determine is someone getting better, is

someone getting worse, what's happening.

          So, again, provided and assuming it's a valid

instrument, the reason that they did it, and they made those

modifications, is because we know that symptoms vary over time;

they vary over the course of a month, they vary over the course

of one's life.  And so, the test is specifically developed to

tap into those kinds of changes.

          So, as long as the test is a valid test, you can see

this person's symptoms and which symptoms, right, not just the

overall test, but which symptoms are getting worse, which

symptoms are getting better, and which are the same.

          THE COURT:  I'm sorry, I just want to understand

this — you talk about Trauma Symptom Inventory scores and

comparing scores over time.  Is this either the same thing or

analogous to what happens when many of us go to the doctor, and

they say on a scale of 1 to 10, how much does it hurt right

now?

          THE WITNESS:  Not really, because it's more analogous

to going to the doctor and having the doctor -- you get on the

1      scale or taking your blood pressure, because there's an

2      objective measure.  The TSI is one of those tests that has the

3      validity scales in it, so it's not obvious how to respond, it's

4      not just self-report.

5              THE COURT:  And what's the objective measure?

6              THE WITNESS:  The objective measure are symptoms that

7      are known to be associated with trauma, all kinds.

8              THE COURT:  Any kind of trauma?

9              THE WITNESS:  Any kind of trauma.

10             THE COURT:  Broken leg?

11             THE WITNESS:  Any kind of psychological trauma, any

12     kind of event that would have negative psychological effects on

13     an individual.

14             THE COURT:  Well, thank you.  I'll leave it at that

15     for now.  Let's go.

16     BY MR. STEIGMAN:

17     Q.  In addition to the objective test, you did two different

18     interviews with Anthony Rapp, right?

19     A.  Yes.

20     Q.  How long did you spend, in total, interviewing him?

21     A.  About eight hours or so.

22     Q.  Can you describe those two interviews?

23     A.  So, one of them was the CAPS-V, and that was the structured

24     clinical interview.  That was actually part of the testing.

25             The other part of the interview is what's called a

semistructured interview.  It means that I have a general

format that I walk through with individuals when I'm conducting

evaluations, and I apply my knowledge and skills and experience

in terms of making -- asking questions and getting an

assessment.

        So, I start with the person's birth, you know, tell me

about your life, and I will have them go through significant

time periods in their life.  And what I'm trying to do is get a

sense of, you know, their family life, their background, the

context of how they are in the world, what was their level of

functioning like, I get an extensive description of whatever it

is that they are alleging happened and how they believe it may

or may not have impacted them, I conduct a symptom conversation

about how are you doing in your life, right, how are your

relationships, and take them all the way through how has this

affected you, tell me about your schooling, tell me about, you

know, all the areas of your life.  And I spend a lot of time

really trying to understand this individual's experience and

how their experience functioning symptoms, distress, may or may

not have changed over the course of time.

Q.  By the way, Dr. Rocchio, when our judge asked you, is this

like when the doctor would ask, you know, how much does it hurt

on a scale of 1 to 10, and you said it's really more like blood

pressure or weight, what did you mean by that?

A.  So, the questions -- how do you respond -- how do you feel

1 to 10, that's exactly like the screening inventories I

referred to earlier, the depression inventory or the anxiety

inventory.  The Traumatic Stress Inventory is much more

objective.  It's not just about how do you feel; it measures

things like depression, it measures things like arousal, it

measures things like overall how anxious are you, overall do

you have sexual concerns, overall do you have, you know,

problems with your mood.  And so, it's an assessment tool to

assess for symptoms that are commonly associated with trauma.

Q.  Thank you.

In addition to the, I think you said, about nine hours

of interviews with Mr. Rapp, you also conducted certain what

you call collateral interviews?

A.  I did.

Q.  What are those?

A.  Those are interviews with people important to the person or

people who may have relevant information to provide so that I

can get a sense of, has the person's functioning been similar,

and, again, is what they're telling me they're suffering from

or the distress that they're reporting, have they been talking

about this distress with others for a long time, for a short

time, has it changed, what has that person noticed, and what

does that person know about this person's psychological health,

well-being, and functioning.

Q.  What collateral interviews did you conduct?

1    A.  I did three in this case.  So, in one, I spoke with

2    lifelong -- long-term friend of Mr. Rapp's, Detective Sean

3    Snow; I spoke with his therapist of a number of years, Robin

4    Magid; and I spoke with his husband, Ken Ithiphol.  Forgive me

5    if I'm mispronouncing the name.

