MADKRAP1

1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ANTHONY RAPP, et al.,

4               Plaintiffs,

5          v.                20 CV 9586 (LAK)
                                 Jury Trial
6  KEVIN SPACEY FOWLER, also
    known as Kevin Spacey,

7

               Defendant.

8  ------------------------------x

9                          New York, N.Y.
                           October 13, 2022
10                        9:40 a.m.

11  Before:

12                HON. LEWIS A. KAPLAN,

13                          District Judge
                          And A Jury
14                  APPEARANCES

15  GAIR GAIR CONASON RUBINOWITZ BLOOM HERSHENHORN STEIGMAN &
    MACKAUF
16        Attorneys for Plaintiffs
    BY:  RICHARD M. STEIGMAN
17        PETER JAMES SAGHIR

18  KELLER/ANDERLE LLP
        Attorneys for Defendant
19    BY:  JENNIFER KELLER
        CHASE SCOLNICK
20        JAY PHILLIP BARRON

21  ALSO PRESENT:

22  ANGELLA IBISHAJ, Gair Gair Conason Rubinowitz Bloom Hershenhorn
    Steigman & Mackauf
23

24

25

MADKRAP1

| | |
|---|---|
| 1 | (In open court; jury not present) |
| 2 | COUNSEL:  Good morning. |
| 3 | THE COURT:  Where is Mr. Scolnick? |
| 4 | MR. STEIGMAN:  They were here.  I can go get them. |
| 5 | THE COURT:  Yes, let's get them. |
| 6 | MR. STEIGMAN:  I think it's being done. |
| 7 | THE COURT:  Okay. |
| 8 | Mr. Scolnick, would you repeat what was conveyed to |
| 9 | me? |
| 10 | MR. SCOLNICK:  Yes, your Honor. |
| 11 | I spoke with Ms. Keller this morning.  She informed me |
| 12 | that she tested positive for COVID, and she is symptomatic. |
| 13 | THE COURT:  Thank you. |
| 14 | So, the question now is where do we go from here. |
| 15 | The first question temporally that I think we need to |
| 16 | deal with is what, if anything, to tell the jury, and when. |
| 17 | MR. SCOLNICK:  Your Honor, I would ask that the Court |
| 18 | inform the jury that Ms. Keller is not here because she tested |
| 19 | positive, and that she will be joining us as soon as possible |
| 20 | and as soon as it's safe to do so. |
| 21 | THE COURT:  Well, that's making a lot of assumptions, |
| 22 | but I think they should be told right away. |
| 23 | MR. SCOLNICK:  I agree, your Honor. |
| 24 | MR. STEIGMAN:  I truly don't know what to say.  I |
| 25 | really don't. |

MADKRAP1

1          THE COURT:  Well, we're starting late because I've

2     been thinking about that.

3          MR. STEIGMAN:  I certainly want to work with

4     Ms. Keller and the Court and everyone, really, as best we can.

5     I'm not a doctor, but, off the top of my head, I would have

6     concern about her showing up here Monday and saying, okay, now

7     I feel okay.

8          THE COURT:  Yes, no.  Well, there are some protocols

9     that I'm obliged to follow.

10         MR. STEIGMAN:  Right.

11         THE COURT:  And under the protocols, first of all,

12    Ms. Keller -- when was the first day that she became

13    symptomatic and/or tested positive?

14         MR. SCOLNICK:  She tested positive this morning, your

15    Honor.

16         THE COURT:  And was she symptomatic before today?

17         MR. SCOLNICK:  I don't believe so.  I think perhaps

18    late last night.

19         THE COURT:  Pardon?

20         MR. SCOLNICK:  Perhaps late last night.

21         THE COURT:  For the sake of discussion, bearing in

22    mind that I could be off a day one way or the other, she is not

23    permitted to enter the courthouse unless one of these tests are

24    satisfied:  She's allowed to return between day six and day ten

25    following symptoms or the start of symptoms or exposure.  If

1   she tests negative on two diagnostic tests at least 24 hours

2   apart and is fever-free for 24 hours and is improving.  If

3   those conditions aren't satisfied, she cannot return until

4   after day ten unless she's fever-free, without fever-reducing

5   medication, she's improving, and she's masked.  So, that's

6   number one.  We're not talking about anything earlier than

7   sometime next week, in the best of cases.  That's as to

8   Ms. Keller.

9           Ms. Keller has obviously been in close contact, which

10  is defined as being less than six feet from another person for

11  ten minutes or more over a 24-hour period, certainly with

12  everybody at the defense table, and if memory serves, certainly

13  at least a number of jurors — probably number 6, number 5, and

14  if we get out the tape measure, maybe some others — because she

15  was at the lectern cross-examining yesterday morning, right?

16          MR. SCOLNICK:  Yes, your Honor.

17          THE COURT:  And that close contact is triggered

18  48 hours before the onset of symptoms or the positive test.

19          In that case, the person who was in close contact — so

20  now we're talking about the defense table and a couple of the

21  jurors — if the person is unvaccinated, can't come back into

22  the courthouse for ten days after the last close contact.  If

23  the person who came into close contact is fully vaccinated and

24  doesn't have ongoing exposure, they can come in on day three

25  and five following the last close contact, with the date of

1  contact being date zero, which certainly wasn't any earlier

2  than yesterday, if they test negative and remain masked through

3  day ten.

4         Now, I have a limited amount of discretion, but not

5  with respect to entry into the courthouse.

6         Now, with that in mind, where do you folks think we

7  should go?

8         MR. STEIGMAN:  To some extent, it's the defense's

9  issue in not having Ms. Keller here, but I guess I just have to

10  be honest and say, if I were -- I'll do whatever, but if I were

11  sitting in your seat, I think I might allow some of these

12  things and some testing to happen and regroup next week.  I

13  don't know.  But I'm perfectly okay continuing on, to the

14  extent it fits within the rules, but it seems problematic.

15         THE COURT:  What seems problematic?

16         MR. STEIGMAN:  To just continue right now.

17         THE COURT:  Oh, I think that's clear.

18         MR. STEIGMAN:  Okay.

19         THE COURT:  I think that's clear.  The question is

20  what we do.

21         I'm first focused on the jury and on trying to save

22  the trial, obviously, if we can safely.  If they're all fully

23  vaccinated --

24         MR. STEIGMAN:  If I may, your Honor.  I think, if I

25  recall correctly, you asked --

1          THE COURT:  I did ask, but I don't think I used the

2    word "fully."

3          MR. STEIGMAN:  Okay.

4          THE COURT:  You're right, and they're all vaccinated

5    to some degree.

6          The earliest they can come back, at least those who

7    are in close contact, would be Tuesday.  So, what I think we do

8    about that is bring them in, tell them where we are, and send

9    them home, and tell them that they are going to have to test on

10   Sunday and on Tuesday, and depending on the outcome of those

11   tests, we may or may not resume on Wednesday, and we'll notify

12   them we'll be in touch with them about the testing, and we'll

13   advise them as to where we are going once we have enough

14   information as to that.

15         Then I can send them home, not have them all in the

16   jury room having contact with each other, and then we can

17   figure out what we're going to do more broadly, because we have

18   the problem of the people at the defense table, at least, all

19   having been in close contact.

20         Okay.  It is pointed out to me that I perhaps misread

21   the rules.  If they are fully vaccinated and don't have ongoing

22   exposure, which appears to be the case, they can come in if

23   they remain masked through the end of day ten and they comply

24   with the testing, even though they're coming in in the interim.

25   I think that's the right reading.

1          So, they're okay to be in the courthouse if they're

2     fully masked and fully vaccinated.  So that's what I'm going to

3     tell them.  And then we'll advise them further, and I'll ask

4     them to wait while we discuss it.

5          MR. SCOLNICK:  Your Honor, my math for the three to

6     five days, if yesterday was day zero, it would be one today,

7     two, three, I think they can probably be testing on Saturday

8     and Sunday, right, and then we can come back to the court on

9     Tuesday if they're clear because I'd hate to lose another day.

10          THE COURT:  No, no, no.  I had misread the restriction

11     as it relates to people who don't have ongoing exposure, and I

12     was focused only on the jury at that point.

13          MR. SCOLNICK:  Understood.

14          THE COURT:  All right.  Let's bring them in.  Have

15     them mask up.

16          And I would ask that everybody at the defense table

17     mask now, and anybody else who's been within six feet of

18     Ms. Keller for ten minutes or more in the last 48 hours.

19          MR. STEIGMAN:  Does Andy have masks?

20          THE COURT:  Does Mr. Mohan actually have masks?

21          If he doesn't have enough, we'll get some more.

22          Get Kathleen to get more.

23          What have I tried, six or eight or nine cases through

24     COVID and never had this problem.

25          (Continued on next page)

MADKRAP1

1           (Jury present)

2           THE COURT:  Well, good morning, everyone.

3           I need to inform you that Ms. Keller has tested

4     positive for the virus, COVID, and is symptomatic.  So, there

5     are rules that affect what we do in an effort to keep all of us

6     safe.

7           First of all, I know I asked you when we were

8     selecting the jury if there was anyone who wasn't vaccinated,

9     or essentially that.  The question I didn't ask is whether

10    there's anyone on the jury who is not fully vaccinated.

11          Fully vaccinated, as I remember, meant the original

12    two Pfizer shots, and in the case of Moderna, three Moderna

13    shots.  That's what I remember.

14          Anybody not fully vaccinated?

15          Okay.  So, that takes us part of the way.

16          Under the protocol that the Court is following, on

17    which we have been in constant contact with a medical school

18    professor of epidemiology and I think infectious disease, you

19    folks are all, for the time being, permitted in the courthouse,

20    provided that you wear your masks, and that on Sunday and

21    Tuesday, you test, either a PCR test or an FDA-authorized

22    at-home test, and you immediately inform us of the result.  And

23    at that point, obviously, if you test positive, you'll probably

24    be excused, and if you test negative, you'll continue.

25          Does anybody need test kits?  Because the Court will

MADKRAP1

1    supply test kits.

2           Okay.  One, two, three, four, five, six, seven.  Okay,

3    we'll have them up here shortly.

4           Now, the next thing that we have to deal with is that

5    there are certainly people in this courtroom who have been in

6    close contact with Ms. Keller, and there is another set of

7    considerations with respect to that, so I'm going to ask you

8    all to return to the jury room while the lawyers and I work on

9    that, which will affect whether we continue today or possibly

10   on a later date.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MADKRAP1

| | |
|---|---|
| 1 | (Jury not present) |
| 2 | THE COURT:  Now, I'm assuming that everybody at the |
| 3 | defense table has been in close contact with Ms. Keller, right? |
| 4 | MR. SCOLNICK:  Correct, your Honor. |
| 5 | THE COURT:  Okay. |
| 6 | Is there anybody else in the courtroom who has been |
| 7 | within six feet of Ms. Keller for a cumulative total of |
| 8 | ten minutes or more over a 24-hour period? |
| 9 | MR. STEIGMAN:  Probably me. |
| 10 | THE COURT:  Mr. Steigman. |
| 11 | Anybody else? |
| 12 | MR. SCOLNICK:  Yes, your Honor, a number of people |
| 13 | have. |
| 14 | THE COURT:  Okay.  Let's identify them. |
| 15 | Well, I think everybody in the first row. |
| 16 | Okay.  Yes?  No? |
| 17 | All right, six people in the first row. |
| 18 | Mr. Steigman, are you fully vaccinated? |
| 19 | MR. STEIGMAN:  I am, your Honor. |
| 20 | THE COURT:  What about each of the people at the |
| 21 | counsel table? |
| 22 | MR. SCOLNICK:  Fully vaccinated and boosted, your |
| 23 | Honor, yes. |
| 24 | MR. BARRON:  Yes, your Honor. |
| 25 | THE COURT:  Is there anybody in the back who |

1    Mr. Scolnick just pointed to who is not fully vaccinated?

2            Okay.  Well, then the rules for you are the same as

3    for the jury:  You have to have masks on for at least ten days,

4    anytime you're in the courthouse, unless you're on the witness

5    stand, and you have to test on Sunday and Tuesday and report

6    the results.  So, let's get a list of all the people who have

7    to report results to Andy, and contact information.

8            And do any of those people need test kits?

9            Two in the first row, one in the last row in the well

10   of the court.

11           Mr. Steigman, you need test kits?

12           MR. STEIGMAN:  Yes.

13           THE COURT:  So, we need, I guess, ten more test kits

14   beyond the jury.  So we're up to 34.

15           MR. SCOLNICK:  35, your Honor.  I could use one, too,

16   please.

17           THE COURT:  Well, 36.

18           MR. SCOLNICK:  Yes, your Honor, 36.

19           THE COURT:  36.

20           So, we'll take a brief recess while Andy gets together

21   the contact list for everybody who's got to report over the

22   weekend and on Tuesday.  And I think, if I understand this

23   correctly — and I'm going to check with the powers that be in

24   the courthouse — we are open so far as the courthouse is

25   concerned to have all the trial participants enter the

courthouse unless and until somebody tests positive, at which

point, we're going to have to go through this whole thing

again, possibly.

Now, let's work out -- I was going to say let's work

out which of the jurors were within six feet of the lectern,

but that seems to me, on reflection, not to be the right

exercise. The jurors have all been close together, and the

risk of having passed from one person in close contact to

somebody else who was not in close contact is, I think, too

high to draw that line.

Anybody disagree with that?

MR. STEIGMAN: No, your Honor.

MR. SCOLNICK: No, your Honor.

THE COURT: Okay.

So, at least provisionally, I think we'll resume this

morning and go as far as we can go. We'll see where we get.

You're going to get a contact list with phone numbers

and emails for everybody who's identified themselves as having

been in close contact, which is ten people in the courtroom,

and then the whole jury, I know you have contact information on

the jury.

Okay. Let's take ten minutes for Andy to get even

more organized than he is.

(Recess)

THE COURT: I know it's going to be awful to deal

1    with.

2         MR. STEIGMAN:  I said it out of abundance of caution,

3    and I'm one of them.

4         THE COURT:  No, no, I appreciate it.  I wonder whether

5    in any other case half of the jurors would be running for the

6    exits.

7         MR. STEIGMAN:  Dr. Rocchio can take her mask off, as I

8    understand it, correct?

9         THE COURT:  Yes.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Dr. Rocchio can come on up.

3          Now, before we get rolling, I want to just make sure

4     the jury understands where we are.

5          We've identified, so far as we know, everybody in the

6     courtroom who has had close contact with Ms. Keller, and they

7     are all going to mask, and they are all going to test and

8     report, as you are.  So, we're going to proceed and see where

9     we get.

10          The Court rules require that counsel, Mr. Steigman, be

11     masked because he may have had close contact.

12          Dr. Rocchio, a mask for you is up to you.  Okay?

13          And I'm wearing it because I'm within six feet of you.

14          Okay, let's go ahead.

15          MR. STEIGMAN:  Thank you, Judge.

16     LISA MARIE ROCCHIO, resumed.

17     DIRECT EXAMINATION CONTINUED

18     BY MR. STEIGMAN:

19     Q.  Good morning, Dr. Rocchio.

20     A.  Good morning.

21     Q.  When we left off yesterday, we were talking about

22     posttraumatic stress disorder and Criteria A.

23          Can you tell the Court and jury, please, what

24     Criteria A events are with respect to posttraumatic stress

25     disorder?

1   A.   They are defined as an event where an individual either

2   experiences or witnesses or knows about, through the course of

3   work or through a family member, an actual or a threatened

4   instance of death, severe bodily injury, or sexual violence.

5            THE COURT:  Well, counsel, there's a document that

6   sets out what Criteria A events are, is there not?  I should

7   address that to you.  It's a document, right?

8            THE WITNESS:  It's defined in a book called the DSM-V.

9            THE COURT:  It's called the DSM-V?

10           THE WITNESS:  Yes.

11           THE COURT:  And what you've told us is not the

12  entirety of what it says, right, as to what a Criterion A event

13  is?

14           THE WITNESS:  I don't believe so, no, sir.

15           THE COURT:  Well, let's get it.

16           MR. STEIGMAN:  I don't have the DSM-V.

17           THE COURT:  Well, let me see counsel at the sidebar.

18           (Continued on next page)

19

20

21

22

23

24

25

1        (At the sidebar)

2        THE COURT:  You have it?

3        MR. SCOLNICK:  I do.

4        THE COURT:  All right.  Now, what you're doing is

5  taking testimony from a witness about what some document says.

6        MR. STEIGMAN:  Well, it's not exactly -- I understand

7  the point, but it's like anything else, she's got an opinion

8  about PTSD, there are certain standards that define it, and the

9  allegations are true, are consistent with PTSD, which is her --

10  I don't know how else to get here.

11        THE COURT:  Well, she's already said that PTSD has a

12  diagnosis as defined by this book, and now we're having hearsay

13  as to what the book says.

14        What's your position?

15        MR. SCOLNICK:  Well, the document should be

16  introduced, your Honor.

17        MR. STEIGMAN:  I don't even think that would be

18  appropriate.  Experts testify all the time to opinions or

19  criteria that are, in part, based upon things they've read and

20  things they've studied.

21        THE COURT:  No, I don't think that's her testimony.  I

22  think her testimony was, was it not, that the elements of what

23  constitutes PTSD are set out in the DSM-V.  I think she said

24  that yesterday, didn't she?

25        MR. STEIGMAN:  She may have, but I don't think she

1    said -- I don't know if she said that's the sole basis of her

2    opinion regarding this being a competent producing cause of

3    PTSD, if it occurred.

4              THE COURT:  That's not the way I see it.

5              MR. STEIGMAN:  So --

6              THE COURT:  She can't have an opinion about what

7    constitutes a roadway.  I guess in certain circumstances, she

8    could, but --

9              MR. STEIGMAN:  But this is not a roadway.  The report

10   of their expert said this wasn't an event that even, if true,

11   could be a competent producing cause of PTSD, and that was his

12   expert's opinion.

13             THE COURT:  That's a different question.  PTSD is a

14   defined term.  And that's what she said, as I remember it.  If

15   I'm wrong in remembering it that way, please tell me.

16             MR. STEIGMAN:  I'm not sure, Judge.

17             But either both experts can testify that this event,

18   if true, could be a competent producing cause of PTSD or

19   neither can, right?

20             THE COURT:  I can't answer that question now.

21             MR. STEIGMAN:  All right.

22             THE COURT:  Let's step back.

23             (Continued on next page)

24

25

1      (In open court)

2      THE COURT:  All right.  Dr. Rocchio, you said

3  yesterday, one of the things as a psychologist that we use is

4  something called the DSM-V, which is a manual that's actually

5  produced by the American Psychiatric Association, and it lists

6  different diagnoses with their criteria.

7      Accurate so far?

8      THE WITNESS:  Yes, sir.

9      THE COURT:  So, for posttraumatic stress disorder, in

10  order to qualify for the diagnosis, you have to experience what

11  the DSM refers to as a Criterion A event, true?

12      THE WITNESS:  Yes, sir.

13      THE COURT:  So, whether something is or is not

14  diagnosable as PTSD depends on whether the criteria set out in

15  a book called the DSM-V have been satisfied, true?

16      THE WITNESS:  Yes.

17      THE COURT:  Okay.

18      MR. STEIGMAN:  May I, Judge?

19      THE COURT:  Go ahead.

20      MR. STEIGMAN:  Okay.

21  BY MR. STEIGMAN:

22  Q.  Dr. Rocchio, let me ask you this:  You understand

23  Mr. Rapp's allegation that that night when he was 14, in

24  Mr. Fowler's bedroom, that he picked him up like a groom would

25  carry a bride, put him down on the bed, got on top of him,

1   stayed on top of him for some period of time with his body on

2   his.  If you assume that that experience is true, as a

3   psychologist, do you have an opinion with regard to whether or

4   not that would be a competent producing cause of emotional

5   distress?

6   A.  So, as a psychologist, that would depend -- if I were to

7   assume that that happened, and that the individual experienced

8   it as a threat of some form of sexual contact, that would meet

9   the diagnostic criteria for Criterion A, yes.

10  Q.  Okay.  I just want to focus now on whether or not it would

11  be a competent producing cause of emotional distress.

12          Do you have such an opinion?

13  A.  Yes, absolutely, it would.

14  Q.  Okay.

15          I want you to assume that Mr. Rapp testified that he

16  wriggled out and went into Mr. Spacey's bathroom.

17          Do you have an opinion, assuming that that's true, as

18  to whether or not that experience during the time he was in the

19  bathroom would be a competent producing cause of emotional

20  distress?

21  A.  I do.

22  Q.  What is that opinion, please?

23  A.  Yes, it would be.

24  Q.  Can you explain why?

25  A.  Because the sense of --

1           MR. SCOLNICK:  Objection, your Honor; this is beyond

2      the scope of the expert opinion.

3           MR. STEIGMAN:  I disagree.

4           THE COURT:  Pardon me?

5           MR. STEIGMAN:  I disagree that it's beyond the scope.

6           THE COURT:  Well, let me see the report, please.  Tell

7      me what it is, and I'll get it up here.

8           MR. STEIGMAN:  I can hand it up.

9           THE COURT:  Okay.  If that's easy for you, it's easy

10     for me.

11          Thank you.

12          So, Mr. Steigman, which opinion in the report do you

13     say goes to that question?

14          MR. STEIGMAN:  Well, I think number 2 does because it

15     needs to be read in conjunction with the rest of the narrative,

16     to see what it is Dr. Rocchio --

17          THE COURT:  I need to read number 2.

18          MR. STEIGMAN:  I would call the Court's attention to

19     her narrative on page 7 as well.

20          THE COURT:  Well, the objection is that what you're

21     asking is not an opinion that she articulated in her report.

22     That's the objection.

23          MR. STEIGMAN:  And my response is:  She lays out the

24     event on page 7, and opinion number 2 speaks to the event laid

25     out on page 7.

1          THE COURT:  But your question goes to whether he's

2     emotionally disturbed, or whatever your term was, by virtue of

3     being in the bathroom, and there's no opinion here about that.