6    Q.  Did you look at any other materials to complete your

7    evaluation?

8    A.  I did.

9    Q.  Describe that for us, please.

10   A.  I looked at a whole range of things.  So, I looked at

11   Anthony's CV in terms of all of the shows he's been in, I read

12   his book, I read extensive deposition data in this case — so, I

13   read Mr. Spacey's deposition, I read Anthony's deposition, I

14   read Dr. Bardey's deposition, I read the depositions of many of

15   the witnesses in this case — so that I could have external

16   sources of information, because, as I said, when I'm doing a

17   forensic evaluation, I don't rely only or even primarily on

18   what the person is telling me, it's the evaluation in its

19   totality.

20   Q.  As a forensic psychologist, was one of the things you did

21   in your examination was evaluate the manner in which Mr. Rapp

22   responded to your questions?

23   A.  Yes.

24   Q.  What were the results of that evaluation?

25   A.  So, when I'm interacting with someone, and I'm doing an

evaluation, I'm looking at what are known as signs and

symptoms.  Symptoms, pretty obviously, those are the things

that the person is reporting to me.  Signs are the things that

I observe as a trained psychologist in terms of their manner of

interacting, so are they open, are they guarded, are they

anxious, are they fidgeting in their seat all the time, do they

look flat, depressed.  And I found Anthony to be remarkably

warm and open, he was very thoughtful in responding to my

questions, he was very careful to clarify, when he said

something, he wanted to make sure I understood he was saying

something, and it wasn't more or less than what he was

describing.  If he had questions about, you know, something he

didn't understand, he asked for clarification.  So, it was a

cooperative interview.

Q.  As a result of putting together these objective tests, the

two interviews with Mr. Rapp, the collaterals -- by the way,

did I ask you, you looked at other materials as well?

A.  Yeah.

Q.  Okay.

        Can you describe those?

A.  I mean, the depositions, any medical records, his book,

some scenes from a play that he was in at the time of this

alleged encounter.  Everything is listed in my report that I

reviewed, but, because I did my evaluation so early — I did it

back in January of 2021 — a lot of things happened after that

1    evaluation.  So, I wasn't -- I reviewed them all, but I wasn't

2    able to incorporate them into my report.

3    Q.  As a result of the entirety of this examination, did you

4    form certain opinions with respect to what, if any,

5    psychological damage Anthony Rapp sustained as a result of what

6    he alleges occurred with Mr. Spacey when he was 14?

7                MR. SCOLNICK:  Objection; motion in limine number 3.

8                THE COURT:  That's a yes-or-no question, I take it?

9                MR. STEIGMAN:  Yes.

10               THE COURT:  All right.  Answer it yes or no, please.

11               THE WITNESS:  Yes, I did.

12   BY MR. STEIGMAN:

13   Q.  And when I ask you about if you formed an opinion, do you

14   understand I mean that to mean an opinion to a reasonable

15   degree of certainty?

16   A.  Yes, I do.

17   Q.  Okay.  So just to keep things moving, anytime I ask you if

18   you have an opinion, I only mean you'd offer that opinion if

19   it's held to a reasonable degree of certainty.  Okay?

20   A.  Yes.

21   Q.  Can you give this Court and jury an overview of the

22   opinions that you reached with regard to whatever psychological

23   damage Anthony Rapp sustained as a result of what he alleges

24   occurred in Mr. Spacey's apartment in 1986?

25               MR. SCOLNICK:  Objection; motion in limine number 3.

MACKRAP4                          Rocchio – Direct

1           THE COURT:  I couldn't understand.

2           MR. SCOLNICK:  Motion in limine number 3.

3           THE COURT:  Let me refresh my recollection here,

4      folks.

5           MR. SCOLNICK:  Could we be heard at sidebar, your

6      Honor?

7           THE COURT:  In a second.

8           Yes, come on up.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Okay.

3          MR. STEIGMAN:  Well, you want to speak?

4          THE COURT:  What are we talking about here?

5          MR. SCOLNICK:  Your Honor, the Court's order, at

6    motion in limine number 3, prohibits Dr. Rocchio from directly

7    or indirectly giving any opinion as to the credibility of the

8    plaintiff or any other witness whether the alleged incident did

9    or did not occur or whether any circumstances support or

10   undermine any view of those matters.