4     And the objection is sustained.

5     BY MR. STEIGMAN:

6     Q.  You've told the jury that Mr. Rapp's experience that day,

7     assuming it's true, was a competent producing cause of

8     emotional distress, correct?

9     A.  Yes.

10    Q.  Can you tell us, please, in detail, all of the aspects that

11    support your opinion that that event, assuming it's true, is a

12    competent producing cause of emotional distress?

13    A.  Yes.

14    Q.  Please do.

15    A.  As I also said yesterday, you have to look at an event in

16    its entirety.  And so, when I was referring to the event as a

17    competent producing event, I was referring to the entire

18    experience of -- that was alleged, which included not only what

19    was alleged to have occurred on the bed, but the fleeing.  The

20    sense of needing to flee and of being in danger, and then

21    needing to escape is, in and of itself, part of a traumatic

22    response and part of the traumatic event.

23          So, the fear of what could have happened, what might

24    happen, of am I going to be able to get out of here, and can I

25    escape is precisely why, within the DSM, they talk about a

1   threat --

2            MR. SCOLNICK:  Objection, your Honor; this is beyond

3   the scope of the opinion.

4            THE COURT:  Overruled.

5   BY MR. STEIGMAN:

6   Q.  You can continue.

7   A.  I think I finished my answer.  Is there a follow-up?

8   Q.  Yes.  We'll figure out something else.

9            At the end of this incident, assuming that it's true,

10  Anthony got away, Mr. Spacey said, are you sure you want to go,

11  and he left, right?

12  A.  Yes.

13  Q.  And there's no allegation that he penetrated him without

14  his consent in this case, right?

15  A.  Correct.

16  Q.  Can you explain why, in your opinion, that could still be a

17  competent producing cause of emotional distress?

18  A.  So, again, in terms of the diagnostic criteria, it's actual

19  or threatened.  So, it's the threat, the internal experience of

20  this could be happening.  So it's analogous, for example, to

21  let's say you're walking down the street, and somebody tries to

22  pull you into a car, and you manage to get away.  You later

23  find out that that person was a kidnapper.  You have that sense

24  of, my life was in danger.  It is the act of freezing, and the

25  fear and the trauma is in the needing to flee.

1          Similarly, if you get kind of charged at and attacked

2     by a dog, but somehow manage to get away without being bitten,

3     that could still be a fear of serious bodily injury that could

4     trigger negative consequences associated with long-term fear of

5     dogs, for example.

6          So, the fact that someone -- you perceive that someone

7     has attempted to cause you harm in some way, but you manage to

8     get away, doesn't have anything to do with whether or not that

9     event is traumatic.

10          Also, I think it's really important in that, if I may,

11     just provide a definition for sexual violence as it's used in

12     the field, because it's not a common understanding.

13          May I do that?

14     Q.   Go ahead.

15     A.   Sexual violence is an umbrella term within my field.  And

16     so, it doesn't actually require what we typically think of as

17     violence, in terms of physical contact or aggression.  It is an

18     umbrella term that's used to refer to a whole range of

19     potentially traumatic sexual events, such as sexual harassment,

20     rape, sexual assault, attempted rape, attempted sexual assault,

21     childhood sexual abuse.

22          So, it's the World Health Organization, the CDC,

23     anywhere you're looking at the research on sexual violence, is

24     that large umbrella term, and for children, in particular, who

25     are abused, as is laid out in the DSM, in the descriptions of

1    the diagnostic criteria, there's a point about attempted sexual

2    interactions can, in fact, meet the criteria for PTSD.

3    Q.  Okay.  You mentioned --

4              THE COURT:  Excuse me.

5              Members of the jury, Dr. Rocchio has just given her

6    opinion about how the term "sexual violence" is used by other

7    people in her field.  She is not telling you what the law is.

8    You are not to consider it as such.  I will instruct you on the

9    law insofar as it is relevant to this case.

10             Let's go on.

11             MR. STEIGMAN:  Thank you, Judge.

12   BY MR. STEIGMAN:

13   Q.  You mentioned a child.  Anthony Rapp was 14 when these

14   incidents occurred, assuming that they're true.

15             Is that a relevant factor to you in forming an opinion

16   with regard to whether or not this would be a cause of

17   emotional distress?

18   A.  Yes.

19   Q.  Can you explain that, please?

20   A.  One of the things that we know about posttraumatic stress

21   disorder is that events that involve interpersonal violence,

22   and, in particular, events that occur to children in

23   developmentally vulnerable times in their life, are more likely

24   than other types of events, particularly any event that has a

25   sexualized type of interaction.

1          So, you can get PTSD from a motor vehicle accident,

2    from being robbed at gunpoint, from all of these kinds of

3    things, but any sort of an event that is sexual in nature,

4    attempted or completed — sexual assault, childhood sexual

5    abuse — has a much higher rate of producing PTSD.  Not

6    everybody develops PTSD, but the rates are much higher with

7    those types of events, as compared to other types of traumatic

8    events.

9    Q.  Mr. Spacey was 26 years old, compared to Mr. Rapp's 14,

10   when this event allegedly occurred.

11         Assuming it did, is Mr. Spacey's age a relevant factor

12   in determining whether or not, in your opinion, this could be a

13   competent producing cause of emotional distress?

14   A.  Yes.

15   Q.  Can you tell us what that opinion is and explain it for us,

16   please?

17   A.  So, if I were to assume this is true, then what you have

18   laid out is an adult interacting with a child in what is a

19   sexualized manner, and laying on that child's body with the

20   child's arms by his side, and him experiencing this as a bodily

21   violation and unwanted, from an adult who he has reason to

22   believe has certainly much more power, control, and ability to

23   cause harm.  And, of course, it's unexpected; children don't

24   anticipate adults are going to come on to them sexually.

25         So, for all of those reasons, when you're talking

1    about an event that occurred, that is when an adult is doing

2    something to a child, that is significant, and, certainly, if

3    an adult were to do something sexual to a child, that would

4    make it childhood sexual abuse, which is one of those things

5    that I said is associated with many types of emotional harm.

6            And, again, to clarify, I'm talking about the entire

7    circumstances, including the fleeing, not just the simple

8    laying — not simple, I apologize — not just the laying on top

9    of and wriggling out, but the sense of needing to flee and the

10   uncertainty of whether or not you're going to be able to.

11   Q.   You formed an opinion with regard to whether or not Anthony

12   Rapp suffered emotional distress as a result of this incident,

13   assuming that it occurred?

14   A.   I did.

15   Q.   What is that opinion?

16   A.   That he did suffer from emotional distress, assuming that

17   this occurred.  That began immediately following -- during and

18   following the event, as well as through the course of his life,

19   up to the present day.

20   Q.   How did that emotional distress manifest itself, assuming

21   the event is true?

22   A.   Initially, with a sense of enormous fear and confusion.  So

23   we know that when individuals experience fear, common responses

24   are fight, flight, or freeze.  So, the sense of being frozen

25   and unsure what to do and being confused, wondering what's

1    going to happen, am I going to be able to get out of here, that

2    is absolutely incredibly distressing, certainly then the act of

3    trying to make sense of it, and then once away, beginning to

4    deal with a sense of what did I do to cause this, why did this

5    happen, is this a reflection on me.  So, those are examples of

6    shame, guilt, self-blame.

7           After that, certainly, questions about sexuality in

8    terms of Mr. Rapp experienced a sense of heightened

9    preoccupation with the idea of others, whether or not they were

10   sexually interested in him.  Certainly, he clearly said, look,

11   you know, I was a teenage boy, teenage boys are interested in

12   sex, but there was something about this, it was much more this

13   preoccupation of kind of encountering others, and that was

14   almost as immediate association, is this -- and that would be

15   kind of an intrusive, cued response, right?  You've had this

16   incident of someone, assuming it happened, coming on to you in

17   an inappropriate way, and now you're suddenly kind of looking

18   for that.  It's a sense of hypervigilance and preoccupation,

19   rumination, about that.

20          So, we have those types of experiences manifesting, as

21   well as significant efforts to avoid, to put this out of his

22   head, a sense of needing to keep it secret, something that he

23   was not wanting to tell, for example, his mother because he was

24   afraid that it would worry and distress her, and, as a

25   teenager, also that it would restrict -- she would, in turn,

1    then restrict his freedom.  So carrying the secret can cause a

2    sense of -- further that sense of shame.

3            Then in terms of trying to put the feelings out of his

4    head, he then experienced physical distress when faced with

5    reminders.  So, a good example of that was his description of

6    what happened when he was in the movie *Working Girl*, not

7    anticipating that -- not knowing ahead of time that Mr. Spacey

8    would be in the movie and kind of having a shocked response.

9    And, again, it's that the image brings you right back to the

10   event that caused you distress to begin with.

11           So, there's all these reminders, and it breaks through

12   your ability to put it out of your head.

13   Q.  Okay.  I think you told us yesterday that Mr. Rapp was, to

14   some extent, successful in using these coping mechanisms to

15   deal with his feelings regarding this incident, assuming it's

16   true, right?

17   A.  At times, yes.

18   Q.  And then I think you told us you believe he experienced

19   PTSD for the first time in 2017; is that correct?

20   A.  The full criteria of PTSD in 2017.

21   Q.  Can you explain to the Court and jury a delayed onset PTSD?

22   A.  Yes.  Delayed onset PTSD is defined in the DSM as PTSD that

23   occurs after -- full PTSD that occurs at some point beyond

24   six months after the traumatic event itself.  And what you see

25   with delayed onset PTSD is people have what are called

1   subclinical, subthreshold, in most cases, symptoms, as I've

2   described, throughout the course of their life, but then

3   something happens, and it brings about the full diagnostic

4   criteria.  And it's my opinion that that is what happened for

5   Mr. Rapp beginning around 2017.

6   Q.  Do you have an opinion with regard to what triggered PTSD

7   with respect to this incident, assuming it's true, in 2017?

8   A.  I do.

9   Q.  Can you please share that with us?

10  A.  So, I believe that there were two things.

11          One was, as Mr. Spacey's career continued to grow, it

12  became harder and harder and harder to avoid seeing his image,

13  reading about him, you know, hearing things about him.  It

14  became harder to avoid.  And then, in addition, in early

15  October of 2017, there began to be reports in the media about

16  Mr. Weinstein's abuse of a number of people, and that coverage

17  also prompted Mr. Rapp to begin to reflect on his own

18  experiences.  He began to feel guilt about not having come

19  forward sooner.  He was very much aware of the stigma that is

20  associated with childhood sexual abuse in this culture,

21  particularly for boys, and it troubled him that he had kept

22  silent about it.

23          He also, as part of that, read -- as he was

24  contemplating coming forward and trying to figure out what that

25  would look like, he also read an article that was written by --

1        MR. SCOLNICK:  Objection, your Honor; this is --

2        MR. STEIGMAN:  I'll move on.  I'll move on.

3  BY MR. STEIGMAN:

4  Q.  I want you to assume that Mr. Rapp testified that events

5  surrounding this lawsuit itself have caused him distress,

6  including his deposition, where Mr. Spacey was on the Zoom

7  taking notes, he could see him on the computer screen.

8        Do you have an opinion with regard to whether or not

9  that would be a competent producing cause of emotional

10 distress?

11 A.  Absolutely.

12 Q.  Okay.  Can you tell us that opinion, please?

13 A.  Yes.  Talking about one's trauma with trusted friends, with

14 a therapist, with people you know and love and care about in a

15 supportive setting, even that can be quite distressing.  To

16 have to go into details about a traumatic experience while the

17 person who allegedly has harmed you is watching you, taking

18 notes, and also simply being questioned in an environment where

19 the sense is that someone's trying to trip you up and being

20 aware that the people who are questioning you are making the

21 allegation that you're a liar, what you're saying didn't

22 happen, so that adds a whole different layer of stress.  And,

23 obviously, as you have to prepare for any sort of litigation,

24 you have to reread documents, you have to --

25        MR. SCOLNICK:  Objection, your Honor; this is

1    inappropriate testimony.

2            THE COURT:  Sustained.

3            Move on.

4            MR. STEIGMAN:  Okay.  Thank you, Judge.

5    BY MR. STEIGMAN:

6    Q.  In providing your evaluation of Mr. Rapp, did you do

7    anything to question or determine whether or not there might be

8    other causes of his anxiety or posttraumatic stress disorder?

9    A.  I did.

10   Q.  First of all, how do you do that?

11   A.  So, part of how I do it is I take an extensive trauma

12   history, and I inquire as to every trauma that the

13   individual -- any potentially traumatic event that the

14   individual has reported to me.  As you recall, I have a scale

15   that I administer called the Life Events Checklist, as well as

16   another called the Adverse Childhood Experiences Scale, and

17   those allow me to ask a whole range of types of potentially

18   traumatic or highly stressful events that an individual may

19   have experienced in their lifetime.  And then for each and

20   every event that Mr. Rapp reported that he had either

21   experienced or witnessed, I did a clinical interview as to what

22   happened, what were the circumstances surrounding that event, I

23   inquired as to whether at the time it had caused him distress,

24   I inquired as to whether he had any ongoing symptoms, whether

25   there was any sort of avoidance, any sort of intrusive

1    memories, any sort of lingering distress when reminded of the

2    event, and how he had coped with that event, and then how he

3    himself had experienced it, because you can have an event that

4    could be traumatic for some people, and that same event could

5    not be traumatic for someone else.

6            So, it's important, as a psychologist with expertise

7    in traumatic stress, for me to conduct that extensive clinical

8    interview, which I did.

9    Q.  Did Mr. Rapp disclose to you other events that you

10   considered potentially Criteria A events?

11   A.  Yes.

12   Q.  What were those?

13   A.  In particular, he disclosed to me that he had been -- I'm

14   sorry.  He was in a car, he was hit by a drunk driver from

15   behind.  A motor vehicle accident could potentially be a

16   Criterion A event.

17           He disclosed to me that when he was 17, a much older

18   adult woman, with whom he was staying at the time, approached

19   him and lifted her dress and was unclothed and initiated a

20   sexual encounter.  Depending upon the age difference, that

21   could potentially have been a Criterion A event.

22           He described a -- what he experienced as a consensual

23   sexual encounter with a classmate who was older than him, but

24   one grade ahead of him, a peer in school, that could

25   potentially have been traumatic.

1      He disclosed an event much later in life as an adult

2 when he was getting a massage, and he fell asleep, and when he

3 awoke, he discovered that the masseuse was fondling his penis.

4 That could potentially induce PTSD.

5      I believe those are all the ones that I found.

6 Q.  In the manner in which you've described, did you inquire

7 with respect to whether or not any of those events was causing

8 or contributing to any emotional distress in this case?

9 A.  I did.

10 Q.  Did you form an opinion with regard to that issue?

11 A.  I did.

12 Q.  What is that opinion?

13      MR. SCOLNICK:  Objection, your Honor; this goes to

14 causation.  This is motion in limine number 3.

15      THE COURT:  I'm sorry?

16      MR. SCOLNICK:  This goes to causation, and it's motion

17 in limine number 3.  It invades the province of the jury, your

18 Honor.

19      THE COURT:  Overruled.

20 BY MR. STEIGMAN:

21 Q.  Do you remember the question, Doctor?

22 A.  I believe so, yes.

23 Q.  Okay.  If you would, please.

24 A.  So, in conducting an inquiry for all of these events, I

25 determined that some of them did not rise to meeting

1    Criterion A, and I determined that none of them resulted in

2    ongoing symptoms of posttraumatic stress.

3    Q.  What was the basis of that opinion?  How did you determine

4    that?

5    A.  Through extensive clinical interviewing, through review of

6    collateral documentation, discussions with Mr. Rapp's long-term

7    therapist about what the focus of treatment had been, whether

8    or not she had dealt with any of these events, whether or not

9    she was aware of them, whether people had observed symptoms in

10   Mr. Rapp, and then also behavior.

11           So, for example, with the massage, I asked did it

12   affect how often you get massages, do you still get massages on

13   a regular basis, do you experience any tension or anxiety when

14   you go to get a massage, and the answer, for example, to all of

15   those things was no.

16   Q.  Thank you, Doctor.

17           THE COURT:  Were those answers from Mr. Rapp or

18   answers from the therapist or somebody else?

19           THE WITNESS:  Both, sir.

20           THE COURT:  Okay.

21   BY MR. STEIGMAN:

22   Q.  And as a result of all of that, you were able to form an

23   opinion?

24   A.  I was.

25   Q.  And you put all the data and the information together and

1  formulated an opinion with respect to the cause of his

2  emotional distress, correct?

3  A.  Yes, but --

4          MR. SCOLNICK:  Same objection, your Honor; motion in

5  limine number 3.

6          THE COURT:  Well, I'm going to sustain it as to form,

7  at least.

8          MR. STEIGMAN:  I'll move on, Judge.

9  BY MR. STEIGMAN:

10  Q.  I want to switch to something else.

11          In your work as a psychologist and dealing with trauma

12  patients, are you familiar with the concept of delayed

13  disclosure in cases of child sexual abuse?

14  A.  I am.

15  Q.  What is that?

16          MR. SCOLNICK:  Objection, your Honor; this is beyond

17  the scope of the opinion.

18          THE COURT:  Which opinion, Mr. Steigman, do you say it

19  comes under?

20          MR. STEIGMAN:  It's referenced in 3, it's referenced

21  in 4, it's referenced in the body of the report.

22          THE COURT:  Look, you were required to disclose

23  specifically the opinions she was going to testify to.  So, I'm

24  looking at the opinions.

25          Sustained.

1    BY MR. STEIGMAN:

2    Q.   Do you have an opinion with regard to whether or not

3    Mr. Rapp's awareness of the impact of what had happened to him,

4    assuming it's true, whether or not that changed over time?

5    A.   I do.

6    Q.   What is that opinion?

7    A.   My opinion is that it definitely did change over time,

8    that, like many individuals who have experienced any form of

9    rape or sexual assault, often they do not conceptualize it as

10   such at the time and for some time thereafter.  There's a word

11   for that; we call it unacknowledged rape and sexual assault.

12   And it's well-established, both in the scientific literature

13   and is something when I teach, I talk about.  It's why you have

14   to ask behavioral questions about what did and didn't happen as

15   opposed to just, hey, were you ever raped or were you ever

16   sexually assaulted.

17          So, if you're not conceptualizing what has happened to

18   you as an assault, and, in combination with that, you're

19   primarily coping with it by trying to push it out of your head,

20   you're compartmentalizing it, thoughts come up, and you

21   suppress them, you try to convince yourself that it was no big

22   deal because you want it to be no big deal, that all can work

23   in terms of functioning, but it definitely interferes with your

24   ability to recognize any potential harm or difficulties.  And

25   often it's not much later in life, in the process of therapy,

1   that you begin the process, because it is a process, of making

2   connections between the events you experienced and their

3   impact.

4   Q.  In your testing, did Mr. Rapp reveal any signs of mental

5   illness?

6   A.  In the testing that I administered, there were indicators

7   of traumatic stress and indicators of symptoms of depression

8   and anxiety.

9   Q.  Was there any sign of issues relating to mental illness,

10  unclear thoughts, any psychopathy?

11          Can you tell us what psychopathy is?

12  A.  Psychopathy would be antisocial behavior, difficulty

13  experiencing empathy, engaging in blatant disregard for the

14  rights, well-being of others, exploitation, that kind of thing.

15          So, there was no evidence of any antisocial behavior,

16  no evidence of any personality disorder, no evidence of any

17  tendencies towards exploitation, no evidence of bipolar

18  disorder, as I testified earlier, which would include things

19  like grandiosity and egoism and things such as that.  There was

20  no evidence of any of that.

21  Q.  As one of the personal characteristics that your test

22  looked at, was it jealousy?

23  A.  I would have to -- jealousy is incorporated into some of

24  the subscales of the PAI.  I can't say whether -- there is not,

25  I'm sorry, a specific jealousy subscale, but, certainly, there

1   was no indication of that in any of my clinical interviewing.

2   Q.  Okay.

3         Do you have an opinion, to a reasonable degree of

4   certainty, with respect to how, if at all, this emotional

5   distress will impact Mr. Rapp in the future as a result of this

6   incident, assuming that it occurred?

7   A.  I do.

8   Q.  Can you share that with us, please?

9   A.  So, I believe that when one has experienced -- if one has

10  experienced a childhood sexual abuse and then has developed

11  PTSD --

12        MR. SCOLNICK:  Objection, your Honor; this violates

13  motion in limine number 3 as far as the nomenclature.

14        THE COURT:  Yes, sustained.  Answer stricken.

15        I think there's a way to get where you want to get,

16  Mr. Steigman, but I don't think this is it.

17        MR. STEIGMAN:  In terms of the question?

18        THE COURT:  I think you need to formulate a question

19  that will not elicit a legal conclusion.

20        MR. STEIGMAN:  Okay.

21  BY MR. STEIGMAN:

22  Q.  So, Doctor, let's not focus on your opinion about whether

23  or not this constituted sexual violence, okay?  I'm not asking

24  you that.  All right?

25  A.  Okay.

Q.  But I am asking you, based upon all of the work you put

into this case, if you have an opinion about whether or not

Anthony Rapp will continue to suffer any emotional or

psychological damage into the future as a result of the

incident that occurred, assuming that it did?

A.  I do.

Q.  Can you share with us that opinion, please?

A.  My opinion is that, assuming that this event occurred, and

that as I did find significant emotional distress and

difficulty, PTSD, symptoms of depression, symptoms of anxiety,

shame, confusion, that all of those symptoms and the disorder

of PTSD will require trauma-focused psychotherapy going into

the future.  These problems don't just go away on their own,

particularly when they're of this long-lasting of a nature.

And the treatment itself can also be very difficult.

Psychotherapy, especially when you're looking at painful events

in one's life, is work, it's hard, it's not a walk in the park,

it's not a chat with a friend.