11         That's directly what --

12         THE COURT:  Okay.  That's not what he asked, I think,

13   but you're going to have to be more specific.  Just give me an

14   overview of the opinions you formed.  She should probably

15   formed lots of opinions, some of them on credibility, among

16   others.

17         MR. STEIGMAN:  I understand there's some overlap.  I'm

18   not going to ask her.  I'm trying to do this very

19   appropriately.

20         THE COURT:  Of course you are.

21         MR. STEIGMAN:  The point of the exercise we've spent

22   hours on is they want to attack her opinion to say maybe some

23   of the symptoms are caused by other things, and the Court has

24   recognized that would be proper.  So, I respectfully believe

25   I'm entitled to bring out her opinion that his psychological

1   injuries are related to his claims.

2            THE COURT:  Yes, of course, but your question is way

3   broader than that.

4            MR. STEIGMAN:  Okay.  It was what -- I'm trying to

5   focus on did you form an opinion with regard -- my question, I

6   thought, was, did you form an opinion about any psychological

7   injury he has that relates to the claims he's made against

8   Spacey.

9            THE COURT:  Now, go back.  That question does not

10  sound objectionable.

11           MR. SCOLNICK:  It certainly does, your Honor, because

12  that's premised upon the assumption that this happened.  So

13  she's saying, yes, this happened.

14           THE COURT:  He said alleged incident.

15           MR. SCOLNICK:  Well --

16           THE COURT:  Right?

17           MR. STEIGMAN:  Yes.  I'll say that a thousand times.

18           MR. SCOLNICK:  It doesn't matter whether he's saying

19  it's alleged because she's assuming in the answer that it did

20  happen and that these things are caused by Mr. Spacey.

21           THE COURT:  Look, you can rephrase to deal with that.

22           MR. STEIGMAN:  If she can't say --

23           THE COURT:  You can rephrase to deal with that in the

24  terms of, did you form an opinion that, assuming for the sake

25  of argument what Rapp said actually happened...

1          MR. STEIGMAN:  You got it.

2          THE COURT:  Yes.  All right?

3          MR. SCOLNICK:  All right.

4          THE COURT:  Okay.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Okay.  Let's go.

3    BY MR. STEIGMAN:

4    Q.  Let's get a couple of things on the table.  You were not

5    retained in this case to evaluate the credibility of the

6    different witnesses, right?

7    A.  Absolutely not.

8    Q.  You didn't do any psychological evaluation of Kevin Spacey,

9    right?

10   A.  No.

11   Q.  You didn't do any evaluation of who seems like a more

12   credible witness or less credible witness, right?

13   A.  No.  That wouldn't be appropriate in my role.

14   Q.  Okay.  Was your role to evaluate what, if any,

15   psychological damage was caused by what Mr. Rapp claims

16   happened?

17   A.  That was my role.

18   Q.  I want you to assume, for the sake of the question, that

19   what Mr. Rapp is saying is true.  When I ask you to assume

20   that, keep in mind, Mr. Spacey says it's not true, right?

21   A.  Yes.

22   Q.  No doubt about that, right?

23          Did you form any opinions, based on your evaluation,

24   with respect to what, if any, psychological impact Mr. Rapp

25   sustained as a result of what he says happened?

MACKRAP4                        Rocchio - Direct

1    A.  Yes, I did.

2    Q.  Can you describe that, please?

3    A.  Yes.  So, my opinions go over time.  So, for me to explain

4    it, what I would need to say is, in the immediate aftermath of

5    this alleged event, I found that Mr. Rapp experienced --

6           THE COURT:  Could you please get a little closer to

7    the microphone.

8    A.   In the immediate aftermath of this event and in early

9    adolescence, I found that Mr. Rapp experienced a tremendous

10   amount of shame, confusion, uncertainty about what perhaps he

11   may have done or not done to have caused this.  It caused him

12   to have questions about him, his sexuality, and the meaning.

13   He really just had a tremendous amount of shame and guilt and

14   distress.