         And so, the act of going through one's life and making

connections between a potentially traumatic event that

occurred, if it occurred in childhood, could certainly require

lengthy psychotherapy, as well as talking about other painful

experiences in one's life.

         In addition to that, the process of learning that some

event has affected you on a psychological level far more than

1  you were ever aware of, that, in and of itself, is a very

2  distressing thing, because you're coming to terms with what

3  your experiences are, what happened, and how it affected you.

4  And that takes time and work and psychotherapy.

5  Q.  In the course of your evaluation, did you come to learn

6  that Mr. Rapp is in a stable, loving marriage?

7  A.  I did.

8  Q.  Did you learn that he has professional success?

9  A.  I did.

10  Q.  He has friends?

11  A.  Yes.

12  Q.  He has fans?

13  A.  Yes.

14  Q.  He's satisfied with his relationships and his career?

15  A.  Yes.

16  Q.  Is that inconsistent with having posttraumatic stress

17  disorder or emotional psychological injuries as a result of

18  this incident, assuming it occurred?

19  A.  No, it's not.

20  Q.  Can you explain that, please?

21  A.  Both a trauma and its effects occur on a continuum.  And

22  separate from that, individuals have a variety of resources and

23  strengths that they can use to apply to the difficulties that

24  they have in one's life.  So, one can have serious

25  psychological difficulties, whether it's depression or anxiety

1   or posttraumatic stress disorder, and continue to function in

2   one's life.

3          I found, in particular, that in the occupational

4   realm, that was not an area where there was significant

5   functional impairment for Mr. Rapp.  There was some, in terms

6   of impaired concentration and some more difficulty than usual

7   memorizing his lines, but, in general, Mr. Rapp, one of the

8   ways he tried to avoid thinking about things was to throw

9   himself into his work.  That was actually a coping strategy for

10  him.

11         But in terms of social relationships, the fact that he

12  has supports and has engaged in psychotherapy and worked very

13  hard to establish healthy relationships at this point in his

14  life does not mean that he hasn't, and is not, suffering.  We

15  know people work and go to jobs and live their lives with

16  significant psychological distress.

17  Q.  Thank you.

18         I want to be really clear for our jury, when you talk

19  about some issues with remembering lines and things like that,

20  are you only talking about that period around 2017?

21  A.  I'm talking about, actually, specifically the period

22  covering the time around the time I was doing my evaluation.

23  So, that would have been after '17, but in '21.

24  Q.  The therapy that you're talking about, in fact, did

25  Mr. Rapp have some trauma-based therapy with Robin Magid?

1    A.  He did.

2    Q.  Can you just describe that for us, please?

3    A.  In addition to talk therapy about trauma, which is a valid

4    form of treatment for trauma, Mr. Rapp also -- Ms. Magid also

5    used a type of therapy called EMDR, which is an evidence-based

6    treatment specifically for the treatment of traumatic memory

7    and traumatic events, the effects of traumatic events.

8    Q.  What traumatic event was that therapy geared towards?

9    A.  Specifically, that was geared towards Mr. Rapp's stated

10   recollections of the experience he alleges to have occurred

11   with Mr. Spacey.

12   Q.  Give us an overview of how that treatment works.

13   A.  So, EMDR has you --

14            MR. SCOLNICK:  Objection; relevance, your Honor.

15            THE COURT:  Let's take our morning break here, and I

16   will talk to counsel.  The witness will leave the room while we

17   have this discussion.  Fifteen minutes, folks.

18            THE WITNESS:  Thank you, your Honor.

19            (Witness temporarily excused)

20            (Continued on next page)

21

22

23

24

25

1        (Jury not present)

2        THE COURT:  Okay.  Mr. Steigman, why is this relevant?

3        MR. STEIGMAN:  Ms. Keller opened on the fact that

4    Mr. Rapp never disclosed this to Robin Magid.  The truth is, he

5    did in 2017.  Robin Magid had a lot to say to both experts when

6    they spoke to her about that, and she initiated therapy with

7    respect to that, and I've gone light with it, I'm not trying to

8    elicit Dr. Magid's opinion through Dr. Rocchio, but the fact

9    that she's talking about the need for therapy, and he's had

10   therapy with respect to --

11       THE COURT:  And now she's going to be a witness to

12   what that therapy was?

13       MR. STEIGMAN:  Well, she's -- it has a specific name,

14   and she's --

15       THE COURT:  I know it has a specific name.

16       MR. STEIGMAN:  Well, it's like anything else.  If it

17   was a knee replacement, and I didn't have --

18       THE COURT:  If it was a knee replacement, we wouldn't

19   be talking about it.

20       MR. STEIGMAN:  Well, I think it's appropriate in

21   mentioning her opinion.  She can describe what the nature of

22   his treatment is — not specific to him, but what the treatment

23   is.  Mr. Rapp testified to it, he mentioned it, but an expert

24   could say, this is what the point of the treatment is.

25       THE COURT:  Mr. Scolnick?

1          MR. SCOLNICK:  Your Honor, first of all, Ms. Keller

2     did not state in her opening that Mr. Rapp never told Ms. Magid

3     what she said.  It was not until after BuzzFeed.  So, my

4     concern with this is that, certainly, we're going to be getting

5     into Ms. Magid, too, on cross-examination of this expert.

6          THE COURT:  You're going to?

7          MR. SCOLNICK:  I'm sorry, it's hard with the mask,

8     your Honor.

9          THE COURT:  Well, I know, and it's also hard when you

10    speak faster than my brain works.

11         MR. SCOLNICK:  We are going to be getting into

12    Ms. Magid extensively on cross-examination as well.  So, I can

13    put that on the table.

14         But if we're going to be going into great detail about

15    Ms. Magid's opinions after 2017, after the BuzzFeed article

16    came out, I think that it's just vouching, and I think --

17         THE COURT:  You think it's just?

18         MR. SCOLNICK:  No one is around me.  Can I take my

19    mask off to speak?

20         THE COURT:  For the moment.

21         MR. SCOLNICK:  Okay.

22         I think that they're using Ms. Magid to vouch for

23    Mr. Rapp, because after 2017, when he came out, he was using

24    her as a tool to corroborate his case here, and I don't think

25    that's appropriate if we're talking about for all the years

MADKRAP1                    Rocchio - Direct

1    before 2017 --

2            THE COURT:  We're not talking about subjective

3    motivations.  We're talking about the relevance of describing

4    EMDR, if I've got the acronym right --

5            MR. SCOLNICK:  Yes.

6            THE COURT:  -- from this witness.

7            MR. SCOLNICK:  Well, your Honor, given that we're

8    going to be discussing Ms. Magid extensively in our

9    cross-examination, I'll withdraw the objection.

10            THE COURT:  Okay.  That's easy.

11            Thank you.  See you in a few minutes.

12            (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court; jury not present)

2      THE DEPUTY CLERK:  Shall I get the jury, Judge?

3      THE COURT:  Yes.

4      (Jury present)

5      THE COURT:  Jury is present.  You may continue,

6  Mr. Steigman.

7      MR. STEIGMAN:  Thank you, your Honor.

8  BY MR. STEIGMAN:

9  Q.  We were talking before the break, Doctor, about the EMDR

10  work that Robin Magid did with Mr. Rapp.

11      You're familiar with that type of work?

12  A.  Yes, I am.  I'm actually certified in it.

13  Q.  Very briefly then, give us an overview of what that is.

14  A.  It's a well-studied form of treatment for traumatic events.

15  It's used in Veterans' Associations.  And basically what it has

16  you do is identify multiple aspects of a specific traumatic

17  event.  So it will have you identify a picture, hold that

18  picture in your mind, it will have you identify any negative

19  thoughts that you have about yourself in relation to that

20  event, and it will measure the level of distress that you're

21  experiencing and where you're experiencing it in your body.

22      It then uses what is called bilateral stimulation,

23  which often is in the form of eye movements or tapping, as you

24  think about the event, and then reports back what your thought

25  feelings pictures are.  And it's a way of exposing you to the

1   memory in a safe way and it's a treatment for trauma-based

2   symptoms.

3            MR. STEIGMAN:  Thank you, Dr. Rocchio.  I have no

4   further questions.

5            THE COURT:  Thank you.  Cross-examination,

6   Mr. Scolnick.

7            MR. SCOLNICK:  Yes, your Honor.

8   CROSS-EXAMINATION

9   BY MR. SCOLNICK:

10  Q.  Good morning, Dr. Rocchio.

11  A.  Good morning.

12  Q.  I have a mask on.  If you can't understand something I'm

13  saying, will you please let me know?

14  A.  Sure.

15  Q.  You would agree with me, Doctor, that if Mr. Rapp's

16  allegations were false, then your opinions would not be valid,

17  right?

18  A.  Some of my opinions would not be valid.  Not all of them.

19  Q.  Can we pull up tab H, please.

20           Dr. Rocchio -- it's Rocchio, right?

21  A.  Roccio.

22  Q.  Roccio, OK.

23           Dr. Rocchio, on April 20, 2021, you were deposed and

24  at page 245, lines 1 through 4:

25  "Q.  You would agree with me that if Mr. Rapp's allegations are

1   false, then your opinions would not be valid, right?"

2              MR. STEIGMAN:  Objection.  Can we approach?

3              THE COURT:  Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Give me a minute.

3              MR. STEIGMAN:  Sure.

4              THE COURT:  OK.  What is it?

5              MR. STEIGMAN:  Defendant makes a motion in limine

6    granted in part that there should be no testimony regarding

7    credibility, and I didn't elicit any such opinions.  I didn't

8    ever ask her what she thought happened here.  One of my

9    questions, with the right formulation, was based on the

10   assumption that this is true.

11             Now he has started out with a question, well, if it

12   isn't true, your opinion is wrong.  Every opinion is based on

13   the assumption it is true.  So I object.

14             And I do say, if the court will allow it, certainly

15   then if the rule still applies, it's not true for this, not

16   true for that, and I can go back into the reasons I think favor

17   it actually happening, the point defendant wanted to avoid and

18   the court agreeing.

19             MR. SCOLNICK:  I'll rephrase, your Honor.

20             (Continued on next page)

21

22

23

24

25

1        (In open court)

2        THE COURT:  Next question.

3   BY MR. SCOLNICK:

4   Q.  Dr. Rocchio, Mr. Steigman asked you a numbers of questions

5   asking you to assume that Mr. Rapp's allegations were correct

6   and true, right?

7   A.  Yes.

8   Q.  Assuming that Mr. Rapp's allegations are false, then any

9   trauma he claims to suffer would not be caused by Mr. Spacey?

10       MR. STEIGMAN:  Same objection.

11       THE COURT:  Overruled.

12  A.  The parts of my opinion that speak to causation by

13  Mr. Spacey would not be true, that is correct.

14  Q.  I would like to speak with you a bit about your practice,

15  OK?

16  A.  Sure.

17  Q.  You're not practicing in New York most of the time, right?

18  A.  I don't treat patients in New York.

19  Q.  Do you have an office in New York?

20  A.  I do not.

21  Q.  Your office is in Rhode Island, correct?

22  A.  Yes.

23  Q.  And you have a number of people that work for you there?

24  A.  I do.

25  Q.  I think you have seven people that work under you?

1   A.  Currently five.

2   Q.  The majority of your caseload consists of patients who

3   claim they suffered from trauma, right?

4   A.  Of some sort or another, yes.

5   Q.  Your office has been referred hundreds of patients who

6   claim they suffer from some type of trauma, right?

7   A.  Yes.

8   Q.  Have any of your patients, your office's patients been

9   referred by law offices?

10  A.  A few.  Not many.

11  Q.  Now, in those cases, it would be patients who were referred

12  by plaintiff's attorneys, right?

13  A.  Um, not necessarily, no.

14  Q.  Well, some of them are referred by plaintiff's attorneys,

15  right?

16  A.  Some are, sure.

17  Q.  You treat those patients who are referred by plaintiff's

18  attorneys, right?

19  A.  I have, yes.

20  Q.  You understand that plaintiff's attorneys sue people for

21  money, right?

22  A.  Yes.

23  Q.  And they sue people for money for damages, right?

24  A.  Yes.

25  Q.  That would include psychological damages, right?

1    A.  Yes.

2    Q.  And a way that they substantiate or try to prove

3    psychological damage may include looking at therapist's notes,

4    right?

5    A.  Yeah, yes.

6    Q.  OK.  How many patients has your office been referred by

7    attorneys?

8    A.  I would actually very few.  But by plaintiff's attorneys or

9    attorneys in general?

10   Q.  Attorneys in general?

11   A.  I really have no idea.  I couldn't really answer that.

12   Minority of patients.

13   Q.  Is it more than ten?

14   A.  Sure, yes.

15   Q.  More than 50?

16   A.  The whole practice or just me?

17   Q.  The whole practice.

18   A.  If you include disability attorneys, yes.

19   Q.  More than 100?

20   A.  I don't know the answer to that question.

21   Q.  A significant number of your patients for your practice are

22   referred by attorneys in one way or another, right?

23   A.  I -- I wouldn't say that that is a significant number, but

24   yes, certainly some percentage are.

25   Q.  Now, is it true that you have treated --

1        THE COURT:  Could I just clarify something?

2        Do you regard what you did in this case as the

3   treatment of Mr. Rapp or something else?

4        THE WITNESS:  No, I was not providing treatment of any

5   kind in this case.

6        THE COURT:  OK.

7        MR. SCOLNICK:  May I continue?

8        THE COURT:  Pardon?

9        Yes, you may.

10        MR. SCOLNICK:  Yes.

11   BY MR. SCOLNICK:

12   Q.  Now, you've treated personally a thousand people or so who

13   claim they suffered from some type of trauma, right?

14   A.  Probably, yes.

15   Q.  And of the thousand or more patients that you have treated

16   in a clinical setting who claim they have suffered from trauma,

17   you have not believed that a single one of them was lying to

18   you, right?

19   A.  I don't form opinions about lying or not lying.  That's not

20   my role as a treating therapist.

21   Q.  You have not opined that a single one of those thousand

22   people were malingering, right?

23   A.  I don't opine about any of my patients as malingering.

24   It's not part of what I do as a clinical psychologist.  It's

25   not consistent with my role.

1    Q.  You're aware of the DSM, right?

2    A.  Yes.

3    Q.  The DSM has a specific code for malingering, right?

4    A.  It has a code, yeah.

5    Q.  And the DSM says that psychotherapists, including treating

6    psychotherapists, should strongly suspect malingering when

7    someone appears in a psychotherapy's office in a medical or

8    legal context, right?

9    A.  I don't know if it says strongly, certainly it's a

10   consideration, yes.

11   Q.  Right.  And you've told us today that a number of the

12   patients showing up in your office have been referred by

13   attorneys, right?

14   A.  Yes.

15   Q.  And these people who come to your office for therapy, they

16   pay per visit, I assume, right?

17   A.  Their insurance company does, yes.

18   Q.  Regardless of whether these people are malingering or not,

19   they are paying for your visits, right?

20   A.  Yes.

21   Q.  You also have a forensic practice, right?

22   A.  I do.

23   Q.  That's what brings you here?

24   A.  Yes.

25   Q.  I want to focus on the time before you were retained in

1    this case, OK?

2    A.  OK.

3    Q.  You've been a forensic psychologist in both civil and

4    criminal cases, right?

5    A.  Yes.

6    Q.  And you said as a forensic psychologist, you never take a

7    litigant's word at face value, right?

8    A.  Correct.

9    Q.  You're not supposed to just believe whatever a litigant

10   says, right?

11   A.  Correct.

12   Q.  Again, going back focusing on the period of time before you

13   were retained in this case, in every case where a criminal

14   defendant claimed they had been abused, you never evaluated the

15   defendant included that they had not been abused, right?

16   A.  No, that's not correct.

17   Q.  OK.  I would like to go to tab H, which is your deposition

18   of April 20, 2021, page 26, lines 18 through 21.

19   "Q.  In cases where abuse was a factor, do you recall ever

20   evaluating any defendant and concluding they had not been

21   abused?

22   "A.  No."

23   Q.  Was that true?

24            MR. STEIGMAN:  Same objection that I raised earlier.

25            MR. SCOLNICK:  Your Honor, we're not getting into the

1   facts of this case.

2              THE COURT:  I understand that.

3              MR. STEIGMAN:  With respect to the scope of the direct

4   and the court's limitation.

5              THE COURT:  Overruled.

6   A.  So my conclusion, I have concluded that there is not

7   evidence to support the person's contention and reported that

8   back to the attorney.  I would never say for sure abuse

9   happened or didn't happen.  So this statement in the deposition

10  is true, and I believe it's consistent with what I'm trying to

11  communicate with you now today.

12  Q.  Going back to the time before you were retained in this

13  case, in cases in which a criminal defendant claimed they were

14  abused, you have never evaluated a defendant and believed the

15  abuse they claimed to suffer did not have some impact on them,

16  right?

17  A.  No, that's not correct.

18  Q.  OK.  Tab H, going to your deposition, page 26, lines 22.

19  "Q.  In cases where abuse was a factor, do you recall

20  evaluating any criminal defendants and opining that the abuse

21  they suffered did not have an impact on them or a traumatic

22  impact on them?"

23             MR. SCOLNICK:  Answer on the next page.

24  "A.  Not to my recollection, no."

25             MR. SCOLNICK:  You can take it down.

1   Q.   Is that true?

2   A.   Do you mean opining in testimony or in a report?

3           Typically I would summarize my conclusion to an

4   attorney.  So I think in the deposition, I thought you were

5   talking about preparing a report and concluding opinions.

6   There have certainly been times I've evaluated someone and said

7   to the attorney, Look, I don't think I'm going to find

8   something going to be helpful to your case, and they don't have

9   me write a report or testify, so...

10          THE COURT:  Doctor.

11  A.   I guess I don't understand the question.

12          THE COURT:  Yes.

13          Doctor, please just answer the question as it is asked

14  and not try to figure out where the lawyer is going and try to

15  explain away the testimony.  The other lawyer will have an

16  opportunity to question you after he's done.

17  A.   Would you clarify the question then?  Because I was

18  confused by what you were asking me.

19  Q.   You didn't seem confused at your deposition, right?

20          You just answered the question, right?

21  A.   I don't recall.  Yes.

22  Q.   OK.

23  A.   In that line, yes, I did.

24  Q.   OK.  You have never evaluated, going back to that period of

25  time before you were retained in this case, you have never

1    evaluated a litigant in any case who claimed to have been

2    abused and opined they did not suffer from some distress

3    related to their alleged abuse, true?

4    A.  No.

5    Q.  OK.  Let's go to deposition page 29, lines 21 through 24.

6    "Q.  Do you recall ever evaluating a litigant in any litigation

7    involving abuse and opining that the litigant did not suffer

8    some distress from the alleged abuse?

9    "A.  No."

10   Q.  Is that true?

11   A.  No.

12   Q.  You've never evaluated a litigant, going back to again

13   before you were retained in this case, you've never evaluated a

14   litigant in any case who claimed to have been abused and opined

15   that they were malingering, right?

16   A.  Could you clarify, opined to whom and where?

17          I'm not sure what -- that's why I'm struggling.

18   Opined to who and where?

19   Q.  Doctor, on page 29 of your deposition, starting at line 21,

20   you were asked:

21   "Q.  Do you recall ever evaluating a litigant in any litigation

22   involving abuse and opining that the litigant did not suffer

23   some distress from the alleged abuse?

24   "A.  No."

25   Q.  Is that true?

1   A.  Could you define opining, please?

2           Opining where?  I know what I thought you meant there,

3   but now I'm not sure.

4           THE COURT:  Would you please follow the instruction I

5   gave you.

6   A.  No, that's not true.

7   Q.  You've never opined that a litigant claiming -- again,

8   going back to before you were retained in this case, you never

9   opined that a litigant claiming sexual abuse was not suffering

10  from some form of emotional distress relating to their

11  allegations of abuse?

12  A.  Is that a question?

13  Q.  That's the question, yes.

14  A.  I -- I said no, I don't believe that's true.

15  Q.  Going to your deposition, page 35, lines 9 through 12:

16  "Q.  Did you ever opine that someone claiming sexual abuse was

17  not suffering from some form of emotional distress relating to

18  the sexual abuse?

19  "A.  No."

20  Q.  Is that true?

21  A.  No, it's not.

22  Q.  Going back, again, to the period of time before you were

23  retained in this case, you've never evaluated someone who

24  claims to have been sexually abused and found they were lying?

25  A.  No, I have not.

1   Q.  I would like to speak with you about your diagnosis in this

2   case which is PTSD, OK?

3   A.  OK.

4   Q.  Exposure to trauma in our society is a common occurrence,

5   right?

6   A.  Yes.

7   Q.  Credible studies have shown that up to 90 percent of adults

8   in our country have experienced at least one traumatic event?

9   A.  The figure I'm aware of is 70 percent.

10  Q.  Well, you in your own literature have cited a 90 percent

11  number, right?

12  A.  OK.  Then I'm mistaken.  I apologize.

13  Q.  Many adults have suffered more than one traumatic event in

14  their life, right?

15  A.  Yes.

16  Q.  Not everyone who experiences a traumatic event suffers from

17  PTSD right?

18  A.  No, not at all.

19  Q.  Although the incidents of traumatic events is high, the

20  prevalence of PTSD following a traumatic event is relatively

21  low?

22  A.  Yes.

23  Q.  Now at any forensic evaluation, there may be external

24  motivation to exaggerate symptoms, and it is essential that the

25  possibility of malingering be considered by the finder of fact,

1    right?

2    A.   Yes.

3    Q.   It's important to accurately identify genuine cases of PTSD

4    and identify in the differential diagnosis a false case of

5    PTSD, right?

6    A.   Yes.

7    Q.   There are a wealth of resources determining how to malinger

8    PTSD, right?

9    A.   I believe so, yes.

10   Q.   You can look on the internet and find symptoms of PTSD,

11   right?

12   A.   Yes.

13   Q.   And you talked about some symptoms of PTSD yesterday and

14   this morning, right?