15          At various points in time, he also then had other

16   symptoms of posttraumatic stress disorder, although he did not

17   meet the full criteria for posttraumatic stress disorder until

18   2017.  So, the finding — now we'll jump forward to 2017 — was

19   that my finding was that in 2017, Mr. Rapp met the full DSM V

20   criteria for posttraumatic stress disorder with the Criterion A

21   identified event as his allegation.  But that is what's known

22   in the field as delayed onset or delayed expression of

23   posttraumatic stress disorder.

24          When you have a delayed onset or delayed expression,

25   in nearly all cases, what you have are evidence of

1    traumatic-based symptoms all the way through.  Mr. Rapp, like

2    many children who are -- well, let me just say, kids who have

3    been sexually abused oftentimes cope by trying to push things

4    out of their mind and trying not to deal with the effects.

5    It's kind of like if I pretend it didn't happen, then they can

6    push it out, and maybe it didn't happen.  It's a very common

7    minimization, denial.  Also a lot of confusion.  It's one of

8    the reasons why more than 50 percent of children don't come

9    forward until adulthood and why only 12 percent ever make a

10   report to any kind of law enforcement.

11         A big part of that is because they don't identify

12   their experience as having been abusive.  They know it

13   happened, they know it felt icky, it made them feel dirty and

14   shameful, but they don't understand that it was abusive.  They

15   just know something bad happened.

16         So, Anthony experienced the same kinds of symptoms I

17   talked about earlier with posttraumatic stress disorder

18   throughout his life.  He had intrusive, unwanted thoughts about

19   the incident that he alleges happened.  He would experience

20   distress, emotional upset, sadness, anger, fear in response to

21   seeing Mr. Spacey, either on TV or hearing about his name.

22   That's that piece about reminders.  There were times when he

23   tried to avoid his thoughts, didn't want to think about it,

24   tried to push aside his feelings, tried to say, hey, this is no

25   big deal, I'm going to be an actor, and I'm just going to push

1   this aside and move forward.  That's the avoidance.

2           And then the third criteria are distortions and

3   problems with mood and thoughts, where he had a profound sense

4   from the very beginning that the theater, which had formerly

5   been a full place of safety and comfort, and adults had

6   largely -- not all, but largely been very supportive and

7   wonderful to him, and all of a sudden now, there's this sense

8   of lack of safety, kind of in one's body, a sense of

9   violation --

10          (Continued on next page)

1              MR. SCOLNICK:  Objection, your Honor.  This is a

2    narrative that is nonresponsive.

3              THE COURT:  Overruled.

4    A.  So symptoms of feeling violated, feeling shamed, feeling

5    uncertain about who is to blame, sense of lack of safety, your

6    body becomes kind of an unsafe place, feelings of powerlessness

7    and loss of control.  So, again, the problems with mood, kind

8    of varying times where he experienced general symptoms of

9    anxiety, agitation, distress or depressive symptoms, right.

10             And then the fourth category for PTSD are what's known

11   as the symptoms of hyperarousal, and that is where you're

12   walking around with physical tension in your body.  You're --

13   you're -- you're likely to jump at an unexpected noise.

14   Earlier I talked about the physical upset in response to a cue.

15   Like, you know, there was a movie Anthony saw when he was young

16   and he didn't realize that Mr. Spacey was going to be in the

17   movie, and he described feeling this electric shock kind of

18   jumping out of his seat in response to the picture of

19   Mr. Spacey.

20             What I'm talking about now is, it's not cued.  It's

21   not in response to any necessary trigger.  It's just someone

22   comes up behind you and you jump.  You're kind of always on

23   edge and on guard.

24             So all of those symptoms from 2017 on, it's my opinion

25   that Anthony experienced all of those along with significant

distress and it affected his sense of self, it affected his

level of sexual desire, it affected his sexual and relational

interactions with his partner, now husband.

And from the age of 14, following the event, there is

evidence throughout his life of manifestations of varying

pieces or examples of these kinds of symptoms.  So he was

always having some form of traumatic response, but because his

psychological coping mechanism was to try to minimize it, put

it aside, push it away, not think about it, not -- that

biologic, it worked for a period of time.  And for a lot of

people, it does.  It worked for a period of time until it

didn't.  And there were a number of things that, you know,

resulted in it no longer working for him, and that is when you

saw the full blown post-traumatic stress disorder.

Q.  OK.  In the beginning you mentioned that he experienced

feelings of shame and confusion, is that correct?

A.  Yes.

Q.  All right.  Do you have an opinion that those feelings are

consistent with someone who has been the victim of childhood

sexual abuse?