15   A.   Yes.

16   Q.   Shame, guilt, confusion, and so on, right?

17   A.   Yes.

18   Q.   If I just Google on the Internet symptoms of PTSD, they all

19   pop up, right?

20   A.   Yes, they do.

21   Q.   You could also type in PTSD related to alleged sexual

22   violence and there would be more symptoms there, right?

23   A.   Yes.

24   Q.   And anyone could look at these on the Internet, right?

25   A.   Yes.

1  Q.  Especially very smart person, right?

2  A.  Yes.

3  Q.  You referenced the DSM-V, right?

4  A.  Yes.

5  Q.  And that contains the criterion or elements necessary to

6  diagnose a mental illness, right?

7  A.  Yes.

8  Q.  It's also available online, right?

9  A.  Segments of it are.  It's copyright, so you can buy it.

10  It's readily available for purchase, I'm for sure.

11  Q.  So if I wanted to go on the Internet and find how to fake

12  PTSD, what I need to prove or establish to meet the DSM

13  criterion, I could just go on the Internet and search it up,

14  right?

15  A.  Yes.

16  Q.  Descriptions of different psychological tests are also

17  available on the Internet, right?

18  A.  Some of them, yes.

19  Q.  Information about malingering or faking a mental disorder

20  is also readily available on the Internet, right?

21  A.  I believe so, yes.

22  Q.  Information about forensic evaluations are also available

23  on the Internet, right?

24  A.  Yes.

25  Q.  And that includes the type of forensic evaluation you would

1  have done in this case, right?

2  A.  Yes.

3  Q.  There is a discussion on the Internet, if you wanted to

4  search for it, about the types of tests that forensic

5  psychologists like you perform, right?

6  A.  I presume so.

7  Q.  In fact, there are probably even psychiatric evaluations

8  from court cases or somewhere else that are running around the

9  Internet as well, right?

10  A.  Yes.

11  Q.  People in your business, and more importantly finders of

12  fact in a court case, should use great care to distinguish

13  between genuine and false cases of PTSD, right?

14          MR. STEIGMAN:  Objection.

15          THE COURT:  Just a minute.

16          MR. STEIGMAN:  Finders of fact --

17          THE COURT:  Just a minute.  Just a minute.

18          Sustained.

19  A.  I'm not a finder of fact.

20          THE COURT:  Sustained.

21          MR. SCOLNICK:  The objection is sustained.

22  Q.  I want to talk to you about malingering.  Malingering

23  occurs when someone claims PTSD symptoms they don't actually

24  have, right?

25  A.  If it's for some external gain, then it would be

 1  malingering.

 2  Q.  Right.  Malingering PTSD may also involve someone

 3  exaggerating symptoms, right?

 4  A.  I -- I think then it would be referred to as exaggerating,

 5  not malingering.  I believe malingering is feigned.  It could

 6  incorporate exaggerating.  I'm not sure.

 7  Q.  You're familiar with the DSM-V, right?

 8  A.  I am.

 9  Q.  DSM-V has a definition of malingering?

10  A.  It does.

11  Q.  OK.  Isn't it true that the DSM-V definition of malingering

12  includes the essential feature of malingering is the

13  intentional production of false or grossly exaggerated physical

14  or psychological symptoms motivated by external incentives,

15  such as avoiding military duty, avoiding work, obtaining

16  financial compensation, avoiding criminal prosecution, or

17  obtaining drugs, right?

18  A.  Yes.

19  Q.  So malingering does include exaggeration, right?

20  A.  Yes.

21  Q.  Individuals may falsify or exaggerate PTSD symptoms for

22  something called external gain, right?

23  A.  Yes.

24  Q.  This would include someone falsely claiming PTSD for money

25  damages in a civil case, right?

1    A.  It would.

2    Q.  You evaluated Mr. Rapp in February of 2021, right?

3    A.  I did.

4    Q.  And a month before your evaluation, Mr. Rapp disclosed he

5    was seeking a large amount of money in pain and suffering

6    damages, right?

7              MR. STEIGMAN:  Your Honor.

8              THE COURT:  Sustained.  Jury will disregard that

9    question.

10   Q.  Another variant of false PTSD is fictitious PTSD, right?

11   A.  Yes.

12   Q.  This would include individuals who deliberately falsify

13   symptoms for something called intrinsic gain, including respect

14   from peers, right?

15   A.  Yes.

16   Q.  This would also include individuals deliberately falsifying

17   symptoms for sympathy -- strike that -- for respect from their

18   peers, right?

19   A.  Yes.

20   Q.  Another form of false PTSD is misattributed PTSD, right?

21   A.  Yes.

22        Misattributed?  You mean -- do you mean attributing it

23   to one event versus another?  Yes.

24   Q.  All right.  Now, this would include legitimate

25   psychological illnesses misdiagnosed at PTSD, right?

1    A.  Yes.

2    Q.  And it's also true that a person may have conscious and

3    unconscious motivation to feign or falsify PTSD, right?

4    A.  Yes.

5    Q.  Some of the motivations would be, for example, personal

6    including justifying relationship strife and other occupational

7    problems, right?

8    A.  Yes.

9    Q.  A person may feign PTSD for social reasons, including

10   gaining sympathy from peers, right?

11   A.  Yes.

12   Q.  Now, you talked about the various traumas that Mr. Rapp

13   claims to have suffered in his life on your direct examination,

14   right?

15   A.  Potential traumas, sure.

16   Q.  Potential traumas.

17   A.  Yes.

18   Q.  OK.  Maybe they happened, maybe they didn't; we don't know,

19   right?

20   A.  Sure.

21   Q.  Is it true that Mr. Rapp told you during your evaluation

22   that what he claimed happened with Mr. Spacey is among the most

23   traumatic incidents of his life?

24   A.  Yes.

25   Q.  It was important for you to evaluate and consider every

1   potentially traumatic event in Mr. Rapp's life when you were

2   evaluating him, right?

3   A.   Yes.

4   Q.   And that is in part because any symptoms he claims to

5   suffer could have been caused by one of those events, right?

6   A.   Yes.

7   Q.   Individuals can falsely attribute real symptoms of distress

8   to a cause that is unrelated to those symptoms, right?

9   A.   Yes.

10   Q.   And that's called malingering by imputation, right?

11   A.   I believe so, yes.

12   Q.   People who are malingering by false imputation may have had

13   other traumatic experiences that are actually causing their

14   reported symptoms, right?

15   A.   Yes.

16   Q.   And I want to talk to about the various traumas Mr. Rapp

17   claims to have suffered from.

18           Some of the trauma he claims to have suffered from was

19   at the hands of celebrities, right?

20   A.   The only -- oh, the only event that I'm aware of that he

21   claims was traumatic by a celebrity is the current matter at

22   hand.

23   Q.   Do you know who Yul Brynner is?

24   A.   Yes, I do.

25   Q.   He was a famous actor, right?

1    A.  Yes.

2    Q.  Died in about 1985?

3    A.  Um-hmm.

4    Q.  Mr. Rapp claims that Yul Brynner assaulted him when he was

5    only ten years old, right?

6    A.  No, that's not what he claimed.

7    Q.  He claims that he told you that Mr. Brynner pushed him,

8    right?

9    A.  Yes.

10   Q.  Now, the details of this story have varied depending on who

11   he's telling, right?

12   A.  I know what he told me.  He also told me he punched him in

13   the stomach.

14   Q.  Right.  So sometimes it's been a push, other times it's

15   been a punch in the stomach, right?

16   A.  To my knowledge, it's always been both.

17   Q.  Yul Brynner is no longer alive, right?

18   A.  Correct.

19   Q.  And Mr. Rapp made those allegations publicly to the press

20   in 2019, right?

21   A.  I don't know that, but I'll take your word for it.

22   Q.  Did you ask Mr. Rapp why he in 2019 made these public

23   allegations against Mr. Yul Brynner?

24   A.  No.  I wasn't aware they were public, but no, I didn't ask

25   him why.

1    Q.  Mr. Brynner is not the only celebrity that Mr. Rapp claims

2    assaulted him, right?

3    A.  Mr. Rapp is not the only celebrity he claims to have

4    touched him.  I mean, Mr. Rapp never used the word assault in

5    conjunction with these events.  I shared what he told me.

6    Q.  OK.  Mr. Rapp also claims that the actress, Susan Tyrrell,

7    committed an act of sexual violence on him, right?

8    A.  No, he did not.

9    Q.  Mr. Rapp said that Ms. Tyrrell made a sexual advance on

10   him, right?

11   A.  Yes.

12   Q.  And at the time -- well, strike that.

13          He's also described that as shocking and

14   inappropriate, right?

15   A.  Yes.

16   Q.  Mr. Rapp claims the actress Susan Tyrrell statutorily raped

17   him when he was a child, right?

18   A.  No, he did not.

19   Q.  He was underage when Ms. Tyrrell had sex with him, right?

20   A.  I don't know what the age of consent was in New York at the

21   time.  I can't comment to that.  That's a legal issue.

22   Q.  First of all, it was in California, right?

23   A.  I don't recall.

24   Q.  And Mr. Rapp told you that he was 16 or 17 when it

25   happened, right?

1    A.  He told me he was 17.

2    Q.  Are you aware that the age of consent in California is 18,

3    so he would have been a minor?

4    A.  Now I am, yes.

5    Q.  And if he was under the age of consent then that would have

6    been statutory rape, right?

7            THE COURT:  Sustained.

8    Q.  Mr. Rapp's allegations against Ms. Tyrrell, if they were

9    actually true, would qualify as a criterion A event capable of

10   causing PTSD, right?

11   A.  No, they would not.

12   Q.  Let's go to tab H, page 199, lines 20 through 24.  You were

13   asked at your deposition:

14   "Q.  Did you determine that Mr. Rapp's experience in which an

15   older woman, a 40-year-old woman, had sex with him when he was

16   underage, whether that was a criterion A event?

17   "A.  It could be a criterion A event."

18           MR. SCOLNICK:  I'm sorry.

19   "A.  It could be a criterion or a criterion A, yes."

20   Q.  Is that true?

21   A.  Yes, it could be.

22   Q.  Are you aware that Mr. Rapp also claims that his mother

23   stumbled down the stairs while she was holding him while he was

24   an infant?

25   A.  I am.

1    Q.  And she broke her spine he claims when that happened?

2    A.  I believe so, yes.

3    Q.  To be fair, Mr. Rapp was probably too young to remember

4    that, right?

5    A.  Yes.

6    Q.  Mr. Rapp also claims he was attacked while getting off a

7    school bus, right?

8    A.  Um, yes.

9    Q.  He was knocked to the ground, right?

10   A.  Yes.

11   Q.  It was a violent event?

12   A.  He was attacked by peers.

13   Q.  This would have been interpersonal violence, right?

14   A.  It would depend on the severity.

15   Q.  Well, assaulting of someone, pushing them, hitting them on

16   the ground, that is interpersonal violence, right?

17   A.  It could be, yes.

18   Q.  Mr. Rapp also claims that his family was targeted by a

19   murderous gang when he was a baby, right?

20   A.  Targeted?  I don't believe targeted, but they drove by.

21   And the gang was later found have been murderous and perhaps

22   threatened by -- I'm -- the details are not ...

23   Q.  He claimed his family was almost killed, right?

24   A.  Could have been killed, yes.

25   Q.  Mr. Rapp apparently vividly remembers that event when he

1    was an infant, right?

2    A.  No.

3    Q.  Did you read his book?

4    A.  I did.

5    Q.  He wrote about the specific dialogue between his family

6    members during that alleged event, right?

7    A.  Mr. Rapp told me that he remembered the event from the

8    accounts of others and that it was something his mother had

9    always shared with him.

10   Q.  Well --

11          THE COURT:  Dr. Rocchio, the question was:  He wrote

12   about the specific dialogue between his family members during

13   that alleged event, right?

14          Please answer that question.

15   A.  I don't know.

16   Q.  Let's pull up tab -- I believe it's in evidence.

17          MR. SCOLNICK:  May I have a moment, your Honor?

18          THE COURT:  Folks, I have to take a telephone call for

19   just a minute.  We'll break for five.

20          (Recess)

21          (Jury not present)

22          THE DEPUTY CLERK:  I'll get the jury, Judge.

23          (Jury present)

24          THE COURT:  Members of the jury, before we resume, I

25   just want to say, earlier in the morning I may once have

1   expressed some impatience with an answer or the manner of the

2   answer by Dr. Rocchio.  You are to expressly understand that I

3   am expressing no opinion about her credibility one way or the

4   other or about the merits of the case.

5           Go ahead, counsel.

6           MR. SCOLNICK:  Thank you.

7   BY MR. SCOLNICK:

8   Q.  Just briefly going back to Mr. Rapp's allegations against

9   the actress Susan Tyrrell, what he described would have been an

10  act of sexual violence on him, right?

11  A.  If you were underage, yes.

12  Q.  You told us about the CDC's definition of violence, you

13  referred to that earlier?

14  A.  Yes.

15  Q.  According to those same definitions, if you want to apply

16  them to his allegations and against another celebrity,

17  Ms. Tyrrell, then that would have been sexual violence, right?

18  A.  Yes.

19  Q.  But even though Mr. Rapp has described that as shocking and

20  inappropriate when he spoke with you, his paid testifying

21  witness in this case, he said it didn't really bother him,

22  right?

23          MR. STEIGMAN:  Object to the form.

24          THE COURT:  Sustained as to form.

25  Q.  Mr. Rapp has described that as shocking and inappropriate

1    in other contexts, right?

2    A.   Yes.

3    Q.   But you are his expert witness in this case, right?

4    A.   I am.

5    Q.   And to you, he said it didn't really bother him, right?

6    A.   And that it was shocking and inappropriate, yes.

7    Q.   Shocking and inappropriate, but didn't bother him.  Did I

8    get that right?

9    A.   Yes, you do.

10   Q.   Ah, thank you.

11        So we left off talking about how Mr. Rapp's family

12   narrowly averted disaster at the hands of a gang, right?

13             THE COURT:  Sustained to that form.

14             MR. SCOLNICK:  OK.

15   Q.   You read Mr. Rapp's book, right?

16   A.   I did.

17   Q.   One of the things you considered in forming your opinions

18   in this case, true?

19   A.   Yes.

20             MR. SCOLNICK:  Can we go to the book exhibit admitted.

21   I think it is DDD -- BBB as in boy.

22        We are at page 56 of 212 of the PDF.  We're looking at

23   here the section of the book where Mr. Rapp describes his

24   family being targeted by this gang, right?

25             THE COURT:  I think we're at page 68, aren't we,

1    counsel?

2            MR. SCOLNICK:  Yes, your Honor, 68 of 303.  56 of 212

3    of the PDF.

4            MR. STEIGMAN:  Run that by me again.

5            MR. SCOLNICK:  We have the e-book.  It is 68 of 303,

6    if you have the 303-page book.

7            THE COURT:  Well, I don't remember who handed this to

8    me, but the one you gave me, the actual Exhibit BBB moves from

9    page 67 to page 69.

10           MR. SCOLNICK:  This is the e-book, your Honor.  This

11   is the complete e-book that we downloaded.

12           THE COURT:  I don't care what it is.  It is not

13   Exhibit BBB.  Look, I told you about paper exhibits.

14           MR. SCOLNICK:  Yes, your Honor.

15           THE COURT:  Exhibit BBB, I was handed this yesterday

16   or perhaps late last week.

17           MR. SCOLNICK:  Yes, your Honor.

18           THE COURT:  I don't know whether it is an e-book.  I

19   don't know what it is.  It has page 68.  This is the exhibit.

20   Now if you want to find another exhibit that is ultimately from

21   the same source, I don't have a problem.

22           MR. SCOLNICK:  Yes, your Honor.

23           THE COURT:  But there was a way to do this properly

24   and it's not being done by anybody.

25           MR. SCOLNICK:  We'll try to correct that, your Honor,

1    page 69 of the book that's in front of you.

2              THE COURT:  Thank you.

3              Let me just make sure before we show them the missing

4    page 68.

5              You may publish.

6              MR. SCOLNICK:  Thank you, your Honor.

7    BY MR. SCOLNICK:

8    Q.  Dr. Rocchio, can you see that on your screen?

9    A.  Yes.

10   Q.  This is the portion of the book where Mr. Rapp describes

11   his family being targeted by the gang, right?

12   A.  Am I looking at the same thing you are?

13   Q.  Starting with Doug?

14   A.  Yes.

15   Q.  It purports to have dialogue, correct?

16   A.  Yes.

17   Q.  Starting with, "Doug."

18             The next person, "What the hell are they doing?  Doug.

19   Another bump.  I'm pulling over.  No, why not?  I'm not to

20   gonna let them just get away that.  Who do they think they are,

21   Jesus.  No, Doug.  Don't just keep driving."

22             "Dad's face was getting all red.  Another bump.  Dad

23   glared at the rearview mirror.  The Elektra zipped back into

24   the lane next to ours and pulled up alongside us again.  One of

25   the white men, his hair a scraggly mane, a lit cigarette

1   hanging from his mouth, made a motion for us to pull over."

2           Did I read that correctly?

3   A.  Yes, you did.

4   Q.  Mr. Rapp's recounting an event that his family experienced

5   years ago, right?

6   A.  He's writing about it, yes.

7   Q.  Right.  He's describing something that happened when he was

8   an infant, right?

9   A.  Yes.

10  Q.  He's recalling very specific dialogue back and forth about

11  what each person in the car is saying and doing and their

12  expressions, even though he was only an infant, right?

13  A.  No.

14  Q.  Well, do you see quotations here?

15  A.  I do.

16  Q.  Do you see Mr. Rapp's description about a cigarette

17  lighting up?

18  A.  I do.

19  Q.  Can we agree that someone who is an infant, who isn't even

20  old enough to raise their head out of a car seat, probably

21  can't understand complex language or dialogue?

22  A.  Absolutely, yes.

23  Q.  Mr. Rapp's family apparently credited him with saving their

24  lives in this event, right?

25  A.  Yes.

1    Q.  Even though he was a small baby, right?

2    A.  His mother did, I believe, yes.

3    Q.  OK.  Did you just -- did you determine whether this was a

4    traumatic event that could have caused Mr. Rapp any trauma?

5    A.  It would not qualify, no.

6    Q.  OK.  Mr. Rapp also claims he was sexually assaulted by a

7    masseur, right?

8    A.  Yes.

9    Q.  And being assaulted by a masseur, if that actually did

10   happen, that would be a criterion A event capable of causing

11   some distress, right?

12   A.  Yes.

13   Q.  Capable of causing PTSD, right?

14   A.  Yes.

15   Q.  If it actually happened, it would be a sexual assault,

16   right?

17   A.  Yes.

18   Q.  It would be sexual violence, right?

19   A.  Yes, it would fall under that umbrella.

20   Q.  Right.  And when Mr. Rapp talked -- you talked to Mr. Rapp

21   about this, right?

22   A.  I did.

23   Q.  And, again, when Mr. Rapp was talking to you about these

24   other traumas, you identified yourself as the expert who was

25   going to testify on his behalf in a case against Kevin Spacey,

1    right?

2    A.  No, I did not.

3    Q.  You did not identify yourself as an expert?

4    A.  I identified myself as an expert, yes.

5    Q.  And did you tell Mr. Rapp that you were retained by his

6    attorneys?

7    A.  I did.

8    Q.  And when he was discussing this with you, he said the

9    alleged sexual assault by a masseuse didn't really bother him

10   either, right?

11   A.  Among other things, yes.

12   Q.  Mr. Rapp also claimed that an 18-year-old man statutorily

13   raped him when he was 14 years old?

14   A.  No.

15   Q.  OK.  Well, you know what statutory rape is, right?

16   A.  I do.

17   Q.  And that is when a person who is an adult or more than a

18   certain number of years has sex with a child, right?

19   A.  Yes.

20   Q.  Mr. Rapp was a child at the time, right?

21   A.  Yes.

22   Q.  And the person was 18 years old, right?

23   A.  To my knowledge, the exact age is unknown.

24   Q.  Have you not been informed that we have provided the exact

25   age of the person to plaintiff's counsel?

1    A.   I was not informed of that, no.

2    Q.   Was that relevant to you, to get the exact age of the

3    person in your analysis?

4    A.   Not in terms of the harm caused by the event, no.

5    Q.   Mr. Rapp has confirmed in his own testimony that this

6    person statutorily raped him; that's his claim, right?

7              MR. STEIGMAN:   Objection to "that's his claim."

8              THE COURT:   Yes.   Sustained as to form.

9    Q.   Did Mr. Rapp testify --

10             First of all, you reviewed Mr. Rapp's deposition

11   testimony, right?

12   A.   I did.

13   Q.   And isn't it true that Mr. Rapp claimed this person

14   statutorily raped him?

15   A.   I believe he did.

16   Q.   Statutory rape can result in trauma, right?

17   A.   It can.

18   Q.   Can result in PTSD, right?

19   A.   It can.

20   Q.   And Mr. Rapp wrote about this incident in his book, right?

21   A.   Yes.

22   Q.   He wrote all about it, right?

23   A.   He wrote about it, yes.

24   Q.   And in his book he said that it felt like he was drowning

25   after the event, right?

1   A.  Yes.

2   Q.  Years later he saw the man in the party, right?

3   A.  Yes.

4   Q.  And when Mr. Rapp saw this man in the party, he said he

5   felt rattled and shocked, right?

6   A.  Yes.

7   Q.  He said he was uncomfortable seeing him, right?

8   A.  I don't recall that piece, but if it's in the book, I'll

9   take your word for it.

10  Q.  That was in his deposition testimony.

11          Do you remember reading that?

12  A.  Yes.  It was sometime ago, though.

13  Q.  He left the party as quickly as he could, right?

14  A.  OK.

15  Q.  But when he talked to you, his expert in this case, he said

16  that that event didn't really bother him, it was consensual,

17  true?

18  A.  He said it was consensual.

19  Q.  Mr. Rapp also claims he was violently attacked by a group

20  in London, right?