A.  Absolutely.

Q.  Can you explain that, please?

A.  So one of the things that is most harmful or most toxic

about childhood sexual abuse is it's most often perpetrated by

someone that the child knows and has reason to trust, and the

1   experience is often incredibly confusing because they have

2   these positive thoughts about this person.  This is an adult,

3   this is somebody who is supposed to treat me well, yet they are

4   doing this thing to me that is incredibly violating, and they

5   really can't make sense of it.

6          They often think, what did I do to cause this.  In

7   addition, in particular when you're talking about male

8   survivors of childhood sexual abuse, that's been sexually

9   abused by a man, there is an added level of shame because of

10  the stigma associated with gay relationships in our society.

11         So oftentimes they will wonder, you know, was there --

12  was there something about me that he picked out.  And I'll see

13  this in who identify as gay now or who identify as straight

14  wondering, what did it mean that this sexual thing happened.

15         MR. SCOLNICK:  Objection, your Honor.  None of this is

16  in the report that was disclosed.

17         THE COURT:  The question was:  Do you have an opinion

18  that those feelings are consistent with someone who has been

19  the victim of childhood sexual abuse?

20         The witness answered:  Absolutely.

21         Question:  Can you explain that, please?

22         The question is:  What is your opinion as to whether

23  or not the feelings to which you refer are consistent with

24  someone who has been the victim of childhood sexual abuse?

25         So I'm going to strike the answer you've given and

1    we'll start again with the question we had pending.

2    BY MR. STEIGMAN:

3    Q.  Those feelings of blaming himself or confusion, are they

4    consistent with someone who has been the victim of childhood

5    sexual abuse?

6    A.  Absolutely.

7    Q.  Can you explain your answer, please?

8    A.  Um, I'm not sure what I'm allowed to say and what I'm not

9    allowed to say.

10   Q.  Sure.

11   A.  I can explain that there is a lot of research that has been

12   done looking at what are the effects of childhood sexual abuse

13   on individuals and what are those effects in childhood, what

14   are those effects in adulthood, and from that research as well

15   as clinical experience, we know that shame and confusion are

16   significant factors that commonly appear when children have

17   been sexually abused.

18   Q.  OK.  You mentioned post-traumatic stress disorder?

19   A.  Yes.

20   Q.  Can you just tell us the criteria, what constitutes, what

21   is it that constitutes PTSD, post-traumatic stress disorder?

22   A.  Sure.  So you have to have a criterion A trauma, then you

23   have to have a minimum of one symptom of intrusion, so that is

24   the nightmares or unwanted memories or physical distress or

25   emotional distress in response to reminders.  So you need just

1    one of those.

2            You need one avoidance symptom where it is either you

3    are avoiding thoughts and feelings associated with the trauma.

4    So internal avoidance or avoidance of external events, people,

5    places, and things.  So you need only one of those two.

6            Then you need two symptoms of cognition and mood,

7    which really is about the self-blame, shame, it's inappropriate

8    blame is the way it is described for PTSD.  So, for example, if

9    somebody is harmed and the only person they think is

10   responsible is the person who harmed them, that wouldn't count

11   for PTSD because it is appropriate to blame somebody who harmed

12   you.  But if you're blaming yourself or if you've been, you

13   know, injured and you're blaming, you know, the government in

14   general, then that wouldn't count as a PTSD symptom.

15           So you have to have some distorted or inappropriate

16   sense of guilt or shame, distorted world view, blame either of

17   yourself or of someone else, or pervasive negative feelings,

18   things like shame, guilt, fear, anger.  Any of those.

19           So you need -- there's a range within that category.

20   You need two of those types of symptoms, and then you need two

21   symptoms of hyperarousal, and that would be the things like

22   trouble with sleep, trouble with concentration, startled

23   response, sometimes people engage in reckless behavior.

24           So those would be kind of alterations in physiological

25   arousal.

1   Q.  Can a patient suffer post-traumatic stress symptoms without

2   having full on post-traumatic stress disorder?

3   A.  Yes.

4   Q.  Explain that, please.

5   A.  So when you make a diagnosis in the DSM, in order to

6   qualify for a particular diagnosis -- I'm sorry -- you have to

7   meet a certain set of criterion that's spelled out.  But within

8   the DSM, there is also ways to classify and categorize varying

9   disorders that, for one reason or another, don't quite meet all

10  of the full criterion.  And those disorders have other names.