21  A.  Yes, he did.

22  Q.  That would be interpersonal violence, right?

23  A.  Yes, it would be.

24  Q.  And interpersonal violence can cause trauma, right?

25  A.  Yes.

1    Q.  It can even cause PTSD, right?

2    A.  If it meets the criterion of serious bodily injury or

3    threat thereof, yes.

4    Q.  Well, being kicked in the head is pretty dangerous, right?

5    A.  Yes.

6    Q.  Being kicked in the head can cause serious trauma and

7    injury, right?

8    A.  Yes.

9    Q.  But Mr. Rapp, when speaking to you, told you this event

10   didn't really bother him that much either, right?

11   A.  No, he didn't say that.

12   Q.  He told you that his current symptoms are not related to

13   that event, right?

14   A.  He told me he wasn't experiencing symptoms related to that

15   event at this time.

16   Q.  Is it true that -- going back to the sexual incident with

17   Mr. Rapp was 14, isn't it true that Mr. Rapp's mom almost went

18   to the police to report this man?

19   A.  I don't know that to be true.

20   Q.  Well, we discussed it in his deposition.  Do you remember

21   that?

22   A.  Not specifically, no.

23   Q.  Was it relevant -- would it be relevant to you whether his

24   mom almost went to the police to report the man?

25   A.  Well, it was relevant when she was distressed by the

1   incident and upset about it.  Whether she almost did or didn't

2   do anything else would not necessarily add to that.

3   Q.  Is it also true that when Mr. Rapp was 14, that incident

4   required him to have a conversation with his mother about his

5   sexual orientation?

6   A.  He -- he had a discussion with his mother about what had

7   happened.  I don't know if it extended into sexual orientation

8   in general.

9   Q.  It was with another man, right?

10  A.  Yes.

11  Q.  OK.  And that was one of the concerns she had, was that it

12  was an older -- an older man, right?

13  A.  I believe her concern was the age difference between the

14  two.  That he was older, yes.

15  Q.  Right.  Did you determine whether or did you ask Mr. Rapp

16  whether he had been the victim of any domestic abuse before his

17  relationship with his husband Ken?

18  A.  I did.

19  Q.  And he told you he had not, right?

20  A.  I can't answer that question with yes or no.

21  Q.  Well, did he or did he not say that any of his prior

22  partners physically abused him?

23  A.  He did not use those words.

24  Q.  Did he say that any of his prior partners hit him?

25  A.  Yes.

1   Q.  Which prior partner hit him?

2   A.  I don't recall the name because I get confused between the

3   pseudonyms and the actual names, so it was -- I don't recall.

4   Q.  What happened when this person hit Mr. Rapp?

5          Tell us about what he told you.

6   A.  Um, I believe he -- he was hit and shoved and fell on his

7   butt.

8   Q.  Oh, that's Ken, right?

9   A.  Yes.

10  Q.  OK.  We'll get to Ken.  I'm talking about before Ken, did

11  Mr. Rapp tell you that any of his partners had been physically

12  abusive towards him?

13  A.  I don't believe so, no.

14  Q.  You read Ms. Quill's testimony, Erin Quill?

15  A.  No, I did not.

16  Q.  It was provided to you, right?

17  A.  Yes.

18  Q.  She was identified as a witness in this case, right?

19  A.  Yes.

20  Q.  And you want to consider all information that's relevant to

21  support or detract from your opinion, right?

22  A.  Yes.

23  Q.  And you were given that deposition by plaintiff's counsel,

24  right?

25  A.  Yes.

1    Q.  And you didn't read it?

2    A.  No, I did not.

3    Q.  Are you aware that Ms. Quill testified that Mr. Rapp told

4    her that his boyfriend Josh had hit him on multiple occasions?

5           MR. STEIGMAN:  I'll object.

6           THE COURT:  Sustained.

7           I'll remind the jury that the questions are not

8    evidence.

9    A.  I'm not sure that I --

10          THE COURT:  Ma'am, I sustained the objection.

11          THE WITNESS:  Oh.

12          THE COURT:  Thank you.

13          THE WITNESS:  Sorry.

14   BY MR. SCOLNICK:

15   Q.  Mr. Rapp told you that Kevin Spacey is responsible for his

16   current alleged emotional distress, right?

17   A.  No.

18   Q.  Well, you asked Mr. Rapp what the most stressful event in

19   his life was that he's currently experiencing, right?

20   A.  The event that was currently bothering him the most.

21   Q.  And he told you it was his Kevin Spacey story, right, Kevin

22   Spacey allegations?

23   A.  Yes.

24   Q.  Right.  So because he gave you that answer, you asked

25   Mr. Rapp a number of questions about the symptoms he attributes

1    to Mr. Spacey, right?

2    A.   Not solely because of that answer, but yes.

3    Q.   You had Mr. Rapp fill out what's called an LEC test, right?

4    A.   Yes.

5    Q.   And that test asks Mr. Rapp to describe the symptoms in

6    detail that he claims to suffer relating to Mr. Spacey, right?

7    A.   I think you're referring to the PCL, which is the symptoms,

8    the life events checklist of the LEC is the list of traumatic

9    events.

10   Q.   Could we turn to tab 40, please.  Thank you.

11          The LEC-5 is a document that inquires of Mr. Rapp

12   about alleged past traumatic events in his life, right?

13   A.   Or highly stressful, yes.

14   Q.   Right.  OK.

15          And the PCL-5 is the other document you were talking

16   about, that's another test, right?

17   A.   It's a checklist, yes.

18   Q.   Right.  OK.

19          Mr. Rapp told you that he had lost interest in sex,

20   right?

21   A.   During this particular period of time, yes.

22   Q.   And that includes the period of time you talked to him,

23   right?

24   A.   Yes.

25   Q.   He also told you that he was hypersexualized, right?

1    A.  Not during the period of time that I was evaluating him,

2    no.

3    Q.  Well, he attributes his -- the lack of sexual interest, he

4    claims that is related to Mr. Spacey, right?

5    A.  No, not specifically.  It's related to the depression which

6    is contributed to by the events alleged with Mr. Spacey.

7    Q.  Right.  So the PCL-5 is a test that inquires of Mr. Rapp

8    the symptoms that he attributes to the alleged incident, right?

9    A.  Yes.

10   Q.  Right.  And when you were talking to him about the symptoms

11   he attributes to the alleged incident, he told you he has a

12   loss of sex drive, right?

13   A.  Yes.

14   Q.  And he also attributes at other points in his life being

15   hypersexualized by Mr. Spacey, right?

16   A.  I wouldn't use the word hypersexualized, no.

17   Q.  Focused on sex?

18   A.  Preoccupied with the thought that other people might be

19   sexually attracted to him.  I wouldn't characterize that as

20   hypersexualization.

21   Q.  Mr. Rapp told you -- what, if anything, did Mr. Rapp tell

22   you about -- I'll strike that.

23        Did he tell you that between 2010 and 2015, that he

24   had -- I don't want any specific events, we're not going to

25   cover that -- but did he tell you that he had a lot of hookups?

1    A.   Yes.

2    Q.   And when you spoke to him about the hookups he had between

3    2010 and 2015, he again brought up Kevin Spacey, right?

4              MR. STEIGMAN:  I'll object, Judge.

5              THE COURT:  Give me a moment.

6              (Pause)

7              Let's break here for lunch.  Two o'clock, members of

8    the jury.

9              Dr. Rocchio, you should leave the room at this moment,

10   please.

11             (Witness temporarily excused)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. STEIGMAN:  Can we clear everyone, Judge?

3          THE COURT:  No.

4          You may be seated.

5          Mr. Steigman, 412?

6          MR. STEIGMAN:  Yes.  This is the ever creeping

7    widening of the 412 material.  This is what happens.  This

8    claim about hooking up with many men during a period of his

9    life, we didn't put it in through Mr. Rapp and I didn't ask

10   Dr. Rocchio about it.  To suggest that the substantive value of

11   this impeachment of the witness --

12         THE COURT:  Well, I don't know yet what the testimony

13   is going to be.  Let me see if I can find out.

14         MR. STEIGMAN:  OK.

15         THE COURT:  Sorry to interrupt you.  Mr. Scolnick,

16   where is this going?

17         MR. SCOLNICK:  These are his claims for damages.  He's

18   attributing this period of time to Mr. Spacey.  This is what he

19   told his expert and he's blaming Mr. Spacey for this.  I don't

20   see how this isn't relevant and something he told her in the

21   basis of her opinion.

22         THE COURT:  I did not let you go into this for that

23   purpose.  I let you, to the extent I have let you go down this

24   road, to the extent it is of probative value with respect to

25   the expert opinion.  Now, where are you going with this and how

1    is it relevant to her opinion?

2              MR. SCOLNICK:  It's relevant to her opinion, your

3    Honor, because it is impeachment.  Mr. Rapp is claiming and her

4    opinion is based on contradictory allegations.  At the same

5    time he's claiming that he has no sex drive and blaming that on

6    Mr. Spacey, he is claiming he's hypersexualized and blames that

7    on Mr. Spacey, too.

8              THE COURT:  Look, let me just go back and review what

9    the question was exactly.

10             Given your proffer, the objection is sustained.

11             Two o'clock.

12             (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       AFTERNOON SESSION

2                            2:00 PM

3             (Trial resumed; in open court)

4             THE COURT:  Okay.  Let's get the jury.

5             (Jury present)

6             THE COURT:  All right, Mr. Scolnick.

7             MR. SCOLNICK:  Thank you, your Honor.

8    LISA MARIE ROCCHIO,

9    CROSS-EXAMINATION CONTINUED

10   BY MR. SCOLNICK:

11   Q.  Good afternoon, Dr. Rocchio.

12   A.  Good afternoon.

13   Q.  Dr. Rocchio, I believe on your direct examination, you

14   testified that as a forensic psychologist, you don't take an

15   evaluatee's word or you just take it at face value, right,

16   you're not supposed to do that?

17   A.  No, I don't do that, correct.

18   Q.  One of the things you do is look at collateral information,

19   right?

20   A.  Yes.

21   Q.  And that would include people who know the person you're

22   evaluating, right?

23   A.  Yes.

24   Q.  Because if a person is suffering from a mental illness,

25   then people in their life would probably know something about

1  it, right?

2  A.  They may or may not, yes.

3  Q.  Right, okay.

4         And, in this case, you were given collateral

5  resources, right, information?

6  A.  Yes.

7  Q.  And that included depositions, right?

8  A.  After I conducted my report, yes.  After I prepared my

9  report, yes.

10  Q.  And you understand in this case a number of depositions

11  were taken, right?

12  A.  Yes.

13  Q.  A number of depositions were taken by the parties, of

14  people who are close to Mr. Rapp in his life, right?

15  A.  Yes.

16  Q.  These are people who have relevant information about

17  Mr. Rapp?

18  A.  Yes.

19  Q.  People who know him, right?

20  A.  Yes.

21  Q.  People who have had the opportunity to observe his

22  behavior, right?

23  A.  Yes.

24  Q.  For example, Adam Rapp?

25  A.  Yes.

1    Q.   That's Mr. Rapp's brother, right?

2    A.   Yes.

3    Q.   He was deposed, right?

4    A.   Yes.

5    Q.   His deposition was provided to you, right?

6    A.   Yes.

7    Q.   Did you read his deposition?

8    A.   I did.

9    Q.   Mr. Rapp's, Adam Rapp's, deposition, excuse me, was

10   relevant for a number of reasons; one because it's Mr. Rapp's

11   brother, right?

12   A.   Yes.

13   Q.   Also because he knew Mr. Rapp before he claims he went to a

14   party at Mr. Spacey's home, right?

15   A.   Yes.

16   Q.   And you can kind of get a picture of Mr. Rapp's family

17   dynamics by reading a deposition of someone in his family,

18   right?

19   A.   From that person's perspective, yes.

20   Q.   "From that person's perspective."

21        And that would be from Adam Rapp's perspective in this

22   case, right?

23   A.   Yes.

24   Q.   And Mr. Rapp spoke about 1986 in his deposition, right,

25   Adam Rapp did?

MADKRAP3                          Rocchio - cross

1    A.  Yes, he did.

2    Q.  And you reviewed that as part of preparing your opinion,

3    right?

4    A.  I reviewed it, yes.

5    Q.  It provided you with some information about Mr. Rapp's

6    family dynamics and his relationship with his mother, from

7    Adam's perspective, right?

8    A.  Correct.

9            MR. STEIGMAN:  Judge, could we have a sidebar?

10           THE COURT:  Is there a question pending?

11           MR. SCOLNICK:  Yes, I'll ask a question.

12           THE COURT:  I'm sorry, I didn't hear what you said.

13           MR. STEIGMAN:  I asked if we could approach, but we

14   could wait for another question.

15           THE COURT:  Okay.

16   BY MR. SCOLNICK:

17   Q.  Did you consider that Mr. Rapp testified that the entire

18   time he was in New York, that Anthony Rapp did not attend any

19   parties without his mother?

20           MR. STEIGMAN:  Objection.

21           THE COURT:  Come to the sidebar.

22           (Continued on next page)

23

24

25

1          (At the sidebar)

2          MR. STEIGMAN:  This isn't going to the question being

3   raised, it's going to the question of whether or not the

4   incident happened, right?  His brother said he didn't go to

5   parties without his mother, and, therefore, he couldn't have

6   come to a party without his mother.  They moved to make sure I

7   couldn't ask all the questions that would support the

8   credibility of this happening.  Whether or not it happened?

9   This has nothing to do with his damages, it has nothing to do

10  with his psychological injury, whether or not his mother was

11  going to parties.  It goes to the claim that he was not telling

12  the truth.  This goes to one thing — their argument that he

13  didn't really go to Mr. Spacey's apartment for a party.  So, if

14  the Court allows this question and answer, I believe it should

15  open the door to my asking this witness other reasons she finds

16  that this event occurred.  I didn't do that; the Court said I

17  couldn't.

18         THE COURT:  What I told you you couldn't do was much

19  narrower than that, but let's go on.

20         Mr. Scolnick?

21         MR. SCOLNICK:  Your Honor, the witness testified that

22  family dynamics of Mr. Rapp at around the time the event with

23  Mr. Spacey was relevant.  This is a person that Mr. Spacey met

24  with John Barrowman in 1986, and the person who was sheltered,

25  was protected, had a good relationship with his mom, and we're

1    going to get into some of the abuse, too.  I think it paints a

2    full picture of him.

3              THE COURT:  Look, there's more basic question here.

4    Unlike both of you, I have not read every word of Adam Rapp's

5    deposition --

6              MR. SCOLNICK:  Right.

7              THE COURT:  -- and I don't have any information, which

8    it seems to me is very important, as to whether Adam Rapp was

9    in a position to know whatever it is he told the witness.

10   Well, I take that back, but --

11             MR. STEIGMAN:  Can I?

12             THE COURT:  Just a minute.  It seems to me you need

13   more of a foundation if this is usable at all.

14             MR. SCOLNICK:  Okay.

15             THE COURT:  Because if it turns out that Adam Rapp

16   said that, and she understood, also, that Adam Rapp was in

17   Wyoming the entire time his brother was in New York, the entire

18   period that's relevant here, then it's nonsense.

19             MR. SCOLNICK:  I'll tell you what, your Honor, I want

20   to expedite this so we can move this witness along, so I'll

21   withdraw the question and move on.

22             THE COURT:  Okay.

23             MR. SCOLNICK:  I don't want to have any arguments I'm

24   opening the door, so I'll move it.

25             THE COURT:  Okay, that's fair.

1           (In open court)

2           THE COURT:  Next question.

3           MR. SCOLNICK:  Thank you, your Honor.

4   BY MR. SCOLNICK:

5   Q.  You were also given the deposition of Tracie Thoms, right?

6   A.  I was.

7   Q.  Did you read that deposition?

8   A.  I don't believe I read that one, no.

9   Q.  Mr. Steigman gave you the deposition, right?

10  A.  I believe I had access to it, yes.

11  Q.  And he gave it to you, your understanding was, because it

12  was relevant to the case, right?

13  A.  He gave it to me because it was potentially relevant

14  because I asked him to give me everything he had.

15  Q.  At the time that it was given to you, did you understand

16  that Ms. Thoms was a person in Mr. Rapp's life?

17  A.  Yes.

18  Q.  Did you understand that she was in a position to observe

19  his behavior or alleged symptoms?

20  A.  I didn't know that to be true at the time, no.

21  Q.  Well, if she was a person in Mr. Rapp's life, then she

22  presumably had interactions with him, fair?

23  A.  Fair, yes.

24  Q.  And, presumably, she could shed some light on those

25  interactions in her deposition, right?

1    A.   Yes.

2    Q.   But you didn't read it?

3    A.   No.

4    Q.   Now, it's possible that this deposition of Ms. Thoms, who's

5    a person in Mr. Rapp's life, could have confirmed or

6    corroborated some of your opinions in this case, right?

7    A.   Yes.

8    Q.   And it's also possible that that deposition, that

9    testimony, could have contradicted some of your opinions in

10   this case, right?

11   A.   Yes.

12   Q.   And you didn't read it?

13   A.   No.

14   Q.   You were also given — I think we covered this — Erin

15   Quill's deposition?

16   A.   I was.

17   Q.   Was it your understanding that Ms. Quill is one of

18   Mr. Rapp's friends since 1991 or 1992?

19   A.   I also realize that I misspoke when I testified last time.

20   If now would be an appropriate time for me to clarify, I will.

21   Q.   Did you read the deposition?

22   A.   I did.

23   Q.   Okay.

24            Were you given Wilson Cruz's deposition?

25   A.   I don't recall.

1    Q.  Were you aware he was deposed in this case?

2    A.  I don't recall.

3    Q.  Were you given Robin Magid's deposition?

4    A.  I was.

5    Q.  Now, Ms. Magid is an important person in Mr. Rapp's life,

6    right?

7    A.  She was, yes.

8    Q.  She is someone -- was, I'm sorry, she passed away, right?

9    A.  Yes.

10   Q.  Ms. Magid is someone who had known Mr. Rapp for 25 years,

11   right?

12   A.  Yes.

13   Q.  And Mr. Rapp sought therapy with Ms. Magid intermittently

14   for 25 years, right?

15   A.  Yes.

16   Q.  Mr. Rapp spoke to Ms. Magid about his feelings, right?

17   A.  Yes.

18   Q.  Spoke to her about his emotions, right?

19   A.  Yes.

20   Q.  Spoke to her about what was on his mind, right?

21   A.  Some of it, yes.

22   Q.  Right.

23           Did you read Ms. Magid's deposition?

24   A.  I did.

25   Q.  Excellent.

1       Sean Snow was also deposed in this case?

2   A.  Yes.

3   Q.  And we saw -- I don't think you were here, but we did watch

4   Sean Snow's deposition.

5       Your understanding is he's a friend of Mr. Rapp's as

6   well?

7   A.  Yes.

8   Q.  Did you read that deposition?

9   A.  I did.

10  Q.  John Barrowman was deposed in this case?

11  A.  Yes.

12  Q.  Did you get that deposition?

13  A.  Yes.

14  Q.  Did you read it?

15  A.  I did.

16  Q.  Chris Hart, he was a witness in this case?

17  A.  Yes.

18  Q.  Did you read his deposition?

19  A.  I did.

20  Q.  Excellent.

21      So, let's talk about Ms. Magid.  You said you read her

22  deposition.

23      Now, I think we covered this — Mr. Rapp did — but is

24  it your understanding that Mr. Rapp started seeing Ms. Magid in

25  around '97, '98 somewhere in there?

1    A.  Yes.

2    Q.  And he saw her more regularly through the early 2000s,

3    right?

4    A.  I don't believe so, no.

5    Q.  You don't believe that he saw her more regularly during

6    those years than later?

7    A.  Not through the 2000s.  My understanding was that their

8    regular treatment was up until around 2000, and then it was

9    intermittent until around 2016.

10   Q.  Okay.  If Mr. Rapp testified that there was more regular

11   treatment from '97 to the early 2000s, and then it was --

12           MR. STEIGMAN:  Objection.

13           THE COURT:  Sustained.

14           MR. SCOLNICK:  Okay.

15   BY MR. SCOLNICK:

16   Q.  Now, it's true you learned from Ms. Magid's deposition that

17   Mr. Rapp did not tell Ms. Magid about his Kevin Spacey

18   allegations until October 2017, right?

19   A.  Correct.

20   Q.  And that was after he contacted BuzzFeed magazine, right?

21   A.  I believe so, yes.

22   Q.  Ms. Magid also confirmed that Mr. Rapp did not tell her for

23   two decades, between '97 and 2017, about the symptoms he now

24   claims to suffer from; fair to say?

25   A.  No.

1    Q.  Well, let's talk about that.

2            Is it true that Ms. Magid testified that Mr. Rapp did

3    not report any difficulties he had in his romantic

4    relationships before his current partner, Ken, in 2017?

5    A.  There's a discrepancy between what she told me and what she

6    said in her deposition, so which one are you referring to?

7    Specifically just the deposition?

8    Q.  Okay.  You interviewed Ms. Magid, right?

9    A.  I did.

10   Q.  You interviewed her by Zoom, I take it, or by phone?

11   A.  By phone.

12   Q.  You didn't record that, did you?

13   A.  No, I did not.

14   Q.  You didn't have a video or an audio recorder that you

15   recorded it with, right?

16   A.  No.

17   Q.  You didn't get a transcription of it, right?

18   A.  No.  I take extensive notes, but not a transcription.

19   Q.  So, we actually have Ms. Magid on the record, under oath,

20   with a transcript, right?

21   A.  Yes.

22   Q.  And that's what I'm referring to now --

23   A.  Okay.

24   Q.  -- that Ms. Magid testified under oath that Mr. Rapp did

25   not tell her about any of his relationship difficulties before

MADKRAP3                    Rocchio - cross

1   2016 or '17, right?