11  There is something called other trauma and stressor disorder,

12  there is something called an adjustment disorder.  And those

13  are meant to capture exactly the question you asked me, which

14  are those circumstances where someone has experienced a

15  stressor or a trauma, and for some reason it doesn't quite meet

16  all of the criterion of PTSD.

17          And as I said, when you have delayed onset PTSD, you

18  almost always have evidence of post-traumatic symptoms prior to

19  the full-blown episode.

20  Q.  Did you form an opinion with regard to whether or not

21  Mr. Rapp had post-traumatic symptoms relating to his

22  allegations against Mr. Spacey prior to 2017?

23          MR. SCOLNICK:  Objection, motion in limine number

24  three.

25          THE COURT:  Pardon me?

1          MR. SCOLNICK:  Motion in limine number three.

2          THE COURT:  I'll tell you what we're going to do.

3    We're going to break for the day.

4          Members of the jury, nine o'clock tomorrow.  Tomorrow

5    afternoon, we're going to break shortly before four o'clock.

6          MR. STEIGMAN:  Did you say nine o'clock tomorrow?

7          THE DEPUTY CLERK:  You said nine.

8          THE COURT:  I'm sorry, I said nine o'clock?  I was

9    mistaken.  9:30, and we'll break shortly before four tomorrow.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. STEIGMAN:  I have one thing.

3          THE COURT:  Well, Mr. Scolnick has got something and

4     he's sneaking ahead of you.  I just want to find out what he's

5     talking about here.

6          Be seated, folks.

7          What are you talking about, Mr. Scolnick.

8          MR. SCOLNICK:  Your Honor, I don't have the line in

9     front of me.  I have realtime that's passed.  It sounded to me

10    like the question was:  Did you find that Mr. Rapp has symptoms

11    consistent along the way with someone who has been abused by

12    Mr. Spacey.  I can't remember exactly what it was.  That is the

13    way I heard it.  Essentially, an assumption it was premised on.

14         THE COURT:  Something like that was asked a half hour

15    ago.

16         MR. STEIGMAN:  I used the word allegations.  I'll make

17    the speech every time, if the court wants, that they are

18    allegations, Mr. Spacey denies them, and she's formed opinions

19    based upon these allegations.

20         THE COURT:  The pending question was:  Did you form an

21    opinion with regard to whether or not Mr. Rapp had post-

22    traumatic symptoms relating to his allegations against

23    Mr. Spacey prior to 2017?

24         So I guess what you're after is a rephrasing of the

25    question?

1          MR. SCOLNICK:  Yes, your Honor.

2          THE COURT:  So you'll rephrase it.

3          MR. STEIGMAN:  I'm open to suggestion because I

4   thought it's appropriate.

5          THE COURT:  Come on.  We had that sidebar.  I gave you

6   my suggestion.  You followed it for a while then you didn't.

7          MR. STEIGMAN:  I'm trying.

8          THE COURT:  I know you are.  Of course you are, and

9   Mr. Scolnick is doing the best he can, too.

10         MR. STEIGMAN:  I had one.

11         THE COURT:  Yes, I know you had one small thing.

12  Let's find out what it is.

13         MR. STEIGMAN:  Can we do it at sidebar?

14         THE COURT:  Because?

15         MR. STEIGMAN:  It would be under seal properly, in my

16  view.

17         THE COURT:  All right.

18         (Continued on next page)

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. STEIGMAN:  The implication is when he

3   cross-examines about one of the prior sexual incidents, based

4   upon the court's prior ruling, there is no reason to name

5   Christopher Hart, because then we go back to the court having

6   said we shouldn't get into that.  He can say they were kids,

7   did this, did that.  There is no probative value of naming him

8   other than that which the court explained.

9          MR. SCOLNICK:  I disagree, your Honor.  The jury has

10  already heard extensive information about their relationship.

11  I think it provides a context of it.  I think it would be

12  misleading to omit that information.  We've already heard from

13  him.  We heard he is one of his close friends, and I think it

14  is relevant.

15         MR. STEIGMAN:  I think that's exactly what the court

16  ruled upon before.