2   A.  Yes.

3         Actually, no, I'm sorry, that's not true.

4   Q.  Would it refresh your recollection to see a transcript from

5   Ms. Magid's deposition about what she said?

6   A.  Did she testify as to why he presented for treatment

7   initially?  I believe she did in that deposition.

8   Q.  Yeah, she did.

9   A.  And that was due to a relationship issue.  That was the

10  prompting event for treatment.  I believe she testified to that

11  in her deposition.

12  Q.  Is it true that -- didn't Ms. Magid testify that the only

13  thing that Mr. Rapp told her about -- I'm sorry, strike that.

14        The only therapy sessions that Ms. Magid had with

15  Mr. Rapp in 1997 was discussing Jonathan Larson and the loss of

16  his mother.

17        Do you remember that?

18  A.  And the impact of those, yes.

19  Q.  Mr. Rapp did not tell Ms. Magid before 2016 or '17 that he

20  had problems tolerating other people's anger, right?

21  A.  2016, yes.

22  Q.  Ms. Magid testified she didn't recall Mr. Rapp telling her

23  before 2016 or '17 that he had problems tolerating other

24  people's disappointment in him, right?

25  A.  I believe she said she didn't recall that, yes.

1  Q.  Ms. Magid testified that Mr. Rapp did not report to her

2  that he had abnormal sexual urges before 2017, right?

3  A.  I believe so.

4  Q.  Ms. Magid confirmed that Mr. Rapp did not tell her before

5  2017 that he needed to be the focus of other men's attention,

6  right?

7  A.  Right.

8  Q.  Ms. Magid confirmed that Mr. Rapp did not tell her before

9  2017 that he couldn't resist the propositions from others,

10  romantic propositions from others, right?

11  A.  I believe so, yes.

12  Q.  Before 2017, Mr. Rapp never told Ms. Magid that he had an

13  extreme fear response, right?

14  A.  I believe -- yes.

15  Q.  Yes, that's true, he did not tell her?

16  A.  Yes, that is true, I believe he did not tell her.

17  Q.  Before 2017, Mr. Rapp did not tell Ms. Magid that he

18  startled easily, right?

19  A.  I believe so, yes.

20  Q.  Before 2017, Mr. Rapp did not report any unexplained

21  emotional symptoms, right?  That's what she testified to?

22  A.  I think she said 2016, when he returned to treatment.

23  Q.  Okay.  You've seen the treatment records from Ms. Magid,

24  right?  Those were provided to you?

25  A.  Yes.

1    Q.  And isn't it true those treatment records start in 2017,

2    March?

3    A.  I believe so, yes.

4    Q.  Mr. Rapp didn't report to Ms. Magid before 2017 having

5    trouble with any boundary issues, right?  That's what she

6    testified to?

7    A.  Again, I believe the date was 2016.

8    Q.  Have you seen any treatment records before 2017 in this

9    case?  What I mean is -- let me rephrase that.

10        Have you seen any treatment records from 2016 in this

11   case?

12   A.  No.

13   Q.  They're all from 2017, correct?

14   A.  There were a few from 2017, yes.

15   Q.  Right.

16        They started in March and then went forward, right?

17   A.  I believe so, yes.

18   Q.  So, Mr. Rapp did not claim that he had any boundary issues

19   with Ms. Magid in the first decades of therapy with her, right?

20   That's what she testified to?

21   A.  I believe so, yes.

22   Q.  In fact, the first time that Mr. Rapp told Ms. Magid he had

23   trouble setting boundaries was during the later years of

24   therapy, either '16 or 2017, right?  That's what she testified

25   to?

1   A.  I believe so, yes.

2   Q.  Before Mr. Rapp's relationship with Ken, he never

3   complained of having any trouble sticking up for himself,

4   right?  That's what she testified to?

5   A.  I don't recall that specific statement.

6   Q.  Do you remember Ms. Magid being asked:

7   "Q. Before that point, you had no concerns that Mr. Rapp had

8   trouble standing up for himself, correct?

9   "A.  No, I have no -- I was not aware of that."

10          Does that sound familiar?

11  A.  It does, yes.

12  Q.  Now, in 2017, Mr. Rapp started seeing Ms. Magid more about

13  his relationship with Ken, right?

14  A.  I believe she said 2016, but, yes, about his relationship

15  with Ken, that was the prompting issue.

16  Q.  '16 or '17, right?  One or the other, that's when he

17  started talking about Ken, right?

18  A.  Yes.

19  Q.  That's when their relationship started, right?

20  A.  Yes.

21  Q.  And he explained to Ms. Magid that Ken was jealous, right?

22  A.  Yes.

23  Q.  He explained that Ken was meanspirited, right?

24  A.  No.

25  Q.  Do you remember that Ms. Magid testified that in early

1    2017, she asked Mr. Rapp if he had ever been abused?  Do you

2    remember her testifying about that?

3    A.  No, I don't.  I remember her testifying that she didn't ask

4    that question.

5    Q.  Okay.

6         Do you remember Ms. Magid testifying:

7    "Q.  Sure.

8         "Is it true sometime between the end of '16 and the

9    beginning of 2017, that's when Mr. Rapp told you he didn't

10   recall any prior traumatic incidents?

11   "A.  When I asked about prior abusive traumatic experiences in,

12   I would say, early 2017, he reported, no."

13        Does that ring a bell?

14   A.  It does.

15   Q.  By that time, this was the therapist he had been seeing for

16   20 years, right, intermittently, but he had known her for

17   20 years?

18   A.  Yes.

19   Q.  Mr. Rapp did not report to Ms. Magid the full extent of the

20   physical altercations he had with Ken, right?

21   A.  I can't speak to that.  I don't know.

22   Q.  Do you remember reading Ms. Magid's transcript where she

23   said that she was not aware of that?

24   A.  You asked me what he did tell her, which is different than

25   what she said he told her.  So, yes, I remember she said that.

1    I don't know what he actually said because she told me

2    something different.

3    Q.  That's a fair distinction.

4         You weren't actually there in the therapy room, right?

5    A.  Right.

6    Q.  And how long ago did you speak to Ms. Magid?

7    A.  I think it would have been sometime in February of 2021.

8    Q.  Wow, so it's a year and a half ago, right?

9    A.  Yes.

10   Q.  So you're trying to remember the specifics of a

11   conversation you had with Ms. Magid a year and a half ago; fair

12   to say?

13   A.  No.  I have extensive notes from that conversation that

14   I've reviewed.

15   Q.  And those notes are not a transcript of the conversation,

16   right?

17   A.  Not a direct transcript.  Pretty close, but not a direct

18   transcript, no.

19   Q.  I'd like to return to PTSD.

20        We talked a bit about the criteria for PTSD earlier in

21   your direct examination; do you remember?

22   A.  Yes.

23   Q.  One of the criterion for PTSD is avoidance, right?

24   A.  Symptoms, yes.

25   Q.  So, Criterion C for PTSD, or the element, is persistent

1  avoidance of stimuli associated with a traumatic event, right?

2  I mean, that's right out of the book, I'm reading it, right?

3  A.  That's the heading for that category, and then there are

4  two different questions within that category.

5  Q.  And the first one is avoidance of or efforts to avoid

6  distressing memories, thoughts, or feelings or closely

7  associated -- about or closely associated with the traumatic

8  events, right?

9  A.  Yes.

10 Q.  And number 2 is, avoidance of or efforts to avoid external

11 reminders, including people, places, conversations, activities,

12 objects, situations that arouse distressing memories, thoughts,

13 or feelings about closely associated with the traumatic events.

14 Is that more or less right?

15 A.  Yes.

16 Q.  Now, Mr. Rapp told you that he had been trying to avoid

17 memories, thoughts, or feelings, as well as external reminders

18 of Mr. Spacey, right?

19 A.  Some of each, yes.

20 Q.  And you asked him about that, right?

21 A.  I did.

22 Q.  And he told you that thinking about Mr. Spacey brought him

23 fear, horror, anger, guilt, and shame, right?

24 A.  Yes.

25 Q.  Now, Mr. Rapp went and saw *Lost In Yonkers* in 1991, right?

1    A.   Uh-huh.

2    Q.   Mr. Spacey was --

3            THE COURT:  You have to answer with words,

4    Dr. Rocchio.

5            THE WITNESS:  Yes.  Sorry, your Honor.

6    BY MR. SCOLNICK:

7    Q.   Mr. Spacey was starring in *Lost In Yonkers*, right?

8    A.   I believe so, yes.

9    Q.   And Mr. Rapp knew Mr. Spacey was starring in *Lost In*

10   *Yonkers* when he went and saw it, right?

11   A.   Right.

12   Q.   He didn't have an electric shock when he saw *Lost In*

13   *Yonkers*, did he?

14   A.   Not to my awareness.

15   Q.   In fact, he didn't tell you that he went and saw *Lost In*

16   *Yonkers* during your interview, did he?

17   A.   He told me he went to see many of Mr. Spacey's performances

18   for a period of time.  He didn't specify which ones.

19   Q.   So the answer is, no, he didn't tell you he saw *Lost In*

20   *Yonkers*, right?

21   A.   No.

22   Q.   Mr. Rapp admitted that he had gone to a party, an Oscar

23   party, in which Mr. Spacey was nominated for *Usual Suspects*,

24   right?

25   A.   Yes.

1   Q.  And he told you that he knew Mr. Spacey was nominated

2   before he went to that party, right?

3   A.  Yes.

4   Q.  He knew Mr. Spacey may have won an award or might win an

5   award when he went there, right?

6   A.  Yes.

7   Q.  And he knew Mr. Spacey may show up on TV, right?

8   A.  Yes.

9   Q.  And he went to the party anyway, right?

10  A.  Yes.

11  Q.  And Mr. Spacey saw that -- I'm sorry, Mr. Rapp saw that

12  Mr. Spacey did win an award, right?

13  A.  I believe so, yes.

14  Q.  And he started throwing pencils at the screen, right?

15  A.  I believe it was one pencil.

16  Q.  Okay.

17         He also told people his Kevin Spacey story, right?

18  A.  Yes.

19  Q.  Isn't it true that it was at this party that Mr. Rapp first

20  told his brother his Kevin Spacey story, his allegations,

21  right?

22  A.  I believe so, yes.

23  Q.  So, this is his brother, obviously, someone he's known his

24  entire life, right?

25  A.  Yes.

MADKRAP3                    Rocchio - cross

1  Q.  And he waits until he's at a party, and Mr. Spacey comes up

2  and wins an award, and that's the first time he tells it,

3  right, to his brother?

4  A.  I believe so, yes.

5  Q.  Mr. Rapp saw *L.A. Confidential*, right?

6  A.  I don't know.

7  Q.  Well, he told you he saw *L.A. Confidential*, right?  That's

8  in your notes.

9  A.  I don't recall the specific names of which performances,

10  when.  So if it's in my notes, then, yes.

11  Q.  That's fair enough.

12         Did you review your notes before today?

13  A.  I did.

14  Q.  Okay.

15         Does it sound familiar, that he told you he saw *L.A.

16  Confidential*?

17  A.  Yes.

18  Q.  And he knew that Kevin Spacey would be in *L.A. Confidential*

19  before he saw it, right?

20  A.  Yes.

21  Q.  He didn't avoid that movie, right?

22  A.  No.

23  Q.  He didn't tell you he had an electric shock, a physical

24  reaction, when he saw Kevin Spacey in *L.A. Confidential*?

25  A.  No, he didn't.

1    Q.  He didn't tell you he had a knot in his stomach?

2    A.  No, he didn't.

3    Q.  He Didn't tell you he started crying or shaking, right?

4    A.  No.

5    Q.  He then went and saw another -- he then went to another

6    Oscar party at which Mr. Spacey was nominated, right, for

7    *American Beauty*?

8    A.  Yes.

9    Q.  And he knew that that was going to happen, that Mr. Spacey

10   may be on the screen, right?

11   A.  Yes.

12   Q.  And that Mr. Spacey may be discussed, right?

13   A.  Yes.

14   Q.  Didn't avoid that party?

15   A.  No.

16   Q.  And he told the people at the party his Kevin Spacey

17   allegations again, right?

18   A.  Yes.

19   Q.  And then he actually went out and saw the movie, right?  He

20   saw *American Beauty*, right?

21   A.  Yes.

22   Q.  And he knew Kevin Spacey, obviously, was in the movie when

23   he saw it, right?

24   A.  Yes.

25   Q.  He didn't avoid that, right?

1  A.  No.

2  Q.  He didn't tell you he had an electric shock when he saw

3  Kevin Spacey, right?

4  A.  No.

5  Q.  Didn't tell you that he was crying or shaking, right?

6  A.  No.

7  Q.  He also saw *The Ref*, right?

8  A.  I'm sorry?

9  Q.  *The Ref*?

10  A.  *The Ref*?  Okay.

11  Q.  Well, it's not -- it wasn't a great movie.  No offense,

12  but...

13          MR. STEIGMAN:  We object.

14  Q.  It wasn't a critically acclaimed movie, was it, *The Ref*?

15  You've never even heard of it?

16  A.  I never even heard of it, no.  Sorry.

17  Q.  Denis Leary, does that sound familiar?

18  A.  Yes.

19  Q.  He went and saw that, too, right?

20  A.  Again, I don't know which movies specifically he saw.  I

21  know some of the ones he saw, but I don't know every one that

22  he saw.

23  Q.  Was it relevant to you to ask him how many movies you saw,

24  and tell me about each one, tell me what you were feeling when

25  you saw each one?  Was that a relevant question?

1   A.  It was relevant -- no, that specific question was not

2   relevant.

3   Q.  Okay.

4         Mr. Rapp did not tell you that he went out and saw *The*

5   *Ref* and had some PTSD symptoms when he saw it, right?

6   A.  No, he did not.

7   Q.  But it didn't stop there, right, he even saw more Kevin

8   Spacey movies, he saw *Seven* as well, right?

9   A.  Yes.

10  Q.  That's the Brad Pitt movie, I think?

11  A.  I know he saw *Seven*.  I didn't see it, so I don't know who

12  was in it, sorry.

13  Q.  He knew Kevin Spacey was going to be in the movie when he

14  went and saw *Seven*?

15  A.  I believe so, yes.

16  Q.  Didn't avoid it, right?

17  A.  Right.

18  Q.  And, again, it wasn't highly acclaimed, something that was

19  winning Oscars, right?

20  A.  Again, I don't know the name of that movie.

21  Q.  I forgive you.  You're not an expert in cinema, right?

22  A.  No, I'm not.

23  Q.  He didn't tell you that he had some strong physical

24  reaction when he saw *Seven* with Kevin Spacey in it, did he?

25  A.  Specifically, no.

1    Q.  He saw a number of movies and plays with Mr. Spacey in it,

2    right?

3    A.  Yes.

4    Q.  And no one forced him to see those plays; can we agree on

5    that?

6    A.  Correct.

7    Q.  He made a choice to see those plays, right?

8    A.  Correct.

9    Q.  He made a choice not to avoid going to those performances,

10   right?

11   A.  Correct.

12   Q.  Even though he knew Kevin Spacey was in them, right?

13   A.  Correct.

14   Q.  He didn't tell you about at any of those performances,

15   having strong physical reactions, putting aside *Working Girl* in

16   '88; fair to say?

17   A.  No.

18          THE COURT:  Not fair to say or what?

19          THE WITNESS:  Not fair to say.

20   BY MR. SCOLNICK:

21   Q.  Okay.  Which performance did he tell you that he had a

22   strong physical response to?

23   A.  He said that, in general, as opposed to a specific

24   response, in the course of seeing many of the films, he would

25   steel himself before going, he would feel tension and some

1   nausea in his stomach, and then he would make deliberate

2   efforts to avoid the feelings that came up.

3   Q.  Ah.  So he was telling you that he had all of this trauma

4   and PTSD symptoms that he would experience, but it wasn't bad

5   enough to miss a good movie?

6   A.  That's not what he said, no.

7   Q.  Mr. Rapp also discussed his Kevin Spacey allegations with a

8   number of people, right?

9   A.  Yes.

10  Q.  He discussed it with dozens and dozens of people over the

11  years, right?

12  A.  Yes.

13  Q.  And he's also done a number of media appearances after

14  BuzzFeed, right?

15  A.  Some number, yes.

16  Q.  You mentioned something interesting.  You mentioned on your

17  direct examination that Mr. Rapp told you that even being a

18  part of this case is painful for him, right?

19  A.  Yes.

20  Q.  Were you aware that there have been a number of depositions

21  in this case?  Obviously, you've read them, right?

22  A.  Yes.

23  Q.  Yeah.

24          Those were all done by Zoom; is that your

25  understanding?

1  A.  I believe so, yes.

2  Q.  Did you know that there were also remote hearings in this

3  case?

4  A.  Yes.

5  Q.  And did you know that before trial, there was only one

6  public hearing at which the press and the cameras and the

7  paparazzi were present?  Did you know about that?

8  A.  I didn't.

9  Q.  Did you know that the only hearing or appearance or event

10  in this case, other than his own deposition, that he attended

11  was the one that had camera, lights, paparazzi, and all these

12  things?

13  A.  No.

14  Q.  We spoke a bit about testing on your direct examination,

15  and I'd like to follow up on that, okay?

16  A.  Sure.

17  Q.  Now, you mentioned that some of these tests are objective,

18  right?

19  A.  Yes.

20  Q.  Now, for most of us who are familiar with the medical

21  setting, we know that objective tests are x-rays, MRIs, right,

22  things like that?

23  A.  Sure, yes.

24  Q.  But these psychological tests, they require someone to

25  provide an answer, right, to a question?

1  A.  Yes.

2  Q.  And those answers are to questions about how someone's

3  feeling, right?

4  A.  Some of them, yes.

5  Q.  Right.

6          And how you are feeling is a subjective issue, right?

7  It's a subjective response?

8  A.  Yes.

9  Q.  So, for example, if my doctor, I go in, and he says, hey,

10 how much did you weigh in, and I give him a really good number,

11 that's a subjective interpretation; it might be more favorable

12 than the reality, but, right, that would be subjective?

13 A.  Correct.

14 Q.  But the scale actually gives us the objective

15 interpretation, right?

16 A.  Correct.

17 Q.  All right.  So let's talk about these tests.

18          One of them was a Beck Depressive Inventory, right?

19 A.  That's not a test, but, yes.

20 Q.  Questions, right?

21 A.  It's called the self-report checklist.

22 Q.  Sure.

23          And this would be an example of a face-valid test,

24 right?

25 A.  Yes.

1  Q.  Now, a face-valid test is something that asks questions

2  that are -- let me start over.

3       A person who's answering the questions can tell what's

4  being asked and why, right?

5  A.  Yes.

6  Q.  For example, are you feeling depressed, and you can answer

7  yes or no, but you know what they're asking; yeah?

8  A.  Correct.

9  Q.  And these are self-reports, right?

10  A.  Yes.

11  Q.  These are less reliable than the tests that have the

12  validity measures, right?

13  A.  Correct.

14  Q.  Now, for the Beck Depressive Inventory, if we call it the

15  BDI, will you know what I mean?

16  A.  Yes.

17  Q.  Mr. Rapp took that on February 6, 2021, right?

18  A.  Yes.

19  Q.  He told you that he feels sad much of the time, right?

20  A.  Within the last two weeks, yes.

21  Q.  Okay.  He said that he, for the relevant time period,

22  failed more than he should, right?

23  A.  He believed he had failed more than he should.  He felt

24  that he --

25  Q.  Sorry, I didn't mean to interrupt you.

1   A.  I think it says he felt that he failed or he felt like a

2   failure, something like that.

3   Q.  He felt that he expects to be punished, right?

4   A.  Yes.

5   Q.  He felt that he lost confidence in himself, right?

6   A.  Yes.

7   Q.  He felt that he's more critical of himself than he used to

8   be, right?

9   A.  Yes.

10  Q.  He felt that he cried more than he used to, right?

11  A.  Yes.

12  Q.  And that he's feeling less interested in other people and

13  things than before?

14  A.  Yes.

15  Q.  The list goes on, but he reported -- on this face-valid

16  test, where it's obvious to see what's being asked, he gave a

17  lot of symptoms, right?  He reported a lot of distress?

18  A.  No.  His scores were moderate on that test, on that

19  checklist, not --

20  Q.  Well, let's go through them, okay?

21  A.  Okay.

22  Q.  He says he feels he finds it more difficult to make

23  decisions than usual and he's less interested in other people

24  or things than before, right?

25  A.  Yeah.

1    Q.  He said he finds it more difficult to make decisions than

2    usual, right?

3    A.  Yes.

4    Q.  He said that he didn't have enough energy to do very much,

5    right?

6    A.  Yes.

7    Q.  Now, for all these questions, it's obvious that you're

8    asking someone if they're depressed, right?

9    A.  Symptoms of depression, yes.

10   Q.  Sure.

11        And you also gave him the Beck Anxiety Inventory,

12   right?

13   A.  I did.

14   Q.  This is an example of another face-valid test, right?

15   A.  Yes.

16   Q.  And, again, on a face-valid test, the person who's taking

17   it can tell what you're trying to get at with the questions,

18   right?

19   A.  Yes.

20   Q.  It's obvious that you're asking someone if they're

21   depressed or anxious, right?

22   A.  Yes.

23   Q.  He told you that he was feeling wobbliness in his legs,

24   right?

25   A.  I'm having trouble answering those yes/no because they're a

1  degree, so I don't recall off the top of my head to what degree

2  he answered that.

3  Q.  Regardless --

4  A.  It's not a yes/no question.

5  Q.  I cut you off, I'm sorry.

6          Did he say, to some degree, he felt wobbliness in his

7  legs?

8  A.  Yes.

9  Q.  Did he say, to some degree, he felt nervous?

10  A.  Yes.

11  Q.  Did he say, to some degree, he felt sweaty?

12  A.  Yes.

13  Q.  Numbness, dizziness, lightheadedness, heart pounding, to

14  some degree, he said he felt all these things and more, right?

15  A.  I don't remember the specific ones.  If you're representing

16  that that's what my testing showed, then I absolutely will

17  agree with that, yes.