17         THE COURT:  I thought so.

18         Mr. X.

19         MR. SCOLNICK:  Or a friend, just not using his name.

20         THE COURT:  Yes, yes.

21         How long is the direct going to continue tomorrow?

22         MR. STEIGMAN:  I'm hoping to be done in an hour or so.

23         THE COURT:  OK.  And the cross I thought you were

24  winding down?

25         MR. STEIGMAN:  I'm trying.

1            THE COURT:  I know.

2            MR. SCOLNICK:  I wasn't anticipating this examination.

3    I would say at least two hours, probably more.  Then, your

4    Honor --

5            THE COURT:  Then you're going to rest, right?

6            MR. STEIGMAN:  I did make one change.  We're going to

7    show Barrowman.  I know they may or may not have.  So much came

8    in on cross, I want the jury to hear Barrowman.  We will play

9    Barrowman's testimony in our case.

10           MR. SCOLNICK:  We don't have any objection to that,

11   your Honor.

12           THE COURT:  How long is it?

13           MR. STEIGMAN:  It's not that long.  It's less than an

14   hour.

15           MR. SCOLNICK:  Less than an hour.

16           THE COURT:  All right.  If there is no objection,

17   fine.  Then you'll rest?

18           MR. STEIGMAN:  Then I'll rest.

19           THE COURT:  Then you're going to make a motion?

20           MR. SCOLNICK:  We will, your Honor.  We have cut our

21   case down significantly.

22           THE COURT:  Yeah, yeah, yeah.  Let me get to the

23   motion for a minute.

24           You're not bound, but what do you anticipate the

25   grounds being?

1          MR. SCOLNICK:  I think it would be similar grounds

2     what we raised pretrial.

3          THE COURT:  So, what?

4          MR. SCOLNICK:  To what we raised pretrial.

5          MR. STEIGMAN:  Summary judgment.

6          THE COURT:  Are you going to seek dismissal of the

7     IIED claim on the merits?

8          MR. SCOLNICK:  Yes.

9          THE COURT:  On what grounds?

10          MR. SCOLNICK:  Well, my colleague is writing the

11     motion right now.  Perhaps he would be better to able to speak

12     to it than I am.  I've been focusing on the cross-examinations.

13     I can bring him up, if the court wants.

14          THE COURT:  No.

15          I gather that there is New York law to the effect that

16     where an IIED claim is based on the same conduct and seeks

17     recovery for the same injuries as another commonly recognized

18     provision sounds to be the case here.  The IIED case goes out,

19     because it's totally surplusage.

20          So I urge you both be prepared on that.

21          MR. SCOLNICK:  Yes.

22          MR. STEIGMAN:  Is there an alternative pleading in

23     New York?

24          THE COURT:  Of course there is.  But the point is, if

25     the battery claim is dismissed, a verdict for the plaintiff on

1   the IIED would be inconsistent and vice versa.  That's the

2   point, I think.

3          MR. STEIGMAN:  So I'll briefly respond.

4          THE COURT:  There is a New York Court of Appeals case

5   and a Second Circuit case that have both, without definitively

6   ruling on that, though, I think the appellate divisions have,

7   some of them.  I'm just inviting your attention to that because

8   it is on my mind and I don't want you to be blindsided.

9          MR. STEIGMAN:  OK.  I think colloquially the standard

10  for a motion, emotional distress is something outrageous,

11  exceeds the bounds of common --

12         THE COURT:  Absolutely.

13         MR. STEIGMAN:  There was a case like about, aha --

14         THE COURT:  The last time I looked, the New York Court

15  of Appeals never sustained the plaintiff's complaint/liability

16  verdict on that cause of action.  Now that may be out of date,

17  but that's not matter.

18         MR. STEIGMAN:  It didn't go to the Court of Appeals,

19  but within the last two years, my office has won in trial

20  court.

21         THE COURT:  That's neither here nor there, all this

22  just chitchat.

23         But it was to your point that there is scarcity, at

24  best, successful plaintiff IIED cases.  That's not the point.

25  The point is there seems to be some law on the question where

1    they are duplicative, so that's what I'm addressing.

2              MR. STEIGMAN:  You're saying, if the battery went, by

3    definition the other one would go, too?

4              THE COURT:  Sure.  If there was no battery, what was

5    the intentional infliction of emotional distress.  He never

6    touched him.

7              MR. STEIGMAN:  Without belaboring it, I understand the

8    point.