18  Q.  Okay.

19          You also gave him the PCL-V, right?

20  A.  Yes.

21  Q.  And this is a test that you gave on the same day, right?

22  A.  I believe so.

23  Q.  Is this another face-valid --

24  A.  It's a face-valid checklist, yes.

25  Q.  So, again, it's pretty clear what you're getting at, right?

1   A.  Yes.

2   Q.  And you're asking these questions in the context of a

3   forensic evaluation for a civil lawsuit, right?

4   A.  Correct.

5   Q.  And he told you he felt, to some degree, repeated,

6   disturbing, unwanted memories of a stressful experience?

7   A.  Yes.

8   Q.  He told you he was avoiding memories, thoughts, or feelings

9   related to stressful experience, right?

10  A.  Yes.

11  Q.  Avoiding external reminders of a stressful -- we did that

12  one.

13          He said he was quite a bit upset when something

14  reminded him of a stressful experience, right?

15  A.  Yes.

16  Q.  And the same thing with the CAPS-V, right, that's also a

17  face-valid test, so it's pretty clear what you're asking?

18  A.  Yes and no.

19  Q.  Okay.  Well, did you ask Mr. Rapp about symptoms he's

20  experiencing relating to the event he claims happened on the

21  CAPS-V?

22  A.  Yes.

23  Q.  And it's for the purpose of diagnosing someone with PTSD,

24  right?

25  A.  Yes.

1    Q.  And he told you that, to some degree, he has recurrent,

2    involuntary, intrusive, distressing memories, right?

3    A.  Yes.

4    Q.  He told you, to some degree, he has intense psychological

5    distress at exposure to external or internal cues, right?

6    A.  Those aren't his words, but, yes.

7    Q.  He endorsed them, right?

8    A.  He endorsed that, yes.

9    Q.  Right.

10          He said he had feelings of attachment and estrangement

11   from others, right?

12   A.  That was what the testing indicated, yes.

13   Q.  And he agreed with it, he endorsed it, right, to some

14   degree?

15   A.  If you're -- you have to read the question as it's written,

16   but, yes, I mean, he endorsed that symptom, yes.

17   Q.  You also gave Mr. Rapp the PAI, right, the Personality

18   Assessment Inventory?

19   A.  I did.

20   Q.  This is not a face-valid test, right?

21   A.  Correct.

22   Q.  This asks questions in a more sophisticated way; fair to

23   say?

24   A.  Yes.

25   Q.  So, people who are being asked the questions don't really

1  understand what's being asked, right, or why?

2  A.  Correct.

3  Q.  And you told us about that, right?

4  A.  I did.

5  Q.  You told us there are validity measures, and you told us

6  all about that test, right?

7  A.  Yes.

8  Q.  But you didn't tell us about the results, and that's what I

9  want to talk to you about now.

10      MR. SCOLNICK:  So can we take out tab 89, please.

11  Q.  Now, the PAI -- it's not on your screen yet, but the PAI

12  asks the subject a number of questions, like over 2 or 300,

13  right?

14  A.  344, yes.

15  Q.  344.

16      And after the person takes the test, it's scored by a

17  computer, right, by a formula, an algorithm; fair to say?

18  A.  Yes.

19  Q.  And one of the sections in the results reads "Clinical

20  Features," right?

21      True, there's a section that says "Clinical Features"?

22  A.  Yes, but that's not the only scoring.  So there is --

23  Q.  We'll get there.

24  A.  Okay.

25  Q.  I'm just asking, is there a section that reads "Clinical

1  Features"?

2  A.  In the treatment report from the scoring, yes.

3  Q.  Right.

4        And this was your test, right?

5  A.  Yeah.

6  Q.  And the second paragraph, it reads, "According to

7  respondent's self-report, he describes no significant problems

8  in the following areas:  Unusual thoughts or peculiar

9  experiences, antisocial behavior, problems with empathy, undue

10  suspiciousness or hostility, extreme moodiness and impulsivity,

11  unhappiness and depression, unusually elevated mood or

12  heightened activity, marked anxiety, problematic behaviors used

13  to manage anxiety, difficulties with health or functioning."

14        Did I read that sentence correctly?

15  A.  You did.

16  Q.  Thank you.

17        And, by the way, this was not a sentence you read on

18  your direct examination, was it?

19  A.  No.

20        MR. STEIGMAN:  Objection.

21        THE COURT:  Overruled.

22  BY MR. SCOLNICK:

23  Q.  There's also a section that reads "DSM Diagnostic

24  Possibilities"; isn't there a section that's titled that?

25  A.  There is.

Q.  And below that, it reads, "Listed below are DSM-V

diagnostic possibilities suggested by the configuration of PAI

scale scores.  The following are advanced as hypotheses.  All

available sources of information should be considered prior to

establishing final diagnoses."

          Did I read that correctly?

A.  Yes.

Q.  And, by the way, you've read this a number of times not

only in this case, but in other cases, right?  You know this

test?

A.  I do.

Q.  So, in this case, there's diagnostic considerations and

there's a DSM code, right?

A.  Yes.

Q.  And there's a code for a variety of mental illnesses,

right?  Each one has a code, right?

A.  Yes.

Q.  And in this test that you gave, PTSD was not the listed

diagnosis, correct?

A.  Correct.

Q.  You did not mention that in your direct examination, did

you?

A.  No, I did not.

Q.  One of the things you said you want to do with these tests

is you want to compare the face-valid test where someone can

1   just easily tell what they're being asked --

2   A.   Uh-huh.

3   Q.   -- with a more valid test, like the PAI, right?

4   A.   Correct.

5   Q.   So let's do that.

6        Isn't it true that, on the same day of this face-valid

7   test, that Mr. Rapp claimed to suffer from severe unwanted

8   memories and claimed to not be able to think about anything but

9   Kevin Spacey, the PAI test gave, quote, no indication of

10  significant problems with unusual thoughts, peculiar

11  experiences, unhappiness, or depression?

12       MR. STEIGMAN:  Objection to form.

13       MR. SCOLNICK:  I'll reword it.

14  BY MR. SCOLNICK:

15  Q.   Is it true, Dr. Rocchio, that in the PCL-V, Mr. Rapp told

16  you that he has very big problems with invasive thoughts about

17  Kevin Spacey, and he can only think about something else if

18  he's totally consumed with something else, but he has to make a

19  conscious effort to do that?  Isn't that what he said?

20  A.   Is that on the PCL or on the CAPS-V?

21  Q.   I'm sorry, you're right, CAPS-V.

22  A.   Yes, for the past month.

23  Q.   So on the very same day, the PAI said, among other things,

24  that Mr. Rapp describes no significant problems with unusual

25  thoughts, peculiar experiences, unhappiness, depression, or

1    anxiety, right?  Isn't that what he said that day?

2    A.   That's what the computerized interpretation said.

3    Q.   Thank you.

4         On the CAPS-5, which was taken in early February of

5    last year, Mr. Rapp told you that he suffers from profound

6    sadness and grief with tears in his eyes, right?

7    A.   I think the tears in his eyes was my observation, and I

8    believe he told me he had profound grief.

9    Q.   So, he was so upset when he was talking to you, that he

10   actually had tears in his eyes?

11   A.   If that's what I wrote in response to that question, that's

12   happened a number of times during my evaluation, yes.

13   Q.   Mr. Rapp, you understand, is an actor, right?

14   A.   I do.

15   Q.   Right.

16        Are you familiar with the literature about actors'

17   ability to feign PTSD within the last few years?

18             MR. STEIGMAN:  Objection to form.

19             MR. SCOLNICK:  Strike that.  I'll start over.

20             THE COURT:  Sustained.

21   BY MR. SCOLNICK:

22   Q.   Are you familiar with any literature about peer-reviewed

23   literature relating to scientific institutions hiring actors to

24   report symptoms of PTSD that are not real?

25             MR. STEIGMAN:  I am going to object to form.  I don't

1    think that's the right way to ask that question.

2             MR. SCOLNICK:  I'll strike that, your Honor.

3    BY MR. SCOLNICK:

4    Q.  So, the same day that Mr. Rapp had tears in his eyes and

5    was telling you about his distress, he took the PAI, right?

6    Correct?

7    A.  Yes.

8    Q.  And the computerized -- by the way, you chose the PAI,

9    right?

10   A.  I did.

11   Q.  And on the same day he took the PAI, the test that you

12   chose, the computer readout read, in part, that he describes no

13   significant problems with unhappiness or depression, right?

14   That was the readout?

15   A.  That was what the readout said, yes.

16   Q.  By the way, there was also the TSI-II, right?

17   A.  Yes.

18   Q.  That's another test that's not face valid, right?  That's

19   one that has the validity scales, all these things, right?

20   A.  Yes.

21   Q.  And, by the way, the PAI, you told us that the validity

22   scales were not triggered by Mr. Rapp's responses, right?

23   A.  Correct.

24   Q.  So, when he gave answers that resulted in no significant

25   problems with trauma, and that long list, those were the same

1   questions that the computer found not to be malingering, right?

2   A.  No, the computer did not find him to say no problems with

3   trauma.

4   Q.  No, my question was a little bit different.

5         The printout that we just read --

6   A.  Yes.

7   Q.  -- that was from the PAI, right?

8   A.  Yes.

9   Q.  And his answers that resulted in that paragraph did not

10  trigger malingering, right?

11  A.  Correct.

12  Q.  Now, by the way, when we're talking about malingering,

13  that's an attempt to evaluate whether symptoms are true or

14  exaggerated, right, among other things?

15  A.  On that test, they're trying to evaluate, more

16  specifically, response style versus malingering specifically,

17  but, yes.

18  Q.  So, those validity scales do not attempt to determine the

19  actual source of trauma, right?

20  A.  Nothing on the test does, no.

21  Q.  So, just so we're clear, when you said that something was

22  valid or not reporting malingering, that was in no way an

23  indication of whether the alleged source of trauma is what

24  Mr. Rapp claims it is, right?

25  A.  Correct.

1    Q.   Now, the TSI.

2    A.   Yes.

3    Q.   The TSI did not report elevations for depression, right?

4    A.   Elevations --

5    Q.   Elevated scales for depression?

6    A.   No, not depression.

7    Q.   Part of your role as a forensic psychologist is to assist

8    the trier of fact to determine how, if at all, an alleged event

9    impacted someone; fair to say?

10   A.   Yes.

11   Q.   An important data point in that analysis is to gather data

12   from before an alleged incident; fair to say?

13   A.   If possible, yes.

14   Q.   Gathering data from before an alleged traumatic incident

15   allows the finder of fact to develop a baseline for a subject's

16   behavior, right?  True?

17   A.   Or behavior, functioning, emotional state, yes.

18   Q.   Looking at someone's behavior before an alleged incident is

19   one data point relevant to determine how someone's behavior may

20   have changed as a result of it, right?

21   A.   It can be, yes.

22   Q.   That includes how someone's sexual behavior may have

23   changed from before an alleged incident to after, right?

24   A.   Yes.

25   Q.   Now, you told us that Mr. Rapp, in your direct examination,

1   reported to you that he had some kind of a preoccupation with

2   sex after 1986, that he was constantly focused on whether

3   people were attracted to him, something like that; fair enough?

4   Is that right?

5   A.  Not a preoccupation with sex, no, that's not correct.

6   Q.  A focus?

7   A.  Not on sex, per se, no, that's not correct.

8   Q.  Okay.

9           Was it on whether people were attracted to him?

10  A.  Yes, that was correct.

11  Q.  Now, is it true that that's also a symptom of narcism?

12  A.  In what way?

13  Q.  Being obsessed with and believing people are interested in

14  you and being focused on that?

15  A.  If you believe it, yes.  Having the question and wondering

16  would not necessarily be a symptom of narcism, no.

17  Q.  Well, my point, Dr. Rocchio, is that in your analysis, you

18  also considered information about Mr. Rapp before he claims he

19  went to a party at Mr. Spacey's house, right?  Apartment?

20  A.  Yes.

21  Q.  And part of that included asking him questions about any

22  sexual activity before then, right?

23  A.  Yes.

24  Q.  And, by the way, these are issues that Mr. Rapp has raised

25  in his discussion, right?

1    A.  Answers he provided, yes.

2    Q.  I'm sure there are things we'd all rather be talking about,

3    but we need to respond to these.

4          Do you understand these concerns?

5    A.  Sure.

6    Q.  Okay.

7          In the course of your analysis, isn't it true that you

8    determined you found evidence that Mr. Rapp was engaged in some

9    sexual activity with boys when he was as young as 11 and

10   12 years old?

11   A.  Yes.

12   Q.  It's true that he was engaged in mutual masturbation when

13   he was 11 or 12, right?

14   A.  Masturbation in the presence of other boys?

15   Q.  Right.

16   A.  Yes, yes.

17   Q.  And also oral sex, right?

18   A.  I believe some, yes.

19   Q.  And this all happened before 1986, right?

20   A.  Yes.

21   Q.  And according to at least one witness that you're familiar

22   with, it happened up to 20 times, right?

23   A.  I believe so.

24   Q.  All before 1986, right?

25   A.  Uh-huh.

1    Q.  So, if someone were to understand from your earlier

2    testimony that there was no sexual activity by Mr. Rapp before

3    1986, that would not be accurate, right?

4            MR. STEIGMAN:  Objection.

5            THE COURT:  Sustained.

6            MR. SCOLNICK:  Okay.

7    BY MR. SCOLNICK:

8    Q.  And those were with boys, right?

9            THE COURT:  I don't understand the question,

10   Mr. Scolnick.

11           MR. SCOLNICK:  Sure.

12   Q.  The experiences that we discussed — the oral sex, mutual

13   masturbation up to 20 times — before '86, those are with boys,

14   right?

15   A.  Yes, they were.

16   Q.  Now, I'm not talking about sexual activity anymore, so

17   we're clear.  I just want to talk to you about Mr. Rapp's

18   discussion of sex at a young age.  Okay?

19   A.  Okay.

20   Q.  Now, we heard from a witness yesterday who told us that

21   Mr. Rapp -- he and Mr. Rapp would discuss sex when they were

22   14 years old.

23           Isn't it true that you've seen records, evidence,

24   testimony that Mr. Rapp would discuss sex with boys 11, 12,

25   13 years old as well?

1   A.  Yes.

2   Q.  Now, in your discussions with Mr. Rapp, he's admitted he

3   has a problem with anger, right?

4   A.  A problem with people being angry with him, yes.

5   Q.  He doesn't have a problem with anger, he didn't tell you

6   that?

7   A.  No, he did not.

8           MR. SCOLNICK:  Can I have a moment, your Honor,

9   please?

10          THE COURT:  Yes.

11          (Pause)

12  BY MR. SCOLNICK:

13  Q.  Mr. Rapp told you about an incident he had with his then

14  boyfriend in, I think it was, 1997 or 1998, right?

15          Let me be more specific.  That's not fair.

16          He told you about an altercation that they had, right?

17  A.  Yes.

18  Q.  In fact, it wasn't an altercation, it wasn't mutual, it was

19  Mr. Rapp beating him up, right?

20  A.  Yes.

21  Q.  And that was his boyfriend at the time for -- I think they

22  had been together for a number of years, right?

23  A.  Yes.

24  Q.  And the man told Mr. Rapp that he wanted to leave him,

25  right?

MADKRAP3                    Rocchio - cross

1   A.  I believe Mr. Rapp initially ended the relationship.

2   Q.  Okay.  Isn't it true that this incident happened backstage

3   or behind the Nederlander Theatre?

4   A.  Behind a back alley behind the theater, yes.

5   Q.  And Mr. Rapp wrote about this incident, right?

6   A.  Yes.

7   Q.  And he wrote about how when his then boyfriend was walking

8   away from him, he grabbed him by the back and started hitting

9   him, right?

10  A.  Yes, he did.

11  Q.  And he said that he pummeled him to the ground, right?

12  A.  Yes.

13  Q.  And while this man was on the ground, he was striking him

14  again and again and again, right?

15  A.  I believe that was the description, yes.

16  Q.  And people that saw this were worried, right?

17  A.  Yes.

18  Q.  They were worried about this man's safety on the ground,

19  right?

20  A.  I believe so, yes.

21  Q.  This man was being domestically abused by his boyfriend,

22  right?

23  A.  So, in my field, domestic abuse has a very specific

24  definition, this does not reach that, but he certainly was

25  being hit by his domestic partner, yes.

1    Q.  Right.

2            Intimate partner violence, right?

3    A.  No, this would not be intimate partner violence.

4    Q.  Was this man Mr. Rapp's intimate partner?

5    A.  Yes, he was.

6    Q.  And he certainly was being violent, right?

7    A.  He was.

8    Q.  Okay.

9            And he continued hitting the man on the ground, and

10   two people had to pull Mr. Rapp off, right?

11   A.  Yes.

12   Q.  They dragged Mr. Rapp away, right?

13   A.  Yes.

14   Q.  And he pulled these two men across the concrete to get back

15   at his boyfriend, right?

16   A.  Yes.

17   Q.  He broke free again and started hitting the man again,

18   right?

19   A.  I believe so.  Or attempted to.  One or the other.

20   Q.  Well, we can read the quote in his book, if you'd like.

21           MR. SCOLNICK:  Let's turn to tab 5, please.  This

22   should now be BBB, as in Brynner.

23   Q.  Okay.  To save time, it was a violent incident, right?

24   A.  Yes.

25   Q.  Okay.  And it wasn't a two-way fight, it was one, right, it

1   was just Mr. Rapp hitting him, right?

2   A.  Correct.

3   Q.  You talked about this with Mr. Rapp, right?

4   A.  I did.

5   Q.  Is it true that when you talked to him about beating up his

6   boyfriend in 1997 or 1998, he brought up Kevin Spacey?

7   A.  No, I don't believe so.

8   Q.  Okay.  Let's take a look at your notes.  This would be tab

9   41, and I'm looking at page 65 of 67.

10          Would it refresh your recollection if you reviewed

11  your notes?

12  A.  It would.  Thank you.

13  Q.  On the bottom half of the page, is it true that you bring

14  up this fight with this man by the pseudonym of Todd?

15  A.  Okay.  Thank you.

16  Q.  True?

17  A.  Could you repeat the question?

18  Q.  Sure.

19          Is it true that in this portion, the bottom -- by the

20  way, these are your notes, right?

21  A.  These are my notes.

22  Q.  From your interviews with Mr. Rapp?

23  A.  Yes.

24  Q.  And is it true that you discussed, in the bottom portion of

25  this page, Mr. Rapp's relationship with Todd?

1   A.  Yes.

2   Q.  And at the bottom of the page, you discuss -- he discussed

3   the fight, right, what he called the fight?

4   A.  Yes.

5   Q.  And he also brought up KS, which is Kevin Spacey, right?

6   A.  Yep.

7   Q.  Okay.

8        MR. SCOLNICK:  You can take it down.

9   Q.  By the way, he didn't tell you that Kevin Spacey was there

10  in 1997 or 1998, right?

11  A.  No, he did not.

12       MR. SCOLNICK:  Can we turn to the same exhibit,

13  page 43.

14  Q.  You told us earlier that you didn't remember Mr. Rapp

15  telling you he had a trouble with anger, and I want to try to

16  refresh your recollection.

17       We're looking at page 41.  These are your notes of

18  your interview with Mr. Rapp, right?

19  A.  Yep.

20  Q.  And isn't it true he told you that he's had trouble with

21  anger since childhood?

22  A.  The rest of that sentence clarifies what that means.

23  Q.  Did he say -- I'm sorry, I interrupted you.

24  A.  What it means is consistent with what I shared.  Trouble

25  with other people's anger and fear of his own anger versus

MADKRAP3                    Rocchio - cross

1   problems being angry with others.

2   Q.  Well, Dr. Rocchio, it says, "Includes fear of my own

3   anger."

4        Those are your own notes, right?

5   A.  Yes.

6   Q.  Okay.  Thank you.

7        And, in fact, there is evidence -- we're talking about

8   a baseline here -- there is evidence that you've reviewed of a

9   baseline of Mr. Rapp's anger from before he claims he went to a

10  party at Mr. Spacey's apartment, right?

11  A.  Yes.

12  Q.  That includes threatening his mother, right?

13  A.  Yes.

14  Q.  And months before he met Mr. Spacey with Mr. Barrowman, he

15  actually assaulted his mother, right?

16  A.  He slapped her, yes.

17  Q.  He slapped her and knocked her glasses off her face, right?

18  A.  Yes.

19  Q.  And she fell to the ground, right?

20  A.  I don't recall, but that's -- yes.

21  Q.  And she was on the ground looking for her glasses trying to

22  pick them up?

23  A.  Yes.

24  Q.  And Mr. Rapp didn't help her pick up her glasses, did he?

25  A.  No, he did not.

1   Q.  He watched her crawl on the ground trying to get her

2   glasses and crying?

3              MR. STEIGMAN:  I am going to object at this point,

4   Judge.

5              THE COURT:  Sustained.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  I may be finishing up here.  Dr. Rocchio, let me review my

2  notes quickly.

3  A.  OK.

4  Q.  I want to finish up talking to you about your compensation

5  in this case.  OK?

6  A.  Yes.

7  Q.  You mentioned earlier that your client is not Mr. Rapp,

8  it's Mr. Rapp's attorneys, right?

9  A.  Correct.

10  Q.  And you know that Mr. Rapp's attorneys had filed this

11  lawsuit on his behalf, right?

12  A.  I do.

13  Q.  And you're charging them $450 an hour, right?

14  A.  I am.

15  Q.  And you've spent a number of hours on this case, right?

16  A.  I have.

17  Q.  At the time in your deposition, which was well over a year

18  ago, you had spent just about 60 hours, I think, fair to say?

19  A.  Um, possibly, yes.

20  Q.  OK.  How much more time have you spent since them?

21  A.  I haven't tallied it.  The time it took to read numerous

22  depositions and prepare, time to get here.  A significant

23  amount of time, but I couldn't give you an hour count.