9              THE COURT:  OK, so...

10             MR. STEIGMAN:  I could imagine the scenario.  Probably

11   doesn't fit here.

12             THE COURT:  I don't know.  I don't know.  I'm just

13   alerting you.

14             MR. SCOLNICK:  Thank you, your Honor.

15             THE COURT:  Thanks, guys.

16             MR. SCOLNICK:  See you tomorrow.

17             MR. STEIGMAN:  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           MS. KELLER:  Your Honor, may I ask the court to

3    quickly revisit the expert witness exclusion.  I haven't --

4           THE COURT:  I'm sorry, the what?

5           MS. KELLER:  May I ask the court to quickly revisit

6    the expert witness exclusion order.

7           I have had a chance -- I don't have the Internet

8    connectivity I need to pull up the case, but I've taken a look

9    at federal courtroom evidence, and it seems -- there seems to

10   be a line of cases saying that the witness exclusion exception

11   is frequently involved in the case of experts, it's within the

12   trial court's discretion.

13          There was a Second Circuit case on it being an abusive

14   discretion to sequester the parties' fire expert.

15          THE COURT:  I'm sorry.  I'm not getting what you're

16   saying.

17          MS. KELLER:  The question of whether you have to

18   exclude a witness is within the discretion of the trial court.

19   There are cases in particular involving expert witnesses where

20   they have been exempted from the usual sequestration of witness

21   rule.  One of those is *Malek v. Federal Insurance Company*,

22   994 F.2d 49 and 54, saying it is an abuse of discretion to

23   sequester a party's fire expert.

24          There are other cases, some of which are circuit cases

25   and some of which are not, one of them is *Yu v. Idaho State*

1    *University*.  That is a district court case, but it discusses

2    that allowing a plaintiff to have his expert rebuttal witnesses

3    present during trial proceedings is important to his trial

4    presentation, especially if you're going to have opposing

5    experts with competing testimony.

6          In this case, your Honor, we never anticipated that

7    there would be a pre-rebuttal of our expert.  We thought their

8    expert would testify, our expert would rebut, they would have a

9    chance at surrebuttal.  That's the anticipated course that

10   things would take.

11         THE COURT:  Ms. Keller, the rule says, at a party's

12   request, the court must order witnesses excluded so that they

13   cannot hear other witness's testimony.  There are exceptions.

14   The exception that you're now advocating for was not raised

15   before.

16         MS. KELLER:  I understand.  The reason I'm asking the

17   court to revisit it is because I don't think it would be fair

18   to allow this witness to keep testifying without our witness

19   being able to come tomorrow and listen and be provided with a

20   copy of her transcript.

21         Because as I said, she's doing pre-rebuttal of our

22   expert's testimony, and it would only be fair to let him hear

23   what she is saying.

24         THE COURT:  There was a very limited amount of that

25   and I think I cut most of it off, if not all of it.

1            MR. STEIGMAN:  All of it.

2            MS. KELLER:  Not all of it, but I agree with the

3    court.  You cut most of it off.

4            THE COURT:  For the obvious reason, and it wasn't in

5    her report.

6            MS. KELLER:  There are a number of things that have

7    been gone into that weren't in her report.

8            THE COURT:  Look, I'll look at your cases and make a

9    decision in the morning, but I don't think we need to take more

10   time on that now.

11           OK.  Thanks, folks.

12           MS. KELLER:  Thank you, your Honor.

13           THE COURT:  Have a nice evening.

14           MR. STEIGMAN:  You too, your Honor.

15           (Adjourned to October 13, 2022, Thursday, at

16   9:30 a.m.)

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 ANTHONY RAPP

Cross By Ms. Keller  . . . . . . . . . . . . 446

Redirect By Mr. Saghir . . . . . . . . . . . 490

Recross By Ms. Keller  . . . . . . . . . . . 530

Redirect By Mr. Saghir . . . . . . . . . . . 534

CHRISTOPHER HART

Direct By Mr. Saghir . . . . . . . . . . . . 536

Cross By Mr. Scolnick  . . . . . . . . . . . 546

Redirect By Mr. Saghir . . . . . . . . . . . 579

 LISA ROCCHIO

Direct By Mr. Steigman . . . . . . . . . . . 603

                    DEFENDANT EXHIBITS

Exhibit No.                                   Received

 AA   . . . . . . . . . . . . . . . . . . . 461