24  Q.  Is it fair to say it's probably been over 40 hours since

25  last year at your deposition?

1    A.   Yes, around there.

2    Q.   That would mean around 45, $50,000, somewhere around there,

3    right?

4    A.   Yeah.

5    Q.   Certainly a lot of money, right?

6    A.   Yes.

7    Q.   And you're here testifying as Mr. Rapp's witness, right?

8    A.   I'm testifying as his attorney's witness, yes.

9            MR. SCOLNICK:  Could I have just a moment, your Honor?

10   I think I'm about done.

11           Nothing further, thank you.

12           THE COURT:  Now, we would normally take a break here,

13   but I'm going to have to leave in about a half hour.

14           Does anyone urgently need a break or can we go for the

15   half hour?

16           Yes or no?

17           JUROR:  I have to go to the bathroom.

18           THE COURT:  Pardon me?

19           JUROR:  I have to go to the bathroom.

20           THE COURT:  Can we do five minutes?

21           JUROR:  Yes, we can.

22           THE COURT:  All right.

23           (Recess)

24           (Jury not present)

25           THE COURT:  Mr. Steigman, before I bring the jury,

1    give me an idea if you think you can finish or not.

2              MR. STEIGMAN:  I'm going to try to go as quickly as

3    I can.

4              THE COURT:  I'll bear with you until the very last

5    second I can.

6              Are we going to have anything else after that on your

7    case?

8              MR. STEIGMAN:  One deposition.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2           THE COURT:  Mr. Steigman.

3           MR. STEIGMAN:  Thank you, Judge.

4  REDIRECT EXAMINATION

5  BY MR. STEIGMAN:

6  Q.  Dr. Rocchio, you were asked a number of questions on

7  cross-examination about Anthony's not telling Robin Magid about

8  the alleged incident with Mr. Spacey until 2017, right?

9  A.  Yes.

10 Q.  Doctor, are you familiar with the concept of delayed

11 disclosure in cases of trial sexual abuse?

12 A.  I am.

13 Q.  Can you describe that for us, please?

14 A.  It refers to the phenomenon of not sharing pieces of the

15 experience with others until some point after the event.

16          MR. SCOLNICK:  Your Honor, this is not in the report.

17 This is beyond the scope of the report.

18          THE COURT:  It seems to me it's appropriate cross to a

19 point.

20          MR. SCOLNICK:  OK.

21          MR. STEIGMAN:  OK.

22 BY MR. STEIGMAN:

23 Q.  Are there both internal and external factors that go into

24 this phenomenon of delayed disclosure in these cases?

25 A.  Yes, there are.

1    Q.   What does that mean?

2    A.   It means that what prompts someone to come forward can be

3    either things that are happening in their external environment

4    that allow them to become more aware either of the nature of

5    what they've experienced, maybe they've begun to label it as

6    abuse when they didn't in the past, or about its impact on

7    them.  And those would be things outside, things that they

8    read, things that they talk about, things that they see.

9         Also there can be internal triggers to a delay in

10   disclosure, and there can be feelings that they are having,

11   maybe they are becoming more symptomatic, maybe they are

12   feeling a certain pressure to come forward, or alternatively,

13   it depends on who they are disclosing to.

14        So the disclosure process is -- it's not like a

15   one-and-done kind of thing.  Oftentimes what happens is people

16   who are traumatized end up telling certain parts of the story.

17   The general overview, for example, but without a lot of

18   emotional content attached to it.

19        MR. SCOLNICK:  Objection, your Honor.  This is a long

20   narrative and beyond the scope of my examination and the

21   report.

22        THE COURT:  I agree at a certain point.

23        The answer stands up to and including "also there can

24   be internal triggers to a delay in disclosure and there can be

25   feelings that they are having, maybe they are becoming more

1  symptomatic, maybe they are feeling a certain pressure to come

2  record, or alternatively, it depends on who they are disclosing

3  to."

4          The rest is stricken.

5  BY MR. STEIGMAN:

6  Q.  Well, Mr. Scolnick asked you a number of questions about

7  the fact that Mr. Rapp saw Robin Magid over the years but

8  didn't tell her until 2017, right?

9  A.  Yes.

10 Q.  And he also asked you questions about the fact that

11 Mr. Rapp did disclose the alleged incident right after it

12 happened with a friend from school, Mr. Hart, right?

13 A.  Yes.

14         MR. SCOLNICK:  Objection, that misstates the

15 testimony.

16         THE COURT:  Overruled.

17 Q.  He asked you questions about the fact that Mr. Rapp told

18 many, many people about the alleged incident over the years

19 when Kevin Spacey's name would come up or people would discuss

20 a film or an award-winning performance of his, right?

21 A.  Yes.

22 Q.  But he didn't call the police, right?

23 A.  No.

24 Q.  And he didn't tell Dr. Magid until 2017, right?

25 A.  Yes.

1   Q.  Do you have an opinion with regard to the significance of

2   those facts with respect to the alleged abuse in this case?

3   A.  I do.

4   Q.  Could you share that, please?

5           MR. SCOLNICK:  Objection, your Honor.  I think this

6   would violate motion in limine number three.

7           THE COURT:  Sustained.

8   Q.  Is the factual scenario that we just discussed, is that, in

9   your opinion, inconsistent?  Is it inconsistent with the event

10  having occurred?

11          MR. SCOLNICK:  Objection, your Honor.  This is motion

12  in limine number three.

13          MR. STEIGMAN:  Then respectfully he shouldn't have

14  asked these questions on cross-examination.

15          THE COURT:  You are doing exactly what was precluded.

16  And in addition, it's not an opinion that was disclosed in your

17  report, and you have known for a very long time that the

18  failure to speak to Dr. Magid was going to be an issue in this

19  case and you had every opportunity and the obligation, if you

20  wanted to elicit this testimony, to discuss the opinion and all

21  the backup for it.

22  BY MR. STEIGMAN:

23  Q.  Do you remember Mr. Scolnick asking you questions about

24  Anthony Rapp's book, and in particular he spent some time

25  asking you questions about a story involving his family when he

1    was one-year-old?

2          Do you remember that?

3    A.  I do.

4    Q.  If we can put up BBB, page 70, please.

5          Do you remember all those questions, he read you

6    dialogue from the book; do you remember that?

7    A.  I do.

8    Q.  And he suggested to you how ridiculous it is that a

9    one-year-old would be reciting dialogue?

10   A.  I do.

11   Q.  He did that, right?

12         Did you notice in the book on page 70, Anthony Rapp,

13   wrote:  Mom told me this whole story one night while I was

14   still young - about nine or so.

15         Did you see that?

16   A.  I did.

17   Q.  Did you find that there was some discrepancy there in a

18   book that he was describing the story and reciting dialogue

19   even though he couldn't remember actually what happened?

20         MR. SCOLNICK:  Objection.

21         THE COURT:  Sustained.

22         MR. SCOLNICK:  Goes ...

23   BY MR. STEIGMAN:

24   Q.  You were asked questions about any number of prior sexual

25   encounters that Mr. Rapp told you about, correct?

1    A.  Yes.

2    Q.  It was one time he told you about sex with an actress who

3    was older than he, right?

4    A.  Yes.

5    Q.  Did he describe that as consensual or something else?

6    A.  Fully consensual.

7    Q.  OK.  Did he make any public report of that?

8    A.  Not to my awareness, no.

9    Q.  Did he use that actress' name to promote his name and get

10   publicity, are you aware?

11   A.  No.

12   Q.  He disclosed that to you why?

13            MR. SCOLNICK:  Objection, your Honor.

14            THE COURT:  Sustained.

15   Q.  Did you ask him about any possible trigger?

16   A.  I asked him for a complete sexual history, yes.

17   Q.  OK.  And, to your knowledge, that's why he was disclosing

18   that incident to you?

19   A.  Yes.

20   Q.  OK.  There were some questions about something that

21   occurred when he was 14 with an older boy in school, sexual

22   experience?

23   A.  Yes.

24   Q.  OK.  Did you understand when it was that he said that

25   experience occurred?

1    A.  I did.

2    Q.  OK.  When was that?

3    A.  That was his junior year in the fall of 1986.

4    Q.  That would have been after the alleged incident with

5    Mr. Spacey?

6    A.  Yes.

7    Q.  OK.  And in the fall of 1986, you're saying that Mr. Rapp

8    was still 14, but he was in eleventh grade already?

9    A.  Yes.

10   Q.  Can you explain that?

11   A.  Mr. Rapp skipped a year in school, so he was a year younger

12   than his peers for his schooling education.

13   Q.  OK.  There were questions about the boy -- he was in

14   eleventh grade.

15           Did you have an understanding in what grade the boy

16   who he engaged in this conduct, what grade was he in?

17   A.  My understanding is he was in the twelfth grade.

18   Q.  So it was an eleventh grader and twelfth grader?

19   A.  Yes.

20   Q.  He testified that, or you were asked questions that reflect

21   that he had some discomfort about the whole thing?

22   A.  After, yes.

23   Q.  Can you describe that, please?

24   A.  Yes.  He had more than one sexual experience with this --

25   with this boy and his -- after the first experience, he was

1   still struggling with what it meant in terms of whether or not

2   he was gay.  This was what he described as his first real

3   crush -- not crush, I'm sorry, I misspoke -- it was his

4   first -- it was a different sort of sexual experience than

5   anything he had ever had before, and he wondered could he have

6   enjoyed it and still not be gay.  Did it have to mean he was

7   gay.

8        And he was concerned was this boy going to tell all of

9   their other friends that they had engaged in -- that he had

10  given him oral sex.  He was worried about that getting around

11  and what that might mean.

12  Q.  Did you find that significant in formulating your opinion

13  with respect to his emotional distress in this case?

14  A.  Um, yes.

15  Q.  Explain it, please.

16       MR. SCOLNICK:  Objection, beyond the scope of the

17  report.

18       THE COURT:  Overruled.

19  Q.  You can answer.

20  A.  So when I'm looking at the impact of an event that has the

21  potential to be traumatic, understanding the context in what

22  someone is thinking, feeling, and experiencing before, during,

23  and after that event is highly relevant.  There was no

24  indication that this experience was unwanted, that it was

25  anything other than consensual.  In fact, it continued.  These

1    guys were, you know, people who had been to parties together,

2    had been out in a friend group together.  They knew one

3    another.  They had played spin the bottle together.

4          And so, in that overall context, the -- the

5    understanding that what, if any, his concerns were, had to do

6    with what did it mean about his own sexuality and how public

7    was this going to get.  To me, that is a very typical

8    adolescent response and perfectly understandable concern, not a

9    traumatic one.  There was nothing about this event, to me, that

10   suggested that it had a traumatic impact on Mr. Rapp either at

11   the time or at any time since.

12         MR. SCOLNICK:  Objection, your Honor.  This is

13   testimony about causation and it's in violation of motion in

14   limine number three.

15         THE COURT:  Overruled.

16   Q.  Doctor, I know you've been doing all this by memory today,

17   right?

18   A.  Yes, I have.

19   Q.  Let me ask you, in your report, in opinion number three,

20   did you write:  The psychological strategies utilized by

21   Mr. Rapp in an effort to cope with the effects of the alleged

22   incident, let's say, included denial, suppression,

23   compartmentalization, directed forgetting, minimization, and

24   avoidance.  These factors, in combination with the effects of

25   the alleged abuse itself, such as feelings of shame, confusion

1   and --

2            MR. SCOLNICK:  Objection, your Honor.

3   Q.  -- self-blame --

4            THE COURT:  Hold it.  Hold it.

5            What's the objection?

6            MR. SCOLNICK:  This is plainly excluded under motion

7   in limine number three.

8            THE COURT:  He's quoting from the report.

9            MR. SCOLNICK:  Exactly, and a lot of the report was

10  ruled off limits.

11           MR. STEIGMAN:  I've actually changed a few words

12  to ...

13           THE COURT:  You've changed words?

14           MR. STEIGMAN:  I'm summarizing, but not changing any

15  meanings.

16           MR. SCOLNICK:  Hearsay as well, your Honor.

17           THE COURT:  We're stopping at the end of the first

18  paragraph, are you?

19           MR. STEIGMAN:  Three, yes.  The court had suggested --

20           THE COURT:  Overruled.

21  BY MR. STEIGMAN:

22  Q.  OK.  I'm going to the psychological strategies utilized by

23  Mr. Rapp in an effort to cope with the effects of this alleged

24  incident, including denial, suppression, compartmentalization,

25  directed forgetting, minimization, and avoidance.  These

1    factors, in combination with the effects of the alleged abuse

2    itself, such as feelings of shame, confusion, and self-blame,

3    interfered with Mr. Rapp's ability to accurately appraise his

4    situation and greatly interfered with his ability to recognize

5    the alleged abuse and have been harmed as a result of that

6    alleged abuse.

7           In substance, is that what you wrote in your opinion?

8    A.  It is.

9    Q.  OK.  And do you hold that opinion today?

10   A.  I do.

11   Q.  Can you explain it for us, please?

12          MR. SCOLNICK:  Objection.  This is not responsive to

13   my cross-examination.  It's beyond the scope.

14          THE COURT:  The objection's sustained.

15          It's cumulative at this point.

16   BY MR. STEIGMAN:

17   Q.  You were asked questions about the objective testing that

18   you performed?

19   A.  I was.

20   Q.  OK.  First of all, about the POI, right?

21   A.  PAI.

22   Q.  PAI.  Pardon me, I can't read my own writing.

23          What's the purpose of it and can you talk to us about

24   what Mr. Scolnick was suggesting that there are discrepancies

25   in your findings?

1          Were there?

2     A.   Not -- not significant ones, no.

3     Q.   OK.  Explain that, please.

4     A.   So, on the PAI, there are a number of major clinical

5     scales, a number of validity scales.  But then each of the

6     major clinical scales is comprised of a set of sub scales.

7     When this particular test was developed, it was developed

8     specifically, and the manual instructs that when interpreting

9     the test, it is appropriate to look at the sub scales, even if

10    the primary scales are not elevated.

11         So there is a primary clinical scale which is referred

12    to as anxiety-related disorders and that has three sub scales

13    on it.  The obsessive compulsive sub scale, I'm not remembering

14    off the top of my head the second one, and a traumatic stress

15    sub scale.

16         Mr. Rapp's scores on two of those sub scales were

17    roughly within normal limits.  However, his score on the

18    traumatic stress sub scale was significantly elevated, and it

19    was only because those three get averaged that on the first

20    page, the main anxiety-related disorder sub scale was -- was

21    lower.

22         Similarly, there is another main clinical scale that

23    taps into types of sexual concerns.  And, again, Mr. Rapp's, on

24    that scale, on the sub scale of experiencing significant

25    concerns related to sex, elevated on that sub scale.

1          The reason I kept trying to distinguish between the

2     computerized report and the test is because, as a psychologist,

3     I am fully trained in the assessment and interpretation of

4     testing.  The computerized report is something that is

5     generated by the test publisher for assistance in understanding

6     the report.  But as a trained psychologist who received

7     extensive training in the instrument, I -- I can do a more

8     nuanced evaluation of the specific scales and sub scales and

9     their meaning, and there were a number of things that were in

10    that particular testing, the raw data, not necessarily the --

11    the report, but the numbers, right, that said things that were

12    contrary to what I was asked about on cross-examination.

13    Q.  OK.  How many tests did you administer that had validity

14    scores?

15    A.  Three.

16    Q.  And if he was exaggerating, malingering, or minimizing,

17    those tests are all designed to pick that up, right?

18    A.  They are.

19    Q.  All three of those tests, what did the validity scores

20    reflect?

21    A.  Perfectly normal validity scores.

22    Q.  OK.  Do you remember you were asked a lot of questions by

23    Mr. Scolnick about your deposition and whether or not you had

24    evaluated anyone, whoever malingered, he read you a question

25    and answer from page 29.

1      Let me read you the very next question and answer:

2  "Q.  Do you recall ever evaluating a litigant in any case

3  involving -- in any case involving abuse and opining the

4  litigant was malingering?

5      MR. STEIGMAN:  Your answer at that time was:

6  "A.  I haven't opined that the individual was malingering.  I

7  certainly evaluated people where certain aspects -- this is of

8  their test date -- for example, could not be interpreted as a

9  result of their responses on certain tests.  But no, I haven't

10  concluded somebody was malingering.  It is certainly something

11  I assess for, but has not been a factor in litigants that I

12  have evaluated."

13  Q.  Were you asked that question and did you give that answer?

14  A.  Yes, I did.

15  Q.  OK.  Were you asked this question on the bottom of 28, line

16  25:

17  "Q.  Do you recall ever evaluating a litigant in a case

18  involving abuse and conclude that the litigant was not actually

19  abused?

20  "A.  It's not for me to determine whether or not specifically

21  to make a finding of fact.  That's something for the trier of

22  fact to decide.  But when I make an evaluation and there are

23  allegations, I will look at what the data that is available to

24  me says in terms of whether it does or does not support an

25  allegation.  Just so -- I wouldn't say this didn't happen, I

1    could also never affirmatively say that I did."

2    Q.  Were you asked that question and did you give that answer?

3    A.  Yes.

4    Q.  Did he ask you a lot of questions about your conversation

5    with Robin Magid, right?

6    A.  Yes.

7    Q.  And he read certain portions of her deposition, right?

8    A.  Yes.

9    Q.  Did you read in that deposition sadly that Mr. Magid was

10   undergoing chemotherapy during that deposition?

11   A.  I did.

12   Q.  I don't mean --

13           THE COURT:  It's already been acknowledged that she's

14   passed away.

15           MR. STEIGMAN:  I understand that.

16   Q.  Did you see her struggle -- say that she was  struggling in

17   that deposition and refer to chemo brain?

18   A.  Yes.

19   Q.  OK.  You were asked questions about your interview with

20   Robin Magid, right?

21   A.  I was.

22   Q.  You told us you believed it was in February of 2021?

23   A.  Yes.

24   Q.  If I told you that your report says you spoke to her for an

25   hour and 15 minutes on February 19, 2021, does that refresh

1    your memory?

2    A.  Yes.

3    Q.  OK.  You were asked questions which Mr. Scolnick said,

4    Dr. Magid never was told about anything, any symptoms that

5    ultimately might be related to this alleged incident, right?

6              THE COURT:  Vast overstatement.

7              MR. STEIGMAN:  OK.

8    Q.  Did you state this in your report with respect to your

9    conversation with Robin Magid?

10             MR. SCOLNICK:  Objection.  This is hearsay, your

11   Honor.

12             MR. STEIGMAN:  This door was opened.

13             MR. SCOLNICK:  About what this witness said in her

14   report.

15             THE COURT:  Sustained.

16             MR. STEIGMAN:  He asked specific questions about it.

17             THE COURT:  Pardon me?

18             MR. STEIGMAN:  He asked questions about what Robin

19   Magid told her.

20             THE COURT:  Yes.

21             MR. STEIGMAN:  I would like to straighten that out.

22             THE COURT:  And you didn't object, right?

23             MR. STEIGMAN:  Right.  Doesn't open the door?

24             THE COURT:  Ruling stands.

25             MR. STEIGMAN:  OK.

1   BY MR. STEIGMAN:

2   Q.  Did you come to form an opinion based upon everything you

3   saw about whether or not Anthony Rapp disclosed symptoms that

4   ultimately Ms. Magid related to the alleged abuse by Kevin

5   Spacey?

6   A.  Yes, I did.

7   Q.  What's the basis for that opinion?

8        What is it?

9   A.  My interview with Ms. Magid.

10  Q.  What is your opinion?

11  A.  My opinion --

12       THE COURT:  I'm sorry.  Excuse me.  You are now

13  asking, do I correctly understand this question, you are asking

14  whether she had an opinion on what Ms. Magid said with respect

15  to what she had been told by Mr. Rapp and the basis of the

16  opinion is her interview?

17       Are you going to tell me this doesn't violate the

18  hearsay rule?

19       MR. STEIGMAN:  Yes.

20       THE COURT:  And the reason for that is?

21       MR. STEIGMAN:  Because experts can testify based on

22  materials that ordinarily they would consider as she -- so

23  she's looked at records, she's looked at the deposition, she

24  spoke to Dr. Magid.

25       THE COURT:  Yes.

1          MR. STEIGMAN:  And you're right, I did not object on

2     cross-examination.

3          THE COURT:  And so what you want is an opinion as to

4     what Dr. Magid concluded or disclosed, is that right?

5          MR. STEIGMAN:  With respect to the things that

6     Mr. Rapp told her.  Just that.

7          THE COURT:  Mr. Scolnick?

8          MR. SCOLNICK:  Your Honor, it's one thing to introduce

9     Mr. Rapp's statements to Ms. Magid, but to backdoor in

10    Ms. Magid's opinions when she wouldn't be qualified by this

11    court to provide them, I don't think that's appropriate for a

12    variety of reasons.  I think 702, I think 801, I think 802.

13    It's an entirely different scenario.

14         THE COURT:  Sustained.

15         MR. STEIGMAN:  OK.  No further questions.

16         THE COURT:  Thank you, Mr. Steigman.

17         Do you have any redirect?

18         MR. SCOLNICK:  Nothing further, your Honor.

19         THE COURT:  Nothing further.

20         All right.  Dr. Rocchio, you're excused.

21         (Witness excused)

22         As for next week, we're going to begin, God willing,

23    9:30 on Monday morning.

24         Andy has instructions, written instructions, for you

25    about how to report for testing and all of that, and I

1   anticipate that we will probably, in fact, go forward on

2   Monday.  If that changes, we will let you all know.  Everybody,

3   counsel and the jury.

4            Thank you very much.  Thank to both counsel for

5   enabling us to conclude today.

6            (Adjourned to Monday, October 17, 2022, at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

LISA MARIE ROCCHIO

Direct By Mr. Steigman . . . . . . . . . . . 683

Cross By Mr. Scolnick  . . . . . . . . . . . 716

Redirect By Mr. Steigman . . . . . . . . . . 816